No. 2023-2045

# United States Court of Appeals
*for the*
# Federal Circuit

MAQUET CARDIOVASCULAR LLC,
*Plaintiff - Appellant*,

*v.*

ABIOMED INC., ABIOMED R&D, INC., ABIOMED EUROPE GMBH,
*Defendants - Appellees*,

*Appeal from the United States District Court for the District of Massachusetts*

**PRINCIPAL BRIEF OF MAQUET CARDIOVASCULAR LLC**

Kirk T. Bradley
Nicholas C. Marais
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000

Christopher L. McArdle
Wade G. Perrin
ALSTON & BIRD LLP
90 Park Ave, 15th Floor
New York, NY 10016
(212) 210-9400

*Counsel for Maquet Cardiovascular LLC*

AUGUST 21, 2023

# PATENT CLAIMS (U.S. PATENT NO. 10,238,783)

1. An intravascular blood pump system, comprising:

an intravascular blood pump comprising:

a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

24. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a first portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula

is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula lumen and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guide wire does not pass through the rotor hub or the catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-2045

**Short Case Caption** Maquet Cardiovascular LLC v. Abiomed, Inc.

**Filing Party/Entity** Maquet Cardiovascular LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/05/2023

Signature: /s/ Kirk T. Bradley

Name: Kirk T. Bradley

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Maquet Cardiovascular LLC | | Datascope Corp. |
| | | Getinge Holding USA, Inc. |
| | | Getinge AB |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Andrew J. Ligotti | Neal J. McLaughlin | James Charles Grant |
| Michael S. Connor | Gregory J. Carbo | Margaret K. Minster |
| Eric P. Belt | Paul Tanck | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


PATENT CLAIMS (U.S. PATENT NO. 10,238,783) ........................................... i

CERTIFICATE OF INTEREST ........................................................................ iii

TABLE OF AUTHORITIES ........................................................................... viii

TABLE OF ABBREVIATIONS AND CONVENTIONS ...................................... x

STATEMENT OF RELATED CASES ................................................................ xi

JURISDICTIONAL STATEMENT .................................................................. xii

STATEMENT OF THE ISSUES........................................................................ 1

STATEMENT OF THE CASE............................................................................ 3

I. Procedural Background. ................................................................................ 3

II. Maquet's '783 Patent. .................................................................................... 5

III. The District Court's Claim Construction Order. ......................................... 11

A. The District Court's Construction of a "Guide Mechanism Comprising a Lumen." ...................................................................... 11

B. The District Court's Construction of the "Guide Wire" Claim Terms. ... 16

SUMMARY OF THE ARGUMENT ............................................................... 22

ARGUMENT ................................................................................................... 27

I. The Applicable Standards of Review. ......................................................... 27

II. In Construing the Term a "Guide Mechanism Comprising a Lumen," the District Court Erred by Improperly Importing a Negative Limitation Into the Claim. ........................................................................................................ 27

A. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment Made During the Prosecution History of a Different Patent Involving a Different Claim Term......................... 28

1. Claim 1 of the ’783 Patent Does Not Include the “Distal” Requirement That Was the Focus of the Examiner’s Rejection of Claims 14 and 22 During Prosecution of the Related ’238 Patent. ....................30

B. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment That Did Not Narrow the Scope of Any Claim....................33

III. The District Court Erred in Construing the “Guide Wire” Terms. ....................37

A. Maquet Had No Obligation to Address, and Did Not Address, the Examiner’s Views Regarding Distinguishing Features in the Prior Art (Völker), and Thus Maquet Did Not Clearly and Unmistakably Disavow Claim Scope. ....................38

B. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment Made During the Prosecution History of a Different Patent Involving a Different Claim Term....................43

IV. Because the Parties’ Stipulation of Noninfringement Was Based Entirely on the District Court’s Erroneous Claim Constructions, This Court Should Reverse the Judgment of Noninfringement and Remand. ....................45

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....................47

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
346 F.3d 1075 (Fed. Cir. 2003) ....................................40

*Advanced Cardiovascular Sys. v. Medtronic*,
265 F.3d 1294 (Fed. Cir. 2001) ....................................24, 30, 44

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) ....................................27

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................................33

*Innovation Scis., LLC v. Amazon.com Inc.*,
778 F. App'x 859 (Fed. Cir. 2019)....................................45

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ....................................31

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010) ....................................36

*Maquet Cardiovascular LLC v. Abiomed, Inc.*,
No. 1:16-cv-10914-FDS (D. Mass.) ....................................passim

*Maquet Cardiovascular LLC v. Abiomed, Inc.*,
No. 1:17-cv-12311-FDS (D. Mass.) ....................................4

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ....................................passim

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ....................................32

*ResQNet.com, Inc. v. Lansa, Inc.*,
346 F.3d 1374 (Fed. Cir. 2003) ....................................32

*Salazar v. AT&T Mobility LLC*,
64 F.4th 1311 (Fed. Cir. 2023) ....................................27

*Salazar v. Procter & Gamble Co.*,
414 F.3d 1342 (Fed. Cir. 2005) ....................................................................40

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ....................................................................30

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)....................................................................................27

*Trustees of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ....................................................................45

*Unwired Planet, LLC v. Apple Inc.*,
829 F.3d 1353 (Fed. Cir. 2016) ....................................................................42

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
473 F.3d 1173 (Fed. Cir. 2006) ..............................................................29, 44

**STATUTES**

35 U.S.C. § 112 ..........................................................................................13, 29

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| ’783 patent | U.S. Patent No. 10,238,783 |
| ’238 patent | U.S. Patent No. 9,789,238 |
| ’728 patent | U.S. Patent No. 8,888,728 |
| Board | USPTO Patent Trial and Appeal Board |
| POPR | Patent Owner Preliminary Response |
| USPTO | United States Patent and Trademark Office |
| Völker | U.S. Patent No. 6,248,091 |

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the district court was previously before this Court or any other appellate court. Counsel is unaware of any case before this Court or any other court that will directly affect or be directly affected by this Court's decision in the current appeal.

## JURISDICTIONAL STATEMENT

Maquet Cardiovascular LLC sued Abiomed, Inc, Abiomed R&D, Inc., and Abiomed Europe GmbH in the U.S. District Court for the District of Massachusetts, asserting infringement of certain patents, including the patent at issue in this appeal, U.S. Patent No. 10,238,783. On May 16, 2023, the district court entered a Final Appealable Judgment based on the parties' stipulation of noninfringement in light of the district court's Memorandum and Order on Claim Construction dated September 12, 2022. Appx1–2. On June 13, 2023, Maquet timely filed a Notice of Appeal. Appx76. This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

Maquet's '783 patent is directed to an intravascular blood pump system for deploying a blood pump to a desired location in a patient's circulatory system, typically the patient's heart. The system includes, among other things, a blood pump, a cannula (through which blood is pumped), a catheter (used to push the pump through the patient's vasculature), and a "guide mechanism" for positioning the blood pump and cannula in the vasculature. Claim 1 of the patent requires "a guide mechanism comprising a lumen," where the "guide mechanism is configured to allow for a guide wire to slideably advance therealong." Claim 24 restricts the path of the guide wire by stating that it does not pass through either "the rotor hub or the catheter." This appeal presents two claim construction questions.

1. When construing the phrase "guide mechanism comprising a lumen" in claim 1 of Maquet's '783 patent, the district court imported a negative limitation stemming from the prosecution history of a parent patent dealing with a different claim phrase ("the entire elongate lumen [is] distal to the intravascular blood pump"). Claim 1 of Maquet's '783 patent places no restriction on the position of the lumen. Did the district court err by construing "guide mechanism comprising a lumen" to require that the lumen "is not distal to the cannula"?

2. When construing the "guide wire" terms found in claims 1 and 24 of Maquet's '783 patent, the district court correctly recognized that a guide wire aids

the placement of a blood pump within a patient's vasculature, and the court correctly recognized that one option is to have the guide wire extend through the free space between the rotor blades of the blood pump. The district court also correctly recognized that the guide wire would be removed prior to operation of the pump. Additionally, the district court acknowledged that "[i]t is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump." Nonetheless, the district court relied on the prosecution history of a different patent concerning different claims to conclude that the guide wire terms of the '783 patent "will be construed to include the limitation that 'the guide wire does not extend through the free space in between the rotor blades.'" Did the district court err in importing that requirement?

## STATEMENT OF THE CASE

### I. Procedural Background.

Appellant Maquet is a worldwide leader in the development of intravascular blood pumps and other life-saving technologies, and Maquet has received numerous patents for its innovations. Appellee Abiomed manufactures and sells intravascular blood pumps including the Impella® line of heart pumps. Maquet and Abiomed are engaged in two litigations, both involving assertions that Abiomed's Impella® products infringe certain Maquet patents directed to intravascular blood pump systems that use a guide mechanism to guide a blood pump to a desired location within a patient's circulatory system. This appeal concerns the second litigation, but events from the first litigation also play a role.

***The first litigation.*** In 2016, Abiomed filed an action against Maquet seeking a declaratory judgment of noninfringement of six Maquet patents. *Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. 1:16-cv-10914-FDS (D. Mass.) ("the *Abiomed* litigation"). Maquet responded by asserting counterclaims of infringement. While that litigation was pending, Maquet was awarded U.S. Patent No. 9,789,238, which was a descendant of the patents at issue in that case. Maquet sought to add allegations of infringement of the '238 patent in the *Abiomed* litigation, but Abiomed objected, prompting Maquet to file a new litigation (the second litigation) asserting infringement of the '238 patent.

In 2018, the district court issued a Memorandum and Order on Claim Construction in the *Abiomed* litigation. *See* Appx187–261.

***The second litigation.*** In 2017, Maquet sued Abiomed for infringement of the ’238 patent. *Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. 1:17-cv-12311-FDS (D. Mass.) (the “*Maquet* litigation”). While that litigation was pending, Maquet was awarded U.S. Patent No. 10,238,783—the patent at issue in this appeal—which is a divisional of the ’238 patent. Maquet then added allegations of infringement of the ’783 patent and eventually dropped its allegations as to the ’238 patent based on certain claim constructions in the *Abiomed* litigation. Maquet alleges that Abiomed’s Impella® line of intravascular blood pumps (including the Impella 2.5®, Impella 5.0®, and Impella CP®) infringe claims 1, 2, 3, and 24 of the ’783 patent, and those four claims are at issue in this appeal.

The parties filed claim construction briefs, and the court then held a claim construction hearing on November 18, 2019. The district court issued its claim construction order nearly three years later, on September 12, 2022. *See* Appx9–39. Because certain of the district court’s claim construction rulings foreclosed Maquet’s infringement position against Abiomed’s Impella® products, the parties stipulated to the entry of a final appealable judgment of noninfringement. *See* Appx3–8. The district court entered a final judgment, and Maquet appealed. Appx1–2.

## II. Maquet's '783 Patent.

Maquet's U.S. Patent No. 10,238,783 is directed to improved intravascular blood pump systems that can be used to supplement or replace the pumping activity of damaged or diseased hearts. *See, e.g.*, Appx130 at 1:29–39.

***Background of the Invention.*** Intravascular blood pumps are pencil-shaped miniaturized blood pumps that can be percutaneously or surgically implanted into the vasculature of a patient. *Id.* at 1:64–67; Appx93 at Fig. 1. They are commonly used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation." Appx130 at 1:39–44. The pumps may be designed to provide right ventricular and/or left ventricular assistance to a patient's heart, with left ventricular assistance being "the most common application in that it is far more common for the left ventricle to become diseased or damaged than it is for the right ventricle." *Id.* at 1:44–48.

The '783 patent explains that, although intravascular blood pumps generally have been effective in providing ventricular assisting functions, prior art pumps were "difficult to guide into the appropriate position within the circulatory system of the patient." *Id.* at 2:20–25. The patent explains the difficulty:

> This is due largely to the fact that the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart. When attempting to place the blood pump in a trans-valvular configuration

> (with the inlet in the left ventricle and the pump outlet in the ascending aorta), the natural tendency of the catheter to stay straight may cause the pump to be inadvertently placed in the carotid ostia, which can be dangerous if the pump is operated to withdraw blood from the brain.

*Id*. at 2:25–34.

One prior art solution used a separate, supplemental guide mechanism such as a guide catheter to guide the intravascular pump while it advanced toward the desired site within the heart. *Id.* at 2:35–45. Even this solution, however, had its drawbacks due to the large size of the guide catheter. As the patent explains:

> While generally effective at providing a guiding feature for such intravascular blood pumps, employing such supplemental guide mechanisms is nonetheless disadvantageous in that they consume valuable space within the vessels. A guide catheter, for example, would necessarily be larger in diameter than the diameter of the pump and protective shroud in order to provide adequate passage of those components. As will be appreciated, this restricts the amount of space available for blood to flow within the particular vessel, and increases the size of the required puncture wound for accessing the vessel.

*Id*. at 2:45–55.

The invention of the '783 patent is directed to an improved intravascular pump system that "eliminates the need for supplemental guiding mechanisms, such as a separate, large diameter guide catheter as used in the prior art." Appx130–131 at 2:62–3:3. The improved system uses an integrated guide mechanism located on the device itself (attached to the device's "cannula," for example) that enables a physician to carefully guide the intravascular pump to a desired location within a

patient's circulatory system while eliminating the need for a separate, cumbersome guide catheter. Appx130 at 1:31–33; *id.* at 2:35–37.

In addition to the integrated guide mechanisms, other features of the intravascular blood pump system include the blood pump portion (comprising a rotor hub, rotor blades, and a rotor shroud) (Appx135 at 11:33–34; Appx134 at 10:20–24); a catheter (providing a connection to components outside the body) (Appx130 at 2:2–8); a cannula (a tube through which blood can be pumped) (Appx134 at 10:24–39); and inlet and outlet ports that allow the device to draw blood into the cannula (from the left ventricle, for example) and eject blood from the cannula into the appropriate place in a patient's vasculature (in the aorta, for example) (*id.* at 10:27–31).

***Explanation of Key Terminology.*** Figure 6 of the '783 patent, reproduced below, depicts an example of the intravascular blood pump system, with a blood pump portion (12), a tube-shaped cannula (14), and a catheter (18).




Appx93 at Fig. 6 (annotated). Placing the intravascular blood pump system into a patient involves first running a guide wire (22) to the desired location, such as the left ventricle. Afterward, the pump system (including the cannula, pump, and catheter) can be guided to that same location along the path set by the guide wire.

The physician typically will push the pump system through the patient's vasculature by pushing the catheter (18), which thereby pushes the attached pump (12) and cannula (14).[1] The pump system is guided by the guide wire, which is threaded through a guide wire lumen. In the context of Figure 6, the "guide wire lumen" is the lumen that is associated with guide carriage (124) (which in Figure 6 is attached to the cannula).[2] As Figure 6 depicts, the pump portion (12), once inserted, may be located within the aorta. The cannula (14) traverses the aortic valve, allowing blood to be pumped through the cannula from the left ventricle into the aorta. *See id.*

***The '783 Patent Claims at Issue.*** Claims 1, 2, 3, and 24 are at issue in this appeal, and there are two claim terms in dispute. The first claim term at issue is found in claim 1, which requires "***a guide mechanism comprising a lumen*** having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion

---

[1] The catheter also maintains the pump and cannula in the proper location, and it provides a connection with external system components outside the body. Appx137 at 15:56–62.

[2] Figure 7 of the '783 patent depicts another view of an exemplary pump system, and it more clearly depicts one embodiment of a guide carriage (124) that is attached to the cannula (the unnumbered elongate tube structure on the right-hand side of Figure 7). Appx94 at Fig. 7. The open space inside of the guide carriage (akin to the open space inside of a drinking straw) is called a "lumen," and it is through this lumen that the guide wire (22) will pass when installing the pump system into the patient's vasculature. This lumen is sometimes referred to as a "guide wire lumen." The guide wire *itself* has no lumen; it is a solid wire. Thus, the term "guide wire lumen" may be thought of as meaning "the lumen through which the guide wire will pass."

of said intravascular blood pump system to a predetermined location within the circulatory system of a patient." Appx146 at claim 1 (emphasis added). Neither the claims nor the written description restrict the position of the guide mechanism lumen relative to the cannula. Rather, as the claim recites, the pertinent requirement of claim 1 is simply that the guide mechanism must "compris[e] a lumen."

The second claim term at issue concerns the "guide wire" terms in claims 1 and 24. Claim 1 specifies that "the guide mechanism is configured to allow for a ***guide wire*** to slideably advance therealong" (Appx146) (emphasis added), and claim 24 requires that "the ***guide wire*** does not pass through the rotor hub or the catheter" (Appx148) (emphasis added). Neither the claims nor the written description restrict the guide wire from passing through the free space between the rotor blades (while the intravascular blood pump system is being placed in a patient's heart, for example). Claim 1 says nothing about the placement of the guide wire. And claim 24 says only that the guide wire "does not pass through the rotor *hub* or the catheter," thus saying nothing about whether the guide wire may pass through the free space in between the rotor *blades*.[3] Notably, the written description specifically

[3] Note that the "rotor hub" (referenced in claim 24) is distinct from the "rotor blades" (not referenced). If one envisions a propeller (for example) with a central hub and blades extending from the hub, claim 24 recites that the guide wire does not pass through the *hub*. Claim 24's language nowhere restricts the guide wire from passing through the free (open) space between the *blades*.

contemplates removing the guide wire before the rotor spins "after the pump 12 and cannula 14 are properly positioned in the patient." Appx135 at 12:63–66.

## III. The District Court's Claim Construction Order.

In the underlying *Maquet* litigation, the district court issued a Memorandum and Order on Claim Construction construing nine terms, two of which are at issue in this appeal. Appx9. The core background for both terms is summarized below.

### A. The District Court's Construction of a "Guide Mechanism Comprising a Lumen."

***Background Regarding the Claim Term.*** The first term at issue in this appeal is the phrase "guide mechanism comprising a lumen," which is found in asserted independent claim 1 of the '783 patent. Claim 1 recites, in pertinent part:

> 1. An intravascular blood pump system, comprising:
>
> an intravascular blood pump comprising:
>
> . . .
>
> a **guide mechanism comprising a lumen** having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient; . . . .

Appx146 (emphasis added).

Maquet proposed construing the term according to its plain and ordinary meaning. Appx602–603. The district court adopted Abiomed's proposal,[4] including a requirement that the "guidewire lumen is not distal to the cannula." Appx22–23. In adopting Abiomed's construction, the district court relied on the prosecution history of the '238 patent—a parent to the '783 patent that has the same specification. Appx21. Specifically, the district court evaluated "whether Maquet made a disclaimer during the prosecution of the '238 patent that necessarily limits [the] claims" in the separate, later-issued '783 patent. Appx21–22. The court answered that question in the affirmative, ruling that Maquet had acquiesced by accepting the Examiner's proposed claim revision in connection with a rejection directed to a claim phrase not found in the '783 patent claims—the phrase "entire elongate lumen distal to the intravascular blood pump." Appx22.

---

[4] The adopted construction included a requirement stemming from the district court's claim construction in the *Abiomed* litigation, namely, that the guide wire ***lumen*** (i.e., the lumen through which a guide wire will travel) "does not extend through the free space between the rotor blades." The court applied that construction in interpreting the "lumen" terms in the patents at issue in the *Abiomed* litigation. *See* Appx20–21. The restriction makes no practical difference because the guide wire lumen would never be placed in the free space between the rotor blades. The lumen (unlike the guide wire) is integral to the device and thus remains in place during operation of the blood pump. If the lumen were placed in the free space between the rotor blades, the blades would not be able to turn (thus preventing the blood pump from working).

***The Prosecution of the Related '238 Patent.*** During prosecution of the '238 patent (a parent to the '783 patent at issue in this appeal), the Examiner rejected pending claims 14 and 22 for failure to comply with the enablement requirement of 35 U.S.C. § 112. Appx493. The rejected claims recited a system having (1) an intravascular blood pump (comprising a rotor, a rotor shroud, and at least one blade extending radially outward from the rotor hub), (2) a cannula coupled to the distal end of the pump, and (3) an "elongate lumen" that is in some manner "associated with the cannula" (e.g., attached to the cannula, inside the cannula, or next to the cannula). Appx422–423; Appx425–427. The pending claims additionally recited that "the entire elongate lumen [is] distal to the intravascular blood pump." Appx423; Appx426. Thus, the pending claims of the '238 patent expressly required that the entirety of the lumen be distal to the pump, as depicted here:




*See* Appx637–642.

In rejecting the phrase "the entire elongate lumen [is] distal to the intravascular blood pump" as not enabled, the Examiner stated:

> The guidewire lumen extends partially along the pump, on a distal segment of the cannula. However, the pump also comprises the cannula, and the cannula is therefore not entirely distal to the pump. This claim should be revised to describe that the entire elongate lumen is distal to one or more of the ***rotor, first port or rotor shroud***.

Appx493 (underline added). Thus, the Examiner was under the mistaken impression that the "pump" "also comprises the cannula," despite that the pending claims recited the pump separately from the cannula.[5] The Examiner's mistaken understanding placed the entirety of the lumen distal to not only the pump, but also the cannula itself. The Examiner's mistaken view is depicted here:




*See* Appx637–642.

---

[5] As set forth in the pending claims, the pump comprised the "rotor having a rotor hub . . . and a rotor shroud . . . [and] at least one blade extending radially outward from the rotor hub." Appx422; Appx425. The claims recited the cannula as a separate structure of the claimed "intravascular blood pump system." *Id.* Indeed, the claims recited that the cannula is "coupled to a distal end of the intravascular blood pump."

With this (mistaken) view in mind, the Examiner suggested that the Applicants should amend the claims to recite that the "entire elongate lumen" is "distal to one or more of the rotor, first port or rotor shroud." Appx493 (emphasis omitted). Maquet recognized the Examiner's mistake and thus "traverse[d] the rejection of record as being inappropriate." Appx517. Nonetheless, the Applicants responded that, "purely in order to expedite prosecution, [they had] amended claims 14 and 22 in accordance with the Examiner's suggestions." *Id.* Specifically, the Applicants changed the phrase "the entire elongate lumen distal to the intravascular blood pump" to "the entire elongate lumen distal to the rotor"—thus changing the terminology but not the scope of the claim. Appx505; Appx508.

***The District Court's Construction Relied on the '238 Patent's Prosecution History.*** The district court construed the claim phrase "guide mechanism comprising a lumen" (in claim 1 of the '783 patent) by importing the above-described perceived restriction from the '238 patent's prosecution history. In particular, the district court relied on the Applicants' changing the claim phrase "the entire elongate lumen distal to the intravascular blood pump" to "the entire elongate lumen distal to the rotor." Although neither phrase is in the '783 patent claims, and although the changed wording did not alter the claim scope, the district court found that Maquet had "accepted" the Examiner's proposed revision and, further, that "Maquet's acquiescence in the resulting changes amounts to a withdrawal of the broader claim,

and that withdrawal is legally binding on [Maquet] in [this] subsequent proceeding." Appx22–23. On that reasoning alone, the district court limited the phrase "guide mechanism comprising a lumen" in claim 1 of the '783 patent to require a guide wire lumen that "is not distal to the cannula." *Id.*

### B. The District Court's Construction of the "Guide Wire" Claim Terms.

***Background Regarding the Claim Terms.*** The remaining terms at issue in this appeal are the "guide wire" terms found in claims 1 and 24 of the '783 patent. Claim 1 recites that a "guide mechanism is configured to allow a ***guide wire*** to slideably advance therealong," Appx146 at 34:13–14, and claim 24 recites that the "***guide wire*** does not pass through the rotor hub or the catheter,"[6] Appx148 at 38:8–9. Maquet proposed to the district court that these phrases should have their ordinary meaning, with no construction necessary. Abiomed agreed that the phrases should have their ordinary meaning yet argued that they should also be saddled "with the additional limitation 'the guide wire does not extend through the free space in between the rotor blades.'" Appx23.

---

[6] The district court's claim construction order includes a typographical error. The claim language requires that a "guide wire does not pass through the rotor hub ***or*** the catheter." Appx148 at 38:9–10 (emphasis added). The court's order errantly recites this limitation as "guide wire does not pass through the rotor hub ***of*** the catheter." Appx23; Appx25 (emphasis added).

In adopting Abiomed's proposed construction, the district court ruled that Maquet had adopted an Examiner's position distinguishing a cited reference called "Völker" during the prosecution of an earlier Maquet patent.

***The Prosecution of the Related '728 Patent.*** The district court relied on events that occurred during the prosecution of Maquet's U.S. Patent No. 8,888,728, which is a great-great-grandparent of the '783 patent at issue in this appeal. Appx130. The pertinent portions of the prosecution history for the '728 patent begin at the end, after Maquet had already received a Notice of Allowance. After receiving that Notice, Maquet filed an Information Disclosure Statement identifying a series of references, including a reference called "Völker" (U.S. Patent No. 6,248,091). Appx534–535. The Examiner then issued another Notice of Allowance, and the application issued as the '728 patent. Appx534.

In the second Notice of Allowance, the Examiner provided a statement of Reasons for Allowance. Appx535–537. The Examiner stated that he had considered "[a]ll references listed on the IDS," and he provided comments about two of the references—Völker, which the Examiner perceived to be the "closest art of record," and a second reference called "Sammler" (not pertinent here). Appx535–536. The Examiner saw no concern with either reference. Regarding Völker, the Examiner stated:

> However, ***Völker lacks several features of the invention***, namely a hub tapering in the distal direction, a hub distal end extending distally

> beyond the blade[,] and a guide mechanism configured as a second lumen. . . . Additionally, Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning (p. 14, ¶ 4, while the guide wire 25 is located in the pump housing, no Rotation of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of claims 15, 29 or 45.

Appx536 (emphasis added). Maquet never responded to the Examiner's statement of Reasons for Allowance, and the '728 patent proceeded to issue in November 2014. Appx130.

Years later, in September 2018, Maquet filed the application that issued as the '783 patent involved in this appeal. That prosecution included no mention of Völker, and it included no mention of whether guide wires may or may not extend through the free space between the pump's rotor blades.

***IPR Proceedings That Addressed the Völker Reference.*** Three years after the prosecution events described above, Abiomed filed twenty IPR petitions challenging the validity of Maquet's '728 patent and five other patents in the same family. None of the IPRs were directed to the '783 patent at issue in this appeal.

During the claim construction process, Abiomed argued that four of the IPRs gave rise to an alleged disclaimer. The district court's claim construction order does not address the IPRs, and thus it is unclear if the district court relied on the IPRs. In the IPRs, Abiomed did not rely on Völker as a ground for unpatentability. Instead, Abiomed cited Völker solely to help "establish the so-called state of the art."

Appx551. In each of the IPR proceedings, Maquet submitted a Patent Owner Preliminary Response ("POPR") that included a short section addressing the redundancy of Abiomed's grounds of unpatentability with prior art already considered by the USPTO during the initial examinations, including Völker. More specifically, each POPR explained that the primary reference in the IPRs, called "Aboul-Hosn," had already been cited during the original prosecutions and, moreover, had teachings like those of Völker. Appx550–551; Appx561–562; Appx567–569; Appx576–578.[7] Maquet also explained to the Board that Völker had been considered during prosecution of the '728 patent, providing an additional reason to deny institution of the IPRs. Appx551 ("One reference that the Examiner explicitly considered and found the claims patentable over is V[ö]lker").

The IPRs did not involve any substantive discussion of Völker. For example, there was no mention of whether guide wires may or may not extend through the free space between the pump's rotor blades, and there was no mention of the myriad other reasons why the Examiner had distinguished Völker during the prosecution of the '728 patent.

***The District Court's Construction Relied on the '728 Patent's Prosecution History.*** In construing the "guide wire" terms in claims 1 and 24 of Maquet's '783

[7] As the relevant POPR portions are nearly identical, Maquet refers to Appx550–551 throughout this brief.

patent, the district court evaluated "whether Maquet's [alleged] adoption of the examiner's position distinguishing Völker resulted in a binding disclaimer of . . . a removable guidewire." Appx24. The district court's claim construction order relies on the prosecution history of the earlier '728 patent, and not any part of the prosecution of the '783 patent at issue here. The order does not state or explain where or how Maquet had allegedly adopted the Examiner's position from the prosecution of the '728 patent. In fact, with respect to these claim terms, the order does not address the IPRs at all.

The district court's order acknowledged that "[i]t is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump." Appx24–25 (citing Appx135 at 12:63–66). The district court also observed that "removal of the guidewire is optional." Appx25. Nonetheless, the district court concluded that "Maquet adopted the examiner's position, which distinguished Völker on the ground that it did not disclose a separate second lumen—that is, a lumen that is separate from the pump housing, whether coaxial or on the side." *Id*. And the court found that "[i]t is difficult, under the circumstances, to construe Maquet's position distinguishing Völker as anything other than a surrender of the subject matter of a guidewire passing through the free space between the rotor blades in the pump housing." *Id*.

Thus, the district court concluded that Maquet had "disclaimed that subject matter during the prosecution," and so the district court limited the "guide wire" terms of claims 1 and 24 "to include the limitation that 'the guide wire does not extend through the free space in between the rotor blades.'" *Id*. Under this construction, Maquet was found to have disclaimed guide wires that even only ***temporarily*** would prevent a blood pump's rotor from turning (*e.g.*, during pump placement, while the pump is not operational).

