No. 2023-2045

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MAQUET CARDIOVASCULAR LLC,

*Plaintiff-Appellant*,

v.

ABIOMED, INC., ABIOMED R&D, INC.,
and ABIOMED EUROPE GmbH,

*Defendants-Appellees*.

Appeal from United States District Court for the
District of Massachusetts (Saylor, C.J.)

# BRIEF OF DEFENDANTS-APPELLEES ABIOMED, INC., ABIOMED R&D, INC. AND ABIOMED EUROPE GMBH

Keith R. Hummel
Lauren A. Moskowitz
Sharonmoyee Goswami
Andrei Harasymiak
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

December 1, 2023

*Attorneys for Defendants-Appellees*

## PATENT CLAIMS

U.S. Patent No. 10,238,783

1–3 and 24 (independent claims shown below)

1. An intravascular blood pump system, comprising:

an intravascular blood pump comprising:

a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

24. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a first portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula lumen and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guide wire does not pass through the rotor hub or the catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

CERTIFICATE OF INTEREST

**Case Number** 23-2045

**Short Case Caption** Maquet Cardiovascular LLC v. Abiomed, Inc.

**Filing Party/Entity** Abiomed, Inc.; Abiomed R&D, Inc.; Abiomed Europe GmbH

I certify the following information is accurate and complete to the best of my knowledge.

Date: 12/01/2023

Signature: /s/ Keith R. Hummel

Name: Keith R. Hummel

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Abiomed, Inc. | N/A | Abiomed, Inc. is a wholly owned subsidiary of Johnson & Johnson. |
| Abiomed R&D, Inc. | N/A | Abiomed R&D, Inc. is a wholly owned subsidiary of Abiomed, Inc. |
| Abiomed Europe GmbH | N/A | Abiomed Europe GmbH is a wholly owned subsidiary of Abiomed R&D, Inc. |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

| | | |
|---|---|---|
| Cravath, Swaine & Moore LLP | Reshma R. Gogineni | Retley G. Locke, Jr. |
| White & Case LLP | Scott T. Weingaertner | John P. Padro |
| Charles D. Larson | Laura Rees Logsdon | Anne-Raphaëlle Aubry |
| Robert E. Counihan | Silvia M. Medina | Stefan M. Mentzer |
| Cale V. Tolbert | Matthew R. Wisnieff | C. Sebastian Zonte |
| Barclay Damon LLP | Joseph L. Stanganelli | Goodwin Procter LLP |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ viii

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 5

A. Parties ........ 5

1. Abiomed ........ 5

2. Maquet ........ 6

B. The ’783 Patent Family ........ 6

1. Overview ........ 6

2. The Problem Alleged to Be Solved ........ 8

3. The Alleged Inventions ........ 8

4. The “Over-the-Wire” Aspect ........ 10

5. The “Side-Rigger”/“Rapid Exchange” Aspect ........ 12

C. The Accused Impella Products ........ 15

D. Procedural History ........ 17

SUMMARY OF THE ARGUMENT ........ 19

ARGUMENT ........ 23

I. AS MAQUET STIPULATED, THE IMPELLA DOES NOT INFRINGE CLAIMS 1–3 BASED ON THE UNCHALLENGED REQUIREMENT (1) OF THE CONSTRUCTION OF “GUIDE MECHANISM” ........ 23

A. Maquet Stipulated to Infringement Under *Either* Requirement of the Construction of "Guide Mechanism Comprising a Lumen." ....................23

B. By Challenging Only Requirement (2), Maquet Concedes Non-Infringement Under Requirement (1). ....................24

C. Maquet Cannot Belatedly Assert that the Impella Does Not Meet Requirement (1) of the "Guide Mechanism" Construction. ......26

1. The Impella Does Not Infringe Because It Fails Requirement (1) of the "Guide Mechanism" Construction. ....................26

2. Maquet Is Precluded from Challenging the District Court's Non-Infringement Judgment. ....................27

3. Maquet's Understanding of "Guide Wire Lumen" Contradicts the Specification. ....................28

4. The Impella Does Not Infringe Even If Requirement (1) of the Guide Mechanism Construction Is Satisfied. ....................32

II. THE DISTRICT COURT CORRECTLY CONSTRUED "GUIDE MECHANISM COMPRISING A LUMEN" ....................34

A. Maquet Conceded During Prosecution that a Lumen Distal to the Cannula Is Not Enabled. ....................35

1. Maquet's Unsubstantiated Traverse Does Not Negate the Effect of Its Claim Amendment to Overcome a Rejection. ......36

B. The Specification Confirms That a Distal Lumen Is Not Enabled And Is Not Within the Scope of the Invention. ....................38

C. Maquet's Prosecution Disclaimer of a Cannula-Distal Lumen Applies to the '783 Patent. ....................42

1. Claims 1–3 Recite the Cannula as Part of the Pump. ....................43

2. Maquet Surrendered Claim Scope Through Its Amendment in Response to the Examiner's Enablement Rejection. ....................46

3. A Disclaimer Made During a Related Prosecution Requires Common Claim Scope, Not Common Claim Language. ....48

4. The Relevant Claims of the ’238 and ’783 Patents Share a Common Scope. ....51

III. THE DISTRICT COURT CORRECTLY CONSTRUED THE “GUIDE WIRE” TERMS ....53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-10914-FDS, ECF 1, (D. Mass.) ....................17

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075 (Fed. Cir. 2003)....................61

*Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994 (Fed. Cir. 2006)....................49, 50

*Advanced Cardiovascular Systems v. Medtronic, Inc.,* 265 F.3d 1294 (Fed. Cir. 2001) ....................50

*AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18 (Fed. Cir. 2023) ....................28

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017) ....................64

*Bai v. L&L Wings, Inc.*, 160 F.3d 1350 (Fed. Cir. 1998)....................36, 37

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792 (Fed. Cir. 1990) ....................27

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090 (Fed. Cir. 2013) ....................47

*Chef America Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371 (Fed. Cir. 2004) ....................46

*Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973 (Fed. Cir. 1999)....................61, 66

*Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379 (Fed. Cir. 1999)....................68

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) ....................37

*Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310 (Fed. Cir. 2013) ....................24

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951 (Fed. Cir. 2000)....................48

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001)....................35

*Johnson v. United States*, 75 F.4th 1354 (2023)....................45

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990)....................66

*LizardTech, Inc. v. Earth Res. Mapping, Inc.,* 424 F.3d 1336 (Fed. Cir. 2005)....................25

*Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343 (Fed. Cir. 2016)....................33

*Omega Eng'g, Inc v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)....................46

*Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. 2013)....................33, 51

*ResQNet.com, Inc. v. Lansa, Inc.,* 346 F.3d 1374 (Fed. Cir. 2003)....................50, 51

*Salazar v. Procter & Gamble Co.,* 414 F.3d 1342 (Fed. Cir. 2005)....................62

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285 (Fed. Cir. 2021)....................35

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)....................27

*Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511 (Fed. Cir. 1990)....................45

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015)....................50

*Toshiba Corp. v. Juniper Networks, Inc.*, 248 F. App'x 170 (Fed. Cir. 2007)....................25

*Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016)....................42

*Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173 (Fed. Cir. 2006)....................50

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................48

*Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999)....................48, 49

*Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418 (Fed. Cir. 1994)....................46

**Statutes & Rules**

Fed. R. Evid. 201(b)....................45

**Other Authorities**

U.S. Patent No. 7,022,100....................6

U.S. Patent No. 8,888,728....................passim

U.S. Patent No. 9,789,238....................passim

U.S. Patent No. 10,238,783....................passim

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the district court was previously before this Court or any other appellate court. Counsel is unaware of any case before this Court or any other court that will directly affect or be directly affected by this Court's decision in the current appeal.

## STATEMENT OF THE ISSUES

1. The district court construed the "guide mechanism comprising a lumen" term of claims 1–3 of U.S. Patent No. 10,238,783 ("the '783 Patent") to have two independent requirements: "the guidewire lumen (1) 'does not extend through the free space between the rotor blades' and (2) 'is not distal to the cannula'." Neither Maquet's stipulation of non-infringement nor the final judgment limit Maquet's concession of non-infringement to requirement (1). Maquet therefore conceded that the accused Impella products do not infringe under the entirety of the claim construction. In fact, the accused Impella products have a guide-wire lumen extending through the free space between the rotor blades, failing requirement (1). And if that free space is not considered to be a guide-wire lumen, then the Impella products do not fall within the specification's definitions of the invention. Maquet failed address these issues in its principal brief. Should the judgment be affirmed as to claims 1–3 on these grounds?

2. Claims 1–3 of the '783 Patent recite an intravascular blood pump that comprises a cannula and a "guide mechanism comprising a lumen." As relevant to the asserted claims, the specification defines the invention as a guide-wire lumen that is either part of the pump or in the cannula. During the prosecution of U.S. Patent No. 9,789,238 ("the '238 Patent"), the parent of the

’783 Patent,[1] the Examiner rejected a pending claim for lack of enablement because it recited a lumen “distal” to the pump, which the Examiner interpreted to include the cannula. Maquet amended the claim as required by the Examiner to overcome the enablement rejection. In view of Maquet’s prosecution actions and the specification’s definition of the invention, which precludes the guide-wire lumen from being distal to either the pump or the cannula, should the construction precluding the lumen from being distal to the cannula be affirmed?