## SUMMARY OF THE ARGUMENT

This appeal concerns two errant claim constructions for Maquet's '783 patent, which is directed to an intravascular blood pump system. The system can be used to supplement or replace the pumping activity of a patient's damaged or diseased heart. Its components include a blood pump, a cannula (through which blood is pumped), a catheter (used to push the pump through the patient's vasculature), and a "guide mechanism" for positioning the blood pump and cannula in the patient's vasculature.

The first term at issue in this appeal is "guide mechanism comprising a lumen" (in claim 1). A "lumen" is simply a cavity within a tubular structure, akin to the cavity within an ordinary drinking straw. In construing the term "guide mechanism comprising a lumen," the district court imported a negative limitation derived from the prosecution history of a different patent (the '238 patent, which is a parent of the '783 patent at issue in this appeal) dealing with a different claim phrase. In the end, the district court imported a requirement that the lumen "is not distal to the cannula." No part of the intrinsic record supports such a restriction.

The second term at issue in this appeal is actually two separate terms, both of which include the word "guide wire." A "guide wire" is used for placing the intravascular blood pump system into a patient. A physician will run a guide wire through a patient's vasculature to a desired location (such as the left ventricle of the patient's heart), and then the pump system can be guided to that same location along

the path set by the guide wire. The first of the two disputed "guide wire" terms recites: "wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong." The second disputed "guide wire" term recites "wherein the guide wire does not pass through the rotor hub or the catheter." In construing these terms, the district court again imported a negative limitation derived from the prosecution history of a different patent (the '728 patent, which is a great-great-grandparent of the '783 patent at issue in this appeal). In the end, the district court imported a requirement that "the guide wire does not extend through the free space in between the rotor blades" of the pump. Once again, no part of the intrinsic record supports such a restriction. Reversal is warranted.

***The District Court's Errant Construction of "Guide Mechanism Comprising a Lumen."*** During the prosecution of the parent '238 patent (relied on by the district court), the Examiner rejected certain claims as not sufficiently enabled. Those claims required "an elongate lumen," and they specified that "the *entire* elongate lumen [is] *distal to* the intravascular blood pump." To overcome the rejection, the Examiner suggested amending the claims "to describe that the entire elongate lumen is distal to one or more of the [pump] rotor, first port or [pump] rotor shroud." Consistent with the Examiner's suggestion, Maquet amended the claims to recite that "the entire elongate lumen [is] distal to the rotor." It made no difference to Maquet since the rotor is part of the pump, meaning that having the "entire

elongate lumen" be distal to the pump was no different than having it be distal to the pump's rotor. The change in language satisfied the Examiner's concern about enablement, and it did so without altering the claim scope.

The district court relied on this sequence of events (in the prosecution of the separate '238 patent) when construing the term "guide mechanism comprising a lumen" in claim 1 of the '783 patent at issue here. The district court ruled that Maquet had "acquiesced" to the Examiner's suggestion. The court continued that, "Maquet's acquiescence . . . amounts to a withdrawal of the broader claim, and that withdrawal is legally binding on [Maquet] in [this] subsequent proceeding to prove infringement" of the '783 patent. Appx22. There are two core errors in the district court's ruling, and both errors independently support reversal.

First, as this Court has repeatedly made clear, the "prosecution history of a related patent can be relevant," but only "if, for example, it addresses a limitation in common with the patent in suit." *Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1305 (Fed. Cir. 2001). Here, claim 1 of the '783 patent includes no term concerning an "entire elongate lumen" being "distal to" another structure. The claim requires merely that the guide mechanism "compris[e] a lumen." Thus, the claim term addressed during the prosecution of the '238 patent has no bearing on the unrelated terms set forth in claim 1 of the '783 patent.

Second, for a claim amendment to potentially operate as a disclaimer, there must be some relinquishment of claim scope, such as a narrowing amendment that results in a clear and unmistakable disavowal of broader coverage. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Here, the prosecution of the related '238 patent did not narrow the claim scope, meaning there was no disavowal—no disclaimer—at all. Maquet amended the claims to change "the entire elongate lumen [is] distal to the intravascular blood pump" to say "the entire elongate lumen [is] distal to the rotor" of the intravascular blood pump. A lumen that is distal to the pump is also distal to the rotor, so the amendment—while overcoming the Examiner's enablement rejection—did not narrow the claim scope.

***The District Court's Errant Construction of the Two "Guide Wire" Terms.*** The district court made a similar error in construing the "guide wire" terms of claims 1 and 24. Neither term says anything about whether the claimed "guide wire" may or may not extend through the free space in between the pump's rotor blades. But the district court saddled both claims with a restriction that "the guide wire does not extend through the free space in between the rotor blades." Appx17. Here again, the district court relied on a separate prosecution history, and here again the district court erred in its analysis.

This time, the separate prosecution history was that of the '728 patent. After the '728 patent Examiner had initially allowed the claims, Maquet submitted an IDS

identifying several new references, including a reference called "Völker." The Examiner then issued a new Notice of Allowance along with a statement of Reasons for Allowance. In the statement, the Examiner noted that he had considered "[a]ll references listed on the IDS," and he provided comments about two of the references. Appx535. The Examiner summarized some of the teachings of Völker, including that "Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning." Appx536. The Examiner saw no issue and concluded that Völker "lacks several features of the invention." Appx536. Maquet did not adopt or even comment on the Examiner's statements about Völker.

In the underlying action, the district court analyzed the "guide wire" terms of claims 1 and 24 in view of the Examiner's statements concerning Völker. The court ruled that Maquet had "adopted" the Examiner's positions regarding Völker, even though Maquet never said anything about the reference during the prosecution. Appx24. Nonetheless, the court ruled that "Maquet thus disclaimed [Völker's] subject matter during the prosecution [of the separate '728 patent], and the present claims [in the '783 patent] should be construed accordingly." This was an error. This court should reverse the district court's errant claim constructions and vacate the parties' stipulated judgment of noninfringement that was premised on those errors.

## ARGUMENT

### I. The Applicable Standards of Review.

Where a party stipulates to noninfringement in view of a district court's claim construction, this Court "need only address the district court's construction of the claims." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed. Cir. 2003). According to the Supreme Court, "when the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). Accordingly, this Court reviews "a district court's claim construction de novo where, as here, it is decided only on the intrinsic evidence." *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315 (Fed. Cir. 2023) (citing *Teva Pharms.*, 574 U.S. at 331).

### II. In Construing the Term a "Guide Mechanism Comprising a Lumen," the District Court Erred by Improperly Importing a Negative Limitation Into the Claim.

The district court's construction of a "guide mechanism comprising a lumen" in claim 1 of the '783 patent (thus affecting asserted dependent claims 2 and 3 as well) improperly adds a negative limitation without any basis in the intrinsic or extrinsic record. Claim 1 of the '783 patent recites in part:

An intravascular blood pump system, comprising:

> . . .
>
> a ***guide mechanism comprising a lumen*** having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

Appx146 at 33:60–34:9 (emphasis added).

The district court construed the term "guide mechanism comprising a lumen" to include two negative limitations: (1) that the guide mechanism comprising a lumen "does not extend through the free space between the rotor blades" and (2) that the guide mechanism comprising a lumen "is not distal to the cannula." Appx22–23. For purposes of this appeal, Maquet disputes only the inclusion of the second negative limitation—i.e., the part of the construction requiring that the guide mechanism comprising a lumen "is not distal to the cannula." The district court's error affects asserted independent claim 1 as well as asserted dependent claims 2 and 3, both of which depend from claim 1.

### A. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment Made During the Prosecution History of a Different Patent Involving a Different Claim Term.

Nothing in the text of claim 1 limits the position of the guide mechanism comprising a lumen to positions that are not distal to the cannula. Nothing in the specification does either. The district court did not find or suggest otherwise. Instead, the district court derived this negative limitation solely from the prosecution history

of a ***different*** patent having ***different*** claim limitations. That approach was improper and warrants reversal. *See, e.g.*, *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language.").

The district court's error is clear from the circumstances of the earlier prosecution history—the prosecution history for Maquet's '238 patent. The Examiner rejected then-pending claims 14 and 22, both of which addressed an elongate lumen and specified that "the ***entire*** elongate lumen" is "***distal to the intravascular blood pump***." Appx493 (emphasis added). The Examiner's rejection was based on a perceived failure to comply with the enablement requirement of pre-AIA 35 U.S.C. § 112. *Id*. The Examiner suggested that the "claim should be revised to describe that the entire elongate lumen is distal to one or more of the ***rotor, first port or rotor shroud***." *Id.* In response, Maquet did exactly that, amending the claims to recite "the entire elongate lumen distal to the rotor." Appx505; Appx508.

The district court relied on this amendment when construing claim 1 of Maquet's '783 patent—a claim that says nothing whatsoever about an elongate lumen being distal to anything, much less an "entire" elongate lumen being distal to an "intravascular blood pump" or a "rotor" (or, as the district court here concluded, a cannula). Nonetheless, the district court relied on the prosecution history for the

’238 patent to conclude that claim 1 of the ’783 patent should bear this same restriction, due to Maquet’s alleged “acquiescence.” Appx22. In a single sentence, the court ruled: “Maquet’s acquiescence in the resulting changes amounts to a withdrawal of the broader claim, and that withdrawal is legally binding on it in a subsequent proceeding to prove infringement.” *Id.* The district court then concluded that the claim term “guide mechanism comprising a lumen” in claim 1 of Maquet’s ’783 patent includes the limitation that the guidewire lumen “is not distal to the cannula.” Appx22–23. The district court’s error was multi-faceted, as described in the sections below.

**1. Claim 1 of the ’783 Patent Does Not Include the “Distal” Requirement That Was the Focus of the Examiner’s Rejection of Claims 14 and 22 During Prosecution of the Related ’238 Patent.**

As this Court has clarified many times, although the “prosecution history of a related patent can be relevant,” it is relevant only “if, for example, it addresses a limitation in common with the patent in suit.” *Advanced Cardiovascular Sys. v*, 265 F.3d at 1305. The district court here recognized that exact rule, quoting this Court’s guidance that “[a] statement made during prosecution of related patents may be properly considered in construing ***a term common to*** those patents.” Appx21 (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1343 (Fed. Cir. 2015)) (emphasis added). But the district court did not follow the rule. Instead, the court relied on prosecution history statements regarding a term that is ***not*** common.

The claim term at issue in the prosecution of the ’238 patent (regarding pending claims 14 and 22) was “the entire elongate lumen [is] distal to the intravascular blood pump,” which the Applicants amended to say, “the entire elongate lumen [is] distal to the rotor.” In contrast, the claim term at issue in claim 1 of the ’783 patent is “guide mechanism comprising a lumen.” Thus, the language at issue in the prosecution of the earlier patent specifically contemplated an “elongate lumen” (indeed, an “***entire*** elongate lumen”) being ***distal*** to something, while claim 1 of the ’783 patent requires nothing of the sort. Appx423; Appx426; Appx146.

Other aspects of the scope of these claim terms are different as well. For example, the “entire elongate lumen” (from the prosecution of the ’238 patent) must be, among other things, “associated with the cannula,” “sized smaller cross sectionally than the cannula lumen,” and “shorter in length than the cannula lumen.” Appx422–423; Appx425–426. By comparison, the “guide mechanism comprising a lumen” recited in claim 1 of the ’783 patent does not have the same cannula association requirements or dimensional restrictions. Appx146.

Claim 1 of the ’783 patent merely requires a lumen, placing no restriction on its location. No positional requirements exist at all. Thus, the earlier prosecution history provides no basis for narrowing claim 1 in such a manner. And, it follows, there was no disclaimer of or acquiescence to any such requirement. *See, e.g.*,

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application."); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) (ruling that, "[a]lthough a parent patent's prosecution history may inform the claim construction of its descendant, the [parent] patent's prosecution history is ***irrelevant*** to the meaning of this limitation because the two patents do not share the same claim language" (emphasis added)).

And for good reason. This Court has explained that the "requirement that the patents share 'limitations in common' is not a mere technicality." *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 944–45 (Fed. Cir. 2013).

> [The requirement] is necessary to support the inference that the patentee's earlier arguments are also applicable to the claim limitations of the patent-in-suit. Without claim language that makes that linkage clear, neither the PTO examiner nor the patentee's competitors would be on notice as to the true scope of the later patent's claims. We have held that it is permissible for a patentee to take a different approach to claiming an invention in subsequent patents, either by adding limitations or by altering the claims' format. When the patentee does so, however, we cannot rely on the dubious argument that dissimilar claims present equivalent issues of validity, or that the applicant's disclaimer with respect to one claim would be equally applicable to another claim.

*Id.* (citation omitted). That same decree applies here. In claim 1 of the '783 patent, Maquet took a different approach than the claims at issue during prosecution of the related '238 patent. Claim 1 recites no positional requirement for the claimed "guide mechanism comprising a lumen." For at least this reason, the alleged disclaimer

stemming from the prosecution of the '238 patent has no effect on the scope of claim 1 of the '783 patent. The district court erred in concluding otherwise.

### B. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment That Did Not Narrow the Scope of Any Claim.

The district court committed a second error when construing "guide mechanism comprising a lumen" in claim 1 of the '783 patent. The amendment relied on by the district court did not even narrow the scope of the claims being prosecuted in the related '238 patent, meaning no claim scope was ever relinquished.

In order for a claim amendment to potentially operate as a disclaimer, the patentee needed to have narrowed the claims in order to make them patentable. *Omega Eng'g, Inc.*, 334 F.3d at 1323 ("[C]laims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.") (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 33, (1966)). Here, contrary to the district court's apparent view, the amendment to claims 14 and 22 during prosecution of the '238 patent did not narrow the scope of those claims. Thus, the doctrine of disclaimer (or acquiescence, in the words of the district court) does not apply.

During prosecution of the '238 patent, the scope of claims 14 and 22 remained the same before and after the amendment. Before the amendment, the claims

required an elongate lumen associated with a cannula, "the entire elongate lumen distal to the intravascular blood pump." Appx423; Appx426. The claims described the pump as comprising a "rotor having a rotor hub . . . and a rotor shroud . . . [and] at least one blade extending radially outward from the rotor hub." Appx422; Appx425. The cannula was recited separately. Indeed, the claims specified that the cannula is "coupled to a distal end of the intravascular blood pump"—and thus clearly was not part of the pump itself. *Id.*

Thus, in the then-pending claims, the phrase "the entire elongate lumen distal to the intravascular blood pump" meant that the "entire elongate lumen" needed to be distal (to the right in the image below) of the intravascular blood pump, which comprised only a rotor, a rotor shroud, and at least one rotor blade extending from a rotor hub.




*See* Appx637–642.

In rejecting these claims, the Examiner stated that "the pump also comprises the cannula," evidencing clear confusion about the scope of the then-pending claims.

Appx493. The Examiner believed the claimed "entire elongate lumen" needed to be distal (again, to the right in the below image) of ***both*** the intravascular blood pump system ***and*** the cannula (which, again, the Examiner mistakenly viewed as being part of the pump).




*See* Appx637–642.

In response to the Examiner's enablement rejection, Maquet revised the claim by changing "the entire elongate lumen ***distal to the intravascular blood pump***" to "the entire elongate lumen ***distal to the rotor***." Appx505; Appx508; Appx517. Thus, the amended claim language did not alter the scope of the claims; instead, it simply averted the Examiner's confusion and thus satisfied the Examiner. The position of the "entire elongate lumen" after the amendment, illustrated below, remained unchanged from the position before the amendment.




*See* Appx637–642. In both cases, the entire elongate lumen was distal to the pump and its rotor.

Because the doctrine of "disclaimer" based on a prosecution amendment requires a ***narrowing*** amendment—that is, some amount of claim scope had to have been disclaimed—an amendment that does ***not*** narrow the claim scope, as here, cannot operate as a disclaimer. *See, e.g.*, *Omega Eng'g*, 334 F.3d at 1323; *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1370 (Fed. Cir. 2010) (holding that prosecution history statements did not amount to disclaimer because they did not "suggest[] a narrower meaning" of the claim limitation). Here, there was no disclaimer, nor was there any "acquiescence" to changes that "amounts to a withdrawal of the broader claim" as the district court concluded. Appx22. No claim scope was relinquished. The district court's error serves as an additional basis for reversing the construction of claim 1 of the '783 patent.

## III. The District Court Erred in Construing the "Guide Wire" Terms.

The district court also erred in its construction of the "guide wire" terms in asserted claims 1 and 24 of the '783 patent (thus affecting asserted dependent claims 2 and 3 as well). The two "guide wire" terms are as follows:

- Claim 1 (and, accordingly, dependent claims 2 and 3): "wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong." Appx146.
- Claim 24: "wherein the guide wire does not pass through the rotor hub or the catheter." Appx148.

Neither of these terms limits the portions of the system that the guide wire may or may not extend through. Nor does the patent specification.[8] Claim 1 says simply that the guide mechanism needs to "allow for a guide wire to slideably advance therealong." Appx146 at 34:13–14. And claim 24 says simply that the guide

[8] As the district court observed, "nothing in the specification teaches the insertion of a guidewire between the rotor blades." Appx25. But nothing in the specification precludes it either. And, as the district court admitted, other "explicit" statements in the specification are consistent with temporarily permitting a guide wire to extend through the free space in between the rotor blades. The district court stated: "It is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump." Appx24. Because the guide wire is removable, it may be temporarily placed in the free space in between the rotor blades during device insertion, as the guide wire would then be removed prior to operation of the pump. Removing the guide wire from that space would then allow the rotor blades to turn freely.

wire "does not pass through the rotor hub or the catheter." Appx148 at 38:8–9. Nevertheless, once again relying on a prosecution history involving different issues for a different patent, the district court limited both of these guide wire terms "to include the limitation that 'the guide wire does not extend through the free space in between the rotor blades.'"[9] Appx25. The district court erred in so ruling, warranting reversal.

### A. Maquet Had No Obligation to Address, and Did Not Address, the Examiner's Views Regarding Distinguishing Features in the Prior Art (Völker), and Thus Maquet Did Not Clearly and Unmistakably Disavow Claim Scope.

The district court based its "disclaimer" ruling on the prosecution history for the application that issued as the '728 patent (a great-great-grandparent of the '783 patent at issue here). In that prosecution, the Examiner addressed a prior art reference called Völker. As the district court recounted in its claim construction order, the Examiner had stated the following about Völker:

> Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning . . . [W]hile the guidewire 25 is located in the pump housing, no [r]otation of the impeller [is possible]. Therefore, Völker fails to teach or suggest the side rigger or coaxial guide mechanisms of claims 15, 29 or 45 [later issued as independent claims 1, 10 and 22].

---

[9] Note that the district court's limitation is directed to the free space between the **rotor *blades***, which is distinct from claim 24's actual requirement of not allowing the guide wire to pass through the **rotor *hub*** (or the catheter).

Appx24 (latter two alterations in original). The claim construction order then states three times that Maquet "adopted" the Examiner's position, but the district court never identifies where or how Maquet purportedly did so. *See* Appx24 ("And Maquet adopted that position."); *id.* ("The question is whether Maquet's adoption of the examiner's position distinguishing Völker resulted in a binding disclaimer of such a removable guidewire."); Appx25 ("In any event, Maquet adopted the examiner's position, which distinguished Völker on the ground that it did not disclose a separate second lumen—that is, a lumen that is separate from the pump housing, whether coaxial or on the side.").

Maquet never adopted the Examiner's position as to Völker during the prosecution of the '728 patent (or anywhere else). Indeed, ***Maquet*** never made ***any*** statement about Völker in connection with the prosecution. After Maquet had received a Notice of Allowance, it submitted an Information Disclosure Statement ("IDS") identifying several references, including Völker. Appx534–535. The Examiner then issued a new Notice of Allowance along with a statement of Reasons for Allowance. *See* Appx534–537.

As part of the statement, ***the Examiner*** (not Maquet) addressed Völker. The Examiner began by noting that he had considered "[a]ll references listed on the IDS," and "the closest art of record," Völker, was distinguishable. Appx535. Next, without any prompting, the Examiner stated that Völker "lacks several features of the

invention," including (among several others) the requirement of a "separate second lumen for the guide mechanism" (i.e., a guide wire lumen). Appx536. The Examiner continued:

> Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning (p. 14, ¶ 4, while the guide wire 25 is located in the pump housing, no Rotation of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of claims 15, 29 or 45.

*Id.* Maquet did not adopt or even comment on the Examiner's statements about Völker—nor did Maquet need to do so since the Examiner's allowance was founded on numerous distinctions from the cited prior art, only one of which concerned the guide wire lumen.

The district court's claim construction order does not reference any of this history. The district court does, however, repeatedly state that Maquet allegedly "adopted the examiner's position" (Appx25), and so perhaps the district court believed that Maquet's *silence* in response to the Examiner's statement created a disclaimer. If that was the district court's view (again, the district court never says), it is incorrect under this Court's clear law: "[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005); *see also, e.g.*, *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) ("[T]here is

no obligation to respond to an examiner's statement of Reasons for Allowance, and the statement of an examiner will not necessarily limit a claim."). Certainly, Maquet's silence was not tantamount to a statement about Völker "so unmistakable as to be unambiguous evidence of disclaimer" such that a guide wire is precluded from ever extending through the free space in between the rotor blades (even temporarily, such as situations where the guide wire would be removed prior to operation of the pump). *See Omega Eng'g*, 334 F.3d at 1325. In fact, the district court acknowledged that the specification for the '783 patent "explicitly" allows for that possibility. The court's claim construction order said: "It is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump." Appx24–25 (citing Appx135 at 12:63–66).[10]

Alternatively, perhaps the district court believed that Maquet had "adopted the examiner's position" (Appx25) through the years-later IPR process. The district court's claim construction order does not mention the IPRs, but the court's earlier claim construction order (issued in the *Abiomed* litigation, addressing different patents) did take that approach. *See* Appx212 (stating, in a single sentence:

[10] Because the guide wire of the '783 patent is removable, it can extend through the free space in between the rotor blades without causing any issue. The guide wire would simply be removed from that free space prior to operation of the pump, thus allowing the pump blades to rotate freely.

"Furthermore, Maquet appears to have approved of the examiner's treatment of Völker as of the IPR proceedings of the '728 and '068 patents.").

During the IPR proceedings for those other patents—*i.e.*, ***not*** the '783 patent at issue here—Abiomed had relied on a primary prior art reference called "Aboul-Hosn." Abiomed did not rely on Völker as a ground for unpatentability. Instead, as Maquet explained (in its POPRs) during the IPRs, Abiomed's IPR petitions identified Völker merely "to establish the so-called state of the art," and Abiomed's petitions "explain[ed] that V[ö]lker and Aboul-Hosn have similar teachings." Appx551. Maquet did not discuss the substance of Völker, but instead merely informed the Board that "the Examiner [had] explicitly considered and found the claims patentable over . . . V[ö]lker." *Id.* Because the Examiner had done so, Maquet argued to the Board that it "should defer to [the Examiner's] considered judgment and deny the Petition." *Id.*

As recounted above, Maquet did not disclaim anything based on Völker during the IPRs. Maquet never came close to clearly and unmistakably disavowing the temporary use of guide wires that extend through the free space between the rotor blades. *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (a "disclaimer or disavowal of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record"); *Omega Eng'g*, 334 F.3d at 1326 (this Court has "consistently rejected prosecution

statements too vague or ambiguous to qualify as a disavowal of claim scope" and has "required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer"). Maquet's years-later comment that the Examiner had already considered (and found the claims patentable over) Völker does not rise to the level of a clear and unmistakable disclaimer that a guide wire may never extend through the free space in between the rotor blades. It certainly does not operate as a disclaimer applicable to all future patents in the same family, including those using a myriad of different wording as is the case here with Maquet's '783 patent.

### B. The District Court Improperly Applied the Doctrine of Disclaimer by Relying on an Amendment Made During the Prosecution History of a Different Patent Involving a Different Claim Term.

Similar to the district court's errors when construing "guide mechanism comprising a lumen" in claim 1 (discussed in Argument Section II, *supra*), the district court committed the same error for the "guide wire" terms in claims 1 and 24. Specifically, as described above, the district court errantly relied on prosecution history statements that did not pertain to the "guide wire" terms at issue here. Indeed, the Examiner's statements during the prosecution of the '728 patent did not pertain to any particular claim terms. Rather, the Examiner issued a Notice of Allowance and commented that Völker "lacks several features of the invention." Appx536. The Examiner's unilateral view that Völker lacks a myriad of limitations in the claims

there at issue (i.e., the claims that issued as the ’728 patent) did not encumber claims 1 and 24 of the ’783 patent with a new requirement—stated nowhere in either claim 1 or claim 24—that the guide wire “does not extend through the free space in between the rotor blades,” as the district court concluded. Appx25.

Claim 24 of the ’783 patent makes this point especially clear. The claim recites that “the guide wire does not pass through the rotor hub or the catheter.” Appx148. That limitation was not part of any claim at issue in the prosecution of the ’728 patent, and so the Examiner’s statements about Völker unquestionably had nothing to do with the limitation. Thus, the prosecution history of the ’728 patent is not relevant, as it does not “address[] a limitation in common with the patent in suit.” *Advanced Cardiovascular Sys.*, 265 F.3d at 1305; *see also, e.g.*, *Ventana Med. Sys.*, 473 F.3d at 1182 (“[P]rosecution disclaimer generally does not apply when the claim term in the descendent patent uses different language.”).

Still further, claim 24 is explicit about the placement of the guide wire. It states that “the guide wire does not pass through the rotor hub or the catheter.” Appx148. It does ***not*** say that the guide wire does not pass through the free space in between the rotor blades, and the district court erred when it imported that requirement based on a perceived disclaimer stemming from an Examiner’s unilateral statements when allowing different claims in a different patent.

### IV. Because the Parties' Stipulation of Noninfringement Was Based Entirely on the District Court's Erroneous Claim Constructions, This Court Should Reverse the Judgment of Noninfringement and Remand.

As discussed in Section I, *supra*, the parties stipulated to the entry of a final appealable judgment of noninfringement because, under the district court's claim construction, the parties agreed that Maquet could not prove infringement. Appx3. In particular, the parties agreed that the accused products do not include (1) a guide mechanism comprising lumen that "is not distal to the cannula," or (2) a guide wire that "does not extend through the free space in between the rotor blades." Appx4 at ¶¶ 2–3. Based on the district court's constructions, the parties therefore sought, and the district court entered, final judgment. *Id.* at ¶¶ 4, 6; Appx1–2.

Because the final judgment is solely based on the parties' stipulation of noninfringement in view of the district court's claim constructions, reversal of those constructions requires this Court to vacate the stipulated judgment of noninfringement and remand for further proceedings. *See, e.g.*, *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1370–71 (Fed. Cir. 2016) ("[B]ased on the district court's claim construction, the parties stipulated to non-infringement of these two patents by the accused Symantec products. Because we reverse the district court's construction . . . , we vacate the stipulated judgment of non-infringement as to all claims . . . and remand for further proceedings consistent with this opinion."); *Innovation Scis., LLC v. Amazon.com Inc.*, 778 F. App'x 859, 871 (Fed. Cir. 2019)

(vacating judgment of noninfringement insofar as one of the claim constructions challenged on appeal was reversed and remanding accordingly).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, this Court should reverse the district court's claim constructions for the terms "guide mechanism comprising a lumen," "guide mechanism is configured to allow for a guide wire to slideably advance," and "guide wire does not pass through the rotor hub of the catheter." This Court should then vacate the stipulated judgment of noninfringement because it was based on incorrect claim constructions, and remand for further proceedings.

Dated: August 21, 2023

*/s/ Kirk T. Bradley*
Kirk T. Bradley
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000

*Counsel for Maquet Cardiovascular LLC*

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **MAQUET CARDIOVASCULAR LLC,**<br><br>**Plaintiff/Counterdefendant,**<br><br>**v.**<br><br>**ABIOMED, INC., ABIOMED R&D, INC., and ABIOMED EUROPE GMBH,**<br><br>**Defendants/Counterclaimants,** | ) | **Civil Action No. 17-12311-FDS** |

**<u>MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION</u>**

**SAYLOR, C.J.**

This is an action for patent infringement. This is the second lawsuit between the parties concerning the same technology. *See Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-10914-FDS (D. Mass.) ("*Abiomed I*").

Plaintiff Maquet Cardiovascular LLC has sued defendants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH for infringing U.S. Patent No. 10,238,783 (filed Sept. 21, 2018) ("the '783 patent"). Defendants (collectively, "Abiomed") counterclaimed for declaratory judgment of noninfringement.

The parties have submitted proposed claim construction of nine terms or groups of terms. The construction of the disputed terms are set forth below.

## I. Background

### A. Parties

Plaintiff Maquet Cardiovascular LLC is the owner by assignment of several patents relating to intravascular blood pumps. As relevant here, Maquet is the owner of the '783 patent,

which is at issue in this case. (Am. Compl. ¶ 1).

Defendant Abiomed manufactures, markets, distributes, and sells medical devices, including the Impella line of intravascular blood pumps, which have been on the market since June 2008. (*Id.* ¶¶ 2, 13).