3. The district court construed certain “guide wire” terms in claims 1–3 and 24 of the ’783 Patent to include the limitation that “the guide wire does not extend through the free space between the rotor blades.” This is consistent with the parties’ agreement that the guide-wire lumen cannot pass through the rotor blades, as well as with the specification’s definitions and descriptions of the alleged invention. During prosecution of a related patent, Maquet distinguished prior art that included a reference threading a guide wire through the rotor blades of a blood pump. Based on Maquet’s arguments, the Examiner issued a Notice of Allowance that distinguished another reference (Völker) because it employed a guide wire threaded through the rotor blades of a blood pump. Maquet cited the Examiner’s allowance over Völker in successfully

[1] The ’783 and ’238 Patents are collectively referred to as the “Patents-in-Suit.”

opposing institution of subsequent IPR proceedings. In light of the specification's definitions of the inventions, Maquet's prosecution actions, and Maquet's IPR arguments, should the district court's construction be affirmed?

4. Maquet's stipulation of non-infringement states that it cannot prove infringement of any independent claim of the '238 Patent under the court's claim constructions. The final judgment states that Maquet cannot prove infringement of the '238 Patent "under the constructions set out in the Court's Memorandum and Order on Claim Construction." Maquet's principal brief does not address the judgment on the '238 Patent and characterizes its appeal as limited to the '783 Patent. Should the judgment be affirmed as to the '238 Patent?

## STATEMENT OF THE CASE

### A. Parties

#### 1. Abiomed

Abiomed is a leading manufacturer of medical devices that provide circulatory and oxygenation support, including the Impella® line of intravascular heart pump systems. The Impella devices are inserted into a patient's blood vessels and then advanced through the circulatory system to the heart. When operated, an Impella allows the heart to rest and recover by temporarily augmenting its pumping function.

Abiomed's Impella devices are truly revolutionary. Earlier blood pump systems, like those described in Patents-in-Suit, required a motor situated ***outside*** the patient to drive the pump via a cable. Appx130, 1:67–2:16. Unlike those earlier pumps, Abiomed's Impella includes an "onboard" motor that is small enough to be integrated with the pump and fit ***inside*** the body, while still generating therapeutically effective blood flow. Abiomed's design was so extraordinary that the inventors of the Patents-in-Suit believed it to be "almost impossible" or even "crazy." Appx1221, 23:16–24:1, 24:13–25:1.

The first Impella received FDA approval in 2008. Each year, thousands of patients with serious heart conditions are successfully treated using Impella devices.

2. Maquet

Maquet is a medical device company. Maquet has never sold intravascular heart pumps that have onboard motors. Maquet did not create any of the purported inventions claimed in the Patents-in-Suit or their related patents (collectively, "the '783 Patent Family"). The priority application for the family was filed in 2000 by an unsuccessful start-up company, whose founders worked on the Hemopump, a prior art cable-driven heart pump similar to that described in the embodiments of the '783 Patent. Appx1219–21, 14:1–17:24, 21:7–22:24.

Maquet acquired the rights to the '783 Patent Family in 2008, the same year the Impella obtained FDA approval.

## B. The '783 Patent Family

1. Overview

All patents in the '783 Patent Family share a common specification. As shown below, the Patents-in-Suit (**red**) issued from continuation or divisional applications claiming priority to U.S. Patent No. 7,022,100.



Maquet prosecuted the '783 Patent Family starting with U.S. Patent No. 8,888,728 ("the '728 Patent"). The same examiner was responsible for all subsequent applications. The Patents-in-Suit, which issued last, have expired.

The specification does not purport to disclose any advances in pumping blood. They are instead directed solely to

> the broad inventive concept of ***equipping the intravascular blood pump with guiding features*** such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient.

Appx78 (emphasis added). Although the '783 Patent Family uses complex-sounding terms such as "guide mechanism" to describe these guiding features, they are simple and were already commonly used to advance intravascular devices through the circulatory system.

Indeed, the Patents-in-Suit describe using the conventional technique of inserting a guide wire into the patient's circulatory system and advancing it through the vasculature to the desired location. The blood pump is then threaded onto the guide wire, inserted into the patient, and pushed along the wire until it reaches the "distal" or far end of the guide wire.[2] Appx134, 9:33–49; Appx136, 14:21–32. The specification asserts that the "present invention" consists of adding

---

[2] "Proximal" means closer to the insertion site of the device into the body, while "distal" means farther from the insertion site. *See* Appx29.

a "guide mechanism"—a passage or "lumen" through which the guide wire passes—to the pump or cannula. Appx133, 8:53–56; Appx136, 14:15–29.

2. <u>The Problem Alleged to Be Solved</u>

The specification of the '783 Patent Family describes only one type of blood pump: one whose motor is located ***outside*** the patient and connected to the pump's rotor by a rotating "drive cable" passing through the patient's vasculature via an "elongated flexible catheter." Appx130, 1:67–2:16. The specification asserts that the elongated catheter containing the drive cable makes the pump difficult to guide into position. Appx130, 2:23–28-34.

3. <u>The Alleged Inventions</u>

The "present invention" provides "an improved intravascular blood pump equipped with ***integrated features***" for guiding the intravascular blood pump." Appx130, 2:62–66 (emphasis added). Specifically,

> the intravascular blood pump system of the ***present invention*** overcomes the drawbacks of the prior art by providing ***a guide mechanism as part of the intravascular blood pump***.

Appx133, 8:53–56 (emphases added).

The specification discloses only three types of guide mechanisms, each corresponding to a "broad aspect of the present invention": (1) "an 'over-the-wire' type guide mechanism"; (2) "a 'side-rigger' or 'rapid exchange' type guide

mechanism";[3] and (3) "a 'guide catheter' type guide mechanism." *See* Appx131, 3:4–59. Guide mechanisms (1) and (2) use a guide wire.[4]

All asserted claims require a guide wire, so only the (1) over-the wire and (2) side-rigger aspects are relevant. In each, the "guide mechanism" is defined as the combination of the guide wire and a lumen through which the wire passes; the lumen is located through or along the pump, or along the cannula. Appx134, 10:47–59; Appx136, 14:15–21; Appx134, 9:20–27. However, the "guide mechanism" is further limited in the asserted claims to the guide-wire lumen because they each recite the guide wire as a separate feature.[5]

The guide wire is described as a "well known guidance mechanism[], "conventional," "known in the art," and an example of a "conventional guiding device." *See, e.g.*, Appx134, 9:24–27, 9:33–38, 10:57–61; Appx142, 26:51.

---

[3] The specification consistently uses "side-rigger" and "rapid exchange" as synonyms. *See*, *e.g,* Appx132, 5:47–52, 5:57–60. This brief will generally use "side-rigger."

[4] Although the specification teaches that the guide mechanism can use a "guide element" other than a guide wire, the asserted claims all recite a guide wire.

[5] Claim 1 recites "wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong". Claim 24 recites "the guide wire establishes slidable contact with the guide mechanism."

4. The "Over-the-Wire" Aspect

The "over-the-wire" guide mechanism is a "central lumen" though which the guide wire traverses the device. Appx131, 3:4–14. The guide wire is described as "pass[ing] slideably through a central lumen extending through the drive cable 18, blood pump 12, and cannula 14." Appx134, 9:20–24.

Figures 1 and 2 show this "over-the-wire" guide mechanism. Appx132, 5:25–30; Appx134, 9:13–33. In each figure (annotated to add specification descriptions), the guide mechanism—the "central lumen"—is contained within other components of the system, so the "guide wire 22" is visible only as it emerges from the cannula's distal end.



*FIG. 2*
**(excerpt)**




The specification defines the "central lumen" as the entire length of the over-the-wire guide mechanism, even though comprises lumens of varying sizes passing through multiple components of the pump system:

> central lumen is established by forming and co-aligning the individual central lumens within each of the drive cable 62, the cable adapter 60, the shaft 46 and hub 56 of the rotor 44, and the cannula 14.

Appx135, 12:51–55. Figure 3 (annotated) shows the guide wire (highlighted red) passing through this central lumen:

*FIG. 3*



The specification does not restrict the width or configuration of the guide-wire lumen, nor require it to be a dedicated channel for the guide wire. Notably, as illustrated in Figure 3, the specification teaches that the large hollow area of the cannula through which the guide wire passes is part of the central lumen. Appx135, 12:51–55. There is no separate lumen that is dimensioned to accommodate only a guide wire running through the cannula.

The specification expressly teaches that the guide wire may be left in place during pump operation. Appx135, 12:59–63. It explains that the central lumen should be wide enough to permit the pump to slide along the guide wire without constricting the guide wire, because such constriction might cause "inadvertent rotation" of the wire during pump operation. *Id*.

The over-the-wire aspect is not described or shown in the specification as having a lumen distal to the cannula.

5. The "Side-Rigger"/"Rapid Exchange" Aspect

The "side-rigger" guide mechanism is "a side lumen formed . . . along a length of at least one of the intravascular blood pump and the cannula." Appx131, 3:19–32. The specification further teaches: ***"In an important aspect of the present invention,*** the . . . 'side-rigger' guide mechanism 122 ***includes a guide carriage 124 formed along at least a portion of the cannula 14***, and a suitable guide element (such as guide wire 22) dimensioned to pass slidably through a

lumen (not shown) extending through the guide carriage 124." Appx136, 14:15–21.

Figure 6 (annotated) illustrates the side-rigger aspect. Appx132, 5:47–50.

*FIG. 6*




This annotated excerpt from Figure 7 shows the distal portion of the side-rigger configuration:

FIG. 7




In Figures 7 and 8 (below), the "guide carriage" is shown as an exterior protuberance along the cannula sidewall, but it may also be "formed along the interior surface of the cannula," Appx136, 14:43–44, as in Figure 9. No other guide carriages are described or depicted.




FIG 8

FIG 9

The specification teaches that in the side-rigger aspect, as in the over-the-wire, the guide wire ***may*** be removed during pump operation, but it does not require removal: "The guide wire 22 ***may*** thereafter be withdrawn from the patient." Appx136, 14:48–49 (emphasis added). The side-rigger mechanism is not described or shown in the specification as having a lumen distal to the cannula. *See*, *e.g.*, Figs. 6–7.