**B. <u>Underlying Technology</u>**

The ’783 patent is a descendant of earlier patents held by Maquet that disclose guidance systems for intravascular blood pumps. For the convenience of the reader, the Court will recap its summary of the underlying technology from *Abiomed I*. (*See Abiomed I*, Docket No. 241 (“*Abiomed I* Mem. & Order on Claim Constr.”) at 1-4). Nevertheless, the Court will briefly survey ground previously covered.

Intravascular blood pumps are essentially miniature pumps that are inserted through a patient’s vasculature to provide blood-pumping support to diseased or damaged hearts, and are used “(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation.” (*See* ’783 patent, col. 1 ll. 37-44). The pumps are capable of being introduced into the vasculature percutaneously in a remote location of the body and then guided into the heart. (*See id.*, col. 1 l. 64 to col. 2 l. 19).

Generally, the blood pump systems discussed by the patent and the parties have the following basic structure: At the far end of the system is a cannula (designated 14 below), a small tube through which blood is drawn into the pump. Attached to the cannula is the blood pump itself (12), which includes a rotor, and is housed within a protective shroud. Extending from the back of the pump is a variable assembly (18), sometimes called a catheter, that can house the drive cable for the blood pump and various guide mechanisms.

FIG. 1




('783 patent, fig.1).

One of the central problems in developing such pumps is that they are "difficult to guide into the appropriate position within the circulatory system of a patient." (*Id.*, col. 2 ll. 22-25). Prior art blood pumps used supplemental guide mechanisms, such as guide catheters, that enlarged the diameter of the device and consumed valuable space within the blood vessel, thereby restricting the available space for blood flow and increasing the size of the wound needed to introduce the device into the patient's circulatory system. (*See id.*, col. 2 ll. 45-55). The '783 patent (as well as the ancestor patents) claims to improve upon the prior art by developing blood pumps with integrated guide mechanisms that facilitate the guidance of the blood pump throughout the vasculature while eliminating the need for supplemental guide

mechanisms that augment the diameter of the device. *(See id.*, col. 2 l. 62 to col. 3 l. 3).

The patent describes three examples of such integrated guide mechanisms. The first is an "over-the-wire" guide mechanism, in which "a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 10-14). Thus, in an "over-the-wire" design, the lumen is situated within the cannula so that the guidewire can be advanced through the device to the desired location within the circulatory system. The blood pump is then advanced along the guide element to that location. (*See id.*, col. 3 ll. 4-17).

The second example of an integrated guide mechanism is a "side-rigger" or "rapid exchange" type guide mechanism, in which "a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 25-29). As with the "over-the-wire" design, the pump is then advanced along the guide element. (*See id.*, col. 3 ll. 29-32).

The third example of an integrated guide mechanism is an "intravascular blood pump system" including a "conduit assembly" with a "guide catheter" and a "pump assembly," such that the conduit assembly is "precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology." (*Id.*, col. 3 ll. 34-53). "The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud." (*Id.*, col. 3 ll. 54-56).

### C. Procedural Posture

During *Abiomed I*, the PTO issued U.S. Patent No. 9,789,238 ("the'238 patent"), which was a descendant of the patents at issue in that case. Maquet sought to add allegations of infringement of the '238 patent, but Abiomed objected, so Maquet agreed to assert those claims in a separate lawsuit. Maquet then filed this action.

On March 26, 2019, the PTO issued the '783 patent, which is a divisional of the '238 patent. Maquet thereafter amended the complaint in this case to add allegations of infringement of the '783 patent. The suit has since been narrowed such that only claims of infringement of the more recently issued '783 patent are at issue.

## II. Standard of Review

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning. The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313. Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at

1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

**A. <u>The Words of the Claim</u>**

The claim-construction analysis normally begins with the claims themselves.[1] The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314. For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *Id.* In addition, "the presence of a

---

[1] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive. The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321. Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

**B. <u>The Specification</u>**

"The claims, of course, do not stand alone." *Id*. "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citations and quotation marks omitted). For that reason, the specification must always be consulted to determine a claim's intended meaning. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA,*

Case: 23-2045 Document: 8 Page: 69 Filed: 08/21/2023

*Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Id.* at 1323. A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

**C. <u>The Prosecution History</u>**

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how

Case 1:17-cv-01751-FDS Document 248 Filed 08/21/2023 Page 9 of 31

the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1316. As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowel of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record."). Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

### D. Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance. *Id.* at 1318-19. Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion. *Id.* at 1319.

## III. Analysis

There are nine groups of terms at issue in the '783 patent, which the Court will address in turn.

### A. "Delimited by Outer Cannula Surface"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | Ordinary meaning or as construed by the Court in *Abiomed I* | As construed by the Court in *Abiomed I* with the additional limitation that "guide wire lumen is not attached outside the cannula" | 1 |

The Court construed an identical term as it was set forth in related patents in *Abiomed I* and concluded that its meaning was as follows:

> [T]he axis of at least a portion of the guide mechanism, "configured as a second lumen," must run through a region delimited by the outer cannula surface. That construction includes configurations such as those depicted in Figures 8 and 9 of the '728 and '068 patents, and configurations such as those depicted in Gordon

> (which the Court sees no reason to distinguish from Figure 9). It also includes configurations where the second lumen is coaxial with the cannula, such as "over-the-wire"-type designs. It does not, however, include configurations such as those depicted in Bagaoisan. The second lumen must be a separate structural element from the cannula itself, as the terms are listed separately.

(*Abiomed I* Mem. & Order on Claim Constr. at 41-42 (footnotes and citation omitted)).

Abiomed contends that the Court should adopt that construction with an additional limitation that "the guide wire lumen is not attached to the outside of the cannula." It contends that the proposed construction clarifies that a structure disclosed in prior art is not encompassed by the claim language.

Maquet contends that the term should be construed according to its ordinary meaning, or, alternatively, according to the Court's order in *Abiomed I*. Any additional limitation, according to Maquet, is unnecessary and unsupported by the specification and prosecution history. Furthermore, Maquet contends that Abiomed should be judicially estopped from arguing for an additional limitation to the claim term because it admitted in *Abiomed I* that an "elongate lumen associated with the cannula" includes lumens that are "separate but permanently bolted on or attached to the side of the cannula." (Docket No. 141 ("Maquet Opening *Markman* Br.") at 16).

The judicial estoppel argument may be disposed of quickly. Judicial estoppel applies only if (1) "the estopping position and the estopped position [are] directly inconsistent" and (2) "the responsible party . . . succeeded in persuading a court to accept its prior position." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). It is not enough for a litigant to make a statement in prior litigation that is arguably inconsistent with its current position; the earlier statement must be directly inconsistent and must have been relied upon by the court in rendering its earlier decision. At a minimum, Maquet cannot establish such

reliance here, and therefore judicial estoppel does not apply.

In any event, while the Court's claim construction in *Abiomed I* surely could have been more succinct, under the circumstances the Court sees no reason to depart from that construction here. Accordingly, it will construe the term in the same manner as in *Abiomed I*, and without the additional language proposed by Abiomed.

**B. <u>"Guide Mechanism Comprising a Lumen"</u>**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism comprising a lumen" | "guide mechanism comprising a lumen that does not extend through the free space between rotor blades" | "guide wire lumen does not extend through the free space between rotor blades" with the additional limitation "guidewire lumen is not distal to the cannula" | 1 |

The next term is best understood within the broader claim language, which reads as follows:

> An intravascular blood pump system, comprising:
>
> . . .
>
> a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient.

('783 patent, App'x B col. 33 ll. 60-61 to col. 34 ll. 5-9).

In *Abiomed I*, the Court construed several terms concerning the lumen component of the guide mechanism individually, but construed all of them to "include the limitation that the guidewire lumen does not extend through the free space between the rotor blades." (*Abiomed I* Mem. & Order on Claim Constr. at 25). Abiomed contends that the same limitation should be

applied here. Maquet does not dispute the point, and therefore the Court will include that limitation here.

Abiomed further contends that an additional limitation is required that the guidewire lumen not be distal to the cannula. According to Abiomed, Maquet acquiesced to an examiner's revision of claims 14 and 22 of the '238 patent, which resulted in a disclaimer of a lumen distal to the cannula in all related patents, including the '783 patent.

Maquet contends that no such disclaimer is apparent in the prosecution history of the '238 patent, nor is that history relevant here. Maquet further argues that Abiomed should be judicially estopped from raising claim construction issues that could have been raised in *Abiomed I*.

To begin, the prosecution history of the '238 patent is relevant when determining the scope of the '783 patent, which is a descendant. *See, e.g., Teva Pharm. USA, Inc. v. Sandoz, Inc*., 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

Furthermore, the doctrine of judicial estoppel is again inapplicable. Maquet essentially argues that Abiomed should be estopped from making any argument that it could have raised in *Abiomed I*, but failed to do so. Even putting to one side the question of whether Abiomed can be faulted for failing to object to claims in a patent that had not yet issued at the time of claim-construction proceeding in *Abiomed I*, it is clear that judicial estoppel does not apply where the court in the earlier matter was not even presented with the party's position, and therefore could not have relied upon it in reaching its decision.

The question, then, is whether Maquet made a disclaimer during the prosecution of the

’238 patent that necessarily limits its claims here. During that prosecution, the examiner rejected claims 14 and 22 of the application (U.S. Patent App. No. 14/966,669) for failing to comply with the enablement requirement of 35 U.S.C. § 112. (Docket No. 138, Ex. 9-C). Those claims described the “entire elongate lumen” as being “distal to the intravascular blood pump,” which was depicted in an embodiment that featured an “offset guidewire lumen” (that is, a “side-rigger” design). (*Id.* at 3). The examiner objected to the claim language because, in the examiner’s opinion, the elongate lumen extended along the cannula, and because the intravascular blood pump comprised the cannula, the lumen could not accurately be described as “distal to the pump.” (*Id.*). As a result, the examiner suggested that the claims be revised to describe the elongate lumen as being distal to the “rotor, first port or rotor shroud.” (*Id.*). Maquet accepted that revision, and the claims were revised accordingly.

It appears that the examiner’s objection stemmed primarily from a disagreement about the taxonomy of the intravascular blood pump (specifically, whether it included the cannula). But the genesis of the objection is immaterial. Maquet’s acquiescence in the resulting changes amounts to a withdrawal of the broader claim, and that withdrawal is legally binding on it in a subsequent proceeding to prove infringement. *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2005) (arguments and amendments made during patent prosecution “can lead to narrow claim interpretations because ‘the public has a right to rely on such definitive statements . . . .’”) (alteration omitted) (quoting *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998)); *UCB, Inc., v. Yeda Research & Dev. Co.*, 837 F.3d 1256, 1261 (Fed. Cir. 2016) (“[T]he general rule is that a patent applicant cannot later obtain scope that was requested during prosecution, rejected by the Examiner, and then withdrawn by the applicant.”).

Accordingly, the term “guide mechanism comprising a lumen” will be construed to

include the limitations that the guidewire lumen (1) "does not extend through the free space between the rotor blades" and (2) "is not distal to the cannula."

### C. "Guide Wire Does Not Pass Through the Rotor Hub"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism is configured to allow a guidewire to slideably advance"<br><br>"guide wire does not pass through the rotor hub of the catheter" | Ordinary meaning | Ordinary meaning with the additional limitation "the guide wire does not extend through the free space in between the rotor blades" | 1, 24 |

As discussed, the Court in *Abiomed I* construed all lumen-related terms to include the limitation that the lumen could not extend through the space between the rotor blades, based on Maquet's disclaimer during the prosecution. The Court addressed only in passing whether the same limitation applied to the guidewire itself:

> Maquet further contends that at most it disclaimed a *permanent* guide lumen that extended between the free space of the blades, not the use of a temporary one. (Maquet Reply Br. at 21-22). But that is not a fair reading of the patent or the disclaimer. While certain parts of the specification suggest that the guidewire can be removed prior to operation, ('437 patent, col. 12 l. 59-col. 13 l.2; *id.*, col. 14 ll. 44-49), nothing suggests that the guidewire lumen itself is removable.

(*Abiomed I* Mem. & Order on Claim Constr. at 25).

Here, Abiomed contends that Maquet, in distinguishing its blood pump from those portrayed in prior art, surrendered any claim to a pump that employed a guidewire extending through the space between the rotor blades. That is made clear, according to Abiomed, by the specification of the '783 patent, which states that the guidewire may either remain in place or be removed once the blood pump is properly positioned within the patient.

In *Abiomed I*, the Court noted that during the prosecution history of earlier patents, Maquet distinguished its device from those that were rendered inoperable by a guide lumen extending between the rotor blades. The prior art was Völker, which discloses a device that runs the guidewire between the rotor blades when being positioned within the circulatory system. The relevant prosecution history discloses that the examiner distinguished Völker in part by noting that because Völker threaded the guidewire through the rotor blades and did not have a separate guide lumen, it did not teach or suggest side-rigger or coaxial guide mechanisms. And Maquet adopted that position. *See* Docket No. 138, Ex. 12-B at MAQ_00004994 ("Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning . . . while the guidewire 25 is located in the pump housing, no Rotation of the impeller [is possible]. Therefore, Völker fails to teach or suggest the side rigger or coaxial guide mechanisms of claims 15, 29 or 45 [later issued as independent claims 1, 10 and 22]."). Abiomed contends that by adopting the examiner's position, Maquet disclaimed devices with a guidewire running between the blades.

A *permanent* guidewire that extended in the space between the rotor blades would render the pump inoperable; that much would be obvious to a lay person, never mind a person of skill in the art. Völker did not claim such an invention, and Maquet does not claim it now. Instead, Völker claimed a *removable* guidewire that extended in the space between the rotor blades. The question is whether Maquet's adoption of the examiner's position distinguishing Völker resulted in a binding disclaimer of such a removable guidewire.

It is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump. (*See, e.g.*,'783 patent, col. 12 ll. 63-

66). But that does not resolve the issue, as the guidewire may be removable in coaxial or side-rigger variations where the wire does not pass through the open space between the rotor blades. Moreover, the specification indicates that removal of the guidewire is optional, suggesting that the specification does not contemplate any variation in which the wire passes between the rotor blades (because the pump would not function if the guidewire were not removed). And nothing in the specification teaches the insertion of a guidewire between the rotor blades.

In any event, Maquet adopted the examiner's position, which distinguished Völker on the ground that it did not disclose a separate second lumen—that is, a lumen that is separate from the pump housing, whether coaxial or on the side. It is difficult, under the circumstances, to construe Maquet's position distinguishing Völker as anything other than a surrender of the subject matter of a guidewire passing through the free space between the rotor blades in the pump housing. Maquet thus disclaimed that subject matter during the prosecution, and the present claims should be construed accordingly.

Accordingly, the terms "guide mechanism is configured to allow a guidewire to slideably advance" and "guide wire does not pass through the rotor hub of the catheter" will be construed to include the limitation that "the guide wire does not extend through the free space in between the rotor blades."

### D. "Establishes Slidable Contact with the Guide Mechanism"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism" | Ordinary meaning | Term fails for indefiniteness | 2 |

Section 112 of the Patent Act provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). A patent claim fails to satisfy that requirement and "is invalid for indefiniteness if its claims, read in the light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). That is, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (quotation marks and alterations omitted). Nevertheless, "the definiteness requirement must take into account the inherent limitations of language," for "[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Id.* (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002)).

Claim indefiniteness is an issue of law to be decided by the court. *Teva Pharms. USA, Inc.*, 789 F.3d at 1341. To determine whether a claim is indefinite, a court "look[s] to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of

skill in the art with reasonable certainty the scope of the invention claimed." *Id.* A patent is presumed to be valid. 35 U.S.C. § 282. Overcoming that presumption requires that a defendant prove indefiniteness by clear and convincing evidence. *Microsoft Corp. v i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Abiomed contends that this term is indefinite because the language of the claim is incomprehensible and ambiguous. The claim describes two spaces or points through which the guidewire passes. The first is "the region delimited by the outer cannula surface"; the second is "where the guide wire establishes slidable contact with the guide mechanism." (Docket No. 143 ("Abiomed Opening *Markman* Br.") at 13-15). Abiomed contends that—aside from the requirement that the first point be proximal to the second—the claim fails to specify where those two points are located, thereby making the claim undefined, vague, and susceptible to multiple interpretations. (*Id.* at 14). Specifically, Abiomed contends that the claim language is unclear whether that first point—located in "the region delimited by the outer cannula surface"—lies within the cannula sidewall or within the cannula itself. (*Id.* at 15). In addition, there is no clear correlation, according to Abiomed, between the claim language and the embodiments specified in the patent, which depict both "side-rigger" and "over-the-wire" designs. (*Id.*).

Abiomed further contends that the second point—"where the guide wire establishes slidable contact with the guide mechanism"—is ambiguous, because the specification does not define what it means for the guide wire to "establish" slidable contact, nor does it define where within the guide mechanism that "contact" must take place. (*Id.* at 14). According to Abiomed, that ambiguity makes it unclear to which embodiments of the invention the claim corresponds.

Maquet contends that the language is clear to a person of ordinary skill in the art. With respect to a "region delimited by the outer cannula surface," Maquet argues that similar language

is set forth in claim 1, which Abiomed does not contest as ambiguous. (Maquet Opening *Markman* Br. at 30). Similarly, Maquet asserts that the point "where the guide wire establishes slidable contact with the guide mechanism" is the same point described in claim 1 where the "guide mechanism is configured to allow for a guide wire to slideably advance therealong." (*Id.* at 30-31). Moreover, Maquet cites to the testimony of Abiomed's expert witnesses, Dr. Antaki and Dr. Collins, as evidence that the term is intelligible to a person of ordinary skill in the art. (Docket No. 156 ("Maquet Reply *Markman* Br.") at 23-26). Finally, the fact that the claim language is broad and may encompass several different embodiments, Maquet argues, does not render it indefinite. (*Id.* at 24-25).

The language is certainly difficult to parse, and Maquet has done little to elucidate its meaning. Nonetheless—and despite the fact that it appears to have a narrow meaning—Abiomed has not met its burden of demonstrating that the language is fatally indefinite.

The Court will begin its analysis with the second location ("where the guidewire establishes slidable contact with the guide mechanism"). The patent, in simplified terms, discloses a pump with a guidewire that slides through a lumen. Maquet contends that the location "where the guidewire establishes slidable contact with the guide mechanism" is "the same location identified in claim 1, where the guide mechanism slidably advances along the guidewire." (Maquet Opening *Markman* Br. at 30-31). That construction, however, cannot be correct. The claims use different terms ("establishes slidable contact" as opposed to "slidably advances along"), which presumably have different meanings. Furthermore, the term "establishes" suggests that things are happening in a particular sequence: (1) at the outset, the guidewire does not have contact with the lumen; (2) the guidewire then "establishes" slidable contact with the lumen: and (3) the guidewire then "slidably advances along" the lumen. Put

another way, the term "establishes contact," in context, suggests the specific point at which the guidewire enters the lumen, not every point along the entire length of the lumen.

The first location ("the region delimited by the outer cannula surface") is perhaps more problematic, but again not fatally so. The Court discussed similar language in its claim construction opinion in *Abiomed I*, without resolving the issue presented here. (*See Abiomed I* Mem. & Order on Claim Constr. at 38).

As a general proposition, the "region delimited by the outer . . . surface" of a regularly shaped three-dimensional object is an unambiguous phrase. For example, even a lay person can readily grasp the meaning of that term when applied to a regularly shaped cylinder, sphere, or cone; the "region" in question is the interior of the cylinder, sphere, or cone. Here, the cannula is in the shape of a tube—essentially, an elongated cylinder. And, as a general matter, the "region delimited by the outer . . . surface" of a tubular object—like any other cylinder—is its interior.

How the second location is defined for an irregularly shaped object, and how the two locations relate to one another, is less than perfectly clear, and again Maquet has not provided much assistance in that regard. The most challenging aspect of the language is the requirement that the guidewire "pass[] through" the delineated "region" at a "location proximal to" the point where it "establishes slidable contact" with the lumen. That requires a design where the entry point for the guidewire into the lumen ("where the guidewire establishes slidable contact with the guide mechanism") must be distal (that is, farther away from the insertion site of the device into the body) than the "region delineated by the outer cannula surface." [2]

For the sake of illustration, consider an over-the-wire design. If the cannula were

[2] The parties do not dispute that "proximal" in the context of the patent means toward the insertion site of the device into the body.

perfectly cylindrical, in the shape of a cigarette, the "region delimited by the outer cannula surface" would be the interior of the cylinder. The entry point for the guidewire ("where the guidewire establishes slidable contact with the guide mechanism") could not be the blunt end of the cylinder; that point would be neither proximal nor distal to the delimited "region." If the ends of the cannula were tapered, in the shape of a cigar, again the entry point would be neither proximal nor distal to the delimited "region." But if the end of the cannula were inwardly indented or tapered—like a cigarette with a recessed filter, or a cylindrical object with a tapered screw hole—part of the delimited region could arguably be proximal to the entry point. In other words, the guidewire could conceivably pass through a region delimited by the outer surface of the cannula before establishing contact with the lumen.

If something is ambiguous, it can be reasonably construed in multiple ways, and if it is incomprehensible, it cannot be reasonably construed at all. Here, it is possible (at least for the Court) to construe the language in at least one way that is comprehensible. If there is another meaning to the language, Maquet has not supplied it—nor, for that matter, has Abiomed, which asserts that the claim is susceptible of multiple interpretations. In any event, the Court has not been asked to construe the claim, only to determine whether it is fatally indefinite. And while the claim language seems to be very narrow, a narrow claim is not the same as an ambiguous or indefinite claim. Under the circumstances, therefore, Abiomed has not met its burden of showing that the term fails for indefiniteness.

**E. <u>"Proximate the Intravascular Blood Pump"</u>**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "Detect a pressure of blood proximate the intravascular blood pump" / "sense pressure proximate the intravascular blood pump" | Ordinary meaning | Term fails for indefiniteness | 3, 24 |

The Court addressed both of the disputed claim terms in *Abiomed I*, albeit in response to arguments that differ from those presented here. There, Abiomed contended that, based on the prosecution history of the '100 patent, Maquet had limited the claim such that "proximate to the intravascular blood pump" meant "at the opening of the blood pump or cannula." (*Abiomed I* Mem. & Order on Claim Construction at 67). The Court determined that the prosecution history did not reveal such a limitation and therefore construed the terms according to their ordinary meaning. (*Id.* at 67-68). At that time, the Court did not address Abiomed's contentions that the terms were ambiguous, stating that Abiomed could raise arguments concerning indefiniteness at the appropriate time. (*Id.*).

Abiomed now contends here that the terms are indefinite. Specifically, it claims that nothing in the claim language, specification, or prosecution history informs a person of ordinary skill in the art of the meaning of "proximate"—that is, how close to the intravascular blood pump the "blood pressure detection mechanism" must be. (Abiomed Opening *Markman* Br. at 16). It further contends that the word "proximate" is a "term of degree," leaving the location of the blood pressure detection mechanism open to subjective interpretation. (*Id.*) The specification, according to Abiomed, does not provide any additional guidance, other than the language it incorporated from U.S. Patent Application No. 09/280,970, entitled "Pressure Sensing Cannula."

(*Id.* at 17). Nevertheless, that application, according to Abiomed, concerned a different invention utilizing different blood-pressure sensing mechanisms, therefore making the application irrelevant to interpreting the terms of the '783 patent. Nor does the prosecution history clarify the meaning of "proximate," as the IPR proceedings concerning this term did not result in a narrowing of claim scope. (*Id.* at 17-18). In support of its contentions, Abiomed points to Antaki's testimony, which states that the terms are ambiguous to a person of ordinary skill in the art. (*Id.* at 17 (citing Antaki Decl. at ¶¶ 52-54)).

In response, Maquet contends that neither term requires additional construction and that the ordinary meaning suffices. It contends that a person of ordinary skill in the art could reasonably determine the location of the blood pressure detection mechanism, given the claim language and the specification support found in the '970 application. (Maquet Reply *Markman* Br. at 20-21). According to Maquet, Antaki admitted as much in his testimony. (*Id.* (citing Antaki Tr. at 121-25)).[3]

In many contexts, the term "proximate"—which is a term of degree that essentially means "near"—would be problematic. *See, e.g., In re Neurografix Patent Litig.*, 201 F. Supp. 3d 206, 223 (D. Mass. 2016) (concluding that the term "near," in context, was indefinite, as it encompassed myriad possible configurations). Nonetheless, a term of degree is not "inherently indefinite." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). If there is sufficient intrinsic or other evidence such that a person of skill in the art could ascertain its meaning with reasonable certainty, it is not indefinite. *Id.*

---

[3] Maquet further contends that Abiomed could have raised this argument in *Abiomed I*, and, consequently, should be estopped from making such arguments here. (Maquet Opening *Markman* Br. at 30). Again, the doctrine of judicial estoppel is inapplicable under the circumstances.

As for support in the specification, the ’970 application describes pressure sensors incorporated into various parts of the cannula. (*See, e.g.*, ‘783 patent, App’x B at cols. 31-32 (appending the ‘970 patent)). Contrary to what Abiomed contends, that application is physically incorporated into the specification here, and therefore is intrinsic evidence as to the meaning of the term.

In any event, under the circumstances presented here, the term “proximate” is not fatally indefinite. The pump in question is designed to operate in a specific, highly confined environment, passing through the vasculature percutaneously and into the heart. Among other things, that operating environment substantially limits the possible configurations for the device. Furthermore, the only function of the device, which is to pump blood, intrinsically suggests that the pressure sensing device must be necessarily proximate to measure that pressure. A person of skill in the art could ascertain with reasonable certainty the limitations of the claim.

Accordingly, the terms “detect a pressure of blood proximate the intravascular blood pump” and “sense pressure proximate the intravascular blood pump” are not indefinite, and will be construed according to their ordinary meanings.

### F. Distal Tip Claims

| Claim Term | Maquet’s Proposed Construction | Abiomed’s Proposed Construction | Claim No. |
|---|---|---|---|
| “pigtail-shaped distal tip” | Ordinary meaning | “thermoplastic rod formed into a loop attached at the distal end of the cannula” | 24 |
| “J-shaped distal tip” | Ordinary meaning | “J-tip guidewire” | 24 |

Abiomed contends that the claim term “pigtail-shaped distal tip” is vague and generic and that, as a result, the claim should be limited to the embodiments presented in the specification.

(Docket No. 155 ("Abiomed Reply *Markman* Br.") at 29-30). Specifically, the specification provides that "[t]he pigtail shape, illustrated in Fig. 30, can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod formed into a loop at the distal end of the cannula 1120." ('783 patent, App'x A at col. 26 ll. 41-44) (appending U.S. Patent No. 09/280,988)). Abiomed asserts that this description should govern the scope of the claim. (Abiomed Reply *Markman* Br. at 29).

Similarly, Abiomed contends that the claim term "J-shaped distal tip" is vague and generic such that it must be limited in scope to the relevant embodiment described in the specification. (Abiomed Reply *Markman* Br. at 31-33). The specification, according to Abiomed, does not describe a "distal tip"; rather, it describes a "J-tip" *guidewire* protruding from the distal end of the device. (*Id.* at 32). Abiomed contends that the term should be construed accordingly.

The Court agrees with Maquet that both terms are understandable to a person of ordinary skill in the art, and that no limitation from the specification should be read into the claims.[4] The terms "pigtail-shaped" and "J-shaped" are readily understandable, as is the term "distal." Nor is the term "tip" so vague that it must be limited to the distal end of the cannula, as opposed to the distal end of the guide wire or some other component. And there is certainly no reason to limit the claim to a particular type of material, such as a "thermoplastic rod."

Accordingly, the Court will construe the terms "pigtail-shaped tip" and "J-shaped distal tip" according to their ordinary meanings.

[4] Maquet again asserts that Abiomed had an opportunity to challenge these terms in *Abiomed I* and failed to do so. (*Id.*). Again, the Court will not apply judicial estoppel as a bar to Abiomed's arguments.

### G. <u>Claim 24</u>

Claim 24 describes, in relevant part,

> An intravascular blood pump system comprising:
>
> an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guidewire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub extending distally beyond a most distal portion of the at least one blade;
>
> . . .
>
> a cannula coupled to a distal end of the intravascular blood pump, . . . the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guidewire does not pass through the rotor hub or catheter;
>
> a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient . . . .

('783 patent, col. 37 l. 32 to col. 38 l. 9).

Abiomed contends that Claim 24 is indefinite on two grounds: first, that the claim describes a function without specifying the structures needed to accomplish that function, (Abiomed Opening *Markman* Brief at 18-21), and second, that the claim impermissibly combines method and apparatus limitations (*Id.* at 21-23). Each contention will be addressed in turn.

**1. <u>"Adapted to be Guided to a Predetermined Location"</u>**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire" | Ordinary meaning or "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire passing through a lumen of the intravascular blood pump" | Term fails for indefiniteness; alternatively, "an intravascular blood pump with either (a) a guide wire passing slideably through a side lumen formed along the side of the cannula, or (b) a conduit assembly, including a guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly. Both structures are for the guiding of the intravascular blood pump to a predetermined location." | 24 |

Abiomed first contends that the claim term is indefinite because it describes a blood pump that is "adapted" to be guided to a spot within the patient's circulatory system, but the claim does not describe a structure by which that adaptation is achieved—that is, the claim describes a device function, but fails to describe a structure that facilitates that function. (*Id.* at 18).