The side-rigger and over-the-wire aspects have different guide mechanisms but are otherwise the same. Appx136–137, 13:62–14:10, 14:59–15:4. The specification nowhere teaches any other guide-wire-based guide mechanisms, or that the over-the-wire and side-rigger aspects may be combined. Indeed, the district court "recognize[d] that Maquet has conceded that the 'over-the-wire' and 'side-rigger' designs are distinct and would not be implemented together." Appx230.

### C. The Accused Impella Products

The Impella devices do not have an over-the-wire or side-rigger guide mechanism. Instead, as shown below, the guide wire takes a completely different route through the Impella device.




Figure 5.31 Guidewire Placement

Appx1164 (annotated).

The guide wire (highlighted yellow) enters the Impella through the outlet area, passes through the pump using the free space between the rotor blades, and passes through the cannula and two structures distal to the cannula, an inlet area and a structure known as a "pigtail." The pigtail is straightened out when the guide wire passes through it, but has this shape when the wire is not present.




Appx1154 (annotation removed).

### D. Procedural History

On May 19, 2016, Abiomed sought declaratory judgment of non-infringement of three patents in the '783 Patent Family. *Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-10914-FDS, ECF 1, (D. Mass.) ("*Abiomed*"). Maquet counterclaimed for infringement and later added three more patents. *See Abiomed*, No. 16-cv-10914-FDS, ECF 26 (D. Mass.).

The '238 Patent issued on October 17, 2017, and Maquet then filed the instant infringement litigation ("*Maquet*").[6] Shortly after the court issued its claim construction order in *Abiomed*, Maquet applied for the '783 Patent. When that patent issued, Maquet added it to the *Maquet* litigation.

The district court construed the "guide mechanism comprising a lumen" term of claims 1–3 of the '783 Patent to prohibit a lumen that (1) passes through the free space between the pump's rotor blades and (2) is distal to the cannula. The parties had agreed on requirement (1). Appx20–23. Similarly, the court construed the "guide wire" terms in claims 1–3 and claim 24 of the '783 Patent to prohibit the guide wire from passing through the free space between the rotor blades. Appx23–25.

[6] The two litigations are sometimes referred to as *Abiomed I* and *Abiomed II*, or *Maquet I* and *Maquet II*. We adopt the nomenclature Maquet uses on appeal.

After the court issued its claim construction order, Maquet served updated infringement contentions that attempted to circumvent the court's constructions. Maquet then changed course and moved for a stipulated judgment of non-infringement of both the '238 and '783 Patents in view of the court's constructions. Appx3–4. The parties' stipulation and the district court's judgment of non-infringement did not differentiate between constructions and did not explain what features of the Impella did not infringe under those constructions. Appx1, Appx4. This appeal followed.

## SUMMARY OF THE ARGUMENT

The Patents-in-Suit are directed to intravascular blood pump systems. As relevant to this appeal, their common specification narrowly defines the "present invention" to be a "guide mechanism" that is an passage—"lumen"—for a guide wire to pass through the pump system. The "present invention" expressly requires that this lumen be "part of the pump" or "formed along at least a portion of the cannula." No other guide-wire-based guide mechanisms are described or depicted.

Maquet acquired the rights to the '783 Patent Family in 2008—the same year Abiomed first received FDA approval for the first of its Impella devices. After 2008, Maquet prosecuted a series of patents in the '783 Patent Family, including the Patents-in-Suit, in an apparent attempt to profit from the Impella's success. But Maquet's attempts to mine the specification for viable claims covering the Impella have been frustrated by the specification's narrow definitions of the purported inventions; the obvious differences between the purported inventions and the Impella; the prosecution history; and numerous prior-art cardiovascular devices that are delivered using guide wires through integrated lumens. This appeal presents yet one instance in which Maquet attempts to stretch its patents too far.

The district court's judgment should be affirmed in full. ***First***, Maquet stipulated to noninfringement of claims 1–3 under the district court's construction of "guide mechanism comprising a lumen". That construction contains two requirements, namely that "the guidewire lumen (1) does not extend through the free space between the rotor blades and (2) is not distal to the cannula." Appx22–23 (internal quotations omitted). On appeal, Maquet does not challenge requirement (1) of the construction, which Maquet conceded below was appropriate. By stipulating to non-infringement under the totality of the district court's construction, Maquet conceded that the Impella ***does not infringe*** claims 1–3 under requirement (1). Even if Maquet's failure to argue non-infringement under requirement (1) were disregarded, Maquet could not show infringement. It is undisputed that the Impella's guide wire passes through the free space between its rotor blades. If that free space is (correctly) considered a lumen, the Impella fails requirement (1). If the free space is not a lumen, the Impella has no "guide mechanism" as part of the pump or along the cannula, as required by the specification's definitions of the "present invention."

***Second***, the district court properly construed the "guidewire mechanism comprising a lumen" limitation of claims 1-3 of the '783 Patent to prohibit the guide wire lumen from being distal to the cannula. In prosecuting the '238 Patent, Maquet amended a claim to overcome a rejection in which the

Examiner's asserted that a guide wire lumen distal to the cannula is not enabled. Because the amended claim of the '238 Patent shares a common scope with independent claim 1 of the '783 Patent, Maquet's disclaimer of such distal lumens also applies to claims 1-3. In addition, the specification defines the "present invention" to require a guide-wire lumen either as part of the pump or along the cannula, making it impossible for the guide-wire lumen to be distal to the cannula.

***Third***, the district court properly construed the "guide wire" terms of the asserted claims to require that "the guide wire does not extend through the free space in between the rotor blades." This construction logically follows from undisputed requirement (1) of the "guide mechanism" construction discussed above. If the guide-wire path (*i.e.*, lumen) cannot pass between the rotor blades, then neither can the guide wire itself, a conclusion confirmed by the specification. Moreover, during prosecution of a related patent, the relevant claim of which shares a common scope with the asserted claims, Maquet distinguished prior art that included a pump that threaded a guide wire through its rotor blades. The Examiner adopted Maquet's reasoning to distinguish an additional prior art reference (Völker) and allowed the claim. Maquet subsequently relied on the Examiner's allowance over Völker to successfully oppose institution of four IPRs.

***Fourth***, the Court should also affirm the judgment of non-infringement of the ’238 Patent because Maquet did not challenge that aspect of the judgment on appeal.

## ARGUMENT

### I. AS MAQUET STIPULATED, THE IMPELLA DOES NOT INFRINGE CLAIMS 1–3 BASED ON THE UNCHALLENGED REQUIREMENT (1) OF THE CONSTRUCTION OF "GUIDE MECHANISM"

#### A. Maquet Stipulated to Infringement Under *Either* Requirement of the Construction of "Guide Mechanism Comprising a Lumen."

The district court construed the term "guide mechanism comprising a lumen" to have ***two*** independent requirements: "the guidewire lumen (1) does not extend through the free space between the rotor blades and (2) is not distal to the cannula." Appx22–23 (internal quotations omitted). Abiomed and Maquet agreed to requirement (1) of the construction, Appx20–21, and Maquet does not challenge that requirement on appeal. Maquet Principal Brief ("PBr.") at 28. Thus, all parties agree that to infringe claim 1, and by extension, dependent claims 2 and 3, the guide-wire lumen cannot "extend through the free space between the rotor blades."

After the district court issued its claim construction, Maquet drafted, proposed and entered into a joint stipulation of non-infringement, which states:

> 2. On September 12, 2022, this Court entered a Memorandum and Order on Claim Construction (Dkt. No. 248), construing various claim terms. ***As relevant to this Stipulation***, the Court construed the term "guide mechanism comprising a lumen" ('783 Patent, cl. 1) to require that the "guidewire lumen (1) does not extend through the free space between the rotor blades and (2) is not distal to the cannula."…
>
> 3. ***Based on the Court's constructions of these terms, Maquet cannot prove infringement of the Claims at Issue by the Accused Products***.

Appx4 (emphases added).[7] These provisions do not distinguish between the two requirements of the "guide mechanism" construction. Nor do they tie Maquet's inability to show infringement to a particular requirement.

The district court entered the Final Judgment "in accordance with the Joint Stipulation." Appx1. The judgment states: "Abiomed has not infringed any claim of U.S. Patent Nos. 9,789,238 or 10,238,783 under the constructions set out in the Court's Memorandum and Order on Claim Construction (Dkt. No. 248)." Appx1. Like the stipulation, the judgment of non-infringement is not limited to any particular requirement of the construction.

### B. By Challenging Only Requirement (2), Maquet Concedes Non-Infringement Under Requirement (1).

On appeal, Maquet challenges only requirement (2) of the district court's construction of the "guide mechanism" term. PBr. at 28. Indeed, Maquet could not challenge the inclusion of the first requirement on appeal, because ***Maquet*** had proposed and agreed to it.[8] *See, e.g., Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1322 (Fed. Cir. 2013) (a party may not object on

[7] The "Claims at Issue," as referenced in the stipulation, are 1, 2, 3 and 24 of the '783 Patent and 1–9, 11–14, 16–20, 22 and 24–28 of the '238 Patent. Appx3.

[8] Appx21. Maquet initially proposed somewhat different wording—"guide mechanism comprising a lumen that does not extend through free space between rotor blades" (Appx20)—but because the claims require a guide wire, a guide-mechanism lumen ***is*** a guidewire lumen.

appeal to a claim construction it proposed); *LizardTech, Inc. v. Earth Res. Mapping, Inc.,* 424 F.3d 1336, 1341 (Fed. Cir. 2005) ("LizardTech agreed to the district court's construction at the time, and it cannot now argue against that claim construction simply because it resulted in an adverse ruling").