In substance, Abiomed construes the opening language to be a "means" limitation, and thus seeks to import structural limitations from the specification into the claims. That is not, however, an accurate interpretation of the language. The challenged claim term is a non-limiting

preamble to the claim, and therefore provides context for the claim rather than a limitation. *See DeGeorge v. Bernier*, 768 F.2d 1318, 1322 (Fed. Cir. 1985) ("Comprising is often used after a claim preamble to introduce elements of the invention."). If the challenged claim language were omitted from the claim altogether, the claim would still disclose a structurally complete device. *See Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (stating that "a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention" (internal quotations and citation omitted)).

Alternatively, Abiomed contends that if the Court is to construe the term, it should do so in a manner that limits the claimed structures to those provided for in the specification—specifically, structures that are characterized as "side-rigger" or "two-piece catheter" designs. (Abiomed Opening *Markman* Brief at 20). It contends that the "over-the-wire" design is not encompassed by the claim terms because such a design is not described by the specification and the claim limitation that "the guidewire does not pass through the rotor hub or catheter" forecloses the possibility of an "over-the-wire" design. (*Id.*). In contrast, claims 26, 28, and 29 describe "side-rigger" designs, and claim 27 describes a "two-piece catheter" design. (*Id.* at 21).

Claim 24 states that "the guidewire [cannot] pass through the rotor hub or catheter," which certainly would appear to foreclose any "over-the wire" design. Abiomed acknowledges that the language would permit either a "side-rigger" or "two-piece catheter" design. And it has failed to explain why other designs (if they exist) should be excluded from the claim language, other than to argue that the limitations in the specification should simply be imported into the claim, which is impermissible.

Accordingly, the Court will construe the term "an intravascular blood pump adapted to be

guided to a predetermined location within a circulatory system of a patient by a guide wire" according to its ordinary meaning.

### 2. <u>"When the Intravascular Blood Pump is Positioned"</u>

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" | Ordinary meaning | Term fails for indefiniteness | 24 |

Claim 24 further recites, in part, the following:

> An intravascular blood pump system, comprising: [a pump with a guidewire; a catheter; a cannula;]
>
> a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and
>
> [a pressure sensing element].

('783 patent, col. 37 l. 32 to col. 38 l. 10-14).

Abiomed contends that the claim term is indefinite according to the Federal Circuit's decision in *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). There, the court determined that a claim reciting both a system for processing financial transactions and a method for that system's use was indefinite because it was unclear whether infringement occurred when the accused system was created or when the accused system was used in a particular manner. *Id.* at 1384. Thus, the claim failed to "apprise a person of ordinary skill in the art of its scope, and it [was] invalid under section 112, paragraph 2." *Id.*

Here, Abiomed contends that claim 24 likewise describes both a system and method for intravascular blood pump. Specifically, it contends that claim 24 purports to describe an intravascular blood pump system, but the claim language describes a method for that blood pump's use through the claim term "when the intravascular blood pump is positioned in the patient." ('783 patent, col. 38 ll. 12-13). That term, according to Abiomed, is not a limitation on the blood pump's structure, but rather a limitation on how the pump may be used. (Abiomed Opening *Markman* Br. at 22).

The Court, however, does not construe the claim in that fashion. Fairly read in context, the term specifies the capabilities of the claim structure and its orientation while in use rather than a method of use—that is, the claim permissibly describes the blood pump's function or capability without claiming a specific method for its use. *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313-16 (Fed. Cir. 2017). Put another way, the claim language does not describe a task in which the pump is used; rather, the term describes the configuration and capability of the device when in the heart.

Accordingly, the term "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" is not impermissibly indefinite, and will be construed according to its ordinary meaning.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: September 12, 2022

# Exhibit 1

US010238783B2

(12) **United States Patent**
**Aboul-Hosn et al.**

(10) **Patent No.: US 10,238,783 B2**
(45) **Date of Patent: *Mar. 26, 2019**

(54) **GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS**

(71) Applicant: **MAQUET Cardiovascular LLC**, Mahwah, NJ (US)

(72) Inventors: **Walid N. Aboul-Hosn**, Btekhnay (LB); **William R. Kanz**, Woodinville, WA (US); **Bruce A. Baker**, Placerville, CA (US)

(73) Assignee: **Maquet Cardiovascular LLC**, Mahwah, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/138,788**

(22) Filed: **Sep. 21, 2018**

(65) **Prior Publication Data**

US 2019/0030231 A1 Jan. 31, 2019

**Related U.S. Application Data**

(60) Division of application No. 15/675,310, filed on Aug. 11, 2017, which is a division of application No.

(Continued)

(51) **Int. Cl.**
***A61M 1/12*** (2006.01)
***A61M 25/01*** (2006.01)

(Continued)

(52) **U.S. Cl.**
CPC .......... ***A61M 1/125*** (2014.02); ***A61M 1/1008*** (2014.02); ***A61M 1/1029*** (2014.02); ***A61M 1/1031*** (2014.02); ***A61M 1/1096*** (2014.02); ***A61M 25/09*** (2013.01); *A61M 1/101* (2013.01); *A61M 1/102* (2014.02); *A61M 1/1012* (2014.02); *A61M 1/1013* (2014.02); *A61M 1/1034* (2014.02); *A61M 1/1086* (2013.01);

(Continued)

(58) **Field of Classification Search**
CPC ............................................ A61M 2025/0183
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,585,983 A 6/1971 Kantrowitz et al.
3,602,009 A 8/1971 Powell

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2256427 A 10/1998
CA 2349483 A1 6/2000

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/675,310, filed Aug. 11, 2017, U.S. Pat. No. 2017/0340791 A1.

(Continued)

*Primary Examiner* — Adam Marcetich

(57) **ABSTRACT**

An improved intravascular blood pump and related methods involving the broad inventive concept of equipping the intravascular blood pump with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient.

**30 Claims, 37 Drawing Sheets**



**Related U.S. Application Data**

14/966,669, filed on Dec. 11, 2015, now Pat. No. 9,789,238, which is a division of application No. 14/543,815, filed on Nov. 17, 2014, now Pat. No. 9,327,068, which is a continuation of application No. 12/772,810, filed on May 3, 2010, now Pat. No. 8,888,728, which is a continuation of application No. 11/375,926, filed on Mar. 15, 2006, now Pat. No. 7,731,675, which is a division of application No. 10/070,178, filed as application No. PCT/US00/24515 on Sep. 1, 2000, now Pat. No. 7,022,100.

(60) Provisional application No. 60/152,249, filed on Sep. 3, 1999.

(51) **Int. Cl.**
***A61M 25/09*** (2006.01)
***A61M 1/10*** (2006.01)

(52) **U.S. Cl.**
CPC ..... *A61M 1/122* (2014.02); *A61M 2025/0177* (2013.01); *A61M 2025/0183* (2013.01); *A61M 2205/3348* (2013.01); *Y10S 415/90* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,724,274 A 4/1973 Millar
3,879,516 A 4/1975 Wolvek
3,904,901 A 9/1975 Renard et al.
3,966,358 A 6/1976 Heimes et al.
3,995,617 A 12/1976 Watkins et al.
4,135,253 A 1/1979 Reich et al.
4,153,048 A 5/1979 Magrini
4,391,547 A 7/1983 Jackson et al.
4,392,836 A 7/1983 Sugawara
4,413,989 A 11/1983 Schjeidahl et al.
4,468,224 A 8/1984 Enzmann et al.
4,479,497 A 10/1984 Forgurty
4,508,535 A 4/1985 Joh et al.
4,591,355 A 5/1986 Hilse
4,625,712 A 12/1986 Wampler
4,679,558 A 7/1987 Kensey et al.
4,686,982 A 8/1987 Nash
4,692,148 A 9/1987 Kantrowitz et al.
4,696,667 A 9/1987 Masch
4,704,121 A 11/1987 Moise
4,722,348 A 2/1988 Ligtenberg et al.
4,728,319 A 3/1988 Masch
4,747,821 A 5/1988 Kensey et al.
4,747,840 A 5/1988 Ladika et al.
4,749,376 A 6/1988 Kensey et al.
4,753,221 A 6/1988 Kensey et al.
4,764,324 A 8/1988 Burnham
4,769,005 A 9/1988 Ginsburg et al.
4,817,586 A 4/1989 Wampler
4,846,152 A 7/1989 Wampler et al.
4,858,810 A 8/1989 Intlekofer et al.
4,895,557 A 1/1990 Moise et al.
4,908,012 A 3/1990 Moise et al.
4,909,781 A 3/1990 Husted
4,917,102 A 4/1990 Miller et al.
4,919,647 A 4/1990 Nash
4,944,722 A 7/1990 Carriker et al.
4,944,745 A 7/1990 Sogard et al.
4,955,856 A 9/1990 Phillips
4,964,839 A 10/1990 Gloor
4,969,865 A 11/1990 Hwang et al.
4,985,022 A 1/1991 Fearnot et al.
4,990,134 A 2/1991 Auth et al.
5,017,103 A 5/1991 Dahl
5,030,204 A 7/1991 Badger et al.
5,040,944 A 8/1991 Cook
5,041,131 A 8/1991 Nagase
5,044,897 A 9/1991 Dorman
5,061,256 A 10/1991 Wampler
5,061,273 A 10/1991 Yock
5,092,879 A 3/1992 Jarvik
5,106,363 A 4/1992 Nobuyoshi
5,108,411 A 4/1992 McKenzie
5,112,292 A * 5/1992 Hwang .................... F04D 3/00 415/900
5,112,349 A 5/1992 Summers et al.
5,135,535 A 8/1992 Kramer
5,137,513 A 8/1992 McInnes et al.
5,160,321 A 11/1992 Sahota
5,163,910 A 11/1992 Schwartz et al.
5,169,378 A 12/1992 Figuera
5,179,862 A 1/1993 Lynnworth
5,199,950 A 4/1993 Schmitt et al.
5,211,546 A 5/1993 Isaacson et al.
5,221,256 A 6/1993 Mahurkar
5,234,407 A 8/1993 Teirsten et al.
5,250,059 A 10/1993 Andreas et al.
5,275,580 A 1/1994 Yamazaki
5,287,858 A 2/1994 Hammerslag et al.
5,300,112 A 4/1994 Barr
5,314,407 A 5/1994 Auth et al.
5,334,142 A 8/1994 Paradis
5,336,184 A * 8/1994 Teirstein ............ A61M 25/104 604/103.04
5,372,138 A 12/1994 Crowley et al.
5,376,114 A 12/1994 Jarvik
5,405,383 A 4/1995 Barr
5,421,338 A 6/1995 Crowley
5,435,308 A 7/1995 Gallup et al.
5,476,450 A 12/1995 Ruggio
5,484,412 A 1/1996 Pierpont
5,507,725 A 4/1996 Savage et al.
5,516,336 A 5/1996 McInnes et al.
5,678,306 A 10/1997 Bozeman et al.
5,692,882 A 12/1997 Bozeman, Jr. et al.
5,697,948 A 12/1997 Marin et al.
5,711,753 A 1/1998 Pacella et al.
5,741,234 A 4/1998 Aboul-Hosn
5,746,575 A 5/1998 Westphal et al.
5,746,709 A 5/1998 Rom et al.
5,746,758 A 5/1998 Nordgren et al.
5,749,855 A 5/1998 Reitan
5,755,687 A 5/1998 Donlon
5,762,624 A 6/1998 Peters
5,776,190 A 7/1998 Jarvik
5,797,948 A 8/1998 Dunham
5,810,088 A 9/1998 Lamirand et al.
5,810,758 A 9/1998 Yamazaki et al.
5,814,004 A 9/1998 Tamari
5,824,070 A 10/1998 Jarvik
5,827,229 A 10/1998 Auth et al.
5,827,267 A 10/1998 Savage et al.
5,851,174 A 12/1998 Jarvik et al.
5,863,179 A 1/1999 Westphal et al.
5,888,241 A 3/1999 Jarvik
5,911,685 A 6/1999 Siess et al.
5,911,702 A 6/1999 Romley et al.
5,921,913 A 7/1999 Siess
5,928,132 A 7/1999 Leschinsky
5,928,181 A 7/1999 Colman et al.
5,938,645 A * 8/1999 Gordon ................. A61B 17/22 604/171
5,938,672 A 8/1999 Nash
5,947,892 A 9/1999 Benkowski et al.
5,957,672 A 9/1999 Aber
5,964,694 A * 10/1999 Siess ....................... H02K 5/08 415/900
5,965,089 A 10/1999 Jarvik et al.
6,001,078 A 12/1999 Reekers
6,007,478 A 12/1999 Seiss et al.
6,058,593 A 5/2000 Siess
6,066,100 A 5/2000 Willard et al.
6,071,093 A 6/2000 Hart
6,083,260 A 7/2000 Aboul-Hosn
6,086,570 A 7/2000 Aboul-Hosn
6,093,001 A 7/2000 Burgreen et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,113,536 A | 9/2000 | Aboul-Hosn | |
| 6,116,862 A | 9/2000 | Rau et al. | |
| 6,123,659 A | 9/2000 | Le Blanc et al. | |
| 6,123,725 A | 9/2000 | Aboul-Hosn | |
| 6,129,704 A | 10/2000 | Forman et al. | |
| 6,136,025 A | 10/2000 | Barbut et al. | |
| 6,139,487 A | 10/2000 | Siess | |
| 6,146,354 A | 11/2000 | Beil | |
| 6,152,704 A | 11/2000 | Aboul-Hosn et al. | |
| 6,171,253 B1 | 1/2001 | Bullister et al. | |
| 6,176,822 B1 | 1/2001 | Nix et al. | |
| 6,176,848 B1 | 1/2001 | Rau et al. | |
| 6,183,220 B1 | 2/2001 | Ohara et al. | |
| 6,197,001 B1 | 3/2001 | Wilson et al. | |
| 6,210,133 B1 | 4/2001 | Aboul-Hosn et al. | |
| 6,210,397 B1 | 4/2001 | Aboul-Hosn et al. | |
| 6,217,541 B1 | 4/2001 | Yu | |
| 6,228,063 B1 | 5/2001 | Aboul-Hosn | |
| 6,234,960 B1 | 5/2001 | Aboul-Hosn et al. | |
| 6,245,007 B1 | 6/2001 | Bedingham et al. | |
| 6,248,091 B1 | 6/2001 | Voelker | |
| 6,287,319 B1 | 9/2001 | Aboul-Hosn et al. | |
| 6,290,689 B1 | 9/2001 | Delaney et al. | |
| 6,295,877 B1 | 10/2001 | Aboul-Hosn et al. | |
| 6,336,939 B1 | 1/2002 | Yamazaki et al. | |
| 6,346,120 B1 | 2/2002 | Yamazaki et al. | |
| 6,354,814 B1 | 3/2002 | Kaufmann et al. | |
| 6,395,026 B1 | 5/2002 | Aboul-Hosn et al. | |
| 6,440,158 B1 | 8/2002 | Saab | |
| 6,532,964 B2 | 3/2003 | Aboul-Hosn et al. | |
| 6,533,716 B1 | 3/2003 | Schmitz Rode et al. | |
| 6,544,216 B1 * | 4/2003 | Sammler | A61M 25/0125 604/95.03 |
| 6,572,530 B1 | 6/2003 | Araki et al. | |
| 6,592,567 B1 | 7/2003 | Levin et al. | |
| 6,613,008 B2 | 9/2003 | Aboul-Hosn et al. | |
| 6,673,040 B1 | 1/2004 | Samson et al. | |
| 6,709,418 B1 | 3/2004 | Aboul-Hosn et al. | |
| 6,716,189 B1 | 4/2004 | Jarvik et al. | |
| 6,733,459 B1 | 5/2004 | Atsumi | |
| 6,849,068 B1 * | 2/2005 | Bagaoisan | A61M 25/1011 604/523 |
| 6,926,662 B1 | 8/2005 | Aboul-Hosn et al. | |
| 7,022,100 B1 * | 4/2006 | Aboul-Hosn | A61M 1/125 604/6.11 |
| 7,517,352 B2 | 4/2009 | Evans et al. | |
| 7,731,675 B2 * | 6/2010 | Aboul-Hosn | A61M 1/125 604/6.11 |
| 7,785,246 B2 | 8/2010 | Aboul-Hosn et al. | |
| 7,998,054 B2 | 8/2011 | Bolling | |
| 8,540,615 B2 | 9/2013 | Aboul-Hosn et al. | |
| 8,545,447 B2 | 10/2013 | Demarais et al. | |
| 8,613,777 B2 | 12/2013 | Siess et al. | |
| 8,721,517 B2 | 5/2014 | Zeng et al. | |
| 8,834,344 B2 | 9/2014 | Aboul-Hosn et al. | |
| 8,888,728 B2 * | 11/2014 | Aboul-Hosn | A61M 1/125 604/6.11 |
| 9,327,068 B2 * | 5/2016 | Aboul-Hosn | A61M 1/125 |
| 9,545,468 B2 * | 1/2017 | Aboul-Hosn | A61M 1/125 |
| 9,561,314 B2 * | 2/2017 | Aboul-Hosn | A61M 1/125 |
| 9,597,437 B2 * | 3/2017 | Aboul-Hosn | A61M 1/125 |
| 9,789,238 B2 * | 10/2017 | Aboul-Hosn | A61M 1/125 |
| 2001/0027287 A1 | 10/2001 | Shmulewitz et al. | |
| 2002/0183628 A1 | 12/2002 | Reich et al. | |
| 2003/0023201 A1 | 1/2003 | Aboul-Hosn et al. | |
| 2003/0065271 A1 | 4/2003 | Khoury | |
| 2003/0088151 A1 | 5/2003 | Kung et al. | |
| 2003/0100816 A1 | 5/2003 | Siess | |
| 2003/0187322 A1 | 10/2003 | Siess | |
| 2003/0205233 A1 | 11/2003 | Aboul-Hosn et al. | |
| 2004/0097995 A1 | 5/2004 | Nash et al. | |
| 2005/0049696 A1 | 3/2005 | Siess et al. | |
| 2007/0118072 A1 | 5/2007 | Nash | |
| 2009/0024212 A1 | 1/2009 | Siess et al. | |
| 2013/0304158 A1 | 11/2013 | Zarinetchi et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2352234 A1 | 6/2000 |
| CA | 2361972 A1 | 8/2000 |
| CN | 1222862 A | 7/1999 |
| CZ | 200000007 A3 | 5/2000 |
| DE | 2355966 A1 | 5/1975 |
| DE | 4016013 A1 | 11/1991 |
| DE | 4105278 A1 | 8/1992 |
| DE | 29604787 U1 | 10/1996 |
| DE | 19622335 A1 | 12/1997 |
| DE | 19626224 A1 | 1/1998 |
| DE | 19821307 C1 | 10/1999 |
| DE | 10017147 A1 | 10/2001 |
| DE | 10018424 A1 | 10/2001 |
| EP | 0280225 A2 | 8/1988 |
| EP | 0364293 A2 | 4/1990 |
| EP | 0445782 A1 | 9/1991 |
| EP | 0157859 B1 | 4/1992 |
| EP | 0611582 A2 | 8/1994 |
| EP | 764448 A2 | 3/1997 |
| EP | 0810002 A1 | 12/1997 |
| EP | 0884064 A2 | 12/1998 |
| EP | 0916359 B1 | 5/1999 |
| JP | H04126158 A | 4/1992 |
| JP | H-0999092 A | 4/1997 |
| JP | 2002-514472 A | 5/2002 |
| WO | WO 89/05164 A1 | 5/1989 |
| WO | WO 1994 005347 A1 | 3/1994 |
| WO | WO 97/37697 A1 | 10/1997 |
| WO | WO 1997 037696 A1 | 10/1997 |
| WO | WO 97/46270 A1 | 12/1997 |
| WO | WO 1997 049440 A2 | 12/1997 |
| WO | WO 99/02204 A1 | 1/1999 |
| WO | WO 1999 044651 A1 | 9/1999 |
| WO | WO 99/58170 A1 | 11/1999 |
| WO | WO 99/59652 A1 | 11/1999 |
| WO | WO 1999/058170 A1 | 11/1999 |
| WO | WO 00/12148 A1 | 3/2000 |
| WO | WO 00/18448 A1 | 4/2000 |
| WO | WO 00/19097 A1 | 4/2000 |
| WO | WO 2000029056 A2 | 5/2000 |
| WO | WO 00/37139 A1 | 6/2000 |
| WO | WO 2000 029056 A1 | 6/2000 |
| WO | WO 2000033047 A1 | 6/2000 |
| WO | WO 2000037139 A1 | 6/2000 |
| WO | WO 2000 043053 A1 | 7/2000 |
| WO | WO 00/44417 A1 | 8/2000 |
| WO | WO 2000053240 A1 | 9/2000 |
| WO | WO 00/69489 A1 | 11/2000 |
| WO | WO 2000074748 A1 | 12/2000 |
| WO | WO 2000029056 A3 | 1/2001 |
| WO | WO 2001039817 A2 | 6/2001 |
| WO | WO 01/78807 A1 | 10/2001 |
| WO | WO 2001039817 A3 | 1/2002 |

OTHER PUBLICATIONS

U.S. Appl. No. 14/966,669, filed Dec. 11, 2015, U.S. Pat. No. 9,789,238.

U.S. Appl. No. 14/543,815, filed Nov. 17, 2014, U.S. Pat. No. 9,327,068.

U.S. Appl. No. 12/772,810, filed May 3, 2010, U.S. Pat. No. 8,888,728.

U.S. Appl. No. 11/375,926, filed Mar. 15, 2006, U.S. Pat. No. 7,731,675.

U.S. Appl. No. 10/070,178, filed Jul. 19, 2002, U.S. Pat. No. 7,022,100.

Abiomed Inc., Abiomed R&D, Inc. and Abiomed Europe GmbH's Preliminary Invalidity Contentions, No. 1:16-cv-10914-FDS, dated Sep. 8, 2017 (redacted).

Abiomed Inc., Abiomed R&D, Inc. and Abiomed Europe GmbH's Preliminary Invalidity Contentions, No. 1:17-cv-12311-FDS, dated Aug. 3, 2018 (redacted).

(56) **References Cited**

OTHER PUBLICATIONS

Abiomed's Opening Claim Construction Brief, No. 1:16-cv-10914-FDS, filed Dec. 15, 2017.
Abiomed's Opposition to Maquet's Motion for Reconsideration, 1:16-cv-10914-FDS, filed Oct. 5, 2018.
Abiomed's Rebuttal Claim Construction Brief, No. 1:16-cv-10914-FDS, filed Jan. 26, 2018.
Abou-Awdi N. L., et al., Hemopump Left Ventricular Support in the Peripartum Cardiomyopathy Patient, 8 J. Cardiovascular Nursing, Issue 2 (Jan. 1994) ("Abou-Awdi").
Akdis, M. et al., *Overview of Blood Pumps*, Cardiovascular Engineering Research Group, Helmholtz-Institute of Biomedical Engineering, RWTH Aachen, Germany (2001).
Andre F. Cournand et al., Nobel Prize in Physiology or Medicine 1956, Nobel Prize, http://www.nobelprize.org/nobel_prizes/medicine/laureates/ (last visited Jan. 25, 2017).
Andrew F. Cournand, Control of the pulmonary circulation in man with some remarks on methodology, Nobel Lecture, Dec. 11, 1956, p. 531 and p. 533.
Antaki, et al., In Vivo Evaluation of the Nimbus Axial Flow Ventricular Assist System: Criteria and Methods, ASAIO J., M231-36 (1993).
Attar, S., *New developments in cardiac assist devices*, Surgical Science Series (1985).
B. Meyns et al., "Coronary Artery Bypass Graft with Biventricular Microaxial Pumps", Journal of Perfusion, Jul. 1999; 14(4):pp. 287-290.
B. Meyns et al., Micro pumps to Support the Heart During CABG, European Journal of Cardiothorac Surg (2000) 17 (2): pp. 169-174.
Butler, et al., Development of a 14 Fr. Size Hemopump, Ann. Int'l Conf. IEEE Eng'g in Med. & Bio Sci., 12(2): 735-36 (1990).
Butler, et al., Development of an Axial Flow Blood Pump LVAS, ASAIO J., M296-300 (1992).
Casimir-Ahn, H. et al., *Clinical Use of the Hemopump Cardiac Assist System for Circulatory Support*, The Annals of Thoracic Surgery, vol. 59 (1995), pp. 539-545.
Collins Declaration IPR-2017-01025.
Collins Declaration IPR-2017-01026.
Collins Declaration IPR-2017-01027.
Collins Declaration IPR-2017-01028.
Collins Declaration IPR-2017-01029.
Collins Declaration IPR-2017-01201.
Collins Declaration IPR-2017-01202.
Collins Declaration IPR-2017-01203.
Collins Declaration IPR-2017-01204.
Collins Declaration IPR-2017-01205.
Collins Declaration IPR-2017-01207.
Collins Declaration IPR-2017-01208.
Collins Declaration IPR-2017-01209.
Collins Declaration IPR-2017-01253.
Colombo, Selecton of Coronary Stents, J. Am. Coll. Cardiology 40(6); 1021-33 (2002).
Compendium of Technical and Scientific Information for the Hemopump Temporary Cardia Assist System, 1988 (15 pages).
Complaint from Abiomet Inv. V. Maquet Cardiovascular, Case No. 1:16-cv-10914, filed in Dist. of Mass. On May 19, 2016.
Cortis, B. S., *From Augiography to Angioscopy: Informal Discussion*, Texas Heart Institute Journal (1986).
Decision Denying Institution of Inter Partes Review Case IPR 2017-01025.
Decision Denying Institution of Inter Partes Review IPR2017-01208.
Decision Denying Institution of Inter Partes Review IPR2017-01209.
Decision Denying Institution of Inter Partes Review IPR2017-02134.
Decision Denying Institution of Inter Partes Review IPR2017-02135.
Decision Denying Institution of Inter Partes Review IPR2017-02150.
Decision Denying Institution of Inter Partes Review IPR2017-02151.
Decision Denying Institution of Inter Partes Review IPR2017-02152.
Decision Denying Institution of Inter Partes Review IPR2017-02153.
Decision Denying Inter Partes Review IPR2017-01026.
Decision Denying Inter Partes Review IPR2017-01027.
Decision Denying Inter Partes Review IPR2017-01028.
Decision Denying Inter Partes Review IPR2017-01029.
Decision Denying Inter Partes Review IPR2017-01201.
Decision Denying Inter Partes Review IPR2017-01202.
Decision Denying Inter Partes Review IPR2017-01203.
Decision Denying Inter Partes Review IPR2017-01204.
Decision Denying Inter Partes Review IPR2017-01205.
Decision Denying Inter Partes Review IPR2017-01207.
Decision Denying Inter Partes Review IPR2017-01253.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01026.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01027.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01028.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01029.
Decision Denying Petition's Request for Rehearing IPR2017-01025.
Decision from the Patent Trial and Appeal Board, USPTO, appeal No. 2013-001967 for U.S. Appl. No. 10-556423 dated Sep. 30, 2015 (4 pages).
Declaration of Kiersten Batzli—IPR-2017-01025.
Declaration of Kiersten Batzli—IPR-2017-01026.
Declaration of Kiersten Batzli—IPR-2017-01027.
Declaration of Kiersten Batzli—IPR-2017-01028.
Declaration of Kiersten Batzli—IPR-2017-01029.
Declaration of Kiersten Batzli—IPR-2017-01201.
Declaration of Kiersten Batzli—IPR-2017-01202.
Declaration of Kiersten Batzli—IPR-2017-01203.
Declaration of Kiersten Batzli—IPR-2017-01204.
Declaration of Kiersten Batzli—IPR-2017-01205.
Declaration of Kiersten Batzli—IPR-2017-01207.
Declaration of Kiersten Batzli—IPR-2017-01208.
Declaration of Kiersten Batzli—IPR-2017-01209.
Declaration of Kiersten Batzli—IPR-2017-01253.
Declaration of Pamela Stransburg IPR-2017-01025.
Declaration of Pamela Stransburg IPR-2017-01026.
Declaration of Pamela Stransburg IPR-2017-01027.
Declaration of Pamela Stransburg IPR-2017-01028.
Declaration of Pamela Stransburg IPR-2017-01029.
Declaration of Pamela Stransburg IPR-2017-01201.
Declaration of Pamela Stransburg IPR-2017-01202.
Declaration of Pamela Stransburg IPR-2017-01203.
Declaration of Pamela Stransburg IPR-2017-01204.
Declaration of Pamela Stransburg IPR-2017-01205.
Declaration of Pamela Stransburg IPR-2017-01207.
Declaration of Pamela Stransburg IPR-2017-01208.
Declaration of Pamela Stransburg IPR-2017-01209.
Declaration of Pamela Stransburg IPR-2017-01253.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01201.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01202.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01203.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01207.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01208.
Dens, J. et al., *First Experience with the Impella Recover® LP 2.5 Micro Axial Pump in Patients with Cardiogenic Shock or Undergoing High-Risk Revascularisation*, EuroIntervention, May 2006.