Maquet stipulated that the Impella products do not infringe claims 1–3 of the '783 Patent under the construction of "guide mechanism comprising a lumen." Appx4. In so stipulating, Maquet did not distinguish between non-infringement based on the requirement (1) or requirement (2) of that construction. Appx4. That is, Maquet never stated that the Impella is non-infringing only because requirement (2) is not met; indeed, Maquet provided no explanation whatsoever for why the Impella does not infringe any aspect of any construction. Accordingly, this Court must assume that the Impella does not meet the unchallenged requirement (1), and therefore does not infringe claims 1–3 on this basis alone. *See Toshiba Corp. v. Juniper Networks, Inc.*, 248 F. App'x 170, 172 (Fed. Cir. 2007) (in appeal of stipulated judgment of non-infringement, holding that "if we affirm the district court's construction of any appealed term in a particular claim, we may affirm the judgment of noninfringement as to that claim.").

Accordingly, even if the Court were to disagree with the district court's inclusion of requirement (2) in its claim construction, the judgment of

non-infringement should still be affirmed on the independent ground that the Impella products do not meet requirement (1) of the "guide mechanism" limitation.

### C. Maquet Cannot Belatedly Assert that the Impella Does Not Meet Requirement (1) of the "Guide Mechanism" Construction.

The Impella cannot infringe claims 1–3 of the '783 Patent under requirement (1) because its guide-wire lumen extends through the free space between the rotor blades. By failing to raise any argument in its principal brief that the Impella somehow meets requirement (1) of the district court's construction, Maquet has forfeited that argument. Even if Maquet had raised such an argument, it could not have prevailed. The Impella's guide-wire path through the rotor blades is unquestionably a lumen. The specification teaches that the entire path of the guide wire through the pump system is a guide-mechanism lumen, which does not require a guide-wire-specific channel. And if the guide-wire's path through the free space were (incorrectly) not considered a lumen, then the Impella would not fall within the scope of the "present invention," which requires a guide mechanism that is part of the pump or along the cannula.

#### 1. The Impella Does Not Infringe Because It Fails Requirement (1) of the "Guide Mechanism" Construction.

Maquet agreed to the district court's construction of "guide mechanism comprising a lumen" to require that "the guidewire lumen (1) does not extend through the free space between the rotor blades." As shown below, in the

Impella, the guide wire (yellow) does exactly that—it traverses the pump using the free space between the rotor blades (located within the red circle).




**Figure 5.31 Guidewire Placement**

Appx1164 (annotated). Consequently, the Impella does not infringe claims 1–3 of the ’783 Patent under requirement (1).

2. Maquet Is Precluded from Challenging the District Court’s Non-Infringement Judgment.

In its principal brief, Maquet made no attempt to show that the Impella meets requirement (1). Maquet is precluded from making this argument in reply. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) (holding that “an issue not raised by an appellant in its opening brief . . . is waived.”); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (“[A]rguments not raised in the opening brief are waived.”).[9]

[9] Although Abiomed believes that the stipulation is clear, if there is any doubt about the extent of Maquet’s stipulation, this case should be remanded to the

3. Maquet's Understanding of "Guide Wire Lumen" Contradicts the Specification.

Although Maquet's brief never explains why its stipulation—specifically, that it is unable to demonstrate infringement of claims 1–3 under the entirety of the construction of "guide mechanism"—should not be dispositive, Maquet may be trying to redefine "guidewire lumen" to give itself an infringement argument. In a footnote, Maquet contends that:

> the guide wire lumen would never be placed in the free space between the rotor blades. The lumen (unlike the guide wire) is integral to the device and thus remains in place during operation of the blood pump. If the lumen were placed in the free space between the rotor blades, the blades would not be able to turn (thus preventing the blood pump from working).

PBr. at 12 n.4.

The problem with an argument that the Impella lumen does not extend through the rotor blades is that it is contradicted by the specification of the '783 Patent Family, which discloses that the guide mechanism lumen is the ***path*** that the guide wire uses to pass through the components of the device. While this path may be a dedicated channel that is crafted specifically to allow a guide wire to pass

---

district court for clarification. *See, e.g.*, *AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18, 22 (Fed. Cir. 2023) (vacating stipulated judgment of non-infringement and remanding to district court where "the parties dispute[d] two aspects of the construction of the term 'cooperating service provider'," and it was "unclear whether, under the stipulation, Amazon prevails on infringement if either [disputed aspect of the relevant construction] is correct or only if both are correct.").

through it (for example, the path through the cannula sidewall in the side-rigger aspect of the invention), the specification expressly teaches that the path may include ***both*** such a dedicated channel and free space within device components.

The guide-mechanism lumen in the over-the-wire aspect of the invention is expressly and repeatedly described as including the large, interior region of the cannula, in addition to a guide-wire-specific channel through the drive cable and pump components:

- The "over-the-wire" type guide mechanism 16 includes the guide wire 22 and, as will be explained in greater detail below, ***a central lumen extending through the cannula 14, blood pump 12, drive cable assembly 18, purge fluid delivery system 26, and motor coupler 24***. Appx134, 10:47–51 (emphasis added).

- The "over-the-wire" guide mechanism 16 includes a central lumen through which the guide wire 22 may extend for the purpose of slideably advancing the blood pump 12 and cannula 14 into a desired position within the circulatory system of a patient. In the embodiment shown, ***this central lumen is established by forming and co-aligning the individual central lumens within each of the drive cable 62, the cable adapter 60, the shaft 46 and hub 56 of the rotor 44, and the cannula 14***. Appx135, 12:47–55 (emphasis added).

- The "over-the-wire" guide mechanism 16 comprises a suitable guide element dimensioned to pass slideably through a ***central lumen extending through the drive cable 18, blood pump 12, and cannula 14***. Appx134, 9:20–24 (emphasis added).

Thus, the guide mechanism's "central lumen" in the "over-the-wire" aspect is the ***entire*** path of the guide wire through the system, *i.e.*, a lumen

throughout any component of the system through which the guide wire passes.[10] The entire device is threaded over the guide wire, as is seen in Figure 1, which shows the end of the guide wire (highlighted red) emerging from the distal end of the cannula after traveling through the drive cable, blood pump and cannula.

FIG. 1




[10] In the side-rigger aspect of the invention, the entirety of the guidewire path through the device likewise comprises the guide-mechanism lumen. In the side-rigger aspect, the entire lumen passes through a guide carriage formed in the cannula sidewall. *See* Appx98–99, Figs. 6–7.

Figure 3 shows a cross section of a portion of the guide mechanism with the guide wire passing through all structures of the intravascular blood pump system, including the free space (colored yellow) in the cannula:

FIG. 3




The specification includes the cannula as part of the guide-mechanism lumen even though it does not have a guide-wire-specific channel and its described purpose is to transport blood to the pump. *See* Appx134, 10:27–39.

Therefore, regardless of whether it is a guide-wire-specific channel, the guide-wire path through the Impella's rotor blades is a guide-wire lumen. Consequently, the Impella cannot infringe under the agreed-upon requirement that the "guidewire lumen (1) 'does not extend through the free space between the rotor blades'." Appx22–23.

4. The Impella Does Not Infringe Even If Requirement (1) of the Guide Mechanism Construction Is Satisfied

In the alternative, even if the Impella guide wire were considered (counterfactually) to not pass through a lumen between the rotor blades, the Impella products would still not infringe claims 1–3 of the '783 Patent. The reason is that the specification expressly defines the "present invention" to require that at least a portion of the guide mechanism be part of the ***pump***. Appx130, 2:63–65; Appx133, 8:55–56. Thus, any contention that the free space between the rotor blades—the only area in the Impella pump through which the guide wire passes—is ***not*** a guide-wire lumen would also preclude infringement.

In the '783 Patent Family, the "present invention" is expressly defined as "providing an improved intravascular blood ***pump equipped with integrated features*** for selectively guiding the intravascular blood pump" and "providing a ***guide mechanism as part of the intravascular blood pump***."[11] Appx130, 2:63–65 (emphases added); Appx133, 8:55–56 (emphasis added). By expressly defining

[11] The sole exception to this second requirement is a side-rigger guide mechanism in which "an important aspect of the present invention" is expressly taught to be "a guide carriage 124 *formed along at least a portion of the cannula* 14, and a suitable guide element (such as guide wire 22) dimensioned to pass slidably through a lumen (not shown) extending through the guide carriage 124." Appx136, 14:15–21 (emphasis added). In the Impella, the guide wire passes through the interior of the cannula, and not through any guide carriage or lumen formed along any portion of the cannula.

and limiting the "present invention" in this manner, the specification disavows any claim to a system lacking a guide mechanism as an "integrated feature" of the ***pump***. *See, e.g.*, *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." (simplified)); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . . ' or 'the present invention is . . . ' or 'all embodiments of the present invention are . . . .'" (citations omitted)).

As shown in the graphics below from Maquet's infringement contentions (annotations in original), it contends that the pigtail comprises the entirety of the Impella's alleged guide mechanism:



Appx1160. In view of the definitions of the "present invention" quoted above, Maquet's infringement theory is untenable. Maquet identifies no guide mechanism, *i.e.*, a lumen, as part of the Impella ***pump*** (or, alternatively, in a guide carriage along the cannula sidewall) as required by the "present invention."

* * *

In sum, if the path through the Impella pump's rotor blades ***is*** a guide-wire lumen, then the Impella cannot infringe under requirement (1) of the claim construction Maquet agreed to ("guidewire lumen . . . does not extend through the free space between the rotor blades"). Alternatively, if the guide-wire path through the Impella rotor blades is ***not*** a lumen, there is no "guide mechanism" in the pump, and the Impella does not fall within the scope of the "present invention" of the '783 Patent Family. The judgment of non-infringement of claims 1–3 of the '783 Patent should therefore be affirmed.