Case: 23-2045 Document: 8 Page: 98 Filed: 08/21/2023



(56) **References Cited**

OTHER PUBLICATIONS

Diastolic Balloon Pumping (With Carbon Dioxide) in the Aorta—a Mechanical Assistance to the Failing Circulation by S. D. Moulopoulos (1962).
Dubois-Rande, J. et al., *Assessment of a Percutaneous Hemopump in a High Risk Coronary Angioplasty Patients,*ASAIO Journal (1994) pp. M486-M488.
E. E. Kunst, J.A. van Alste, T. Arts, and H. B. K. Boom, Integrated Unit for Programmable Control of the 21F Hemopump and Registration of Physiological Signals, Med. & Biol. Eng. & Comput. 694-95 (Nov. 1994).
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1001 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1002 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1003 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1004 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1005 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1006 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1007 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1007 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1007 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1007 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1007 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1008 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1009 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1010 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1011 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1015 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1031 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1031 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1057 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1057 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1058 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1059 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1059 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1060 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1060 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1061 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1061 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1062 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1062 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1063 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1064 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1065 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1066 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.

Case: 23-2045 Document: 8 Page: 103 Filed: 08/21/2023



(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

(56) **References Cited**

OTHER PUBLICATIONS


Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2013 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2013 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2014 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2014 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2015 of Patent Owner's Preliminary Response filed. In Inter Partes Review Case No. IPR2017-01208.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2015 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2015 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2016 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2016 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2017 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2018 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2019 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

(56) **References Cited**

OTHER PUBLICATIONS

Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2025 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2026 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2027 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2028 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2029 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Figulla, H. R., *Circulatory support devices in clinical cardiology*, Cardiology (1994).
File wrapper for U.S. Appl. No. 09/280,970 entitled "Pressure Sensing Cannula"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 09/280,987 entitled "Cannula with Balloon Tip"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 09/280,988 entitled "Steerable Cannula"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 10/566,423 entitled "Intracardiac Pumping Device", USPTO, filed Jan. 30, 2006.
Flameng, W., ed., Temporary Cardiac Assist with an Axial Pump System, Steinkopff Veriag Darmstadt, Springer-Verleg, New York, 1991.
Fraden, AIP Handbook of Modern Sensors: Physics, Design, and Applications, Amer. Inst. Physics (1993).
Frank K. White, Fluid Mechanics, 2nd edition, 1986.
Frazier, et al., Treatment of Cardiac Allograft Failure by Use of an Intraaortic Axial Flow Pump, J. Heart Transplanation 110 (1989).
Frazier, Mechanical Circulatory Assist Device Development at the Texas Heart Institute: A Personal Perspective, J. Thorac. & Cardiovascular Surg., 1738-44.
Frazier, O. H. et al., "First Human Use of the Hemopump, A Gather-Mounted Ventricular Assist Device," Ann Thorac Surg., Feb. 1990; 49(2): pp. 299-304.
Gacioch, G. M. et al., *Cardiogenic shock complicating acute myocardial infarction: the use of coronary angioplasty and the integration of the new support devices into patient management*, Journal of the American College of Cardiology (1992).
H. Reul et al., "Artificial Heart and Assist Device: New Developments at the Helmholtz Institute", Chapter from *Heart Replacement* publ. springer at the (Japan), pp. 201-227, 1996.
*Hemopump Cardiac Assist Systems—Instructions for Use for the 14 French and 24 French Pump Assemblies*, Medtronic, Hemodynamics Division (1995).
Hemopump® : Temporary Cardiac Assist System Directions for Use, Nimbus Medical, Inc. (1988).
Impella RECOVER LP2.5: Percutaneous Cardiac Support System Instructions for Use, Abiomed, Inc. (2015).
Invalidity Contentions from Abiomed Inc. v. Maquet Cardiovascular, Case No. 1:16-cv-10914, filed in Dist. of Mass. On Sep. 8, 2017.
JOMED Reitan Catheter Pump Brochure, www.jomed.com/rcp (undated) (6 pages).
K.C. Butler et al., "The Hemopump—a New Cardiac Prosthesis Device", IEEE Trans Biomed Eng. 1990;37:193-196.
Kapoor, A., *Interventional Cardiology*, Springer-Verlag (1989).
Khashaba, RotablatorTM: Rotational Angioplasty System Basics of Operation.
Kirsten-Treptow, P., & Sieß, T. (2000), the intracardiac pump system—High-tech product and Technology Platform (original title in German "Das intrakardiale Pumpsystem—Hightech-Produkt and Technologie-Plattform"). Kardiotechnik, 9(3), pp. 77-80.
Konishi, H. et al., Controller for an Axial Flow Blood Pump, Artificial Organs 20(6): 618-20 (Jun. 1996).
Kozik, et al., Mechanical Circulatory Support, Organogenesis 7(1):50-63 (2001).

(56) **References Cited**

OTHER PUBLICATIONS

Lawrence K. Altman, A. Tiny Heart Pump Saves Its First Life, Researchers Report, N.Y. Times, May 5, 1988.
Letter from Ajey Atre to Michael R. Minogue dated Dec. 15, 2015.
Letter from Michael S. Connor to Richard T. McCaulley, Jr. dated May 3, 2016.
Letter from Richard T. McCaulley, Jr. dated May 19, 2016.
Letter from Richard T. McCaulley, Jr. To Ajey Atre dated Jan. 19, 2016.
Leupold Declaration—Jegaden IPR-201701204.
Leupold Declaration—Jegaden IPR-201701205.
Leupold Declaration—Jegaden IPR-201701209.
Leupold Declaration—Jegaden IPR-201701253.
Library of Congress, Catalog Record of "Supported Complex and High Risk Coronary Angioplasty" (1991).
Library of Congress, Catalog Record of Fluid Mechanics, 2nd edition, ed. Frank M. White (1986).
Library of Congress, Catalog Record of Konishi et al., "Controller for an axial flow blood pump," in Artificial Organs Journal, vol. 20, No. 6 (Jun. 1996) 618-612.
Library of Congress, Catalog Record of Moulopoulos et al., "Diastolic Balloon Pumping (With Carbon Dioxide) in the Aorta—a Mechanical Assistance to the Failing Circulation," in the American Heart Journal, vol. 63, No. 1 (1962) 669-675.
Library of Congress, Catalog Record of Textbook of Medical Physiology by Arthur C. Guyton and John E. Hall, 9th edition (1996).
Lincoff, A. M. et al., *Percutaneous Support Devices for High Risk or Complicated Coronary Angioplasty*, Journal of American College of Cardiology (1997).
Loisance, et al., Left-Ventricular Support by Intraventricular Blood Pump During High-Risk Coronary Angioplasty, The Lancet, 561 (1989).
Loisance, et al., Prophylactic Intraventricular Pumping in High-Risk Coronary Angioplasty, The Lancet, 438-40 (1990).
Lynn R. Williams, Reference Values for Total Blood Volumeand Cardiac Output in Humans, Oak Ridge Nat'l Lab. (Sep. 1994).
Magovern, et al., Nonpulsatile Circulatory Support: Techniques of Insertion, Ann. Thorac. Surg. 55(2): 66-72 (1993).
Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarificatlon of Order on Claim Construction Regarding "Passing Purge Fluid" Terms, C.A. No. 1:16-CV-10914-FDS, Jury Demand, filed Sep. 27, 2018.
Maquet Cardiovascular LLC's Opening Markman Brief, C.A. No. 1:16-cv-10914-FDS, filed Dec. 15, 2017.
Maquet Cardiovascular LLC's Responsive Markman Brief, CA. No. 1:16-cv-10914-FDS, filed Jan. 26, 2018.
Marseille, et al., Implantable Micropump System for Augmented Liver Perfusion, Int'l J. Artificial Organs 22(6): 458-60 (1998).
Maslen et al., "Feedback Control Applications in Artificial Hearts," in IEEE Control systems Magazine, vol. 18, No. 6 (1998).
Memorandum and Order on Claim Construction, Civil Action No. 16-10914-FDS, dated Sep. 7, 2018.
Memorandum of Law in Support of Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarification of Order on Claim Construction Regarding "Passing Purge Fluid" Terms, C.A. No. 1:16-CV-10914-FDS, Jury Demand, filed Sep. 27, 2018.
Meyns, B. et al., *Mechanical Support with Microaxial Blood Pumps for Postcardiotomy Left Ventricular Failure: Can Outcome be Predicted?*, Elsevier Inc. (Aug. 2000).
Mihaylov, D. et al., *Development of a New Introduction Technique for the Pulsatile Catheter Pump*, Artif. Organs (1997).
Mizuno, K., *New Percutaneous Transluminal Coronary Angioscope*, Journal of American College of Cardiology (1989).
Nakatani, et al., In Vitro and In Vivo Assessment of an Intravenous Axial Flow Pump for Right Heart Assist, ASAIO J. M723-27 (1994).
Non-Final Office Action—dated Jun. 21, 2017—for U.S. Appl. No. 14/966,669, filed Dec. 11, 2015, which is related to this present application.
O. Jegaden, "Clinical results of Hemopump support in surgical cases," 1991.
Online encyclopedia article "Pyrolytic Carbon" accessed Feb. 19, 2009, http://en.wikipedia.org/wiki/Pyrolytlc/carbon, 1 page.
Online encyclopedla article "Ventricular assist device, List of implantable VAD devices" accessed Jan. 12, 2010, http://en.wikipedia.org/wiki/Ventricular_assist_device, 11 pages.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01025.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01026.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01027.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01028.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01029.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Patent Owner's Preliminary Response IPR2017-02134.
Patent Owner's Preliminary Response IPR2017-02135.
Patent Owner's Preliminary Response IPR2017-02150.
Patent Owner's Preliminary Response IPR2017-02151.
Patent Owner's Preliminary Response IPR2017-02152.
Patent Owner's Preliminary Response IPR2017-02153.
Petition for Inter Partes Review IPR2017-01205.
Petition IPR-2017-01025.
Petition IPR-2017-01026.
Petition IPR-2017-01027.
Petition IPR-2017-01028.
Petition IPR-2017-01029.
Petition IPR-2017-01201.
Petition IPR-2017-01202.
Petition IPR-2017-01203.
Petition IPR-2017-01204.
Petition IPR-2017-01207.
Petition IPR-2017-01208.
Petition IPR-2017-01209.
Petition IPR-2017-01253.
Petition, IPR2017-02134.
Petition, IPR2017-02135.
Petition, IPR2017-02150.
Petition, IPR2017-02151.
Petition, IPR2017-02152.
Petition, IPR2017-02153.
Petitioner's Request for Rehearing IPR2017-01026.
Petitioner's Request for Rehearing IPR2017-01027.
Petitioner's Request for Rehearing IPR2017-01025.
Petitioner's Request for Rehearing IPR2017-01028.
Petitioner's Request for Rehearing IPR2017-01029.
Pierce, W. S. et al., Portable artificial heart systems, ASAIO Journal 29.1: 757-59 (Apr. 1983).
Practical Angioplasty (David P. Faxon, M.D. ed., Raven Press 1993)—pp. 1 to 9.
Quaal, S., *Cardiac Mechanical Assistance Beyond Balloon Pumping*, Mosby (1993).

Case: 23-2045 Document: 8 Page: 108 Filed: 08/21/2023



(56) **References Cited**

OTHER PUBLICATIONS

R. W. Smalling, The use of mechanical assist devices in the management of cardiogenic shock, Tecas Heart Institute Journal, vol. 18, No. 4, 1991, 275-81.
Reitan, Oyvind et al., "Hydrodynamic Properties of a New Percutaneous Intraaortic Axial Flow Pump," ASAIO Journal; Jay-Jun. 2000; vol. 16; pp. 323-329.
Reul et al., "Rotary Blood Pumps in Circulatory Assist", Perfusion, May 1995; 10(3); pp. 153-168.
Schmitz, et al., An Expandable Percutaneous Catheter Pump for Left Ventricular Support: Proof of Concept, J. Am. Coll. Cardiology, 45 (11): 1856-61 (2005).
Schner, Design and Selection of Flexible Shaft (Aug. 15, 2016).
Scholz, et al.,Clinical Experience with the Percutaneous Hemopump During High-Risk Coronary Angioplasty, Am. J. Cardiology, 82(9): 1107-10 (1998).
Scholz, et al., Mechanical Left Ventricular Unloading During High Risk Coronary Angioplsaty: First Use of a New Percutaneous Transvalvular Left Ventricular Assist Device, Catherization & Cardiovascular Disease 31: 61-69 (1994).
Seldinger, Catheter Replacement of the Needle in Percutaneous Arteriography, Acta Radiologica 39:368-76 (1953).
Siess, et al., Concept, Realization, and First In Vitro Testing of an Intraarterial Microaxial Blood Pump, Int'l J. Artificial Organs 19(7): 644-52 (1995).
Siess, et al., From a Lab Type to a Product: A Retrospective View on Impella's Assist Technology, Int'l J. Artificial Organs 25(5); 414-21 (2001).
Siess, et al., Hydraulic Refinement of an Intrarterial Microaxial Blood Pump, Int'l J. Artificial Organs 18(5): 273-85 (1995).
Stedman's Medical Dictionary, 27th edition, (1999).
Stolinski, et al., The Heart-Pump Interaction: Effects of a Microaxial Blood Pump, Int'l J. Artificial Organs 25(11): 1082-88 (2002).
Stronebridge, P. A., *Angioscopy: a New Light on Perpheral Vascular Disease*, European Journal of Vascular Surgery (1992).
Strong, Biophysical Measurements, Tektronix, Inc., 93-115 (1970).
Sweeney, The Hemopump in 1997: A Clinical, Political, and Marketing Evolution, Ann. Thorac. Surg. 68:761-63 (1999).
T. Siess et al., "Concept, Realization, and First In Vitro Testing of an Intraarterial Microaxial Blood Pump", Artificial Organs, vol. 19, Issue 7, pp. 644-652, Jul. 1995.
T. Siess, "System Analysis and Development of Intravascular Rotary Pumps to Support the Heart" (original title in German Systemanalyse and Entwicklung intravasaler Rotationspumpen zur Herzunterstutzung), Shaker, 1989 pages, 1999.
Taylor, K. M., *Cardiopulmonary Bypass, Principles and Management*, Williams & Wilkins (1986).
Textbook of Medical Physiology by Arthur C. Guyton and John E. Hall, 9th Edition (1996).
Throckmorton, et al., Numerical Design and Experimental Hydraulic Testing of an Axial Flow, ASAIO J., 754-61 (2007).
Throckmorton, et al., Numerical, Hydraulic, and Hemolytic Evalation of an Intravascular Axial Flow Blood Pump to Mechanically Support Fontan Patients, Ann. Biomed. Eng'g 39(1): 324-36 (2011.
U. Lonn et al., "Beating Heart Coronary Surgery Supported by an Axial Blood Flow Pump", The Annals of Thoracic Surgery, Jan. 1999, vol. 67, Issue 1, pp. 99-104.
Wampler et al., Clinical Experience with the Hemopump Left Ventricular Support Device, published in Supported Complex and High Risk Coronary Angioplasty, ch. 14, 231-49 (Springer 1st ed. 1991).
Wampler, et al., Circulatory Support of Cardiac Interventional Procedures with the HemopumpTM Cardiac Assist System, Cardiology 84:194-201 (1994).
Wampler, et al., The Sternotomy Hemopump: A Second Generation Intrarterial Ventricular Assist, ASAIO J., M218-23 (1993).
Wampler, Ricahrd K., "In Vivo Evaluation of a Peripheral Vascular Access Axial Flow Blood Pump," ASAIO Trans., Jul.-Sep. 1988; 34(3): pp. 450-454.
Webster, Medical Instrumentation, John Wiley & Sons (1973).
Wu et al., Ventricular Assist Devices: Current Status and Future Perspective, Frontiers in Biomedical Engineering, 197-231 (2003).
Wu, et al., Fluid Dynamic Characterization of Operating Conditions for Continuous Flow Blood Pumps, ASAIO J., 442-49 (1999).
ZB Med, Catalog Record of Temporary Cardiac Assist with an Axial Pump, ed. W. Flaming (1991).
Maq Rebuttal Validity Contentions Ex. A6 (Oct. 9, 2018).
Maq Rebuttal Validity Contentions Ex. A1.
Maq Rebuttal Validity Contentions Ex. A3.
Maq Rebuttal Validity Contentions Ex. A5.
Maq Rebuttal Validity Contentions Ex. A7.
Maq Rebuttal Validity Contentions Ex. A2.
Maq Rebuttal Validity Contentions Ex. A4.
Maq Rebuttal Validity Contentions.
Maq I Ex. A1—Invalidity by PCT Pub. No. WO 99/02204 ("Aboul-Hosn").
Maq I Ex. A2—Invalidity by "The Hemopump References".
Maq I Ex. A3—Invalidity based on "Jegaden".
Maq I Ex. A4—Invalidity by U.S. Pat. No. 6,248,091 ("Voelker").
Maq I Ex. A5—Invalidity by U.S. Pat. No. 5,921,913 ("Siess").
Maq I Ex. A6—Invalidity by U.S. Pat. No. 6,544,216 B1 ("Sammler").
Maq I Ex. A7—Invalidity by U.S. Pat. No. 6,247,007 B1 ("Bedingham").
Maq II Ex. A1—238 Invalidity—Aboul-Hosn Chart.
Maq II Ex. A2—238 Invality—Hemopump Char.
Maq II Ex. A3—238 Invalidity—Jegaden Chart.
Maq II Ex. A4—23 Invalidity—Voelker Chart.
Maq II Ex. A5—238 Invality—Siess Chart.
Maq II Ex. A6—238 Invalidity—Bedingham Chart.
Abiomed's Surreply to Maquet's Motion for Reconsideration dated Oct. 26, 2018.
Sur-Response of Maquet Cardiovascular LLC Concerning Its Motion for Reconsideration and/or Clarification of Claim Construction Regarding "Passing Purge Fluid" Terms dated Nov. 2, 2018.
Abiomed's Opposition to Maquet's Motion for Reconsideration dated Oct. 5, 2018.
Reply Memorandum of Law in Further Support of Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarification of Order on Claim Construction Regarding "Passing Purge Fluid" Terms dated Oct. 17, 2018.
U.S. Appl. No. 15/675,310, filed Aug. 11, 2017, Aboul-Hosn et al.
U.S. Appl. No. 16/138,788, filed Sep. 21, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/143,289, filed Sep. 26, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/153,355, filed Oct. 5, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/153,473, filed Oct. 5, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/153,619, filed Oct. 5, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/159,553, filed Oct. 12, 2018, Aboul-Hosn et al.
U.S. Appl. No. 16/167,400, filed Oct. 22, 2018, Aboul-Hosn et al.
Akdis, M. et al., *Blood Pumps for Circulatory Support*, Perfusion 15 (2000) 295-311 NOTE: Erroneously cited on Dec. 5, 2018 as *Overview of Blood Pumps*, Cardiovascular Engineering Research Group, Helmhortz-Institute of Biomedical Engineering, RWTH Aachen, Germany (2001).

* cited by examiner

FIG. 1






FIG. 2


14
72
72
70
22
56
68
36
58
58
12
38
44
64
48
66
52
54
34
46
50
60
32
62
18
76
74
4
4
16

FIG. 3




*FIG. 4*


18
32
62
22
74
74
76
76
26
96
28
114
100
108
110
112
106
102
86
104
30
114
92
94
80
90
24
78
88
82
84

*FIG. 5*

FIG. 6



FIG. 7






*FIG 9*




*FIG 8*

*FIG. 10*




FIG. 11
130
26
20
MOTOR
150
62
PURGE
FLUID
SOURCE
SEAL
32
140
18
146
CONTROL
14
132
148
142
132
144
36

FIG. 12


42
40
134
14
136
44
136
34
138
130
132
18
32
154
152
156
140
26
160
28
158
96
30
24


42
40
14
134
36
12
138
132
130
154
152
140
156
160
158
26
28
96
30
24

*FIG 13*

FIG. 14


14
72
72
70
56
12
36
58
44
38
64
48
52
66
54
46
132
50
60
34
74
62
76
18
138
15
32
138
15




FIG. 15

*FIG. 16*


156
160
158
18
62
74
76
96
26
108
28
114
112
100
106
102
98
86
104
30
114
24
92
80
94
90
78
88
84




*FIG. 17*


14
134
44
58
58
130
36
38
38
192
34
184
188
182
46
196
196
194
194
186
180
180
190
34
60
32
136
132
62

FIG. 18

*FIG. 19*






Figure 20




Figure 22




**Figure 21**




**Figure 23**




Figure 24




Figure 26




Figure 25



Figure 27



Figure 28



Figure 29




Figure 30




Figure 31




Figure 32




Figure 33




Figure 34




Figure 35




Figure 36

Figure 37

Figure 38




**Figure 39**

Case: 23-2045 Document: 8 Page: 139 Filed: 08/21/2023






**Figure 40**




**Figure 41**




Figure 42

Figure 43


2222
2226
2236
2220
2259
2256
2254
2238
2263
2261
2257
2249
2225

Figure 44




Figure 45




Figure 46



Figure 51



Figure 50



Figure 47



Figure 48



Figure 49




Figure 52




Figure 53




Figure 54

Case: 23-2045 Document: 8 Page: 146 Filed: 08/21/2023



# GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS

## RELATED APPLICATIONS

This application is a divisional of co-pending U.S. patent application Ser. No. 15/675,310, filed Aug. 11, 2017, which is a divisional of U.S. patent application Ser. No. 14/966, 669, filed Dec. 11, 2015 (now U.S. Pat. No. 9,789,238), which is a divisional of U.S. patent application Ser. No. 14/543,815, filed Nov. 17, 2014 (now U.S. Pat. 9,327,068, issued May 3, 2016), which is a continuation of U.S. patent application Ser. No. 12/772810, filed May 3, 2010 (now U.S. Pat. No. 8,888,728, issued Nov. 18, 2014), which is a continuation of U.S. patent application Ser. No. 11/375,926, filed Mar. 15, 2006 (now U.S. Pat. No. 7,731,675, issued Jun. 8, 2010), which is a divisional of U.S. patent application Ser. No. 10/070,178, filed Jul. 19, 2002, (now U.S. Pat. No. 7,022,100, issued Apr.4, 2006) which claims the benefit of PCT/US00/24515 filed Sep. 1, 2000, which claims the benefit of provisional U.S. Patent Application Ser. No. 60/152,249 filed Sep. 3, 1999. We hereby claim priority to the aforementioned application(s) and also incorporate herein by reference each of the afore-listed patents and applications in their entirety.

## FIELD OF THE INVENTION

The present invention relates generally to blood pumps and, more particularly, to an improved intra-vascular blood pump having a guide mechanism which provides the ability to selectively guide the intravascular pump to a desired location within a patient's circulatory system.

## DESCRIPTION OF RELATED ART

Over the years, various types of blood pumps have been developed for the purpose of augmenting or replacing the blood pumping action of damaged or diseased hearts. Blood pumps are commonly used in three situations: (1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation. The pumps may be designed to provide right and/or left ventricular assist, although left ventricle assist is the most common application in that it is far more common for the left ventricle to become diseased or damaged than it is for the right ventricle.

Blood pumps must provide leak-free operation and must avoid contamination of the fluid by the pump components and the external environment. Such pumps must also pump the fluid at a suitable rate without applying excessive Reynolds shear stress to the fluid. It is well known to those skilled in the art that lysis or cell destruction may result from application of shear stress to cell membranes. Red blood cells are particularly susceptible to shear stress damage as their cell membranes do not include a reinforcing cytoskeleton to maintain cell shape. Lysis of white blood cells and platelets also occurs upon application of high shear stress. Lysis of red blood cells can result in release of cell contents which trigger subsequent platelet aggregation. Sublytic shear stress leads to cellular alterations and direct activation and aggregation of platelets and white blood cells.

Intravascular blood pumps comprise miniaturized blood pumps capable of being percutaneously or surgically introduced into the vascular system of a patient, typically to provide left and/or right heart support. One type of intravascular pump is an axial flow blood pump comprising a cable-mounted rotor surrounded by a protective shroud. The pump, along with the rotor and shroud, are mounted at the end of an elongated flexible catheter. The catheter is inserted into the aorta from a remote entry point, such as an incision below the groin that provides access into a femoral artery. The catheter then passes through the descending aorta until it reaches the ascending aorta, near the heart. The catheter device encloses a rotating drive cable which is coupled to the impeller blade at one end, and which emerges from the exposed end of the catheter, near the patient's groin, at the other end. When the exposed end of the drive cable is mechanically rotated, using a device located outside the patient's body, it conveys the rotational force through the length of the catheter, causing the impeller to spin at high speed near the heart. This type of blood pump finds particular application in providing ventricular assist during surgery or providing temporary bridging support to help a patient survive a crisis.

While generally effective in providing ventricular assisting functions, prior art intravascular blood pumps nonetheless suffer various drawbacks. A significant drawback is that prior art intravascular blood pumps are difficult to guide into the appropriate position within the circulatory system of a patient. This is due largely to the fact that the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart. When attempting to place the blood pump in a trans-valvular configuration (with the inlet in the left ventricle and the pump outlet in the ascending aorta), the natural tendency of the catheter to stay straight may cause the pump to be inadvertently placed in the carotid ostia, which can be dangerous if the pump is operated to withdraw blood from the brain.

To overcome these difficulties, certain guide mechanisms may be employed to assist the physician placing the pump in the appropriate position within the circulatory system. One type of supplemental guide mechanism is a guide catheter. Guide catheters are designed with certain guidability characteristics such that physicians can selectively position them within the vasculature or heart with relative ease. A central lumen is provided within the guide catheter such that the intravascular pump may be introduced therein and guided while it is advanced towards the predetermined circulatory site. While generally effective at providing a guiding feature for such intravascular blood pumps, employing such supplemental guide mechanisms is nonetheless disadvantageous in that they consume valuable space within the vessels. A guide catheter, for example, would necessarily be larger in diameter than the diameter of the pump and protective shroud in order to provide adequate passage of those components. As will be appreciated, this restricts the amount of space available for blood to flow within the particular vessel, and increases the size of the required puncture wound for accessing the vessel.

The present invention is directed at eliminating and/or reducing the effects of the foregoing drawbacks of prior art intravascular blood pumps.

## SUMMARY OF THE INVENTION

The present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system. i.e. heart and/or vasculature. In so doing, the intravascular blood pump of the present

Case: 23-2045 Document: 8 Page: 147 Filed: 08/21/2023



invention eliminates the need for supplemental guiding mechanisms, such as a separate, large diameter guide catheter as used in the prior art.

In a first broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and an "over-the-wire" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. To accomplish this, a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient. After the guide element is advanced to this desired location, the intravascular blood pump and cannula may thereafter be advanced along the guide element to the desired location.

In a second broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and a "side-rigger" or "rapid exchange" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. To accomplish this, a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula. A guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient. After the guide element is advanced to this desired location, the intravascular blood pump and cannula may thereafter be advanced along the guide element to the desired location.

In a third broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and a "guide catheter" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. The pump system of this broad aspect includes a conduit assembly and a separate pump assembly. The conduit assembly includes a guide catheter, a rotor shroud, and a cannula, with the cannula and guide catheter disposed on either side of the rotor shroud. The pump assembly includes a rotor, a drive member coupled to the rotor, and a pump disposed between the rotor and the drive member. The guide catheter is dimensioned to receive and guide the pump assembly to the point where the rotor docks within the rotor shroud so as to form an operational blood pump. This configuration allows the conduit assembly to be precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology. The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud. This dual construction arrangement provides improved placement of the pump assembly by using the conduit as a guiding mechanism.

The foregoing broad aspects of the present invention may be manifested according to the following recitations:

According to a first broad recitation of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto, and a guide mechanism adapted to guide the intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient.

In a further embodiment, the intravascular blood pump includes a rotor, a shroud for receiving the rotor, and a drive cable coupled to the rotor for driving the rotor within the shroud.

In a further embodiment, the cannula is coupled to the shroud of the intravascular blood pump.

In a further embodiment, the guide mechanism comprises a guide catheter coupled to the shroud.

In a further embodiment, the guide catheter may be used to guide the shroud and cannula to the predetermined location within the circulatory system of the patient, after which point the rotor and drive cable of the intravascular blood pump may be docked within the shroud for pump operation.

In a further embodiment, the drive cable sheath is provided having a central lumen for receiving the drive cable, and wherein a purge fluid delivery system is coupled to the drive cable sheath to deliver purge fluid to the rotor.

In a further embodiment, the drive cable sheath includes at least one side lumen for delivering the purge fluid towards the rotor.

In a further embodiment, a portion of the purge fluid is delivered through the at least one side lumen and past the rotor, and a portion of purge fluid is rerouted back from the rotor through the central lumen of the drive cable.

In a further embodiment, a perfusion assembly is provided communicatively coupled to the guide catheter for selectively rerouting blood from within the guide catheter to a point downstream from the introduction site of the guide catheter into the vasculature of the patient.

In a further embodiment, the perfusion assembly includes a first conduit communicatively coupled to the guide catheter, a second conduit dimensioned to be introduced into the vasculature of the patient, and a selectively operable valve disposed in between the first conduit and the second conduit.

In a further embodiment, a blood pressure detection mechanism is provided to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula.

In a further embodiment, the blood pressure detection mechanism comprises at least one of fluid filled column disposed within at least a portion of the cannula, a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, and a strain gauge coupled to at least one of the intravascular blood pump and cannula.

In a further embodiment, the blood pressure detection mechanism involves calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor.

In a further embodiment, the guide mechanism comprises a guide element disposed at least partially within the cannula.