## II. THE DISTRICT COURT CORRECTLY CONSTRUED "GUIDE MECHANISM COMPRISING A LUMEN"

The district court appropriately construed the limitation "guide mechanism comprising a lumen" in claims 1–3 of the '783 Patent to require that the "guidewire lumen . . . not be distal to the cannula." Maquet attacks this construction as improperly derived from a claim amendment to overcome an enablement rejection during the prosecution of the '238 Patent. In doing so,

Maquet misstates the applicable law and ignores that the Court's construction is supported by both the prosecution history of the '238 Patent and the specification of the '783 Patent Family.[12] Because the prosecution history and specification confirm disclaimer of any lumen located distal to the cannula, the district court's construction should be upheld.

### A. Maquet Conceded During Prosecution that a Lumen Distal to the Cannula Is Not Enabled.

During prosecution of the '238 Patent, the Examiner rejected then-pending claims 14 and 22 as not enabled:

> Claims 14 and 22 call for " . . . the ***entire elongate lumen distal to*** the intravascular blood pump . . . " This claim describes the embodiment of Fig. 7, which comprises an offset guidewire lumen. The guidewire lumen extends partially along the pump, on a distal segment of the cannula. However, the pump also comprises the cannula, and the cannula is therefore not entirely distal to the pump. This claim should be revised to describe that the entire elongate lumen is distal to one or more of the ***rotor, first port or rotor shroud***.

Appx493. The Examiner did not indicate that the lack of enablement resulted from any of the specific requirements for the lumen recited in those claims; instead, he asserted that the side-rigger embodiment of Fig. 7 did not enable a lumen distal to

[12] The district court's claim construction may be defended using additional intrinsic evidence. *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1289 (Fed. Cir. 2021) (on appeal, a party may "support[] its original claim construction with new citations to intrinsic evidence of record"); *Interactive Gift Express, Inc. v. Compuserve Inc*., 256 F.3d 1323, 1347 (Fed. Cir. 2001) (a party may rely on other portions of the specification in a claim construction appeal).

the cannula. Although Maquet purported to traverse the Examiner's rejection, Maquet provided no grounds for, and made no argument to support, its traversal. Instead, as Maquet admits, PBr. at 15, Maquet amended the claims as the Examiner requested, Appx517, who then withdrew the rejection and allowed the claims.

By agreeing to the Examiner's request to amend without substantively challenging his reasoning, Maquet agreed that the guide-wire lumen cannot be distal to the cannula. That disclaimer applies equally to claims 1–3.

1. Maquet's Unsubstantiated Traverse Does Not Negate the Effect of Its Claim Amendment to Overcome a Rejection.

Maquet now tries to cast its perfunctory traverse as evidence that it thought the Examiner was wrong in considering the cannula part of the blood pump and that it intended no substantive change in amending the claim. But Maquet never made this argument when it mattered—during prosecution. Maquet could have argued that the pump and cannula were separate components, but did not. Maquet could have stated that the Examiner's proposed amendment would not actually change claim scope, but did not. Instead, it amended the claim exactly as the Examiner requested, thereby surrendering claim scope.

Under similar circumstances, this Court has rejected attempts to argue in hindsight that amending a claim should not be considered agreement with an examiner's position. In *Bai v. L&L Wings, Inc.*, the examiner rejected a claim, after which the patentee amended the claim. 160 F.3d 1350 (Fed. Cir. 1998). This

Court rejected the patentee's subsequent attempts to argue that the amendment was unnecessary and did not signify agreement with the examiner:

> When an applicant disagrees with the examiner's prior art rejection and fails to prevail by argument, he has two choices: either to amend the claim or to appeal the rejection. He may not both make the amendment and then challenge its necessity in a subsequent infringement action on the allowed claim. [The patentee] made his choice and amended the claim. A patentee does not have a second chance to relitigate the merits of a prior art rejection that caused an amendment to be made to gain allowance of the claims.

*Id*. at 1356; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) ("A rejection indicates that the patent examiner does not believe the original claim could be patented. While the patentee has the right to appeal, his decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim.").

Maquet made no effort "to prevail by argument" with the Examiner, let alone appeal the rejection. At no point during prosecution did Maquet argue that the specification enables a guide-wire lumen that is located distal to the cannula or otherwise attempt to challenge the Examiner's position on the merits. Under the reasoning of *Bai* and *Festo*, it accepted the Examiner's position and must now, as the district court correctly found, live with its choice to agree that the specification does not enable a guide-wire lumen distal to the cannula.

### B. The Specification Confirms That a Distal Lumen Is Not Enabled And Is Not Within the Scope of the Invention.

The reason Maquet did not offer any substantive argument in response to the Examiner's enablement rejection is because it had none. The specification never discloses the placement of any guide-wire lumen distal to the cannula. Indeed, the specification does not disclose ***any*** structure distal to the cannula through which a guide-wire lumen could pass. Instead, in all guide mechanisms that use a guide wire, the only item depicted as extending distal to the cannula is an unenclosed guide wire. The distal end of the distal-most lumen—which is always in or along the cannula—as well as the unenclosed guide wire emerging from that lumen, are circled in the annotated versions of Figures 1, 2, 6 and 7 below:

FIG. 1



*FIG. 2*
**(excerpt)**




*FIG. 6*



*FIG. 7*
**(excerpt)**




Figures 31, 32 and 51 below are from patent applications purportedly incorporated by reference into the specification, Appx133, 7:25–32, 8:22–24, and now physically incorporated as Appendix A and B, Appx139, 20:24–36. Although these applications are not described as embodying any "guide mechanism" aspect of the invention, Appx139, 20:24–44, their figures also show an unenclosed guide wire emerging from a lumen at the distal end of the cannula.




Figure 31




Figure 32




**Figure 51**

By definition, a guide wire cannot be a guide-wire lumen. The guide wire is separate from—and not integrated with—the device; it is meant to be threaded through the guide-wire lumen. Thus, consistent with the Examiner's position, the specification fails to describe or enable a guide-wire lumen that is distal to the cannula.

It is not surprising that the specification fails to enable a guide mechanism with a guide-wire lumen located distal to the cannula because the

specification characterizes the "present invention" in a manner that is clearly and unmistakably inconsistent with such claim scope. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1367–69 (Fed. Cir. 2016) (like the prosecution history, the specification is relevant to determining whether a patentee has disclaimed claim scope). The specification of the '783 Patent unequivocally states that in the "present invention" the guide mechanism must be part of the pump, or must include a guide carriage and lumen formed along the cannula. *See* Section I.C.4. It is physically impossible for the guide mechanism lumen to be part of the pump or cannula, and also be distal to the cannula.

Accordingly, the specification's description of the scope of the '783 Patent Family's inventions is consistent with the disclaimer of claim scope found by the district court.

### C. Maquet's Prosecution Disclaimer of a Cannula-Distal Lumen Applies to the '783 Patent.

Contrary to Maquet's arguments that the pump and cannula are necessarily separate, claim 1 of the '783 Patent claims the cannula as part of the pump. And while Maquet argues in hindsight that it did not "narrow" the relevant '238 Patent claims, the dispositive question is whether a patentee has disclaimed a particular understanding of its claim. Here, Maquet accepted the Examiner's position that a lumen distal to the cannula is not enabled, and must live with that decision; it cannot now strategically reinterpret the prosecution history. Maquet

also misstates the law in arguing that disclaimer during prosecution of one patent can only affect a related patent if they share the same claim terms. Instead, this Court requires only common claim scope to apply disclaimer across patents, and this requirement is met here.

1. Claims 1–3 Recite the Cannula as Part of the Pump.

Maquet argues that its agreement to the Examiner's proposed amendment could not disclaim anything because the pump is separate from the cannula. As discussed above, this is irrelevant because Maquet acquiesced in the Examiner's finding that a lumen distal to the cannula is not enabled. Moreover, claim 1 of the '783 Patent, from which claims 2 and 3 depend, recites that the intravascular blood pump comprises multiple components, specifically including ***the cannula***. This is clear from this image from the published patent, which shows that the cannula is one of the pump's components:

What is claimed is:

**1**. An intravascular blood pump system, comprising:

an intravascular blood pump comprising:

a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

Appx146, 33:59–34:14 (column break omitted).

This is the exact format in which the claim was presented to the PTO in Maquet's application, as shown in this image from the application:

2. (Previously Presented) An intravascular blood pump system, comprising:

an intravascular blood pump comprising:

a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

’783 Patent Prosecution History, Claims (12/10/2018).[13]

Throughout its brief, Maquet tries to obscure that the “intravascular blood pump” of the claim includes the cannula. Maquet fails to accurately to indent the claim elements, PBr. at i, and when excerpting the claim language, it

[13] The ’783 Patent prosecution is not in the record, but the Court may take judicial notice of it. *See Johnson v. United States*, 75 F.4th 1354, 1357 n.2 (2023) (noting that “this court can take judicial notice of publicly accessible government documents because they ‘are capable of being accurately and readily determined from sources whose accuracy cannot reasonably be questioned,’ as required by Federal Rule of Evidence 201(b)”) (simplified); *Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990) (taking judicial notice of a reexamination office action). The complete prosecution history is available at https://patentcenter.uspto.gov/applications/16138788/ifw/docs?application=. The application claim text is in the document dated 12/10/2018 and titled “Claims.”

repeatedly omits the key phrase "an intravascular blood pump comprising" ahead of "cannula," PBr. at 11, 27–28. But that phrase ***is*** in claims 1–3, and therefore Maquet's acceptance of an enablement rejection premised on the cannula being part of the pump applies to those claims.[14]

2. Maquet Surrendered Claim Scope Through Its Amendment in Response to the Examiner's Enablement Rejection.

Maquet argues that disclaimer requires it to have narrowed the language of the claims during prosecution. Not so. This Court has repeatedly held disclaimer results if a patentee disclaims a particular ***interpretation*** of the claim:

> Prosecution history serves as a limit on the scope of claims by excluding any interpretation of the claim language that would permit the patentee to assert a meaning for the claim that was disclaimed or disavowed during prosecution in order to obtain claim allowance.

*Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1421 (Fed. Cir. 1994); *see also Omega Eng'g, Inc v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."). Thus, Maquet's citation to cases in which narrowing amendments resulted in disclaimer are not

[14] To the extent Maquet argues that the placement of "and" in claim 1 justifies altering the claim as Maquet drafted and published it, that argument should be rejected. *See Chef America Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written, not as the patentees wish they had written it.").

relevant, PBr. at 36; indeed, none of them announce a rule ***requiring*** claim narrowing for a finding of disclaimer.

During the prosecution of the ’238 Patent, the Examiner rejected for lack of enablement claims he understood to require a guide-wire lumen distal to the cannula. Appx493. The Examiner’s non-enablement finding is entirely consistent with the specification, which, as discussed above, contains no description of such a guide-wire lumen, let alone an enabling one. Even if the Examiner misinterpreted what Maquet was subjectively attempting to claim, that is irrelevant because Maquet ***declined to substantively argue against the Examiner’s understanding of claim scope.*** Instead, Maquet acquiesced to the Examiner’s interpretation, entering the Examiner’s proposed amendment lock, stock and barrel. Appx505; Appx508. As here, when an applicant agrees to an examiner’s proposed amendment to overcome an rejection, the applicant disclaims the rejected claim scope. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 n.6 (Fed. Cir. 2013) (finding disclaimer because that case dealt “not only with applicants letting stand an examiner’s narrow characterization of a claim term, but also their adoption of that characterization to overcome the examiner’s enablement rejection”).

In assessing the scope of the claims, the public is entitled to rely on the prosecution history, which makes clear that Maquet acceded to the Examiner’s

finding that a guide-wire lumen distal to the cannula is not enabled,. *See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) (holding patentee's "request for a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning" was to be "inimical to the public notice function provided by the prosecution history."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that the prosecution history of a patent is part of "the public record of the patentee's claim, a record on which the public is entitled to rely.").

3. A Disclaimer Made During a Related Prosecution Requires Common Claim Scope, Not Common Claim Language.

Maquet similarly misstates the law in contending that arguments made during prosecution of one patent can result in a disclaimer applying to a related patent ***only*** if the two patents share ***the same claim language***. PBr. at 29–33. But Maquet's cited authorities hold only that a disclaimer ***may*** apply to claims in a different patent if the claims share claim language—they do not hold that the same claim language is ***required*** for a disclaimer to apply across patents. Instead, this Court has repeatedly held that common ***subject matter*** across patents—not only common language—is sufficient for a disclaimer to apply to related patents.

For example, *Wang Laboratories, Inc. v. America Online, Inc.*, involved construction of "frame." 197 F.3d 1377, 1383–84 (Fed. Cir. 1999).

Although the parties agreed that the general meaning of "frame" encompassed either character-based protocols or bit-mapped protocols, the district court construed it to exclude bit-mapped protocols. This Court affirmed, in part because during the prosecution of the parent patent, the applicant distinguished the prior art Fleming reference by stating that it "encodes pictorial information . . . on the pel [picture element] level, rather than on the character level." *Id.* at 1384. The Court found the disclaimer was applicable to a continuation-in-part patent because

> this subject matter is common to the continuation-in-part application, and argument concerning the Fleming reference was correctly viewed as applying to the common subject matter. This history reinforces the conclusions that the inventors focused their invention, and the description and claims directed to that invention, on a character-based system, and that a person of skill in this field reading this history would so understand the explanation of the Fleming reference.

*Id.* (citation omitted).

Similarly, in *Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*, the Court held that substantially different claim terms were subject to the same disclaimer because the terms had the same scope. 182 F. App'x 994, 998–99 (Fed. Cir. 2006). The Court stated that the

> claims do not all use the term "end" to describe the connection between the "substantially straight segments." Instead, certain claims use "turn" or "curved member." However, because the specification for the '331 patent uses "peaks" and "turns" synonymously, and "turn" and "curved member" are used in the '053 patent claims synonymously with "end," we find that those claims embody the same "peak" or "end" limitation as the '331 patent, i.e., the disclaimer from the '331 patent applies against the '053 patent.

*Id*. at 998 (citation omitted).

By contrast, the cases cited by Maquet establish merely that common claim language is ***a*** basis for disclaimer, not that it is a ***required*** basis. Maquet's principal authority, *Advanced Cardiovascular Systems v. Medtronic, Inc.*, expressly states that "[t]he prosecution history of a related patent can be relevant if, ***for example***, it addresses a limitation in common with the patent in suit." 265 F.3d 1294, 1305 (Fed. Cir. 2001). In quoting this, Maquet's brief twice resorts to splitting the quote in two and inserting "only" between the two halves; for example: "as this Court has repeatedly made clear, the 'prosecution history of a related patent can be relevant,' but ***only*** 'if, for example, it addresses a limitation in common with the patent in suit.' PBr. at 24 (emphasis added); *see also* PBr. at 30.

The other decisions cited by Maquet similarly find that common language can support disclaimer, but do not hold that it is required. *See, e.g.*, *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer ***generally*** does not apply when the claim term in the descendant patent uses different language") (emphasis added); *Teva Pharms. USA, Inc. v. Sandoz, Inc*., 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents ***may*** be properly considered in construing a term common to those patents.") (emphasis added). Only *ResQNet.com, Inc. v. Lansa, Inc.* implies that common language is

mandatory, but the sole support for this proposition is *Advanced Cardiovascular*, which, as discussed above, expressly states that common language is an example, not a requirement.[15] 346 F.3d 1374, 1383 (Fed. Cir. 2003).

#### 4. The Relevant Claims of the ’238 and ’783 Patents Share a Common Scope.

The specification’s definition of the “present invention” requires the guide-mechanism lumen to be in one of two configurations: it must either be part of the pump (as in the over-the-wire aspect) or situated along the cannula (as in the side-rigger aspect). *See* Section I.C.4. During prosecution of the ’238 Patent, the claims rejected by the Examiner for lack of enablement covered the side-rigger aspect of the invention. As the Examiner noted, those claims described “the embodiment of Fig. 7, which comprises an offset guidewire lumen.” Appx493. Maquet did not dispute this characterization when amending the claims. Thus, the relevant disclaimer arose with respect to the side-rigger aspect in the ’238 Patent claims.

---

[15] While Maquet cites *Regents of the University of Minnesota v. AGA Medical Corp.* for the proposition that commonality of claim language serves the policy objectives of preventing situations where “neither the PTO examiner nor the patentee’s competitors would be on notice as to the true scope of the later patent’s claims,” it omits that this language was directed against a patentee attempting to leverage purported disclaimers to evade invalidity. 717 F.3d at 944–45.

Because claim 1 of the ’783 Patent recites a “guide mechanism comprising a lumen” without any further restrictions, it is broad enough to cover the side-rigger aspect of the invention.[16] Accordingly, Maquet’s disclaimer of a lumen that is distal to the cannula during prosecution of side-rigger claims during the ’238 Patent prosecution applies equally to the side-rigger aspect of Claim 1. The prosecution history thus confirms what the specification also makes clear—there is no enablement of a guide-wire lumen that is distal to the cannula in the side-rigger aspect of claim 1.

* * *

In sum, the definitions of the “present invention” in the specification, read in conjunction with Maquet’s actions during prosecution of the ’238 Patent, represent a clear and unmistakable disclaimer of any claim scope that allows the guide-wire lumen to be distal to the cannula. The specification disclaims that scope by teaching that the “present invention” is providing a guide mechanism (*i.e.*, a lumen) either as part of the pump or along the cannula, which makes it impossible for the guide-wire lumen to be distal to the cannula. The prosecution

---

[16] Claim 1 is broader overall because it covers both the side-rigger and over-the-wire aspects of the invention. However, because these aspects are discrete, the fact that only the side-rigger aspect of claim 1 overlaps with the ’238 claims does not alter the applicability of the disclaimer. Indeed, because the over-the-wire aspect of claim 1 requires the lumen to be in the pump, it is already inherently incapable of covering a lumen distal to the cannula.

history of the '238 Patent confirms that disclaimer with respect to the side-rigger aspect of the invention by disclaiming lumens distal to the cannula.

## III. THE DISTRICT COURT CORRECTLY CONSTRUED THE "GUIDE WIRE" TERMS

The district court correctly construed the "guide wire" terms[17] to prohibit the guide wire from passing through the free space between the rotor blades. Maquet's contention that this construction is purportedly based only on the prosecution history of a claim from the '728 Patent with different language simplistically ignores or minimizes material facts that fully support the district court's construction, such as the parties' agreement that the guide-wire lumen cannot pass through this space. Moreover, the district court's finding of a disclaimer is fully supported by both the full prosecution record and the specification's definitions of the "present invention."

### A. The District Court's Construction Is Supported by the Parties' Agreement that the Guide-Wire Lumen Cannot Pass Through the Rotor Blades.

The parties agreed that the term "guide mechanism comprising a lumen" in claim 1 of the '783 Patent has the negative construction that the "lumen does not extend through the free space between rotor blades." Appx20–21.

[17] These are the claim 1 element "guide mechanism is configured to allow for a guide wire to slideably advance therealong" and the claim 24 element "guide wire does not pass through the rotor hub or the catheter." PBr. at 37; *see also* Appx23.