In a further embodiment, the guide element comprises a guide wire for passage through a side lumen formed in the cannula.

In a further embodiment, the guide element comprises a selectively deformable element disposed at least partially within the cannula.

In a further embodiment, the intravascular blood pump and cannula may be selectively advanced to the predetermined location within the vasculature of the patient by first passing the guide wire to the predetermined location and thereafter sliding the intravascular blood pump and cannula along the guide wire to the predetermined location.

In a further embodiment, the guide element comprises a guide wire for passage through a lumen extending through the drive cable and rotor.

Case: 23-2045 Document: 8 Page: 148 Filed: 08/21/2023



In a further embodiment, the intravascular blood-pump and cannula may be selectively advanced to the predetermined location within the vasculature of the patient by first passing the guide wire to the predetermined location and thereafter sliding the intravascular blood pump and cannula along the guide wire to the predetermine location.

In a further embodiment, the guide mechanism further includes guide element for passage through the guide catheter to facilitate placement of the shroud and the cannula at the predetermined location within the vasculature of the patient.

In a further embodiment, the guide mechanism further includes a guide element for passage through a side lumen formed along at least a portion of the guide catheter.

In a further embodiment, the guide element comprises at least one of a guide wire and a balloon catheter.

## BRIEF DESCRIPTION OF THE DRAWINGS

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. **1** is a partial sectional view of a human heart illustrating an intravascular blood pump system having an "over-the-wire" type guide mechanism according to a first broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. **2** is side view of the guidable intravascular blood pump system of the type shown in FIG. **1** including a motor coupler and purge fluid delivery system according to an exemplary embodiment of the present invention;

FIG. **3** is a cross-sectional view illustrating an exemplary construction of the blood pump, drive cable assembly, and cannula of the intravascular blood pump system according to the first broad aspect of the present invention;

FIG. **4** is a cross-sectional view taken along lines **4-4** of FIG. **3** illustrating an exemplary construction of the drive cable assembly and guide mechanism according to the first broad aspect of the present invention;

FIG. **5** is a cross-sectional view illustrating an exemplary construction of the motor coupler and purge fluid delivery system according to the first broad aspect of the present invention;

FIG. **6** is a partial sectional view of a human heart illustrating an intravascular blood pump system having a "rapid exchange" or "side-rigger" type guide mechanism according to a second broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. **7** is side view of the guidable intravascular blood pump system of the type shown in FIG. **6** including a motor coupler and purge fluid delivery system according to an exemplary embodiment of the present invention;

FIG. **8** is a cross-sectional view taken along lines **8-8** of FIG. **7** illustrating the "side-rigger" or "rapid exchange" type guide mechanism according to the second broad aspect of the present invention;

FIG. **9** is a cross-sectional view of the type shown in FIG. **8** illustrating an alternate configuration of the guide mechanism according to the second broad aspect of the present invention;

FIG. **10** is a partial sectional view of a human heart illustrating an intravascular blood pump system having a "guide catheter" type guide mechanism according to a third broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. **11** is a schematic view of a human being illustrating the intravascular blood pump system of the type shown in FIG. **10** inserted through the femoral artery and including an optional perfusion assembly for perfusing the vasculature downstream from the incision site where guide catheter enters the femoral artery;

FIG. **12** is a side view of the intravascular blood pump system shown in FIGS. **10-11** illustrating the separable nature of a pump assembly and a conduit assembly which collectively form the intravascular blood pump system according to the third broad aspect of the present invention;

FIG. **13** is a side view illustrating the intravascular blood pump system shown in FIG. **12** with the pump assembly docked into the conduit assembly according to the third broad aspect of the present invention;

FIG. **14** is a cross-sectional view illustrating an exemplary construction of the blood pump, drive cable assembly, cannula, and guide catheter of the intravascular blood pump system shown in FIG. **13**;

FIG. **15** is a cross-sectional view taken along lines **15-15** of FIG. **14** illustrating an exemplary construction of the drive cable assembly and guide catheter according to the third broad aspect of the present invention;

FIG. **16** is a cross-sectional view illustrating an exemplary construction of the motor coupler, purge fluid delivery system, and a proximal portion of the guide catheter biasing assembly according to the third broad aspect of the present invention;

FIG. **17** is a cross-sectional view illustrating an exemplary construction of the perfusion assembly and a distal portion of the guide catheter biasing assembly according to the third broad aspect of the present invention;

FIG. **18** is a cross-sectional view of an intravascular blood pump system of the type shown in FIGS. **12-13** having an alternate configuration for docking the rotor within the shroud according to the principles of the present invention; and

FIG. **19** is a partial sectional view of a human heart illustrating an alternate intravascular blood pump system having an "over-the-wire" type guide mechanism according to the first broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide right-heart assist.

FIG. **20** corresponds to FIG. 1 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula in the undeformed state in accordance with the first embodiment of U.S. Ser. No. 09/280,988;

FIG. **21** corresponds to FIG. 2 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view of the steerable cannula of FIG. **20** taken along line A-A:

FIG. **22** corresponds to FIG. 3 of U.S. Ser. No. 09/280,988, and is a schematic side view of the steerable cannula in the deformed state in accordance with the first embodiment of U.S. Ser. No. 09/280,988;

FIG. **23** corresponds to FIG. 4 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view of a steerable cannula having two cables in accordance with a second embodiment of U.S. Ser. No. 09/280,988:

FIG. **24** corresponds to FIG. 5 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula having a reinforcing wire in accordance with a third embodiment of U.S. Ser. No. 09/280,988;

FIG. **25** corresponds to FIG. 6 of U.S. Ser. No. 09/280,988, and is a schematic cut-away view of a steerable cannula in accordance with a fourth embodiment of U.S. Ser. No. 09/280,988;

FIG. **26** corresponds to FIG. 7 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view taken along line B-B of FIG. **25**;

FIG. **27** corresponds to FIG. 8 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula having a preformed curve and an inflatable balloon formed at a distal end thereof in accordance with a fifth embodiment of U.S. Ser. No. 09/280,988;

FIG. **28** corresponds to FIG. 9 of U.S. Ser. No. 09/280,988, and is a schematic side view of the inflatable balloon of a fifth embodiment of U.S. Ser. No. 09/280,988, wherein the balloon is shown in the inflated state:

FIG. **29** corresponds to FIG. 10 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view taken along line C-C of FIG. **28**;

FIG. **30** corresponds to FIG. 11 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a pigtail distal tip configuration in accordance with a sixth embodiment of U.S. Ser. No. 09/280,988;

FIG. **31** corresponds to FIG. 12 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with a seventh embodiment of U.S. Ser. No. 09/280,988;

FIG. **32** corresponds to FIG. 13 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with an eighth embodiment of U.S. Ser. No. 09/280,988;

FIG. **33** corresponds to FIG. 14 of U.S. Ser. No. 09/280,988, and is a schematic side view showing a steerable cannula used in a co-axial configuration in accordance with a ninth embodiment of U.S. Ser. No. 09/280,988, wherein the steerable cannula is advanced to a first relative position;

FIG. **34** corresponds to FIG. 15 of U.S. Ser. No. 09/280,988, and is a schematic side view showing a steerable cannula of FIG. **33**, wherein the steerable cannula is advanced to a second relative position; and

FIG. **35** corresponds to FIG. 16 of U.S. Ser. No. 09/280,988, and is a schematic side view of a configuration in accordance with a tenth embodiment of U.S. Ser. No. 09/280,988.

FIG. **36** corresponds to FIG. 1 of U.S. Ser. No. 09/280,970, and is a schematic side view of a first embodiment of U.S. Ser. No. 09/280,970:

FIG. **37** corresponds to FIG. 2 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line D-D of FIG. **36**;

FIG. **38** corresponds to FIG. 3 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line E-E of FIG. **36**;

FIG. **39** corresponds to FIG. 4 of U.S. Ser. No. 09/280,970, and is a schematic view of a cannula in accordance with an embodiment in a surgical application;

FIG. **40** corresponds to FIG. 5 of U.S. Ser. No. 09/280,970, and is a schematic partial cut-away side view of a second embodiment of U.S. Ser. No. 09/280,970;

FIG. **41** corresponds to FIG. 6 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line F-F of FIG. **40**;

FIG. **42** corresponds to FIG. 7 of U.S. Ser. No. 09/280,970, and is a schematic side view of a third embodiment of U.S. Ser. No. 09/280,970;

FIG. **43** corresponds to FIG. 8 of U.S. Ser. No. 09/280,970, and is a schematic side view of a fourth embodiment of U.S. Ser. No. 09/280,970;

FIG. **44** corresponds to FIG. 9 of U.S. Ser. No. 09/280,970, and is a schematic side view of a fifth embodiment of U.S. Ser. No. 09/280,970;

FIG. **45** corresponds to FIG. 10 of U.S. Ser. No. 09/280,970, and is a schematic side view of a sixth embodiment of U.S. Ser. No. 09/280,970;

FIG. **46** corresponds to FIG. 11 of U.S. Ser. No. 09/280,970, and is a schematic cross sectional view taken along line G-G of FIG. **45**;

FIG. **47** corresponds to FIG. 12 of U.S. Ser. No. 09/280,970, and is a schematic side view of a seventh embodiment of U.S. Ser. No. 09/280,970;

FIGS. **48** and **49** correspond to FIGS. 13 and 14, respectively, of U.S. Ser. No. 09/280,970, and are schematic side views of an eighth embodiment of U.S. Ser. No. 09/280,970;

FIG. **50** corresponds to FIG. 15 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line H-H of FIG. **49**;

FIG. **51** corresponds to FIG. 16 of U.S. Ser. No. 09/280,970, and is a schematic side view of a ninth embodiment of U.S. Ser. No. 09/280,970;

FIG. **52** corresponds to FIG. 17 of U.S. Ser. No. 09/280,970, and is a schematic side view of a tenth embodiment of U.S. Ser. No. 09/280,970;

FIG. **53** corresponds to FIG. 18 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line K-K of FIG. **52**; and

FIG. **54** corresponds to FIG. 19 of U.S. Ser. No. 09/280,970, and is a schematic side view of an eleventh embodiment of U.S. Ser. No. 09/280,970.

## DETAILED DESCRIPTION OF THE INVENTION

Illustrative embodiments of the invention are described below. In the interest of clarity, not all features of an actual implementation may be described in this specification. It will of course be appreciated that in the development of any such actual embodiment, numerous implementation-specific decisions must be made to achieve the developers' specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

The present invention involves an intravascular pump system for use in a number of broad ranging applications involving the augmentation of blood flow within the circulatory system of a patient. As will be described below, the intravascular blood pump system of the present invention overcomes the drawbacks of the prior art by providing a guide mechanism as part of the intravascular blood pump. This advantageously allows the intravascular blood pump to be selectively guided to a predetermined location within the circulatory system of a patient without the need for bulky supplemental guide mechanisms, such as a separate guide catheter.

The intravascular pump assembly of the present invention is particularly suited for trans-valvular use, such as for left and/or right ventricular assist procedures. By way of example only, such ventricular assist procedures may be employed in cardiac operations including, but not limited to, coronary bypass graft (CABG), cardio-pulmonary bypass

Case: 23-2045 Document: 8 Page: 150 Filed: 08/21/2023



(CPB), open chest and closed chest (minimally invasive) surgery, bridge-to-transplant and/or failure-to-wean-from-bypass situations. It is to be readily understood, however, that the intravascular blood pump assembly and methods of the present invention are not to be limited to such applications. Moreover, while illustrated and described largely with reference to left-heart assist applications, it is to be readily understood that the principles of the present invention apply equally with regard to right-heart assist application, which are contemplated as within the scope of the present invention. These and other variations and additional features will be described throughout.

Referring to FIG. **1**, shown is a guidable intra-vascular blood pump system **10** according to a first broad aspect of the present invention shown, by way of example only, in a left-heart assist configuration within a human heart. The system **10** includes an intravascular blood pump **12**, a cannula **14**, and an "over-the-wire" type guide mechanism **16**. A drive cable assembly **18** and a motor assembly **20** are provided to drive the intravascular blood pump **12**. The "over-the-wire" guide mechanism **16** comprises a suitable guide element dimensioned to pass slideably through a central lumen extending through the drive cable **18**, blood pump **12**, and cannula **14**. Suitable guide elements may include any number of conventional guiding devices, including but limited to those employed in cardiology. By way of example only, the guide element is shown as a guide wire **22**. According to the present invention, the "over-the-wire" guide mechanism **16** provides the ability to selectively guide the blood pump **12** and cannula **14** to a predetermined position in the circulatory system of a patient, such as the trans-valvular position shown.

To accomplish this, the guide wire **22** is first introduced into the vascular system of a patient through any suitable access point, such as through the use of the well known Seldinger technique. The guide wire **22** can then be advanced within the patient to a desired location within the circulatory system of the patient. This may be done using the control features of the guide wire **22** itself, or may be facilitated through the use of any number of supplemental guidance mechanisms or techniques to ensure the proper and efficient placement of the guide wire **22**. Such supplemental guidance techniques may include, but are not necessarily limited to, guide catheters and/or techniques involving ultrasound or flouroscopy. Once the guide wire **22** is positioned at the desired location (such as in left ventricle as shown), the blood pump **12** and cannula **14** may thereafter be advanced along the guide wire **22** and positioned in the trans-valvular configuration shown. Under the operation of the motor assembly **20**, the blood pump **12** may be used for left-heart assist by selectively withdrawing blood from the left ventricle (through the interior of the cannula **14**) for delivery outward through outflow apertures formed in the blood pump **12**. This outflow from the blood pump **12** flows along the exterior of the drive cable assembly **18** in a substantially axial fashion for arterial distribution throughout the body.

Referring to FIGS. **2-5**, an exemplary embodiment of the intravascular blood pump system **10** of FIG. **1** will now be described. As shown in FIG. **2**, the intravascular blood pump system **10** includes a coupler **24** and, as will be described in greater detail below, a purge fluid delivery system **26** for providing a two-way fluid flow within the drive cable assembly **18** during pump operation. The purge fluid delivery system **26** includes a fluid inlet conduit **28** for introducing pressurized purge fluid from a fluid source (not shown) for delivery into the blood pump **12**, and a fluid outlet conduit **30** to withdraw a return flow of purge fluid from the blood pump **12**. The motor coupler **24** establishes a mechanical connection between a motor (not shown) and a drive cable (not shown) for providing motive force to the blood pump **12** for pump operation. The drive cable assembly **18** includes a drive cable sheath **32** which, in addition to serving a purge fluid delivery function, also serves as a protective housing for the drive cable (not shown). Although shown in broken form for clarity, it will be appreciated that the drive cable assembly **18** (and all components thereof) may be provided in any suitable length sufficient for intravascular applications. That is to say, the length of the drive cable assembly **18** must be enough to reach between the motor coupler **24** and purge fluid delivery system **26**, located outside the patient, and the desired location within the patient's circulatory system where the blood pump **12** is to be positioned.

The intravascular blood pump **12** is shown (by way of example only) as an axial flow intravascular blood pump. The blood pump **12** includes pump body **34**, a rotor shroud **36** having flow ports **38**, and an internally disposed rotor (not shown) having a shaft rotatably disposed within the pump body **34** and an impeller rotatably disposed within the rotor shroud **36**. The cannula **14** is fixedly attached to the rotor shroud **36** and may extend any suitable length therefrom depending upon the particular intravascular application. The cannula **14** preferably includes a plurality of ports or fenestrations **40** about its distal region, as well as an end port **42**, which allow for the ingress or egress of blood into or from the cannula **14** depending upon the operation of the blood pump **12**. That is to say, if the pump **12** is configured for left-heart assist as shown in FIG. **1**, then the ports **40**, **42** will allow the ingress of blood into the cannula **14** from the left ventricle. If, on the other hand, the blood pump **12** is configured for right-heart assist (i.e. with the pump **12** in the right atrium and the distal end of the cannula **14** located within the pulmonary artery), then the ports **40**, **42** will allow the egress of blood from the cannula **14** into the pulmonary artery. (Details on right-heart assist applications will be discussed in greater detail below.) The pump **12** and cannula **14** may be dimensioned to any suitable diameter for intravascular applications. For example, the range of sizes may include, but is not necessarily limited to, 9 French to 30 French, although the range is more preferably from 14 French to 24 French, and most preferably from 18 French to 20 French.

The "over-the-wire" type guide mechanism **16** includes the guide wire **22** and, as will be explained in greater detail below, a central lumen extending through the cannula **14**, blood pump **12**, drive cable assembly **18**, purge fluid delivery system **26**, and motor coupler **24**. As noted above, the central lumen is dimensioned to slideably receive the guide wire **22** such that the blood pump **12** and cannula **14** may be slideably advanced along the guide wire **22** to a desired location within the circulatory system of a patient after the guide wire **22** has been so positioned using conventional guidance techniques. It is to be readily understood that, while shown as a conventional guide wire **22**, the guide element forming part of the guide mechanism **16** of the present invention may include any number of well known guidance mechanisms depending upon the application, including but not limited to balloon catheters, imaging wires, and guide catheters dimensioned to be slideably received through the central lumen. For example, although not appropriate for retrograde progression (such as the left-heart application shown in FIG. **1**), a balloon catheter may be a suitable guidance mechanism for a right-heart

Case: 23-2045 Document: 8 Page: 151 Filed: 08/21/2023



assist application. In such a case, the balloon may be inflated and used as a "sail" to direct the catheter to a desired location (such as the pulmonary artery), after which point the blood pump **12** and cannula **14** can be advanced over the catheter to a trans-valvular configuration with the blood pump **12** in the right atrium and the ports **38**, **40** of the cannula **14** in the pulmonary artery.

FIGS. **3** and **4** further detail the construction of the blood pump **12**, cannula **14**, drive cable assembly **18**, and "over-the-wire" guide mechanism **16**. The blood pump **12** includes a rotor **44** having a shaft **46** and an impeller **48**. The shaft **46** is rotatably disposed within the pump body **34** via a bearing pack comprising, by way of example, ball bearing assemblies **50**, **52** and spring **54**. Ball bearings assemblies **50**, **52** are well known in the art, each comprising an inner race which rotates along with the rotor shaft **46**, an outer race which remains in a static and fixed position against the inner surface of the pump body **34**, and a plurality of ball bearings disposed between the inner and outer races. The spring **54** biases each bearing assembly **50**, **52** axially away from one another to reduce axial play during pump operation. The shaft **46** is generally hollow and dimensioned to receive a cable adapter **60** therein for the purpose of coupling the rotor **44** to a drive cable **62** forming part of the drive cable assembly **18**. The drive cable **62** may be secured to the cable adapter **60** in any number of suitable fashions, including but not limited to the use of adhesives, crimping, and laser welding. These same techniques may be used to secure the cable adapter **60** within the shaft **46** of the rotor **44**. A radial seal **64** is provided in between the wall of the pump body **34** and a distal stepped region **66** on the rotor shaft **46**, the function of which will be described below.

The impeller **48** includes a hub **56** and a plurality of blades **58** extending therefrom. The hub **56** is generally conical and, according to the first broad aspect of the present invention, is hollow throughout to form part of the central lumen of the guide mechanism **16**. In this regard, the hub **56** is preferably provided with a gasket or seal member **68** at its distal tip. The seal member **68** may be made of any suitable sealing material (including but not limited to silicone) such that the pump **12** and cannula **14** may be easily progressed along the guide wire **22** for delivery to a desired circulatory site. The seal member **68** should also be robust enough to prevent the ingress of blood into the interior of the rotor hub **56** during pump operation, whether the guide wire **22** remains in place or is fully withdrawn. The blades **58** are dimensioned to reside in close tolerance with the interior surface of the shroud **36**. In operation, the blades **58** impart both an axial and radial vector on the blood which causes it to flow outward through the flow ports **38** formed in the shroud **36**. As used herein, the term "axial flow" is deemed to include flow characteristics like that shown in FIG. **3**, which include both an axial and slight radial component. It is to be readily appreciated that, although shown as an axial flow type, blood pump **12** may comprise any number of suitable types of intravascular blood pumps, including but not limited to so-called "mixed flow" intravascular blood pumps without departing from the scope of the present invention.

The cannula **14** is coupled at its proximal end to the rotor shroud **36**. This may be accomplished in any number of fashions, including but not limited to the use of adhesives. This may also be facilitated by dimensioning the shroud **36** to include a narrow inlet region **70** capable of being received flushly within the proximal end of the cannula **14**. The inlet region **70** of the shroud **36** should preferably have a tapered interior surface for establishing a smooth flow transition between the cannula **14** and the region containing the impeller blades **58**. Although shown as a single integral element, it is to be understood that the pump body **34** and shroud **36** may comprise two separate (and sometimes separable) components, the significance of which will become apparent below. The pump body **34** and shroud **36** may be constructed from any number of suitable materials, including but not limited to stainless steel or other medical grade compositions or alloys. The cannula **14** may also be constructed from any number of suitable materials, including but not limited to medical grade plastics. As shown, the cannula **14** may also be fortified with spiral-wound reinforcement wire **72** within the walls of the cannula **14**.

The drive cable assembly **18** includes the drive cable **62** and the drive cable sheath **32**. The drive cable **62** is coupled to the rotor **44** via the cable adapter **60**. The drive cable sheath **32** includes a central lumen **74** and a plurality of side lumens **76**. The central lumen **74** serves as a protective covering for the drive cable **62**. The central lumen **74**, along with the side lumens **76**, also forms part of the purge fluid delivery system **26** shown above in FIG. **2**, which will be described in greater detail below. The side lumens **76** are provided in fluid communication with the fluid inlet conduit **28**, while the central lumen **74** is provided in fluid communication with the fluid outlet conduit **30**. The side lumens **76** are thus configured to deliver purge, fluid into the pump **12**, while the central lumen **74** is configured to transport purge fluid away from the pump **12** along the length of the drive cable **62**.

The pressurized purge fluid within the side lumens **76** may take one of two flow paths upon entry into the pump **12**. One flow path passes through the interior of the pump **12** and onward past the radial seal **64** to prevent the ingress of blood into the pump body **34** during pump operation. More specifically, the purge fluid flows distally around the cable adapter **60**, through the ball bearing assemblies **50**, **52**, and onward past the radial seal **64**. This egress of purge fluid past the radial seal **64** can be controlled to effectively thwart the ingress of blood past the radial seal **64**, which might otherwise cause clotting and/or pump damage. The other flow path is directed back out the central lumen **74** for delivery to the fluid outlet conduit **30**. In so doing, this flow path bathes the components of the pump **12** and/or drive cable **62** and thereby reduces frictional heating within the pump **12** and/or the central lumen **74** of the sheath **32** during pump operation.

The "over-the-wire" guide mechanism **16** includes a central lumen through which the guide wire **22** may extend for the purpose of slideably advancing the blood pump **12** and cannula **14** into a desired position within the circulatory system of a patient. In the embodiment shown, this central lumen is established by forming and co-aligning the individual central lumens within each of the drive cable **62**, the cable adapter **60**, the shaft **46** and hub **56** of the rotor **44**, and the cannula **14**. In this regard, the drive cable **62** is preferably of wound-wire construction having a central lumen formed therein. The central lumens within the cable adapter **60**, rotor **44**, and gasket **68** may be formed via machining or molding processes. These central lumens should preferably be sized such that they permit the slideable passage of the pump **12** and cannula **14** therealong, but do not interfere with or constrain the guide wire **22** to cause inadvertent rotation of the guide wire **22** during pump operation. As noted above, it is also contemplated to remove the guide wire **22** after the pump **12** and cannula **14** are properly positioned in the patient. In this case, the gasket or seal **68** on the hub **56** should be robust enough to reseal after the

Case: 23-2045 Document: 8 Page: 152 Filed: 08/21/2023



guide wire **22** is withdrawn and prevent the ingress of blood into the interior of the rotor **44**.

Referring to FIG. **5**, the motor coupler **24** includes a housing **78**, a drive shaft adapter **80**, and a bearing assembly **82**. The drive shaft adapter **80** includes a drive shaft coupler **84** dimensioned to receive a drive shaft of a motor (not shown), and a drive cable coupler **86** dimensioned to receive the drive cable **62**. Any of a variety of attachment techniques may be employed to securely fasten the drive cable **62** to the drive cable coupler **86**, including but not limited to adhesives, crimping, and laser welding. The drive shaft adapter **80** is rotatably disposed within the housing **78** by the bearing assembly **82**. The bearing assembly **82** includes a sleeve **88** (which may alternatively be formed as an integral part of the housing **78**) for retaining a pair of ball bearing assemblies **90**, **92** and a spring **94** of the type described above. That is, each bearing assembly **90**, **92** generally comprises an inner race which rotates along with the drive shaft adapter **80**, an outer race which remains in a static and fixed position against the inner surface of the retaining sleeve **88**, and a plurality of ball bearings disposed between the inner and outer races. The spring **94** is provided to bias each bearing assembly **90**, **92** axially away from one another to reduce axial play during operation.

The purge fluid delivery system **26** includes a housing **96** having a central lumen **98**, an inflow port **100**, and an outflow port **102**. The housing **96** is also dimensioned to matingly receive a portion of the motor coupler **24**. In this regard, a seal element **104** is provided sandwiched in between the housing **96** and housing **78** and including an aperture which extends about the drive shaft adapter **80** as it exits the housing **78** to prevent the ingress of purge fluid into the motor coupler **24**. A fluid guide structure **106** is also provided within the central lumen **98** for the purpose of separating the inflow and outflow ports **100**, **102**. The fluid guide structure **106** includes a central lumen **108** through which the drive cable **62** extends, and an elevated portion **110** that retains an O-ring **112** against the inner surface of the central lumen **98** of the housing **96**. The drive cable sheath **32** is secured to the housing **96** such that the inflow port **100** is communicatively coupled to the side lumens **76**, and the outflow port **102** is communicatively coupled to the central lumen **74**. In this fashion, pressurized purge fluid may be introduced through the inflow port **100** via inflow conduit **28**, and removed through the outflow port **102** via outflow conduit **30**. By way of example, the inflow conduit **28** and outflow conduit **30** may be coupled to their respective ports **100**, **102** via barbed connectors **114**. Similarly, the inflow and outflow conduits **28**, **30** may be equipped with any number of suitable connectors (such as those illustrated by way of example in FIG. **2**) for establishing fluid communication with a source of pressurized fluid (not shown). The pressurized fluid source (not shown) may include, but is not necessarily limited to, the use of a syringe, an indeflator, a fluid delivery pump, or an accumulator arrangement to provide the requisite delivery of pressurized fluid. The purge fluid delivery system **26** thus provides a two-way transmission of purge fluid within the drive cable sheath **32** for the purposes of cooling the blood pump **12** and preventing the ingress of blood past the radial seal **64** and into blood pump **12**.

Referring to FIG. **6**, shown is a guidable intra-vascular blood pump system **120** according to a second broad aspect of the present invention. As will be described hereinafter, the intravascular blood pump system **120** differs from the intravascular blood pump system **10** described above only as to the type of guide mechanism employed. In the interest of clarity and consistency, then, like reference numerals will be used to denote like elements and distinctions pointed out where necessary. Moreover, due to the commonality of principles employed in both intravascular blood pump systems **10**, **120**, a discussion to the level of detail set forth above is not deemed necessary with regard to the intravascular blood pump system **120**. Instead, those aspects in common with the intravascular blood pump **10** are hereby incorporated into the discussion of the intravascular blood pump system **120**.

In its most general form, the intravascular blood pump system **120** of this second broad aspect of the present invention comprises the blood pump **12** and cannula **14** arrangement, wherein the cannula **14** is equipped with a "side-rigger" or "rapid exchange" guide mechanism **122**. In an important aspect of the present invention, the "rapid exchange" or "side-rigger" guide mechanism **122** includes a guide carriage **124** formed along at least a portion of the cannula **14**, and a suitable guide element (such as guide wire **22**) dimensioned to pass slidably through a lumen (not shown) extending through the guide carriage **124**. The "rapid exchange" guide mechanism **122** thereby provides the ability to selectively guide the blood pump **12** and cannula **14** to a predetermined position in the circulatory system of a patient in the manner described above. Namely, the guide wire **22** may be first introduced into the vascular system of a patient through any suitable access point and guided to a desired location within the circulatory system of the patient, i.e. the left ventricle as shown. The blood pump **12** and cannula **14** may thereafter be advanced along the guide wire **22** and positioned in the trans-valvular configuration shown for providing left-heart assist.

FIGS. **7-9** further illustrate the "side-rigger" or "rapid-exchange" guide mechanism **122** of this second broad aspect of the present invention. In a preferred embodiment, the "side-rigger" guide mechanism **122** includes a lumen **126** formed within the guide carriage **124**. The guide carriage **124** is preferably formed as an integral extension of the wall of the cannula **14**. FIGS. **7** and **8** comport with the embodiment shown in FIG. **6**, namely illustrating the guide carriage **124** formed along the exterior surface of the cannula **14**. FIG. **9** illustrates an alternate embodiment wherein the guide carriage **124** may be formed along the interior surface of the cannula **14**. In either case, the guide wire **22** is advanced to a desired location in the vasculature of the patient, after which point the blood pump **12** and cannula **14** can be slidably advanced therealong for delivery to the desired location according to the present invention. The guide wire **22** may thereafter be withdrawn from the patient. If the guide carriage **124** is formed along the exterior surface of the cannula **14** (as shown in FIGS. **7-8**), then the cannula **14** should preferably be positioned so that the guide carriage **124** does not extend in a trans-valvular fashion. For example, with reference to FIG. **6**, the guide carriage **124** should be positioned wholly within the left ventricle such that the pulsatile blood flow during beating heart procedures will not inadvertently pass through the side lumen **126** and pass through the aortic valve.