Because the specification teaches that the lumen of the guide-mechanism is the path the guide wire takes through the blood pump system, *see* Section I.C.3, if the guide-wire lumen of claim 1 cannot pass through the free space between rotor blades, then by logical extension neither can the guide wire.

The same conclusion applies to Claim 24. The antecedent for "the guide wire" in the term construed by the district court is "***an intravascular blood pump adapted to be guided*** to a predetermined location within a circulatory system of a patient ***by a guide wire***." Appx148, 37:33–35 (emphasis added). The '783 Patent teaches that in the "present invention," this adaptation is accomplished through the use of a guide mechanism. Appx133, 8:53–56. The only guide-wire-based guide mechanism taught by the '783 Patent comprises a guide-wire lumen through which the guide wire may slideably pass. Thus, claim 24, like claim 1, must use a guide mechanism that employs a guide-wire lumen to allow the guide wire to pass through the pump, in order to guide the pump into the desired location. In this respect, claim 24 and claim 1 share common subject matter of the "present invention": a guide-wire lumen "as part of the pump." Because the guide-wire lumen of claim 1 cannot pass through the rotor blades, by logical extension the guide wire of claim 24 cannot pass through those blades either.

To be sure, as Maquet points out, that claim 24 *additionally* prohibits the guide wire from passing through the rotor hub or the catheter. That limitation

simply places further restrictions on the placement of the guide-wire lumen in the device of claim 24. It does not change the fact that the adaptation used in the device of claim 24 to guide the pump using a guide wire must have a guide-wire lumen—and therefore a guide wire—that does not pass through the rotor blades.

### B. The Specification Does Not Disclose or Support Claims to a Guide Wire Passing Through the Rotor Blades

Nowhere does the specification depict, teach or suggest a guide wire passing through the rotor blades. To the contrary, the specification's definitions of the "present invention" do not support such a configuration.

The specification defines the "broad aspects of the present invention" to permit only three guide-wire configurations. *First*, the guide wire can pass through a "central lumen" that passes through the pump, for example through the center of the pump's rotor hub. Appx131, 3:4-14; Appx135, 11:34-37. *Second*, the guide wire can pass through "a side lumen [] formed along a length of" the pump. Appx131, 3:25–27. Both of these configurations are consistent with the "present invention" requiring a "guide mechanism as part of the intravascular blood pump." Appx133, 8:53–56. *Third*, the guide wire can pass through a lumen "along a length" of the cannula. Appx131, 3:25–27. This is consistent with the specification's teaching that the "present invention" additionally encompasses "a guide carriage 124 formed along at least a portion of the cannula 14, and . . . a lumen . . . extending through the guide carriage 124." Appx136, 14:17–21. None

of these configurations permit the guide wire to pass through the pump rotor blades.

In attacking the district court's claim construction solely in terms of prosecution disclaimer, Maquet ignores that the district court's construction was also based on its examination of the specification. As the district court correctly recognized, the specification teaches that the guide wire does not have to be removed during pump operation. With respect to the over-the-wire aspect of the invention, in which the guide wire passes through the "central lumen," the specification teaches:

> These central lumens should preferably be sized such that they permit the slideable passage of the pump 12 and cannula 14 therealong, but do not interfere with or constrain the guide wire 22 to cause inadvertent rotation of the guide wire 22 during pump operation.

Appx135, 12:59–63. With respect to the side-rigger aspect, the specification teaches that the guide wire "may"—but does not have to be—removed after the pump is placed:

> the guide wire 22 is advanced to a desired location in the vasculature of the patient, after which point the blood pump 12 and cannula 14 can be slidably advanced therealong for delivery to the desired location according to the present invention. The guide wire 22 may thereafter be withdrawn from the patient.

Appx136, 14:44–49.[18] By contrast, a guide wire passing through the rotor blades would prevent pump operation and would have to be removed.

Maquet further contends that the claims do not expressly prohibit a guide wire from passing through the rotor blades (or a lumen distal to the cannula). But that simply begs the question of whether their scope is otherwise limited by the specification and prosecution history.[19] For the reasons discussed herein, it is.

## C. The Prosecution History of the ’728 Patent Limits the Asserted Claims of the ’783 Patent.

### 1. The Examiner’s View of Völker Came from Arguments Maquet Made During Prosecution to Distinguish Prior Art.

Maquet argues that the Examiner’s statements in the Notice of Allowance (“NOA”) concerning the patentability of the ’728 Patent over the Völker reference could not result in disclaimer because Maquet never made them. But Maquet chooses to start the story at the end of the prosecution, which leaves out highly relevant earlier interactions between it and the Examiner. Those interactions shaped the Examiner’s understanding of the scope of Maquet’s claims

[18] Because the side-rigger aspect requires the guide wire to run “along” the pump or the cannula, it would not prevent the rotor blades located inside the rotor shroud of the pump from turning.

[19] Indeed, by proposing a construction prohibiting the guide mechanism lumen from passing through the rotor blades—a limitation that also appears nowhere in the claims—Maquet itself acknowledges that claim language need not expressly state a negative limitation.

and lead to his statements in the NOA about Völker, where he adopts Maquet's arguments.[20]

The '728 Patent was the first patent prosecuted entirely by Maquet after it acquired the rights to the '783 Patent Family in 2008. After several rounds of claim amendments and argument, the Examiner finally rejected application claim 15 (among other claims) as obvious over the Bedingham and Nix patents in view of the Gordon patent. In support of the rejection, the Examiner annotated Figure 7 of Bedingham to show its intravascular blood pump:




[20] Maquet's silence concerning these portions of the prosecution history is puzzling because they were discussed at length in the *Markman* order in *Abiomed*, where the court also found a disclaimer of guide wire lumens that pass through the rotor blades. Appx208–13. Indeed, Abiomed addressed these portions of the prosecution history at the *Markman* hearing in *this* case, Appx1006–10, and the district court's *Markman* order at issue here references those earlier constructions, Appx23.

Appx1072. The Examiner found that Bedingham teaches the invention substantially as claimed in application claim 15, with only two exceptions: (1) "a tapered rotor hub extending distally beyond a blade," disclosed by Nix; and (2) "a guide mechanism configured as a second lumen that extends through the outer cannula surface," *i.e.*, paraphrasing the last two claim elements, both of which the Examiner found disclosed by Gordon. Appx1073–75.

Maquet initiated an interview with the Examiner, during which it distinguished claim 15 based solely on the alleged impossibility of a guide-wire lumen running through the rotor blades:

> Applicant clarified the nature of the invention, noting that the rotors require a space to rotate within the shroud while pumping blood. . . . [I]f Bedingham were modified with guidewire lumen 46 of Gordon, it would occupy space within the shroud and obstruct impeller 56 of Bedingham.

Appx1097.

Maquet subsequently filed a response that amended some claims, but not claim 15. In defending claim 15, Maquet argued that Bedingham ***disclosed no guide-wire path or lumen whatsoever*** and ***that its guide wire merely passed through the existing structure (inlet, rotor blades, outline) of the blood pump***:

> Bedingham only suggests inserting a guide wire into the existing structure of the pump housing . . . so that the guide wire 'passes between the vanes of the outlet flow straightener, impeller and inlet flow straightener'. The use of a lumen is not taught in Bedingham."

Appx1109. Maquet also characterized a device where a physical guide-wire lumen is placed through the rotor blades as "inoperable." Appx1111.

The Examiner expressly accepted Maquet's arguments in favor of patentability and issued a first NOA. Appx174. Maquet filed a request for continued examination and submitted an IDS listing six foreign references, including Völker. The Examiner allowed the claims over these references as well.

Consistent with the arguments Maquet had made against the Bedingham and Gordon references, the Examiner distinguished Völker:

> Völker lacks several features of the invention, namely a hub tapering in the distal direction, a hub distal end extending distally beyond the blade and a guide mechanism configured as a second lumen. Instead, vanes 22 extend along the full length of impeller 20. Additionally, Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning (p. 14, ¶ 4, while the guide wire 25 is located in the pump housing, no Rotation of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of claims 15, 29 or 45.

Appx536. The guide-wire path through Völker's pump is shown in the annotated version of Völker's Figure 2 below:




Appx279.

The Examiner's NOA statements regarding Völker thus did not arise spontaneously, as Maquet implies. They were based on Maquet's earlier, successful argument, used to overcome prior art rejections, that a pump which threads a guide wire through the free space between the rotor blades cannot be modified to have a guide-wire lumen. The Examiner applied Maquet's reasoning to find the claim patentable over Völker, which he specifically noted has a guide wire running through the rotor blades.

Maquet argues that "this Court's clear law" holds that its lack of response to the NOA cannot be a disclaimer, citing *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003). PBr. at 40–41. But this is yet another instance of Maquet advancing an absolute rule where none exists. Although *ACCO* states that an examiner's statement "will not ***necessarily*** limit a claim," it also recognizes that a NOA is relevant to claim construction where it is based on an ***applicant's*** earlier arguments:

> Although there is no obligation to respond to an examiner's statement of Reasons for Allowance, and the statement of an examiner will not necessarily limit a claim, in this case the examiner simply repeated the arguments that the patentee had presented.

*ACCO Brands, Inc.*, 346 F.3d at 1079 (citation omitted) (finding disclaimer); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (finding disclaimer and noting applicant's silence to an NOA relying on applicant's earlier

arguments).[21] That is what happened here: the Examiner relied on and adopted arguments Maquet made to overcome a prior art rejection to later distinguish Völker in the NOA.

2. Maquet Adopted the Examiner's Position in IPR Proceedings

Even if Maquet's acceptance of the patent in light of the Examiner's NOA was not in itself a disclaimer, Maquet later ratified and adopted the Examiner's statements by relying on the Examiner's patentability findings in successfully arguing against institution of IPRs challenging the '728 Patent and another, related patent. Maquet's brief obscures the true scope of its IPR arguments.