The intravascular blood pump system **120** is constructed in virtually the same manner as the intravascular blood pump system **10** shown and described above, with the exception of the location of the respective guide mechanisms **16**, **122**. More specifically, because the guide mechanism **122** is disposed along the side of the cannula **14**, there is no need to form a central lumen extending through the blood pump **12**, drive cable assembly **18**, purge fluid delivery system **26**, and motor coupler **24** as detailed above with

Case: 23-2045 Document: 8 Page: 153 Filed: 08/21/2023



regard to the intravascular blood pump system **10**. As such, these components need not be specially machined or molded to include such central lumens as was required with the intravascular blood pump system **10** set forth above.

Referring to FIG. **10**, shown is a guidable intravascular blood pump system **130** according to a third broad aspect of the present invention. Again, due to the commonality between many of the same components and features of the intravascular blood pump systems described above and the intravascular blood pump system **130**, like reference numerals will be used to denote like elements and distinctions pointed out where necessary. As will be explained in greater detail below, the intravascular blood pump system **130** employs yet another unique and useful guide mechanism according to the present invention. However, because many of the same components are employed, a discussion to the level of detail set forth above is not deemed necessary with regard to the intravascular blood pump system **130**. Instead, those aspects in common with the intravascular blood pumps described above are hereby incorporated into the discussion of the intravascular blood pump system **130**.

In its most general form, the intravascular blood pump system **130** of this third broad aspect of the present invention comprises the blood pump **12** and cannula **14** arrangement, wherein a "guide catheter" **132** is provided as the guide mechanism for positioning the pump **12** and cannula **14** at a desired location within the circulatory system of the patient. More specifically, with brief reference to FIG. **12**, the intravascular blood pump system **130** is formed in two separate assemblies according to the present invention: a conduit assembly **134** and pump assembly **136**. In its most basic form, the conduit assembly **134** comprises the guide catheter **132** and cannula **14** coupled to the rotor shroud **36**. The pump assembly **136** is constructed such that the pump body **34** and rotor **44** can be disengaged from the rotor shroud **36** and removed entirely from the conduit assembly **134**. Referring again to FIG. **10**, this dual construction forms a significant feature of the present invention because it provides the ability to form the blood pump **12** at a desired location in a patient using two separate and distinct steps. The first step involves positioning the conduit assembly **134** (with the pump assembly **136** removed) within a patient such that the shroud **36** and cannula **14** are each disposed in a desired location, such as a trans-valvular configuration for cardiac assist procedures. In an important aspect, the task of positioning the conduit assembly **134** within the patient may be advantageously facilitated through the use of any number of well known guidance mechanisms, including but not limited to guide wires, balloon catheters, imaging wires, guide catheters, and/or techniques involving ultra-sound or flouroscopy. The second step in providing the intravascular blood pump system **130** of the present invention involves advancing the pump assembly **136** through the conduit assembly **134** such that the rotor **44** docks within the shroud **36** to form the pump **12** at the desired location.

By way of clarification, the term "cannula" is used to denote cannula **14** because it serves a primary purpose of transporting fluid into the blood pump **12**, whereas the term "catheter" is used to denote the catheter **132** because it serves a primary purpose of guiding or directing devices or components (i.e. the pump assembly **136**) to a desired location within the body. It is to be readily understood, however, that these terms are only used for convenience and in a general fashion such that the cannula **14** may serve certain guiding functions and the catheter **132** may serve certain fluid transportation functions without departing from the scope of the present invention. For example, the cannula **14** may be equipped with dedicated lumens to receive various guide mechanisms (such as guide wires, balloon catheters, selectively deformable elements such as Nitonol, etc). In similar fashion, the guide catheter **132** may be used to transport fluid to and/or from the patient, such as by providing apertures **138** along predetermined regions of the catheter **132**.

FIG. **11** demonstrates a significant feature of the present invention involving the use of the guide catheter **132** to transport fluid to and/or from the patient. An optional perfusion assembly **140** is provided as part of the intravascular blood pump system **130** of the present invention. The perfusion assembly **140** includes a conduit **142** in fluid communication with the apertures **138**, which in this case are formed near the distal region of the guide catheter **132** a short distance downstream from the blood pump **12**. In use, blood will pass along the exterior of the guide catheter **132** for distribution throughout the body, as well as within the interior of the guide catheter **132** after passing into the apertures **138**. The perfusion assembly **140** may then be employed to selectively reroute blood from within the guide catheter **132** to a point within the patient's vasculature downstream from the point where the guide catheter **132** enters the body. A hemostasis valve assembly **146** of the perfusion assembly **140** permits the drive cable assembly **18** to pass through to the purge fluid delivery system **26** while preventing blood flow other than into the perfusion assembly **140**. A seal assembly **150** of the purge fluid delivery system **26** permits the drive cable **62** to pass through to the motor **20** while preventing the flow of purge fluid other than into and from the purge fluid delivery system **26**. The perfusion assembly **140** includes a control mechanism **148** for selectively controlling the distribution of perfusion blood flow from the perfusion assembly **140** into the patient. This control mechanism **148** may be automatic based on certain feedback criteria or manually operated.

FIGS. **12-17** illustrate an exemplary construction of the intravascular blood pump system **130** according to the third broad aspect of the present invention. As shown in FIG. **12**, the conduit assembly **134** may be selectively disengaged so as to remove the pump assembly **136** therefrom. According to the present invention, the conduit assembly **134** may be introduced (without the pump assembly **136**) into the circulatory system of a patient and selectively guided such that the rotor shroud **36** and cannula **14** are positioned at a desired location. The pump assembly **136** can thereafter be selectively introduced into the conduit assembly **134**. A challenge in such a "back-loading" arrangement is ensuring that the pump assembly **136** docks appropriately within the rotor shroud **36** and is maintained in proper engagement during operation of the resulting pump **12**.

An exemplary docking arrangement will now be described with reference to FIG. **14**. In a preferred embodiment, the rotor **44** may be properly and accurately docked within the shroud **36** by forming angled mating surfaces on corresponding portions of the shroud **36** and pump body **34**. More specifically, an angled mating surface may be formed on the interior surface of the rotor shroud **36** along that portion extending proximally from the flow aperture **38**. A corresponding angled mating surface may be provided along the exterior surface of the pump body **34** along a distal portion thereof. The mating surfaces shown in FIG. **14** may preferably be formed in the range from about 2 degrees to 10 degrees, and more preferably formed in the range from about 3 degrees to 6 degrees. Mating angles within these ranges are adequate to guide the distal end of the pump body **34** to a point generally flush with the proximal edge of the flow

Case: 23-2045 Document: 8 Page: 154 Filed: 08/21/2023



aperture **38** as shown in FIG. **14**. In this fashion, the pump assembly **136** and the rotor shroud **36** combine to form the blood pump **12**. More importantly, this docking is carried out such that the rotor **44** and rotor blades **58** are maintained in proper position for efficient and safe pump operation.

An exemplary biasing scheme for maintaining the pump assembly **136** in this docked relationship will now be described with reference to FIGS. **12-13** and **16-17**. The conduit assembly **134** is preferably equipped with a male quick-connect coupling **152** capable of engaging with a female quick-connect coupling **154** forming part of the perfusion assembly **140** of the present invention. A bias spring **156** is provided in between the perfusion assembly **140** and the housing **96** of the purge fluid delivery system **26**. The bias spring **156** is preferably dimensioned so as to be in tension when the male quick-connect **152** is engaged within the female quick-connect **154** as part of the docking process of the present invention. As such, the bias spring **156** serves to maintain the pump assembly **136** in the docked position within the rotor shroud **36**. The bias spring **156** may be coupled to the housing **96** of the purge fluid delivery system **26** in any number of suitable fashions. One such coupling arrangement may comprise a female quick-connect coupling **158** attached to the housing **96** and a male quick-connect coupling **160** attached to the bias spring **156**.

An exemplary embodiment of the perfusion assembly **140** is shown with reference to FIGS. **12-13** and **17**. The perfusion assembly **140** shown includes the hemostasis valve **146** coupled to the female quick-connect coupling **154**. A length of tubing **162** extends between the opposing barb connectors of the hemostasis valve **146** and the female quick-connect coupling **154**. A continuous lumen is formed extending through the interior of the male quick-connect coupling **152**, the female-quick-connect coupling **154**, the tubing **162**, and the hemostasis valve **146**. The drive cable assembly **18** extends through this continuous lumen and exits through a Touehy-Borst hemostasis seal **164** which prevents the migration of blood out of the proximal end of the perfusion assembly **140**. A side-port **166** is disposed in fluid communication with the central lumen of the perfusion assembly **140**. In one embodiment, this side-port **166** may be equipped with a conduit **168** having a stop-cock **170** to selectively control the distribution of blood through a perfusion conduit (i.e. conduit **142** of FIG. **11**) coupled to the stop-cock **170**. It will be appreciated that this type of manual control system for selectively perfusing the patient may be replaced with control circuitry for automatically controlling the rate of perfusion. Such automatic perfusion may be based on control algorithms based on contemporaneous feedback or pre-programmed thresholds.

The foregoing discussion details a host of inventive aspects forming part of the present invention. It will be appreciated by those skilled in the art that changes could be made to the embodiments described above without departing from the broad inventive concepts thereof. The following evidences, by way of example only, various additional aspects forming part of the present invention.

FIG. **18** illustrates an alternate configuration of the intravascular blood pump system **130** of the third broad aspect of the present invention having an alternate bearing assembly, purge fluid delivery, and docking scheme. The bearing assembly includes a seal spring **182** and a bearing assembly **180**. The bearing assembly **180** includes an inner race **184**, an outer race **186**, and a plurality of balls **188** which enable the inner race **184** to rotate along with the rotor shaft **46** while the outer race **186** remains in a static and fixed position relative to an inner surface of the pump body **34**. An O-ring **190** is disposed within a groove formed in the rotor shaft **46** so as to maintain the bearing assembly **180** against the seal spring **182**. The O-ring **190** is further secured within the groove in the rotor shaft **46** via a contoured lip portion extending from the distal end of the cable adapter **60**. The proximal end of the cable adapter **60** flushly engages the drive cable **62**.

The purge fluid delivery system of the embodiment shown in FIG. **18** provides for a one way delivery of purge fluid to the blood pump **12**. That is, pressurized fluid (namely, fluid pressurized to some level elevated above the blood pressure in the surrounding vessel) is injected in between the drive cable **62** and the interior of the protective sheath **32** during operation. This serves to reduce any frictional heating that exists between the drive cable **62** and sheath **32**. The pressurized fluid also flows through the interior of the pump **12** such that, if the seal at **192** is broken, the pressurized fluid will flow past the open seal **192** and onward through the blood flow ports **38** formed in the shroud **36**. This serves to keep blood from entering the pump **12** in an effort to avoid clotting and/or damaging the pump **12**.

The pump assembly **136** may be docked within the conduit assembly **134** in any number of different fashions without departing from the scope of the present invention. That is to say, the docking scheme shown in FIG. **18** is set forth by way of example only and is not to be deemed limiting or restrictive as to numerous ways to temporarily engage or "dock" the pump assembly **136** within the conduit assembly **134**. The only requirement is that the pump assembly **136** and conduit assembly **134** dock such that the rotor **44** is disposed within the shroud **36** to provide the desired axial flow through the cannula **14** and out the shroud **36**. The exemplary docking scheme involves forming an annular engagement groove **194** along the interior of the shroud **36**, and forming a complementary annular ridge **196** along the exterior surface of the pump body **34**. During insertion, the pump assembly **136** will be advanced into the conduit assembly **134** until the annular ridge **196** on the pump body **34** engages within the groove **194** formed in the shroud **36**. This docking scheme is generally advantageous in that the engagement action between the annular ridge **196** and groove **194** will provide tactile feedback to the physician during the process of inserting the pump assembly **136** into the conduit assembly **134** such that the physician will be able to determine when the docking has been completed.

As will be appreciated by those skilled in the art, the location of the annular ridge **196** and engagement groove **194** may be varied such that they are disposed closer or farther away from the flow apertures **38**. It may be advantageous to form these docking structures close to the flow apertures **38** in an effort to thwart the ingress of blood into the junction extending between the interior of the shroud **36** and the exterior surface of the pump body **34**. It is also contemplated to employ selectively inflatable structures, such as balloons, in an effort to temporarily engage or dock the pump assembly **136** within the conduit assembly **134**. In this regard, one or more lumens may be formed within the pump body **34** extending from the interior of the pump body **34** in fluid communication with a balloon disposed along the exterior surface of the pump body **34**. The pressurized fluid flowing within the interior of the pump body **34** may then be used to inflate the balloon, which will then engage within an annular groove in the shroud **36**, such as at **194**. Of course, the engagement structures may also be reversed without departing from the scope of the present invention. For example, the shroud **36** may be equipped with a fluid delivery lumen therein for inflating a balloon disposed on

Case: 23-2045 Document: 8 Page: 155 Filed: 08/21/2023



the interior surface of the shroud **36**, which may in turn be disposed within an annular engagement groove formed along the exterior surface of the pump body **34**.

While this invention has been shown in use largely in during left-heart applications it is to be readily appreciated that this does not limit the applications of this invention for use in left heart support only. Rather, the guidable intravascular blood pump of the present invention can be utilized in right-heart support applications and a wide variety of other applications apparent to those skilled in the art. For example, with reference to FIG. **19**, shown is an intravascular blood pump **200** (of the type shown and described above with reference to FIGS. **2**-**5**) configured for use in a right-heart support application. In this embodiment, the intravascular blood pump system **200** is equipped, by way of example, with an "over-the-wire" guide mechanism **16** comprising a balloon catheter **202**. It is to be readily appreciated that, although shown and described below in terms of an embodiment of the type shown in FIGS. **2**-**5**, the intravascular blood pump systems **120**, **130** disclosed herein may also be configured for use in right-heart applications. Such right-heart configurations, and others apparent to those skilled in the art based on the broad principles enumerated in this application, are contemplated as being within the scope of the present invention.

The intravascular blood pump system **200** is shown positioned within the heart, such as may be advantageous to provide right heart support during beating heart surgery. To position the guidable intravascular blood pump system **200** in the right heart according to the present invention, a suitable guide element (such as balloon catheter **202**) is first advanced to a desired location within the heart via the "sail" action of an inflated balloon. After the balloon catheter **202** is located in the desired position (such as in the pulmonary artery as shown), the intravascular blood pump system **200** according to the present invention may be advanced over the balloon catheter **202** and guided into a desired arrangement. For right heart support, this would involve advanced into the pump **12** and cannula **14** overt the balloon catheter **202** until the fluid inlet **204** is disposed within the vena cava (or right atrium) and the fluid outlet **206** is positioned within the pulmonary artery. The pump **12** may then be selectively (i.e. automatically or on-demand) controlled to transport blood from the vena cava (or right atrium) in a trans-valvular fashion through the tricuspid valve, the right ventricle, and the pulmonary valve for deposit within the pulmonary artery. Providing right-heart support during beating heart surgery advantageously overcomes conditions where cardiac output may become compromised during beating heart surgery, such as when the heart is lifted to gain access to posterior vessels, thereby avoiding the need for cardiopulmonary bypass.

It is also contemplated as part of the present invention that the guidable intravascular blood pump systems can be introduced into the patient's vasculature to achieve the intravascular access into the right or left heart through any number of access points, including but not limited to the internal jugular vein, the brachiocephalic vein, carotid artery, axillary artery, femoral vein, femoral artery, and subclavian artery. The intravascular blood pump systems of the present invention may also be introduced via direct introduction, such as into the aorta, the atria, and the ventricles. As is well known in the art, such intravascular access may be achieved percutaneously through the use of the Seldinger technique or directly through the use of minimally invasive access techniques.

Those skilled in the art will also appreciate that, although shown and described above in terms of "axial flow," the present invention is not limited to the axial flow type intravascular blood pumps. Rather, the intravascular blood pumps **12** may comprise any number of suitable types of intravascular blood pumps, including but not limited to so-called "mixed flow" intravascular blood pumps, without departing from the scope of the present invention.

With regard to the embodiments shown in FIGS. **10**-**17**, it is furthermore contemplated that the guide catheter **132** may be separable from the conduit assembly **134** after the pump assembly **136** is docked within the shroud **36** to form the pump **12** at the desired location within the circulatory system of the patient. This may be accomplished by providing the guide catheter **132** in a detachable fashion via any number of suitable arrangements. By removing the guide catheter **132** after the pump **12** assembled, wound management of the access point into the patient's vasculature may be improved. This is due, in part, to the substantial reduction in size of the device extending into the patient (i.e. the drive cable assembly **18** as opposed to the larger diameter guide catheter **132**).

It is also contemplated to incorporate various pressure sensing and/or guidability features into at least one of the cannula, **14** and pump **12**. Such features may include, but are not necessarily limited to, those shown and described in commonly-owned and co-pending U.S. patent application Ser. No. 09/280,988 (filed Mar. 30, 1999) entitled "Steerable Cannula," and U.S. patent application Ser. No. 09/280,970 (filed Mar. 30, 1999) entitled "Pressure Sensing Cannula," the disclosures of which are hereby expressly incorporated by reference as if set forth herein in their entirety and physically incorporated as APPENDIX A and APPENDIX B respectively to the present specification. These pressure sensing features may include, but are not necessarily limited to, the use of fluid-filled lumens, piezo-electric pressure sensing elements, strain gauges, and analysis of the torque/current relationship (based on the dynamic pressure differential between the inlet and outlet of the pump). The guidability features may include, but are not necessarily limited to, the use of side lumens and deformable materials (i.e. Nitonol).

Various pump and cannula arrangements have been described and shown above for providing right and/or left heart support wherein blood is deliberately re-routed through and past the right and/or left ventricle in an effort to reduce the volume of blood to be pumped by the particular ventricle. While "unloading" the ventricles in this fashion is preferred in certain instances, it is to be readily understood that the pump and cannula arrangements described herein may also be employed to "preload" the ventricles. Ventricular preloading may be accomplished by positioning the outflow cannula from the pump into a given ventricle such that the pump may be employed to fill or preload the ventricle with blood. This may be particularly useful with the right ventricle. On occasion, the right ventricle is not supplied with sufficient levels of blood from the right atrium such that, upon contraction, the right ventricle delivers an insufficient quantity of blood to the pulmonary artery. This may result when the right ventricle and/or right atrium are in a stressed or distorted condition during surgery. Preloading overcomes this problem by actively supplying blood into the right ventricle, thereby facilitating the delivery of blood into the pulmonary artery. The same technique can be used to

preload the left ventricle and thus facilitate the delivery of blood from the left ventricle into the aorta.

Appendix A—(U.S. Ser. No. 09/280,988)

Steerable Cannula

Background of the Invention

1. Field of the Invention

The invention relates to vaqscular cannulas for use in medical procedures.

2. Description of Related Art

In medical applications and specifically in surgery, the list of uses for cannulas is exhaustive. Cannulas are to be distinguished from catheters in that catheters generally have a substantially smaller fluid-carrying capacity are used primarily for sampling or measurement purposes or for delivery of small quantities of fluid, whereas cannulas are generally larger and are used for volumetric fluid transfer. One application of cannulas involves the augmenting or supplementing of pulmonary blood flow through the beating heart during cardiac-surgery by use of one or more cannulas involved in the intake and return of blood into the circulatory system. The cannulas interface between the patient's circulatory system and the mechanical pumps that power the augmentation procedure. Such an application is described in co-pending PCT Application no. PCT/US97/18674 entitled "Single Port Cardiac Support Apparatus", filed Oct. 14, 1997 and incorporated herein by reference in its entirety.

As will be appreciated, precise and quick placement of the cannula in surgical applications is critical, given the severe time constraints facing a surgeon whose patient's vital life sustaining functions have been suspended during the procedure. Currently, methods for placing cannulas in a patient's body are crude, in that they rely on guesswork and trial and error. Specifically, a surgeon will insert the cannula and direct it towards the desired destination, but ultimately must feel by hand, through the patient's tissue for example, whether it has reached that destination. The surgeon may be forced to make several retractions and re-insertions until the process succeeds. Shortcomings of such a procedure are clear and may include damage to the delicate tissue involved and waste of valuable lime. Additionally, constraints on the flexibility of the material are imposed since a prescribed amount of rigidity is required to enable the cannula to be felt through the tissue and insure that the cannula does not collapse under insertion force.

Alternatively, the surgeon may rely on the use of guiding devices such as a guide wire threaded through the cannula. The guide wire is often easier to manipulate than the cannula, and its placement precedes placement of the cannula. After the guide wire is in place, the cannula is pushed along the length of the guide wire, following the guide wire to the desired destination.

It is also known that a flow directed balloon catheter can be used as a guide wire. Balloon catheters are well known in the art and have a multitude of uses, including delivery or removal of fluid from the surgical site. However, flow directed balloon catheters arc typically at least an order of magnitude smaller than cannulas. Their small size accordingly severely limits their application since both quantity and rate of fluid flow through the catheter are limited. In fact it is precisely because of their small size thai flow directed balloon calhcters can be used as guiding devices for the larger, more robust and versatile cannulas. During use as a guiding device for a cannula, the flow directed balloon catheter acts as a guide wire in facilitating the advancement of the cannula to the desired destination. The flow directed balloon catheter is first inserted into place in the patient's body, and the cannula, threaded around the flow directed balloon catheter, is then advanced into the desired position.

Insertion of the flow directed balloon catheter is effected using the inflatable balloon disposed at a distal tip of the flow directed balloon catheter. A lumen in communication with the balloon delivers inflating fluid in the balloon, thereby inflating the balloon and causing it to operate as a "sail" which is pulled along in the blood stream through the natural blood flow in the patient's circulatory system.

The above procedures have met with only limited success, and there exists a long felt need for devices and methods that facilitate placement of a cannula in a patient's body. A system that will assist in the manipulation of the cannula through the vascular structure or other bodily regions of the patient would accordingly serve to make the placement process more efficient and less time-consuming, improving the chance of overall success of a surgical procedure.

Brief Summary of the Invention

The present invention overcomes the deficiencies of the prior art by providing a cannula which can be steered during its advancement in the body of the patient. Steering is implemented using cables connected to a deformable portion of the cannula. The cables extend to the proximal end of the cannula from where the operator can selectively apply tensional forces to thereby cause the cannula to curve at the deformable portion. The deformable portion is disposed preferable at the distal end of the cannula, but may be located at other sites along the length of the cannula.

In accordance with a second embodiment of the invention, the cannula is provided with more than one cable for facilitating deformation along multiple planes. Additionally, preformed curves may be provided along the length of the cannula, which curves can be either augmented or straightened by applied tension to the cables.

The cannula, in accordance with a third embodiment, is provided with a spiraling wire formed in the cannula wall. The spiraling wire operates to provide rigidity to the body of the cannula and maintain good fluid flow therein. The spiraling wire may comprise a portion of the cable used to impart deformation in an arrangement in accordance with a fourth embodiment of the invention.

In accordance with a fifth embodiment of the invention, the steerable cannula is provided with an inflatable balloon at the distal end thereof for assisting in guiding the cannula to its desired destination. The inflatable balloon is selectively inflatable using a lumen which effects fluid communication between an fluid source and the balloon.

In accordance with a fifth embodiment of the invention, the steerable cannula is provided with an inflatable balloon at the distal end thereof for assisting in guiding the cannula to its desired destination. The inflatable balloon is selectively inflatable using a lumen which effects fluid communication between an fluid source and the balloon.

In accordance with a sixth embodiment of the invention, a steerable cannula having a pigtail distal tip configuration is provided.

In accordance with a seventh embodiment of the invention, a steerable cannula having a movably supported guide wire is provided.

In accordance with an eighth embodiment of the invention, a steerable cannula having an integrally formed guide wire is provided.

Case: 23-2045 Document: 8 Page: 157 Filed: 08/21/2023





In accordance with a ninth embodiment of the invention, a steerable cannula is used in a co-axial cannula arrangement.

Brief Description of the Several Views of the Drawing(s)

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. **20** is schematic side view of a steerable cannula in the undeformcd state in accordance with the first embodiment of the invention;

FIG. **21** is a schematic cross-sectional view of the steerable cannula of FIG. **20** taken along line A-A;

FIG. **22** is a schematic side view of the steerable cannula in the deformed state in accordance with the first embodiment;

FIG. **23** is a schematic cross-sectional view of a steerable cannula having two cables in accordance with a second embodiment of the invention;

FIG. **24** is a schematic side view of a steerable cannula having a reinforcing wire in accordance with a third embodiment of the invention;

FIG. **25** is a schematic cut-away view of a steerable cannula in accordance with a fourth embodiment of the invention;

FIG. **26** is a schematic cross-sectional view taken along line B-B of FIG. **25**;

FIG. **27** is a schematic side view of a steerable cannula having a preformed curve and an inflatable balloon formed at a distal end thereof in accordance with a fifth embodiment of the invention;

FIG. **28** is a schematic side view of the inflatable balloon of fifth embodiment of the invention, wherein the balloon is shown in the inflated state;

FIG. **29** is a schematic cross-sectional view taken along line C-C of FIG. **28**;

FIG. **30** is a schematic view showing a steerable cannula having a pigtail distal tip configuration in accordance with a sixth embodiment of the invention;

FIG. **31** is a schematic view showing a steerable cannula having a guidewire distal lip configuration in accordance with a seventh embodiment of the invention;

FIG. **32** is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with an eighth embodiment of the invention:

FIG. **33** is a schematic side view showing a steerable cannula used in a co-axial configuration in accordance with a ninth embodiment of the invention, wherein the steerable cannula is advanced to a first relative position;

FIG. **34** is a schematic side view showing a steerable cannula of FIG. **33**, wherein the steerable cannula is advanced to a second relative position; and

FIG. **35** is a schematic side view of a configuration in accordance with a tenth embodiment of the invention.

Detailed Description of the Invention

The present invention comprises a steerable cannula in which a portion which is adapted for insertion into the body of a patient, preferably into the vascular system of the patient, is configured to be selectively deformable. The deformation aids in changing the direction of the cannula during the insertion process such that the cannula can be steered in a desired direction as it is advanced toward its destination in the patient's body. Deformation is effected using a cable connected with the deformable portion of the cannula. Tension on the cable, induced by for example rotating a portion of a handle disposed at a proximal end of the cannula exterior of the body of the patient, results in tension on one wall of the deformable portion and thereby causes it to bend in the direction of the cable.



With reference lo FIGS. **20-23** in which an exemplary arrangement in accordance with a first embodiment of the invention is shown, cannula **1120** can be seen as comprising a substantially cylindrical structure having a wall **1122** which defines a main lumen **1124**. Lumen **1124** is adapted for fluid transport to or from the body of the patient and may be provided with one or more holes **1126** located adjacent to distal tip **1128** and permitting passage of fluid therethrough. Holes **1126** supplement fluid flow through main port **1125**, especially in situations of blockage of main port **1125**. Cannula **1120** may be one of two complementary cannulas (not shown) used in a surgical procedure, one for intake and the other for removal of blood or other fluid from the patient'body. Alternatively cannula **1120** may comprise a component of a co-axial, single port device in which cannula **1120** is surrounded by a second, larger conduit, with cannula **1120** for example operating to intake blood from the patient towards a pump system and the conduit operating to replace the blood from the pump back into the patient for augmentation of blood flow during beating heart surgery as described in co-pending PCT Application no. PCT/US97/18674 mentioned above.

At a proximal end **1130** of cannula **1120** is provided a handle **1132** which serves to transmit turning forces applied by an operator's hand to the cannula to aid in its manipulation in the patient's body. As such, handle **1132** is rigidly attached to wall **1122** of cannula **1120**, although portions of handle **1132** may be configured for motion relative to cannula **1120** in order impart the necessary tension on cables used for deforming the cannula **1120** as described below. Rotation of the rigidly attached portion of handle **1132**, results in a corresponding rotation of the distal end **1128** of the cannula **1120** within the patient's body, thus aiding in the cannula's manipulation and advancement to the desired destination.

Wall **1122**, in addition to defining main lumen **1124** of cannula **1120**, contains a secondary lumen **1136** formed therein. Movably mounted in lumen **1136** is a cable **1138** which is secured at point **1140** in wall **1122**. Point **1140** may be disposed anywhere along the length of the cannula **1120**, but in the preferred embodiment lies at distal end **1128**.

Cannula **1120** is provided with a deformable portion **1142** formed along at least a segment of its length. In the exemplary arrangement shown in FIGS. **20-22**, deformable portion **1142** is disposed in close proximity to distal end **1128** of cannula **1120**; however, it is to be understood that this not intended to be limiting and that other regions in the cannula **1120** can alternatively or additionally be made deformable depending on the contemplated application.