According to Maquet, Abiomed's IPR petitions took the position that Völker and a prior art reference called Aboul-Hosn have similar teachings. Maquet's then represents that in opposing Abiomed's petitions, Maquet "did not discuss the substance of Völker, but instead merely informed the Board that 'the Examiner [had] explicitly considered and found the claims patentable

[21] Maquet also cites *Salazar v. Procter & Gamble Co.*, but that case also does not state an absolute rule. 414 F.3d 1342 (Fed. Cir. 2005). Instead, it says that silence "without more" cannot be a disclaimer. *Id.* at 1345. Here, there is "more," namely Maquet's arguments before and after the NOA. Maquet's argument appears to be that a lack of response to a NOA provides an absolute ***shield*** against disclaimer.

over . . . V[ö]lker'" and had "argued to the Board that it 'should defer to [the Examiner's] considered judgment and deny the Petition'." PBr. at 42.

Maquet's account leaves out the most salient fact about its IPR arguments—the only similarity between Aboul-Hosn and Völker that Maquet cited to the Board was the ***guide mechanism***:

> the Petition admits that Voelker [sic] teaches the same guide mechanism as Aboul-Hosn: "[a]s explained in further detail in Sections VII and X below, Aboul-Hosn disclosed that same well-known 'over-the-wire' catheterization technique and used it in delivering intravascular blood pumps into the heart" (Petition, 8). This alleged similarity should provide the Board with sufficient reason to deny the Petition.

Appx551. On that basis, Maquet argued to the Board that "[i]n short, the Petition presents 'old art'—Aboul-Hosn is no different from other art already considered," including Völker, and that the Board should defer to the Examiner's "considered judgment" and deny the Petition. Appx551. Maquet made this argument not once, but in four separate IPRs. *See* Appx562; Appx569; Appx578.

By urging the Board to deny Abiomed's petition because the Examiner had "explicitly considered" Völker and had come to the "considered judgment" that the '728 Patent's guide mechanisms were specifically patentable over Völker, Appx551, Maquet adopted the Examiner's reasoning, including the key distinction based on Völker's guide wire passing through the rotor blades. *See*

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) (patent owner IPR statements can be basis for claim construction and disclaimer).[22]

3. The Relevant Claim of the ’728 Patent Is Substantively Identical to, or Has Overlapping Scope with, the Asserted Claims of the ’783 Patent

To try to distance itself from the prosecution history of the ’728 patent, Maquet characterizes the ’783 Patent as using “a myriad of different wording” than the relevant claim of the ’728 Patent. But as the chart below shows, the claims have virtually identical wording and are substantively identical, including the relevant “guide mechanism” elements (highlighted purple):

| **783 Claim 1** | **728 App Claim 15** |
|---|---|
| An intravascular blood pump system, comprising: | An intravascular blood pump system, comprising: |
| an intravascular blood pump comprising: | an intravascular blood pump comprising: |

[22] Maquet characterizes the NOA as representing the “Examiner’s unilateral view that Völker lacks a myriad of limitations in the claims there at issue” and refers to “myriad other reasons why the Examiner had distinguished Völker during the prosecution of the ’728 patent.” PBr. at 19, 43–44. This is simply not true. Apart from the guide-mechanism distinction, the Examiner only referenced two minor aspects of the configuration of the rotor hub—that it was tapered and that it extended beyond the blades. These aspects were not dispositive because the Examiner had previously noted that this exact hub configuration was taught in the Nix reference’s heart pump. And in urging the Board to deny Abiomed’s IPR petitions, Maquet’s IPR arguments about Völker said nothing about the patentability of the rotor hub—just the guide mechanism.

| 783 Claim 1 | 728 App Claim 15 |
|---|---|
| a rotor having a rotor hub tapering in **a** distal direction, at least one blade extending outward from the rotor hub, the **rotor** hub has a distal end extending distally beyond the most distal portion of the **at least one** blade and | a rotor having a rotor hub tapering in **the** distal direction, at least one blade extending **radially** outward from the rotor hub, the hub has a distal end extending distally beyond the most distal portion of the blade and |
| a shroud within which the rotor is rotatably disposed; | a shroud within which the rotor is rotatably disposed; |
| a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length; | a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length; |
| | **a first lumen in fluid communication with the intravascular blood pump and operatively arranged to deliver purge fluid to the intravascular blood pump; and** |
| a guide mechanism **comprising** a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within **a** circulatory system of a patient; | a guide mechanism **configured as** a **second** lumen[23] having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within **the** circulatory system of a patient; |
| wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong. | wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong. |

[23] The reference to a "second lumen" in the '728 application claim is a function of its also claiming a first lumen for purge fluid, which is not relevant here.

Even Maquet asserted, below, that the claims are virtually identical, presenting this slide during the *Markman* hearing:




Appx723. Maquet’s counsel, discussing the slide, represented to the district court:

> So the ’783 patent is a patent that we’re construing now, and the ’728 patent was a patent that was construed in Maquet I [*i.e.*, *Abiomed*], and this red line shows you that ***hardly anything has changed***, it’s just some deletions. Some things were removed, and the Patent Office granted this patent.

Appx971 (emphasis added).

This Court has recognized that minor differences in claim language do not bar disclaimer in one prosecution from applying to a related patent. *See, e.g.*, *Elkay Mfg. Co.*, 192 F.3d at 979–80 (parent application disclaimer relating to “feed tube” applied to “feed probe” in child patent); *Jonsson v. Stanley Works*, 903 F.2d 812, 818–19 (Fed. Cir. 1990) (disclaimer regarding “diffuse light” applied to

"diffuse radiation" in related patent). As a result, even if substantially identical claim language is the only basis on which prosecution actions and arguments apply to a related patent—which it is not—that requirement is plainly met by claims 1–3 of the '783 Patent.

Maquet argues that claim 24 contains additional restrictions not found in the '728 claim. But common claim scope, not common claim language, is required for disclaimer. *See* Section II.C.3. As discussed above, claim 24 shares common claim scope with claim 1, *see* Section III.A, and claim 1 is substantively identical to the '728 claim in all relevant respects. Consequently, Maquet's '728 prosecution actions and arguments apply to claim 24 as well. The additional limitations of claim 24, which preclude the guide wire from passing through the catheter or rotor blades, does not affect the scope that the '728 claim and claim 24 have in common.

## IV. THE FINAL JUDGMENT AS TO THE '238 PATENT MUST BE AFFIRMED BECAUSE MAQUET HAS NOT APPEALED IT

The stipulation of non-infringement expressly states that it applies to all asserted claims, including those of the '238 Patent: "3. Based on the Court's constructions of these terms, Maquet cannot prove infringement of the ***Claims at Issue*** by the Accused Products." Appx4 (emphasis added). The "Claims at Issue" are defined to include the claims of the '238 Patent. Appx3. The Final Appealable

Judgment also expressly states that "Abiomed has not infringed ***any claim of U.S. Patent Nos. 9,789,238*** or 10,238,783 under the constructions set out in the Court's Memorandum and Order on Claim Construction (Dkt. No. 248)." Appx1 (emphasis added).

Despite this unequivocal language, Maquet's principal brief makes no arguments concerning the '238 Patent. To the contrary, the brief repeatedly indicates that the '238 Patent is not a subject of this appeal:

- Maquet "assert[ed] infringement of certain patents, including the patent at issue in this appeal, U.S. Patent No. 10,238,783." PBr. at xii.
- "In adopting Abiomed's construction, the district court relied on the prosecution history of the '238 patent—a parent to the '783 patent that has the same specification." PBr. at 12.
- "Maquet then added allegations of infringement of the '783 patent and eventually dropped its allegations as to the '238 patent based on certain claim constructions in the *Abiomed* litigation." PBr. at 4.
- "Claims 1, 2, 3, and 24 [of the '783 Patent] are at issue in this appeal . . . ." PBr. at 9.

Because Maquet has chosen not to appeal the stipulation of non-infringement and final judgment concerning the '238 Patent, that portion of the judgment must be affirmed. See *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) ("An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived.").

## V. CONCLUSION

For the foregoing reasons, Abiomed respectfully requests that the district court's claim constructions and judgment be affirmed in their entirety.

Alternatively, Abiomed respectfully requests that the district court's judgment be affirmed as to claims 1–3 of the '783 Patent because Maquet has stipulated to non-infringement under a construction it proposed and does not appeal, as well as that the judgment be affirmed as to the '238 Patent because Maquet has not appealed the judgment as to that patent.

Dated: December 1, 2023

Respectfully submitted,

/s/ Keith R. Hummel

Keith R. Hummel
Lauren A. Moskowitz
Sharonmoyee Goswami
Andrei Harasymiak
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Attorneys for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number:** 23-2045

**Short Case Caption:** Maquet Cardiovascular LLC v. Abiomed, Inc.

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on December 1, 2023,

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☒ Other: CM/ECF

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Kirk T. Bradley | Served via CM/ECF |
| Nicholas C. Marais | Served via CM/ECF |
| Christopher L. McArdle | Served via CM/ECF |
| Wade G. Perrin | Served via CM/ECF |

☐ Additional pages attached.

Date: December 1, 2023 Signature: /s/ Keith R. Hummel

Name: Keith R. Hummel

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-2045

**Short Case Caption:** Maquet Cardiovascular LLC v. Abiomed, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☒ the filing has been prepared using a proportionally-spaced typeface and includes 13091 words.

☐ the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

☐ the filing contains___________pages /___________words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No.______).

Date: December 1, 2023

Signature: /s/ Keith R. Hummel

Name: Keith R. Hummel