Deformable portion **1142** serves to cause cannula **1120** to bend in response to tension applied to cable **1138** and thereby assume a configuration as shown in FIG. **22**. Depending on the location of point **1140** and the location of lumen **1136** radially and axially along wall **1122**, applied tension to cable **1138** causes cannula **1120** to turn on itself in the direction of pull to thereby assume a curve having a predetermined orientation. Additionally, if cannula **1120** is provided with one or more preformed curves, which may be in identical or in different planes along the length of the

Case: 23-2045 Document: 8 Page: 158 Filed: 08/21/2023



cannula as is contemplated, tension in cable **1138** can operate to temporarily straighten the cannula along at least one of these planes to facilitate handling during a particular maneuver through the patient's body.

It is also contemplated that more than one cable can be provided, supported in suitable secondary lumens formed in cannula **1120**. As can be seen from FIG. **23**, a second lumen **1146** can be provided in wall **1122** of cannula **1120**. second lumen **1146** movably supporting cable **1144** therein. Cables **1138** and **1144** are thus disposed on opposite sides of cannula **1120** and serve to provide steerabilily in two directions. The cables are configured such that a pulling of one cable is coordinated with a slacking of the other cable in order permit bending of cannula **1120** at deformable portion **1142**. Although shown to be diametrically opposed in position, cables **1138** and **1144** can occupy any position along wall **1122**, and it will be appreciated that the number of such cables used can vary depending on the application, as can their distribution in wall **1122**, and any desired number of turning directions can accordingly be achieved in accordance with the present invention.

Wall **1122** can be formed of materials ranging from rigid to flexible, and in the preferred embodiment comprises a semi-rigid transparent material such as silicone rubber. Of course it is to be understood that by definition deformable portion **1142** is to be constructed of a flexible material, regardless of the construction of the remainder of the wall **1122**, such that cannula **1120** can bend when appropriate pulling forces are imparted through the cable(s).

Selective bending of cannula **1120** can also be facilitated using a core member provided for this purpose. Core member **1182**, preferable formed of material having appreciable stiffness relative to wall **1122**, is disposed longitudinally within cannula **1120** and serves to provide a deflection point to locate and control the bending point of the cannula. Core **1182** is removable and can be movable distally or proximally within cannula **1120** in order to alter the deflection point. In this manner also flow blockage in the cannula **1120** can be insured during insertion.

As can be seen from FIG. **24**, a spiraling wire **1148** can be provided for structural reinforcement of cannula **1120**. Wire **1148** is either molded into the wall **1122** or is otherwise supported therein, and extends either partially or fully across the length of the cannula **1120**. Wire **1148** facilitates handling of the cannula **1120** and reduces the possibility of cannula **1120** collapsing or being pinched shut and thus closing off the flow of fluid to or from the patient. Other ways of reinforcing the tubular body of cannula **1120** are known in the art and will adapt equally well to the present invention. In addition, no reinforcement may be needed if the cannula material is sufficiently rigid or if sufficient fluid flow is present within the cannula.

Alternatively, as shown in FIGS. **25-26**, spiraling wire **1148** can itself comprise a portion of cable **1138**. In such an arrangement, cannula wall **1122** is formed of two layers **1162** and **1164**, between which is formed a lumen **1166**. Layers **1162** and **1164** may be discrete layers bonded together at appropriate regions, or they may be a single layer folded back upon itself to form the two layers, with lumen **1166** and wire **1148** occupying predetermined regions therebetween. Cable **1138** is housed in a polymide tube **1170** disposed in lumen **1166** and extends beyond the end **1168** of tube **1170** to then spiral exteriorly of inner layer **1162** and interiorly of outer layer **1164** to thereby lend structural support to the cannula **1120**. Metal or other tape **1172** can be used to secure spiraling wire **1148** in place. In a variation of this, cable **1138** and wire **1148** may be two discrete components which are welded or otherwise connected together at any desired point along the body of cannula **1120**. Alternatively, as shown in FIG. **35**. cable **1138** may be secured to a band **1184** disposed radially about or adjacently to tip **1186** of cannula **1120**. In all of these variations, cable **1138** may be formed of single or multiple strands of metal, plastic or carbon fiber composite, but preferably cable **1138** is formed of a single strand of stainless steel having a TEFLON™ coating. In the FIGS. **33-35** arrangements, cannula **1120** is shown with an atraumatic bullet lip **1186** having side holes **1188** and end holes **1190**. It will be appreciated that such a tip can be provided for any arrangement of the invention. It will also be appreciated that the tip **1186** can itself serve as the anchor for the cable **1138** in certain arrangements. The tip **1186** is fixedly bonded to distal end **1125** of cannula **1120** and enables a simplified construction of the steering mechanism and provides a blunt surface that will not injure tissue in the body.

Lumens **1136** and **1146**, or other similar lumens, in addition to supporting cables **1138** and **1144** therein, may be used to supply inflating fluid to a balloon **1150** provided at the outer surface of the distal end **1128** of cannula **1120**. As shown in the exemplary embodiment of FIGS. **27-29**, balloon **1150** is in fluid communication with inflating fluid source **1152**, via supply tube **1154** and lumen **1156**. Fluid source **1152** serves to selectively provide fluid, such as saline, air or other gas, to balloon **1150** to thereby cause the balloon to inflate within the patient's body. Balloon inflation in this manner assists in placement of the cannula **1120**, especially when inserting the cannula antegrade, with the inflated balloon serving to float the tip of cannula within the fluid flow to thus transport it to the desired location in the body. Cannula **1120** is provided with one preformed curve **1158** in addition to curve **1160** imparted by the tension in cable **1138**. Balloon **1150** is shown in the deflated state in FIG. **27** and in the inflated state in FIGS. **28** and **29**.

Various distal tip configurations can be selected for cannula **1120**, depending on the particular application as appreciated by those of ordinary skill in the art. For example, a pigtail shape can be used for crossing the aortic valve retrograde. The pigtail shape, illustrated in FIG. **30**, can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod **1174** formed into a loop at the distal end of the cannula **1120**. Alternatively, a J-tip wire **1176** can be configured to protrude from the distal tip **1128**, as illustrated in FIGS. **31** and **32**. The J-tip wire can be a conventional guide wire movable or fixedly supported in a dedicated lumen **1178** formed in a rigidly attached tube **1180** (FIG. **31**), or it can be supported, rigidly or movably, between layers of material from which the wall **1122** of cannula **1120** is formed. Guidewires are known in the art and can for example be formed of windings of wire coiled around a core and having one or more preformed curves formed therein.

An embodiment in which cannula **1120** is used in a coaxial configuration is shown in FIGS. **33** and **34**. Cannula **1120** serves as an inner cannula, passing through outer conduit **1180** while the two components are disposed in the patient's body. An important advantage of this arrangement is that outer conduit **1180** operates to vary the radius of curvature of inner cannula **1120** by providing a base point as the inner cannula **1120** is advanced. In this manner manipulation of the inner cannula **1120** and outer conduit **1180** is facilitated and advancement to the desired destination in the body of the patient is more efficiently accomplished.

The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be

Case: 23-2045 Document: 8 Page: 159 Filed: 08/21/2023



apparent to one of ordinary skill in the art that modifications thereto can be made without inventive departure from the spirit and scope of the invention.

Abstract of the Appendix A

A steerable cannula is provided with at least one cable through which tension is communicated to a deformable portion of the cannula. The tension causes the cannula to bend at the deformable portion, enabling selective steering of the cannula during insertion into the body of the patient.

Appendix B—(U.S. Ser. No. 09/280,970)

Pressure Sensing Cannula

Background of the Invention

Field of the Invention

The present invention relates to cannulas used in surgical applications, and more particularly, to a cannula equipped with a pressure/flow rate transducer.

Description of the Related Art

In medical applications and specifically in surgery, the list of uses for cannulas is exhaustive. One application involves the augmenting or supplementing of pulmonary blood flow through the beating heart during cardio-surgcry by use of one or more cannulas involved in the intake and return of blood into the circulatory system. The cannulas interface between the patient's circulatory system and the mechanical pumps that power the augmentation procedure. Such an application is described in co-pending PCT Application no. PCT/US97/18674 emitted "Single Port Cardiac Support Apparatus", filed Oct. 14, 1997 and incorporated herein by reference in its entirety.

When performing cardiac surgery cannulas are placed within the patient's blood stream and used for inflow and outflow of blood or other fluids. If the operator wishes to determine the rate of fluid flow, either a catheter with appropriate sensors must also be placed in the patient's blood stream, or other sensors such as an external ultrasonic sensor as disclosed in U.S. Pat. No. 5,179,862 are used. A shortcoming of ultrasonic systems such as that described in U.S. Pat. No. 5,179,862 is that they require significant monitoring. Ultrasonic sensors also require that tubing of a specific diameter be used, thereby adding to the cost and complexity of the surgical procedure. Additionally, ultrasonic sensors are expensive and nondisposable, thereby adding to the cost of the surgical procedure.

Another method to measure flow rate is through the use of a thermodilution catheter. Thermodilution catheters require the infusion of a solution, typically saline, of a known temperature, with a distally disposed thermistor measuring the temperature change to determine the flow rate. This method is also expensive, increasing the cost of the surgical procedure. A second problem with using flow-sensing catheters, such as thermodilution catheters, is that they require the operator to place more incisions within the patient. The catheters must be placed so that they do not interfere with the inflow or out flow of the cannula. Visual markers along the length of the cannula may also be used to determine location, the greater the number of markers the more accurate the placement at the expense of quick readings due to the greater number of markings.

Summary of the Invention

The present invention overcomes the deficiencies of the prior art by providing a cannula assembly having one or more pressure transducers coupled to a main lumen thereof. In accordance with a first embodiment, the pressure transducers are attached to the substantially tubular wall defining the main lumen.

In accordance with a second embodiment, a partial occlusion is provided in the cannula to increase the pressure drop across the main lumen. In this manner transducer signal is increased, and an improved differential pressure measurement signal achieved.

In accordance with a third embodiment of the invention, one or more pressure transducers are used in conjunction with a pair of coaxial cannulas for measuring pressure.

In accordance with at fourth embodiment of the invention, a differential pressure transducer is used, the differential pressure transducer being mounted in a dedicated secondary lumen in communication with the first lumen.

In accordance with a fifth embodiment of the invention, the secondary lumen housing the differential pressure transducer is disposed across a knee formed in the cannula to augment pressure measurement. Partial occlusions may also be provided for this purpose.

In accordance with a sixth embodiment of the invention, the secondary lumen housing the differential pressure transducer is formed integrally with the tubular wall defining the main lumen.

In accordance with a seventh embodiment of the invention, a soft, flexible tapered tip is provided at the distal end of the cannula. Such a configuration allows for easier negotiation through the patient's body during surgical procedure.

In accordance with an eighth embodiment of the invention, an inflatable balloon is provided at the distal end of the cannula. The inflatable balloon aids in transporting the cannula to the desired destination.

In accordance with a ninth embodiment of the invention, a guide wire lumen is provided for supporting a guide wire in the cannula. The guide wire is used as a predecessor step in the insertion of the cannula.

In accordance wilh a tenth embodiment of the invention, a light guide is supported in the cannula. The light guide conveys light to a predetermined portion of the cannula to thereby aid in the visualization and location of the cannula during the surgical procedure.

The invention realizes various advantages over the prior art, including a reduction in the number of incisions that a surgeon must make in performing surgical procedures, along with a reduction in the amount of foreign material introduced into the patient's body, while providing safe, rapid, accurate and cost-effective fluid flow rate measurements.

Brief Description of the Drawings

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. **36** is a schematic side view of a first embodiment of the invention;

FIG. **37** is a schematic cross-sectional view taken along line D-D of FIG. **36**;

FIG. **38** is a schematic cross-sectional view taken along line E-E of FIG. **36**;

FIG. **39** is a schematic view of a cannula in accordance with the invention in a surgical application;

FIG. **40** is a schematic partial cut-away side view of a second embodiment of the invention;

FIG. **41** is a schematic cross-sectional view taken along line F-F of FIG. **40**;

FIG. **42** is a schematic side view of a third embodiment of the invention;

FIG. **43** is a schematic side view of a fourth embodiment of the invention;

FIG. **44** is a schematic side view of a fifth embodiment of the invention;

FIG. **45** is a schematic side view of a sixth embodiment of the invention;

FIG. **46** is a schematic cross sectional view taken along line G-G of FIG. **45**;

FIG. **47** is a schematic side view of a seventh embodiment of the invention;

FIGS. **48** and **49** are schematic side views of an eighth embodiment of the invention;

FIG. **50** is a schematic cross-sectional view taken along line H-H of FIG. **49**;

FIG. **51** is a schematic side view of a ninth embodiment of the invention;

FIG. **52** is a schematic side view of a tenth embodiment of the invention; and

FIG. **53** is a schematic cross-sectional view taken along line K-K of FIG. **52**; and

FIG. **54** is a schematic side view of an eleventh embodiment of the invention.

## Detailed Description of the Preferred Embodiments

In accordance with the invention, a cannula comprising a substantially tubular, semi-flexible material adapted for fluid transport while inserted in a patient's body is provided with one or more pressure transducers which are fixedly or adjustably supported in the cannula. The pressure transducers are disposed internally or externally of the cannula and are used to provide a measurement of the rate of fluid flow. In the internal configuration, the rate of fluid flow within the cannula is measured, in the external configuration, the rate of fluid flow outside the cannula is measured. The cannula can also be adapted to support a guide wire to aid the operator in its insertion through the patient's body, and/or a light source to provide a visual reference during the insertion procedure. It is to be understood that the use of the term "cannula"is intended to encompass cannulas, catheters, and any related devices having similar application.

An exemplary arrangement in accordance with a first embodiment of the invention is shown FIGS. **36-38**. Cannula **2220** comprises a substantially cylindrical structure having a wall **2228** defining a main lumen **2221**. Wall **2228** can be formed of materials ranging from rigid to flexible, and in the preferred embodiment comprises a semi-rigid transparent material such as polyurethane, silicone rubber or other material. Lumens other than main lumen **2221** may also be provided, as described below. The cannula may also be formed from vinyl plastisol. To form a cannula of vinyl plastisol, a mandrel is dipped into liquid vinyl plastisol and heated. Wire is then wrapped around the mandrel and first formed layer. The mandrel is then dipped again encasing the wire, and then heated. The mandrel is then removed. Lumens and transducers may be formed within the wall of the cannula during the dipping process.

To lend structural support for the thin wall which allows maximum flow with minimal insertion damage, spiraling wire **2230** is provided for reinforcement and is either molded into the wall **2228** or is otherwise supported therein, and extends either partially or fully across the length of the cannula **2220**. Wire **2230** facilitates handling of the cannula **2220** and reduces the possibility of cannula **2220** collapsing or being pinched shut and thus closing off the flow of fluid to or from the patient. Other ways of reinforcing the tubular body of cannula **2220** are known in the art and will adapt equally well to the present invention. In addition, no reinforcement may be needed if the cannula material is sufficiently rigid or if sufficient fluid flow is present within the cannula.

A connector **2223** is provided at the proximal **2225** end of cannula **2220**. Connector **2223** is suitably sized to interface with various surgical instruments, including but not limited to a reverse flow pump or fluid conduits leading thereto (not shown). Cannula **2220** may also have one or more holes **2226** located adjacent to distal tip **2222** to facilitate fluid flow therethrough. Cannula **2220** may be one of two complementary cannulas used in a surgical procedure, one for intake and the other for removal of blood or other biocompatible fluid from the patient's body. Alternatively, cannula **2220** may comprise a component of a co-axial, single port device in which cannula **2220** is surrounded by a second, larger conduit, with cannula **2220** for example operating to intake blood from the patient towards a pump system and the conduit operating to replace the blood from the pump system back into the patient for augmentation of blood flow during beating heart surgery as described in the co-pending PCT Application No. PCT/US97/18674 mentioned above.

In order to provide real time fluid flow information in accordance with the present invention, a pair of pressure transducers **2224**, **2232** are provided at two separate locations as illustrated in FIG. **36**. Pressure transducers **2224**, **2232** are of the type known in the art and each comprises for instance a piezo-electric crystal housed in an integrated circuit (IC) chip (not shown). The crystal configuration is designed to be pressure sensitive, generating an electrical signal in proportion to the amount of pressure experienced.

The principle governing the relationship between fluid flow and pressure is defined by Bernoulli's equation, herein solved for flow rate V and is determined by:

$$V = \sqrt{\frac{\Delta P \cdot 2d \cdot a^2}{f \cdot L \cdot \rho}}$$

where ΔP is the measured difference in pressure, d is the internal diameter of the lumen, a is the area of the lumen, f is a frictional factor of ihe lumen material. L is the lumen length over which the pressure measurement is conducted, and p is a measurable constant representative of the density of the fluid. The flow rale information can be used for a variety of purposes, including monitoring the patient's condition and controlling the fluid pump used during the procedure.

In the preferred embodiment, transducers **2224**, **2232** are imbedded in the wall **2228**, which is formed for instance by application of successive layers of laminate and interjecting the transducers therebetween during the layering process. Depending on at what stage in the layering process the transducers **2224**, **2232** are put in place in the wall **2228**, their proximity to the interior of Ihe cannula **2220** or its exterior can be controlled in order to optimize measurement of cannula interior or exterior pressure. From the interior pressure measurements, a determination of flow rate within main lumen **2221** can be made using the known diameter of the main lumen **2221**. Similarly, from the exterior pressure measurements, flow rate of exterior fluid—for example, blood—can be measured if the diameter of the blood chan-

Case: 23-2045 Document: 8 Page: 161 Filed: 08/21/2023



nel, such as the artery, is known, or the cannula can be calibrated with thermodilution catheters which assume the diameter of the vessel or artery they are placed within.

In the FIG. **36** exemplary arrangement, pressure transducer **2232** is disposed at a location near the distal tip **2222** of cannula **2220**, while pressure transducer **2224** may be disposed anywhere along the length of cannula **2220** between pressure transducer **2232** and proximal end **2225**. It is also contemplated that the pressure transducers **2224**, **2232** may be detachable disposed in dedicated secondary lumens formed in or along tubular wall **2228**, the dedicated secondary lumen extending to the proximal end **2225** and supporting any electrical cables connected to the pressure transducers **2224**, **2232**. In the detachable arrangement, the location of pressure transducers **2224**, **2232** in the cannula **2220** can be adjusted to suit the particular application, such that one transducer can be disposed within one chamber of the heart while the other is at a different of portion of the heart to thereby provide a pressure/flow rate measurement of a predetermined portion of the patient's body, for example flow into the heart from a designated blood vessel. Such an application is shown in FIG. **39**.

Pressure transducers **2224**, **2232** are in electrical communication with console **2236** via cable **2238**, which is supported in secondary lumen **4222** provided in cannula **2220**. Calculations for determining fluid flow rate using signals generated by the pressure transducers **2224**, **2232** and relayed via cable **2238** are conducted at the console **2236** or at any processor or processing system connected thereto.

As shown in FIGS. **40** and **41**, cannula **2220** may also contain a partial occlusion portion **2247** that forms a venturi **2246** within the main lumen **2221** of cannula **2220**. Venturi **2246**, which may be disposed anywhere along the length of the cannula **2220**, induces a pronounced pressure drop, creating a greater differential in pressure between proximal region **2225** and distal region **2222**, thereby requiring less signal amplification of the pressure transducers and less filtering of the signal and consequently yielding a more accurate flow rate measurement. Preferably the location of the pressure transducer **2232** is in the vicinity of venturi **2246** as shown in FIG. **54**.

FIG. **42** shows an embodiment in accordance with the invention in which the pressure transducers **2224**, **2232** are used with a co-axial, single port device **2250** in which cannula **2220** is surrounded by a second, larger conduit **2248**, with cannula **2220** for example operating to intake blood from the patient towards a pump system (not shown) and conduit **2248** operating to replace the blood from the pump system, via openings **2252**, back into the patient for augmentation of blood flow during beating heart surgery as described in the co-pending PCT Application no. PCT/US97/18674 mentioned above. It is to be understood that pressure transducers **2224**, **2232** can be mounted fixedly or detachably either to the interior or exterior of rither the cannula **2220** or the conduit **2248** in the above-described manner. More than one pair of these transducers can also be used in a myriad possible combinations in accordance with the invention. In the preferred embodiment, the cannula **2220** is provided with a bullet nosed tip, as illustrated in for example FIGS. **42-44**. Other tip configurations, such as a bevel, may also be used, as will be appreciated by those skilled in the art.

An alternative to using pairs of pressure transducers such as transducers **2224**, **2232** is the use of a single differential pressure transducer **2254**, as shown in FIG. **43**. Differential pressure transducers are also well known in the art and comprise for example a piezo-electric crystal electro-mechanically configured to be responsive to a pressure difference between two opposing sides thereof. These two sides correspond respectively to proximal end **2257** and distal end **2259** of secondary lumen **2256** in which transducer **2254** is mounted. Proximal and distal ends **2257** and **2259** are attached at any desired points along the length of cannula **2220** to thereby couple secondary lumen **2256** to main lumen **2221** and provide a pressure difference measurement between the desired points. Attachment of lumen **2257** and transducer **2254** across knee **2249** of cannula **2220**, as shown in FIG. **44**, will provide a stronger signal, with knee **2249** operating in accordance with the same principal as venturi **2246** discussed above. Thus it is to be understood that a venturi could also be used in conjunction with the differential pressure transducer **2254**. The ports **2261** and **2263** at which the lumen **2256** interfaces with cannula **2220** may be scaled by an appropriate membrane, with saline or other fluid being permanently housed in the lumen **2256**. Alternatively, ports **2261** and **2263** may be open, permitting fluid communication between the cannula **2220** and the lumen **2256** and attached transducer **2254**. The latter, open configuration would achieve a more faithful pressure representation. Stopcocks **2274** and **2276** can be provided in the ports **2261** and **2263** to permit priming and/or de-airing of the ports. It should also be noted that although in the arrangements of FIGS. **43** and **44** the lumen **2256** is provided as a separate tubular structure, lumen **2256** may alternatively be formed integrally with wall **2228** of cannula **2220**, again with ports **2261** and **2263** being either open or closed to main lumen **2221** depending on the application. Such an arrangement is illustrated in FIGS. **45** and **46** in which is shown transducer **2254** in communication with lumen **2272** integrally formed in wall **2228** of cannula **2220**.

Various distal tip configurations can be selected for cannula **2220** and used with the pressure sensing transducers, depending on the particular application as appreciated by those of ordinary skill in the art. FIG. **47** shows an exemplary embodiment in which the distal tip **2222** is formed of a soft, flexible material having a bullet shape. As shown exemplarily in FIGS. **48-50**, the cannula **2220** may be equipped to support other tools, such as an inflatable balloon **2240** which is deployed for example in order to assist in transporting the distal tip **2222** to the desired destination in the patient's body during the surgical procedure. Balloon **2240** is inflated through an inflating lumen **2244** provided in cannula **2220** using a bio-compatible fluid such as saline or carbon dioxide gas. Preferably inflating lumen **2244** is formed integrally within wall **2228**, by leaving an appropriate gap during the fabrication process, and is provided with a fitting (not shown) at its proximal end to interface with an inflating device for supplying the bio-compatible fluid. The lumen **2221** within the cannula **2220** can also be adapted to support a balloon catheter (not shown) which can be used to place the cannula within the patient's body. An obturator (not shown) may also be disposed through the main lumen **2221** to aid in insertion and guiding within the patient's body.

Another tool which cannula **2220** may support is shown in FIG. **51** and comprises a J-hook guide wire **2262** disposed slideably within lumen **2264**, which is formed integrally in wall **2228** of cannula **2220**. In operation, guidewire **2262**, easier to manipulate than the cannula **2220**, is first inserted into the patient's body and manipulated to the surgical site. Subsequently the cannula **2220** is maneuvering along the guidewire **2262**, which passes through lumen **2264**, to the desired destination.

Case: 23-2045 Document: 8 Page: 162 Filed: 08/21/2023



As illustrated in FIGS. **52** and **53**, cannula **2220** may also contain a light guide **2266**, which may be supported in lumen **2268**. Light guide **2266** comprises one or more optical fibers formed of, for example, glass or other materials, such as plastic, known for that purpose. Distal tip of light guide **2266** is configured for light projection, such that light provided at the proximal end of light guide **2266** is projected therefrom. An appropriate shape for such projection is a spherical shape, although other shapes and projection schemes, such as directional projection, fall within the purview of the invention. The source of tight may be any conventional monochromatic (lascr/LED) or polychromatic device **2270**, and more than one light source with associated light guide can be used for color coding and providing a visual reference to different portions of the cannula **2220**, depending on the colors of light used and on the location of the projection terminus of the light guides. In this manner cannula **2220** can be visually guided through the patient's body, relying on the transmissivity of tissue to permit the location of the illuminated cannula in the patient's body. As will be appreciated, the location of the cannula **2220** can also be determined by examining the pressure waveform detected by the pressure transducers **2224**, **2232** and **2254**. The physiological pressure waveform recorded by the transducers can be used to determine the location of cannula **2220** in relation to the valves of the patient's heart.

As will be appreciated by those skilled in the art, cannula **2220** may be provided with one or more preformed curves along its length to aid in its manipulation through the patient's vasculature. Multiple curves may be disposed along the same plane or in different planes, depending on the application.

An additional feature in accordance with the invention is the use of radiopaque markings (not shown) anywhere along the cannula body. Such markings render portions of the cannula **2220** visible to x-ray radiation for visualizing the cannula during its use.

The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be apparent to those skilled in the art that modifications thereto can be made without departure from the spirit and scope of the invention. It will also be apparent that all devices and methods herein disclosed will adapt equally to animal use as well as human use.

Abstract of Appendix B

A cannula is provided with one or more pressure transducers for measuring fluid pressure interiorly or exteriorly of the cannula. The pressure transducers may be mounted integrally with the tubular wall defining the main lumen of the cannula, or they may comprise differential pressure transducers mounted in dedicated lumens in communication with the main lumen. The pressure measurements from the transducers is used to determine fluid flow rate.

What is claimed is:

**1**. An intravascular blood pump system, comprising:

an intravascular blood pump comprising:

a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

**2**. The intravascular blood pump system of claim **1**, wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism.

**3**. The intravascular blood pump system of claim **1**, further comprising:

an elongate catheter extending proximally with respect to the intravascular blood pump; and

a blood pressure detection mechanism comprising a fluid column disposed within the elongate catheter and configured to detect a pressure of blood proximate the intravascular blood pump.

**4**. The intravascular blood pump system of claim **3**, wherein the blood pressure detection mechanism comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

**5**. The intravascular blood pump system of claim **1**, further comprising:

one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient,

wherein a portion of the shroud has an outer diameter matching an inner diameter of a proximal portion of the cannula, and the proximal portion of the cannula is disposed about a distal end of the shroud.

**6**. The intravascular blood pump system of claim **1**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

**7**. The intravascular blood pump system of claim **6**, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support, the pigtail shaped distal tip or the J-shaped distal tip is wholly within a left ventricle of the patient.

**8**. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide

Case: 23-2045 Document: 8 Page: 163 Filed: 08/21/2023



left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula that is coupled to a distal end of the intravascular blood pump, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient;

an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub or the catheter, the guide wire not passing through the rotor hub or the catheter, and the guide wire extending out of the intravascular blood pump system in the distal direction through the elongate lumen; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump.

**9**. The intravascular blood pump system of claim **8**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

**10**. The intravascular blood pump system of claim **8**, further comprising:

a rotor shroud, motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**11**. The intravascular blood pump system of claim **8**, further comprising a rotor shroud, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud.

**12**. The intravascular blood pump system of claim **8**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**13**. The intravascular blood pump system of claim **8**, wherein the elongate lumen is adapted to guide the guide wire through a distal end of the intravascular blood pump system.

**14**. The intravascular blood pump system of claim **8**, wherein the elongate lumen is shorter in length than the cannula lumen.

**15**. The intravascular blood pump system of claim **8**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**16**. The intravascular blood pump system of claim **8**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

**17**. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient;

an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen and is shorter in length than the cannula lumen, both the elongate lumen and the cannula not extending through the rotor hub or the catheter, the guide wire not passing through the rotor hub or the catheter, and the guide wire extending out of the intravascular blood pump system in the distal direction through the elongate lumen; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

**18**. The intravascular blood pump system of claim **17**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

Case: 23-2045 Document: 8 Page: 164 Filed: 08/21/2023



**19**. The intravascular blood pump system of claim **17**, further comprising:

a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**20**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**21**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is adapted to guide the guide wire through a distal end of the intravascular blood pump system.

**22**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**23**. The intravascular blood pump system of claim **17**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

**24**. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a first portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula lumen and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guide wire does not pass through the rotor hub or the catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

**25**. The intravascular blood pump system of claim **24**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge, and wherein at least a second portion of the rotor shroud has the same outer diameter as the proximal portion of the cannula.

**26**. The intravascular blood pump system of claim **24**, further comprising an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen and is shorter in length than the cannula, both the elongate lumen and the cannula lumen not extending through the rotor hub or the catheter.

**27**. The intravascular blood pump system of claim **26**, further comprising:

a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**28**. The intravascular blood pump system of claim **26**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**29**. The intravascular blood pump system of claim **26**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**30**. The intravascular blood pump system of claim **26**, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-2045

**Short Case Caption:** Maquet Cardiovascular LLC v. Abiomed, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 10,594 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.
- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 08/21/2023

Signature: /s/ Kirk T. Bradley

Name: Kirk T. Bradley