No. 2023-2045

# United States Court of Appeals
*for the*
# Federal Circuit

MAQUET CARDIOVASCULAR LLC,

*Plaintiff-Appellant,*

*v.*

ABIOMED INC., ABIOMED R&D, INC., ABIOMED EUROPE GMBH,

*Defendants-Appellees,*

*Appeal from the United States District Court for the District of Massachusetts*

## CORRECTED JOINT APPENDIX

Keith R. Hummel
Lauren A. Moskowitz
Sharonmoyee Goswami
Andrei Harasymiak
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for Defendants-Appellees*

Kirk T. Bradley
Nicholas C. Marais
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000

Christopher L. McArdle
Wade G. Perrin
ALSTON & BIRD LLP
90 Park Ave, 15th Floor
New York, NY 10016
(212) 210-9400

*Counsel for Plaintiffs-Appellants*

# No. 23-2045
## Maquet Cardiovascular LLC v. Abiomed Inc.
### Joint Appendix Table of Contents

| Date | Description | Appx. Page No. |
|---|---|---|
| 2023-05-16 | Final Appealable Judgment | Appx1 |
| 2023-05-15 | Stipulation of Non-Infringement | Appx3 |
| 2022-09-12 | Claim Construction Order in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx9 |
| | Docket Sheet | Appx40 |
| 2019-03-26 | U.S. Patent No. 10,238,783 | Appx78 |
| 2017-12-15 | Prosecution History Excerpts Related to U.S. Application No. 12/772,810 | Appx169 |
| 2018-09-07 | Claim Construction Order in *Abiomed Inc. v. Maquet Cardiovascular LLC*, No. 1:16-cv-10914-FDS | Appx187 |
| 2019-09-24 | Abiomed Opening Claim Construction Brief in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx262 |
| 2016-08-17 | Prosecution History Excerpts Related to U.S. Patent No. 9,789,238 | Appx421 |
| 2012-07-17 | Prosecution History Excerpts Related to U.S. Patent No. 8,888,728 | Appx530 |

| | | |
|---|---|---|
| 2017-06-29 | Patent Owner's Preliminary Response in IPR2017-01027 regarding U.S. Patent No. 8,888,728 | Appx546 |
| 2017-06-27 | Patent Owner's Preliminary Response in IPR2017-01026 regarding U.S. Patent No. 8,888,728 | Appx555 |
| 2017-06-29 | Patent Owner's Preliminary Response in IPR2017-01028 regarding U.S. Patent No. 9,327,068 | Appx566 |
| 2017-06-30 | Patent Owner's Preliminary Response in IPR2017-01029 regarding U.S. Patent No. 9,327,068 | Appx572 |
| 2019-09-24 | Maquet Cardiovascular LLC's Opening *Markman* Brief in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx580 |
| 2019-10-22 | Maquet Cardiovascular LLC's Reply Claim Construction Brief in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx624 |
| 2019-11-19 | Maquet Cardiovascular LLC's *Markman* Hearing Presentation in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx721 |
| 2019-11-18 | *Markman* Hearing Transcript in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx956 |
| 2013-11-25 | Prosecution History Excerpts Related to U.S. Patent No. 8,888,728 | Appx1068 |
| 2014-11-25 | Prosecution History Excerpts Related to U.S. Patent No. 8,888,728 | Appx1101 |

| | | |
|---|---|---|
| 2019-06-24 | Maquet Cardiovascular, LLC's Supplemental Preliminary Infringement Contentions in *Maquet Cardiovascular LLC v. Abiomed Inc.*, No. 1:17-cv-12311-FDS | Appx1140 |
| 2019-08-22 | Deposition Testimony of Walid Aboul-Hosn in *Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 1:16-cv-10914-FDS | Appx1215 |
| 2017-12-15 | Abiomed's Opening Claim Construction Brief in *Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 1:16-cv-10914-FDS | Appx1280 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MAQUET CARDIOVASCULAR LLC,

              Plaintiff/Counter-Defendant,

    v.

ABIOMED, INC.; ABIOMED R&D, INC.;
and ABIOMED EUROPE GMBH,

              Defendants/Counter-
              Claimants,

No. 1:17-cv-12311-FDS

### FINAL APPEALABLE JUDGMENT

Before the Court is the Joint Stipulation of Non-Infringement and Motion for Entry of Final Appealable Judgment ("the Joint Stipulation") filed by Plaintiff/Counter-Defendant Maquet Cardiovascular LLC ("Maquet") and Defendants/Counter-Claimants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GMBH (collectively "Abiomed") (together with Maquet the "Parties"). Pursuant to Rules 54(b) and 58 of the Federal Rules of Civil Procedure, and in accordance with the Joint Stipulation:

1. The Court expressly finds there is no just reason for delaying entry of this Final Appealable Judgment.

2. It is hereby **ORDERED, ADJUDGED** and **DECREED** that Abiomed has not infringed any claim of U.S. Patent Nos. 9,789,238 or 10,238,783 under the constructions set out in the Court's Memorandum and Order on Claim Construction (Dkt. No. 248);

3.  The deadline for filing any petition, bill, or motion to recover costs and/or fees shall be **STAYED** pending disposition of any appeal of this Final Appealable Judgment by Maquet.

4.  Abiomed's Third Counterclaim seeking Declaratory Judgment that U.S. Patent Nos. 9,789,238 or 10,238,783 are each unenforceable ("Unenforceability Counterclaim") shall be **STAYED** pending disposition of any appeal of this Final Appealable Judgment by Maquet.

5.  If Maquet does not file a timely appeal of this Final Appealable Judgment, the stays shall terminate automatically and the Unenforceability Counterclaim shall be deemed **DISMISSED WITHOUT PREJUDICE**. If the Final Appealable Judgment is affirmed on appeal, the stays shall terminate automatically and the Unenforceability Counterclaim shall be deemed **DISMISSED WITHOUT PREJUDICE** upon the issuance of the mandate of the United States Court of Appeals for the Federal Circuit.

6.  This Judgment is **FINAL** and **APPEALABLE** under Rule 54(b) of the Federal Rules of Civil Procedure.

All other requests for relief now pending and requested by either party but not specifically addressed herein are **DENIED WITHOUT PREJUDICE**.

**SO ORDERED:**

Dated: May 16, 2023

United States District Judge
F. DENNIS SAYLOR

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MAQUET CARDIOVASCULAR LLC,

        Plaintiff/Counter-Defendant,

   v.

ABIOMED, INC.; ABIOMED R&D, INC.;
and ABIOMED EUROPE GMBH,

        Defendants/Counter-
Claimants,

No. 1:17-cv-12311-FDS

## JOINT STIPULATION OF NON-INFRINGEMENT AND MOTION
## FOR ENTRY OF FINAL APPEALABLE JUDGMENT

Plaintiff/Counter-Defendant Maquet Cardiovascular LLC ("Maquet") and Defendants/Counter-Claimants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GMBH (collectively "Abiomed") (together with Maquet the "Parties") hereby stipulate and agree, subject to the approval of the Court, as follows:

1. This is a patent infringement action in which Maquet has alleged, *inter alia*, that Abiomed has infringed claims 1, 2, 3, and 24 of U.S. Patent No. 10,238,783 (the "'783 Patent") (the "Asserted Claims") and claims 1–9, 11–14, 16–20, 22, and 24–28 or U.S. Patent No. 9,789,238 (the "'238 Patent") (collectively the "Asserted Claims") through, *inter alia*, their sales and use of the Impella line of intravascular blood pumps including the Impella 2.5, Impella 5.0, and Impella CP (collectively the "Accused Products"). Abiomed has asserted affirmative defenses and has counterclaimed, seeking a declaration that it has not infringed any claim of the '783 Patent or the '238 Patent (together with the Asserted Claims, the "Claims at Issue"), as well as a declaration that the '783 Patent or the '238 Patent are each unenforceable as the result of inequitable conduct.

Appx3

2.      On September 12, 2022, this Court entered a Memorandum and Order on Claim Construction (Dkt. No. 248), construing various claim terms. As relevant to this Stipulation, the Court construed the term "guide mechanism comprising a lumen" ('783 Patent, cl. 1) to require that the "guidewire lumen (1) does not extend through the free space between the rotor blades and (2) is not distal to the cannula." The Court also construed the terms "guide mechanism is configured to allow a guidewire to slideably advance" / "guide wire does not pass through the rotor hub of the catheter" ('783 Patent cls. 1, 24; '238 Patent, cls. 1, 13, 19) to require that the "guide wire does not extend through the free space in between the rotor blades."

3.      Based on the Court's constructions of these terms, Maquet cannot prove infringement of the Claims at Issue by the Accused Products.

4.      To preserve Court's and Parties' resources and permit appellate review of the Court's claim construction, the Parties stipulate to the entry of a Final Appealable Judgment against Maquet and in favor of Abiomed that the Accused Products do not infringe the Claims at Issue. On entry of that judgment, Maquet intends to appeal the Court's judgment of non-infringement based on this Stipulation and the Court's claim construction.

5.      The Parties further stipulate and agree that Abiomed's unadjudicated affirmative defenses and counterclaims and any claim for attorneys' fees or costs are stayed pending Maquet's appeal of the judgment of non-infringement. Abiomed reserves and retains the right to reassert, and Maquet reserves and retains the right to oppose, any such affirmative defenses, counterclaims, and claim for attorneys' fees or costs in the future, including in the event of a reversal or remand to this Court following the expected appeal from the Final Appealable Judgment entered pursuant to this stipulation. The stay shall be lifted after the appellate court's issuance of the mandate

regarding Maquet's appeal of the Court's Final Appealable Judgment or, if Maquet later decides it will not pursue an appeal, the stay shall be lifted after the time to appeal has passed.

6.      A proposed Final Appealable Judgment reflecting this stipulation is submitted herewith. The parties jointly move for entry of the Final Appealable Judgment.

7.      The Parties further stipulate and agree that this Stipulation and the Final Appealable Judgment submitted herewith cannot be used by the Parties for any evidentiary purpose at a trial in this case or any other case.

8.      This stipulation may be made part of the appellate record by any Party.

Respectfully submitted,

*/s/ Paul Tanck*

Paul Tanck
Christopher McArdle
Neal McLaughlin
Wade Perrin
Andrew Ligotti
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Fax: (212) 210-9444
paul.tanck@alston.com
chris.mcardle@alston.com
neal.mclaughlin@alston.com
wade.perrin@alston.com
andy.ligotti@alston.com

Erik Paul Belt (BBO # 558620)
**McCARTER & ENGLISH, LLP**
265 Franklin Street
Boston, MA 02110
Tel: (617) 449-6506
ebelt@mccarter.com

*Attorneys for Maquet Cardiovascular LLC*

Dated:  May 15, 2023

*/s/ Keith R. Hummel*

Keith R. Hummel (*pro hac vice*)
Lauren A. Moskowitz (*pro hac vice*)
Sharonmoyee Goswami (*pro hac vice*)
Andrei Harasymiak (*pro hac vice*)
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700
khummel@cravath.com
lmoskowitz@cravath.com
sgoswami@cravath.com
aharasymiak@cravath.com

Joseph L. Stanganelli (BBO# 628958)
**BARCLAY DAMON LLP**
160 Federal Street, Suite 1001
Boston, MA 02110
Telephone:  (617) 274-2900
jstanganelli@barclaydamon.com

*Attorneys for Abiomed Inc.; Abiomed R&D, Inc.; and Abiomed Europe GmbH*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2023, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF, which sends electronic notice to all counsel of record.


*/s/ Paul Tanck*
Paul Tanck

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAQUET CARDIOVASCULAR LLC,<br><br>          Plaintiff/Counter-Defendant,<br><br>  v.<br><br>ABIOMED, INC.; ABIOMED R&D, INC.;<br>and ABIOMED EUROPE GMBH,<br><br>          Defendants/Counter-<br>          Claimants, | No. 1:17-cv-12311-FDS |

**[PROPOSED] FINAL APPEALABLE JUDGMENT**

Before the Court is the Joint Stipulation of Non-Infringement and Motion for Entry of Final Appealable Judgment ("the Joint Stipulation") filed by Plaintiff/Counter-Defendant Maquet Cardiovascular LLC ("Maquet") and Defendants/Counter-Claimants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GMBH (collectively "Abiomed") (together with Maquet the "Parties"). Pursuant to Rules 54(b) and 58 of the Federal Rules of Civil Procedure, and in accordance with the Joint Stipulation:

1. The Court expressly finds there is no just reason for delaying entry of this Final Appealable Judgment.

2. It is hereby **ORDERED, ADJUDGED** and **DECREED** that Abiomed has not infringed any claim of U.S. Patent Nos. 9,789,238 or 10,238,783 under the constructions set out in the Court's Memorandum and Order on Claim Construction (Dkt. No. 248);

3. The deadline for filing any petition, bill, or motion to recover costs and/or fees shall be **STAYED** pending disposition of any appeal of this Final Appealable Judgment by Maquet.

4. Abiomed's Third Counterclaim seeking Declaratory Judgment that U.S. Patent Nos. 9,789,238 or 10,238,783 are each unenforceable ("Unenforceability Counterclaim") shall be **STAYED** pending disposition of any appeal of this Final Appealable Judgment by Maquet.

5. If Maquet does not file a timely appeal of this Final Appealable Judgment, the stays shall terminate automatically and the Unenforceability Counterclaim shall be deemed **DISMISSED WITHOUT PREJUDICE**. If the Final Appealable Judgment is affirmed on appeal, the stays shall terminate automatically and the Unenforceability Counterclaim shall be deemed **DISMISSED WITHOUT PREJUDICE** upon the issuance of the mandate of the United States Court of Appeals for the Federal Circuit.

6. This Judgment is **FINAL** and **APPEALABLE** under Rule 54(b) of the Federal Rules of Civil Procedure.

All other requests for relief now pending and requested by either party but not specifically addressed herein are **DENIED WITHOUT PREJUDICE**.


**SO ORDERED:**


Dated: _____                          _____

                                                                      United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
MAQUET CARDIOVASCULAR LLC,                  )
                                            )
        Plaintiff/Counterdefendant,         )
                                            )          **Civil Action No.**
        v.                                  )          **17-12311-FDS**
                                            )
ABIOMED, INC., ABIOMED R&D, INC.,           )
and ABIOMED EUROPE GMBH,                    )
                                            )
        Defendants/Counterclaimants,        )
_____     )


**MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION**

**SAYLOR, C.J.**

This is an action for patent infringement.  This is the second lawsuit between the parties

concerning the same technology.  *See Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-

10914-FDS (D. Mass.) ("*Abiomed I*").

Plaintiff Maquet Cardiovascular LLC has sued defendants Abiomed, Inc., Abiomed

R&D, Inc., and Abiomed Europe GmbH for infringing U.S. Patent No. 10,238,783 (filed Sept.

21, 2018) ("the '783 patent").  Defendants (collectively, "Abiomed") counterclaimed for

declaratory judgment of noninfringement.

The parties have submitted proposed claim construction of nine terms or groups of terms.

The construction of the disputed terms are set forth below.

**I.     Background**

        **A.     Parties**

        Plaintiff Maquet Cardiovascular LLC is the owner by assignment of several patents

relating to intravascular blood pumps.  As relevant here, Maquet is the owner of the '783 patent,

which is at issue in this case.  (Am. Compl. ¶ 1).

Defendant Abiomed manufactures, markets, distributes, and sells medical devices, including the Impella line of intravascular blood pumps, which have been on the market since June 2008.  (*Id.* ¶¶ 2, 13).

**B.**     **Underlying Technology**

The '783 patent is a descendant of earlier patents held by Maquet that disclose guidance systems for intravascular blood pumps.  For the convenience of the reader, the Court will recap its summary of the underlying technology from *Abiomed I*.  (*See Abiomed I*, Docket No. 241 ("*Abiomed I* Mem. & Order on Claim Constr.") at 1-4).  Nevertheless, the Court will briefly survey ground previously covered.

Intravascular blood pumps are essentially miniature pumps that are inserted through a patient's vasculature to provide blood-pumping support to diseased or damaged hearts, and are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation."  (*See* '783 patent, col. 1 ll. 37-44).  The pumps are capable of being introduced into the vasculature percutaneously in a remote location of the body and then guided into the heart.  (*See id.*, col. 1 l. 64 to col. 2 l. 19).

Generally, the blood pump systems discussed by the patent and the parties have the following basic structure:  At the far end of the system is a cannula (designated 14 below), a small tube through which blood is drawn into the pump.  Attached to the cannula is the blood pump itself (12), which includes a rotor, and is housed within a protective shroud.  Extending from the back of the pump is a variable assembly (18), sometimes called a catheter, that can house the drive cable for the blood pump and various guide mechanisms.

2



*FIG. 1*

('783 patent, fig.1).

One of the central problems in developing such pumps is that they are "difficult to guide into the appropriate position within the circulatory system of a patient." (*Id.*, col. 2 ll. 22-25). Prior art blood pumps used supplemental guide mechanisms, such as guide catheters, that enlarged the diameter of the device and consumed valuable space within the blood vessel, thereby restricting the available space for blood flow and increasing the size of the wound needed to introduce the device into the patient's circulatory system. (*See id.*, col. 2 ll. 45-55). The '783 patent (as well as the ancestor patents) claims to improve upon the prior art by developing blood pumps with integrated guide mechanisms that facilitate the guidance of the blood pump throughout the vasculature while eliminating the need for supplemental guide

3

mechanisms that augment the diameter of the device.  *(See id.*, col. 2 l. 62 to col. 3 l. 3).

The patent describes three examples of such integrated guide mechanisms.  The first is an "over-the-wire" guide mechanism, in which "a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 10-14).  Thus, in an "over-the-wire" design, the lumen is situated within the cannula so that the guidewire can be advanced through the device to the desired location within the circulatory system.  The blood pump is then advanced along the guide element to that location.  (*See id.*, col. 3 ll. 4-17).

The second example of an integrated guide mechanism is a "side-rigger" or "rapid exchange" type guide mechanism, in which "a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 25-29).  As with the "over-the-wire" design, the pump is then advanced along the guide element.  (*See id.*, col. 3 ll. 29-32).

The third example of an integrated guide mechanism is an "intravascular blood pump system" including a "conduit assembly" with a "guide catheter" and a "pump assembly," such that the conduit assembly is "precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology." (*Id.*, col. 3 ll. 34-53).  "The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud." (*Id.*, col. 3 ll. 54-56).

### C.    **Procedural Posture**

During *Abiomed I*, the PTO issued U.S. Patent No. 9,789,238 ("the'238 patent"), which was a descendant of the patents at issue in that case.  Maquet sought to add allegations of infringement of the '238 patent, but Abiomed objected, so Maquet agreed to assert those claims in a separate lawsuit.  Maquet then filed this action.

On March 26, 2019, the PTO issued the '783 patent, which is a divisional of the '238 patent.  Maquet thereafter amended the complaint in this case to add allegations of infringement of the '783 patent.  The suit has since been narrowed such that only claims of infringement of the more recently issued '783 patent are at issue.

## II.   **Standard of Review**

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at

5

1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

A.     **The Words of the Claim**

The claim-construction analysis normally begins with the claims themselves.[1]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314.  For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *Id.*  In addition, "the presence of a

---

[1] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

### B.  <u>The Specification</u>

"The claims, of course, do not stand alone." *Id.*  "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citations and quotation marks omitted).  For that reason, the specification must always be consulted to determine a claim's intended meaning.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316.  It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.*  Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA*,

7

*Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Id.* at 1323.  A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect.").  "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.  This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.*  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

### C.   The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how

the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1316. As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowel of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record."). Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

### D.   Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history,

9

including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.  However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance.  *Id.* at 1318-19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion.  *Id.* at 1319.

## III.   Analysis

There are nine groups of terms at issue in the '783 patent, which the Court will address in turn.

### A.   "Delimited by Outer Cannula Surface"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | Ordinary meaning or as construed by the Court in *Abiomed I* | As construed by the Court in *Abiomed I* with the additional limitation that "guide wire lumen is not attached outside the cannula" | 1 |

The Court construed an identical term as it was set forth in related patents in *Abiomed I* and concluded that its meaning was as follows:

[T]he axis of at least a portion of the guide mechanism, "configured as a second lumen," must run through a region delimited by the outer cannula surface.  That construction includes configurations such as those depicted in Figures 8 and 9 of the '728 and '068 patents, and configurations such as those depicted in Gordon

10

(which the Court sees no reason to distinguish from Figure 9).  It also includes configurations where the second lumen is coaxial with the cannula, such as "over-the-wire"-type designs.  It does not, however, include configurations such as those depicted in Bagaoisan.  The second lumen must be a separate structural element from the cannula itself, as the terms are listed separately.

(*Abiomed I* Mem. & Order on Claim Constr. at 41-42 (footnotes and citation omitted)).

Abiomed contends that the Court should adopt that construction with an additional limitation that "the guide wire lumen is not attached to the outside of the cannula."  It contends that the proposed construction clarifies that a structure disclosed in prior art is not encompassed by the claim language.

Maquet contends that the term should be construed according to its ordinary meaning, or, alternatively, according to the Court's order in *Abiomed I*.  Any additional limitation, according to Maquet, is unnecessary and unsupported by the specification and prosecution history.  Furthermore, Maquet contends that Abiomed should be judicially estopped from arguing for an additional limitation to the claim term because it admitted in *Abiomed I* that an "elongate lumen associated with the cannula" includes lumens that are "separate but permanently bolted on or attached to the side of the cannula."  (Docket No. 141 ("Maquet Opening *Markman* Br.") at 16).

The judicial estoppel argument may be disposed of quickly.  Judicial estoppel applies only if (1) "the estopping position and the estopped position [are] directly inconsistent" and (2) "the responsible party . . . succeeded in persuading a court to accept its prior position." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).  It is not enough for a litigant to make a statement in prior litigation that is arguably inconsistent with its current position; the earlier statement must be directly inconsistent and must have been relied upon by the court in rendering its earlier decision.  At a minimum, Maquet cannot establish such

reliance here, and therefore judicial estoppel does not apply.

In any event, while the Court's claim construction in *Abiomed I* surely could have been more succinct, under the circumstances the Court sees no reason to depart from that construction here. Accordingly, it will construe the term in the same manner as in *Abiomed I*, and without the additional language proposed by Abiomed.

### B. "Guide Mechanism Comprising a Lumen"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism comprising a lumen" | "guide mechanism comprising a lumen that does not extend through the free space between rotor blades" | "guide wire lumen does not extend through the free space between rotor blades" with the additional limitation "guidewire lumen is not distal to the cannula" | 1 |

The next term is best understood within the broader claim language, which reads as follows:

An intravascular blood pump system, comprising:

. . .

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient.

('783 patent, App'x B col. 33 ll. 60-61 to col. 34 ll. 5-9).

In *Abiomed I*, the Court construed several terms concerning the lumen component of the guide mechanism individually, but construed all of them to "include the limitation that the guidewire lumen does not extend through the free space between the rotor blades." (*Abiomed I* Mem. & Order on Claim Constr. at 25). Abiomed contends that the same limitation should be

applied here.  Maquet does not dispute the point, and therefore the Court will include that limitation here.

Abiomed further contends that an additional limitation is required that the guidewire lumen not be distal to the cannula.  According to Abiomed, Maquet acquiesced to an examiner's revision of claims 14 and 22 of the '238 patent, which resulted in a disclaimer of a lumen distal to the cannula in all related patents, including the '783 patent.

Maquet contends that no such disclaimer is apparent in the prosecution history of the '238 patent, nor is that history relevant here.  Maquet further argues that Abiomed should be judicially estopped from raising claim construction issues that could have been raised in *Abiomed I*.

To begin, the prosecution history of the '238 patent is relevant when determining the scope of the '783 patent, which is a descendant.  *See, e.g., Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

Furthermore, the doctrine of judicial estoppel is again inapplicable.  Maquet essentially argues that Abiomed should be estopped from making any argument that it could have raised in *Abiomed I*, but failed to do so.   Even putting to one side the question of whether Abiomed can be faulted for failing to object to claims in a patent that had not yet issued at the time of claim-construction proceeding in *Abiomed I*, it is clear that judicial estoppel does not apply where the court in the earlier matter was not even presented with the party's position, and therefore could not have relied upon it in reaching its decision.

The question, then, is whether Maquet made a disclaimer during the prosecution of the

'238 patent that necessarily limits its claims here.  During that prosecution, the examiner rejected claims 14 and 22 of the application (U.S. Patent App. No. 14/966,669) for failing to comply with the enablement requirement of 35 U.S.C. § 112.  (Docket No. 138, Ex. 9-C).  Those claims described the "entire elongate lumen" as being "distal to the intravascular blood pump," which was depicted in an embodiment that featured an "offset guidewire lumen" (that is, a "side-rigger" design).  (*Id.* at 3).  The examiner objected to the claim language because, in the examiner's opinion, the elongate lumen extended along the cannula, and because the intravascular blood pump comprised the cannula, the lumen could not accurately be described as "distal to the pump."  (*Id.*).  As a result, the examiner suggested that the claims be revised to describe the elongate lumen as being distal to the "rotor, first port or rotor shroud."  (*Id.*).  Maquet accepted that revision, and the claims were revised accordingly.

It appears that the examiner's objection stemmed primarily from a disagreement about the taxonomy of the intravascular blood pump (specifically, whether it included the cannula). But the genesis of the objection is immaterial.  Maquet's acquiescence in the resulting changes amounts to a withdrawal of the broader claim, and that withdrawal is legally binding on it in a subsequent proceeding to prove infringement.  *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2005) (arguments and amendments made during patent prosecution "can lead to narrow claim interpretations because 'the public has a right to rely on such definitive statements . . . .'") (alteration omitted) (quoting *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998)); *UCB, Inc., v. Yeda Research & Dev. Co.*, 837 F.3d 1256, 1261 (Fed. Cir. 2016) ("[T]he general rule is that a patent applicant cannot later obtain scope that was requested during prosecution, rejected by the Examiner, and then withdrawn by the applicant.").

Accordingly, the term "guide mechanism comprising a lumen" will be construed to

14

include the limitations that the guidewire lumen (1) "does not extend through the free space between the rotor blades" and (2) "is not distal to the cannula."

### C.     "Guide Wire Does Not Pass Through the Rotor Hub"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism is configured to allow a guidewire to slideably advance"<br><br>"guide wire does not pass through the rotor hub of the catheter" | Ordinary meaning | Ordinary meaning with the additional limitation "the guide wire does not extend through the free space in between the rotor blades" | 1, 24 |

As discussed, the Court in *Abiomed I* construed all lumen-related terms to include the limitation that the lumen could not extend through the space between the rotor blades, based on Maquet's disclaimer during the prosecution.  The Court addressed only in passing whether the same limitation applied to the guidewire itself:

> Maquet further contends that at most it disclaimed a *permanent* guide lumen that extended between the free space of the blades, not the use of a temporary one. (Maquet Reply Br. at 21-22).  But that is not a fair reading of the patent or the disclaimer.  While certain parts of the specification suggest that the guidewire can be removed prior to operation, ('437 patent, col. 12 l. 59-col. 13 l.2; *id.*, col. 14 ll. 44-49), nothing suggests that the guidewire lumen itself is removable.

(*Abiomed I* Mem. & Order on Claim Constr. at 25).

Here, Abiomed contends that Maquet, in distinguishing its blood pump from those portrayed in prior art, surrendered any claim to a pump that employed a guidewire extending through the space between the rotor blades.  That is made clear, according to Abiomed, by the specification of the '783 patent, which states that the guidewire may either remain in place or be removed once the blood pump is properly positioned within the patient.

15

In *Abiomed I*, the Court noted that during the prosecution history of earlier patents, Maquet distinguished its device from those that were rendered inoperable by a guide lumen extending between the rotor blades.  The prior art was Völker, which discloses a device that runs the guidewire between the rotor blades when being positioned within the circulatory system. The relevant prosecution history discloses that the examiner distinguished Völker in part by noting that because Völker threaded the guidewire through the rotor blades and did not have a separate guide lumen, it did not teach or suggest side-rigger or coaxial guide mechanisms.  And Maquet adopted that position.  *See* Docket No. 138, Ex. 12-B at MAQ_00004994 ("Völker does not provide a separate second lumen for the guide mechanism.  Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning . . . while the guidewire 25 is located in the pump housing, no Rotation of the impeller [is possible]. Therefore, Völker fails to teach or suggest the side rigger or coaxial guide mechanisms of claims 15, 29 or 45 [later issued as independent claims 1, 10 and 22].")  Abiomed contends that by adopting the examiner's position, Maquet disclaimed devices with a guidewire running between the blades.

A *permanent* guidewire that extended in the space between the rotor blades would render the pump inoperable; that much would be obvious to a lay person, never mind a person of skill in the art.  Völker did not claim such an invention, and Maquet does not claim it now.  Instead, Völker claimed a *removable* guidewire that extended in the space between the rotor blades.  The question is whether Maquet's adoption of the examiner's position distinguishing Völker resulted in a binding disclaimer of such a removable guidewire.

It is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump.  (*See, e.g.*, '783 patent, col. 12 ll. 63-

16

66).  But that does not resolve the issue, as the guidewire may be removable in coaxial or side-rigger variations where the wire does not pass through the open space between the rotor blades. Moreover, the specification indicates that removal of the guidewire is optional, suggesting that the specification does not contemplate any variation in which the wire passes between the rotor blades (because the pump would not function if the guidewire were not removed).  And nothing in the specification teaches the insertion of a guidewire between the rotor blades.

In any event, Maquet adopted the examiner's position, which distinguished Völker on the ground that it did not disclose a separate second lumen—that is, a lumen that is separate from the pump housing, whether coaxial or on the side.  It is difficult, under the circumstances, to construe Maquet's position distinguishing Völker as anything other than a surrender of the subject matter of a guidewire passing through the free space between the rotor blades in the pump housing.  Maquet thus disclaimed that subject matter during the prosecution, and the present claims should be construed accordingly.

Accordingly, the terms "guide mechanism is configured to allow a guidewire to slideably advance" and "guide wire does not pass through the rotor hub of the catheter" will be construed to include the limitation that "the guide wire does not extend through the free space in between the rotor blades."

17

D.    **"Establishes Slidable Contact with the Guide Mechanism"**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism" | Ordinary meaning | Term fails for indefiniteness | 2 |

Section 112 of the Patent Act provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).  A patent claim fails to satisfy that requirement and "is invalid for indefiniteness if its claims, read in the light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  That is, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (quotation marks and alterations omitted).  Nevertheless, "the definiteness requirement must take into account the inherent limitations of language," for "[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Id.* (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002)).

Claim indefiniteness is an issue of law to be decided by the court. *Teva Pharms. USA, Inc.*, 789 F.3d at 1341.  To determine whether a claim is indefinite, a court "look[s] to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of

18

skill in the art with reasonable certainty the scope of the invention claimed." *Id.*  A patent is presumed to be valid.  35 U.S.C. § 282.  Overcoming that presumption requires that a defendant prove indefiniteness by clear and convincing evidence.  *Microsoft Corp. v i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Abiomed contends that this term is indefinite because the language of the claim is incomprehensible and ambiguous.  The claim describes two spaces or points through which the guidewire passes.  The first is "the region delimited by the outer cannula surface"; the second is "where the guide wire establishes slidable contact with the guide mechanism."  (Docket No. 143 ("Abiomed Opening *Markman* Br.") at 13-15).  Abiomed contends that—aside from the requirement that the first point be proximal to the second—the claim fails to specify where those two points are located, thereby making the claim undefined, vague, and susceptible to multiple interpretations.  (*Id.* at 14).  Specifically, Abiomed contends that the claim language is unclear whether that first point—located in "the region delimited by the outer cannula surface"—lies within the cannula sidewall or within the cannula itself.  (*Id.* at 15).  In addition, there is no clear correlation, according to Abiomed, between the claim language and the embodiments specified in the patent, which depict both "side-rigger" and "over-the-wire" designs.  (*Id.*).

Abiomed further contends that the second point—"where the guide wire establishes slidable contact with the guide mechanism"—is ambiguous, because the specification does not define what it means for the guide wire to "establish" slidable contact, nor does it define where within the guide mechanism that "contact" must take place.  (*Id.* at 14).  According to Abiomed, that ambiguity makes it unclear to which embodiments of the invention the claim corresponds.

Maquet contends that the language is clear to a person of ordinary skill in the art.  With respect to a "region delimited by the outer cannula surface," Maquet argues that similar language

19

is set forth in claim 1, which Abiomed does not contest as ambiguous.  (Maquet Opening *Markman* Br. at 30).  Similarly, Maquet asserts that the point "where the guide wire establishes slidable contact with the guide mechanism" is the same point described in claim 1 where the "guide mechanism is configured to allow for a guide wire to slideably advance therealong."  (*Id.* at 30-31).  Moreover, Maquet cites to the testimony of Abiomed's expert witnesses, Dr. Antaki and Dr. Collins, as evidence that the term is intelligible to a person of ordinary skill in the art. (Docket No. 156 ("Maquet Reply *Markman* Br.") at 23-26).  Finally, the fact that the claim language is broad and may encompass several different embodiments, Maquet argues, does not render it indefinite.  (*Id.* at 24-25).

The language is certainly difficult to parse, and Maquet has done little to elucidate its meaning.  Nonetheless—and despite the fact that it appears to have a narrow meaning— Abiomed has not met its burden of demonstrating that the language is fatally indefinite.

The Court will begin its analysis with the second location ("where the guidewire establishes slidable contact with the guide mechanism").  The patent, in simplified terms, discloses a pump with a guidewire that slides through a lumen.  Maquet contends that the location "where the guidewire establishes slidable contact with the guide mechanism" is "the same location identified in claim 1, where the guide mechanism slidably advances along the guidewire."  (Maquet Opening *Markman* Br. at 30-31).  That construction, however, cannot be correct.  The claims use different terms ("establishes slidable contact" as opposed to "slidably advances along"), which presumably have different meanings.  Furthermore, the term "establishes" suggests that things are happening in a particular sequence:  (1) at the outset, the guidewire does not have contact with the lumen; (2) the guidewire then "establishes" slidable contact with the lumen: and (3) the guidewire then "slidably advances along" the lumen.  Put

20

another way, the term "establishes contact," in context, suggests the specific point at which the guidewire enters the lumen, not every point along the entire length of the lumen.

The first location ("the region delimited by the outer cannula surface") is perhaps more problematic, but again not fatally so.  The Court discussed similar language in its claim construction opinion in *Abiomed I*, without resolving the issue presented here.  (*See Abiomed I* Mem. & Order on Claim Constr. at 38).

As a general proposition, the "region delimited by the outer . . . surface" of a regularly shaped three-dimensional object is an unambiguous phrase.  For example, even a lay person can readily grasp the meaning of that term when applied to a regularly shaped cylinder, sphere, or cone; the "region" in question is the interior of the cylinder, sphere, or cone.  Here, the cannula is in the shape of a tube—essentially, an elongated cylinder.  And, as a general matter, the "region delimited by the outer . . . surface" of a tubular object—like any other cylinder—is its interior.

How the second location is defined for an irregularly shaped object, and how the two locations relate to one another, is less than perfectly clear, and again Maquet has not provided much assistance in that regard.  The most challenging aspect of the language is the requirement that the guidewire "pass[] through" the delineated "region" at a "location proximal to" the point where it "establishes slidable contact" with the lumen.  That requires a design where the entry point for the guidewire into the lumen ("where the guidewire establishes slidable contact with the guide mechanism") must be distal (that is, farther away from the insertion site of the device into the body) than the "region delineated by the outer cannula surface." [2]

For the sake of illustration, consider an over-the-wire design.  If the cannula were

---

[2] The parties do not dispute that "proximal" in the context of the patent means toward the insertion site of the device into the body.

21

perfectly cylindrical, in the shape of a cigarette, the "region delimited by the outer cannula surface" would be the interior of the cylinder.  The entry point for the guidewire ("where the guidewire establishes slidable contact with the guide mechanism") could not be the blunt end of the cylinder; that point would be neither proximal nor distal to the delimited "region."  If the ends of the cannula were tapered, in the shape of a cigar, again the entry point would be neither proximal nor distal to the delimited "region."  But if the end of the cannula were inwardly indented or tapered—like a cigarette with a recessed filter, or a cylindrical object with a tapered screw hole—part of the delimited region could arguably be proximal to the entry point.  In other words, the guidewire could conceivably pass through a region delimited by the outer surface of the cannula before establishing contact with the lumen.

If something is ambiguous, it can be reasonably construed in multiple ways, and if it is incomprehensible, it cannot be reasonably construed at all.  Here, it is possible (at least for the Court) to construe the language in at least one way that is comprehensible.  If there is another meaning to the language, Maquet has not supplied it—nor, for that matter, has Abiomed, which asserts that the claim is susceptible of multiple interpretations.  In any event, the Court has not been asked to construe the claim, only to determine whether it is fatally indefinite.  And while the claim language seems to be very narrow, a narrow claim is not the same as an ambiguous or indefinite claim.  Under the circumstances, therefore, Abiomed has not met its burden of showing that the term fails for indefiniteness.

22

E.    **"Proximate the Intravascular Blood Pump"**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "Detect a pressure of blood proximate the intravascular blood pump" / "sense pressure proximate the intravascular blood pump" | Ordinary meaning | Term fails for indefiniteness | 3, 24 |

The Court addressed both of the disputed claim terms in *Abiomed I*, albeit in response to arguments that differ from those presented here.  There, Abiomed contended that, based on the prosecution history of the '100 patent, Maquet had limited the claim such that "proximate to the intravascular blood pump" meant "at the opening of the blood pump or cannula."  (*Abiomed I* Mem. & Order on Claim Construction at 67).  The Court determined that the prosecution history did not reveal such a limitation and therefore construed the terms according to their ordinary meaning.  (*Id.* at 67-68).  At that time, the Court did not address Abiomed's contentions that the terms were ambiguous, stating that Abiomed could raise arguments concerning indefiniteness at the appropriate time.  (*Id.*).

Abiomed now contends here that the terms are indefinite.  Specifically, it claims that nothing in the claim language, specification, or prosecution history informs a person of ordinary skill in the art of the meaning of "proximate"—that is, how close to the intravascular blood pump the "blood pressure detection mechanism" must be.  (Abiomed Opening *Markman* Br. at 16).  It further contends that the word "proximate" is a "term of degree," leaving the location of the blood pressure detection mechanism open to subjective interpretation.  (*Id.*)  The specification, according to Abiomed, does not provide any additional guidance, other than the language it incorporated from U.S. Patent Application No. 09/280,970, entitled "Pressure Sensing Cannula."

23

(*Id.* at 17).  Nevertheless, that application, according to Abiomed, concerned a different invention utilizing different blood-pressure sensing mechanisms, therefore making the application irrelevant to interpreting the terms of the '783 patent.  Nor does the prosecution history clarify the meaning of "proximate," as the IPR proceedings concerning this term did not result in a narrowing of claim scope.  (*Id.* at 17-18).  In support of its contentions, Abiomed points to Antaki's testimony, which states that the terms are ambiguous to a person of ordinary skill in the art.  (*Id.* at 17 (citing Antaki Decl. at ¶¶ 52-54)).

In response, Maquet contends that neither term requires additional construction and that the ordinary meaning suffices.  It contends that a person of ordinary skill in the art could reasonably determine the location of the blood pressure detection mechanism, given the claim language and the specification support found in the '970 application.  (Maquet Reply *Markman* Br. at 20-21).  According to Maquet, Antaki admitted as much in his testimony.  (*Id.* (citing Antaki Tr. at 121-25)).[3]

In many contexts, the term "proximate"—which is a term of degree that essentially means "near"—would be problematic.  *See, e.g., In re Neurografix Patent Litig.*, 201 F. Supp. 3d 206, 223 (D. Mass. 2016) (concluding that the term "near," in context, was indefinite, as it encompassed myriad possible configurations).  Nonetheless, a term of degree is not "inherently indefinite."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  If there is sufficient intrinsic or other evidence such that a person of skill in the art could ascertain its meaning with reasonable certainty, it is not indefinite.  *Id.*

---

[3] Maquet further contends that Abiomed could have raised this argument in *Abiomed I*, and, consequently, should be estopped from making such arguments here.  (Maquet Opening *Markman* Br. at 30).  Again, the doctrine of judicial estoppel is inapplicable under the circumstances.

As for support in the specification, the '970 application describes pressure sensors incorporated into various parts of the cannula. (*See, e.g.*, '783 patent, App'x B at cols. 31-32 (appending the '970 patent)). Contrary to what Abiomed contends, that application is physically incorporated into the specification here, and therefore is intrinsic evidence as to the meaning of the term.

In any event, under the circumstances presented here, the term "proximate" is not fatally indefinite. The pump in question is designed to operate in a specific, highly confined environment, passing through the vasculature percutaneously and into the heart. Among other things, that operating environment substantially limits the possible configurations for the device. Furthermore, the only function of the device, which is to pump blood, intrinsically suggests that the pressure sensing device must be necessarily proximate to measure that pressure. A person of skill in the art could ascertain with reasonable certainty the limitations of the claim.

Accordingly, the terms "detect a pressure of blood proximate the intravascular blood pump" and "sense pressure proximate the intravascular blood pump" are not indefinite, and will be construed according to their ordinary meanings.

### F.   Distal Tip Claims

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "pigtail-shaped distal tip" | Ordinary meaning | "thermoplastic rod formed into a loop attached at the distal end of the cannula" | 24 |
| "J-shaped distal tip" | Ordinary meaning | "J-tip guidewire" | 24 |

Abiomed contends that the claim term "pigtail-shaped distal tip" is vague and generic and that, as a result, the claim should be limited to the embodiments presented in the specification.

25

(Docket No. 155 ("Abiomed Reply *Markman* Br.") at 29-30).  Specifically, the specification

provides that "[t]he pigtail shape, illustrated in Fig. 30, can be formed by bonding or thermal

welding or otherwise attaching a thermoplastic rod formed into a loop at the distal end of the

cannula 1120."  ('783 patent, App'x A at col. 26 ll. 41-44) (appending U.S. Patent No.

09/280,988)).  Abiomed asserts that this description should govern the scope of the claim.

(Abiomed Reply *Markman* Br. at 29).

Similarly, Abiomed contends that the claim term "J-shaped distal tip" is vague and

generic such that it must be limited in scope to the relevant embodiment described in the

specification.  (Abiomed Reply *Markman* Br. at 31-33).  The specification, according to

Abiomed, does not describe a "distal tip"; rather, it describes a "J-tip" *guidewire* protruding from

the distal end of the device.  (*Id.* at 32).  Abiomed contends that the term should be construed

accordingly.

The Court agrees with Maquet that both terms are understandable to a person of ordinary

skill in the art, and that no limitation from the specification should be read into the claims.[4]  The

terms "pigtail-shaped" and "J-shaped" are readily understandable, as is the term "distal."  Nor is

the term "tip" so vague that it must be limited to the distal end of the cannula, as opposed to the

distal end of the guide wire or some other component.  And there is certainly no reason to limit

the claim to a particular type of material, such as a "thermoplastic rod."

Accordingly, the Court will construe the terms "pigtail-shaped tip" and "J-shaped distal

tip" according to their ordinary meanings.

---

[4] Maquet again asserts that Abiomed had an opportunity to challenge these terms in *Abiomed I* and failed to
do so.  (*Id.*).  Again, the Court will not apply judicial estoppel as a bar to Abiomed's arguments.

G.     <u>**Claim 24**</u>

Claim 24 describes, in relevant part,

An intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guidewire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub extending distally beyond a most distal portion of the at least one blade;

. . .

a cannula coupled to a distal end of the intravascular blood pump, . . . the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guidewire does not pass through the rotor hub or catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient . . . .

('783 patent, col. 37 l. 32 to col. 38 l. 9).

Abiomed contends that Claim 24 is indefinite on two grounds:  first, that the claim describes a function without specifying the structures needed to accomplish that function, (Abiomed Opening *Markman* Brief at 18-21), and second, that the claim impermissibly combines method and apparatus limitations (*Id.* at 21-23).  Each contention will be addressed in turn.

27

### 1.  <u>"Adapted to be Guided to a Predetermined Location"</u>

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire" | Ordinary meaning or "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire passing through a lumen of the intravascular blood pump" | Term fails for indefiniteness; alternatively, "an intravascular blood pump with either (a) a guide wire passing slideably through a side lumen formed along the side of the cannula, or (b) a conduit assembly, including a guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly.  Both structures are for the guiding of the intravascular blood pump to a predetermined location." | 24 |

Abiomed first contends that the claim term is indefinite because it describes a blood pump that is "adapted" to be guided to a spot within the patient's circulatory system, but the claim does not describe a structure by which that adaptation is achieved—that is, the claim describes a device function, but fails to describe a structure that facilitates that function.  (*Id.* at 18).

In substance, Abiomed construes the opening language to be a "means" limitation, and thus seeks to import structural limitations from the specification into the claims.  That is not, however, an accurate interpretation of the language.  The challenged claim term is a non-limiting

28

preamble to the claim, and therefore provides context for the claim rather than a limitation. *See DeGeorge v. Bernier*, 768 F.2d 1318, 1322 (Fed. Cir. 1985) ("Comprising is often used after a claim preamble to introduce elements of the invention."). If the challenged claim language were omitted from the claim altogether, the claim would still disclose a structurally complete device. *See Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (stating that "a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention" (internal quotations and citation omitted)).

Alternatively, Abiomed contends that if the Court is to construe the term, it should do so in a manner that limits the claimed structures to those provided for in the specification—specifically, structures that are characterized as "side-rigger" or "two-piece catheter" designs. (Abiomed Opening *Markman* Brief at 20). It contends that the "over-the-wire" design is not encompassed by the claim terms because such a design is not described by the specification and the claim limitation that "the guidewire does not pass through the rotor hub or catheter" forecloses the possibility of an "over-the-wire" design. (*Id.*). In contrast, claims 26, 28, and 29 describe "side-rigger" designs, and claim 27 describes a "two-piece catheter" design. (*Id.* at 21).

Claim 24 states that "the guidewire [cannot] pass through the rotor hub or catheter," which certainly would appear to foreclose any "over-the wire" design. Abiomed acknowledges that the language would permit either a "side-rigger" or "two-piece catheter" design. And it has failed to explain why other designs (if they exist) should be excluded from the claim language, other than to argue that the limitations in the specification should simply be imported into the claim, which is impermissible.

Accordingly, the Court will construe the term "an intravascular blood pump adapted to be

29

guided to a predetermined location within a circulatory system of a patient by a guide wire" according to its ordinary meaning.

### 2.   "When the Intravascular Blood Pump is Positioned"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" | Ordinary meaning | Term fails for indefiniteness | 24 |

Claim 24 further recites, in part, the following:

An intravascular blood pump system, comprising:  [a pump with a guidewire; a catheter; a cannula;]

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

[a pressure sensing element].

('783 patent, col. 37 l. 32 to col. 38 l. 10-14).

Abiomed contends that the claim term is indefinite according to the Federal Circuit's decision in *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005).  There, the court determined that a claim reciting both a system for processing financial transactions and a method for that system's use was indefinite because it was unclear whether infringement occurred when the accused system was created or when the accused system was used in a particular manner.  *Id.* at 1384.  Thus, the claim failed to "apprise a person of ordinary skill in the art of its scope, and it [was] invalid under section 112, paragraph 2."  *Id.*

30

Here, Abiomed contends that claim 24 likewise describes both a system and method for intravascular blood pump.  Specifically, it contends that claim 24 purports to describe an intravascular blood pump system, but the claim language describes a method for that blood pump's use through the claim term "when the intravascular blood pump is positioned in the patient."  ('783 patent, col. 38 ll. 12-13).  That term, according to Abiomed, is not a limitation on the blood pump's structure, but rather a limitation on how the pump may be used.  (Abiomed Opening *Markman* Br. at 22).

The Court, however, does not construe the claim in that fashion.  Fairly read in context, the term specifies the capabilities of the claim structure and its orientation while in use rather than a method of use—that is, the claim permissibly describes the blood pump's function or capability without claiming a specific method for its use.  *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313-16 (Fed. Cir. 2017).  Put another way, the claim language does not describe a task in which the pump is used; rather, the term describes the configuration and capability of the device when in the heart.

Accordingly, the term "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" is not impermissibly indefinite, and will be construed according to its ordinary meaning.

**So Ordered.**

|  |  |
|---|---|
|  | /s/ F. Dennis Saylor IV |
|  | F. Dennis Saylor IV |
| Dated: September 12, 2022 | Chief Judge, United States District Court |

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:17–cv–12311–FDS

Maquet Cardiovascular LLC v. Abiomed Inc. et al
Assigned to: Chief Judge F. Dennis Saylor, IV
related Case: <u>1:16–cv–10914–FDS</u>
Case in other court:  USCA for the Federal Circuit, 23–02045
Cause: 15:1126 Patent Infringement

Date Filed: 11/22/2017
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

| **Maquet Cardiovascular LLC** | represented by | **Andrew J. Ligotti** |
|---|---|---|

represented by **Andrew J. Ligotti**
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016
212–210–9400
Email: <u>Andy.Ligotti@alston.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher L. McArdle**
Alston & Bird, LLP
90 Park Ave.
15th Floor
New York, NY 10016
212–210–9400
Email: <u>chris.mcardle@alston.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory J. Carbo**
Chadbourne & Parke LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 408–1159
Email: <u>greg.carbo@alston.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Charles Grant**
Alston & Bird, LLP
1201 W. Peachtree Street NW Suite 4000
Atlanta, GA 30309
(404) 881–7859
Email: <u>jim.grant@alston.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Margaret K. Minister**
Pierce Atwood LLP
254 Commercial Street
Portland, ME 04101
207–791–1340
Email: <u>mminister@pierceatwood.com</u>
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Connor**
Alston & Bird LLP
Bank of America Plaza Building
Suite 4000
101 South Tryon Street
Charlotte, NC 28280
704–444–1022
Email: mike.connor@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal J. Mclaughlin**
Alston & Bird, LLP
90 Park Ave.
New York, NY 10016
212–210–9400
Email: Neal.McLaughlin@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul J. Tanck**
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
(212) 210–9438
Email: paul.tanck@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wade G. Perrin**
Alston & Bird, LLP
90 Park Avenue
15th Floor
New York, NY 10016
212–210–9450
Email: wade.perrin@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erik Paul Belt**
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
617–449–6506
Email: ebelt@mccarter.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Abiomed Inc.**                    represented by    **Andrei Harasymiak**
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
(212) 474–1000
Email: aharasymiak@cravath.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020–1095
(212) 819–8356
Email: sebastian.zonte@whitecase.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
White & Case LLP
Palo Alto, CA
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Padro**
White & Case, LLP
1221 Avenue of the Americas
New York, NY 10020
212–819–8200
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474–1000
Email: khummel@cravath.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
White & Case LLP
New York, NY
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Ave
New York, NY 10019
212–474–1000
Fax: 212–474–3700
Email: lmoskowitz@cravath.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
White & Case, LLP
1221 Avenue of the Americas
New York, NY 10020
212–819–8248
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
212–474–1000
Email: reshma.gogineni@wilmerhale.com
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
Fenwick & West LLP
902 Broadway, 14th Floor
New York, NY 11207
212–430–2600
Fax: (212) 354–813
Email: rcounihan@fenwick.com
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
Goodwin Procter LLP
620 8th Ave
New York, NY 10018
212–813–8800
Fax: 212–355–3333
Email: SWeingaertner@goodwinlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
(212) 474–1000
Email: sgoswami@cravath.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
White & Case LLP
New York, NY
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
Goodwin Procter LLP
620 8th Ave
New York, NY 10018
212–813–8800
Email: SMentzer@goodwinlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne–Raphaelle Aubry**
Quinn Emanuel Urquhart & Sullivan

24th Floor
111 Huntington Ave Suite 520
Boston, MA 02199
617–712–7109
Email: anneraphaelleaubry@quinnemanuel.com
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
Barclay Damon, LLP
160 Federal Street
Boston, MA 02110
617–274–2900
Fax: 617–722–6003
Email: jstanganelli@barclaydamon.com
*ATTORNEY TO BE NOTICED*

**Retley G. Locke , Jr**
Fenwick & West LLP
902 Broadway
18th Floor
New York, NY 10010
212–430–2600
Fax: 650–938–5200
Email: rlocke@fenwick.com
*TERMINATED: 04/14/2023*
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
White & Case, LLP
24th Floor
75 State Street
Boston, MA 02109
617–979–9336
*ATTORNEY TO BE NOTICED*

**Defendant**

Abiomed R&D, Inc.                   represented by   **Andrei Harasymiak**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne–Raphaelle Aubry**
(See above for address)
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Retley G. Locke , Jr**
(See above for address)
*TERMINATED: 04/14/2023*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Abiomed Europe GmbH**                    represented by     **Andrei Harasymiak**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
(See above for address)
*TERMINATED: 09/12/2022*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anne−Raphaelle Aubry**
(See above for address)
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Retley G. Locke , Jr**
(See above for address)
*TERMINATED: 04/14/2023*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Getinge AB**                        represented by   **Wade G. Perrin**
*TERMINATED: 09/04/2018*                                (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed R&D, Inc.**                 represented by   **C. Sebastian Zonte**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Joseph L. Stanganelli**
                                                        (See above for address)

*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed Inc.**                    represented by    **C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Maquet Cardiovascular LLC**       represented by    **Andrew J. Ligotti**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher L. McArdle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory J. Carbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Margaret K. Minister**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Connor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal J. Mclaughlin**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul J. Tanck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wade G. Perrin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed Europe GmbH**                    represented by   **C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed R&D, Inc.**                 represented by    **C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed Inc.**                    represented by    **C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

Appx51

V.

**Counter Defendant**

**Maquet Cardiovascular LLC**                 represented by   **Andrew J. Ligotti**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher L. McArdle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory J. Carbo**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Margaret K. Minister**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Connor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal J. Mclaughlin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul J. Tanck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wade G. Perrin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed R&D, Inc.**                 represented by   **Andrei Harasymiak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne–Raphaelle Aubry**
(See above for address)
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed Inc.**        represented by   **Andrei Harasymiak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne–Raphaelle Aubry**
(See above for address)
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Abiomed Europe GmbH**                  represented by   **Andrei Harasymiak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**C. Sebastian Zonte**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cale V Tolbert**
(See above for address)
*TERMINATED: 09/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles D. Larsen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Padro**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith R. Hummel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Rees Logsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren A Moskowitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Wisnieff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reshma R. Gogineni**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E. Counihan**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott T. Weingaertner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sharonmoyee Goswami**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvia M. Medina**
(See above for address)
*TERMINATED: 08/31/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stefan M. Mentzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne–Raphaelle Aubry**
(See above for address)
*TERMINATED: 09/29/2020*
*ATTORNEY TO BE NOTICED*

**Joseph L. Stanganelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**Maquet Cardiovascular LLC**                    represented by

**Andrew J. Ligotti**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher L. McArdle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory J. Carbo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Charles Grant**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret K. Minister**
(See above for address)
*TERMINATED: 09/12/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neal J. Mclaughlin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul J. Tanck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wade G. Perrin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik Paul Belt**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 11/22/2017 | 1 | COMPLAINT against All Defendants Filing fee: $ 400, receipt number 0101–6899444 (Fee Status: Filing Fee paid), filed by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit A – US 9,789,238, # 2 Exhibit B – 8/24/2016 Letter, # 3 Civil Cover Sheet, # 4 Category Sheet, # 5 Form AO 120, # 6 Corporate Disclosure Statement)(Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 2 | REPORT ON THE FILING/TERMINATION OF AN ACTION REGARDING PATENT OR TRADEMARK. (Minister, Margaret) (Main Document 2 replaced on 11/27/2017) (Caruso, Stephanie). (Entered: 11/22/2017) |

| 11/22/2017 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge F. Dennis Saylor, IV assigned to case. (adminn, ) (Entered: 11/22/2017) |
|---|---|---|
| 11/22/2017 | 4 | CORPORATE DISCLOSURE STATEMENT by Maquet Cardiovascular LLC identifying Corporate Parent Getinge AB, Other Affiliate Datascope Corp., Other Affiliate Getinge Holding USA, Inc., Other Affiliate Getinge Holding USA II, Inc. for Maquet Cardiovascular LLC.. (Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 5 | Summons Issued as to Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Burgos, Sandra) (Entered: 11/22/2017) |
| 11/22/2017 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew Ligotti Filing fee: $ 100, receipt number 0101−6899575 by Maquet Cardiovascular LLC. (Attachments: # 1 Affidavit of Andrew Ligotti)(Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Christopher McArdle Filing fee: $ 100, receipt number 0101−6899592 by Maquet Cardiovascular LLC. (Attachments: # 1 Affidavit of Christopher McArdle)(Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Connor Filing fee: $ 100, receipt number 0101−6899599 by Maquet Cardiovascular LLC. (Attachments: # 1 Affidavit of Michael Connor)(Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Paul Tanck Filing fee: $ 100, receipt number 0101−6899605 by Maquet Cardiovascular LLC. (Attachments: # 1 Affidavit of Paul Tanck)(Minister, Margaret) (Entered: 11/22/2017) |
| 11/22/2017 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Wade Perrin Filing fee: $ 100, receipt number 0101−6899615 by Maquet Cardiovascular LLC. (Attachments: # 1 Affidavit of Wade Perrin)(Minister, Margaret) (Entered: 11/22/2017) |
| 12/04/2017 | 11 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 6 Motion for Leave to Appear Pro Hac Vice ; granting 7 Motion for Leave to Appear Pro Hac Vice ; granting 8 Motion for Leave to Appear Pro Hac Vice ; granting 9 Motion for Leave to Appear Pro Hac Vice ; granting 10 Motion for Leave to Appear Pro Hac Vice (Halley, Taylor) (Entered: 12/04/2017) |
| 01/23/2018 | 12 | SUMMONS Returned Executed Abiomed Inc. served on 1/9/2018, answer due 1/30/2018. (Perrin, Wade) (Entered: 01/23/2018) |
| 01/23/2018 | 13 | SUMMONS Returned Executed Abiomed R&D, Inc. served on 1/9/2018, answer due 1/30/2018. (Perrin, Wade) (Entered: 01/23/2018) |
| 01/30/2018 | 14 | *Answer and Counterclaims of Abiomed, Inc. and Answer of Abiomed R&D, Inc. to the Complaint of Maquet Cardiovascular LLC /* ANSWER to 1 Complaint, with Jury Demand , COUNTERCLAIM against Maquet Cardiovascular LLC by Abiomed R&D, Inc., Abiomed Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Larsen, Charles) (Entered: 01/30/2018) |
| 01/30/2018 | 15 | CORPORATE DISCLOSURE STATEMENT by Abiomed Inc., Abiomed R&D, Inc. identifying Corporate Parent No Corporate Parent for Abiomed Inc., Abiomed Inc.; Corporate Parent Abiomed, Inc. for Abiomed R&D, Inc., Abiomed R&D, Inc... (Larsen, Charles) (Entered: 01/30/2018) |
| 01/31/2018 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Scott T. Weingaertner Filing fee: $ 100, receipt number 0101−6989602 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Scott T. Weingaertner)(Larsen, Charles) (Entered: 01/31/2018) |
| 01/31/2018 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Stefan Mentzer Filing fee: $ 100, receipt number 0101−6989630 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Stefan Mentzer)(Larsen, Charles) (Entered: 01/31/2018) |

| | | |
|---|---|---|
| 01/31/2018 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Robert E. Counihan Filing fee: $ 100, receipt number 0101–6989642 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Declaration of Robert E. Counihan)(Larsen, Charles) (Entered: 01/31/2018) |
| 01/31/2018 | 19 | MOTION for Leave to Appear Pro Hac Vice for admission of John P. Padro Filing fee: $ 100, receipt number 0101–6989648 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Declaration of John P. Padro)(Larsen, Charles) (Entered: 01/31/2018) |
| 01/31/2018 | 20 | MOTION for Leave to Appear Pro Hac Vice for admission of Silvia M. Medina Filing fee: $ 100, receipt number 0101–6989660 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Declaration of Silvia M. Medina)(Larsen, Charles) (Entered: 01/31/2018) |
| 01/31/2018 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Cale V. Tolbert Filing fee: $ 100, receipt number 0101–6989674 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Declaration of Cale V. Tolbert)(Larsen, Charles) (Entered: 01/31/2018) |
| 01/31/2018 | 22 | MOTION for Leave to Appear Pro Hac Vice for admission of Laura Rees Logsdon Filing fee: $ 100, receipt number 0101–6989682 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Declaration of Laura Rees Logsdon)(Larsen, Charles) (Entered: 01/31/2018) |
| 02/01/2018 | 23 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice ; granting 17 Motion for Leave to Appear Pro Hac Vice ; granting 18 Motion for Leave to Appear Pro Hac Vice ; granting 19 Motion for Leave to Appear Pro Hac Vice ; granting 20 Motion for Leave to Appear Pro Hac Vice ; granting 21 Motion for Leave to Appear Pro Hac Vice ; granting 22 Motion for Leave to Appear Pro Hac Vice (Halley, Taylor) (Entered: 02/01/2018) |
| 02/06/2018 | 24 | Summons Issued as to Getinge AB. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (McKillop, Matthew) (Entered: 02/06/2018) |
| 02/20/2018 | 25 | ANSWER to Counterclaim *of Abiomed [D.E.14]* by Maquet Cardiovascular LLC.(Connor, Michael) (Entered: 02/20/2018) |
| 03/27/2018 | 26 | ANSWER to 1 Complaint, */ Answer of Abiomed Europe GmbH to the Complaint of Maquet Cardiovascular LLC* by Abiomed Europe GmbH.(Larsen, Charles) (Entered: 03/27/2018) |
| 03/27/2018 | 27 | CORPORATE DISCLOSURE STATEMENT by Abiomed Europe GmbH identifying Corporate Parent Abiomed R&D, Inc. for Abiomed Europe GmbH.. (Larsen, Charles) (Entered: 03/27/2018) |
| 04/11/2018 | 28 | SUMMONS Returned Executed Abiomed Europe GmbH served on 3/6/2018, answer due 3/27/2018. (Perrin, Wade) (Entered: 04/11/2018) |
| 04/16/2018 | 29 | NOTICE of Scheduling Conference Scheduling Conference set for 5/30/2018 03:20 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Attachments: # 1 Text of Proposed Order)(Pezzarossi, Lisa) (Entered: 04/16/2018) |
| 05/23/2018 | 30 | CERTIFICATION pursuant to Local Rule 16.1 *(D)(3)* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc..(Larsen, Charles) (Entered: 05/23/2018) |
| 05/23/2018 | 31 | CERTIFICATION pursuant to Local Rule 16.1 by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 05/23/2018) |
| 05/23/2018 | 32 | JOINT SUBMISSION pursuant to Local Rule 16.1 by Maquet Cardiovascular LLC.(Connor, Michael) (Entered: 05/23/2018) |
| 05/24/2018 | 33 | *Joint* Letter/request (non–motion) from Micahel S. Connor and Charles Larson Respectfully Requesting to Appear by Telephone at the May 30, 2018 Scheduling Conference . (Connor, Michael) (Entered: 05/24/2018) |

| 05/25/2018 | 34 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Treating the 33 Letter/request as a motion to appear telephonically for the scheduling conference set for 5/30/2018, the motion is GRANTED. Please use the following dial–in #s: DIAL IN: 1–888–675–2535, ACCESS CODE: 7629998. Lead counsel are directed to forward to the clerk via email a list of all counsel who will be addressing the Court. Counsel are reminded to identify themselves before speaking in order that the Court Reporter can create an accurate record. (Pezzarossi, Lisa) (Entered: 05/25/2018) |
|---|---|---|
| 05/30/2018 | 35 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Scheduling Conference held on 5/30/2018; an order will issue reflecting the provisions and directions given by the Court, including scheduling deadlines. (Court Reporter: Valerie O'Hara at vaohara@gmail.com.)(Attorneys present: Connor, Counihan, Ligotti, Perrin, and Weingaertner all by telephone) (Lovett, Jarrett) (Entered: 05/31/2018) |
| 05/31/2018 | 36 | Judge F. Dennis Saylor, IV: ORDER entered. INITIAL SCHEDULING ORDER. (Pezzarossi, Lisa) (Entered: 05/31/2018) |
| 05/31/2018 | 37 | Judge F. Dennis Saylor, IV: ORDER entered. SUPPLEMENTAL DISCOVERY ORDER.(Pezzarossi, Lisa) (Entered: 05/31/2018) |
| 06/07/2018 | 38 | ELECTRONIC NOTICE of Hearing. Status Conference set for 9/13/2018 10:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 06/07/2018) |
| 06/20/2018 | 39 | AFFIDAVIT OF SERVICE Executed by Abiomed Europe GmbH, Abiomed R&D, Inc., Abiomed Inc.. Acknowledgement filed by Abiomed Europe GmbH, Abiomed R&D, Inc., Abiomed Inc.. (Larsen, Charles) (Entered: 06/20/2018) |
| 06/28/2018 | 40 | Assented to MOTION to File One Consolidated Brief and to Enlarge Page Count in Support of its Anticipated Motions to Dismiss and to Extend Time for Opposition Brief by Getinge AB, Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 06/28/2018) |
| 06/28/2018 | 41 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 40 Motion Getinge AB may file a single memorandum up to 35 pages in support of its motions to dismiss by July 5, 2018. Abiomed may file a single memorandum in opposition of up to 35 pages by July 24, 2018.(FDS, law1) (Entered: 06/28/2018) |
| 07/05/2018 | 42 | Joint MOTION for Protective Order by Maquet Cardiovascular LLC.(Connor, Michael) (Entered: 07/05/2018) |
| 07/05/2018 | 43 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Getinge AB.(Perrin, Wade) (Entered: 07/05/2018) |
| 07/05/2018 | 44 | MEMORANDUM in Support re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Getinge AB. (Perrin, Wade) (Entered: 07/05/2018) |
| 07/05/2018 | 45 | DECLARATION re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM /Declaration of Wade G. Perrin in Support of Motion to Dismiss by Getinge AB. (Attachments: # 1 Exhibit A (Subject to Motion to Seal), # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Perrin, Wade) (Entered: 07/05/2018) |
| 07/05/2018 | 46 | DECLARATION re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM /Declaration of Hans Peter Hjalmarsson in Support of Motion to Dismiss by Getinge AB. (Perrin, Wade) (Entered: 07/05/2018) |
| 07/05/2018 | 47 | MOTION to Seal Exhibit A to Declaration of Wade G.. Perrin in Support of Motion to Dismiss by Getinge AB.(Perrin, Wade) (Entered: 07/05/2018) |
| 07/06/2018 | 48 | Letter/request (non–motion) from Scott T. Weingaertner on behalf of the Abiomed defendants and counter–claimants to request a telephone conference to discuss discovery and a briefing schedule in connection with Getinge AB's motions to dismiss. (Weingaertner, Scott) (Entered: 07/06/2018) |
| 07/09/2018 | 49 | Response by Getinge AB, Maquet Cardiovascular LLC to 48 Letter/request (non–motion), . (Connor, Michael) (Entered: 07/09/2018) |

| 07/09/2018 | 50 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 42 Joint Motion for Entry of Stipulated Protective Order. (Pezzarossi, Lisa) (Entered: 07/09/2018) |
|---|---|---|
| 07/09/2018 | 51 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting in part 47 Motion for Leave to File Under Seal. Getinge AB may file under seal, but shall also electronically file a public version with as minimal redactions as necessary to protect the confidential information within ten days. (Pezzarossi, Lisa) (Entered: 07/09/2018) |
| 07/09/2018 | 52 | ELECTRONIC NOTICE of Hearing. Status Conference set for 7/24/2018 11:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 07/09/2018) |
| 07/12/2018 | 54 | NOTICE: Briefing deadlines re: 43 Motion to Dismiss are STAYED pending the upcoming status conference. (Pezzarossi, Lisa) (Entered: 07/12/2018) |
| 07/12/2018 | 55 | Transcript of Scheduling Conference held on May 30, 2018, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 8/2/2018. Redacted Transcript Deadline set for 8/13/2018. Release of Transcript Restriction set for 10/10/2018. (Scalfani, Deborah) (Entered: 07/12/2018) |
| 07/12/2018 | 56 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 07/12/2018) |
| 07/19/2018 | 57 | EXHIBIT re 45 Declaration, *Redacted Version of Exhibit A to Declaration of Wade G. Perrin in Support of Motion to Dismiss* by Getinge AB. (Perrin, Wade) (Entered: 07/19/2018) |
| 07/24/2018 | 58 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference held on 7/24/2018. Case called. Court set briefing scheduling as to pending motion to dismiss. Opposition due 8/10/2018, replies by 8/22/2018, and hearing on motion set for 8/29/2018 at 2:30 PM. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: For Abiomed, S. Weingaertner, C. Larsen, S. Mentzer, and J. Padro. For Maquet/Getinge, M. Connor, C. McArdle, W. Perrin, A. Ligotti, and M. Derderian.) (Pezzarossi, Lisa) (Entered: 07/24/2018) |
| 07/24/2018 | 59 | ELECTRONIC NOTICE Setting Hearing on Motion 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 8/29/2018 02:30 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 07/24/2018) |
| 08/10/2018 | 60 | MEMORANDUM in Opposition re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Abiomed's Opposition to Getinge AB's Motions to Dismiss, to Strike, and for More Definite Statements [Public Redacted Version]* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Larsen, Charles) (Entered: 08/10/2018) |
| 08/10/2018 | 61 | AFFIDAVIT of / Declaration of Stefan Mentzer [Public Redacted Version] in Opposition re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B [Redacted], # 3 Exhibit C [Redacted], # 4 Exhibit D, # 5 Exhibit E [Redacted], # 6 Exhibit F [Redacted], # 7 Exhibit G [Redacted], # 8 Exhibit H, # 9 Exhibit I [Redacted], # 10 Exhibit J [Redacted], # 11 Exhibit K [Redacted], # 12 Exhibit L [Redacted], # 13 Exhibit M [Redacted], # 14 Exhibit N [Redacted], # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(Mentzer, Stefan) (Entered: 08/10/2018) |
| 08/10/2018 | 62 | MOTION to Seal *Abiomed's Motion to Impound Documents 60 61* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Larsen, Charles) (Entered: 08/10/2018) |
| 08/15/2018 | 63 | MOTION for Leave to Appear Pro Hac Vice for admission of Matthew R. Wisnieff Filing fee: $ 100, receipt number 0101–7276785 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Matthew R. Wisnieff)(Larsen, Charles) (Entered: 08/15/2018) |

| | | |
|---|---|---|
| 08/16/2018 | 64 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>63</u> Motion for Leave to Appear Pro Hac Vice Added Matthew R. Wisnieff. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/16/2018) |
| 08/17/2018 | 65 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>62</u> MOTION to Seal / Abiomed's Motion to Impound Documents. (Pezzarossi, Lisa) (Entered: 08/17/2018) |
| 08/20/2018 | <u>67</u> | DECLARATION OF Stefan Mentzer by Abiomed Inc.. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit D, # <u>3</u> Exhibit H, # <u>4</u> Exhibit O, # <u>5</u> Exhibit P, # <u>6</u> Exhibit Q)(Halley, Taylor) (Entered: 08/21/2018) |
| 08/20/2018 | <u>69</u> | Abiomed's Motion to Impound Documents by Abiomed Inc..(Halley, Taylor) (Entered: 08/21/2018) |
| 08/22/2018 | 70 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>69</u> Abiomed's Motion to Impound Documents. (Pezzarossi, Lisa) (Entered: 08/22/2018) |
| 08/22/2018 | <u>71</u> | REPLY to Response to <u>43</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *(Redacted)* filed by Getinge AB. (Perrin, Wade) (Entered: 08/22/2018) |
| 08/22/2018 | <u>72</u> | DECLARATION re <u>43</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM */Declaration of Wade G. Perrin* by Getinge AB. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C (Filed Under Seal), # <u>4</u> Exhibit D)(Perrin, Wade) (Entered: 08/22/2018) |
| 08/22/2018 | <u>73</u> | MOTION to Seal *Reply Memorandum and Exhbibit C to Declaration of Wade G. Perrin* by Getinge AB.(Perrin, Wade) (Entered: 08/22/2018) |
| 08/24/2018 | 74 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>73</u> Motion to Seal (FDS, law1) (Entered: 08/24/2018) |
| 08/29/2018 | 75 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Motion Hearing held on 8/29/2018 re <u>43</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Getinge AB. Court heard argument on the motion. Court took the motion UNDER ADVISEMENT. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: M. Connor, W. Perrin, S. Weingaertner, S. Mentzer) (Pezzarossi, Lisa) (Entered: 08/29/2018) |
| 08/30/2018 | <u>76</u> | MOTION to Withdraw as Attorney by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Larsen, Charles) (Entered: 08/30/2018) |
| 08/31/2018 | 77 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>76</u> Motion to Withdraw as Attorney. Attorney Robert E. Counihan and Silvia M. Medina terminated (Pezzarossi, Lisa) (Entered: 08/31/2018) |
| 09/04/2018 | <u>78</u> | Judge F. Dennis Saylor, IV: ORDER entered granting <u>43</u> Getinge AB's Motion to Dismiss for Failure to State a Claim. (FDS, law2) (Entered: 09/04/2018) |
| 09/04/2018 | 79 | **NEW TIME AND DATE**: ELECTRONIC NOTICE OF RESCHEDULING: Due to Court unavailability, the Status Conference has been rescheduled for 9/27/2018 02:30 PM in Courtroom 2 before Judge F. Dennis Saylor IV. If parties want to participate via telephone they must contact the clerk at least two business days prior to the hearing for dial–in information. (The 9/13/2018 status is OFF.)(Pezzarossi, Lisa) (Entered: 09/04/2018) |
| 09/20/2018 | 80 | ELECTRONIC NOTICE Canceling Hearing. The status conference set for 9/27/2018 is OFF. The matter will be rescheduled. (Pezzarossi, Lisa) (Entered: 09/20/2018) |
| 10/01/2018 | 81 | ELECTRONIC NOTICE of Hearing. Status Conference set for 10/17/2018 10:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. Parties are directed file a proposed scheduling order 3 days prior to the hearing. Parties may dial, but must provide a list of participants to the clerk via email.<br>DIAL IN – 1–888–675–2535 and enter PASSCODE – 7629998<br>Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Pezzarossi, Lisa) |

| | | |
|---|---|---|
| | | (Entered: 10/01/2018) |
| 10/12/2018 | 82 | *Joint* Letter/request (non–motion) from Charles Larsen *Joint Letter to Judge Saylor regarding the status of Abiomed/Maquet I and Abiomed/Maquet II and proposed schedule in Abiomed/Maquet I.* (Larsen, Charles) (Entered: 10/12/2018) |
| 10/17/2018 | 83 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference held on 10/17/2018. Colloquy re: motion for reconsideration and schedule going forward. Court will GRANT the motion to impound. Court set hearing on Motion for Reconsideration on 11/2/2019 at 9:00 a.m. Motion to compel remains pending. Court granted Abiomed an extension to its deadline to narrow primary prior art references to 28 days after decision on motion for reconsideration. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Weingaertner, Padro, Larson, Connor, McArdle) Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Pezzarossi, Lisa) (Entered: 10/17/2018) |
| 03/27/2019 | 84 | Joint MOTION for Relief from the Scheduling Order for Maquet to File a First Amended Complaint by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 03/27/2019) |
| 03/27/2019 | 85 | DECLARATION re 84 Joint MOTION for Relief from the Scheduling Order for Maquet to File a First Amended Complaint *Declaration of Wade G. Perrin* by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1)(Perrin, Wade) (Entered: 03/27/2019) |
| 04/02/2019 | 86 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 84 Joint MOTION for Relief from the Scheduling Order for Maquet to File a First Amended Complaint. (Pezzarossi, Lisa) (Entered: 04/02/2019) |
| 04/02/2019 | 87 | AMENDED COMPLAINT against Abiomed Inc., Abiomed R&D, Inc., Abiomed Europe GmbH, filed by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Perrin, Wade) (Entered: 04/02/2019) |
| 04/11/2019 | 88 | *Request for Status Conference* Letter/request (non–motion) from Michael S. Connor . (Connor, Michael) (Entered: 04/11/2019) |
| 04/11/2019 | 89 | Transcript of Status Conference held on October 17, 2018, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 5/2/2019. Redacted Transcript Deadline set for 5/13/2019. Release of Transcript Restriction set for 7/10/2019. Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 04/11/2019) |
| 04/11/2019 | 90 | Transcript of Telephonic Status Conference held on July 24, 2018, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 5/2/2019. Redacted Transcript Deadline set for 5/13/2019. Release of Transcript Restriction set for 7/10/2019. (Scalfani, Deborah) (Entered: 04/11/2019) |
| 04/11/2019 | 91 | Transcript of Motion Hearing held on August 29, 2018, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 5/2/2019. Redacted Transcript Deadline set for 5/13/2019. Release of Transcript Restriction set for 7/10/2019. (Scalfani, Deborah) (Entered: 04/11/2019) |
| 04/11/2019 | 92 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 04/11/2019) |
| 04/11/2019 | 93 | Response by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. to 88 Letter/request (non–motion) *Abiomed's Response to Maquet's Unilateral Request for* |

| | | |
|---|---|---|
| | | *Status Conference.* (Larsen, Charles) (Entered: 04/11/2019) |
| 04/16/2019 | 94 | NOTICE RESETTING DEADLINE: By agreement of the parties, the deadline for Abiomed to respond to Maquet's First Amended Complaint (D.I. 87) under Fed. R. Civ. P. 15(a)(3) is extended to April 23, 2019. (Pezzarossi, Lisa) (Entered: 04/16/2019) |
| 04/22/2019 | 95 | Joint MOTION for Relief from the Scheduling Order for Maquet to File a Second Amended Complaint by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 04/22/2019) |
| 04/22/2019 | 96 | DECLARATION re 95 Joint MOTION for Relief from the Scheduling Order for Maquet to File a Second Amended Complaint */Declaration of Wade G. Perrin* by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1 (Filed Under Seal))(Perrin, Wade) (Entered: 04/22/2019) |
| 04/22/2019 | 97 | MOTION to Seal Document 96 Declaration, *Exhibit 1 to Declaration of Wade G. Perrin* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 04/22/2019) |
| 04/23/2019 | 98 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 95 Joint MOTION for Relief from the Scheduling Order for Maquet to File a Second Amended Complaint. (Pezzarossi, Lisa) (Entered: 04/23/2019) |
| 04/23/2019 | 99 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 97 MOTION to Seal Document 96 Declaration, Exhibit 1 to Declaration of Wade G. Perrin. (Pezzarossi, Lisa) (Entered: 04/23/2019) |
| 04/23/2019 | 100 | AMENDED COMPLAINT */Second Amended Complaint* against Abiomed Europe GmbH, Abiomed R&D, Inc., Abiomed Inc., filed by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Perrin, Wade) (Entered: 04/23/2019) |
| 05/07/2019 | 101 | ANSWER to 100 Amended Complaint , COUNTERCLAIM against Maquet Cardiovascular LLC by Abiomed Europe GmbH, Abiomed R&D, Inc., Abiomed Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Larsen, Charles) (Entered: 05/07/2019) |
| 05/20/2019 | 102 | ANSWER to Counterclaim *of Abiomed, Inc.* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 05/20/2019) |
| 05/22/2019 | 103 | ELECTRONIC NOTICE of Hearing. Status Conference set for 6/3/2019 11:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. Associated Cases: 1:16−cv−10914−FDS, 1:17−cv−12311−FDS(Pezzarossi, Lisa) (Entered: 05/22/2019) |
| 06/03/2019 | 104 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference held on 6/3/2019. Colloquy re: party submissions(docket entries 302 and 303). Court directed parties to meet and confer re: claim construction. Court will reconvene to discuss plan going forward.<br><br>NOTICE OF HEARING: Status Conference set for 6/10/2019 11:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. Parties may attend by telephone, but should provide the clerk with a list of attendees. Please use the following dial−in #s: DIAL IN: 1−888−675−2535, ACCESS CODE: 7629998. Counsel are reminded to identify themselves before speaking in order that the Court Reporter can create an accurate record. Dial in a few minutes early and please wait on the line until the clerk calls the case and asks you to identify yourself for the record to avoid interruptions to other matters before the Court. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Weingaertner, Padro, Larson, Connor, McArdle, Tanck) Associated Cases: 1:16−cv−10914−FDS, 1:17−cv−12311−FDS(Pezzarossi, Lisa) (Entered: 06/03/2019) |
| 06/07/2019 | 105 | Transcript of Status Conference held on June 3, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 6/28/2019. Redacted Transcript Deadline set for 7/8/2019. Release of Transcript Restriction set for 9/5/2019. Associated Cases: 1:16−cv−10914−FDS, 1:17−cv−12311−FDS(Scalfani, Deborah) (Entered: 06/07/2019) |

| 06/07/2019 | 106 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 06/07/2019) |
|---|---|---|
| 06/07/2019 | 107 | NOTICE Resetting Status Conference. Status Conference set for 6/12/2019 03:00 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Status Conference set for 6/10/2019 is canceled.) <br><br> Parties may attend by telephone, but should provide the clerk with a list of attendees. Please use the following dial–in #s: DIAL IN: 1–888–675–2535, ACCESS CODE: 7629998. Counsel are reminded to identify themselves before speaking in order that the Court Reporter can create an accurate record. Dial in a few minutes early and please wait on the line until the clerk calls the case and asks you to identify yourself for the record to avoid interruptions to other matters before the Court. Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Bono, Christine) (Entered: 06/07/2019) |
| 06/12/2019 | 110 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference held on 6/12/2019. Colloquy re: proposed schedules and plan going forward. Court will keep matters on separate track. Court set deadlines and hearings in Maquet I and Maquet II. Scheduling Orders to issue separately in individual matters. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Various) Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Pezzarossi, Lisa) (Entered: 06/23/2019) |
| 06/18/2019 | 108 | Transcript of Telephonic Status Conference held on June 12, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 7/9/2019. Redacted Transcript Deadline set for 7/19/2019. Release of Transcript Restriction set for 9/16/2019. Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 06/18/2019) |
| 06/18/2019 | 109 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 06/18/2019) |
| 06/23/2019 | 111 | Judge F. Dennis Saylor, IV: ORDER entered. SCHEDULING ORDER and NOTICE OF HEARING: Markman Hearing set for 9/24/2019 02:00 PM in Courtroom 2 before Judge F. Dennis Saylor IV.(Pezzarossi, Lisa) (Entered: 06/23/2019) |
| 06/24/2019 | 112 | MOTION to Amend *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Text of Proposed Order)(Larsen, Charles) (Entered: 06/24/2019) |
| 06/24/2019 | 113 | MEMORANDUM in Support re 112 MOTION to Amend *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Larsen, Charles) (Entered: 06/24/2019) |
| 06/24/2019 | 114 | AFFIDAVIT of / Declaration of Laura R. Logsdon in Support re 112 MOTION to Amend *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C (Redacted in Full))(Larsen, Charles) (Entered: 06/24/2019) |
| 06/24/2019 | 115 | MOTION to Seal *Abiomed's Motion to Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Larsen, Charles) (Entered: 06/24/2019) |

| 07/08/2019 | 116 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 115 Motion to Seal (FDS, law1) (Entered: 07/08/2019) |
| --- | --- | --- |
| 07/08/2019 | 117 | MEMORANDUM in Opposition re 112 MOTION to Amend / *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing* filed by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 07/08/2019) |
| 07/08/2019 | 118 | DECLARATION re 112 MOTION to Amend / *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing /Declaration of Paul Tanck in Opposition* filed by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Tanck, Paul) (Entered: 07/08/2019) |
| 07/11/2019 | 120 | REPLY to Response to 112 MOTION to Amend / *Abiomed's Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing / Reply Memorandum in Support of Abiomeds' Motion to Amend the Scheduling Order, Adopt Contention Amendment Procedures, and for Expedited Briefing* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Larsen, Charles) (Entered: 07/11/2019) |
| 07/12/2019 | 121 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting in part and denying in part 112 Motion to Amend. The court has adopted the proposed deadlines as follows. The motion is otherwise DENIED.<br>Abiomed's preliminary invalidity and noninfringement contentions: August 7, 2019<br>Parties to simultaneously exchange a list of claim terms to be construed with proposed constructions: August 28, 2019<br>Preliminary claim construction briefs: September 24, 2019<br>eply claim construction briefs: October 22, 2019<br>The parties shall file the joint claim construction and prehearing statement: October 29, 2019<br>Markman Hearing: November 18, 2019 at 2:00 PM<br>(Bono, Christine) (Entered: 07/12/2019) |
| 07/12/2019 | 122 | ELECTRONIC NOTICE OF RESCHEDULING. Markman Hearing set for 11/18/2019 02:00 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Bono, Christine) (Entered: 07/12/2019) |
| 07/12/2019 | 123 | ELECTRONIC NOTICE Canceling 9/24/2019 Markman Hearing. This hearing has been rescheduled to take place 11/18/2019 at 2:00 PM. (Bono, Christine) (Entered: 07/12/2019) |
| 07/25/2019 | 124 | Transcript of Telephonic Status Conference held on July 22, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 8/15/2019. Redacted Transcript Deadline set for 8/26/2019. Release of Transcript Restriction set for 10/23/2019. Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 07/25/2019) |
| 07/25/2019 | 125 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 07/25/2019) |
| 08/02/2019 | 126 | Transcript of Status Conference held on August 1, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 8/23/2019. Redacted Transcript Deadline set for 9/3/2019. Release of Transcript Restriction set for 10/31/2019. Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 08/02/2019) |
| 08/02/2019 | 127 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at |

| | | |
|---|---|---|
| | | http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 08/02/2019) |
| 08/13/2019 | 128 | NOTICE of Appearance by Anne–Raphaelle Aubry on behalf of Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. (Aubry, Anne–Raphaelle) (Entered: 08/13/2019) |
| 08/14/2019 | 129 | MOTION for Leave to Appear Pro Hac Vice for admission of C. Sebastian Zonte Filing fee: $ 100, receipt number 0101–7830975 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of C. Sebastian Zonte)(Larsen, Charles) (Entered: 08/14/2019) |
| 08/15/2019 | 130 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 129 Motion for Leave to Appear Pro Hac Vice Added C. SEBASTIAN ZONTE. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/15/2019) |
| 08/22/2019 | 131 | MOTION for Leave to Appear Pro Hac Vice for admission of Gregory Carbo Filing fee: $ 100, receipt number 0101–7845334 by Maquet Cardiovascular LLC. (Attachments: # 1 Declaration)(Perrin, Wade) (Entered: 08/22/2019) |
| 08/22/2019 | 132 | MOTION for Leave to Appear Pro Hac Vice for admission of Neal J. McLaughlin Filing fee: $ 100, receipt number 0101–7845374 by Maquet Cardiovascular LLC. (Attachments: # 1 Declaration)(Perrin, Wade) (Entered: 08/22/2019) |
| 08/26/2019 | 133 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 131 Motion for Leave to Appear Pro Hac Vice Added Gregory Carbo, Esq. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/26/2019) |
| 08/26/2019 | 134 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 132 Motion for Leave to Appear Pro Hac Vice Added Neal J. McLaughlin, Esq.. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/26/2019) |
| 09/12/2019 | 135 | Transcript of Status Conference held on September 10, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 10/3/2019. Redacted Transcript Deadline set for 10/15/2019. Release of Transcript Restriction set for 12/11/2019. Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 09/12/2019) |
| 09/12/2019 | 136 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:16–cv–10914–FDS, 1:17–cv–12311–FDS(Scalfani, Deborah) (Entered: 09/12/2019) |
| 09/24/2019 | 137 | Markman Brief by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Weingaertner, Scott) (Entered: 09/24/2019) |
| 09/24/2019 | 138 | DECLARATION re 137 Markman Brief *Declaration of John P. Padro* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9–A, # 10 Exhibit 9–B, # 11 Exhibit 9–C, # 12 Exhibit 9–D, # |

| | | |
|---|---|---|
| | | 13 Exhibit 10 (Filed Under Seal), # 14 Exhibit 11, # 15 Exhibit 12–A, # 16 Exhibit 12–B, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18)(Weingaertner, Scott)(Entered: 09/24/2019) |
| 09/24/2019 | 139 | DECLARATION re 137 Markman Brief / *Declaration of James Antaki, Ph.D. in Support of Defendants' Claim Construction Brief* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Weingaertner, Scott) (Entered: 09/24/2019) |
| 09/24/2019 | 140 | MOTION to Seal / *Abiomed's Motion to Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Weingaertner, Scott) (Entered: 09/24/2019) |
| 09/24/2019 | 141 | Preliminary Claim Construction Briefs by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 09/24/2019) |
| 10/03/2019 | 142 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 140 Motion to Seal (Halley, Taylor) Modified on 10/4/2019 (Halley, Taylor). (Entered: 10/04/2019) |
| 10/17/2019 | 145 | MOTION for Discovery *Concerning Dr. Walid Aboul–Hosn* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 10/17/2019) |
| 10/17/2019 | 146 | MEMORANDUM in Support re 145 MOTION for Discovery *Concerning Dr. Walid Aboul–Hosn (Redacted)* filed by Maquet Cardiovascular LLC. (Perrin, Wade) (Entered: 10/17/2019) |
| 10/17/2019 | 147 | DECLARATION re 145 MOTION for Discovery *Concerning Dr. Walid Aboul–Hosn /Declaration of Wade G. Perrin, Esq. in Support* by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1 (Redacted), # 2 Exhibit 2 (Redacted), # 3 Exhibit 3, # 4 Exhibit 4 (Redacted), # 5 Exhibit 5, # 6 Exhibit 6 (Redacted), # 7 Exhibit 7, # 8 Exhibit 8)(Perrin, Wade) (Entered: 10/17/2019) |
| 10/17/2019 | 148 | MOTION to Seal Document 146 Memorandum in Support of Motion, 147 Declaration, *Exhibits 1, 2, 4 and 6 to Declaration of Wade G. Perrin, Esq.* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 10/17/2019) |
| 10/21/2019 | 149 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 148 Motion to Seal Document (Halley, Taylor) (Entered: 10/22/2019) |
| 10/22/2019 | 153 | Transcript of Status Conference held on October 8, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 11/12/2019. Redacted Transcript Deadline set for 11/22/2019. Release of Transcript Restriction set for 1/21/2020. Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 10/22/2019) |
| 10/22/2019 | 154 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:17–cv–12311–FDS, 1:16–cv–10914–FDS(Scalfani, Deborah) (Entered: 10/22/2019) |
| 10/22/2019 | 155 | Reply to Preliminary Claim Construction Briefs by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Weingaertner, Scott) (Entered: 10/22/2019) |
| 10/22/2019 | 156 | Reply to Preliminary Claim Construction Briefs by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 10/22/2019) |
| 10/22/2019 | 157 | DECLARATION of Wade G. Perrin by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5 (Redacted), # 6 Exhibit 6)(Perrin, Wade) (Additional attachment(s) added on 10/24/2019: # 7 SEALED EX. 5 PART 1, # 8 SEALED EX. 5 PART 2) (Lara, Miguel). (Entered: 10/22/2019) |
| 10/22/2019 | 158 | MOTION to Seal Document 157 Declaration *Exhibit 5 to Declaration of Wade G. Perrin* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 10/22/2019) |

| | | |
|---|---|---|
| 10/30/2019 | 159 | Joint Claim Construction and Prehearing Statement by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 10/30/2019) |
| 10/31/2019 | 160 | MEMORANDUM in Opposition re 145 MOTION for Discovery *Concerning Dr. Walid Aboul−Hosn [Public Version]* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Weingaertner, Scott) (Entered: 10/31/2019) |
| 10/31/2019 | 161 | AFFIDAVIT of / Declaration of Laura R. Logsdon in Opposition re 145 MOTION for Discovery *Concerning Dr. Walid Aboul−Hosn* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Weingaertner, Scott) (Entered: 10/31/2019) |
| 10/31/2019 | 162 | MOTION to Seal */ Abiomed's Motion to Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Weingaertner, Scott) (Entered: 10/31/2019) |
| 11/07/2019 | 164 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 162 Motion to Seal (Halley, Taylor) (Entered: 11/07/2019) |
| 11/12/2019 | 165 | REPLY to Response to 145 MOTION for Discovery *Concerning Dr. Walid Aboul−Hosn (Redacted)* filed by Maquet Cardiovascular LLC. (Perrin, Wade) (Entered: 11/12/2019) |
| 11/12/2019 | 166 | DECLARATION re 145 MOTION for Discovery *Concerning Dr. Walid Aboul−Hosn /Declaration of Wade G. Perrin, Esq. in Further Support* by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 9 (Redacted), # 2 Exhibit 10, # 3 Exhibit 11 (Redacted), # 4 Exhibit 12, # 5 Exhibit 13, # 6 Exhibit 14, # 7 Exhibit 15 (Redacted), # 8 Exhibit 16, # 9 Exhibit 17)(Perrin, Wade) (Entered: 11/12/2019) |
| 11/12/2019 | 167 | MOTION to Seal Document 165 Reply to Response to Motion, 166 Declaration, *Exhibits 9, 11 and 15 to the Declaration* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 11/12/2019) |
| 11/14/2019 | 168 | MOTION for Leave to File *a Reply Memorandum of Law on Claim Construction* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A)(Weingaertner, Scott) (Entered: 11/14/2019) |
| 11/14/2019 | 169 | AFFIDAVIT of / Declaration of John P. Padro in Support re 168 MOTION for Leave to File *a Reply Memorandum of Law on Claim Construction* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit 1)(Weingaertner, Scott) (Entered: 11/14/2019) |
| 11/18/2019 | 177 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Markman Hearing held on 11/18/2019. Case called. Court hears argument from parties and takes matter under advisement. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Tanck, McCardle, Weingaertner, Padro, Logsdon, Larsen, Zonte) (Bono, Christine) (Entered: 11/19/2019) |
| 11/19/2019 | 178 | EXHIBIT re 156 Reply to Preliminary Claim Construction Briefs */Maquet's Markman Hearing Slides* by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 11/19/2019) |
| 11/25/2019 | 179 | Letter/request (non−motion) from Scott T. Weingaertner *Scott T. Weingaertner to Judge Saylor re: Reexamination*. (Attachments: # 1 Exhibit A)(Weingaertner, Scott) (Entered: 11/25/2019) |
| 11/26/2019 | 180 | NOTICE by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. */ Abiomeds Markman Presentation* (Weingaertner, Scott) (Entered: 11/26/2019) |
| 11/26/2019 | 181 | Letter/request (non−motion) *to Judge Saylor re: Hearing Presentations*. (Weingaertner, Scott) (Entered: 11/26/2019) |
| 11/27/2019 | 182 | Letter/request (non−motion) from Paul Tanck in Response to Abiomed's November 25, 2019 Letter regarding Reexamination . (Tanck, Paul) (Entered: 11/27/2019) |
| 11/27/2019 | 183 | Letter/request (non−motion) from Paul Tanck in Response to Abiomed's November 26, 2019 Letters regarding Maquet's Submission of Hearing Slides . (Tanck, Paul) (Entered: 11/27/2019) |

| | | |
|---|---|---|
| 12/03/2019 | 184 | Transcript of Markman Hearing held on November 18, 2019, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com Redaction Request due 12/24/2019. Redacted Transcript Deadline set for 1/3/2020. Release of Transcript Restriction set for 3/2/2020. (Scalfani, Deborah) (Entered: 12/03/2019) |
| 12/03/2019 | 185 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 12/03/2019) |
| 12/31/2019 | 186 | MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Text of Proposed Order)(Weingaertner, Scott) (Entered: 12/31/2019) |
| 12/31/2019 | 187 | MEMORANDUM in Support re 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims [Public Version]* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit 1 [Public Version])(Weingaertner, Scott) (Entered: 12/31/2019) |
| 12/31/2019 | 188 | AFFIDAVIT of / Declaration of Matthew R. Wisnieff in Support re 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F [Redacted], # 7 Exhibit G [Redacted], # 8 Exhibit H [Redacted], # 9 Exhibit I [Redacted], # 10 Exhibit J, # 11 Exhibit K [Redacted], # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N [Redacted], # 15 Exhibit O [Redacted], # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T)(Weingaertner, Scott) (Entered: 12/31/2019) |
| 12/31/2019 | 189 | MOTION to Seal */ Abiomed's Motion to Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Weingaertner, Scott) (Entered: 12/31/2019) |
| 01/03/2020 | 191 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 189 Motion to Seal (Halley, Taylor) Modified on 1/6/2020 (Halley, Taylor). (Entered: 01/06/2020) |
| 01/14/2020 | 193 | MEMORANDUM in Opposition re 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims* filed by Maquet Cardiovascular LLC. (Perrin, Wade) (Entered: 01/14/2020) |
| 01/14/2020 | 194 | DECLARATION re 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims /Declaration of Wade G. Perrin, Esq. in Opposition* by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1 (Redacted), # 2 Exhibit 2 (Redacted), # 3 Exhibit 3 (Redacted), # 4 Exhibit 4 (Redacted), # 5 Exhibit 5 (Redacted), # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15 (Redacted))(Perrin, Wade) (Entered: 01/14/2020) |
| 01/14/2020 | 195 | MOTION to Seal Document 193 Memorandum in Opposition to Motion, 194 Declaration,, *Exhibits 1–5 and Exhibit 15 to Declaration* by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 01/14/2020) |
| 01/15/2020 | 196 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 158 Motion to Seal Document; granting 167 Motion to Seal Document; granting 195 Motion to Seal Document. (Bono, Christine) (Entered: 01/15/2020) |
| 01/24/2020 | 199 | REPLY to Response to 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, */ Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims [Public Version]* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Weingaertner, Scott) (Entered: 01/24/2020) |

| | | |
|---|---|---|
| 01/24/2020 | 200 | AFFIDAVIT of / Declaration of Matthew R. Wisnieff in Support re 186 MOTION to Amend 101 Answer to Amended Complaint,, Counterclaim, / *Abiomed's Motion for Leave to Amend Its Amended Answer and Counterclaims and re: 199 REPLY to Response to 186 Motion for Leave to Amend* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D., Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B [Redacted])(Weingaertner, Scott) (Entered: 01/24/2020) |
| 01/24/2020 | 201 | MOTION to Seal / *Abiomed's Motion to Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Weingaertner, Scott) (Entered: 01/24/2020) |
| 01/28/2020 | 202 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 201 Motion to Seal (Halley, Taylor) Modified on 1/29/2020 (Halley, Taylor). (Entered: 01/29/2020) |
| 02/28/2020 | 205 | Letter/request (non–motion) from Paul Tanck *Re: Office Action in Ex Parte Reexamination*. (Tanck, Paul) (Entered: 02/28/2020) |
| 02/28/2020 | 206 | EXHIBIT re 205 Letter/request (non–motion) *Exhibit A* by Maquet Cardiovascular LLC. (Attachments: # 1 Certificate of Service)(Tanck, Paul) (Entered: 02/28/2020) |
| 03/09/2020 | 207 | Letter/request (non–motion) from Scott T. Weingaertner *in response to Maquet's letter of February 28, 2020 205* . (Attachments: # 1 Exhibit A)(Weingaertner, Scott) (Entered: 03/09/2020) |
| 05/06/2020 | 208 | MOTION to Withdraw as Attorney / *Motion for Leave to Withdraw as Counsel* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Weingaertner, Scott) (Entered: 05/06/2020) |
| 05/19/2020 | 209 | MOTION for Leave to Appear Pro Hac Vice for admission of James C. Grant Filing fee: $ 100, receipt number 0101–8247968 by Maquet Cardiovascular LLC. (Attachments: # 1 Declaration of James C. Grant)(Perrin, Wade) (Entered: 05/19/2020) |
| 05/20/2020 | 210 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 209 Motion for Leave to Appear Pro Hac Vice Added James Charles Grant. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 05/20/2020) |
| 06/02/2020 | 211 | MOTION for Leave to Appear Pro Hac Vice for admission of Declaration of Keith R. Hummel, Declaration of Lauren A. Moskowitz and Declaration of Andrei Harasymiak Filing fee: $ 300, receipt number 0101–8267060 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Keith R. Hummel, # 2 Declaration of Lauren A. Moskowitz, # 3 Declaration of Andrei Harasymiak)(Larsen, Charles) (Entered: 06/02/2020) |
| 06/03/2020 | 212 | NOTICE of Appearance by Erik Paul Belt on behalf of Maquet Cardiovascular LLC (Belt, Erik) (Entered: 06/03/2020) |
| 06/03/2020 | 213 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 211 Motion for Leave to Appear Pro Hac Vice Added LAUREN A. MOSKOWITZ, ANDREI HARASYMIAK, KEITH R. HUMMEL. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 06/03/2020) |
| 08/10/2020 | 214 | MOTION for Leave to Appear Pro Hac Vice for admission of Sharonmoyee Goswami and Reshma Gogineni Filing fee: $ 200, receipt number 0101–8366428 by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Sharonmoyee Goswami, # 2 Declaration of Reshma Gogineni)(Larsen, Charles) (Entered: 08/10/2020) |

| | | |
|---|---|---|
| 08/11/2020 | 215 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>214</u> Motion for Leave to Appear Pro Hac Vice Added Sharonmoyee Goswami,Reshma Gogineni. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/11/2020) |
| 08/28/2020 | 216 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>168</u> MOTION for Leave to File a Reply Memorandum of Law on Claim Construction ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Halley, Taylor) (Entered: 08/28/2020) |
| 08/28/2020 | <u>217</u> | MEMORANDUM OF LAW by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. to 216 Order on Motion for Leave to File, <u>156</u> Reply to Preliminary Claim Construction Briefs. (Hummel, Keith) (Entered: 08/28/2020) |
| 09/29/2020 | 218 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>208</u> Motion to Withdraw as Attorney. Attorney Anne–Raphaelle Aubry and Cale V Tolbert terminated. (Kelly, Danielle) (Entered: 09/29/2020) |
| 10/27/2020 | <u>219</u> | Letter/request (non–motion) from Paul Tanck *re: Status Report: Ex Parte Reexamination of Claims 1–3 and 24 of '783 Patent*. (Attachments: # <u>1</u> Exhibit A)(Tanck, Paul) (Entered: 10/27/2020) |
| 10/28/2020 | <u>220</u> | Letter/request (non–motion) from Keith R. Hummel *in response to Maquet's October 27, 2020 letter*. (Hummel, Keith) (Entered: 10/28/2020) |
| 10/29/2020 | <u>221</u> | Letter/request (non–motion) from Paul Tanck in Response to Abiomed Inc's Letter dated October 28, 2020 . (Tanck, Paul) (Entered: 10/29/2020) |
| 12/21/2020 | <u>222</u> | MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses")* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # <u>1</u> Exhibit 1 – Text of Proposed Order)(Goswami, Sharonmoyee) (Entered: 12/21/2020) |
| 12/21/2020 | <u>223</u> | DECLARATION re <u>222</u> MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses") Declaration of Sharonmoyee Goswami in Support* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit G, # <u>8</u> Exhibit H, # <u>9</u> Exhibit I, # <u>10</u> Exhibit J, # <u>11</u> Exhibit K, # <u>12</u> Exhibit L, # <u>13</u> Exhibit M)(Goswami, Sharonmoyee) (Entered: 12/21/2020) |
| 12/21/2020 | <u>224</u> | MEMORANDUM in Support re <u>222</u> MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses")* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Goswami, Sharonmoyee) (Entered: 12/21/2020) |
| 12/23/2020 | <u>225</u> | Assented to MOTION for Extension of Time to January 18, 2021 to File Response/Reply as to <u>222</u> MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses")* by Maquet Cardiovascular LLC.(Tanck, Paul) (Entered: 12/23/2020) |
| 12/23/2020 | 226 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>225</u> Motion for Extension of Time to File Response/Reply. (Bono, Christine) (Entered: 12/23/2020) |
| 01/19/2021 | <u>227</u> | MEMORANDUM in Opposition re <u>222</u> MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses")* filed by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 01/19/2021) |
| 01/19/2021 | <u>228</u> | DECLARATION re <u>222</u> MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses") /Declaration of Wade G. Perrin in Opposition* by Maquet Cardiovascular LLC. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7 (Redacted), # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13 (Redacted), # <u>14</u> Exhibit 14)(Perrin, Wade) (Entered: 01/19/2021) |

| 01/19/2021 | 229 | MOTION to Seal Document 228 Declaration,, *Exhibits 7 and 13 to Declaration of Wade G. Perrin in Opposition* by Maquet Cardiovascular LLC.(Tanck, Paul) (Entered: 01/19/2021) |
|---|---|---|
| 01/20/2021 | 230 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 229 Motion to Seal Document. (Bono, Christine) (Entered: 01/20/2021) |
| 01/28/2021 | 232 | REPLY to Response to 222 MOTION to Compel *("Abiomed's Motion to Compel Discovery Responses")* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Goswami, Sharonmoyee) (Entered: 01/28/2021) |
| 02/02/2021 | 233 | MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Declaration of Reshma Gogineni in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Hummel, Keith) (Entered: 02/02/2021) |
| 02/02/2021 | 234 | MEMORANDUM in Support re 233 MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Hummel, Keith) (Entered: 02/02/2021) |
| 02/16/2021 | 235 | MEMORANDUM in Opposition re 233 MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* filed by Maquet Cardiovascular LLC. (Tanck, Paul) (Entered: 02/16/2021) |
| 02/16/2021 | 236 | DECLARATION re 233 MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* /Declaration of Wade G. Perrin in Opposition by Maquet Cardiovascular LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Perrin, Wade) (Entered: 02/16/2021) |
| 02/25/2021 | 237 | DECLARATION re 233 MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* *("Declaration of Reshma Gogineni")* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A to Gogineni Declaration, # 2 Exhibit B to Gogineni Declaration--SEALED, # 3 Exhibit C to Gogineni Declaration--SEALED)(Hummel, Keith) (Entered: 02/25/2021) |
| 02/25/2021 | 238 | REPLY to Response to 233 MOTION for Judgment on the Pleadings *("Abiomed's Motion for Partial Judgment on the Pleadings")* ("Reply Memorandum Of Law In Support Of Abiomed's Motion For Partial Judgment On The Pleadings--REDACTED") filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Hummel, Keith) (Entered: 02/25/2021) |
| 02/25/2021 | 239 | MOTION to Seal *Doc. No. 238 and Exhibits B & C to Doc. No. 237* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Hummel, Keith) (Entered: 02/25/2021) |
| 02/26/2021 | 240 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 239 MOTION to Seal Doc. No. 238 and Exhibits B & C to Doc. No. 237. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Halley, Taylor) (Entered: 02/26/2021) |
| 03/19/2021 | 241 | CORPORATE DISCLOSURE STATEMENT by Maquet Cardiovascular LLC identifying Corporate Parent Getinge AB, Other Affiliate Getinge Holding USA, Inc., Other Affiliate Datascope Corp. for Maquet Cardiovascular LLC.. (Tanck, Paul) (Entered: 03/19/2021) |
| 10/05/2021 | 242 | MOTION to Withdraw as Attorney by Maquet Cardiovascular LLC.(Minister, Margaret) (Entered: 10/05/2021) |
| 11/16/2021 | 243 | Letter/request (non–motion) from Paul Tanck *Respectfully Requesting a Status Conference*. (Tanck, Paul) (Entered: 11/16/2021) |

| 11/17/2021 | 244 | Letter/request (non–motion) from Keith Hummel *in Response to Maquet's Request for a Status Conference and Oral Argument*. (Hummel, Keith) (Entered: 11/17/2021) |
|---|---|---|
| 12/22/2021 | 245 | MOTION to Withdraw as Attorney by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Gogineni, Reshma) (Entered: 12/22/2021) |
| 06/16/2022 | 246 | MOTION for Telephonic Status Conference by Maquet Cardiovascular LLC.(Tanck, Paul) (Entered: 06/16/2022) |
| 09/12/2022 | 247 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS. Abiomed's motion for partial judgment on the pleadings (D. 233 ) is DENIED.(McKillop, Matthew) (Entered: 09/12/2022) |
| 09/12/2022 | 248 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION. (McKillop, Matthew) (Entered: 09/12/2022) |
| 09/12/2022 | 249 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER ON DISCOVERY MOTIONS AND MOTION TO AMEND. Plaintiff's motion for leave to take ESI discovery concerning Dr. Aboul–Hosn (D. 145 ) is GRANTED in part and DENIED in part. Defendant's motion to amend its answer and counterclaims (D. 186 ) is GRANTED. Defendant's motion to compel (D. 222 ) is GRANTED in part and DENIED in part.(McKillop, Matthew) (Entered: 09/12/2022) |
| 09/12/2022 | 250 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 242 Motion to Withdraw as Attorney. Attorney Margaret K. Minister terminated (McKillop, Matthew) (Entered: 09/12/2022) |
| 09/12/2022 | 251 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 245 Motion to Withdraw as Attorney. Attorney Reshma R. Gogineni terminated (McKillop, Matthew) (Entered: 09/12/2022) |
| 09/15/2022 | 252 | NOTICE of Appearance by Joseph L. Stanganelli on behalf of Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. (Stanganelli, Joseph) (Entered: 09/15/2022) |
| 09/22/2022 | 253 | AMENDED ANSWER to 100 Amended Complaint *("Amended Answer and Counterclaims of Abiomed, Inc. and Answer of Abiomed R&D, Inc. and Abiomed Europe GMBH to the Second Amended Complaint of Maquet Cardiovascular LLC")*, COUNTERCLAIM against Maquet Cardiovascular LLC by Abiomed R&D, Inc., Abiomed Inc., Abiomed Europe GmbH. (Goswami, Sharonmoyee) (Additional attachment(s) added on 9/23/2022: # 1 Unredacted document) (Dore, Samantha). (Entered: 09/22/2022) |
| 09/22/2022 | 254 | MOTION to Seal *and Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Goswami, Sharonmoyee) (Entered: 09/22/2022) |
| 09/23/2022 | 255 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 254 Motion to Seal (McKillop, Matthew) (Entered: 09/23/2022) |
| 10/06/2022 | 256 | ANSWER to Counterclaim by Maquet Cardiovascular LLC.(Perrin, Wade) (Entered: 10/06/2022) |
| 10/20/2022 | 257 | MOTION for Discovery *("Motion for Leave to Depose Wesley Ashton, Kirk Swenson and Rosalind Castor")* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Goswami, Sharonmoyee) (Entered: 10/20/2022) |
| 10/20/2022 | 258 | DECLARATION re 257 MOTION for Discovery *("Motion for Leave to Depose Wesley Ashton, Kirk Swenson and Rosalind Castor")* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Attachments: # 1 Exhibit A––Prosecution history excerpts, # 2 Exhibit B––(Redacted)––Transcript of Kirk Swenson Deposition, # 3 Exhibit C––(Redacted)––Transcript excerpt of Rosalind Castor Deposition, # 4 Exhibit D––August 27, 2019 letter, # 5 Exhibit E––(Redacted)––Excerpts of Rosalind Castor's lab notebook)(Goswami, Sharonmoyee) (Additional attachment(s) added on 10/21/2022: # 6 Sealed Exhibit B, # 7 Sealed Exhibit C, # 8 Sealed Exhibit E) (Dore, Samantha). (Entered: 10/20/2022) |

| | | |
|---|---|---|
| 10/20/2022 | 259 | MEMORANDUM in Support re 257 MOTION for Discovery *("Motion for Leave to Depose Wesley Ashton, Kirk Swenson and Rosalind Castor") (Redacted)* filed by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc.. (Goswami, Sharonmoyee) (Additional attachment(s) added on 10/21/2022: # 1 Unredacted Memorandum) (Dore, Samantha). (Entered: 10/20/2022) |
| 10/20/2022 | 260 | MOTION to Seal *and Impound Documents* by Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc..(Goswami, Sharonmoyee) (Entered: 10/20/2022) |
| 10/21/2022 | 261 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 260 Motion to Seal. (Dore, Samantha) (Entered: 10/21/2022) |
| 10/21/2022 | 262 | NOTICE of Appearance by Retley G. Locke, Jr on behalf of Abiomed Europe GmbH, Abiomed Inc., Abiomed R&D, Inc. (Locke, Retley) (Entered: 10/21/2022) |
| 11/03/2022 | 263 | Letter/request (non−motion) from Paul Tanck *seeking a 60−day suspension of deadlines*. (Tanck, Paul) (Entered: 11/03/2022) |
| 11/03/2022 | 264 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Due to case settlement discussions re 263 Letter/request (non−motion). The case is stayed for 60 days. (McKillop, Matthew) (Entered: 11/03/2022) |
| 12/30/2022 | 265 | Letter/request (non−motion) from Paul Tanck *providing a status update and respectfully requesting a second 60−day suspension of deadlines*. (Tanck, Paul) (Entered: 12/30/2022) |
| 01/04/2023 | 266 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Due to case settlement discussions re 265 Letter/request (non−motion). The case is stayed for 60 days to 3/6/23. (McKillop, Matthew) (Entered: 01/04/2023) |
| 02/01/2023 | 267 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered finding as moot 246 Motion for Status Conference (McKillop, Matthew) (Entered: 02/01/2023) |
| 03/02/2023 | 268 | *Joint* Letter/request (non−motion) from Paul Tanck and Keith R. Hummel Providing a Status Update and Respectfully Requesting an Additional 60−Day Suspension of Deadlines . (Tanck, Paul) (Entered: 03/02/2023) |
| 03/03/2023 | 269 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Due to case settlement discussions re 268 Letter/request (non−motion). The case is stayed for 60 days to 5/8/23. (McKillop, Matthew) (Entered: 03/03/2023) |
| 04/06/2023 | 270 | MOTION to Withdraw as Attorney by Abiomed Europe GmbH, Abiomed Inc..(Locke, Retley) (Entered: 04/06/2023) |
| 04/14/2023 | 271 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 270 Motion to Withdraw as Attorney. Attorney Retley G. Locke, Jr terminated (McKillop, Matthew) (Entered: 04/14/2023) |
| 04/14/2023 | 272 | **ELECTRONIC NOTICE of Hearing:** Status Conference set for 5/1/2023 02:00 PM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 04/14/2023) |
| 05/01/2023 | 273 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference held by telephone on 5/1/2023. Case called; status discussed; stipulation of non−infringemnt anticipated; Pending motions in related case discussed.<br><br>NOTICE OF HEARING:<br><br>Status Conference set for 6/15/2023 03:30 PM by telephone before Chief Judge F. Dennis Saylor IV. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Christopher L. McArdle, Paul J. Tanck and Wade G. Perrin for the plaintiff. Keith R. Hummel and Scott T. Weingaertner for the defendant.) (McKillop, Matthew) (Entered: 05/01/2023) |
| 05/15/2023 | 274 | STIPULATION *of Non−Infringement and Motion for Entry of Final Appealable Judgment* by Maquet Cardiovascular LLC. (Attachments: # 1 Proposed Final Appealable Judgment)(Tanck, Paul) (Entered: 05/15/2023) |

| | | |
|---|---|---|
| 05/16/2023 | 275 | Chief Judge F. Dennis Saylor, IV: ORDER entered. FINAL APPEALABLE JUDGMENT. (McKillop, Matthew) (Entered: 05/16/2023) |
| 06/13/2023 | 276 | NOTICE OF APPEAL to the Federal Circuit as to 275 Judgment, 248 Memorandum & ORDER by Maquet Cardiovascular LLC Filing fee: $ 505, receipt number AMADC−9901893 Fee Status: Filing Fee paid. US District Court Clerk to deliver official record to Court of Appeals by 7/3/2023. (Tanck, Paul) (Entered: 06/13/2023) |
| 06/13/2023 | 277 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals for the Federal Circuit re 276 Notice of Appeal to the Federal Circuit, (Paine, Matthew) (Entered: 06/13/2023) |
| 06/15/2023 | 278 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference held by telephone on 6/15/2023. Case called; Status discussed; Counsel to confer and file report before next status conference. Next status conference to be set in related case 16−10914−FDS. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Christopher L. McArdle, Paul J. Tanck and Wade G. Perrin for the plaintiff. Keith R. Hummel and Joseph L. Stanganelli for the defendant.) (McKillop, Matthew) (Entered: 06/15/2023) |
| 06/20/2023 | 279 | USCA Case Number 23−2045 for 276 Notice of Appeal to the Federal Circuit, filed by Maquet Cardiovascular LLC. (Paine, Matthew) (Entered: 06/24/2023) |
| 06/28/2023 | 280 | Transcript of Status Conference held on June 15, 2023, before Chief Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie O'Hara at vaohara@gmail.com. Redaction Request due 7/19/2023. Redacted Transcript Deadline set for 7/31/2023. Release of Transcript Restriction set for 9/26/2023. (McDonagh, Christina) (Entered: 06/29/2023) |
| 06/28/2023 | 281 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 06/29/2023) |

US010238783B2

(12) **United States Patent**
Aboul-Hosn et al.

(10) **Patent No.:** US 10,238,783 B2
(45) **Date of Patent:** *Mar. 26, 2019

(54) **GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS**

(71) Applicant: **MAQUET Cardiovascular LLC,** Mahwah, NJ (US)

(72) Inventors: **Walid N. Aboul-Hosn**, Btekhnay (LB); **William R. Kanz**, Woodinville, WA (US); **Bruce A. Baker**, Placerville, CA (US)

(73) Assignee: **Maquet Cardiovascular LLC,** Mahwah, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/138,788**

(22) Filed: **Sep. 21, 2018**

(65) **Prior Publication Data**

US 2019/0030231 A1    Jan. 31, 2019

**Related U.S. Application Data**

(60) Division of application No. 15/675,310, filed on Aug. 11, 2017, which is a division of application No.

(Continued)

(51) **Int. Cl.**
*A61M 1/12*       (2006.01)
*A61M 25/01*      (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *A61M 1/125* (2014.02); *A61M 1/1008* (2014.02); *A61M 1/1029* (2014.02); *A61M 1/1031* (2014.02); *A61M 1/1096* (2014.02);

*A61M 25/09* (2013.01); *A61M 1/101* (2013.01); *A61M 1/102* (2014.02); *A61M 1/1012* (2014.02); *A61M 1/1013* (2014.02); *A61M 1/1034* (2014.02); *A61M 1/1086* (2013.01);

(Continued)

(58) **Field of Classification Search**
CPC ............................................ A61M 2025/0183
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,585,983 A    6/1971    Kantrowitz et al.
3,602,009 A    8/1971    Powell
(Continued)

FOREIGN PATENT DOCUMENTS

CA        2256427 A    10/1998
CA        2349483 A1    6/2000
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/675,310, filed Aug. 11, 2017, U.S. Pat. No. 2017/0340791 A1.

(Continued)

*Primary Examiner* — Adam Marcetich

(57)     **ABSTRACT**

An improved intravascular blood pump and related methods involving the broad inventive concept of equipping the intravascular blood pump with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient.

**30 Claims, 37 Drawing Sheets**



**US 10,238,783 B2**

Page 2

### Related U.S. Application Data

14/966,669, filed on Dec. 11, 2015, now Pat. No. 9,789,238, which is a division of application No. 14/543,815, filed on Nov. 17, 2014, now Pat. No. 9,327,068, which is a continuation of application No. 12/772,810, filed on May 3, 2010, now Pat. No. 8,888,728, which is a continuation of application No. 11/375,926, filed on Mar. 15, 2006, now Pat. No. 7,731,675, which is a division of application No. 10/070,178, filed as application No. PCT/US00/24515 on Sep. 1, 2000, now Pat. No. 7,022,100.

(60) Provisional application No. 60/152,249, filed on Sep. 3, 1999.

(51) **Int. Cl.**
**A61M 25/09** (2006.01)
**A61M 1/10** (2006.01)

(52) **U.S. Cl.**
CPC ..... *A61M 1/122* (2014.02); *A61M 2025/0177* (2013.01); *A61M 2025/0183* (2013.01); *A61M 2205/3348* (2013.01); *Y10S 415/90* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,724,274 A | 4/1973 | Millar | |
| 3,879,516 A | 4/1975 | Wolvek | |
| 3,904,901 A | 9/1975 | Renard et al. | |
| 3,966,358 A | 6/1976 | Heimes et al. | |
| 3,995,617 A | 12/1976 | Watkins et al. | |
| 4,135,253 A | 1/1979 | Reich et al. | |
| 4,153,048 A | 5/1979 | Magrini | |
| 4,391,547 A | 7/1983 | Jackson et al. | |
| 4,392,836 A | 7/1983 | Sugawara | |
| 4,413,989 A | 11/1983 | Schjeidahl et al. | |
| 4,468,224 A | 8/1984 | Enzmann et al. | |
| 4,479,497 A | 10/1984 | Forgurty | |
| 4,508,535 A | 4/1985 | Joh et al. | |
| 4,591,355 A | 5/1986 | Hilse | |
| 4,625,712 A | 12/1986 | Wampler | |
| 4,679,558 A | 7/1987 | Kensey et al. | |
| 4,686,982 A | 8/1987 | Nash | |
| 4,692,148 A | 9/1987 | Kantrowitz et al. | |
| 4,696,667 A | 9/1987 | Masch | |
| 4,704,121 A | 11/1987 | Moise | |
| 4,722,348 A | 2/1988 | Ligtenberg et al. | |
| 4,728,319 A | 3/1988 | Masch | |
| 4,747,821 A | 5/1988 | Kensey et al. | |
| 4,747,840 A | 5/1988 | Ladika et al. | |
| 4,749,376 A | 6/1988 | Kensey et al. | |
| 4,753,221 A | 6/1988 | Kensey et al. | |
| 4,764,324 A | 8/1988 | Burnham | |
| 4,769,005 A | 9/1988 | Ginsburg et al. | |
| 4,817,586 A | 4/1989 | Wampler | |
| 4,846,152 A | 7/1989 | Wampler et al. | |
| 4,858,810 A | 8/1989 | Intlekofer et al. | |
| 4,895,557 A | 1/1990 | Moise et al. | |
| 4,908,012 A | 3/1990 | Moise et al. | |
| 4,909,781 A | 3/1990 | Husted | |
| 4,917,102 A | 4/1990 | Miller et al. | |
| 4,919,647 A | 4/1990 | Nash | |
| 4,944,722 A | 7/1990 | Carriker et al. | |
| 4,944,745 A | 7/1990 | Sogard et al. | |
| 4,955,856 A | 9/1990 | Phillips | |
| 4,964,839 A | 10/1990 | Gloor | |
| 4,969,865 A | 11/1990 | Hwang et al. | |
| 4,985,022 A | 1/1991 | Fearnot et al. | |
| 4,990,134 A | 2/1991 | Auth et al. | |
| 5,017,103 A | 5/1991 | Dahl | |
| 5,030,204 A | 7/1991 | Badger et al. | |
| 5,040,944 A | 8/1991 | Cook | |
| 5,041,131 A | 8/1991 | Nagase | |

| | | | |
|---|---|---|---|
| 5,044,897 A | 9/1991 | Dorman | |
| 5,061,256 A | 10/1991 | Wampler | |
| 5,061,273 A | 10/1991 | Yock | |
| 5,092,879 A | 3/1992 | Jarvik | |
| 5,106,363 A | 4/1992 | Nobuyoshi | |
| 5,108,411 A | 4/1992 | McKenzie | |
| 5,112,292 A * | 5/1992 | Hwang ................... F04D 3/00 |
| | | | 415/900 |
| 5,112,349 A | 5/1992 | Summers et al. | |
| 5,135,535 A | 8/1992 | Kramer | |
| 5,137,513 A | 8/1992 | McInnes et al. | |
| 5,160,321 A | 11/1992 | Sahota | |
| 5,163,910 A | 11/1992 | Schwartz et al. | |
| 5,169,378 A | 12/1992 | Figuera | |
| 5,179,862 A | 1/1993 | Lynnworth | |
| 5,199,950 A | 4/1993 | Schmitt et al. | |
| 5,211,546 A | 5/1993 | Isaacson et al. | |
| 5,221,256 A | 6/1993 | Mahurkar | |
| 5,234,407 A | 8/1993 | Teirsten et al. | |
| 5,250,059 A | 10/1993 | Andreas et al. | |
| 5,275,580 A | 1/1994 | Yamazaki | |
| 5,287,858 A | 2/1994 | Hammerslag et al. | |
| 5,300,112 A | 4/1994 | Barr | |
| 5,314,407 A | 5/1994 | Auth et al. | |
| 5,334,142 A | 8/1994 | Paradis | |
| 5,336,184 A * | 8/1994 | Teirstein ............. A61M 25/104 |
| | | | 604/103.04 |
| 5,372,138 A | 12/1994 | Crowley et al. | |
| 5,376,114 A | 12/1994 | Jarvik | |
| 5,405,383 A | 4/1995 | Barr | |
| 5,421,338 A | 6/1995 | Crowley | |
| 5,435,308 A | 7/1995 | Gallup et al. | |
| 5,476,450 A | 12/1995 | Ruggio | |
| 5,484,412 A | 1/1996 | Pierpont | |
| 5,507,725 A | 4/1996 | Savage et al. | |
| 5,516,336 A | 5/1996 | McInnes et al. | |
| 5,678,306 A | 10/1997 | Bozeman et al. | |
| 5,692,882 A | 12/1997 | Bozeman, Jr. et al. | |
| 5,697,948 A | 12/1997 | Marin et al. | |
| 5,711,753 A | 1/1998 | Pacella et al. | |
| 5,741,234 A | 4/1998 | Aboul-Hosn | |
| 5,746,575 A | 5/1998 | Westphal et al. | |
| 5,746,709 A | 5/1998 | Rom et al. | |
| 5,746,758 A | 5/1998 | Nordgren et al. | |
| 5,749,855 A | 5/1998 | Reitan | |
| 5,755,687 A | 5/1998 | Donlon | |
| 5,762,624 A | 6/1998 | Peters | |
| 5,776,190 A | 7/1998 | Jarvik | |
| 5,797,948 A | 8/1998 | Dunham | |
| 5,810,088 A | 9/1998 | Lamirand et al. | |
| 5,810,758 A | 9/1998 | Yamazaki et al. | |
| 5,814,004 A | 9/1998 | Tamari | |
| 5,824,070 A | 10/1998 | Jarvik | |
| 5,827,229 A | 10/1998 | Auth et al. | |
| 5,827,267 A | 10/1998 | Savage et al. | |
| 5,851,174 A | 12/1998 | Jarvik et al. | |
| 5,863,179 A | 1/1999 | Westphal et al. | |
| 5,888,241 A | 3/1999 | Jarvik | |
| 5,911,685 A | 6/1999 | Siess et al. | |
| 5,911,702 A | 6/1999 | Romley et al. | |
| 5,921,913 A | 7/1999 | Siess | |
| 5,928,132 A | 7/1999 | Leschinsky | |
| 5,928,181 A | 7/1999 | Colman et al. | |
| 5,938,645 A * | 8/1999 | Gordon ................. A61B 17/22 |
| | | | 604/171 |
| 5,938,672 A | 8/1999 | Nash | |
| 5,947,892 A | 9/1999 | Benkowski et al. | |
| 5,957,672 A | 9/1999 | Aber | |
| 5,964,694 A * | 10/1999 | Siess ....................... H02K 5/08 |
| | | | 415/900 |
| 5,965,089 A | 10/1999 | Jarvik et al. | |
| 6,001,078 A | 12/1999 | Reekers | |
| 6,007,478 A | 12/1999 | Seiss et al. | |
| 6,058,593 A | 5/2000 | Siess | |
| 6,066,100 A | 5/2000 | Willard et al. | |
| 6,071,093 A | 6/2000 | Hart | |
| 6,083,260 A | 7/2000 | Aboul-Hosn | |
| 6,086,570 A | 7/2000 | Aboul-Hosn | |
| 6,093,001 A | 7/2000 | Burgreen et al. | |

**US 10,238,783 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,113,536 | A | 9/2000 | Aboul-Hosn |
| 6,116,862 | A | 9/2000 | Rau et al. |
| 6,123,659 | A | 9/2000 | Le Blanc et al. |
| 6,123,725 | A | 9/2000 | Aboul-Hosn |
| 6,129,704 | A | 10/2000 | Forman et al. |
| 6,136,025 | A | 10/2000 | Barbut et al. |
| 6,139,487 | A | 10/2000 | Siess |
| 6,146,354 | A | 11/2000 | Beil |
| 6,152,704 | A | 11/2000 | Aboul-Hosn et al. |
| 6,171,253 | B1 | 1/2001 | Bullister et al. |
| 6,176,822 | B1 | 1/2001 | Nix et al. |
| 6,176,848 | B1 | 1/2001 | Rau et al. |
| 6,183,220 | B1 | 2/2001 | Ohara et al. |
| 6,197,001 | B1 | 3/2001 | Wilson et al. |
| 6,210,133 | B1 | 4/2001 | Aboul-Hosn et al. |
| 6,210,397 | B1 | 4/2001 | Aboul-Hosn et al. |
| 6,217,541 | B1 | 4/2001 | Yu |
| 6,228,063 | B1 | 5/2001 | Aboul-Hosn |
| 6,234,960 | B1 | 5/2001 | Aboul-Hosn et al. |
| 6,245,007 | B1 | 6/2001 | Bedingham et al. |
| 6,248,091 | B1 | 6/2001 | Voelker |
| 6,287,319 | B1 | 9/2001 | Aboul-Hosn et al. |
| 6,290,689 | B1 | 9/2001 | Delaney et al. |
| 6,295,877 | B1 | 10/2001 | Aboul-Hosn et al. |
| 6,336,939 | B1 | 1/2002 | Yamazaki et al. |
| 6,346,120 | B1 | 2/2002 | Yamazaki et al. |
| 6,354,814 | B1 | 3/2002 | Kaufmann et al. |
| 6,395,026 | B1 | 5/2002 | Aboul-Hosn et al. |
| 6,440,158 | B1 | 8/2002 | Saab |
| 6,532,964 | B2 | 3/2003 | Aboul-Hosn et al. |
| 6,533,716 | B1 | 3/2003 | Schmitz Rode et al. |
| 6,544,216 | B1 * | 4/2003 | Sammler ........... A61M 25/0125 |
| | | | 604/95.03 |
| 6,572,530 | B1 | 6/2003 | Araki et al. |
| 6,592,567 | B1 | 7/2003 | Levin et al. |
| 6,613,008 | B2 | 9/2003 | Aboul-Hosn et al. |
| 6,673,040 | B1 | 1/2004 | Samson et al. |
| 6,709,418 | B1 | 3/2004 | Aboul-Hosn et al. |
| 6,716,189 | B1 | 4/2004 | Jarvik et al. |
| 6,733,459 | B1 | 5/2004 | Atsumi |
| 6,849,068 | B1 * | 2/2005 | Bagaoisan ......... A61M 25/1011 |
| | | | 604/523 |
| 6,926,662 | B1 | 8/2005 | Aboul-Hosn et al. |
| 7,022,100 | B1 * | 4/2006 | Aboul-Hosn ......... A61M 1/125 |
| | | | 604/6.11 |
| 7,517,352 | B2 | 4/2009 | Evans et al. |
| 7,731,675 | B2 * | 6/2010 | Aboul-Hosn ......... A61M 1/125 |
| | | | 604/6.11 |
| 7,785,246 | B2 | 8/2010 | Aboul-Hosn et al. |
| 7,998,054 | B2 | 8/2011 | Bolling |
| 8,540,615 | B2 | 9/2013 | Aboul-Hosn et al. |
| 8,545,447 | B2 | 10/2013 | Demarais et al. |
| 8,613,777 | B2 | 12/2013 | Siess et al. |
| 8,721,517 | B2 | 5/2014 | Zeng et al. |
| 8,834,344 | B2 | 9/2014 | Aboul-Hosn et al. |
| 8,888,728 | B2 * | 11/2014 | Aboul-Hosn ......... A61M 1/125 |
| | | | 604/6.11 |
| 9,327,068 | B2 * | 5/2016 | Aboul-Hosn ......... A61M 1/125 |
| 9,545,468 | B2 * | 1/2017 | Aboul-Hosn ......... A61M 1/125 |
| 9,561,314 | B2 * | 2/2017 | Aboul-Hosn ......... A61M 1/125 |
| 9,597,437 | B2 * | 3/2017 | Aboul-Hosn ......... A61M 1/125 |
| 9,789,238 | B2 * | 10/2017 | Aboul-Hosn ......... A61M 1/125 |
| 2001/0027287 | A1 | 10/2001 | Shmulewitz et al. |
| 2002/0183628 | A1 | 12/2002 | Reich et al. |
| 2003/0023201 | A1 | 1/2003 | Aboul-Hosn et al. |
| 2003/0065271 | A1 | 4/2003 | Khoury |
| 2003/0088151 | A1 | 5/2003 | Kung et al. |
| 2003/0100816 | A1 | 5/2003 | Siess |
| 2003/0187122 | A1 | 10/2003 | Siess |
| 2003/0205233 | A1 | 11/2003 | Aboul-Hosn et al. |
| 2004/0097095 | A1 | 5/2004 | Nash et al. |
| 2005/0049696 | A1 | 3/2005 | Siess et al. |

| | | | |
|---|---|---|---|
| 2007/0118072 | A1 | 5/2007 | Nash |
| 2009/0024212 | A1 | 1/2009 | Siess et al. |
| 2013/0304158 | A1 | 11/2013 | Zarinetchi et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2352234 A1 | 6/2000 |
| CA | 2361972 A1 | 8/2000 |
| CN | 1222862 A | 7/1999 |
| CZ | 200000007 A3 | 5/2000 |
| DE | 2355966 A1 | 5/1975 |
| DE | 4016013 A1 | 11/1991 |
| DE | 4105278 A1 | 8/1992 |
| DE | 29604787 U1 | 10/1996 |
| DE | 19622335 A1 | 12/1997 |
| DE | 19626224 A1 | 1/1998 |
| DE | 19821307 C1 | 10/1999 |
| DE | 10017147 A1 | 10/2001 |
| DE | 10018424 A1 | 10/2001 |
| EP | 0280225 A2 | 8/1988 |
| EP | 0364293 A2 | 4/1990 |
| EP | 0445782 A1 | 9/1991 |
| EP | 0157859 B1 | 4/1992 |
| EP | 0611582 A2 | 8/1994 |
| EP | 764448 A2 | 3/1997 |
| EP | 0810002 A1 | 12/1997 |
| EP | 0884064 A2 | 12/1998 |
| EP | 0916359 B1 | 5/1999 |
| JP | H04126158 A | 4/1992 |
| JP | H-0999092 A | 4/1997 |
| JP | 2002-514472 A | 5/2002 |
| WO | WO 89/05164 A1 | 5/1989 |
| WO | WO 1994 005347 A1 | 3/1994 |
| WO | WO 97/37697 A1 | 10/1997 |
| WO | WO 1997 037696 A1 | 10/1997 |
| WO | WO 97/46270 A1 | 12/1997 |
| WO | WO 1997 049440 A2 | 12/1997 |
| WO | WO 99/02204 A1 | 1/1999 |
| WO | WO 1999 044651 A1 | 9/1999 |
| WO | WO 99/58170 A1 | 11/1999 |
| WO | WO 99/59652 A1 | 11/1999 |
| WO | WO 1999/058170 A1 | 11/1999 |
| WO | WO 00/12148 A1 | 3/2000 |
| WO | WO 00/18448 A1 | 4/2000 |
| WO | WO 00/19097 A1 | 4/2000 |
| WO | WO 2000/029056 A2 | 5/2000 |
| WO | WO 00/37139 A1 | 6/2000 |
| WO | WO 2000 029056 A1 | 6/2000 |
| WO | WO 2000033047 A1 | 6/2000 |
| WO | WO 2000037139 A1 | 6/2000 |
| WO | WO 2000 043053 A1 | 7/2000 |
| WO | WO 00/44417 A1 | 8/2000 |
| WO | WO 2000053240 A1 | 9/2000 |
| WO | WO 00/69489 A1 | 11/2000 |
| WO | WO 2000074748 A1 | 12/2000 |
| WO | WO 2000029056 A3 | 1/2001 |
| WO | WO 2001039817 A2 | 6/2001 |
| WO | WO 01/78807 A1 | 10/2001 |
| WO | WO 2001039817 A3 | 1/2002 |

OTHER PUBLICATIONS

U.S. Appl. No. 14/966,669, filed Dec. 11, 2015, U.S. Pat. No. 9,789,238.

U.S. Appl. No. 14/543,815, filed Nov. 17, 2014, U.S. Pat. No. 9,327,068.

U.S. Appl. No. 12/772,810, filed May 3, 2010, U.S. Pat. No. 8,888,728.

U.S. Appl. No. 11/375,926, filed Mar. 15, 2006, U.S. Pat. No. 7,731,675.

U.S. Appl. No. 10/070,178, filed Jul. 19, 2002, U.S. Pat. No. 7,022,100.

Abiomed Inc., Abiomed R&D, Inc. and Abiomed Europe GmbH's Preliminary Invalidity Contentions, No. 1:16-cv-10914-FDS, dated Sep. 8, 2017 (redacted).

Abiomed Inc., Abiomed R&D, Inc. and Abiomed Europe GmbH's Preliminary Invalidity Contentions, No. 1:17-cv-12311-FDS, dated Aug. 3, 2018 (redacted).

## US 10,238,783 B2

Page 4

(56)     **References Cited**

OTHER PUBLICATIONS

Abiomed's Opening Claim Construction Brief, No. 1:16-cv-10914-FDS, filed Dec. 15, 2017.
Abiomed's Opposition to Maquet's Motion for Reconsideration, 1:16-cv-10914-FDS, filed Oct. 5, 2018.
Abiomed's Rebuttal Claim Construction Brief, No. 1:16-cv-10914-FDS, filed Jan. 26, 2018.
Abou-Awdi N. L., et al., Hemopump Left Ventricular Support in the Peripartum Cardiomyopathy Patient, 8 J. Cardiovascular Nursing, Issue 2 (Jan. 1994) ("Abou-Awdi").
Akdis, M. et al., *Overview of Blood Pumps*, Cardiovascular Engineering Research Group, Helmholtz-Institute of Biomedical Engineering, RWTH Aachen, Germany (2001).
Andre F. Cournand et al., Nobel Prize in Physiology or Medicine 1956, Nobel Prize, http://www.nobelprize.org/nobel_prizes/medicine/laureates/ (last visited Jan. 25, 2017).
Andrew F. Cournand, Control of the pulmonary circulation in man with some remarks on methodology, Nobel Lecture, Dec. 11, 1956, p. 531 and p. 533.
Antaki, et al., In Vivo Evaluation of the Nimbus Axial Flow Ventricular Assist System: Criteria and Methods, ASAIO J., M231-36 (1993).
Attar, S., *New developments in cardiac assist devices*, Surgical Science Series (1985).
B. Meyns et al., "Coronary Artery Bypass Graft with Biventricular Microaxial Pumps", Journal of Perfusion, Jul. 1999; 14(4):pp. 287-290.
B. Meyns et al., Micro pumps to Support the Heart During CABG, European Journal of Cardiothorac Surg (2000) 17 (2): pp. 169-174.
Butler, et al., Development of a 14 Fr. Size Hemopump, Ann. Int'l Conf. IEEE Eng'g in Med. & Bio Sci., 12(2): 735-36 (1990).
Butler, et al., Development of an Axial Flow Blood Pump LVAS, ASAIO J., M296-300 (1992).
Casimir-Ahn, H. et al., *Clinical Use of the Hemopump Cardiac Assist System for Circulatory Support*, The Annals of Thoracic Surgery, vol. 59 (1995), pp. 539-545.
Collins Declaration IPR-2017-01025.
Collins Declaration IPR-2017-01026.
Collins Declaration IPR-2017-01027.
Collins Declaration IPR-2017-01028.
Collins Declaration IPR-2017-01029.
Collins Declaration IPR-2017-01201.
Collins Declaration IPR-2017-01202.
Collins Declaration IPR-2017-01203.
Collins Declaration IPR-2017-01204.
Collins Declaration IPR-2017-01205.
Collins Declaration IPR-2017-01207.
Collins Declaration IPR-2017-01208.
Collins Declaration IPR-2017-01209.
Collins Declaration IPR-2017-01253.
Colombo, Selecton of Coronary Stents, J. Am. Coll. Cardiology 40(6); 1021-33 (2002).
Compendium of Technical and Scientific Information for the Hemopump Temporary Cardia Assist System, 1988 (15 pages).
Complaint from Abiomet Inv. V. Maquet Cardiovascular, Case No. 1:16-cv-10914, filed in Dist. of Mass. On May 19, 2016.
Cortis, B. S., *From Augiography to Angioscopy: Informal Discussion*, Texas Heart Institute Journal (1986).
Decision Denying Institution of Inter Partes Review Case IPR 2017-01025.
Decision Denying Institution of Inter Partes Review IPR2017-01208.
Decision Denying Institution of Inter Partes Review IPR2017-01209.
Decision Denying Institution of Inter Partes Review IPR2017-02134.
Decision Denying Institution of Inter Partes Review IPR2017-02135.
Decision Denying Institution of Inter Partes Review IPR2017-02150.

Decision Denying Institution of Inter Partes Review IPR2017-02151.
Decision Denying Institution of Inter Partes Review IPR2017-02152.
Decision Denying Institution of Inter Partes Review IPR2017-02153.
Decision Denying Inter Partes Review IPR2017-01026.
Decision Denying Inter Partes Review IPR2017-01027.
Decision Denying Inter Partes Review IPR2017-01028.
Decision Denying Inter Partes Review IPR2017-01029.
Decision Denying Inter Partes Review IPR2017-01201.
Decision Denying Inter Partes Review IPR2017-01202.
Decision Denying Inter Partes Review IPR2017-01203.
Decision Denying Inter Partes Review IPR2017-01204.
Decision Denying Inter Partes Review IPR2017-01205.
Decision Denying Inter Partes Review IPR2017-01207.
Decision Denying Inter Partes Review IPR2017-01253.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01026.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01027.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01028.
Decision Denying Petitioner's Requests for Rehearing IPR2017-01029.
Decision Denying Petition's Request for Rehearing IPR2017-01025.
Decision from the Patent Trial and Appeal Board, USPTO, appeal No. 2013-001967 for U.S. Appl. No. 10-556423 dated Sep. 30, 2015 (4 pages).
Declaration of Kiersten Batzli—IPR-2017-01025.
Declaration of Kiersten Batzli—IPR-2017-01026.
Declaration of Kiersten Batzli—IPR-2017-01027.
Declaration of Kiersten Batzli—IPR-2017-01028.
Declaration of Kiersten Batzli—IPR-2017-01029.
Declaration of Kiersten Batzli—IPR-2017-01201.
Declaration of Kiersten Batzli—IPR-2017-01202.
Declaration of Kiersten Batzli—IPR-2017-01203.
Declaration of Kiersten Batzli—IPR-2017-01204.
Declaration of Kiersten Batzli—IPR-2017-01205.
Declaration of Kiersten Batzli—IPR-2017-01207.
Declaration of Kiersten Batzli—IPR-2017-01208.
Declaration of Kiersten Batzli—IPR-2017-01209.
Declaration of Kiersten Batzli—IPR-2017-01253.
Declaration of Pamela Stransburg IPR-2017-01025.
Declaration of Pamela Stransburg IPR-2017-01026.
Declaration of Pamela Stransburg IPR-2017-01027.
Declaration of Pamela Stransburg IPR-2017-01028.
Declaration of Pamela Stransburg IPR-2017-01029.
Declaration of Pamela Stransburg IPR-2017-01201.
Declaration of Pamela Stransburg IPR-2017-01202.
Declaration of Pamela Stransburg IPR-2017-01203.
Declaration of Pamela Stransburg IPR-2017-01204.
Declaration of Pamela Stransburg IPR-2017-01205.
Declaration of Pamela Stransburg IPR-2017-01207.
Declaration of Pamela Stransburg IPR-2017-01208.
Declaration of Pamela Stransburg IPR-2017-01209.
Declaration of Pamela Stransburg IPR-2017-01253.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01201.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01202.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01203.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01207.
Declaration of Susanne Leupold and Accompanying Exhibits regarding O. Jegaden, IPR-2017-01208.
Dens, J. et al., *First Experience with the Impella Recover® LP 2.5 Micro Axial Pump in Patients with Cardiogenic Shock or Undergoing High-Risk Revascularisation*, EuroIntervention, May 2006.

**US 10,238,783 B2**

Page 5

(56)          **References Cited**

OTHER PUBLICATIONS

Diastolic Balloon Pumping (With Carbon Dioxide) in the Aorta—a
Mechanical Assistance to the Failing Circulation by S. D. Moulopoulos
(1962).
Dubois-Rande, J. et al., *Assessment of a Percutaneous Hemopump
in a High Risk Coronary Angioplasty Patients,* ASAIO Journal
(1994) pp. M486-M488.
E. E. Kunst, J.A. van Alste, T. Arts, and H. B. K. Boom, Integrated
Unit for Programmable Control of the 21F Hemopump and Regis-
tration of Physiological Signals, Med. & Biol. Eng. & Comput.
694-95 (Nov. 1994).
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1001 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1002 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1003 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1004 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.

Exhibit 1005 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1006 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1007 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1007 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1007 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1007 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1007 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1008 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1009 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1010 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02134.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02135.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02150.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02151.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02152.
Exhibit 1011 of Petition filed in Inter Partes Review Case No.
IPR2017-02153.

**US 10,238,783 B2**

Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1012 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1013 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1014 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1015 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1018 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1019 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1020 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1021 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1022 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1023 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1024 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1025 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1026 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

**US 10,238,783 B2**

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

Exhibit 1027 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1028 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1029 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1030 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1031 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1031 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1032 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1033 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1034 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1035 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1036 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1037 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1038 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1039 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1040 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

**US 10,238,783 B2**

Page 8

(56)         **References Cited**

OTHER PUBLICATIONS

Exhibit 1041 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1042 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1043 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1044 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1045 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1046 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1047 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1048 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1049 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1050 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1051 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1052 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1053 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 1054 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 1055 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

# US 10,238,783 B2

Page 9

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 1056 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 1057 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1057 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 1058 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1059 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1059 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1060 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1060 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1061 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1061 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1062 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 1062 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1063 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1064 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1065 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 1066 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.

Exhibit 2001 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 2001 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.

Exhibit 2002 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 2002 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.

Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.

Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.

Exhibit 2003 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02135.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02150.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02151.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02152.

Exhibit 2003 of Petition filed in Inter Partes Review Case No. IPR2017-02153.

Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.

Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.

## US 10,238,783 B2

Page 10

(56)           **References Cited**

OTHER PUBLICATIONS

Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2004 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2004 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2005 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2005 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2006 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2006 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2007 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2007 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2008 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2008 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2009 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2009 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2010 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2010 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2011 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2011 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2012 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02150.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02151.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02152.
Exhibit 2012 of Petition filed in Inter Partes Review Case No. IPR2017-02153.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

## US 10,238,783 B2

Page 12

(56)  **References Cited**

OTHER PUBLICATIONS

Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2013 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2013 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2013 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2014 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2014 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2014 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2015 of Patent Owner's Preliminary Response filed. In Inter Partes Review Case No. IPR2017-01208.
Exhibit 2015 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2015 of Petition filed in Inter Partes Review Case No. IPR2017-02134.

Exhibit 2015 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2016 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2016 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2016 of Petition filed in Inter Partes Review Case No. IPR2017-02135.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2017 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2017 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2018 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2018 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2019 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2019 of Petition filed in Inter Partes Review Case No. IPR2017-02134.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.

## US 10,238,783 B2
Page 13

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2020 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01025.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01026.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01027.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01028.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2021 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2022 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2023 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.

Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Exhibit 2024 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Exhibit 2025 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2026 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2027 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2028 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Exhibit 2029 of Patent Owner's Preliminary Response filed in Inter Partes Review Case No. IPR2017-01029.
Figulla, H. R., *Circulatory support devices in clinical cardiology*, Cardiology (1994).
File wrapper for U.S. Appl. No. 09/280,970 entitled "Pressure Sensing Cannula"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 09/280,987 entitled "Cannula with Balloon Tip"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 09/280,988 entitled "Steerable Cannula"—filed Mar. 30, 1999, USPTO.
File wrapper for U.S. Appl. No. 10/566,423 entitled "Intracardiac Pumping Device", USPTO, filed Jan. 30, 2006.
Flameng, W., ed., Temporary Cardiac Assist with an Axial Pump System, Steinkopff Verlag Darmstadt, Springer-Verlag, New York, 1991.
Fraden, AIP Handbook of Modern Sensors: Physics, Design, and Applications, Amer. Inst. Physics (1993).
Frank K. White, Fluid Mechanics, 2nd edition, 1986.
Frazier, et al., Treatment of Cardiac Allograft Failure by Use of an Intraaortic Axial Flow Pump, J. Heart Transplanation 110 (1989).
Frazier, Mechanical Circulatory Assist Device Development at the Texas Heart Institute: A Personal Perspective, J. Thorac. & Cardiovascular Surg., 1738-44.
Frazier, O. H. et al., "First Human Use of the Hemopump, A Gather-Mounted Ventricular Assist Device", Ann Thorac Surg., Feb. 1990; 49(2): pp. 299-304.
Gacioch, G. M. et al., *Cardiogenic shock complicating acute myocardial infarction: the use of coronary angioplasty and the integration of the new support devices into patient management*, Journal of the American College of Cardiology (1992).
H. Reul et al., "Artificial Heart and Assist Device: New Developments at the Helmholtz Institute", Chapter from *Heart Replacement* publ. springer at the (Japan), pp. 201-227, 1996.
*Hemopump Cardiac Assist Systems—Instructions for Use for the 14 French and 24 French Pump Assemblies*, Medtronic, Hemodynamics Division (1995).
Hemopump® : Temporary Cardiac Assist System Directions for Use, Nimbus Medical, Inc. (1988).
Impella RECOVER LP2.5: Percutaneous Cardiac Support System Instructions for Use, Abiomed, Inc. (2015).
Invalidity Contentions from Abiomed Inc. v. Maquet Cardiovascular, Case No. 1:16-cv-10914, filed in Dist. of Mass. On Sep. 8, 2017.
JOMED Reitan Catheter Pump Brochure, www.jomed.com/rcp (undated) (6 pages).
K.C. Butler et al., "The Hemopump—a New Cardiac Prosthesis Device", IEEE Trans Biomed Eng. 1990;37:193-196.
Kapoor, A., *Interventional Cardiology*, Springer-Verlag (1989).
Khashaba, RotablatorTM: Rotational Angioplasty System Basics of Operation.
Kirsten-Treptow, P., & Sieß, T. (2000), the intracardiac pump system—High-tech product and Technology Platform (original title in German "Das intrakardiale Pumpsystem—Hightech-Produkt and Technologie-Plattform"). Kardiotechnik, 9(3), pp. 77-80.
Konishi, H. et al., Controller for an Axial Flow Blood Pump, Artificial Organs 20(6): 618-20 (Jun. 1996).
Kozik, et al., Mechanical Circulatory Support, Organogenesis 7(1):50-63 (2001).

## US 10,238,783 B2

Page 14

(56)         **References Cited**

OTHER PUBLICATIONS

Lawrence K. Altman, A. Tiny Heart Pump Saves Its First Life, Researchers Report, N.Y. Times, May 5, 1988.
Letter from Ajey Atre to Michael R. Minogue dated Dec. 15, 2015.
Letter from Michael S. Connor to Richard T. McCaulley, Jr. dated May 3, 2016.
Letter from Richard T. McCaulley, Jr. dated May 19, 2016.
Letter from Richard T. McCaulley, Jr. To Ajey Atre dated Jan. 19, 2016.
Leupold Declaration—Jegaden IPR-201701204.
Leupold Declaration—Jegaden IPR-201701205.
Leupold Declaration—Jegaden IPR-201701209.
Leupold Declaration—Jegaden IPR-201701253.
Library of Congress, Catalog Record of "Supported Complex and High Risk Coronary Angioplasty" (1991).
Library of Congress, Catalog Record of Fluid Mechanics, 2nd edition, ed. Frank M. White (1986).
Library of Congress, Catalog Record of Konishi et al., "Controller for an axial flow blood pump," in Artificial Organs Journal, vol. 20, No. 6 (Jun. 1996) 618-612.
Library of Congress, Catalog Record of Mouloupoulos et al., "Diastolic Balloon Pumping (With Carbon Dioxide) in the Aorta—a Mechanical Assistance to the Failing Circulation," in the American Heart Journal, vol. 63, No. 1 (1962) 669-675.
Library of Congress, Catalog Record of Textbook of Medical Physiology by Arthur C. Guyton and John E. Hall, 9th edition (1996).
Lincoff, A. M. et al., *Percutaneous Support Devices for High Risk or Complicated Coronary Angioplasty*, Journal of American College of Cardiology (1997).
Loisance, et al., Left-Ventricular Support by Intraventricular Blood Pump During High-Risk Coronary Angioplasty, The Lancet, 561 (1989).
Loisance, et al., Prophylactic Intraventricular Pumping in High-Risk Coronary Angioplasty, The Lancet, 438-40 (1990).
Lynn R. Williams, Reference Values for Total Blood Volumeand Cardiac Output in Humans, Oak Ridge Nat'l Lab. (Sep. 1994).
Magovern, et al., Nonpulsatile Circulatory Support: Techniques of Insertion, Ann. Thorac. Surg. 55(2): 66-72 (1993).
Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarification of Order on Claim Construction Regarding "Passing Purge Fluid" Terms, C.A. No. 1:16-CV-10914-FDS, Jury Demand, filed Sep. 27, 2018.
Maquet Cardiovascular LLC's Opening Markman Brief, C.A. No. 1:16-cv-10914-FDS, filed Dec. 15, 2017.
Maquet Cardiovascular LLC's Responsive Markman Brief, CA. No. 1:16-cv-10914-FDS, filed Jan. 26, 2018.
Marseille, et al., Implantable Micropump System for Augmented Liver Perfusion, Int'l J. Artificial Organs 22(6): 458-60 (1998).
Maslen et al., "Feedback Control Applications in Artificial Hearts," in IEEE Control systems Magazine, vol. 18, No. 6 (1998).
Memorandum and Order on Claim Construction, Civil Action No. 16-10914-FDS, dated Sep. 7, 2018.
Memorandum of Law in Support of Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarification of Order on Claim Construction Regarding "Passing Purge Fluid" Terms, C.A. No. 1:16-CV-10914-FDS, Jury Demand, filed Sep. 27, 2018.
Meyns, B. et al., *Mechanical Support with Microaxial Blood Pumps for Postcardiotomy Left Ventricular Failure: Can Outcome be Predicted?*, Elsevier Inc. (Aug. 2000).
Mihaylov, D. et al., *Development of a New Introduction Technique for the Pulsatile Catheter Pump*, Artif. Organs (1997).
Mizuno, K., *New Percutaneous Transluminal Coronary Angioscope*, Journal of American College of Cardiology (1989).
Nakatani, et al., In Vitro and In Vivo Assessment of an Intravenous Axial Flow Pump for Right Heart Assist, ASAIO J. M723-27 (1994).
Non-Final Office Action—dated Jun. 21, 2017—for U.S. Appl. No. 14/966,669, filed Dec. 11, 2015, which is related to this present application.

O. Jegaden, "Clinical results of Hemopump support in surgical cases," 1991.
Online encyclopedia article "Pyrolytic Carbon" accessed Feb. 19, 2009, http://en.wikipedia.org/wiki/Pyrolytlc/carbon, 1 page.
Online encyclopedia article "Ventricular assist device, List of implantable VAD devices" accessed Jan. 12, 2010, http://en.wikipedia.org/wiki/Ventricular_assist_device, 11 pages.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01025.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01026.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01027.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01028.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR-2017-01029.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01201.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01202.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01203.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01204.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01205.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01207.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01208.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01209.
Patent Owner Preliminary Response filed in Inter Partes Review Case No. IPR2017-01253.
Patent Owner's Preliminary Response IPR2017-02134.
Patent Owner's Preliminary Response IPR2017-02135.
Patent Owner's Preliminary Response IPR2017-02150.
Patent Owner's Preliminary Response IPR2017-02151.
Patent Owner's Preliminary Response IPR2017-02152.
Patent Owner's Preliminary Response IPR2017-02153.
Petition for Inter Partes Review IPR2017-01205.
Petition IPR-2017-01025.
Petition IPR-2017-01026.
Petition IPR-2017-01027.
Petition IPR-2017-01028.
Petition IPR-2017-01029.
Petition IPR-2017-01201.
Petition IPR-2017-01202.
Petition IPR-2017-01203.
Petition IPR-2017-01204.
Petition IPR-2017-01207.
Petition IPR-2017-01208.
Petition IPR-2017-01209.
Petition IPR-2017-01253.
Petition, IPR2017-02134.
Petition, IPR2017-02135.
Petition, IPR2017-02150.
Petition, IPR2017-02151.
Petition, IPR2017-02152.
Petition, IPR2017-02153.
Petitioner's Request for Rehearing IPR2017-01026.
Petitioner's Request for Rehearing IPR2017-01027.
Petitioner's Request for Rehearing IPR2017-01025.
Petitioner's Request for Rehearing IPR2017-01028.
Petitioner's Request for Rehearing IPR2017-01029.
Pierce, W. S. et al., Portable artificial heart systems, ASAIO Journal 29.1: 757-59 (Apr. 1983).
Practical Angioplasty (David P. Faxon, M.D. ed., Raven Press 1993)—pp. 1 to 9.
Quaal, S., *Cardiac Mechanical Assistance Beyond Balloon Pumping*, Mosby (1993).

**US 10,238,783 B2**

Page 15

(56)        **References Cited**

OTHER PUBLICATIONS

R. W. Smalling, The use of mechanical assist devices in the management of cardiogenic shock, Tecas Heart Institute Journal, vol. 18, No. 4, 1991, 275-81.

Reitan, Oyvind et al., "Hydrodynamic Properties of a New Percutaneous Intraaortic Axial Flow Pump," ASAIO Journal; Jay-Jun. 2000; vol. 16; pp. 323-329.

Reul et al., "Rotary Blood Pumps in Circulatory Assist", Perfusion, May 1995; 10(3); pp. 153-168.

Schmitz, et al., An Expandable Percutaneous Catheter Pump for Left Ventricular Support: Proof of Concept, J. Am. Coll. Cardiology, 45 (11): 1856-61 (2005).

Schner, Design and Selection of Flexible Shaft (Aug. 15, 2016).

Scholz, et al.,Clinical Experience with the Percutaneous Hemopump During High-Risk Coronary Angioplasty, Am. J. Cardiology, 82(9): 1107-10 (1998).

Scholz, et al., Mechanical Left Ventricular Unloading During High Risk Coronary Angioplsaty: First Use of a New Percutaneous Transvalvular Left Ventricular Assist Device, Catherization & Cardiovascular Disease 31: 61-69 (1994).

Seldinger, Catheter Replacement of the Needle in Percutaneous Arteriography, Acta Radiologica 39:368-76 (1953).

Siess, et al., Concept, Realization, and First In Vitro Testing of an Intraarterial Microaxial Blood Pump, Int'l J. Artificial Organs 19(7): 644-52 (1995).

Siess, et al., From a Lab Type to a Product: A Retrospective View on Impella's Assist Technology, Int'l J. Artificial Organs 25(5); 414-21 (2001).

Siess, et al., Hydraulic Refinement of an Intrarterial Microaxial Blood Pump, Int'l J. Artificial Organs 18(5): 273-85 (1995).

Stedman's Medical Dictionary, 27th edition, (1999).

Stolinski, et al., The Heart-Pump Interaction: Effects of a Microaxial Blood Pump, Int'l J. Artificial Organs 25(11): 1082-88 (2002).

Stronebridge, P. A., *Angioscopy: a New Light on Perpheral Vascular Disease*, European Journal of Vascular Surgery (1992).

Strong, Biophysical Measurements, Tektronix, Inc., 93-115 (1970).

Sweeney, The Hemopump in 1997: A Clinical, Political, and Marketing Evolution, Ann. Thorac. Surg. 68:761-63 (1999).

T. Siess et al., "Concept, Realization, and First In Vitro Testing of an Intraarterial Microaxial Blood Pump", Artificial Organs, vol. 19, Issue 7, pp. 644-652, Jul. 1995.

T. Siess, "System Analysis and Development of Intravascular Rotary Pumps to Support the Heart" (original title in German Systemanalyse and Entwicklung intravasaler Rotationspumpen zur Herzunterstutzung), Shaker, 1989 pages, 1999.

Taylor, K. M., *Cardiopulmonary Bypass, Principles and Management*, Williams & Wilkins (1986).

Textbook of Medical Physiology by Arthur C. Guyton and John E. Hall, 9th Edition (1996).

Throckmorton, et al., Numerical Design and Experimental Hydraulic Testing of an Axial Flow, ASAIO J., 754-61 (2007).

Throckmorton, et al., Numerical, Hydraulic, and Hemolytic Evalation of an Intravascular Axial Flow Blood Pump to Mechanically Support Fontan Patients, Ann. Biomed. Eng'g 39(1): 324-36 (2011.

U. Lonn et al., "Beating Heart Coronary Surgery Supported by an Axial Blood Flow Pump", The Annals of Thoracic Surgery, Jan. 1999, vol. 67, Issue 1, pp. 99-104.

Wampler et al., Clinical Experience with the Hemopump Left Ventricular Support Device, published in Supported Complex and High Risk Coronary Angioplasty, ch. 14, 231-49 (Springer 1st ed. 1991).

Wampler, et al., Circulatory Support of Cardiac Interventional Procedures with the HemopumpTM Cardiac Assist System, Cardiology 84:194-201 (1994).

Wampler, et al., The Sternotomy Hemopump: A Second Generation Intrarterial Ventricular Assist, ASAIO J., M218-23 (1993).

Wampler, Ricahrd K., "In Vivo Evaluation of a Peripheral Vascular Access Axial Flow Blood Pump," ASAIO Trans., Jul.-Sep. 1988; 34(3): pp. 450-454.

Webster, Medical Instrumentation, John Wiley & Sons (1973).

Wu et al., Ventricular Assist Devices: Current Status and Future Perspective, Frontiers in Biomedical Engineering, 197-231 (2003).

Wu, et al., Fluid Dynamic Characterization of Operating Conditions for Continuous Flow Blood Pumps, ASAIO J., 442-49 (1999).

ZB Med, Catalog Record of Temporary Cardiac Assist with an Axial Pump, ed. W. Flaming (1991).

Maq Rebuttal Validity Contentions Ex. A6 (Oct. 9, 2018).

Maq Rebuttal Validity Contentions Ex. A1.

Maq Rebuttal Validity Contentions Ex. A3.

Maq Rebuttal Validity Contentions Ex. A5.

Maq Rebuttal Validity Contentions Ex. A7.

Maq Rebuttal Validity Contentions Ex. A2.

Maq Rebuttal Validity Contentions Ex. A4.

Maq Rebuttal Validity Contentions.

Maq I Ex. A1—Invalidity by PCT Pub. No. WO 99/02204 ("Aboul-Hosn").

Maq I Ex. A2—Invalidity by "The Hemopump References".

Maq I Ex. A3—Invalidity based on "Jegaden".

Maq I Ex. A4—Invalidity by U.S. Pat. No. 6,248,091 ("Voelker").

Maq I Ex. A5—Invalidity by U.S. Pat. No. 5,921,913 ("Siess").

Maq I Ex. A6—Invalidity by U.S. Pat. No. 6,544,216 B1 ("Sammler").

Maq I Ex. A7—Invalidity by U.S. Pat. No. 6,247,007 B1 ("Bedingham").

Maq II Ex. A1—238 Invalidity—Aboul-Hosn Chart.

Maq II Ex. A2—238 Invality—Hemopump Char.

Maq II Ex. A3—238 Invalidity—Jegaden Chart.

Maq II Ex. A4—23 Invalidity—Voelker Chart.

Maq II Ex. A5—238 Invalidity—Siess Chart.

Maq II Ex. A6—238 Invalidity—Bedingham Chart.

Abiomed's Surreply to Maquet's Motion for Reconsideration dated Oct. 26, 2018.

Sur-Response of Maquet Cardiovascular LLC Concerning Its Motion for Reconsideration and/or Clarification of Claim Construction Regarding "Passing Purge Fluid" Terms dated Nov. 2, 2018.

Abiomed's Opposition to Maquet's Motion for Reconsideration dated Oct. 5, 2018.

Reply Memorandum of Law in Further Support of Maquet Cardiovascular LLC's Motion for Reconsideration and/or Clarification of Order on Claim Construction Regarding "Passing Purge Fluid" Terms dated Oct. 17, 2018.

U.S. Appl. No. 15/675,310, filed Aug. 11, 2017, Aboul-Hosn et al.

U.S. Appl. No. 16/138,788, filed Sep. 21, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/143,289, filed Sep. 26, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/153,355, filed Oct. 5, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/153,473, filed Oct. 5, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/153,619, filed Oct. 5, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/159,553, filed Oct. 12, 2018, Aboul-Hosn et al.

U.S. Appl. No. 16/167,400, filed Oct. 22, 2018, Aboul-Hosn et al.

Akdis, M. et al., *Blood Pumps for Circulatory Support*, Perfusion 15 (2000) 295-311 NOTE: Erroneously cited on Dec. 5, 2018 as *Overview of Blood Pumps*, Cardiovascular Engineering Research Group, Helmhortz-Institute of Biomedical Engineering, RWTH Aachen, Germany (2001).

* cited by examiner



*FIG. 1*



FIG. 2



*FIG. 3*



FIG. 4



FIG. 5



*FIG. 6*

MOTOR
ASSEMBLY



FIG. 7



*FIG 9*

*FIG 8*



*FIG. 10*



FIG. 11



*FIG. 12*



*FIG 13*



FIG. 14



*FIG. 15*



FIG. 16



FIG. 17



FIG. 18



*FIG. 19*



Figure 20

Figure 22



**Figure 21**



**Figure 23**



Figure 24



Figure 26

Figure 25



Figure 27

Figure 28

Figure 29



Figure 30



Figure 31



Figure 32



Figure 33

Figure 34



**Figure 35**



Figure 36

Figure 37

Figure 38



**Figure 39**



**Figure 40**



**Figure 41**





Figure 44



Figure 45

Figure 46



Figure 51

Figure 50

Figure 47

Figure 48

Figure 49



Figure 52

Figure 53



Figure 54

US 10,238,783 B2

| 1 | 2 |

# GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS

## RELATED APPLICATIONS

This application is a divisional of co-pending U.S. patent application Ser. No. 15/675,310, filed Aug. 11, 2017, which is a divisional of U.S. patent application Ser. No. 14/966, 669, filed Dec. 11, 2015 (now U.S. Pat. No. 9,789,238), which is a divisional of U.S. patent application Ser. No. 14/543,815, filed Nov. 17, 2014 (now U.S. Pat. 9,327,068, issued May 3, 2016), which is a continuation of U.S. patent application Ser. No. 12/772810, filed May 3, 2010 (now U.S. Pat. No. 8,888,728, issued Nov. 18, 2014), which is a continuation of U.S. patent application Ser. No. 11/375,926, filed Mar. 15, 2006 (now U.S. Pat. No. 7,731,675, issued Jun. 8, 2010), which is a divisional of U.S. patent application Ser. No. 10/070,178, filed Jul. 19, 2002, (now U.S. Pat. No. 7,022,100, issued Apr.4, 2006) which claims the benefit of PCT/US00/24515 filed Sep. 1, 2000, which claims the benefit of provisional U.S. Patent Application Ser. No. 60/152,249 filed Sep. 3, 1999. We hereby claim priority to the aforementioned application(s) and also incorporate herein by reference each of the afore-listed patents and applications in their entirety.

## FIELD OF THE INVENTION

The present invention relates generally to blood pumps and, more particularly, to an improved intra-vascular blood pump having a guide mechanism which provides the ability to selectively guide the intravascular pump to a desired location within a patient's circulatory system.

## DESCRIPTION OF RELATED ART

Over the years, various types of blood pumps have been developed for the purpose of augmenting or replacing the blood pumping action of damaged or diseased hearts. Blood pumps are commonly used in three situations: (1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation. The pumps may be designed to provide right and/or left ventricular assist, although left ventricle assist is the most common application in that it is far more common for the left ventricle to become diseased or damaged than it is for the right ventricle.

Blood pumps must provide leak-free operation and must avoid contamination of the fluid by the pump components and the external environment. Such pumps must also pump the fluid at a suitable rate without applying excessive Reynolds shear stress to the fluid. It is well known to those skilled in the art that lysis or cell destruction may result from application of shear stress to cell membranes. Red blood cells are particularly susceptible to shear stress damage as their cell membranes do not include a reinforcing cytoskeleton to maintain cell shape. Lysis of white blood cells and platelets also occurs upon application of high shear stress. Lysis of red blood cells can result in release of cell contents which trigger subsequent platelet aggregation. Sublytic shear stress leads to cellular alterations and direct activation and aggregation of platelets and white blood cells.

Intravascular blood pumps comprise miniaturized blood pumps capable of being percutaneously or surgically introduced into the vascular system of a patient, typically to provide left and/or right heart support. One type of intra-vascular pump is an axial flow blood pump comprising a cable-mounted rotor surrounded by a protective shroud. The pump, along with the rotor and shroud, are mounted at the end of an elongated flexible catheter. The catheter is inserted into the aorta from a remote entry point, such as an incision below the groin that provides access into a femoral artery. The catheter then passes through the descending aorta until it reaches the ascending aorta, near the heart. The catheter device encloses a rotating drive cable which is coupled to the impeller blade at one end, and which emerges from the exposed end of the catheter, near the patient's groin, at the other end. When the exposed end of the drive cable is mechanically rotated, using a device located outside the patient's body, it conveys the rotational force through the length of the catheter, causing the impeller to spin at high speed near the heart. This type of blood pump finds particular application in providing ventricular assist during surgery or providing temporary bridging support to help a patient survive a crisis.

While generally effective in providing ventricular assisting functions, prior art intravascular blood pumps nonetheless suffer various drawbacks. A significant drawback is that prior art intravascular blood pumps are difficult to guide into the appropriate position within the circulatory system of a patient. This is due largely to the fact that the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart. When attempting to place the blood pump in a trans-valvular configuration (with the inlet in the left ventricle and the pump outlet in the ascending aorta), the natural tendency of the catheter to stay straight may cause the pump to be inadvertently placed in the carotid ostia, which can be dangerous if the pump is operated to withdraw blood from the brain.

To overcome these difficulties, certain guide mechanisms may be employed to assist the physician placing the pump in the appropriate position within the circulatory system. One type of supplemental guide mechanism is a guide catheter. Guide catheters are designed with certain guidability characteristics such that physicians can selectively position them within the vasculature or heart with relative ease. A central lumen is provided within the guide catheter such that the intravascular pump may be introduced therein and guided while it is advanced towards the predetermined circulatory site. While generally effective at providing a guiding feature for such intravascular blood pumps, employing such supplemental guide mechanisms is nonetheless disadvantageous in that they consume valuable space within the vessels. A guide catheter, for example, would necessarily be larger in diameter than the diameter of the pump and protective shroud in order to provide adequate passage of those components. As will be appreciated, this restricts the amount of space available for blood to flow within the particular vessel, and increases the size of the required puncture wound for accessing the vessel.

The present invention is directed at eliminating and/or reducing the effects of the foregoing drawbacks of prior art intravascular blood pumps.

## SUMMARY OF THE INVENTION

The present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system. i.e. heart and/or vasculature. In so doing, the intravascular blood pump of the present

US 10,238,783 B2

3

invention eliminates the need for supplemental guiding mechanisms, such as a separate, large diameter guide catheter as used in the prior art.

In a first broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and an "over-the-wire" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. To accomplish this, a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient. After the guide element is advanced to this desired location, the intravascular blood pump and cannula may thereafter be advanced along the guide element to the desired location.

In a second broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and a "side-rigger" or "rapid exchange" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. To accomplish this, a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula. A guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient. After the guide element is advanced to this desired location, the intravascular blood pump and cannula may thereafter be advanced along the guide element to the desired location.

In a third broad aspect of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto and a "guide catheter" type guide mechanism for selectively positioning the intravascular blood pump and cannula at a predetermined location within the circulatory system of a patient. The pump system of this broad aspect includes a conduit assembly and a separate pump assembly. The conduit assembly includes a guide catheter, a rotor shroud, and a cannula, with the cannula and guide catheter disposed on either side of the rotor shroud. The pump assembly includes a rotor, a drive member coupled to the rotor, and a pump disposed between the rotor and the drive member. The guide catheter is dimensioned to receive and guide the pump assembly to the point where the rotor docks within the rotor shroud so as to form an operational blood pump. This configuration allows the conduit assembly to be precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology. The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud. This dual construction arrangement provides improved placement of the pump assembly by using the conduit as a guiding mechanism.

The foregoing broad aspects of the present invention may be manifested according to the following recitations:

According to a first broad recitation of the present invention, an intravascular blood pump system is provided comprising an intravascular blood pump having a cannula coupled thereto, and a guide mechanism adapted to guide the intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient.

4

In a further embodiment, the intravascular blood pump includes a rotor, a shroud for receiving the rotor, and a drive cable coupled to the rotor for driving the rotor within the shroud.

In a further embodiment, the cannula is coupled to the shroud of the intravascular blood pump.

In a further embodiment, the guide mechanism comprises a guide catheter coupled to the shroud.

In a further embodiment, the guide catheter may be used to guide the shroud and cannula to the predetermined location within the circulatory system of the patient, after which point the rotor and drive cable of the intravascular blood pump may be docked within the shroud for pump operation.

In a further embodiment, the drive cable sheath is provided having a central lumen for receiving the drive cable, and wherein a purge fluid delivery system is coupled to the drive cable sheath to deliver purge fluid to the rotor.

In a further embodiment, the drive cable sheath includes at least one side lumen for delivering the purge fluid towards the rotor.

In a further embodiment, a portion of the purge fluid is delivered through the at least one side lumen and past the rotor, and a portion of purge fluid is rerouted back from the rotor through the central lumen of the drive cable.

In a further embodiment, a perfusion assembly is provided communicatively coupled to the guide catheter for selectively rerouting blood from within the guide catheter to a point downstream from the introduction site of the guide catheter into the vasculature of the patient.

In a further embodiment, the perfusion assembly includes a first conduit communicatively coupled to the guide catheter, a second conduit dimensioned to be introduced into the vasculature of the patient, and a selectively operable valve disposed in between the first conduit and the second conduit.

In a further embodiment, a blood pressure detection mechanism is provided to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula.

In a further embodiment, the blood pressure detection mechanism comprises at least one of fluid filled column disposed within at least a portion of the cannula, a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, and a strain gauge coupled to at least one of the intravascular blood pump and cannula.

In a further embodiment, the blood pressure detection mechanism involves calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor.

In a further embodiment, the guide mechanism comprises a guide element disposed at least partially within the cannula.

In a further embodiment, the guide element comprises a guide wire for passage through a side lumen formed in the cannula.

In a further embodiment, the guide element comprises a selectively deformable element disposed at least partially within the cannula.

In a further embodiment, the intravascular blood pump and cannula may be selectively advanced to the predetermined location within the vasculature of the patient by first passing the guide wire to the predetermined location and thereafter sliding the intravascular blood pump and cannula along the guide wire to the predetermined location.

In a further embodiment, the guide element comprises a guide wire for passage through a lumen extending through the drive cable and rotor.

US 10,238,783 B2

5

In a further embodiment, the intravascular blood-pump and cannula may be selectively advanced to the predetermined location within the vasculature of the patient by first passing the guide wire to the predetermined location and thereafter sliding the intravascular blood pump and cannula along the guide wire to the predetermine location.

In a further embodiment, the guide mechanism further includes guide element for passage through the guide catheter to facilitate placement of the shroud and the cannula at the predetermined location within the vasculature of the patient.

In a further embodiment, the guide mechanism further includes a guide element for passage through a side lumen formed along at least a portion of the guide catheter.

In a further embodiment, the guide element comprises at least one of a guide wire and a balloon catheter.

BRIEF DESCRIPTION OF THE DRAWINGS

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. 1 is a partial sectional view of a human heart illustrating an intravascular blood pump system having an "over-the-wire" type guide mechanism according to a first broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. 2 is side view of the guidable intravascular blood pump system of the type shown in FIG. 1 including a motor coupler and purge fluid delivery system according to an exemplary embodiment of the present invention;

FIG. 3 is a cross-sectional view illustrating an exemplary construction of the blood pump, drive cable assembly, and cannula of the intravascular blood pump system according to the first broad aspect of the present invention;

FIG. 4 is a cross-sectional view taken along lines 4-4 of FIG. 3 illustrating an exemplary construction of the drive cable assembly and guide mechanism according to the first broad aspect of the present invention;

FIG. 5 is a cross-sectional view illustrating an exemplary construction of the motor coupler and purge fluid delivery system according to the first broad aspect of the present invention;

FIG. 6 is a partial sectional view of a human heart illustrating an intravascular blood pump system having a "rapid exchange" or "side-rigger" type guide mechanism according to a second broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. 7 is side view of the guidable intravascular blood pump system of the type shown in FIG. 6 including a motor coupler and purge fluid delivery system according to an exemplary embodiment of the present invention;

FIG. 8 is a cross-sectional view taken along lines 8-8 of FIG. 7 illustrating the "side-rigger" or "rapid exchange" type guide mechanism according to the second broad aspect of the present invention;

FIG. 9 is a cross-sectional view of the type shown in FIG. 8 illustrating an alternate configuration of the guide mechanism according to the second broad aspect of the present invention;

FIG. 10 is a partial sectional view of a human heart illustrating an intravascular blood pump system having a "guide catheter" type guide mechanism according to a third

6

broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide left-heart assist;

FIG. 11 is a schematic view of a human being illustrating the intravascular blood pump system of the type shown in FIG. 10 inserted through the femoral artery and including an optional perfusion assembly for perfusing the vasculature downstream from the incision site where guide catheter enters the femoral artery;

FIG. 12 is a side view of the intravascular blood pump system shown in FIGS. 10-11 illustrating the separable nature of a pump assembly and a conduit assembly which collectively form the intravascular blood pump system according to the third broad aspect of the present invention;

FIG. 13 is a side view illustrating the intravascular blood pump system shown in FIG. 12 with the pump assembly docked into the conduit assembly according to the third broad aspect of the present invention;

FIG. 14 is a cross-sectional view illustrating an exemplary construction of the blood pump, drive cable assembly, cannula, and guide catheter of the intravascular blood pump system shown in FIG. 13;

FIG. 15 is a cross-sectional view taken along lines 15-15 of FIG. 14 illustrating an exemplary construction of the drive cable assembly and guide catheter according to the third broad aspect of the present invention;

FIG. 16 is a cross-sectional view illustrating an exemplary construction of the motor coupler, purge fluid delivery system, and a proximal portion of the guide catheter biasing assembly according to the third broad aspect of the present invention;

FIG. 17 is a cross-sectional view illustrating an exemplary construction of the perfusion assembly and a distal portion of the guide catheter biasing assembly according to the third broad aspect of the present invention;

FIG. 18 is a cross-sectional view of an intravascular blood pump system of the type shown in FIGS. 12-13 having an alternate configuration for docking the rotor within the shroud according to the principles of the present invention; and

FIG. 19 is a partial sectional view of a human heart illustrating an alternate intravascular blood pump system having an "over-the-wire" type guide mechanism according to the first broad aspect of the present invention positioned, by way of example, in a trans-valvular configuration to provide right-heart assist.

FIG. 20 corresponds to FIG. 1 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula in the undeformed state in accordance with the first embodiment of U.S. Ser. No. 09/280,988;

FIG. 21 corresponds to FIG. 2 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view of the steerable cannula of FIG. 20 taken along line A-A:

FIG. 22 corresponds to FIG. 3 of U.S. Ser. No. 09/280,988, and is a schematic side view of the steerable cannula in the deformed state in accordance with the first embodiment of U.S. Ser. No. 09/280,988;

FIG. 23 corresponds to FIG. 4 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view of a steerable cannula having two cables in accordance with a second embodiment of U.S. Ser. No. 09/280,988:

FIG. 24 corresponds to FIG. 5 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula having a reinforcing wire in accordance with a third embodiment of U.S. Ser. No. 09/280,988;

US 10,238,783 B2

7                                             8

FIG. **25** corresponds to FIG. 6 of U.S. Ser. No. 09/280,988, and is a schematic cut-away view of a steerable cannula in accordance with a fourth embodiment of U.S. Ser. No. 09/280,988;

FIG. **26** corresponds to FIG. 7 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view taken along line B-B of FIG. **25**;

FIG. **27** corresponds to FIG. 8 of U.S. Ser. No. 09/280,988, and is a schematic side view of a steerable cannula having a preformed curve and an inflatable balloon formed at a distal end thereof in accordance with a fifth embodiment of U.S. Ser. No. 09/280,988;

FIG. **28** corresponds to FIG. 9 of U.S. Ser. No. 09/280,988, and is a schematic side view of the inflatable balloon of a fifth embodiment of U.S. Ser. No. 09/280,988, wherein the balloon is shown in the inflated state;

FIG. **29** corresponds to FIG. 10 of U.S. Ser. No. 09/280,988, and is a schematic cross-sectional view taken along line C-C of FIG. **28**;

FIG. **30** corresponds to FIG. 11 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a pigtail tip configuration in accordance with a sixth embodiment of U.S. Ser. No. 09/280,988;

FIG. **31** corresponds to FIG. 12 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with a seventh embodiment of U.S. Ser. No. 09/280,988;

FIG. **32** corresponds to FIG. 13 of U.S. Ser. No. 09/280,988, and is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with an eighth embodiment of U.S. Ser. No. 09/280,988;

FIG. **33** corresponds to FIG. 14 of U.S. Ser. No. 09/280,988, and is a schematic side view showing a steerable cannula used in a co-axial configuration in accordance with a ninth embodiment of U.S. Ser. No. 09/280,988, wherein the steerable cannula is advanced to a first relative position;

FIG. **34** corresponds to FIG. 15 of U.S. Ser. No. 09/280,988, and is a schematic side view showing a steerable cannula of FIG. **33**, wherein the steerable cannula is advanced to a second relative position; and

FIG. **35** corresponds to FIG. 16 of U.S. Ser. No. 09/280,988, and is a schematic side view of a configuration in accordance with a tenth embodiment of U.S. Ser. No. 09/280,988.

FIG. **36** corresponds to FIG. 1 of U.S. Ser. No. 09/280,970, and is a schematic side view of a first embodiment of U.S. Ser. No. 09/280,970;

FIG. **37** corresponds to FIG. 2 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line D-D of FIG. **36**;

FIG. **38** corresponds to FIG. 3 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line E-E of FIG. **36**;

FIG. **39** corresponds to FIG. 4 of U.S. Ser. No. 09/280,970, and is a schematic view of a cannula in accordance with an embodiment in a surgical application;

FIG. **40** corresponds to FIG. 5 of U.S. Ser. No. 09/280,970, and is a schematic partial cut-away side view of a second embodiment of U.S. Ser. No. 09/280,970;

FIG. **41** corresponds to FIG. 6 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line F-F of FIG. **40**;

FIG. **42** corresponds to FIG. 7 of U.S. Ser. No. 09/280,970, and is a schematic side view of a third embodiment of U.S. Ser. No. 09/280,970;

FIG. **43** corresponds to FIG. 8 of U.S. Ser. No. 09/280,970, and is a schematic side view of a fourth embodiment of U.S. Ser. No. 09/280,970;

FIG. **44** corresponds to FIG. 9 of U.S. Ser. No. 09/280,970, and is a schematic side view of a fifth embodiment of U.S. Ser. No. 09/280,970;

FIG. **45** corresponds to FIG. 10 of U.S. Ser. No. 09/280,970, and is a schematic side view of a sixth embodiment of U.S. Ser. No. 09/280,970;

FIG. **46** corresponds to FIG. 11 of U.S. Ser. No. 09/280,970, and is a schematic cross sectional view taken along line G-G of FIG. **45**;

FIG. **47** corresponds to FIG. 12 of U.S. Ser. No. 09/280,970, and is a schematic side view of a seventh embodiment of U.S. Ser. No. 09/280,970;

FIGS. **48** and **49** correspond to FIGS. 13 and 14, respectively, of U.S. Ser. No. 09/280,970, and are schematic side views of an eighth embodiment of U.S. Ser. No. 09/280,970;

FIG. **50** corresponds to FIG. 15 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line H-H of FIG. **49**;

FIG. **51** corresponds to FIG. 16 of U.S. Ser. No. 09/280,970, and is a schematic side view of a ninth embodiment of U.S. Ser. No. 09/280,970;

FIG. **52** corresponds to FIG. 17 of U.S. Ser. No. 09/280,970, and is a schematic side view of a tenth embodiment of U.S. Ser. No. 09/280,970;

FIG. **53** corresponds to FIG. 18 of U.S. Ser. No. 09/280,970, and is a schematic cross-sectional view taken along line K-K of FIG. **52**; and

FIG. **54** corresponds to FIG. 19 of U.S. Ser. No. 09/280,970, and is a schematic side view of an eleventh embodiment of U.S. Ser. No. 09/280,970.

## DETAILED DESCRIPTION OF THE INVENTION

Illustrative embodiments of the invention are described below. In the interest of clarity, not all features of an actual implementation may be described in this specification. It will of course be appreciated that in the development of any such actual embodiment, numerous implementation-specific decisions must be made to achieve the developers' specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

The present invention involves an intravascular pump system for use in a number of broad ranging applications involving the augmentation of blood flow within the circulatory system of a patient. As will be described below, the intravascular blood pump system of the present invention overcomes the drawbacks of the prior art by providing a guide mechanism as part of the intravascular blood pump. This advantageously allows the intravascular blood pump to be selectively guided to a predetermined location within the circulatory system of a patient without the need for bulky supplemental guide mechanisms, such as a separate guide catheter.

The intravascular pump assembly of the present invention is particularly suited for trans-valvular use, such as for left and/or right ventricular assist procedures. By way of example only, such ventricular assist procedures may be employed in cardiac operations including, but not limited to, coronary bypass graft (CABG), cardio-pulmonary bypass

9

(CPB), open chest and closed chest (minimally invasive) surgery, bridge-to-transplant and/or failure-to-wean-from-bypass situations. It is to be readily understood, however, that the intravascular blood pump assembly and methods of the present invention are not to be limited to such applications. Moreover, while illustrated and described largely with reference to left-heart assist applications, it is to be readily understood that the principles of the present invention apply equally with regard to right-heart assist application, which are contemplated as within the scope of the present invention. These and other variations and additional features will be described throughout.

Referring to FIG. **1**, shown is a guidable intra-vascular blood pump system **10** according to a first broad aspect of the present invention shown, by way of example only, in a left-heart assist configuration within a human heart. The system **10** includes an intravascular blood pump **12**, a cannula **14**, and an "over-the-wire" type guide mechanism **16**. A drive cable assembly **18** and a motor assembly **20** are provided to drive the intravascular blood pump **12**. The "over-the-wire" guide mechanism **16** comprises a suitable guide element dimensioned to pass slideably through a central lumen extending through the drive cable **18**, blood pump **12**, and cannula **14**. Suitable guide elements may include any number of conventional guiding devices, including but limited to those employed in cardiology. By way of example only, the guide element is shown as a guide wire **22**. According to the present invention, the "over-the-wire" guide mechanism **16** provides the ability to selectively guide the blood pump **12** and cannula **14** to a predetermined position in the circulatory system of a patient, such as the trans-valvular position shown.

To accomplish this, the guide wire **22** is first introduced into the vascular system of a patient through any suitable access point, such as through the use of the well known Seldinger technique. The guide wire **22** can then be advanced within the patient to a desired location within the circulatory system of the patient. This may be done using the control features of the guide wire **22** itself, or may be facilitated through the use of any number of supplemental guidance mechanisms or techniques to ensure the proper and efficient placement of the guide wire **22**. Such supplemental guidance techniques may include, but are not necessarily limited to, guide catheters and/or techniques involving ultrasound or flouroscopy. Once the guide wire **22** is positioned at the desired location (such as in left ventricle as shown), the blood pump **12** and cannula **14** may thereafter be advanced along the guide wire **22** and positioned in the trans-valvular configuration shown. Under the operation of the motor assembly **20**, the blood pump **12** may be used for left-heart assist by selectively withdrawing blood from the left ventricle (through the interior of the cannula **14**) for delivery outward through outflow apertures formed in the blood pump **12**. This outflow from the blood pump **12** flows along the exterior of the drive cable assembly **18** in a substantially axial fashion for arterial distribution throughout the body.

Referring to FIGS. **2-5**, an exemplary embodiment of the intravascular blood pump system **10** of FIG. **1** will now be described. As shown in FIG. **2**, the intravascular blood pump system **10** includes a coupler **24** and, as will be described in greater detail below, a purge fluid delivery system **26** for providing a two-way fluid flow within the drive cable assembly **18** during pump operation. The purge fluid delivery system **26** includes a fluid inlet conduit **28** for introducing pressurized purge fluid from a fluid source (not shown) for delivery into the blood pump **12**, and a fluid outlet

10

conduit **30** to withdraw a return flow of purge fluid from the blood pump **12**. The motor coupler **24** establishes a mechanical connection between a motor (not shown) and a drive cable (not shown) for providing motive force to the blood pump **12** for pump operation. The drive cable assembly **18** includes a drive cable sheath **32** which, in addition to serving a purge fluid delivery function, also serves as a protective housing for the drive cable (not shown). Although shown in broken form for clarity, it will be appreciated that the drive cable assembly **18** (and all components thereof) may be provided in any suitable length sufficient for intravascular applications. That is to say, the length of the drive cable assembly **18** must be enough to reach between the motor coupler **24** and purge fluid delivery system **26**, located outside the patient, and the desired location within the patient's circulatory system where the blood pump **12** is to be positioned.

The intravascular blood pump **12** is shown (by way of example only) as an axial flow intravascular blood pump. The blood pump **12** includes pump body **34**, a rotor shroud **36** having flow ports **38**, and an internally disposed rotor (not shown) having a shaft rotatably disposed within the pump body **34** and an impeller rotatably disposed within the rotor shroud **36**. The cannula **14** is fixedly attached to the rotor shroud **36** and may extend any suitable length therefrom depending upon the particular intravascular application. The cannula **14** preferably includes a plurality of ports or fenestrations **40** about its distal region, as well as an end port **42**, which allow for the ingress or egress of blood into or from the cannula **14** depending upon the operation of the blood pump **12**. That is to say, if the pump **12** is configured for left-heart assist as shown in FIG. **1**, then the ports **40**, **42** will allow the ingress of blood into the cannula **14** from the left ventricle. If, on the other hand, the blood pump **12** is configured for right-heart assist (i.e. with the pump **12** in the right atrium and the distal end of the cannula **14** located within the pulmonary artery), then the ports **40**, **42** will allow the egress of blood from the cannula **14** into the pulmonary artery. (Details on right-heart assist applications will be discussed in greater detail below.) The pump **12** and cannula **14** may be dimensioned to any suitable diameter for intravascular applications. For example, the range of sizes may include, but is not necessarily limited to, 9 French to 30 French, although the range is more preferably from 14 French to 24 French, and most preferably from 18 French to 20 French.

The "over-the-wire" type guide mechanism **16** includes the guide wire **22** and, as will be explained in greater detail below, a central lumen extending through the cannula **14**, blood pump **12**, drive cable assembly **18**, purge fluid delivery system **26**, and motor coupler **24**. As noted above, the central lumen is dimensioned to slideably receive the guide wire **22** such that the blood pump **12** and cannula **14** may be slideably advanced along the guide wire **22** to a desired location within the circulatory system of a patient after the guide wire **22** has been so positioned using conventional guidance techniques. It is to be readily understood that, while shown as a conventional guide wire **22**, the guide element forming part of the guide mechanism **16** of the present invention may include any number of well known guidance mechanisms depending upon the application, including but not limited to balloon catheters, imaging wires, and guide catheters dimensioned to be slideably received through the central lumen. For example, although not appropriate for retrograde progression (such as the left-heart application shown in FIG. **1**), a balloon catheter may be a suitable guidance mechanism for a right-heart

US 10,238,783 B2

11

assist application. In such a case, the balloon may be inflated and used as a "sail" to direct the catheter to a desired location (such as the pulmonary artery), after which point the blood pump 12 and cannula 14 can be advanced over the catheter to a trans-valvular configuration with the blood pump 12 in the right atrium and the ports 38, 40 of the cannula 14 in the pulmonary artery.

FIGS. 3 and 4 further detail the construction of the blood pump 12, cannula 14, drive cable assembly 18, and "over-the-wire" guide mechanism 16. The blood pump 12 includes a rotor 44 having a shaft 46 and an impeller 48. The shaft 46 is rotatably disposed within the pump body 34 via a bearing pack comprising, by way of example, ball bearing assemblies 50, 52 and spring 54. Ball bearings assemblies 50, 52 are well known in the art, each comprising an inner race which rotates along with the rotor shaft 46, an outer race which remains in a static and fixed position against the inner surface of the pump body 34, and a plurality of ball bearings disposed between the inner and outer races. The spring 54 biases each bearing assembly 50, 52 axially away from one another to reduce axial play during pump operation. The shaft 46 is generally hollow and dimensioned to receive a cable adapter 60 therein for the purpose of coupling the rotor 44 to a drive cable 62 forming part of the drive cable assembly 18. The drive cable 62 may be secured to the cable adapter 60 in any number of suitable fashions, including but not limited to the use of adhesives, crimping, and laser welding. These same techniques may be used to secure the cable adapter 60 within the shaft 46 of the rotor 44. A radial seal 64 is provided in between the wall of the pump body 34 and a distal stepped region 66 on the rotor shaft 46, the function of which will be described below.

The impeller 48 includes a hub 56 and a plurality of blades 58 extending therefrom. The hub 56 is generally conical and, according to the first broad aspect of the present invention, is hollow throughout to form part of the central lumen of the guide mechanism 16. In this regard, the hub 56 is preferably provided with a gasket or seal member 68 at its distal tip. The seal member 68 may be made of any suitable sealing material (including but not limited to silicone) such that the pump 12 and cannula 14 may be easily progressed along the guide wire 22 for delivery to a desired circulatory site. The seal member 68 should also be robust enough to prevent the ingress of blood into the interior of the rotor hub 56 during pump operation, whether the guide wire 22 remains in place or is fully withdrawn. The blades 58 are dimensioned to reside in close tolerance with the interior surface of the shroud 36. In operation, the blades 58 impart both an axial and radial vector on the blood which causes it to flow outward through the flow ports 38 formed in the shroud 36. As used herein, the term "axial flow" is deemed to include flow characteristics like that shown in FIG. 3, which include both an axial and slight radial component. It is to be readily appreciated that, although shown as an axial flow type, blood pump 12 may comprise any number of suitable types of intravascular blood pumps, including but not limited to so-called "mixed flow" intravascular blood pumps without departing from the scope of the present invention.

The cannula 14 is coupled at its proximal end to the rotor shroud 36. This may be accomplished in any number of fashions, including but not limited to the use of adhesives. This may also be facilitated by dimensioning the shroud 36 to include a narrow inlet region 70 capable of being received flushly within the proximal end of the cannula 14. The inlet region 70 of the shroud 36 should preferably have a tapered interior surface for establishing a smooth flow transition

12

between the cannula 14 and the region containing the impeller blades 58. Although shown as a single integral element, it is to be understood that the pump body 34 and shroud 36 may comprise two separate (and sometimes separable) components, the significance of which will become apparent below. The pump body 34 and shroud 36 may be constructed from any number of suitable materials, including but not limited to stainless steel or other medical grade compositions or alloys. The cannula 14 may also be constructed from any number of suitable materials, including but not limited to medical grade plastics. As shown, the cannula 14 may also be fortified with spiral-wound reinforcement wire 72 within the walls of the cannula 14.

The drive cable assembly 18 includes the drive cable 62 and the drive cable sheath 32. The drive cable 62 is coupled to the rotor 44 via the cable adapter 60. The drive cable sheath 32 includes a central lumen 74 and a plurality of side lumens 76. The central lumen 74 serves as a protective covering for the drive cable 62. The central lumen 74, along with the side lumens 76, also forms part of the purge fluid delivery system 26 shown above in FIG. 2, which will be described in greater detail below. The side lumens 76 are provided in fluid communication with the fluid inlet conduit 28, while the central lumen 74 is provided in fluid communication with the fluid outlet conduit 30. The side lumens 76 are thus configured to deliver purge, fluid into the pump 12, while the central lumen 74 is configured to transport purge fluid away from the pump 12 along the length of the drive cable 62.

The pressurized purge fluid within the side lumens 76 may take one of two flow paths upon entry into the pump 12. One flow path passes through the interior of the pump 12 and onward past the radial seal 64 to prevent the ingress of blood into the pump body 34 during pump operation. More specifically, the purge fluid flows distally around the cable adapter 60, through the ball bearing assemblies 50, 52, and onward past the radial seal 64. This egress of purge fluid past the radial seal 64 can be controlled to effectively thwart the ingress of blood past the radial seal 64, which might otherwise cause clotting and/or pump damage. The other flow path is directed back out the central lumen 74 for delivery to the fluid outlet conduit 30. In so doing, this flow path bathes the components of the pump 12 and/or drive cable 62 and thereby reduces frictional heating within the pump 12 and/or the central lumen 74 of the sheath 32 during pump operation.

The "over-the-wire" guide mechanism 16 includes a central lumen through which the guide wire 22 may extend for the purpose of slideably advancing the blood pump 12 and cannula 14 into a desired position within the circulatory system of a patient. In the embodiment shown, this central lumen is established by forming and co-aligning the individual central lumens within each of the drive cable 62, the cable adapter 60, the shaft 46 and hub 56 of the rotor 44, and the cannula 14. In this regard, the drive cable 62 is preferably of wound-wire construction having a central lumen formed therein. The central lumens within the cable adapter 60, rotor 44, and gasket 68 may be formed via machining or molding processes. These central lumens should preferably be sized such that they permit the slideable passage of the pump 12 and cannula 14 therealong, but do not interfere with or constrain the guide wire 22 to cause inadvertent rotation of the guide wire 22 during pump operation. As noted above, it is also contemplated to remove the guide wire 22 after the pump 12 and cannula 14 are properly positioned in the patient. In this case, the gasket or seal 68 on the hub 56 should be robust enough to reseal after the

13                                                    14

guide wire 22 is withdrawn and prevent the ingress of blood into the interior of the rotor 44.

Referring to FIG. 5, the motor coupler 24 includes a housing 78, a drive shaft adapter 80, and a bearing assembly 82. The drive shaft adapter 80 includes a drive shaft coupler 84 dimensioned to receive a drive shaft of a motor (not shown), and a drive cable coupler 86 dimensioned to receive the drive cable 62. Any of a variety of attachment techniques may be employed to securely fasten the drive cable 62 to the drive cable coupler 86, including but not limited to adhesives, crimping, and laser welding. The drive shaft adapter 80 is rotatably disposed within the housing 78 by the bearing assembly 82. The bearing assembly 82 includes a sleeve 88 (which may alternatively be formed as an integral part of the housing 78) for retaining a pair of ball bearing assemblies 90, 92 and a spring 94 of the type described above. That is, each bearing assembly 90, 92 generally comprises an inner race which rotates along with the drive shaft adapter 80, an outer race which remains in a static and fixed position against the inner surface of the retaining sleeve 88, and a plurality of ball bearings disposed between the inner and outer races. The spring 94 is provided to bias each bearing assembly 90, 92 axially away from one another to reduce axial play during operation.

The purge fluid delivery system 26 includes a housing 96 having a central lumen 98, an inflow port 100, and an outflow port 102. The housing 96 is also dimensioned to matingly receive a portion of the motor coupler 24. In this regard, a seal element 104 is provided sandwiched in between the housing 96 and housing 78 and including an aperture which extends about the drive shaft adapter 80 as it exits the housing 78 to prevent the ingress of purge fluid into the motor coupler 24. A fluid guide structure 106 is also provided within the central lumen 98 for the purpose of separating the inflow and outflow ports 100, 102. The fluid guide structure 106 includes a central lumen 108 through which the drive cable 62 extends, and an elevated portion 110 that retains an O-ring 112 against the inner surface of the central lumen 98 of the housing 96. The drive cable sheath 32 is secured to the housing 96 such that the inflow port 100 is communicatively coupled to the side lumens 76, and the outflow port 102 is communicatively coupled to the central lumen 74. In this fashion, pressurized purge fluid may be introduced through the inflow port 100 via inflow conduit 28, and removed through the outflow port 102 via outflow conduit 30. By way of example, the inflow conduit 28 and outflow conduit 30 may be coupled to their respective ports 100, 102 via barbed connectors 114. Similarly, the inflow and outflow conduits 28, 30 may be equipped with any number of suitable connectors (such as those illustrated by way of example in FIG. 2) for establishing fluid communication with a source of pressurized fluid (not shown). The pressurized fluid source (not shown) may include, but is not necessarily limited to, the use of a syringe, an indeflator, a fluid delivery pump, or an accumulator arrangement to provide the requisite delivery of pressurized fluid. The purge fluid delivery system 26 thus provides a two-way transmission of purge fluid within the drive cable sheath 32 for the purposes of cooling the blood pump 12 and preventing the ingress of blood past the radial seal 64 and into blood pump 12.

Referring to FIG. 6, shown is a guidable intra-vascular blood pump system 120 according to a second broad aspect of the present invention. As will be described hereinafter, the intravascular blood pump system 120 differs from the intra-vascular blood pump system 10 described above only as to the type of guide mechanism employed. In the interest of

clarity and consistency, then, like reference numerals will be used to denote like elements and distinctions pointed out where necessary. Moreover, due to the commonality of principles employed in both intravascular blood pump systems 10, 120, a discussion to the level of detail set forth above is not deemed necessary with regard to the intravascular blood pump system 120. Instead, those aspects in common with the intravascular blood pump 10 are hereby incorporated into the discussion of the intravascular blood pump system 120.

In its most general form, the intravascular blood pump system 120 of this second broad aspect of the present invention comprises the blood pump 12 and cannula 14 arrangement, wherein the cannula 14 is equipped with a "side-rigger" or "rapid exchange" guide mechanism 122. In an important aspect of the present invention, the "rapid exchange" or "side-rigger" guide mechanism 122 includes a guide carriage 124 formed along at least a portion of the cannula 14, and a suitable guide element (such as guide wire 22) dimensioned to pass slidably through a lumen (not shown) extending through the guide carriage 124. The "rapid exchange" guide mechanism 122 thereby provides the ability to selectively guide the blood pump 12 and cannula 14 to a predetermined position in the circulatory system of a patient in the manner described above. Namely, the guide wire 22 may be first introduced into the vascular system of a patient through any suitable access point and guided to a desired location within the circulatory system of the patient, i.e. the left ventricle as shown. The blood pump 12 and cannula 14 may thereafter be advanced along the guide wire 22 and positioned in the trans-valvular configuration shown for providing left-heart assist.

FIGS. 7-9 further illustrate the "side-rigger" or "rapid-exchange" guide mechanism 122 of this second broad aspect of the present invention. In a preferred embodiment, the "side-rigger" guide mechanism 122 includes a lumen 126 formed within the guide carriage 124. The guide carriage 124 is preferably formed as an integral extension of the wall of the cannula 14. FIGS. 7 and 8 comport with the embodiment shown in FIG. 6, namely illustrating the guide carriage 124 formed along the exterior surface of the cannula 14. FIG. 9 illustrates an alternate embodiment wherein the guide carriage 124 may be formed along the interior surface of the cannula 14. In either case, the guide wire 22 is advanced to a desired location in the vasculature of the patient, after which point the blood pump 12 and cannula 14 can be slidably advanced therealong for delivery to the desired location according to the present invention. The guide wire 22 may thereafter be withdrawn from the patient. If the guide carriage 124 is formed along the exterior surface of the cannula 14 (as shown in FIGS. 7-8), then the cannula 14 should preferably be positioned so that the guide carriage 124 does not extend in a trans-valvular fashion. For example, with reference to FIG. 6, the guide carriage 124 should be positioned wholly within the left ventricle such that the pulsatile blood flow during beating heart procedures will not inadvertently pass through the side lumen 126 and pass through the aortic valve.

The intravascular blood pump system 120 is constructed in virtually the same manner as the intravascular blood pump system 10 shown and described above, with the exception of the location of the respective guide mechanisms 16, 122. More specifically, because the guide mechanism 122 is disposed along the side of the cannula 14, there is no need to form a central lumen extending through the blood pump 12, drive cable assembly 18, purge fluid delivery system 26, and motor coupler 24 as detailed above with

US 10,238,783 B2

15                                                     16

regard to the intravascular blood pump system **10**. As such, these components need not be specially machined or molded to include such central lumens as was required with the intravascular blood pump system **10** set forth above.

Referring to FIG. **10**, shown is a guidable intravascular blood pump system **130** according to a third broad aspect of the present invention. Again, due to the commonality between many of the same components and features of the intravascular blood pump systems described above and the intravascular blood pump system **130**, like reference numerals will be used to denote like elements and distinctions pointed out where necessary. As will be explained in greater detail below, the intravascular blood pump system **130** employs yet another unique and useful guide mechanism according to the present invention. However, because many of the same components are employed, a discussion to the level of detail set forth above is not deemed necessary with regard to the intravascular blood pump system **130**. Instead, those aspects in common with the intravascular blood pumps described above are hereby incorporated into the discussion of the intravascular blood pump system **130**.

In its most general form, the intravascular blood pump system **130** of this third broad aspect of the present invention comprises the blood pump **12** and cannula **14** arrangement, wherein a "guide catheter" **132** is provided as the guide mechanism for positioning the pump **12** and cannula **14** at a desired location within the circulatory system of the patient. More specifically, with brief reference to FIG. **12**, the intravascular blood pump system **130** is formed in two separate assemblies according to the present invention: a conduit assembly **134** and pump assembly **136**. In its most basic form, the conduit assembly **134** comprises the guide catheter **132** and cannula **14** coupled to the rotor shroud **36**. The pump assembly **136** is constructed such that the pump body **34** and rotor **44** can be disengaged from the rotor shroud **36** and removed entirely from the conduit assembly **134**. Referring again to FIG. **10**, this dual construction forms a significant feature of the present invention because it provides the ability to form the blood pump **12** at a desired location in a patient using two separate and distinct steps. The first step involves positioning the conduit assembly **134** (with the pump assembly **136** removed) within a patient such that the shroud **36** and cannula **14** are each disposed in a desired location, such as a trans-valvular configuration for cardiac assist procedures. In an important aspect, the task of positioning the conduit assembly **134** within the patient may be advantageously facilitated through the use of any number of well known guidance mechanisms, including but not limited to guide wires, balloon catheters, imaging wires, guide catheters, and/or techniques involving ultra-sound or flouroscopy. The second step in providing the intravascular blood pump system **130** of the present invention involves advancing the pump assembly **136** through the conduit assembly **134** such that the rotor **44** docks within the shroud **36** to form the pump **12** at the desired location.

By way of clarification, the term "cannula" is used to denote cannula **14** because it serves a primary purpose of transporting fluid into the blood pump **12**, whereas the term "catheter" is used to denote the catheter **132** because it serves a primary purpose of guiding or directing devices or components (i.e. the pump assembly **136**) to a desired location within the body. It is to be readily understood, however, that these terms are only used for convenience and in a general fashion such that the cannula **14** may serve certain guiding functions and the catheter **132** may serve certain fluid transportation functions without departing from the scope of the present invention. For example, the cannula

**14** may be equipped with dedicated lumens to receive various guide mechanisms (such as guide wires, balloon catheters, selectively deformable elements such as Nitonol, etc). In similar fashion, the guide catheter **132** may be used to transport fluid to and/or from the patient, such as by providing apertures **138** along predetermined regions of the catheter **132**.

FIG. **11** demonstrates a significant feature of the present invention involving the use of the guide catheter **132** to transport fluid to and/or from the patient. An optional perfusion assembly **140** is provided as part of the intravascular blood pump system **130** of the present invention. The perfusion assembly **140** includes a conduit **142** in fluid communication with the apertures **138**, which in this case are formed near the distal region of the guide catheter **132** a short distance downstream from the blood pump **12**. In use, blood will pass along the exterior of the guide catheter **132** for distribution throughout the body, as well as within the interior of the guide catheter **132** after passing into the apertures **138**. The perfusion assembly **140** may then be employed to selectively reroute blood from within the guide catheter **132** to a point within the patient's vasculature downstream from the point where the guide catheter **132** enters the body. A hemostasis valve assembly **146** of the perfusion assembly **140** permits the drive cable assembly **18** to pass through to the purge fluid delivery system **26** while preventing blood flow other than into the perfusion assembly **140**. A seal assembly **150** of the purge fluid delivery system **26** permits the drive cable **62** to pass through to the motor **20** while preventing the flow of purge fluid other than into and from the purge fluid delivery system **26**. The perfusion assembly **140** includes a control mechanism **148** for selectively controlling the distribution of perfusion blood flow from the perfusion assembly **140** into the patient. This control mechanism **148** may be automatic based on certain feedback criteria or manually operated.

FIGS. **12-17** illustrate an exemplary construction of the intravascular blood pump system **130** according to the third broad aspect of the present invention. As shown in FIG. **12**, the conduit assembly **134** may be selectively disengaged so as to remove the pump assembly **136** therefrom. According to the present invention, the conduit assembly **134** may be introduced (without the pump assembly **136**) into the circulatory system of a patient and selectively guided such that the rotor shroud **36** and cannula **14** are positioned at a desired location. The pump assembly **136** can thereafter be selectively introduced into the conduit assembly **134**. A challenge in such a "back-loading" arrangement is ensuring that the pump assembly **136** docks appropriately within the rotor shroud **36** and is maintained in proper engagement during operation of the resulting pump **12**.

An exemplary docking arrangement will now be described with reference to FIG. **14**. In a preferred embodiment, the rotor **44** may be properly and accurately docked within the shroud **36** by forming angled mating surfaces on corresponding portions of the shroud **36** and pump body **34**. More specifically, an angled mating surface may be formed on the interior surface of the rotor shroud **36** along that portion extending proximally from the flow aperture **38**. A corresponding angled mating surface may be provided along the exterior surface of the pump body **34** along a distal portion thereof. The mating surfaces shown in FIG. **14** may preferably be formed in the range from about 2 degrees to 10 degrees, and more preferably formed in the range from about 3 degrees to 6 degrees. Mating angles within these ranges are adequate to guide the distal end of the pump body **34** to a point generally flush with the proximal edge of the flow

US 10,238,783 B2

17

aperture **38** as shown in FIG. **14**. In this fashion, the pump assembly **136** and the rotor shroud **36** combine to form the blood pump **12**. More importantly, this docking is carried out such that the rotor **44** and rotor blades **58** are maintained in proper position for efficient and safe pump operation.

An exemplary biasing scheme for maintaining the pump assembly **136** in this docked relationship will now be described with reference to FIGS. **12-13** and **16-17**. The conduit assembly **134** is preferably equipped with a male quick-connect coupling **152** capable of engaging with a female quick-connect coupling **154** forming part of the perfusion assembly **140** of the present invention. A bias spring **156** is provided in between the perfusion assembly **140** and the housing **96** of the purge fluid delivery system **26**. The bias spring **156** is preferably dimensioned so as to be in tension when the male quick-connect **152** is engaged within the female quick-connect **154** as part of the docking process of the present invention. As such, the bias spring **156** serves to maintain the pump assembly **136** in the docked position within the rotor shroud **36**. The bias spring **156** may be coupled to the housing **96** of the purge fluid delivery system **26** in any number of suitable fashions. One such coupling arrangement may comprise a female quick-connect coupling **158** attached to the housing **96** and a male quick-connect coupling **160** attached to the bias spring **156**.

An exemplary embodiment of the perfusion assembly **140** is shown with reference to FIGS. **12-13** and **17**. The perfusion assembly **140** shown includes the hemostasis valve **146** coupled to the female quick-connect coupling **154**. A length of tubing **162** extends between the opposing barb connectors of the hemostasis valve **146** and the female quick-connect coupling **154**. A continuous lumen is formed extending through the interior of the male quick-connect coupling **152**, the female-quick-connect coupling **154**, the tubing **162**, and the hemostasis valve **146**. The drive cable assembly **18** extends through this continuous lumen and exits through a Touehy-Borst hemostasis seal **164** which prevents the migration of blood out of the proximal end of the perfusion assembly **140**. A side-port **166** is disposed in fluid communication with the central lumen of the perfusion assembly **140**. In one embodiment, this side-port **166** may be equipped with a conduit **168** having a stop-cock **170** to selectively control the distribution of blood through a perfusion conduit (i.e. conduit **142** of FIG. **11**) coupled to the stop-cock **170**. It will be appreciated that this type of manual control system for selectively perfusing the patient may be replaced with control circuitry for automatically controlling the rate of perfusion. Such automatic perfusion may be based on control algorithms based on contemporaneous feedback or pre-programmed thresholds.

The foregoing discussion details a host of inventive aspects forming part of the present invention. It will be appreciated by those skilled in the art that changes could be made to the embodiments described above without departing from the broad inventive concepts thereof. The following evidences, by way of example only, various additional aspects forming part of the present invention.

FIG. **18** illustrates an alternate configuration of the intravascular blood pump system **130** of the third broad aspect of the present invention having an alternate bearing assembly, purge fluid delivery, and docking scheme. The bearing assembly includes a seal spring **182** and a bearing assembly **180**. The bearing assembly **180** includes an inner race **184**, an outer race **186**, and a plurality of balls **188** which enable the inner race **184** to rotate along with the rotor shaft **46** while the outer race **186** remains in a static and fixed position relative to an inner surface of the pump body **34**. An

18

O-ring **190** is disposed within a groove formed in the rotor shaft **46** so as to maintain the bearing assembly **180** against the seal spring **182**. The O-ring **190** is further secured within the groove in the rotor shaft **46** via a contoured lip portion extending from the distal end of the cable adapter **60**. The proximal end of the cable adapter **60** flushly engages the drive cable **62**.

The purge fluid delivery system of the embodiment shown in FIG. **18** provides for a one way delivery of purge fluid to the blood pump **12**. That is, pressurized fluid (namely, fluid pressurized to some level elevated above the blood pressure in the surrounding vessel) is injected in between the drive cable **62** and the interior of the protective sheath **32** during operation. This serves to reduce any frictional heating that exists between the drive cable **62** and sheath **32**. The pressurized fluid also flows through the interior of the pump **12** such that, if the seal at **192** is broken, the pressurized fluid will flow past the open seal **192** and onward through the blood flow ports **38** formed in the shroud **36**. This serves to keep blood from entering the pump **12** in an effort to avoid clotting and/or damaging the pump **12**.

The pump assembly **136** may be docked within the conduit assembly **134** in any number of different fashions without departing from the scope of the present invention. That is to say, the docking scheme shown in FIG. **18** is set forth by way of example only and is not to be deemed limiting or restrictive as to numerous ways to temporarily engage or "dock" the pump assembly **136** within the conduit assembly **134**. The only requirement is that the pump assembly **136** and conduit assembly **134** dock such that the rotor **44** is disposed within the shroud **36** to provide the desired axial flow through the cannula **14** and out the shroud **36**. The exemplary docking scheme involves forming an annular engagement groove **194** along the interior of the shroud **36**, and forming a complementary annular ridge **196** along the exterior surface of the pump body **34**. During insertion, the pump assembly **136** will be advanced into the conduit assembly **134** until the annular ridge **196** on the pump body **34** engages within the groove **194** formed in shroud **36**. This docking scheme is generally advantageous in that the engagement action between the annular ridge **196** and groove **194** will provide tactile feedback to the physician during the process of inserting the pump assembly **136** into the conduit assembly **134** such that the physician will be able to determine when the docking has been completed.

As will be appreciated by those skilled in the art, the location of the annular ridge **196** and engagement groove **194** may be varied such that they are disposed closer or farther away from the flow apertures **38**. It may be advantageous to form these docking structures close to the flow apertures **38** in an effort to thwart the ingress of blood into the junction extending between the interior of the shroud **36** and the exterior surface of the pump body **34**. It is also contemplated to employ selectively inflatable structures, such as balloons, in an effort to temporarily engage or dock the pump assembly **136** within the conduit assembly **134**. In this regard, one or more lumens may be formed within the pump body **34** extending from the interior of the pump body **34** in fluid communication with a balloon disposed along the exterior surface of the pump body **34**. The pressurized fluid flowing within the interior of the pump body **34** may then be used to inflate the balloon, which will then engage within an annular groove in the shroud **36**, such as at **194**. Of course, the engagement structures may also be reversed without departing from the scope of the present invention. For example, the shroud **36** may be equipped with a fluid delivery lumen therein for inflating a balloon disposed on

US 10,238,783 B2

19
20

the interior surface of the shroud **36**, which may in turn be disposed within an annular engagement groove formed along the exterior surface of the pump body **34**.

While this invention has been shown in use largely in during left-heart applications it is to be readily appreciated that this does not limit the applications of this invention for use in left heart support only. Rather, the guidable intravascular blood pump of the present invention can be utilized in right-heart support applications and a wide variety of other applications apparent to those skilled in the art. For example, with reference to FIG. **19**, shown is an intravascular blood pump **200** (of the type shown and described above with reference to FIGS. **2-5**) configured for use in a right-heart support application. In this embodiment, the intravascular blood pump system **200** is equipped, by way of example, with an "over-the-wire" guide mechanism **16** comprising a balloon catheter **202**. It is to be readily appreciated that, although shown and described below in terms of an embodiment of the type shown in FIGS. **2-5**, the intravascular blood pump systems **120**, **130** disclosed herein may also be configured for use in right-heart applications. Such right-heart configurations, and others apparent to those skilled in the art based on the broad principles enumerated in this application, are contemplated as being within the scope of the present invention.

The intravascular blood pump system **200** is shown positioned within the heart, such as may be advantageous to provide right heart support during beating heart surgery. To position the guidable intravascular blood pump system **200** in the right heart according to the present invention, a suitable guide element (such as balloon catheter **202**) is first advanced to a desired location within the heart via the "sail" action of an inflated balloon. After the balloon catheter **202** is located in the desired position (such as in the pulmonary artery as shown), the intravascular blood pump system **200** according to the present invention may be advanced over the balloon catheter **202** and guided into a desired arrangement. For right heart support, this would involve advanced into the pump **12** and cannula **14** overt the balloon catheter **202** until the fluid inlet **204** is disposed within the vena cava (or right atrium) and the fluid outlet **206** is positioned within the pulmonary artery. The pump **12** may then be selectively (i.e. automatically or on-demand) controlled to transport blood from the vena cava (or right atrium) in a trans-valvular fashion through the tricuspid valve, the right ventricle, and the pulmonary valve for deposit within the pulmonary artery. Providing right-heart support during beating heart surgery advantageously overcomes conditions where cardiac output may become compromised during beating heart surgery, such as when the heart is lifted to gain access to posterior vessels, thereby avoiding the need for cardiopulmonary bypass.

It is also contemplated as part of the present invention that the guidable intravascular blood pump systems can be introduced into the patient's vasculature to achieve the intravascular access into the right or left heart through any number of access points, including but not limited to the internal jugular vein, the brachiocephalic vein, carotid artery, axillary artery, femoral vein, femoral artery, and subclavian artery. The intravascular blood pump systems of the present invention may also be introduced via direct introduction, such as into the aorta, the atria, and the ventricles. As is well known in the art, such intravascular access may be achieved percutaneously through the use of the Seldinger technique or directly through the use of minimally invasive access techniques.

Those skilled in the art will also appreciate that, although shown and described above in terms of "axial flow," the present invention is not limited to the axial flow type intravascular blood pumps. Rather, the intravascular blood pumps **12** may comprise any number of suitable types of intravascular blood pumps, including but not limited to so-called "mixed flow" intravascular blood pumps, without departing from the scope of the present invention.

With regard to the embodiments shown in FIGS. **10-17**, it is furthermore contemplated that the guide catheter **132** may be separable from the conduit assembly **134** after the pump assembly **136** is docked within the shroud **36** to form the pump **12** at the desired location within the circulatory system of the patient. This may be accomplished by providing the guide catheter **132** in a detachable fashion via any number of suitable arrangements. By removing the guide catheter **132** after the pump **12** assembled, wound management of the access point into the patient's vasculature may be improved. This is due, in part, to the substantial reduction in size of the device extending into the patient (i.e. the drive cable assembly **18** as opposed to the larger diameter guide catheter **132**).

It is also contemplated to incorporate various pressure sensing and/or guidability features into at least one of the cannula, **14** and pump **12**. Such features may include, but are not necessarily limited to, those shown and described in commonly-owned and co-pending U.S. patent application Ser. No. 09/280,988 (filed Mar. 30, 1999) entitled "Steerable Cannula," and U.S. patent application Ser. No. 09/280,970 (filed Mar. 30, 1999) entitled "Pressure Sensing Cannula," the disclosures of which are hereby expressly incorporated by reference as if set forth herein in their entirety and physically incorporated as APPENDIX A and APPENDIX B respectively to the present specification. These pressure sensing features may include, but are not necessarily limited to, the use of fluid-filled lumens, piezo-electric pressure sensing elements, strain gauges, and analysis of the torque/current relationship (based on the dynamic pressure differential between the inlet and outlet of the pump). The guidability features may include, but are not necessarily limited to, the use of side lumens and deformable materials (i.e. Nitonol).

Various pump and cannula arrangements have been described and shown above for providing right and/or left heart support wherein blood is deliberately re-routed through and past the right and/or left ventricle in an effort to reduce the volume of blood to be pumped by the particular ventricle. While "unloading" the ventricles in this fashion is preferred in certain instances, it is to be readily understood that the pump and cannula arrangements described herein may also be employed to "preload" the ventricles. Ventricular preloading may be accomplished by positioning the outflow cannula from the pump into a given ventricle such that the pump may be employed to fill or preload the ventricle with blood. This may be particularly useful with the right ventricle. On occasion, the right ventricle is not supplied with sufficient levels of blood from the right atrium such that, upon contraction, the right ventricle delivers an insufficient quantity of blood to the pulmonary artery. This may result when the right ventricle and/or right atrium are in a stressed or distorted condition during surgery. Preloading overcomes this problem by actively supplying blood into the right ventricle, thereby facilitating the delivery of blood into the pulmonary artery. The same technique can be used to

US 10,238,783 B2

21

preload the left ventricle and thus facilitate the delivery of blood from the left ventricle into the aorta.

Appendix A—(U.S. Ser. No. 09/280,988)

Steerable Cannula

Background of the Invention

1. Field of the Invention

The invention relates to vaqscular cannulas for use in medical procedures.

2. Description of Related Art

In medical applications and specifically in surgery, the list of uses for cannulas is exhaustive. Cannulas are to be distinguished from catheters in that catheters generally have a substantially smaller fluid-carrying capacity are used primarily for sampling or measurement purposes or for delivery of small quantities of fluid, whereas cannulas are generally larger and are used for volumetric fluid transfer. One application of cannulas involves the augmenting or supplementing of pulmonary blood flow through the beating heart during cardiac-surgery by use of one or more cannulas involved in the intake and return of blood into the circulatory system. The cannulas interface between the patient's circulatory system and the mechanical pumps that power the augmentation procedure. Such an application is described in co-pending PCT Application no. PCT/US97/18674 entitled "Single Port Cardiac Support Apparatus", filed Oct. 14, 1997 and incorporated herein by reference in its entirety.

As will be appreciated, precise and quick placement of the cannula in surgical applications is critical, given the severe time constraints facing a surgeon whose patient's vital life sustaining functions have been suspended during the procedure. Currently, methods for placing cannulas in a patient's body are crude, in that they rely on guesswork and trial and error. Specifically, a surgeon will insert the cannula and direct it towards the desired destination, but ultimately must feel by hand, through the patient's tissue for example, whether it has reached that destination. The surgeon may be forced to make several retractions and re-insertions until the process succeeds. Shortcomings of such a procedure are clear and may include damage to the delicate tissue involved and waste of valuable lime. Additionally, constraints on the flexibility of the material are imposed since a prescribed amount of rigidity is required to enable the cannula to be felt through the tissue and insure that the cannula does not collapse under insertion force.

Alternatively, the surgeon may rely on the use of guiding devices such as a guide wire threaded through the cannula. The guide wire is often easier to manipulate than the cannula, and its placement precedes placement of the cannula. After the guide wire is in place, the cannula is pushed along the length of the guide wire, following the guide wire to the desired destination.

It is also known that a flow directed balloon catheter can be used as a guide wire. Balloon catheters are well known in the art and have a multitude of uses, including delivery or removal of fluid from the surgical site. However, flow directed balloon catheters arc typically at least an order of magnitude smaller than cannulas. Their small size accordingly severely limits their application since both quantity and rate of fluid flow through the catheter are limited. In fact it is precisely because of their small size thai flow directed balloon calhcters can be used as guiding devices for the larger, more robust and versatile cannulas. During use as a guiding device for a cannula, the flow directed balloon

22

catheter acts as a guide wire in facilitating the advancement of the cannula to the desired destination. The flow directed balloon catheter is first inserted into place in the patient's body, and the cannula, threaded around the flow directed balloon catheter, is then advanced into the desired position.

Insertion of the flow directed balloon catheter is effected using the inflatable balloon disposed at a distal tip of the flow directed balloon catheter. A lumen in communication with the balloon delivers inflating fluid in the balloon, thereby inflating the balloon and causing it to operate as a "sail" which is pulled along in the blood stream through the natural blood flow in the patient's circulatory system.

The above procedures have met with only limited success, and there exists a long felt need for devices and methods that facilitate placement of a cannula in a patient's body. A system that will assist in the manipulation of the cannula through the vascular structure or other bodily regions of the patient would accordingly serve to make the placement process more efficient and less time-consuming, improving the chance of overall success of a surgical procedure.

Brief Summary of the Invention

The present invention overcomes the deficiencies of the prior art by providing a cannula which can be steered during its advancement in the body of the patient. Steering is implemented using cables connected to a deformable portion of the cannula. The cables extend to the proximal end of the cannula from where the operator can selectively apply tensional forces to thereby cause the cannula to curve at the deformable portion. The deformable portion is disposed preferable at the distal end of the cannula, but may be located at other sites along the length of the cannula.

In accordance with a second embodiment of the invention, the cannula is provided with more than one cable for facilitating deformation along multiple planes. Additionally, preformed curves may be provided along the length of the cannula, which curves can be either augmented or straightened by applied tension to the cables.

The cannula, in accordance with a third embodiment, is provided with a spiraling wire formed in the cannula wall. The spiraling wire operates to provide rigidity to the body of the cannula and maintain good fluid flow therein. The spiraling wire may comprise a portion of the cable used to impart deformation in an arrangement in accordance with a fourth embodiment of the invention.

In accordance with a fifth embodiment of the invention, the steerable cannula is provided with an inflatable balloon at the distal end thereof for assisting in guiding the cannula to its desired destination. The inflatable balloon is selectively inflatable using a lumen which effects fluid communication between an fluid source and the balloon.

In accordance with a fifth embodiment of the invention, the steerable cannula is provided with an inflatable balloon at the distal end thereof for assisting in guiding the cannula to its desired destination. The inflatable balloon is selectively inflatable using a lumen which effects fluid communication between an fluid source and the balloon.

In accordance with a sixth embodiment of the invention, a steerable cannula having a pigtail distal tip configuration is provided.

In accordance with a seventh embodiment of the invention, a steerable cannula having a movably supported guide wire is provided.

In accordance with an eighth embodiment of the invention, a steerable cannula having an integrally formed guide wire is provided.

US 10,238,783 B2

23

In accordance with a ninth embodiment of the invention, a steerable cannula is used in a co-axial cannula arrangement.

## Brief Description of the Several Views of the Drawing(s)

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. **20** is schematic side view of a steerable cannula in the undeformed state in accordance with the first embodiment of the invention;

FIG. **21** is a schematic cross-sectional view of the steerable cannula of FIG. **20** taken along line A-A;

FIG. **22** is a schematic side view of the steerable cannula in the deformed state in accordance with the first embodiment;

FIG. **23** is a schematic cross-sectional view of a steerable cannula having two cables in accordance with a second embodiment of the invention;

FIG. **24** is a schematic side view of a steerable cannula having a reinforcing wire in accordance with a third embodiment of the invention;

FIG. **25** is a schematic cut-away view of a steerable cannula in accordance with a fourth embodiment of the invention;

FIG. **26** is a schematic cross-sectional view taken along line B-B of FIG. **25**;

FIG. **27** is a schematic side view of a steerable cannula having a preformed curve and an inflatable balloon formed at a distal end thereof in accordance with a fifth embodiment of the invention;

FIG. **28** is a schematic side view of the inflatable balloon of fifth embodiment of the invention, wherein the balloon is shown in the inflated state;

FIG. **29** is a schematic cross-sectional view taken along line C-C of FIG. **28**;

FIG. **30** is a schematic view showing a steerable cannula having a pigtail distal tip configuration in accordance with a sixth embodiment of the invention;

FIG. **31** is a schematic view showing a steerable cannula having a guidewire distal lip configuration in accordance with a seventh embodiment of the invention;

FIG. **32** is a schematic view showing a steerable cannula having a guidewire distal tip configuration in accordance with an eighth embodiment of the invention:

FIG. **33** is a schematic side view showing a steerable cannula used in a co-axial configuration in accordance with a ninth embodiment of the invention, wherein the steerable cannula is advanced to a first relative position;

FIG. **34** is a schematic side view showing a steerable cannula of FIG. **33**, wherein the steerable cannula is advanced to a second relative position; and

FIG. **35** is a schematic side view of a configuration in accordance with a tenth embodiment of the invention.

## Detailed Description of the Invention

The present invention comprises a steerable cannula in which a portion which is adapted for insertion into the body of a patient, preferably into the vascular system of the patient, is configured to be selectively deformable. The deformation aids in changing the direction of the cannula during the insertion process such that the cannula can be

24

steered in a desired direction as it is advanced toward its destination in the patient's body. Deformation is effected using a cable connected with the deformable portion of the cannula. Tension on the cable, induced by for example rotating a portion of a handle disposed at a proximal end of the cannula exterior of the body of the patient, results in tension on one wall of the deformable portion and thereby causes it to bend in the direction of the cable.

With reference lo FIGS. **20**-**23** in which an exemplary arrangement in accordance with a first embodiment of the invention is shown, cannula **1120** can be seen as comprising a substantially cylindrical structure having a wall **1122** which defines a main lumen **1124**. Lumen **1124** is adapted for fluid transport to or from the body of the patient and may be provided with one or more holes **1126** located adjacent to distal tip **1128** and permitting passage of fluid therethrough. Holes **1126** supplement fluid flow through main port **1125**, especially in situations of blockage of main port **1125**. Cannula **1120** may be one of two complementary cannulas (not shown) used in a surgical procedure, one for intake and the other for removal of blood or other fluid from the patient'body. Alternatively cannula **1120** may comprise a component of a co-axial, single port device in which cannula **1120** is surrounded by a second, larger conduit, with cannula **1120** for example operating to intake blood from the patient towards a pump system and the conduit operating to replace the blood from the pump back into the patient for augmentation of blood flow during beating heart surgery as described in co-pending PCT Application no. PCT/US97/18674 mentioned above.

At a proximal end **1130** of cannula **1120** is provided a handle **1132** which serves to transmit turning forces applied by an operator's hand to the cannula to aid in its manipulation in the patient's body. As such, handle **1132** is rigidly attached to wall **1122** of cannula **1120**, although portions of handle **1132** may be configured for motion relative to cannula **1120** in order impart the necessary tension on cables used for deforming the cannula **1120** as described below. Rotation of the rigidly attached portion of handle **1132**, results in a corresponding rotation of the distal end **1128** of the cannula **1120** within the patient's body, thus aiding in the cannula's manipulation and advancement to the desired destination.

Wall **1122**, in addition to defining main lumen **1124** of cannula **1120**, contains a secondary lumen **1136** formed therein. Movably mounted in lumen **1136** is a cable **1138** which is secured at point **1140** in wall **1122**. Point **1140** may be disposed anywhere along the length of the cannula **1120**, but in the preferred embodiment lies at distal end **1128**.

Cannula **1120** is provided with a deformable portion **1142** formed along at least a segment of its length. In the exemplary arrangement shown in FIGS. **20**-**22**, deformable portion **1142** is disposed in close proximity to distal end **1128** of cannula **1120**; however, it is to be understood that this not intended to be limiting and that other regions in the cannula **1120** can alternatively or additionally be made deformable depending on the contemplated application.

Deformable portion **1142** serves to cause cannula **1120** to bend in response to tension applied to cable **1138** and thereby assume a configuration as shown in FIG. **22**. Depending on the location of point **1140** and the location of lumen **1136** radially and axially along wall **1122**, applied tension to cable **1138** causes cannula **1120** to turn on itself in the direction of pull to thereby assume a curve having a predetermined orientation. Additionally, if cannula **1120** is provided with one or more preformed curves, which may be in identical or in different planes along the length of the

25

26

cannula as is contemplated, tension in cable **1138** can operate to temporarily straighten the cannula along at least one of these planes to facilitate handling during a particular maneuver through the patient's body.

It is also contemplated that more than one cable can be provided, supported in suitable secondary lumens formed in cannula **1120**. As can be seen from FIG. **23**, a second lumen **1146** can be provided in wall **1122** of cannula **1120**. second lumen **1146** movably supporting cable **1144** therein. Cables **1138** and **1144** are thus disposed on opposite sides of cannula **1120** and serve to provide steerabilily in two directions. The cables are configured such that a pulling of one cable is coordinated with a slacking of the other cable in order permit bending of cannula **1120** at deformable portion **1142**. Although shown to be diametrically opposed in position, cables **1138** and **1144** can occupy any position along wall **1122**, and it will be appreciated that the number of such cables used can vary depending on the application, as can their distribution in wall **1122**, and any desired number of turning directions can accordingly be achieved in accordance with the present invention.

Wall **1122** can be formed of materials ranging from rigid to flexible, and in the preferred embodiment comprises a semi-rigid transparent material such as silicone rubber. Of course it is to be understood that by definition deformable portion **1142** is to be constructed of a flexible material, regardless of the construction of the material of the wall **1122**, such that cannula **1120** can bend when appropriate pulling forces are imparted through the cable(s).

Selective bending of cannula **1120** can also be facilitated using a core member provided for this purpose. Core member **1182**, preferable formed of material having appreciable stiffness relative to wall **1122**, is disposed longitudinally within cannula **1120** and serves to provide a deflection point to locate and control the bending point of the cannula. Core **1182** is removable and can be movable distally or proximally within cannula **1120** in order to alter the deflection point. In this manner also flow blockage in the cannula **1120** can be insured during insertion.

As can be seen from FIG. **24**, a spiraling wire **1148** can be provided for structural reinforcement of cannula **1120**. Wire **1148** is either molded into the wall **1122** or is otherwise supported therein, and extends either partially or fully across the length of the cannula **1120**. Wire **1148** facilitates handling of the cannula **1120** and reduces the possibility of cannula **1120** collapsing or being pinched shut and thus closing off the flow of fluid to or from the patient. Other ways of reinforcing the tubular body of cannula **1120** are known in the art and will adapt equally well to the present invention. In addition, no reinforcement may be needed if the cannula material is sufficiently rigid or if sufficient fluid flow is present within the cannula.

Alternatively, as shown in FIGS. **25-26**, spiraling wire **1148** can itself comprise a portion of cable **1138**. In such an arrangement, cannula wall **1122** is formed of two layers **1162** and **1164**, between which is formed a lumen **1166**. Layers **1162** and **1164** may be discrete layers bonded together at appropriate regions, or they may be a single layer folded back upon itself to form the two layers, with lumen **1166** and wire **1148** occupying predetermined regions therebetween. Cable **1138** is housed in a polymide tube **1170** disposed in lumen **1166** and extends beyond the end **1168** of tube **1170** to then spiral exteriorly of inner layer **1162** and interiorly of outer layer **1164** to thereby lend structural support to the cannula **1120**. Metal or other tape **1172** can be used to secure spiraling wire **1148** in place. In a variation of this, cable **1138** and wire **1148** may be two discrete components which are welded or otherwise connected together at any desired point along the body of cannula **1120**. Alternatively, as shown in FIG. **35**. cable **1138** may be secured to a band **1184** disposed radially about or adjacently to tip **1186** of cannula **1120**. In all of these variations, cable **1138** may be formed of single or multiple strands of metal, plastic or carbon fiber composite, but preferably cable **1138** is formed of a single strand of stainless steel having a TEFLON™ coating. In the FIGS. **33-35** arrangements, cannula **1120** is shown with an atraumatic bullet lip **1186** having side holes **1188** and end holes **1190**. It will be appreciated that such a tip can be provided for any arrangement of the invention. It will also be appreciated that the tip **1186** can itself serve as the anchor for the cable **1138** in certain arrangements. The tip **1186** is fixedly bonded to distal end **1125** of cannula **1120** and enables a simplified construction of the steering mechanism and provides a blunt surface that will not injure tissue in the body.

Lumens **1136** and **1146**, or other similar lumens, in addition to supporting cables **1138** and **1144** therein, may be used to supply inflating fluid to a balloon **1150** provided at the outer surface of the distal end **1128** of cannula **1120**. As shown in the exemplary embodiment of FIGS. **27-29**, balloon **1150** is in fluid communication with inflating fluid source **1152**, via supply tube **1154** and lumen **1156**. Fluid source **1152** serves to selectively provide fluid, such as saline, air or other gas, to balloon **1150** to thereby cause the balloon to inflate within the patient's body. Balloon inflation in this manner assists in placement of the cannula **1120**, especially when inserting the cannula antegrade, with the inflated balloon serving to float the tip of cannula within the fluid flow to thus transport it to the desired location in the body. Cannula **1120** is provided with one preformed curve **1158** in addition to curve **1160** imparted by the tension in cable **1138**. Balloon **1150** is shown in the deflated state in FIG. **27** and in the inflated state in FIGS. **28** and **29**.

Various distal tip configurations can be selected for cannula **1120**, depending on the particular application as appreciated by those of ordinary skill in the art. For example, a pigtail shape can be used for crossing the aortic valve retrograde. The pigtail shape, illustrated in FIG. **30**, can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod **1174** formed into a loop at the distal end of the cannula **1120**. Alternatively, a J-tip wire **1176** can be configured to protrude from the distal tip **1128**, as illustrated in FIGS. **31** and **32**. The J-tip wire can be a conventional guide wire movable or fixedly supported in a dedicated lumen **1178** formed in a rigidly attached tube **1180** (FIG. **31**), or it can be supported, rigidly or movably, between layers of material from which the wall **1122** of cannula **1120** is formed. Guidewires are known in the art and can for example be formed of windings of wire coiled around a core and having one or more preformed curves formed therein.

An embodiment in which cannula **1120** is used in a coaxial configuration is shown in FIGS. **33** and **34**. Cannula **1120** serves as an inner cannula, passing through outer conduit **1180** while the two components are disposed in the patient's body. An important advantage of this arrangement is that outer conduit **1180** operates to vary the radius of curvature of inner cannula **1120** by providing a base point as the inner cannula **1120** is advanced. In this manner manipulation of the inner cannula **1120** and outer conduit **1180** is facilitated and advancement to the desired destination in the body of the patient is more efficiently accomplished.

The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be

US 10,238,783 B2

27

apparent to one of ordinary skill in the art that modifications thereto can be made without inventive departure from the spirit and scope of the invention.

## Abstract of the Appendix A

A steerable cannula is provided with at least one cable through which tension is communicated to a deformable portion of the cannula. The tension causes the cannula to bend at the deformable portion, enabling selective steering of the cannula during insertion into the body of the patient.

Appendix B—(U.S. Ser. No. 09/280,970)

Pressure Sensing Cannula

## Background of the Invention

Field of the Invention

The present invention relates to cannulas used in surgical applications, and more particularly, to a cannula equipped with a pressure/flow rate transducer.

Description of the Related Art

In medical applications and specifically in surgery, the list of uses for cannulas is exhaustive. One application involves the augmenting or supplementing of pulmonary blood flow through the beating heart during cardio-surgery by use of one or more cannulas involved in the intake and return of blood into the circulatory system. The cannulas interface between the patient's circulatory system and the mechanical pumps that power the augmentation procedure. Such an application is described in co-pending PCT Application no. PCT/US97/18674 emitted "Single Port Cardiac Support Apparatus", filed Oct. 14, 1997 and incorporated herein by reference in its entirety.

When performing cardiac surgery cannulas are placed within the patient's blood stream and used for inflow and outflow of blood or other fluids. If the operator wishes to determine the rate of fluid flow, either a catheter with appropriate sensors must also be placed in the patient's blood stream, or other sensors such as an external ultrasonic sensor as disclosed in U.S. Pat. No. 5,179,862 are used. A shortcoming of ultrasonic systems such as that described in U.S. Pat. No. 5,179,862 is that they require significant monitoring. Ultrasonic sensors also require that tubing of a specific diameter be used, thereby adding to the cost and complexity of the surgical procedure. Additionally, ultrasonic sensors are expensive and nondisposable, thereby adding to the cost of the surgical procedure.

Another method to measure flow rate is through the use of a thermodilution catheter. Thermodilution catheters require the infusion of a solution, typically saline, of a known temperature, with a distally disposed thermistor measuring the temperature change to determine the flow rate. This method is also expensive, increasing the cost of the surgical procedure. A second problem with using flow-sensing catheters, such as thermodilution catheters, is that they require the operator to place more incisions within the patient. The catheters must be placed so that they do not interfere with the inflow or out flow of the cannula. Visual markers along the length of the cannula may also be used to determine location, the greater the number of markers the more accurate the placement at the expense of quick readings due to the greater number of markings.

## Summary of the Invention

The present invention overcomes the deficiencies of the prior art by providing a cannula assembly having one or

28

more pressure transducers coupled to a main lumen thereof. In accordance with a first embodiment, the pressure transducers are attached to the substantially tubular wall defining the main lumen.

In accordance with a second embodiment, a partial occlusion is provided in the cannula to increase the pressure drop across the main lumen. In this manner transducer signal is increased, and an improved differential pressure measurement signal achieved.

In accordance with a third embodiment of the invention, one or more pressure transducers are used in conjunction with a pair of coaxial cannulas for measuring pressure.

In accordance with at fourth embodiment of the invention, a differential pressure transducer is used, the differential pressure transducer being mounted in a dedicated secondary lumen in communication with the first lumen.

In accordance with a fifth embodiment of the invention, the secondary lumen housing the differential pressure transducer is disposed across a knee formed in the cannula to augment pressure measurement. Partial occlusions may also be provided for this purpose.

In accordance with a sixth embodiment of the invention, the secondary lumen housing the differential pressure transducer is formed integrally with the tubular wall defining the main lumen.

In accordance with a seventh embodiment of the invention, a soft, flexible tapered tip is provided at the distal end of the cannula. Such a configuration allows for easier negotiation through the patient's body during surgical procedure.

In accordance with an eighth embodiment of the invention, an inflatable balloon is provided at the distal end of the cannula. The inflatable balloon aids in transporting the cannula to the desired destination.

In accordance with a ninth embodiment of the invention, a guide wire lumen is provided for supporting a guide wire in the cannula. The guide wire is used as a predecessor step in the insertion of the cannula.

In accordance with a tenth embodiment of the invention, a light guide is supported in the cannula. The light guide conveys light to a predetermined portion of the cannula to thereby aid in the visualization and location of the cannula during the surgical procedure.

The invention realizes various advantages over the prior art, including a reduction in the number of incisions that a surgeon must make in performing surgical procedures, along with a reduction in the amount of foreign material introduced into the patient's body, while providing safe, rapid, accurate and cost-effective fluid flow rate measurements.

## Brief Description of the Drawings

Many advantages of the present invention will be apparent to those skilled in the art with a reading of this specification in conjunction with the attached drawings, wherein like reference numerals are applied to like elements and wherein:

FIG. **36** is a schematic side view of a first embodiment of the invention;

FIG. **37** is a schematic cross-sectional view taken along line D-D of FIG. **36**;

FIG. **38** is a schematic cross-sectional view taken along line E-E of FIG. **36**;

FIG. **39** is a schematic view of a cannula in accordance with the invention in a surgical application;

FIG. **40** is a schematic partial cut-away side view of a second embodiment of the invention;

29

FIG. **41** is a schematic cross-sectional view taken along line F-F of FIG. **40**;

FIG. **42** is a schematic side view of a third embodiment of the invention;

FIG. **43** is a schematic side view of a fourth embodiment of the invention;

FIG. **44** is a schematic side view of a fifth embodiment of the invention;

FIG. **45** is a schematic side view of a sixth embodiment of the invention;

FIG. **46** is a schematic cross sectional view taken along line G-G of FIG. **45**;

FIG. **47** is a schematic side view of a seventh embodiment of the invention;

FIGS. **48** and **49** are schematic side views of an eighth embodiment of the invention;

FIG. **50** is a schematic cross-sectional view taken along line H-H of FIG. **49**;

FIG. **51** is a schematic side view of a ninth embodiment of the invention;

FIG. **52** is a schematic side view of a tenth embodiment of the invention; and

FIG. **53** is a schematic cross-sectional view taken along line K-K of FIG. **52**; and

FIG. **54** is a schematic side view of an eleventh embodiment of the invention.

Detailed Description of the Preferred Embodiments

In accordance with the invention, a cannula comprising a substantially tubular, semi-flexible material adapted for fluid transport while inserted in a patient's body is provided with one or more pressure transducers which are fixedly or adjustably supported in the cannula. The pressure transducers are disposed internally or externally of the cannula and are used to provide a measurement of the rate of fluid flow. In the internal configuration, the rate of fluid flow within the cannula is measured, in the external configuration, the rate of fluid flow outside the cannula is measured. The cannula can also be adapted to support a guide wire to aid the operator in its insertion through the patient's body, and/or a light source to provide a visual reference during the insertion procedure. It is to be understood that the use of the term "cannula"is intended to encompass cannulas, catheters, and any related devices having similar application.

An exemplary arrangement in accordance with a first embodiment of the invention is shown FIGS. **36**-**38**. Cannula **2220** comprises a substantially cylindrical structure having a wall **2228** defining a main lumen **2221**. Wall **2228** can be formed of materials ranging from rigid to flexible, and in the preferred embodiment comprises a semi-rigid transparent material such as polyurethane, silicone rubber or other material. Lumens other than main lumen **2221** may also be provided, as described below. The cannula may also be formed from vinyl plastisol. To form a cannula of vinyl plastisol, a mandrel is dipped into liquid vinyl plastisol and heated. Wire is then wrapped around the mandrel and first formed layer. The mandrel is then dipped again encasing the wire, and then heated. The mandrel is then removed. Lumens and transducers may be formed within the wall of the cannula during the dipping process.

To lend structural support for the thin wall which allows maximum flow with minimal insertion damage, spiraling wire **2230** is provided for reinforcement and is either molded into the wall **2228** or is otherwise supported therein, and extends either partially or fully across the length of the cannula **2220**. Wire **2230** facilitates handling of the cannula

30

**2220** and reduces the possibility of cannula **2220** collapsing or being pinched shut and thus closing off the flow of fluid to or from the patient. Other ways of reinforcing the tubular body of cannula **2220** are known in the art and will adapt equally well to the present invention. In addition, no reinforcement may be needed if the cannula material is sufficiently rigid or if sufficient fluid flow is present within the cannula.

A connector **2223** is provided at the proximal **2225** end of cannula **2220**. Connector **2223** is suitably sized to interface with various surgical instruments, including but not limited to a reverse flow pump or fluid conduits leading thereto (not shown). Cannula **2220** may also have one or more holes **2226** located adjacent to distal tip **2222** to facilitate fluid flow therethrough. Cannula **2220** may be one of two complementary cannulas used in a surgical procedure, one for intake and the other for removal of blood or other biocompatible fluid from the patient's body. Alternatively, cannula **2220** may comprise a component of a co-axial, single port device in which cannula **2220** is surrounded by a second, larger conduit, with cannula **2220** for example operating to intake blood from the patient towards a pump system and the conduit operating to replace the blood from the pump system back into the patient for augmentation of blood flow during beating heart surgery as described in the co-pending PCT Application No. PCT/US97/18674 mentioned above.

In order to provide real time fluid flow information in accordance with the present invention, a pair of pressure transducers **2224**, **2232** are provided at two separate locations as illustrated in FIG. **36**. Pressure transducers **2224**, **2232** are of the type known in the art and each comprises for instance a piezo-electric crystal housed in an integrated circuit (IC) chip (not shown). The crystal configuration is designed to be pressure sensitive, generating an electrical signal in proportion to the amount of pressure experienced.

The principle governing the relationship between fluid flow and pressure is defined by Bernoulli's equation, herein solved for flow rate V and is determined by:

$$V = \sqrt{\frac{\Delta P \cdot 2d \cdot a^2}{f \cdot L \cdot \rho}}$$

where $\Delta P$ is the measured difference in pressure, d is the internal diameter of the lumen, a is the area of the lumen, f is a frictional factor of ihe lumen material. L is the lumen length over which the pressure measurement is conducted, and p is a measurable constant representative of the density of the fluid. The flow rale information can be used for a variety of purposes, including monitoring the patient's condition and controlling the fluid pump used during the procedure.

In the preferred embodiment, transducers **2224**, **2232** are imbedded in the wall **2228**, which is formed for instance by application of successive layers of laminate and interjecting the transducers therebetween during the layering process. Depending on at what stage in the layering process the transducers **2224**, **2232** are put in place in the wall **2228**, their proximity to the interior of ihe cannula **2220** or its exterior can be controlled in order to optimize measurement of cannula interior or exterior pressure. From the interior pressure measurements, a determination of flow rate within main lumen **2221** can be made using the known diameter of the main lumen **2221**. Similarly, from the exterior pressure measurements, flow rate of exterior fluid—for example, blood—can be measured if the diameter of the blood chan-

US 10,238,783 B2

31

32

nel, such as the artery, is known, or the cannula can be calibrated with thermodilution catheters which assume the diameter of the vessel or artery they are placed within.

In the FIG. 36 exemplary arrangement, pressure transducer 2232 is disposed at a location near the distal tip 2222 of cannula 2220, while pressure transducer 2224 may be disposed anywhere along the length of cannula 2220 between pressure transducer 2232 and proximal end 2225. It is also contemplated that the pressure transducers 2224, 2232 may be detachable disposed in dedicated secondary lumens formed in or along tubular wall 2228, the dedicated secondary lumen extending to the proximal end 2225 and supporting any electrical cables connected to the pressure transducers 2224, 2232. In the detachable arrangement, the location of pressure transducers 2224, 2232 in the cannula 2220 can be adjusted to suit the particular application, such that one transducer can be disposed within one chamber of the heart while the other is at a different of portion of the heart to thereby provide a pressure/flow rate measurement of a predetermined portion of the patient's body, for example flow into the heart from a designated blood vessel. Such an application is shown in FIG. 39.

Pressure transducers 2224, 2232 are in electrical communication with console 2236 via cable 2238, which is supported in secondary lumen 4222 provided in cannula 2220. Calculations for determining fluid flow rate using signals generated by the pressure transducers 2224, 2232 and relayed via cable 2238 are conducted at the console 2236 or at any processor or processing system connected thereto.

As shown in FIGS. 40 and 41, cannula 2220 may also contain a partial occlusion portion 2247 that forms a venturi 2246 within the main lumen 2221 of cannula 2220. Venturi 2246, which may be disposed anywhere along the length of the cannula 2220, induces a pronounced pressure drop, creating a greater differential in pressure between proximal region 2225 and distal region 2222, thereby requiring less signal amplification of the pressure transducers and less filtering of the signal and consequently yielding a more accurate flow rate measurement. Preferably the location of the pressure transducer 2232 is in the vicinity of venturi 2246 as shown in FIG. 54.

FIG. 42 shows an embodiment in accordance with the invention in which the pressure transducers 2224, 2232 are used with a co-axial, single port device 2250 in which cannula 2220 is surrounded by a second, larger conduit 2248, with cannula 2220 for example operating to intake blood from the patient towards a pump system (not shown) and conduit 2248 operating to replace the blood from the pump system, via openings 2252, back into the patient for augmentation of blood flow during beating heart surgery as described in the co-pending PCT Application no. PCT/US97/18674 mentioned above. It is to be understood that pressure transducers 2224, 2232 can be mounted fixedly or detachably either to the interior or exterior of rither the cannula 2220 or the conduit 2248 in the above-described manner. More than one pair of these transducers can also be used in a myriad possible combinations in accordance with the invention. In the preferred embodiment, the cannula 2220 is provided with a bullet nosed tip, as illustrated in for example FIGS. 42-44. Other tip configurations, such as a bevel, may also be used, as will be appreciated by those skilled in the art.

An alternative to using pairs of pressure transducers such as transducers 2224, 2232 is the use of a single differential pressure transducer 2254, as shown in FIG. 43. Differential pressure transducers are also well known in the art and comprise for example a piezo-electric crystal electro-me-

chanically configured to be responsive to a pressure difference between two opposing sides thereof. These two sides correspond respectively to proximal end 2257 and distal end 2259 of secondary lumen 2256 in which transducer 2254 is mounted. Proximal and distal ends 2257 and 2259 are attached at any desired points along the length of cannula 2220 to thereby couple secondary lumen 2256 to main lumen 2221 and provide a pressure difference measurement between the desired points. Attachment of lumen 2257 and transducer 2254 across knee 2249 of cannula 2220, as shown in FIG. 44, will provide a stronger signal, with knee 2249 operating in accordance with the same principal as venturi 2246 discussed above. Thus it is to be understood that a venturi could also be used in conjunction with the differential pressure transducer 2254. The ports 2261 and 2263 at which the lumen 2256 interfaces with cannula 2220 may be sealed by an appropriate membrane, with saline or other fluid being permanently housed in the lumen 2256. Alternatively, ports 2261 and 2263 may be open, permitting fluid communication between the cannula 2220 and the lumen 2256 and attached transducer 2254. The latter, open configuration would achieve a more faithful pressure representation. Stopcocks 2274 and 2276 can be provided in the ports 2261 and 2263 to permit priming and/or de-airing of the ports. It should also be noted that although in the arrangements of FIGS. 43 and 44 the lumen 2256 is provided as a separate tubular structure, lumen 2256 may alternatively be formed integrally with wall 2228 of cannula 2220, again with ports 2261 and 2263 being either open or closed to main lumen 2221 depending on the application. Such an arrangement is illustrated in FIGS. 45 and 46 in which is shown transducer 2254 in communication with lumen 2272 integrally formed in wall 2228 of cannula 2220.

Various distal tip configurations can be selected for cannula 2220 and used with the pressure sensing transducers, depending on the particular application as appreciated by those of ordinary skill in the art. FIG. 47 shows an exemplary embodiment in which the distal tip 2222 is formed of a soft, flexible material having a bullet shape. As shown exemplarily in FIGS. 48-50, the cannula 2220 may be equipped to support other tools, such as an inflatable balloon 2240 which is deployed for example in order to assist in transporting the distal tip 2222 to the desired destination in the patient's body during the surgical procedure. Balloon 2240 is inflated through an inflating lumen 2244 provided in cannula 2220 using a bio-compatible fluid such as saline or carbon dioxide gas. Preferably inflating lumen 2244 is formed integrally within wall 2228, by leaving an appropriate gap during the fabrication process, and is provided with a fitting (not shown) at its proximal end to interface with an inflating device for supplying the bio-compatible fluid. The lumen 2221 within the cannula 2220 can also be adapted to support a balloon catheter (not shown) which can be used to place the cannula within the patient's body. An obturator (not shown) may also be disposed through the main lumen 2221 to aid in insertion and guiding within the patient's body.

Another tool which cannula 2220 may support is shown in FIG. 51 and comprises a J-hook guide wire 2262 disposed slideably within lumen 2264, which is formed integrally in wall 2228 of cannula 2220. In operation, guidewire 2262, easier to manipulate than the cannula 2220, is first inserted into the patient's body and manipulated to the surgical site. Subsequently the cannula 2220 is maneuvering along the guidewire 2262, which passes through lumen 2264, to the desired destination.

33

34

As illustrated in FIGS. **52** and **53**, cannula **2220** may also contain a light guide **2266**, which may be supported in lumen **2268**. Light guide **2266** comprises one or more optical fibers formed of, for example, glass or other materials, such as plastic, known for that purpose. Distal tip of light guide **2266** is configured for light projection, such that light provided at the proximal end of light guide **2266** is projected therefrom. An appropriate shape for such projection is a spherical shape, although other shapes and projection schemes, such as directional projection, fall within the purview of the invention. The source of tight may be any conventional monochromatic (lascr/LED) or polychromatic device **2270**, and more than one light source with associated light guide can be used for color coding and providing a visual reference to different portions of the cannula **2220**, depending on the colors of light used and on the location of the projection terminus of the light guides. In this manner cannula **2220** can be visually guided through the patient's body, relying on the transmissivity of tissue to permit the location of the illuminated cannula in the patient's body. As will be appreciated, the location of the cannula **2220** can also be determined by examining the pressure waveform detected by the pressure transducers **2224**, **2232** and **2254**. The physiological pressure waveform recorded by the transducers can be used to determine the location of cannula **2220** in relation to the valves of the patient's heart.

As will be appreciated by those skilled in the art, cannula **2220** may be provided with one or more preformed curves along its length to aid in its manipulation through the patient's vasculature. Multiple curves may be disposed along the same plane or in different planes, depending on the application.

An additional feature in accordance with the invention is the use of radiopaque markings (not shown) anywhere along the cannula body. Such markings render portions of the cannula **2220** visible to x-ray radiation for visualizing the cannula during its use.

The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be apparent to those skilled in the art that modifications thereto can be made without departure from the spirit and scope of the invention. It will also be apparent that all devices and methods herein disclosed will adapt equally to animal use as well as human use.

Abstract of Appendix B

A cannula is provided with one or more pressure transducers for measuring fluid pressure interiorly or exteriorly of the cannula. The pressure transducers may be mounted integrally with the tubular wall defining the main lumen of the cannula, or they may comprise differential pressure transducers mounted in dedicated lumens in communication with the main lumen. The pressure measurements from the transducers is used to determine fluid flow rate.

What is claimed is:

1. An intravascular blood pump system, comprising:
an intravascular blood pump comprising:
a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and
a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;
a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient;
wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

2. The intravascular blood pump system of claim **1**, wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism.

3. The intravascular blood pump system of claim **1**, further comprising:
an elongate catheter extending proximally with respect to the intravascular blood pump; and
a blood pressure detection mechanism comprising a fluid column disposed within the elongate catheter and configured to detect a pressure of blood proximate the intravascular blood pump.

4. The intravascular blood pump system of claim **3**, wherein the blood pressure detection mechanism comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

5. The intravascular blood pump system of claim **1**, further comprising:
one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein a portion of the shroud has an outer diameter matching an inner diameter of a proximal portion of the cannula, and the proximal portion of the cannula is disposed about a distal end of the shroud.

6. The intravascular blood pump system of claim **1**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

7. The intravascular blood pump system of claim **6**, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support, the pigtail shaped distal tip or the J-shaped distal tip is wholly within a left ventricle of the patient.

8. An intravascular blood pump system, comprising:
an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide

35

left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula that is coupled to a distal end of the intravascular blood pump, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient;

an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub or the catheter, the guide wire not passing through the rotor hub or the catheter, and the guide wire extending out of the intravascular blood pump system in the distal direction through the elongate lumen; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump.

**9.** The intravascular blood pump system of claim **8**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

**10.** The intravascular blood pump system of claim **8**, further comprising:

a rotor shroud, motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**11.** The intravascular blood pump system of claim **8**, further comprising a rotor shroud, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud.

**12.** The intravascular blood pump system of claim **8**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**13.** The intravascular blood pump system of claim **8**, wherein the elongate lumen is adapted to guide the guide wire through a distal end of the intravascular blood pump system.

36

**14.** The intravascular blood pump system of claim **8**, wherein the elongate lumen is shorter in length than the cannula lumen.

**15.** The intravascular blood pump system of claim **8**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**16.** The intravascular blood pump system of claim **8**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

**17.** An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside the patient's heart and a proximal end of the cannula and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient;

an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen and is shorter in length than the cannula lumen, both the elongate lumen and the cannula not extending through the rotor hub or the catheter, the guide wire not passing through the rotor hub or the catheter, and the guide wire extending out of the intravascular blood pump system in the distal direction through the elongate lumen; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

**18.** The intravascular blood pump system of claim **17**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge.

37

**19**. The intravascular blood pump system of claim **17**, further comprising:

a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**20**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**21**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is adapted to guide the guide wire through a distal end of the intravascular blood pump system.

**22**. The intravascular blood pump system of claim **17**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**23**. The intravascular blood pump system of claim **17**, having a pigtail shaped distal tip or a J-shaped distal tip, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

**24**. An intravascular blood pump system, comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub, a distal end of the rotor hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump;

a cannula coupled to a distal end of the intravascular blood pump, a first portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a lumen of the cannula and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port, the cannula is configured such that when the intravascular blood pump is positioned in the patient to provide left-heart support a distal end of the cannula and the at least one second port are positioned inside

38

the patient's heart and a proximal end of the cannula lumen and the at least one first port are positioned in the patient's aorta, the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guide wire does not pass through the rotor hub or the catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

a pressure sensing element configured to sense pressure proximate the intravascular blood pump comprising a fluid column extending through the catheter.

**25**. The intravascular blood pump system of claim **24**, wherein the pressure sensing element comprises at least one of a piezo-electric pressure sensing element and a strain gauge, and wherein at least a second portion of the rotor shroud has the same outer diameter as the proximal portion of the cannula.

**26**. The intravascular blood pump system of claim **24**, further comprising an elongate lumen sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen and is shorter in length than the cannula, both the elongate lumen and the cannula lumen not extending through the rotor hub or the catheter.

**27**. The intravascular blood pump system of claim **26**, further comprising:

a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

**28**. The intravascular blood pump system of claim **26**, wherein the elongate lumen is an integral extension of a wall of the cannula.

**29**. The intravascular blood pump system of claim **26**, wherein the elongate lumen is at least partially disposed within an outer surface of the cannula and wherein the intravascular blood pump system is configured for the guide wire to exit the intravascular blood pump system through an end of the elongate lumen.

**30**. The intravascular blood pump system of claim **26**, wherein at least a portion of the elongate lumen is located proximal to the pigtail shaped distal tip or the J-shaped distal tip.

* * * * *



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 99185 | 7590 | 04/07/2014 |

MAQUET Cardiovascular LLC
120 Baytech Drive
San Jose, CA 95134

| EXAMINER |
|---|
| MARCETICH, ADAM M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3761 | |

DATE MAILED: 04/07/2014

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/772,810 | 05/03/2010 | Walid N. Aboul-Hosn | 06-01506US04 | 4661 |

TITLE OF INVENTION: Guidable Intravascular Blood Pump and Related Methods

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 07/07/2014 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

Appx169

MAQ_00004741

Application/Control Number: 12/772,810                                    Page 2
Art Unit: 3761

## EXAMINER'S COMMENT / REASONS FOR ALLOWANCE

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Examiner's Comment*

Rejection of claims 30 and 46 under 35 U.S.C. 112 (pre-AIA), first paragraph and

rejection of claim 49 under 35 U.S.C. 112 (pre-AIA), second paragraph are withdrawn in

view of the amendments filed 29 March 2014.

### *Allowable Claims*

Claims 15, 23-27, 29, 31, 33, 35-39, 41-45 and 48-52 are allowed.

### *Reasons for Allowance*

Regarding claim 15, Applicant's arguments filed 28 March 2014 regarding

Bedingham; William et al. (US 6245007), Nix; Christoph et al. (US 6176822) and

Gordon; Lucas S. (US 5938645) have been considered and are persuasive. Examiner

advances additional reasons for allowance.

Modifying Bedingham and Nix with Gordon would not provide an operable device

since Bedingham requires free space for impeller 56 to rotate. Impeller 56 would be

impinged upon by guidewire lumen 46 of Gordon when modified in the proposed

manner. Applicant's Fig. 7 shows carriage 124 as longitudinally offset from rotor shroud

36, which allows rotors 44 to spin without interference. In comparison, Bedingham does

not provide any location along the length of outer sleeve 32 or inner sleeve 38 to add

MAQ_00004746

guidewire lumen 46 of Gordon. Adding guidewire lumen 46 of Gordon along any point

on inner sleeve 38 of Bedingham would interfere with the rotation of impeller 56.

A combination of Nix in view of Bedingham and Gordon would likewise be

inoperable, since Nix does not provide any space to add a first lumen for delivering

purge fluid. Nix calls for an electrically powered pump (col. 3, lines 11-19, Fig. 1, electric

motor 21 and electric lines 23), and therefore cannot accommodate an additional purge

fluid lumen.


Not cited in a previous action, <u>Teirstein; Paul S. (US 5336184)</u> discloses a guide

mechanism configured as a second lumen (col. 5, lines 63-66; col. 6, lines 8-22, Fig. 7,

guidewire channel 36),

the guide mechanism adapted to guide a distal portion of a catheter (col. 5, lines

35-49, balloon catheter can be advanced partly into the artery);

wherein said guide mechanism extends through a cannula surface (Figs. 6, 7,

guidewire channel 36 extends through a portion of catheter body 26); and

wherein the guide mechanism accepts a guide wire (Figs. 6, 7, guidewire 14).

However, Teirstein requires a "Y" shape 22 (col. 4, lines 6-12, Figs. 1, 6), which

would interfere with the operation of a strictly linear blood pump as disclosed by

Gordon. That is, Teirstein does not provide a guide mechanism suitable for an

intravascular blood pump.

MAQ_00004747

Application/Control Number: 12/772,810                                    Page 4
Art Unit: 3761

_Regarding claims 29 and 49_, Applicant's arguments filed 28 March 2014 regarding _Bedingham, Nix and Masch; Helmut (US 4728319)_ have been considered and are persuasive. Examiner agrees that a skilled artisan would not have been motivated to modify Bedingham with the concentric lumen of Masch. Bedingham calls for a close-ended distal member 42 and tip portion 46 (Fig. 7). Masch provides no teaching for how to modify drive cable 30, impeller 56, vane portion and distal member 42 in order to pass a guidewire. Motivation is lacking to modify Bedingham with the concentric guide mechanism of Masch since Bedingham already solves the problem of guiding the catheter by passing a guidewire through the pump housing (col. 9, lines 35-43).

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### _Conclusion_

Any inquiry concerning this communication or earlier communications from the examiner should be directed to:

Tel    571-272-2590
Fax    571-273-2590
Email  Adam.Marcetich@uspto.gov

The Examiner can be reached 8:00am to 4:00pm Monday through Friday.

MAQ_00004748

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **ABIOMED, INC.,** ) | |
| ) | |
| **Plaintiff/Counter-Defendant,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **16-10914-FDS** |
| ) | |
| **MAQUET CARDIOVASCULAR LLC,** ) | |
| ) | |
| **Defendant/Third-Party** ) | |
| **Plaintiff/Counter-Defendant/** ) | |
| **Counter-Claimant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ABIOMED EUROPE GMBH,** ) | |
| ) | |
| **Third-Party Defendant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ABIOMED R&D, INC.,** ) | |
| ) | |
| **Third-Party Defendant/** ) | |
| **Counter-Claimant.** ) | |

_____)

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**SAYLOR, J.**

This is an action for patent infringement.  Defendant Maquet Cardiovascular, LLC owns six patents directed to guidable intravascular blood pumps and related methods.  Plaintiff Abiomed, Inc. ("Abiomed") filed this action seeking declaratory judgment that it does not infringe those patents and that they are invalid.

The parties have submitted proposed claim constructions of eighteen terms or groups of terms.  The Court held a *Markman* hearing on April 24 and 25, 2018.  The construction of the

various terms in dispute is set forth below.

## Table of Contents

I.    Background ........................................................................................................ 1

   A.    Parties .......................................................................................................... 1

   B.    The Underlying Technology ........................................................................ 1

   C.    Patents at Issue ........................................................................................... 2

II.   Standard of Review ......................................................................................... 4

   A.    The Words of the Claim .............................................................................. 5

   B.    The Specification ......................................................................................... 6

   C.    The Prosecution History ............................................................................. 8

   D.    Extrinsic Sources ........................................................................................ 9

III.  Analysis ............................................................................................................ 9

   A.    Intravascular Blood Pump ......................................................................... 14

   B.    Guide Mechanism Terms .......................................................................... 20

      1.    Lumens Generally ............................................................................... 20

      2.    Lumen Arranged Coaxially with the Cannula .................................... 25

      3.    Elongate Lumen Associated with the Cannula ................................... 30

      4.    "Delimited by the Outer Cannula Surface" ........................................ 34

   C.    Means-Plus-Function Terms ..................................................................... 42

      1.    "Guide Mechanism" ........................................................................... 44

      2.    "Blood Pressure Detection Mechanism" and "Pressure Sensing Element" ............... 48

   D.    Rotor Terms ............................................................................................... 51

      1.    Rotor Blade Terms .............................................................................. 51

      2.    Rotor Hub Term .................................................................................. 54

   E.    Purge-Fluid Terms ..................................................................................... 56

      1.    "Passing Purge Fluid" ......................................................................... 56

      2.    "First Conduit" and "Second Conduit" ............................................... 59

   F.    Miscellaneous Terms ................................................................................. 63

      1.    Perfusion ............................................................................................. 63

      2.    Measuring Pressure "Proximate" or "Adjacent" the Intravascular Blood Pump ....... 65

      3.    "Distal Tip Member" ........................................................................... 68

      4.    "Cannula Coupled to a Distal End of the Intravascular Blood Pump" ............ 70

I.      **Background**

A.      **Parties**

Plaintiff Abiomed is a manufacturer of the "Impella" line of intravascular blood pumps, which it has been marketing since June 2008.  (Am. Compl. ¶¶ 4, 8).

Defendant Maquet Cardiovascular is the owner of several patents directed to intravascular blood pumps, including the six at issue in this case:  U.S. Patent Nos. 7,022,100 ("the '100 patent"); 8,888,728 ("the '728 patent"); 9,327,068 ("the '068 patent"); 9,545,468 ("the '468 patent"); 9,561,314 ("the '314 patent); and 9,597,437 ("the '437 patent").

B.      **The Underlying Technology**

The patents at issue in this case involve guidance systems for intravascular blood pumps—essentially, miniature pumps that are inserted through a patient's vasculature into the heart for medical purposes.  (*See* '100 patent, col. 1 ll. 48-51; *id.*, col. 17 ll. 52-59).  Intravascular blood pumps are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation."  (*Id.*, col. 1 ll. 22-27).

Among the challenges in developing such pumps are miniaturization (that is, designing a pump that will work effectively but be small enough to be inserted); preventing the pump from damaging the heart or the blood (blood cells are delicate); and providing a method for guiding the device to the heart (such pumps are commonly inserted through the femoral artery in the thigh and guided through the body to the heart).  (*See id.*, col 1 l. 33-col. 2 l. 18).  The patents at issue here principally address the third issue:  safely and effectively guiding the pump into the heart.

A subsidiary challenge is that of keeping blood out of the pump, where it may cause clotting or pump damage, and preventing frictional heating of the system.  ('100 patent, col. 10

1

ll. 28-44).  The patents at issue here also describe a "purge fluid delivery system" for addressing those problems.

Generally, the blood pump systems discussed by the patents and the parties have the following basic structure:  At the far end of the system is a cannula (designated 14 below), a small tube through which blood is drawn into the pump.  Attached to the cannula is the blood pump itself (12), which includes a rotor, and is housed within a protective shroud.  Extending from the back of the pump is a variable assembly (18), sometimes called a catheter, that can house the drive cable for the blood pump, purge fluid lines, and various guide mechanisms.



FIG. 1

('100 patent, fig.1).

### C.   Patents at Issue

The amended pleadings include declaratory judgment claims for six patents:  U.S. Patent

2

Nos. 7,022,100 ("the '100 patent"); 8,888,728 ("the '728 patent"); 9,327,068 ("the '068 patent"); 9,545,468 ("the '468 patent"); 9,561,314 ("the '314 patent); and 9,597,437 ("the '437 patent"). These patents belong to the same "patent family," in that they all stem from provisional application No. 60/152,249, filed September 3, 1999.  Each subsequent application is either a continuation or division of the previous one; no new material was added to the disclosure.  The specifications of the '100, '728, and '068 patents are identical, and the specifications of the '468, '314, and '437 patents are different only in that they explicitly incorporate as Appendices A and B certain material that was incorporated by reference in the other three patents—namely, two patent applications, also owned by Maquet, U.S. Patent App. Nos. 09/280,988 and 09/280,970.[1]

Broadly speaking, the patents are directed to "[a]n improved intravascular blood pump system . . . and related methods involving the broad inventive concept of equipping the intravascular blood pump . . . with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient." (*E.g.*, '100 patent, Abstract).  The patents explain that a "significant drawback" of prior-art intravascular blood pumps is that they were "difficult to guide into the appropriate position within the circulatory system of a patient" because "the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart." (*Id.*, col. 2 ll. 6-12).  The supplemental guide mechanisms then available had the disadvantage of taking up valuable extra space in the blood vessel and requiring a larger access wound than would otherwise be necessary. (*Id.*, col. 2 ll. 19-39).  The patents purport to improve the prior art by equipping the pump with integrated guide

---

[1] The '988 patent application was abandoned and never published (except as it appeared in the patents-at-issue here).  The '970 patent application issued as U.S. Patent No. 6,295,877 on October 2, 2001, but expired due to non-payment of maintenance fees on October 2, 2009.

3

mechanisms.  (*Id.*, col. 2 ll. 47-55).

The patents describe three particular examples of such "integrated" guide mechanisms as "broad aspects of the present invention."  The first is an "'over-the-wire' type guide mechanism," in which "a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient."  ('100 patent, col. 2 ll. 56-66).  A "lumen," in this context, is the central cavity of a tubular structure.  In the "over-the-wire" system, there is in effect a tube within a tube; the innermost tube contains a space (the lumen) through which the guide wire is inserted.  The intravascular blood pump is then advanced along the guide element.  (*Id.*, col. 2 l. 66-col. 3 l. 2).

The second broad aspect is a "'side-rigger' or 'rapid exchange' type guide mechanism," in which "a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient."  (*Id.*, col. 3 ll. 3-13).  As with the "over-the-wire" design, the pump and cannula are then advanced along the guide element. (*Id.*, col. 3 ll. 13-16).

The third broad aspect of the invention is an "intravascular blood pump system" including a "conduit assembly" with a "guide catheter" and a "pump assembly," such that the conduit assembly is "precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology." (*Id.*, col. 3 ll. 17-36).  "The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud."  (*Id.*, col. 3 ll. 36-39).

## II.   **Standard of Review**

The construction of claim terms is a question of law, which may in some cases rely on

4

underlying factual determinations.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.¸* 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### A.    The Words of the Claim

The claim-construction analysis normally begins with the claims themselves.[2]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude."

---

[2] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

5

*Phillips*, 415 F.3d at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."  *Phillips*, 415 F.3d at 1314.  For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another.  *Id.*  In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id.* at 1315.

### B.    The Specification

"The claims, of course, do not stand alone."  *Id.*  "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."  *Id.* (citations and quotation marks omitted).  For that reason, the specification must always be consulted to determine a claim's intended meaning.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention."  *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir.

6

2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316.  It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id.*  Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification.  *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim."  *Id.* at 1323.  A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect.").  "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Phillips*, 415 F.3d at 1323.  This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments."  *Id.*

7

Case 1:16-cv-10914-FDS   Document 241   Filed 09/07/18   Page 10 of 75

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

### C. **The Prosecution History**

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*  The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1316.  As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution.

8

*Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowel of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record."). Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

### D. Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance. *Id.* at 1318-19. Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion. *Id.* at 1319.

### III. Analysis

There are 18 groups of terms at issue in the patents, which are summarized in the following chart.

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construc-tion | Patent: claim(s) |
|---|---|---|---|
| "intravascular blood pump" | "a drive cable-mounted rotor and rotor housing (i.e., body and shroud), which collectively are capable of insertion into a patient's circulatory system" | Ordinary meaning | '100: 16, 17<br>'728: 1, 6, 8, 10, 15<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |
| "guide mechanism"  ('100: 16)<br><br>"elongate lumen sized to slideably receive a guide wire" ('468: 1, 22; '437: 1, 28; '314: 1, 20, 27)<br><br>"guide mechanism is configured as a second lumen . . . wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong" ('728: 1; '068: 1)<br><br>"a guide mechanism configured as an elongate lumen . . . a guide wire arranged to be advanced along the lumen" ('728: 10)<br><br>"guide mechanism configured as an elongate lumen and adapted to guide said intravascular blood pump . . . the method comprising: . . . advancing the blood pump system along the guide wire" ('068: 10)<br><br>"elongate lumen having a luminal interior . . . sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong . . . advancing the blood pump along the guide wire to the | The terms to the left should be construed to have the same meaning:  "lumen and guide wire not extending through the free space between the rotor blades" | Ordinary meaning | '100: 16<br>'728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

10

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| predetermined location" ('068: 20) | | | |
| "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" | "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter" | Ordinary meaning | '728: 10 '068: 10, 20 '314: 1, 20 |
| "an elongate lumen associated with the cannula" | "a permanent lumen formed along the side of the cannula" | Ordinary meaning | '468: 1, 22 '314: 27 '437: 1, 28 |
| "wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | "guide lumen integrally formed within the surface of the cannula" | Ordinary meaning | '728: 1 '068: 1 |
| "a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" | Means plus function: Claimed function—"guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient" Claimed structures—"(a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly" | Ordinary meaning | '100: 16 |
| "blood pressure detection | Means plus function: | Ordinary | '100: 16 |

11

Appx199

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Claimed function—"to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | meaning | |
| "pressure sensing element configured to sense pressure proximate the intravascular blood pump" | Claimed structures—"(a) a fluid filled column disposed within at least a portion of the cannula, (b) a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, (c) a strain gauge coupled to at least one of the intravascular blood pump and cannula, and (d) calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor" | | '468: 1<br>'314: 1 |
| "blade extending radially outward from the rotor hub"<br><br>"blade[s] extending radially from the rotor hub" | "blade[s] shaped as an extension of a radius of the rotor hub, not including helical, corkscrew or screw-shaped" | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |
| "a rotor having a rotor hub tapering in the distal direction" | Plain meaning, where patentee disclaimed a hub where any portion tapers in the proximal direction | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |
| "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" | "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '728: 1<br>'068: 1<br>'468: 1, 22<br>'314: 1, 20, 27 |
| "passing purge fluid through the purge lumen to the | "passing purge fluid to the blood pump where the purge | Ordinary meaning | '437: 1 |

12

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| intravascular blood pump"<br><br>"passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" | fluid does not go through the rotor bearings and into the bloodstream" | | '437: 28 |
| "first conduit . . . second conduit" | "a pair of conduits for introducing and returning purge fluid" | Ordinary meaning | '728: 8<br>'068: 9<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 10, 29 |
| "perfusing / perfusion [of a patient]" | "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient" | Ordinary meaning | '068: 1, 10, 20 |
| "[detect the pressure of the blood] proximate at least one of the intravascular blood pump and cannula" | "at the opening of the blood pump or the cannula" | Ordinary meaning | '100: 16 |
| "[detect the pressure of the blood / sense pressure] proximate the intravascular blood pump"<br><br>"[measuring pressure / calculating blood pressure] adjacent the intravascular blood pump" | "at the opening of the blood pump" | Ordinary meaning | '728: 6, 10<br>'068: 7, 10<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 8, 12 |
| "distal tip member" | "rod bonded to the end of the cannula" | Ordinary meaning where the "distal tip member" is not a guidewire | '314: 21<br>'437: 22 |
| "cannula coupled to a distal end of the intravascular blood pump" | Maquet disclaimed a cannula with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end of | Ordinary meaning | '468: 1, 22 |

13

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| | the cannula" | | |

The Court will address each term in turn.

### A.   Intravascular Blood Pump

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "intravascular blood pump" | "a drive cable-mounted rotor and rotor housing (i.e., body and shroud), which collectively are capable of insertion into a patient's circulatory system" | Ordinary meaning | '100: 16, 17<br>'728: 1, 6, 8, 10, 15<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

Abiomed argues that the term "intravascular blood pump" should be construed to be limited to "a drive cable-mounted rotor and rotor housing"—in other words, describing a device in which the motor is outside the human body and driven by a cable.[3]  In support of that interpretation, Abiomed contends that (1) all the embodiments described in the patent include a cable-mounted rotor coupled to a motor external to the patient's body; (2) the guide mechanisms described in the specifications indicate that they are specifically designed for pumps that use a rotating drive cable; (3) the patent does not meet the written-description requirement or enable one of skill in the art to make and use a blood pump without a rotating drive cable; and (4) Maquet has given up a broader scope by way of statements made before the PTO.  (Abiomed Opening Br. at 31).  Maquet acknowledges that the only commercial intravascular blood pump available at the time of the invention was the Hemopump, which was a cable-driven rotor pump.

---

[3] It appears that the pump in Abiomed's accused products is designed with a motor that is part of the apparatus inserted into the heart, and that therefore has no drive cable.

(Maquet Opening Br. at 7).  And it does not attempt to argue that its patents teach a person of ordinary skill in the art to make and use a blood pump that is not cable-driven.  Nevertheless, it contends that the description of a cable-driven pump in the specification is merely a preferred embodiment.

Claim terms are to be given their "ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  While a patentee may use the specification to redefine a term, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a work in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term.'" *Id.* (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).  Here, to limit the term "intravascular blood pump"—which, on its own, makes no reference to how the pump is driven—to cable-driven pumps, simply because the only examples in the specification are cable-driven pumps, would be inappropriate.  The specification explicitly recognizes that cable-driven pumps are just an example:  "Intravascular blood pumps comprise miniaturized blood pumps capable of being percutaneously or surgically introduced into the vascular system of a patient, typically to provide left and/or right heart support.  *One type* of intravascular pump is an axial flow blood pump comprising a cable-mounted rotor surrounded by a protective shroud."  ('437 patent col. 1 l. 65- col. 2 l. 3 (emphasis added)).

Abiomed argues that the claims should be limited to cable-driven pumps because the particular guide mechanisms disclosed are specifically designed for cable-driven pumps.  But although the specification repeatedly describes the guide mechanisms in terms of a cable-driven pump and explains how they could be integrated with such a pump, Abiomed has not shown that

15

the guide mechanisms of the invention actually require a cable-driven pump or even that they contain features that would be useless without such a pump.

Abiomed also contends that the specification repeatedly characterizes the "present invention" as a cable-driven pump, and that such a characterization should be limiting.  *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398-400 (Fed. Cir. 2008).  But the strongest statements in the specifications describing "the present invention" do not make any specific mention of cable-driven pumps.  The patents state:  "The present invention is directed at eliminating and/or reducing the effects of the foregoing drawbacks of prior art intravascular blood pumps" and "[t]he present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system."  ('437 patent, col. 2 ll. 57-67; *see also id.*, col. 8 ll. 50-64).  But the "drawbacks" discussed have to do with difficulty guiding the catheter, not any particular difficulty with the drive cable.  And the other statements to which Abiomed points are explicitly termed as "broad aspects" of the present invention, or manifestations or embodiments of those broad aspects.  (*See id.*, col. 9 ll. 13-31; *id.*, col. 13 l. 63-col. 14 l. 14; *id.*, col. 15 ll. 5-21; *see generally id.*, col. 3 l. 5-col. 4 l. 4).

Abiomed also points to two parts of the prosecution history.  In the notice of allowance for the '068 patent, the examiner stated:  "Sammler lacks several critical feature [sic] of the invention.  Sammler lacks both a first lumen arranged to deliver purge fluid, and a guide mechanism configured as an elongate lumen.  Significantly, Sammler relies on the motor-driven pump of Siess to move blood through vessels (Siess, Figs. 2, 3).  Since the motor of Siess occupies the entire cross-section of the lumen, no space remains for a lumen to pass a guide wire

16

or purge fluid."  (Abiomed Opening Markman Br. Ex. 8-B at MAQ_00005189).

That history is likewise not dispositive.  First, the statement of an examiner in the notice of reasons for allowance does not normally constitute clear and unmistakable disclaimer of scope by the patentee, unless it illuminates the meaning a person of ordinary skill in the art would ascribe to an argument made by the patentee.  *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005); *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) ("[T]here is no obligation to respond to an examiner's statement of Reasons for Allowance, and the statement of an examiner will not necessarily limit a claim . . . .").  Second, the fact that the motor-driven pump of Siess specifically is incompatible with a lumen that would permit the passage of a guide wire or purge fluid does not mean that every motor-driven pump is so incompatible.

During the IPR proceedings for the '468, '314, and '437 patents, Maquet included an annotated version of Figure 1 of the patents and described it as follows:

> Figure 1 illustrates an exemplary embodiment of the present invention, with guide wire (22) extending out the distal end of the cannula, along with various other features associated with this invention.  The above shows the intravascular blood pump, catheter, cannula, and guide mechanism located within the circulatory system.  This embodiment is designed to support the function of the left ventricle circulating blood.  Once inserted, intravascular pump (12) is located within the aorta (Ex. 1001, 9:13-16, Fig. 1).  Cannula (14) traverses the aortic valve, allowing blood to flow from the left ventricle to the pump and then into the aorta (*id.*, 9:28-32, Fig. 1).  Also, the above figure shows catheter (18), which moves the intravascular pump through the circulatory system, maintains the pump and cannula in the proper location, and allows for communication between pump features and devices located outside the body (*id.*, 9:58-10:17).

(Abiomed Opening Markman Br. Ex. 16 at 12-13; *see also id.* Ex. 18 at 11-12; *id.* Ex. 21 at 11-12; *id.* Ex. 22 at 11-12).  Abiomed contends that the statement that there are "pump features and devices located outside the body" means that Maquet "emphasized that the drive cable is an essential aspect of its claimed invention."  (Abiomed Opening Markman Br. at 36).  But Maquet

17

was merely describing Figure 1, which is only an embodiment of the invention, for the purposes of introducing the invention to the PTAB.  It did not distinguish any prior art on the basis of the motor being located outside the body, and did not purport to define the claimed invention.  It is no more limiting or a disclaimer than the appearance of figure 1 in the patents themselves.

Whether the claims are enabled or supported by adequate written description are not issues before the Court at this time.  Nonetheless, the question is worth addressing, because the treatment of this concept is not intuitive.

As to enablement, Abiomed argues that the claims must be limited to cable-driven pumps because the specification does not enable or describe other types of pumps.  But that is not strictly correct.  "Whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed . . . ." *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371 (Fed. Cir. 1999); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323 (Fed. Cir. 2009).  "If the original inventor has at that time enabled the use of an entire class of products, a claim covering that entire class is warranted.  But if the class subsequently expands to include other species not conceived at the time of the first patent, the generic claim language will allow the first inventor to capture those new species within the scope of his claim."  Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law*, 75 TEX. L. REV. 989, 1009 (1997); *see CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1340 (Fed. Cir. 2003) ("Improvement and selection inventions are ubiquitous in patent law; such developments do not cast doubt on enablement of the original invention.").  Thus, for example, an inventor of an improved windshield wiper may claim a car equipped with those improved wipers even if cars are already in the prior art, and that claim may cover a car with an improved engine that did not exist at the time of patenting as long as the car also includes the wipers of the

18

patented invention.  *See Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339-41 (Fed. Cir. 2003) (discussing *In re Hogan*¸ 559 F.2d 595 (C.C.P.A. 1977), in depth).

Thus, Maquet may well have a valid patent on guide mechanisms attached broadly to all "intravascular blood pumps" that was fully enabled at the time of patenting.  Abiomed may well have significantly improved intravascular blood pumps, but Maquet would not be required to have enabled blood pumps not existing at the time of its application.

The written-description requirement is a separate issue.  In *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc), the Federal Circuit expressly held that the written-description requirement is separate from the enablement requirement, and that a patentee may enable his invention while simultaneously failing to describe it.  *Id.* at 1344-45.  It is not clear how that doctrine interacts with the newly-discovered-species doctrine of *In re Hogan.  See Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) (explaining genus-species written description); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247 (Fed. Cir. 2004) (discussing enablement, written description, and new matter in the context of priority to earlier applications); *see also Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1365-66 (Fed. Cir. 2010) (en banc) (Rader, J., dissenting in part and concurring in part) (explaining the effect of having a written-description requirement separate from enablement on genus-species improvement patents).

The Court need not resolve the issue at this stage.  For now, it is sufficient to note that Maquet has taken the position that its claim is broad enough to encompass intravascular blood pumps that include cable-driven blood pumps and other types of pumps.  It may later have to defend that scope against a challenge under § 112.  *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) ("[A] patentee chooses broad claim language

19

at the peril of losing any claim that cannot be enabled across its full scope of coverage.").  But that issue will be resolved when and if it is raised.

Accordingly, the term "intravascular blood pump" will be given its ordinary meaning.

B.      **Guide Mechanism Terms**

1.      **Lumens Generally**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "guide mechanism" ('100: 16)<br><br>"elongate lumen sized to slideably receive a guide wire" ('468: 1, 22; '437: 1, 28; '314: 1, 20, 27)<br><br>"guide mechanism is configured as a second lumen . . . wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong" ('728: 1; '068: 1)<br><br>"a guide mechanism configured as an elongate lumen . . . a guide wire arranged to be advanced along the lumen" ('728: 10)<br><br>"guide mechanism configured as an elongate lumen and adapted to guide said intravascular blood pump . . . the method comprising: . . . advancing the blood pump system along the guide wire" ('068: 10)<br><br>"elongate lumen having a luminal interior . . . sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong . . . advancing the blood pump along the guide wire to the predetermined location" ('068: 20) | The terms to the left should be construed to have the same meaning: "lumen and guide wire not extending through the free space between the rotor blades" | Ordinary meaning | '100: 16<br>'728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

Abiomed identifies six separate terms that appear in all six patents-in-suit that generally

20

refer to a guide mechanism made from an elongate lumen and a guide wire (although not all the grouped terms refer to all three of those components). It contends that the guide mechanism/lumen in those claims must not run through the free space between the rotor blades of the pump. Maquet contends that those terms need no construction.

Abiomed's primary argument is that during prosecution Maquet disclaimed any scope that would include guide mechanisms running through the rotor blades. It points to various statements in the prosecution history of Application No. 12/772,810, which later issued as the '728 patent.

First, at an interview with the examiner on February 28, 2014, Maquet distinguished its invention from a combination of two prior-art references, Bedingham and Gordon, as follows:

> Applicant clarified the nature of the invention, noting that the rotors require a space to rotate within the shroud while pumping blood. Applicant noted that Gordon is a catheter, not a blood pump, and therefore does not require an open lumen for a rotor. [I]f Bedingham were modified with guidewire lumen 46 of Gordon, it would occupy space within the shroud and obstruct impeller 56 of Bedingham. Examiner acknowledged that this combination would destroy the teachings of Bedingham.

(Abiomed Opening Markman Br. Ex. 7-H at MAQ_00004714).

Second, it points to an amendment to the '810 application dated March 27, 2014, in which Maquet stated:

> Bedingham does not include simply an open lumen akin to the Gordon catheter. As a result, Bedingham teaches guiding the blood pump into a location by threading a guide wire in through one of a plurality of outlets of the blood pump, through the space between the blades, and out through one of the plurality of inlet [sic] of the blood pump. Modifying the Bedingham device with the structure of the lumen 46 of Gordon would thus result in the lumen 46 and its sidewall being located in the open space between the blades of the blood pump of Bedingham. If such a lumen were so arranged, the blades of the motor would hit the wall of the lumen and be unable to rotate, thereby preventing the blood pump from operating.

> Accordingly, one of ordinary skill in the art both could not and would not combine Bedingham, Nix, and Gordon.

21

(Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004726).

The Examiner relied on that distinction to find the claims patentable over three possible prior-art grounds:  (1) Bedingham in view of Gordon or Nix, (2) Bedingham in view of Nix and Masch, and (3) Völker.  (Abiomed Opening Markman Br. Exs. 7-J & 7-K ("Additionally, Völker does not provide a separate second lumen for the guide mechanism.  Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning.")).

Abiomed lumps the term "guide mechanism," as used in claim 16 of the '100 patent, together with claim terms from the other patents that refer specifically to "lumens."  But Abiomed also contends that the larger phrase, "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient," as it appears in claim 16 of the '100 patent, should be construed as a means-plus-function term.  The prosecution history on which Abiomed relies in this section refers specifically to lumens and does not readily apply to so generic a term as "guide mechanism."  The Court will therefore address the term "guide mechanism," as used in claim 16 of the '100 patent, below with the other terms alleged to be means-plus-function claims.

As to the other five terms, the Court concludes that Maquet's statements during prosecution indeed serve to disclaim the scope of the patent.  Maquet made clear, unequivocal statements that a person of ordinary skill in the art would not combine the prior-art references suggested by the examiner, because the combination would result in a guidewire lumen running through the open space between the blades of the pump and would prevent those blades from turning.

Although that disclaimer appears in the prosecution of the '810 application, which became the '728 patent, it applies with equal force to the later-issued patents.  The '068, '468,

'314, and '437 patents all issued from applications that were descendants of the '810 application.

Moreover, each descendant was either a continuation or division of the previous application,

such that the specifications are identical and no new matter was ever introduced that might widen

the scope of the meaning of the claim terms when read in light of the specification.  It is

generally true that a statement disclaiming claim scope is directed at the particular claims at issue

during the prosecution in which the statement is made.  However, the Federal Circuit has

expanded the effect of disclaimers to claims of other patents in the same family when the

statement unambiguously reflects the patentee's own understanding of the scope of its invention.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement

made during prosecution of related patents may be properly considered in construing a term

common to those patents, regardless of whether the statement pre- or post-dates the issuance of

the particular patent at issue."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295,

1306-07 (Fed. Cir. 2007); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 537 F.3d 1340, 1349-50 (Fed.

Cir. 2004) ("[T]he prosecution history of one patent is relevant to an understanding of the scope

of a common term in a second patent stemming from the same parent application."); *see also Trs.*

*of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) ("We have

previously held that where multiple patents 'derive from the same parent application and share

many common terms, we must interpret the claims consistently across all asserted patents.'"

(quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005))).

Such is the case here.  There is nothing in the claims of the later-issued patents to suggest

that Maquet intended to claim what it admitted to be inoperable devices, in which the lumen for

the guidewire extended through the free space between the rotor blades.  *See Stryker Corp. v.*

*Zimmer, Inc.*, 837 F.3d 1268, 1274 (Fed. Cir. 2016) (explaining that applying a disclaimer made

23

during prosecution of one patent to a related patent is not appropriate when the "purported disclaimers are directed to specific claims terms that have been omitted or materially altered in subsequent applications" (quoting *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007))).  Indeed, the examiner of the application that later issued as the '468 patent allowed those claims over Bedingham for the same reason:  "Bedingham also lacks an elongate lumen sized to slidably receive a guide wire.  At most, Bedingham calls for a guide wire that does not pass through a separate lumen, but instead passes through existing openings of the rotor and pump."  (Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009242).

Maquet argues that the examiner's unilateral statements about Völker as to the '728 patent and Bedingham as to the '468 patent do not amount to a disclaimer.  *See Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).  But they need not be—Maquet had already explicitly disclaimed embodiments in which the guidewire lumen extends through the free space between the rotor blades.  The examiners' later statements merely tend to show that one of ordinary skill in the art, reading the prosecution history in this patent family, would view the claims of the '728 and '468 patents as excluding the inoperable embodiments that would result from applying the teachings of the prior-art references cited.  *Id.* at 1346 ("[T]he Examiner's Statement of Reasons for Allowance may help show that the applicant's own arguments during prosecution constitute a clear disavowal of claim scope.").  Furthermore, Maquet appears to have approved of the examiner's treatment of Völker as of the IPR proceedings of the '728 and '068 patents.  (Abiomed Opening Markman Br. Ex. 12 at 63 (stating in its preliminary patent owner's response that "the Examiner explicitly considered and found the claims [of the '728 patent] patentable over . . . Voelker" and that "the Board should defer to Primary Examiner Kidwell's considered judgment and deny the petition"); Abiomed Opening

Markman Br. Ex. 13 at 64 (same)).

Maquet further contends that at most it disclaimed a *permanent* guide lumen that extended between the free space of the blades, not the use of a temporary one. (Maquet Reply Br. at 21-22). But that is not a fair reading of the patent or the disclaimer. While certain parts of the specification suggest that the guidewire can be removed prior to operation, ('437 patent, col. 12 l. 59-col. 13 l.2; *id.*, col. 14 ll. 44-49), nothing suggests that the guidewire lumen itself is removable. Moreover, the patent's whole purpose is to "provid[e] an improved intravascular blood pump equipped with *integrated* features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system." (*Id.*, col. 2 ll. 64-67 (emphasis added)). Maquet criticized the proposed combination of prior art because "the structure of the lumen . . . of Gordon would thus result in the lumen . . . and its sidewall being located in the open space between the blades of the blood pump of Bedingham." (Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004726). There is nothing about the examiner's proposed combination to suggest that he was rejecting the claims only as they applied to "permanent" lumens, and a person of ordinary skill in the art would not read the exchange that way. Maquet's attempt to narrow its disclaimer is therefore unpersuasive.

Accordingly, the term "guide mechanism" as it appears in claim 16 of the '100 patent will be construed below. The other five terms identified in this group will be construed to include the limitation that the guidewire lumen does not extend through the free space between the rotor blades.

### 2.   <u>Lumen Arranged Coaxially with the Cannula</u>

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construc-tion | Patent: claim(s) |
|---|---|---|---|

| "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" | "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter" | Ordinary meaning | '728: 10<br>'068: 10, 20<br>'314: 1, 20 |
|---|---|---|---|

Abiomed contends that this term must be construed to require that the guidewire lumen pass coaxially through (1) the cannula (as to the '728 and '068 patents) or a portion of the cannula (as to the '314 patent) and (2) the catheter. Maquet contends that the lumen need not pass through either the cannula or the catheter. Although the parties group these claims for construction, they are in fact different and worth reciting separately and in context.

As it appears in claim 10 of the '728 patent, the term is as follows: "wherein the lumen is arranged coaxially with at least one of a distal end or a proximal end of the cannula, and the cannula and the lumen are arranged in series longitudinally." ('728 patent, col. 19 ll. 53-56).

Claims 10 and 20 of the '068 patent state as follows: "wherein the elongate lumen (a) is sized substantially smaller than an inner diameter of the cannula and intravascular blood pump; (b) is arranged coaxially with at least one of a distal end or a proximal end of the cannula, and (c) is arranged in series longitudinally with the cannula," ('068 patent, col. 19 ll. 56-61), and "the elongate lumen (a) having a luminal interior sized smaller than an inside diameter of the cannula and sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong, (b) arranged coaxially with respect to at least one of a distal end or a proximal end of the cannula, and (c) arranged in series longitudinally with the cannula," (*id.*, col. 20 ll. 49-55).

Claims 1 and 20 of the '314 patent identically read: "an elongate lumen arranged coaxially with at least a portion of the cannula and in series longitudinally with the cannula, and an end of the elongate lumen is adjacent an end of the cannula, the elongate lumen sized to slidably receive the guide wire and having a diameter sized smaller than a diameter of the cannula lumen." ('314 patent, col. 34 ll. 15-21; *id.*, col. 36 ll. 5-11).

26

Therefore, as to the '728 and '068 patents, the claim language requires that the lumen be arranged coaxially with at least a one of a distal end or a proximal end of the cannula, and, as to the '314 patent, it must be arranged coaxially with at least a portion of the cannula.  Every claim requires the lumen to be arranged "in series longitudinally" with the cannula.

During the prosecution of the '728 patent, Maquet attempted to add dependent claim 30, which included the phrase "the guide wire passing through the elongate lumen in the cannula but not extending through the catheter."  (Abiomed Opening Markman Br. Ex. 7-G at MAQ_00004679).  The examiner rejected that claim for failing to comply with the enablement requirement of 35 U.S.C. § 112.  He explained:

> Parent claim 29 has been amended to describe a guide mechanism having a lumen arranged coaxially with the cannula.  This describes the embodiment of Figs. 1-5 (¶ [0069], "over-the-wire" guide mechanism 16).  The claimed embodiment has a guide lumen that extends through the catheter.  Another embodiment describes a guide mechanism that does not extend through the catheter (¶ [0073], Figs 6-9, "side-rigger" guide mechanism 122).  However, no single embodiment or combination of embodiments discloses a coaxial guide lumen that passes through an elongate lumen in the cannula and does not extend through the catheter.

(*Id.* at MAQ_00004679-80).  In response to this rejection, Maquet simply cancelled claim 30.  (Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004723).

As to passing through the catheter, Maquet has clearly disclaimed devices in which a lumen coaxial with the cannula passes through the cannula but not the catheter.  "[A] patent applicant cannot later obtain scope that was requested during prosecution, rejected by the Examiner, and then withdrawn by the applicant."  *UCB, Inc. v. Yeda Research & Dev. Co.*, 837 F.3d 1256, 1260-61 (Fed. Cir. 2016).  That is exactly what happened here:  Maquet requested a claim that would cover a lumen coaxial with the cannula that passes through the cannula but not the catheter; the examiner rejected it as not enabled; and then Maquet withdrew the claim.  It may not now argue that the claims remaining in the patent cover such lumens.

27

Maquet contends that any disclaimer in the prosecution of the '728 patent should not apply to the '068 and '314 patents, which are different in scope from (unasserted) claim 10 of the '728 patent.  While the claims of the '068 and '314 patent are certainly different in scope in that they contain different and additional limitations, they are not significantly different in scope as to the limitation at issue here.  The reason the examiner balked at the addition of claim 30 is that it was not *enabled* by the specification, because the specification did not adequately describe an embodiment in which (1) the lumen was coaxial with the cannula and (2) the lumen did not extend through the catheter.  Claims 10 and 20 of the '068 patent and claims 1 and 20 of the '314 patent also recite a lumen that is coaxial with the cannula, and the specification is identical.  Therefore, the examiner's objection and Maquet's disclaimer should apply with equal force to the later patents.

The closer question is whether the lumen that is "coaxial" with the cannula must "pass through" the cannula.  Maquet contends that it need not, arguing that "a POSA would understand that lumen and cannula elements may share a common axis without physically intersecting one another" because "(a) the lumen at issue is capable of extending through structures other than the cannula, such as the blood pump, drive cable assembly, purge fluid delivery system, and motor coupler" and "(b) neither the lumen nor the cannula is necessarily straight from end to end, and in fact specific embodiments containing non-linear lumens and cannulas are provided."  (Maquet Opening Markman Br. at 37).

The Court fails to see how the fact that the cannula may be non-linear would make a person of ordinary skill in the art understand that the lumen and cannula may be coaxial without intersecting.  Surely that fact works against Maquet, as the benefit of describing the lumen as coaxial with the cannula in a non-linear configuration is that it neatly explains that the lumen

28

takes the shape of the cannula by following the curve of the cannula's axis.  And while (in a

linear configuration), one could describe a lumen that passes through the blood pump and drive-

cable assembly but not the cannula as "coaxial" with the cannula, Maquet does not explain how a

device so configured could possibly function as a guide mechanism.  There is certainly no such

embodiment described in the specification or the claims—all of the figures describing a lumen

coaxial with the cannula also show the lumen passing through the cannula.  ('728 patent, figs.1-

5).  Indeed, some of the claims require that the lumen be sized substantially smaller than the

cannula, and that the guidewire be slidably advanced through the lumen.  Those requirements

make no sense if the lumen is not to go through the cannula, or is to abruptly terminate before

reaching the cannula.  Added to that, the examiner—the closest thing to a person of ordinary skill

in the art to express an opinion, as neither party has presented expert evidence at this stage—

clearly viewed the claims in which the lumen was coaxial with the cannula as claiming the

"over-the-wire" embodiment of the invention, in which the lumen passes through the cannula.

*See Salazar*, 414 F.3d at 1347 ("Statements about a claim term made by an examiner during

prosecution of an application may be evidence of how one of skill in the art understood the term

at the time the application was filed.").

Maquet is correct that nothing in the claims or specification explicitly requires that the

lumen coaxial with the cannula pass through the cannula, and generally it is inappropriate to read

particular embodiments as limitations on the claims.  But claims must be read in light of the

specification, and it is equally inappropriate to pluck the claims out of context.  *Eon Corp. IP*

*Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320-21 (Fed. Cir. 2016); *Trs. of Columbia*

*Univ. v. Symantec Corp*, 811 F.3d 1359, 1364 (Fed. Cir. 2016); *Nystrom v. TREX Co.*, 424 F.3d

1136, 1142-45 (Fed. Cir. 2005) ("Nystrom is not entitled to a claim construction divorced from

the context of the written description and prosecution history . . . .  What *Phillips* counsels is that in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public—i.e., those of ordinary skill in the art—that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.").  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Here, not only are there no examples in the specification of a coaxial guide lumen that does not pass through the cannula, but the Court cannot see—and Maquet appears unable to explain—how such a device would function.  Thus, in the context of this specification, the claims cannot reasonably be read to cover a device whose lumen does not pass through at least a portion of the cannula.

Therefore, the term "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" will be construed to mean "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter."

### 3.    Elongate Lumen Associated with the Cannula

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "an elongate lumen associated with the cannula" | "a permanent lumen formed along the side of the cannula" | Ordinary meaning | '468: 1, 22 '314: 27 '437: 1, 28 |

Abiomed contends that the term "an elongate lumen associated with the cannula" should

30

be construed to mean "a permanent lumen formed along the side of the cannula."  Maquet
contends that the term should be given its ordinary meaning.

Abiomed contends that every claim that discusses an "elongate lumen associated with the
cannula" must be claiming a "side-rigger" design, and that therefore the elongate lumen must be
"a permanent lumen formed along the side of the cannula."  Its chain of reasoning is as follows:
(1) every elongate-lumen claim contains language that the elongate lumen does not extend
through the rotor hub, that the elongate lumen must "slidably receive the guide wire," and that
the guide wire does not pass through the rotor hub or the catheter; (2) Maquet acquiesced in the
examiner's determination that a "guide wire not passing through the catheter" is inconsistent
with an over-the-wire design, but is part of the side-rigger design; and (3) the specification
repeatedly and consistently describes the "side-rigger" design as having a "side lumen . . .
formed along a length of at least one of the intravascular blood pump and cannula."  ('437
patent, col. 3 ll. 26-29; *see id.*, col. 14 ll.15-21 ("In an important aspect of the present invention,
the 'rapid exchange' or 'side-rigger' guide mechanism 122 includes a guide carriage 124 formed
along at least a portion of the cannula . . . ."); *id.*, col. 14 ll. 39-44 ("[T]he guide carriage 124
may be formed along the interior surface of the cannula 14."); *id.*, col. 14 l. 63-col. 15 l.4
("[B]ecause the guide mechanism 122 is disposed along the side of the cannula 14, there is no
need to form a central lumen extending through the blood pump 12 . . . .")).

If that were the only evidence, it would not be sufficient to support the construction
proposed by Abiomed.  By cancelling "over-the-wire" claims in which the guide wire does not
pass through the catheter, Maquet was at most agreeing that such claims were not enabled; it was
not necessarily declaring that all claims in which the guidewire does not pass through the
catheter are side-rigger claims.  And the portions of the specification Abiomed points to as

31

describing the elongate lumen as "formed along" the side of the cannula are "preferred embodiments" and do not explicitly define even the "side-rigger" aspect of the invention, much less the invention as a whole.  Nonetheless, there is substantial evidence that during the IPR proceedings Maquet disclaimed certain interpretations, and that a narrower construction is accordingly required.

In IPR petitions to the Patent Office, Abiomed cited to Jegaden as part of certain obviousness combinations.[4]  Jegaden describes passing a guide catheter through a hole in the cannula and passing the guide wire through the catheter.  (Maquet Opening Br. Ex. 21 at 61).



The guidewire, then the catheter, then the cannula are successively advanced into the heart. Once the cannula is in place, the guidewire and catheter are removed.  (*Id.* Ex. 21 at 61-63). During the IPRs of the '468, '314, and '437 patents, Maquet took the position that "Jegaden does not teach or suggest a *permanent* lumen at the distal end of the cannula," and therefore it "fail[s] to teach or suggest the claimed 'elongate lumen.'"  (Abiomed Opening Markman Br. Ex. 15 at 48 (emphasis added); *id.* Ex. 19 at 47; Patent Owner's Preliminary Response at 44, IPR2017-

---

[4] O. Jegaden, *Clinical Results of Hemopump Support in Surgical Cases*, *in* TEMPORARY CARDIAC ASSIST WITH AN AXIAL PUMP SYSTEM 61 (W. Flameng ed., 1991).  (Maquet Opening Markman Br. Ex. 21).

01207 (PTAB Aug. 8, 2017)).  That is a clear and unmistakable statement that the "elongate lumen" must be permanent.

During the IPR proceedings, Maquet also distinguished its "elongate lumen" claims from Jegaden by explaining that "Jegaden provides a separate device—a catheter with a guide wire—to guide an unmodified device into a patient.  If anything, this teaches away from the modification Petitioners propose.  Jegaden teaches that instead of modifying the cannula to accommodate a side lumen, a separate catheter should be used."  (Abiomed Opening Markman Br. Ex. 15 at 47; *id.* Ex. 19 at 46-47; *see* Patent Owner's Preliminary Response at 43, IPR2017-01207 (PTAB Aug. 8, 2017)).  By saying that the "elongate lumen" claims are not satisfied unless the cannula is modified to accommodate a side lumen, Maquet has clearly and unmistakably (1) associated the "elongate lumen" claims with the side-rigger design and (2) explained that, in its view, the cannula itself must be modified to support the side lumen. That concession effectively disclaims an embodiment where the "elongate lumen" merely runs through the cannula.

Abiomed concedes that the words "associated with"—and its proposed construction, "formed along"—include "lumens formed along the side of a cannula, [and] lumens formed within a guide carriage that is formed as an extension of either the interior or exterior surface of a cannula."  (Maquet Opening Markman Br. at 38-39; Abiomed Reply at 25).  It is hard to tell exactly what lumen positions Maquet intends to encompass with its ordinary-meaning construction, but once "elongate lumens" that merely run through the cannula are eliminated, then there appears to be no difference between lumens "associated with" versus "formed along"

33

the cannula.[5]

Accordingly, considering the claims, specification, and prosecution history as a whole, the term "an elongate lumen associated with the cannula" will be construed to mean "a permanent elongate lumen formed along the side of the cannula."

### 4. "Delimited by the Outer Cannula Surface"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | "guide lumen integrally formed within the surface of the cannula" | Ordinary meaning | '728: 1<br>'068: 1 |

The next disputed term is best understood in connection with the phrase that immediately precedes it. In both the '728 and the '068 patents, the relevant portion of the claim reads:

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

. . .

a guide mechanism configured as a second lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within the circulatory system of a patient;

*wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface*, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

('728 patent, col. 18 ll. 43-59 (emphasis added); '068 patent, col. 18 ll. 48-62 (emphasis added)).

---

[5] Even Maquet's dictionary definitions appear to suggest, in the context of a description of the physical arrangement of components, a physical connection. "'Associated' is defined as: 'to join together; connect; combine' (as a verb); 'accompanying; connected' (as an adjective). (Maquet Opening Markman Br. at 38)."

34

Abiomed contends that those claims are directed to a subset of the "side-rigger" designs, and that the italicized portion should be construed to mean a "guide lumen integrally formed within the surface of the cannula." Maquet contends that there is no reason to believe that the claims are limited to "side-rigger" designs, and therefore the term should be given its ordinary meaning.

Abiomed's argument focuses on the prosecution history for this claim term, which was amended twice. It first appeared in the application that later issued as the '728 patent in claim 15 as the following: "wherein said guide mechanism is configured to accept a guide wire for passage through a side lumen formed in said distal portion of said intravascular blood pump system." (Abiomed Opening Markman Br. Ex. 7-A at MAQ_00004467-68). Maquet did not point to any particular part of the specification as support for this claim—it asserted only that "[n]o new matter has been added." (*Id.* Ex. 7-A at MAQ_00004470). The examiner rejected the claim by citing Bagaoisan (U.S. Patent No. 6,849,068), which shows a side lumen for a guide wire attached to the outside of the cannula:



*FIG. 7A*

(*See* Abiomed Opening Markman Br. Ex. 7-B at MAQ_00004568).

Maquet responded by amending the claim as follows: "wherein said guide mechanism is positioned along a length of the cannula and interior to a region delimited by the outer cannula surface, wherein the guide mechanism is configured to ~~accept~~ allow for a guide wire to slideably

35

advance therealong ~~for passage through a side lumen formed in said distal portion of said~~ ~~intravascular blood pump system~~." (*Id.* Ex. 7-B at MAQ_00004564).  It explained: "Claim 15 as amended recites among other things, 'a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length', 'a guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within the circulatory system of a patient,' and 'wherein said guide mechanism is positioned along the length of the cannula *and interior to a region delimited by the outer cannula surface*.'  Applicants respectfully submit that neither Summers et al., nor Bagaoisan et al., individually or in any proper combination disclose, teach or suggest the amended claim." (*Id.* Ex. 7-B at MAQ_00004568).  Maquet did not identify any support for the amendment to claim 15 in its remarks.  (*Id.* Ex. 7-B at MAQ_00004567).

Maquet had claimed priority to its 1999 provisional filing.  The examiner stated that the support for the amendment came from Figure 9 of the pending application, which did not appear in the 1999 provisional filing, but first appeared in the PCT utility application that eventually issued as the '100 patent in the United States.  (Abiomed Opening Markman Br. Ex. 7-C at MAQ_00004580 ("Claim 15 has been amended to call for a guide mechanism described in the specification (¶ [0074], Fig. 9, guide carriage 124 formed along the interior surface of the cannula 14.")).

36



*FIG 9*

The examiner therefore rejected the 1999 priority date and afforded amended claim 15 (and other claims dependent from it) a priority date of September 1, 2000.  (*Id.* Ex. 7-C at MAQ_00004580).  He also rejected claim 15 again, this time citing Gordon (U.S. Patent No. 5,938,645), which showed a guide lumen interior to the cannula surface:



*FIG. 5(c)*

(*Id.* Ex. 7-C at MAQ_00004584).

Maquet did not make any argument to distinguish Gordon's guide lumen from the claimed guide mechanism—instead, it distinguished Gordon by citing to other claim amendments (relating to the rotor blades).  (Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004625-26).  Nevertheless, it did amend the term at issue here to its final form without comment:  a guide mechanism "wherein <u>an axis coaxial with and extending through a portion of</u> said guide mechanism <s>positioned along a length of the cannula and</s> <u>extends through</u> a region

37

delimited by the outer cannula surface, <u>and</u> wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong." (*Id.* Ex. 7-D at MAQ_00004616).

In the next office action, the examiner again cited to Figure 9 in connection with this claim limitation, explaining that "[c]laim 15 has been amended to describe the 'side-rigger' or 'rapid-exchange' guide mechanism described in the specification (¶ [0074], Fig. 9, guide carriage 124 formed along the interior surface of the cannula 14)." (Abiomed Opening Markmant Br. Ex. 7-E at MAQ_00004633). The examiner again refused to grant priority to 1999 because that material was not included in the provisional filing. (*Id.*). Maquet did not contest the priority determination.

Maquet contends that the term should be given its ordinary meaning. However, of all the terms presented to the Court for construction, this is the most ambiguous on its face. The Court is not certain what the ordinary meaning of the term would be, and Maquet has taken shifting positions as to what it covers.

According to Maquet's opening brief, "a person of ordinary skill would understand the 'region delimited by the outer cannula surface' to encompass the entire cannula, and such person would likewise be capable of determining whether 'an axis coaxial with and extending through' some portion of a guide mechanism extends through, or intersects, such region." (Maquet Opening Markman Br. at 40). By this it appears that Maquet is arguing that the guide mechanism may be anywhere "interior to a region delimited by the outer cannula surface," and that the claim would cover any device where the axis of the guide mechanism even "intersects" the region delimited by the outer surface of the cannula—even if the axis of the cannula and the axis of the guide mechanism are perpendicular to each other. That understanding is clearly too broad. Among other things, nothing in the specification supports a guide mechanism

perpendicular to the cannula and, if such a design would even be operable, it would work in a completely different way from the examples described in the specification.

But then in its reply, Maquet argues that "neither [Bagaoisan nor Gordon] discloses that a portion of the guide mechanism shares an axis with a region delimited by the outer cannula surface.  Instead, these figures only show guide mechanism axes that are off-set from the cannula axis.  Thus, neither reference discloses the claimed limitation under Maquet's ordinary meaning construction."  (Maquet Reply at 30).  By this, Maquet seems to change course, and suggest that the guide mechanism axis must be coaxial with the cannula axis.  But that understanding is not consistent with the Court's parsing of the claim language—it is not the axis of the cannula that must be coaxial with the axis of the guide mechanism (like an over-the-wire design).  It is that *an* axis coaxial with a portion of *the guide mechanism* (that is, the axis of the guide mechanism) must extend through a region delimited by the outer cannula surface (any region, according to Maquet's opening position).  There is nothing to suggest that the "guide mechanism . . . configured as a second lumen" must be coaxial with the cannula.

Abiomed contends that the back-and-forth of the prosecution history shows that both the examiner and Maquet intended, with this limitation, to describe the kinds of guide mechanisms described in Figures 8 and 9 of the patents, where the guide lumen is "integrally formed within the surface of the cannula."  The first and second iterations of the claim refer respectively to a "side lumen" and a mechanism "positioned along a length of the cannula and interior to a region delimited by the outer cannula surface," which strongly suggest that Maquet set out to claim "side-rigger" type designs.  The examiner clearly thought so, as he rejected the claims with reference to two prior-art references describing side lumens—Bagaoisan, with its lumen attached outside the cannula, and Gordon, with its lumen formed along the inside of the cannula—and

cited to Figure 9 of the application, showing a side lumen formed within the cannula wall, as the support for the claim.  And, at least with the first amendment, Maquet did not appear to change the side-lumen character of the claim—it just moved the side lumen to the inside of the cannula.

The second amendment is more ambiguous.  Nothing about the new text appears to require that the guide mechanism run along or within the side of the cannula.  Yet the examiner appeared to think that there was no significant change—he continued to cite Figure 9 as the support for the claim, and even explicitly stated that "[c]laim 15 has been amended to describe the 'side rigger' or 'rapid exchange' guide mechanism."  (Abiomed Opening Markman Br. Ex. 7-E at MAQ_00004633).

Abiomed argues that Maquet adopted the examiner's view by failing to contest the examiner's determination that it did not deserve priority going back to the 1999 provisional application.  But it appears that the 1999 provisional application covered only the "third broad aspect" of the final invention—the guidable conduit assembly into which the pump assembly can be docked.  (*See* U.S. App. No. 60/152,249 (filed Sept. 3, 1999)).  Neither party argues that the claim limitation at issue is directed to that embodiment of the invention, as to which the precise position of any guidewire lumen is never described.  (*See id.* at 7 ("[T]he task of positioning the conduit assembly 14 within the patient may be advantageously facilitated through the use of any number of well known guidance mechanisms, including but not limited to guide wires, balloon catheters, imaging wires, guide catheters, and/or techniques involving ultra-sound or fluoroscopy."); *id.* at 9; *id.* at 12 ("Moreover, it is contemplated to provide guide structures to the intravascular pump of the present invention.  For example, lumens may be provided within such structures as to the pump body 30, the cable drive sheath 46, the catheter section 20 of the conduit assemble 14, etc . . . in order to receive wires for fashioning certain guidance

40

characteristics, as well for receiving expandable balloon structures for venous applications.");
*see also* '728 patent, col. 13 ll. 19-35).  Therefore, even if a failure to contest a priority
determination can sometimes amount to acquiescence in the examiner's description of what the
terms cover, it appears that Maquet would have nothing to gain by protesting the determination
here.  Even if it intended to claim more than "side-rigger"-type devices, there was no disclosure
in the provisional application to support any particular guide lumen location in relation to the
cannula.

Nevertheless—and given the ambiguity of the term and Maquet's inability to articulate a
coherent theory of what it believes the claim terms should cover—the examiner's interpretation
of the amendment to claim a "side-rigger"-type design such as that shown in Figure 9 deserves
considerable weight, at least as representative of how one of ordinary skill in the art would
interpret the claims.  *Salazar*, 414 F.3d at 1347.  However, Maquet specifically amended the
claims to eliminate a reference to the guide mechanism running "along" the cannula in favor of
guide mechanisms "extend[ing] through a region delimited by the outer cannula surface," and
presumably the second-amended claim cannot have an identical scope to the first-amended
claim, regardless of whether the examiner found them to be supported by the same figure of the
application.

The Court accordingly concludes that the meaning of "wherein an axis coaxial with and
extending through a portion of said guide mechanism extends through a region delimited by the
outer cannula surface," considered in light of the claims, the specification, and the prosecution
history, is as follows:  the axis of at least a portion of the guide mechanism, "configured as a
second lumen," must run through a region delimited by the outer cannula surface.  That
construction includes configurations such as those depicted in Figures 8 and 9 of the '728 and

41

'068 patents,[6] and configurations such as those depicted in Gordon (which the Court sees no reason to distinguish from Figure 9).  It also includes configurations where the second lumen is coaxial with the cannula, such as "over-the-wire"-type designs.[7]  It does not, however, include configurations such as those depicted in Bagaoisan.  The second lumen must be a separate structural element from the cannula itself, as the terms are listed separately.  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254-55 (Fed. Cir. 2010).

## C.      Means-Plus-Function Terms

There are three terms that Abiomed contends should be construed as means-plus-function terms.  Maquet contends these terms should be given their plain and ordinary meaning.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts

---

[6] Abiomed concedes that configurations such as that depicted in Figure 8 of the '728 and '068 patents are included in its proposed construction, even though the outer cannula surface protrudes more than it ordinarily would due to the guide lumen disposed in the cannula wall.  (Abiomed Opening Markman Br. at 30).



*FIG 8*

[7] Although the Court recognizes that Maquet has conceded that the "over-the-wire" and "side-rigger" designs are distinct and would not be implemented together, those claims do not contain limitations that either clearly indicate one design or are clearly incompatible with any design.  (*See* Maquet Reply at 27).  General claim language frequently is read to cover more than one embodiment of an invention, and the Court sees no reason that Maquet cannot have generally claimed both designs, even if dependent claims could be limited to one design or the other.

42

described in the specification and equivalents thereof." 35 U.S.C. § 112(f).[8]  "In enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir, 2015).  "Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the '*quid pro quo*' for the convenience of employing § 112, ¶ 6."  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007).

If a claim uses the word "means," there is a rebuttable presumption that § 112(f) applies. *Williamson*, 792 F.3d at 1348.  Conversely, if a claim does not use the word "means," there is a rebuttable presumption that § 112(f) does not apply.  *Id.*  While the Federal Circuit in the past described that presumption as "strong," it has abandoned the heightened standard.  *Id.* at 1349.  Instead:

> The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.  *Greenberg* [*v. Ethicon Endo-Surgery, Inc.*], 91 F.3d [1580,] 1583 [(Fed. Cir. 1996)].  When a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails "to recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."

---

[8] The America Invents Act, Pub. L. 112-29, 125 Stat. 284 (2011), updated § 112 to letter the paragraphs and insert references to joint inventors.  *Id.* § 4(c).  That amendment became effective on September 16, 2012, and applies to any patent application filed on or after that date.  *See id.* § 4(e).  As a result, the '100 and '728 patents are subject to the earlier § 112, while the '068, '468, '314, and '437 patents are subject to the new § 112.  Happily, the text of the relevant subsection has not changed at all—it has merely transitioned from being referred to as "§ 112 ¶ 6" to "§ 112(f)."  For the sake of simplicity, the Court will refer to that subsection as "§ 112(f)" throughout.

43

*Watts* [*v. XL Sys., Inc.*], 232 F.3d [877,] 880 [(Fed. Cir. 2000)].
*Williamson*, 792 F.3d at 1349.  Furthermore, "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6."  *Id.* at 1350 (quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)).

If § 112(f) does apply, then the claims are limited to the corresponding structure disclosed in the specification.  At that stage, "[i]t is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure," and "[i]t is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003).

### 1.   "Guide Mechanism"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" | Means plus function: Claimed function—"guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient" Claimed structures—"(a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally | Ordinary meaning | '100: 16 |

44

| | formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly" | | |
|---|---|---|---|

The term "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" does not use the word "means," and so there is rebuttable presumption that § 112(f) does not apply.  Nonetheless, it is clearly a means-plus-function term.  The words "adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" describe a function.  As for the words "guide mechanism," "guide" is merely a functional descriptor and "mechanism" is a classic nonce word tantamount to using the word "means."  *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) ("We have never found that the term 'mechanism'—without more—connotes an identifiable structure; certainly merely adding the modifier 'compliance' to that term would not do so either.").  There is no evidence beyond Maquet's attorney argument that a person of ordinary skill in the art would understand "guide mechanism" to connote a particular, definite structure, and the specification itself clearly uses the term to encompass the prior art:

> To overcome these difficulties [in placing the blood pump in the heart], certain **guide mechanisms** may be employed to assist the physician placing the pump in the appropriate position within the circulatory system.  One type of supplemental **guide mechanism** is a guide catheter. . . .  While generally effective at providing a guiding feature for such intravascular blood pumps, employing such supplemental **guide mechanisms** is nonetheless disadvantageous in that they consume valuable space within the vessels. . . .  The present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system, i.e. heart and/or vasculature.  In so doing, the intravascular blood pump of the present invention eliminates the need for supplemental **guiding mechanisms**, such as a separate, large diameter guide catheter as used in the prior art.

45

('100 patent, col. 2 ll. 19-55 (emphasis added)). A person of ordinary skill in the art reading the patent would conclude that the patentee was using the word "guide mechanism" generally to refer to mechanisms for guiding, and that the patent is claiming only certain kinds of "guide mechanisms." The Court therefore concludes that although the claim does not use the word "means," the use of the generic term "guide mechanism" overcomes the presumption that § 112(f) does not apply.

Maquet argues that even if § 112(f) applies, Abiomed has limited the corresponding structure too narrowly. It points to text—incorporated by reference into the '100 patent, but reproduced in the '437 patent—that describes additional structural forms that a guide cannula can take. ('437 patent, col. 22 ll. 23-61). But the Federal Circuit has held that while the § 112(a) requirement that a patent be enabled can be satisfied by material incorporated by reference, § 112(f) does not allow a patentee to look beyond the text of the specification for the required structure. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (explaining that § 112(a) "permits resort to material outside of the specification in order to satisfy the enablement portion of the statute because it makes no sense to encumber the specification of a patent with all the knowledge of the past concerning how to make and use the claimed invention," but that § 112(f) does not have the same "expansive purpose" and merely sets forth "a simple requirement, a *quid pro quo*, in order to utilize a generic means of expression"). In other words, if a patentee wishes to engage in functional claiming, he must clearly set forth in the specification itself the structure he means to include to put the world on notice of the boundaries of his property right. *Medical Instrumentation*, 344 F.3d at 1220 ("The public should not be required to guess as to the structure for which the patentee enjoys the right to exclude."). Incorporating material by reference is not sufficient—especially in a case such as

this, where the material incorporated by reference is an abandoned application that was never published (except when it was copied into Maquet's subsequent applications more than a decade later).[9]

Apart from the structure described in the material incorporated by reference, Maquet does not attempt to particularly define what structure it contends should be included in the construction; it points only to "the numerous types and configurations of catheters, guide wires, lumens, conduit assemblies, and cannulas that are also disclosed," without any citation to the specification.  (Maquet Opening Markman Br. at 43-44).  The Court cannot discern from such a vague statement what additional structure, beyond what Abiomed has proposed, Maquet contends should be included.  It therefore considers any argument as to additional structures to be waived.  *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013) ("We have held that structure disclosed in the specification is corresponding structure *only* if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.  This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997))).

Therefore, the term "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" will be construed as a mean-plus-function term, with the corresponding structure identified by Abiomed.

---

[9] In *Atmel*, the Federal Circuit was deciding whether the claim was indefinite under § 112(b) for failing to recite any structure at all.  *Atmel*, 198 F.3d at 1381-82.  Here, there is no dispute as to whether any structure is provided; the question is the scope of that structure.  In addition, in *Atmel*, the court held that even though it was not proper to look to the content of the article incorporated by reference, the title of the article, which appeared in the specification, was sufficient to connote structure because it referred to a particular structure that one of ordinary skill would recognize.  *Id.* at 1382.  Here, the title of the application incorporated by reference was "Steerable Cannula." ('100 patent, col. 18 ll. 25-27).  Maquet has provided no evidence that that term alone would sufficiently connote to one of ordinary skill the structures it contends should be included in the construction.

2.    **"Blood Pressure Detection Mechanism" and "Pressure Sensing Element"**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "blood pressure detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Means plus function: Claimed function—"to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Ordinary meaning | '100: 16 |
| "pressure sensing element configured to sense pressure proximate the intravascular blood pump" | Claimed structures—"(a) a fluid filled column disposed within at least a portion of the cannula, (b) a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, (c) a strain gauge coupled to at least one of the intravascular blood pump and cannula, and (d) calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor" | | '468: 1 '314: 1 |

Abiomed contends that the terms "blood pump detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" and "pressure sensing element configured to sense pressure proximate the intravascular blood pump" should be construed as means-plus-function terms.[10]   Again, neither term uses the word "means," and so there is thus a rebuttable presumption that § 112(f) does not apply.

As compared to the "guide mechanism" term discussed above, the proper treatment of

_____

[10] Although not included in the parties' charts as part of the term, the text immediately following "pressure sensing element" in both claims 1 of the '468 and '314 patents reads "configured to sense pressure proximate the intravascular blood pump."

48

these terms is a closer question.  On the one hand, the words "mechanism" and "element" are both nonce words, and the adjectival phrases "blood pressure detection" and "pressure sensing" simply refer to the function of detecting/sensing the pressure of the blood.  On the other hand, sensing blood pressure is not a core feature of the invention, which is primarily directed to improved guide mechanisms.  Thus, while it was important to distinguish the precise structure of the guide mechanisms claimed (which were new and distinguishable from prior-art guide mechanisms with which the person of ordinary skill might have been familiar), the blood pressure detection mechanisms added to the core invention do not inherently need to be specified in the same way.  *See Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019-20 (Fed. Cir. 2017) (holding that "wireless device means" was not a means-plus-function term); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1582-83 (Fed. Cir. 1996) (holding that "detent mechanism" was not a means-plus-function term).

Furthermore, the specification of the '468 patent indicates that a person of ordinary skill in the art would understand the words "blood pressure detection mechanism" and "pressure sensing element" to have sufficiently definite meaning as the name for structure.  First, the patent states:

> It is also contemplated to incorporate various pressure sensing and/or guidability features into at least one of the cannula[] 14 and pump 12.  Such features may include, but are not necessarily limited to, those shown and described in . . . U.S. patent application Ser. No. 09/280,970 (filed Mar. 30, 1999) entitled "Pressure Sensing Cannula" . . . .  These pressure sensing features may include, but are not necessarily limited to, the use of fluid-filled lumens, piezo-electric pressure sensing elements, strain gauges, and analysis of the torque/current relationship (based on the dynamic pressure differential between the inlet and outlet of the pump).

('468 patent, col. 20 ll. 24-40).  The specification of the incorporated application further states:

> Pressure transducers 2224, 2232 are of the type known in the art and each comprises for instance a piezo-electric crystal housed in an integrated circuit (IC) chip (not shown).

49

. . . .

An alternative to using pairs of pressure transducers such as transducers 2224, 2232 is the use of a single differential pressure transducer 2254, as shown in FIG. 43. Differential pressure transducers are also well known in the art and comprise for example a piezo-electric crystal electro-mechanically configured to be responsive to a pressure difference between two opposing sides thereof.

(*Id.*, col. 30 ll. 31-34; *id.*, col. 31 l. 64-col. 32 l. 3).[11]  The patent not only recites several kinds of structures, which of course would not be sufficient to show that the patentee was not invoking § 112(f), but recites them in such a way as to indicate that the precise structure of the mechanism/element/transducer is unimportant and known.

Thus, from the four corners of the patent itself, it appears that a person of ordinary skill in the art would be aware of various types of pressure transducers that could be used to measure blood pressure in connection with intravascular cannulas.  *See Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 885 (Fed. Cir. 2018) (discussing terms including the words "equipment" and "device" and explaining "[a] claim term that has an understood meaning in the art as reciting structure is not a nonce word triggering § 112, ¶ 6").  Abiomed has provided no evidence, beyond the admitted sparseness of the words "mechanism" and "element," to show that a person of ordinary skill would have difficulty determining what structure is meant by these terms.  Therefore, the Court holds that Abiomed has not rebutted the presumption that § 112(f) does not apply, and the Court will not construe "blood pressure detection mechanism" or "pressure sensing element" to be means-plus-function terms.  Instead, they will be given their ordinary meanings.

---

[11] This material does not appear in the '100 patent, which contains the term "blood pressure mechanism detection."  While material that is incorporated by reference is not properly used to determine structure corresponding to a functionally claimed term, the Court sees no reason to ignore it in the initial inquiry as to whether § 112(f) applies.

50

D.      **Rotor Terms**

1.      **Rotor Blade Terms**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "blade extending radially outward from the rotor hub"  "blade[s] extending radially from the rotor hub" | "blade[s] shaped as an extension of a radius of the rotor hub, not including helical, corkscrew or screw-shaped" | Ordinary meaning | '728: 1, 10 '068: 1, 10, 20 '468: 1, 2, 22 '314: 1, 2, 20, 27 '437: 1, 28 |

Abiomed contends that the terms "blade extending radially outward from the rotor hub" and "blade[s] extending radially from the rotor hub" should be construed (1) to require that the blades be "shaped as an extension of a radius of the rotor hub," by which it means that the blades cannot be curved, and (2) to exclude helical, corkscrew, or screw-shaped blades.  Maquet contends that the terms should be given their ordinary meaning, which does not exclude curved blades.

The specification describes the rotor blades as follows:

> The impeller 48 includes a hub 56 and a plurality of blades 58 extending therefrom. . . .  The blades 58 are dimensioned to reside in close tolerance with the interior surface of the shroud 36.  In operation, the blades 58 impart both an axial and radial vector on the blood which causes it to flow outward through the flow ports 38 formed in the shroud 36.

('437 patent, col. 11 ll. 33-34, 46-51).  The figures showing the rotor blades are cross-sections—they seem to show straight blades, but do not clearly indicate one way or the other.  (*See id.* figs.3, 14, 18).  And they illustrate "exemplary construction[s]" only.  (*Id.*, col. 5 ll. 35-36; *id.*, col. 6 ll. 20-21).

The words "blade extending radially outward from the rotor hub" do not appear in the specification, but were first added to the claims of what became the '728 patent in response to obviousness rejections over Summers (U.S. Patent No. 5,112,349) in combination with other

references.  (Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004616, 4618; *id.* Ex. 7-C at MAQ_00004585).  The examiner indicated its mapping of Summers onto the claims as follows:



Annotated Fig. 3 of Summers et al. (US 5112349)

(*Id.* Ex. 7-C at MAQ_00004585).  Maquet distinguished its claims from Summers by explaining:

> Applicants submit that the Examiner's interpretation of Summers et al. is erroneous, and that the structure of Figure 3 of Summers is directed to a moineau-type pump.  This type of pump is described in Summers to have a rotor 42 is fabricated [sic] of stainless steel material and formed in a helical shape.  Applicants submit that the Summers rotor appears to have a shape resembling a cork-screw of a consistent cross-sectional shape.  Notably, this cork-screw rotor does not extend radially from a rotor hub and therefore cannot be construed as a blade of the claimed invention.

(Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004625).[12]

The ordinary meaning of "extending radially from the rotor hub" conveys that there is a central hub with blades sticking out from the sides.  Abiomed focuses on the word "radially" to suggest that the blades must be straight, arguing that it means "the blade extends like a radius,

---

[12] Abiomed also points to the fact that Maquet distinguished its claims from Masch (U.S. Patent No. 4,728,319), which Abiomed contends shows screw-shaped blades that Maquet disclaimed.  (Abiomed Opening Markman Br. at 39).  But the examiner never contended that Masch showed a "blade extending radially from the rotor hub"; he relied on Summers for the blade and contended that a person of ordinary skill would have modified Summers with the guide mechanism of Masch.  (Abiomed Opening Markman Br. Ex. 7-C at MAQ_00004592-93).  Indeed, a look at Figures 6 and 7 of Masch shows that there is no discernable "blade" separate from a "hub"; rather, the catheter appears to be one piece with rounded ridges.  Therefore, Maquet's statement that "the structure of a 'blade' is not found in Summers, nor is the structure of a 'blade' taught or suggested in Siess, Masch, or Gordon" does not clearly and unmistakably disclaim screw-shaped blades.  (*See* Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004628).

*i.e.*, in a straight line in a single direction from the rotor hub where it originates" and that "[t]o read the claims to include non-radial blades, such as curved blades, for example, would read the modifier 'radially' out of the claim." (Abiomed Opening Markman Br. at 37). But there is nothing in the specification to suggest that the claims are so limited. The specification appears to use the word "radial" in contrast to the word "axial," and to acknowledge that a given feature can include both radial and axial components. (*Cf.* '437 patent, col. 11 ll. 48-53 (speaking about "axial" and "radial" flow of blood, and stating that "[a]s used herein, the term 'axial flow' is deemed to include flow characteristics like that shown in FIG. 3, which include both an axial and slight radial component"; *id.* at col. 24 ll. 53-57 ("Depending on the location of point 1140 and the location of lumen 1136 radially and axially along wall 1122, applied tension to cable 1138 causes cannula 1120 to turn on itself in the direction of pull to thereby assume a curve having a predetermined orientation")). The Court therefore concludes that the term "radially" does not exclude blades that are curved. (*See also* '728 patent, col. 20, ll. 36-42 (contrasting the "blades extending radially from the rotor hub" with "rotor hub having a distal tip extending distally beyond the blades" and the "cannula extending distally from the intravascular blood pump")).

That interpretation accords with the prosecution history. Far from being a disclaimer of "helical, corkscrew, or screw-shaped" blades, Maquet's statements in the prosecution of the '728 patent and addition of the words "extending radially from a rotor hub" indicate that it intended to claim rotor blades that extend outward from the *side* of the rotor hub, and not down from the *bottom* of the rotor hub, as the examiner noted in its annotations to Summers. Indeed, in Maquet's view, the corkscrew-shaped component of Summers was properly termed a "rotor" and not a "blade." There is nothing about Maquet's statements distinguishing Summers that forbids the rotor blades from being curved, as long as they extend radially outward from the rotor hub.

53

Indeed, the examiner went on to reject the new claims as obvious over Bedingham, which has

curved blades, (Abiomed Opening Markman Br. Ex. 7-G at MAQ_00004682), and Maquet did

not distinguish Bedingham on that ground, (*id.* Ex. 7-I).  Therefore there is no clear and

unmistakable disclaimer of helical, corkscrew, or screw-like blades.

The terms "blade extending radially outward from the rotor hub" and "blade[s] extending

radially from the rotor hub" will therefore be construed to have their ordinary meaning.

### 2. Rotor Hub Term

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "a rotor having a rotor hub tapering in the distal direction" | Plain meaning, where patentee disclaimed a hub where any portion tapers in the proximal direction | Ordinary meaning | '728: 1, 10 '068: 1, 10, 20 '468: 1, 2, 22 '314: 1, 2, 20, 27 '437: 1, 28 |

Abiomed contends that the rotor hub must taper *only* in the distal direction, whereas

Maquet contends that the rotor hub may have some portion that tapers in the proximal direction.

The specification states that:

> The impeller 48 includes a hub 56 and a plurality of blades 58 extending
> therefrom.  The hub 56 is generally conical and, according to the first broad
> aspect of the present invention, is hollow throughout to form part of the central
> lumen of the guide mechanism 16.  In this regard, the hub 56 is preferably
> provided with a gasket or seal member 68 at its distal tip.

('437 patent, col. 11 ll. 33-39).  The figures show the rotor hub tapering entirely in the distal

direction, but, again, they are only exemplary embodiments.  (*Id.*, col. 5 ll. 35-36; *id.*, col. 6 ll.

20-21).

As part of the IPR proceedings for all five patents in which this term appears, Abiomed

cited to Aboul-Hosn (Pub. PCT App. WO 99/02204) as invalidating prior art.  Figure 7B from

Aboul-Hosn (annotated to show proximal and distal directions) is shown below:



Aboul-Hosn Patent, Fig. 7B (annotated)

(Abiomed Opening Markman Br. at 41).  Maquet distinguished Aboul-Hosn in its preliminary

patent owner's responses by arguing that "while having a pointed tip, [it] tapers in the opposite

direction, i.e., it tapers in the proximal direction."  (Abiomed Opening Markman Br. Ex. 11 at

46; *id.* Ex. 12 at 47; *id.* Ex. 14 at 47; *id.* Ex. 15 at 38; *id.* Ex. 16 at 38; *id.* Ex. 17 at 37; *id.* Ex. 18

at 40; *id.* Ex. 19 at 36; *id.* Ex. 20 at 34; *id.* Ex. 21 at 37; *id.* Ex. 23 at 37).

The plain meaning of the phrase "rotor hub tapering in the distal direction" does not

exclude hubs that also have a proximal-tapering portion—it only requires that the rotor hub taper

distally.  The specification does not say much about the rotor hub; it merely states that, in one

embodiment, the rotor hub is "generally conical," a description that allows for variations in

shape.  ('437 patent, col. 11 ll. 34-37).

While the Court agrees that Maquet's statements during the IPR proceedings disclaim

something, they are not clear and unmistakable disclaimers of rotor hubs that include *any*

tapering in the proximal direction.  Rather, Maquet's statements are most naturally read to

explain that Aboul-Hosn *generally* tapers in the proximal direction, contrary to the claims.  But

even Maquet acknowledges that its IPR statement shows that it does not view the presence of

some small tapering in the distal direction (such as the "pointed tip" of Aboul-Hosn) to meet the

55

limitation "tapering in the distal direction," and the claim construction should reflect that concession.  (*See* Maquet Opening Markman Br. at 28 ("Maquet was explaining that Aboul-Hosn's rotor hub generally tapered in the proximal direction—not the distal direction as required by the limitation-at-issue.")).

Therefore, the term "a rotor having a rotor hub tapering in the distal direction" will be construed as meaning "a rotor having a rotor hub generally tapering in the distal direction."

### E.   Purge-Fluid Terms

#### 1.   "Passing Purge Fluid"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construc-tion | Patent: claim(s) |
|---|---|---|---|
| "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" | "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '728: 1<br>'068: 1<br>'468: 1, 22<br>'314: 1, 20, 27 |
| "passing purge fluid through the purge lumen to the intravascular blood pump"<br><br>"passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" | "passing purge fluid to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '437: 1<br><br><br><br>'437: 28 |

Abiomed contends that the terms "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" should be construed to mean "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid

56

does not go through the rotor bearings and into the bloodstream." It also contends that the terms "passing purge fluid through the purge lumen into the intravascular blood pump" and "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" should be construed to mean "passing purge fluid to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." Maquet contends that those terms should be given their ordinary meaning.

In support of its construction, Abiomed points to a statement made by Maquet during the IPR of the '728 patent:

> In addition, Figure 10 shows bearings (78) engage [sic] with rotor shaft (81). Petitioners' "gap" theory would require purge fluid to run directly between these bearings. Running purge fluid through these bearings and into the bloodstream provides a mechanism to directly inject foreign bearing particles into the circulatory system (e.g., when the pump operates, the bearings wear, releasing solid particles). A POSITA would recognize that injecting floating particles from bearings into a patient's blood stream is a bad idea.

(Abiomed Opening Markman Br. Ex. 11 at 53).

The Court is not entirely sure what to make of this statement. It directly contradicts statements in the specification that clearly contemplate passing purge fluid through ball bearing assemblies and into the bloodstream. ('437 patent, col. 12 ll. 34-36 ("[T]he purge fluid flows distally around the cable adapter 60, through the ball bearing assemblies 50, 52, and onward past the radial seal 64. This egress of purge fluid past the radial seal 64 can be controlled to effectively thwart the ingress of blood past the radial seal 64, which might otherwise cause clotting and/or pump damage."); *see id.*, col. 18 ll. 8-21).

Nonetheless, Maquet clearly and unmistakably disparaged one-way systems in which the purge fluid runs both (1) through bearing assemblies and (2) into the blood stream. And the public is entitled to rely on those clear statements. *Sightsound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015) (interpreting disparagement as disclaimer); *Chi. Bd. Options*

57

*Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) (same).[13]

Maquet argues that it "never stated that ***purge fluid*** cannot enter the blood stream in the claimed invention, only that Aboul-Hosn does not teach a purge fluid line because, *inter alia*, Aboul-Hosn's particular configuration would allow ***solid bearing particles*** to enter the bloodstream if it were to be used as a purge fluid lumen." (Maquet Reply at 19). But Maquet does not attempt to show that purge fluid flowing through the bearing assemblies of the claimed invention would not also carry solid bearing particles into the bloodstream. Maquet's IPR statements thus apply with equal force to the embodiment described in the specification of the patents at issue here, in which the purge fluid flows "through the ball bearing assemblies" and "past the radial seal" into the bloodstream.

Finally, Maquet contends that, even if its IPR statements do amount to a disclaimer, that disclaimer should only apply to the '728 patent, the subject of the IPR proceeding in which the statements were made. But as the Court has explained, courts routinely apply disclaimers across claims of related patents with similar terms. Here, Maquet has unequivocally stated that running purge fluid through the bearings and into the bloodstream is a "bad idea," with no qualifications that would suggest the statement applies only to the circumstances of the '728 patent. It makes no difference that that claim 1 of the '728 patent require "a first lumen in fluid communication with the intravascular blood pump," whereas claim 22 of the '468 patent requires a purge lumen "in fluid communication" with "at least one" of the first and second conduits—the '468 patent claims clearly also require passing purge fluid to the pump. (*See* '468 patent, col. 36 ll. 56-69

---

[13] A statement disclaiming claim scope is not erased simply because it was made as an alternative argument—the public is entitled to rely on it as a statement by the patentee as to what it regards as its invention. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

(including "a fluid delivery pump configured to deliver purge fluid . . . towards the intravascular blood pump")).  And according to Maquet's own statement, passing purge fluid through ball bearing assemblies into the bloodstream is not its invention.

The Court is thus faced with a direct contradiction between the specification and the disclaimer in the IPR.  Under the circumstances, the narrower construction controls.  Therefore, the term "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" will be construed to mean "[first lumen / purge lumen] . . . arranged to operate such that purge fluid is delivered to the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream."  The term "passing purge fluid through the purge lumen into the intravascular blood pump" will be construed to mean "passing purge fluid through the purge lumen into the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." The term "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" will be construed to mean "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream."

2.      **"First Conduit" and "Second Conduit"**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "first conduit . . . second conduit" | "a pair of conduits for introducing and returning purge fluid" | Ordinary meaning | '728: 8 '068: 9 '468: 1, 22 '314: 1, 20, 27 '437: 10, 29 |

Every claim in which the words "first conduit" and "second conduit" appear also requires

"a first lumen" or "purge lumen" "operatively arranged to deliver purge fluid to the intravascular blood pump" and where "at least one of the first conduit and second conduit [is] in fluid communication with the first lumen" or "purge lumen." Abiomed contends that when read in the context of the claims and the specification, the second conduit must also be part of the purge fluid system, and therefore the terms "first conduit" and "second conduit" should be construed to mean "a pair of conduits for introducing and returning purge fluid." Maquet contends they should be given their ordinary meaning.

Abiomed is correct that the specification generally refers to the purge fluid conduits as part of a two-way system: "[T]he intravascular blood pump system 10 includes . . . a purge fluid delivery system 26 for providing a two-way fluid flow within the drive cable assembly 18 during pump operation. The purge fluid delivery system 26 includes a fluid inlet conduit 28 for introducing pressurized purge fluid from a fluid source (not shown) for delivery into the blood pump 12, and a fluid outlet conduit 30 to withdraw a return flow of purge fluid from the blood pump 12." ('437 patent, col. 9 l. 60-col. 10 l. 2). "The side lumens 76 are provided in fluid communication with the fluid inlet conduit 28, while the central lumen 74 is provided in fluid communication with the fluid outlet conduit 30. The side lumens 76 are thus configured to deliver purge[] fluid into the pump 12, while the central lumen 74 is configured to transport purge fluid away from the pump 12 along the length of the drive cable 62." ('437 patent, col. 12 ll. 22-29).

But those descriptions explicitly concern an "exemplary embodiment." ('437 patent, col. 9 ll. 58-60). And the specification also explains that, even in a two-conduit system, the purge fluid need not use the second conduit:

> The pressurized purge fluid within the side lumens 76 may take one of two flow
> paths upon entry into the pump 12. One flow path passes through the interior of

60

the pump 12 and onward past the radial seal 64 to prevent the ingress of blood into the pump body 34 during pump operation.  More specifically the purge fluid flows distally around the cable adapter 60, through the ball bearing assemblies 50, 52, and onward past the radial seal 64.  This egress of purge fluid past the radial seal 64 can be controlled to effectively thwart the ingress of blood past the radial seal 64, which might otherwise cause clotting and/or pump damage.  The other flow path is directed back out the central lumen 74 for delivery to the fluid outlet conduit 30.  In so doing, this flow path bathes the components of the pump 12 and/or drive cable 62 and thereby reduces frictional heating within the pump 12 and/or the central lumen 74 of the sheath 32 during pump operation.

('437 patent, col. 12 ll. 30-46).[14]  That description in the specification seems to describe an embodiment where, although the system contains both a first and second conduit, only one conduit is used.  Abiomed contends that such a construction would render the other conduit superfluous.  But while superfluity of claim language is indeed discouraged, *see Merck & Co. v. Teva Pharm. USA Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005), superfluity of system components is not necessarily problematic.

Abiomed also contends that "the claimed pump would be inoperative if only the outflow conduit (second port) was connected, as no purge fluid would enter into the pump."  (Abiomed Opening Markman Br. at 44).  But the claims only require two conduits, at least one of which is connected to a lumen operatively arranged to deliver purge fluid to the pump.  It is immaterial which conduit is labeled the "first" or "second"; whichever is connected to the lumen operatively arranged to deliver purge fluid *to* the pump is the inflow conduit, under the plain meaning of the text.

Even if the Court were to agree that there appears to be no other possible purpose for this second conduit described in the specification, to hold that the second conduit must be an

---

[14] The specification also explicitly describes a "one way delivery of purge fluid to the blood pump 12" in connection with "an alternate configuration of the intravascular blood pump system 130 of the third broad aspect of the present invention."  ('437 patent, col. 17 ll. 58-61, col. 18 8-21).  But that discussion does not refer to "conduits" and so does not inform the construction of the terms "first conduit" and "second conduit."

61

"outflow" conduit would be to import limitations from the specification into the claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Abiomed also points to two portions of the prosecution history in support of its construction. First, it points to the examiner's notice of allowance for the '468 patent, in which the examiner distinguished the allowed claims from prior-art reference Bedingham as follows:

> The claimed invention includes a pair of conduit [sic] for introducing and returning purge fluid (¶ [0061], fluid inlet conduit 28 for introducing pressurized purge fluid, and a fluid outlet conduit 30 to withdraw a return flow of purge fluid). In contrast, Bedingham discloses only a single channel for supplying purge fluid which is not returned through a second lumen but instead mixes with blood.

(Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009242). Although these statements are illuminating as to how a person of ordinary skill in the art would read the patent, such unilateral statements of the examiner cannot be considered a clear and unmistakable disclaimer by the patent owner. *See ACCO Brands*, 346 F.3d at 1079. Furthermore, the examiner's statement is consistent with the ordinary meaning of the claims as requiring two conduits, even if one of them is not being used to return purge fluid from them pump—an invention requiring two conduits is still distinguishable from an invention having only one.

Second, Abiomed points to the statement made by Maquet during the '728 patent IPR discussed above, which it contends disclaimed one-way purge systems. (*See* Abiomed Opening Markman Br. Ex. 11 at 53). But the disclaimer is not as broad as that—it only disclaims purge systems wherein the purge fluid flows *both* through the ball bearing assembly *and* into the blood stream. A one-way purge system that does not go through the ball bearing assembly, for

62

example, may fall within the claims.[15]

Accordingly, the terms "first conduit" and "second conduit" will be given their ordinary meaning.

**F.    Miscellaneous Terms**

**1.    Perfusion**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "perfusing / perfusion [of a patient]" | "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient" | Ordinary meaning | '068: 1, 10, 20 |

Abiomed contends that the terms "perfusing" and "perfusion" must be construed to mean "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient." Maquet would give the terms their ordinary meaning.

The terms "perfusing" and "perfusion" appear only in the preambles of the claims at issue. "'Generally, the preamble does not limit the claims.'" *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (quoting *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002)). A preamble may be limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). Examples include when "claims 'depend[] on a particular disputed preamble phrase for antecedent basis'; the

---

[15] The Court acknowledges that the specification does not contain an example of such a system. As with certain other claim terms, Maquet may face enablement or written description challenges on the broader scope it has sought. But those are questions for another day.

preamble 'is essential to understand limitations of terms in the claim body'; the preamble

'recit[es] additional structure or steps underscored as important by the specification'; or there

was 'clear reliance on the preamble during prosecution to distinguish the claimed invention from

the prior art.'" *Georgetown Rail*, 867 F.3d at 1236 (alterations in original) (quoting *Catalina

Mktg.*, 289 F.3d at 808).  "Conversely, a preamble is not limiting 'where a patentee defines a

structurally complete invention in the claim body and uses the preamble only to state a purpose

of intended use for the invention.'" *Catalina Mktg.*, 289 F.3d at 808 (quoting *Rowe v. Dror*, 112

F.3d 473, 478 (Fed. Cir. 1997)); *see Georgetown*, 867 F.3d at 1236.

   The preamble here is used only to state a purpose of intended use—the body of the claims

describe a complete invention without the need for the preamble.  Abiomed contends that the

preamble "breathes life" into the claims because, if the preamble does not limit method claims 1,

10, and 20 of the '068 patent, they would be identical to apparatus claims 1, 10, and 22 of the

'728 patent.  The examiner of the '068 patent recognized that although the '068 patent claims

methods while the '728 patent claims an apparatus, the '068 claims were not patentably distinct

from the already-allowed claims of the '728 patent, because "the blood pump system claimed by

[the '728 patent] will perform these steps when used as intended."  (Non-Final Rejection at 2, 4,

'068 patent file wrapper (Aug. 17, 2015)).  He rejected them for obviousness-type double

patenting, and Maquet filed a terminal disclaimer giving up any rights in the '068 patent that

extended beyond the term of the '728 patent.  (Terminal Disclaimer Filed, '068 patent file

wrapper (Sept. 10, 2015)).

   It is not uncommon for a patentee to claim his invention as both an apparatus and a

method in the same patent; given the terminal disclaimer, the situation here is no different from

that.  The doctrine of claim differentiation does not require the preamble to be limiting in such a

case—the claims are fundamentally different in that one is a method and the other is an apparatus.  Abiomed provides no other rationale to depart from the general rule that the preamble is not limiting.  Indeed, if the '728 patent claims a complete invention, and (as Abiomed contends) the '068 claims are almost identical, then there is no reason to believe that anything is missing from the body of the '068 claims.

"It is well settled that if the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) (quoting *Schumer v. Lab. Comput. Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002).

Accordingly, the Court holds that "perfusing / perfusion [of a patient]" does not limit the claims and therefore does not require construction.

## 2. Measuring Pressure "Proximate" or "Adjacent" the Intravascular Blood Pump

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "[detect the pressure of the blood] proximate at least one of the intravascular blood pump and cannula" | "at the opening of the blood pump or the cannula | Ordinary meaning | '100: 16 |
| "[detect the pressure of the blood / sense pressure] proximate the intravascular blood pump"<br><br>"[measuring pressure / calculating blood pressure] adjacent the intravascular blood | "at the opening of the blood pump" | Ordinary meaning | '728: 6, 10<br>'068: 7, 10<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 8, 12 |

65

| pump" | | | |
|---|---|---|---|

Abiomed contends that "proximate at least one of the intravascular blood pump and cannula" should be construed to mean "at the opening of the blood pump or cannula" and that "proximate the intravascular blood pump" and "adjacent the intravascular blood pump" should be construed to mean "at the opening of the blood pump."  Maquet contends that the terms can be given their ordinary meaning.

Abiomed's argument, again, primarily concerns disclaimer.  In its petition for IPR of the '100 patent, Abiomed argued that prior-art reference Aboul-Hosn taught measuring the pressure as required by the claims.  Maquet responded:

> The Petition cites to a vague disclosure in Aboul-Hosn that states that the catheter may include a feature "to measure pressure in the vicinity of the catheter along its entire length" disclosed as part of the stabilization system embodiment (Petition, 43; Ex. 1004 29:19-25). . . .  This vague disclosure **never states that pressure should be measured near the intravascular blood pump**, and thus it does not disclose either of the requirements for the claimed blood pressure detection mechanism.
>
> . . . .
>
> Further, the petition relies on the following statement from Aboul-Hosn:  the reverse flow pump (50) "may be also equipped with sensing devices (not shown) for measuring various body conditions such as blood pressure, the presence of blood, or other parameters that would suggest the need for altering the flow rate of the fluid transport apparatus 10" (Ex. 1004, 23:4-8; Petition, 44).  This disclosure is directed to a different pressure detector than the one sent forth in the claims.
>
> Claim 16 specifies that the pressure detection mechanism is **located proximate the intravascular pump or cannula** (Ex. 1001, claim 16).  This arrangement allows the pressure detection mechanism to **measure the pressure associated with the pump directly, either at the cannula opening or the pump opening**, which assists operators in locating and operating the pump.  In contrast, the disclosure in Aboul-Hosn (and relied on by the Petition) measures the operation of the pump indirectly.  Aboul-Hosn discloses using a sensor with the reverse flow pump to measure "body conditions" ***not*** pump conditions.  Aboul-Hosn discloses using this sensor to measure a patient's "blood pressure," and that this measurement provides an indication of the efficacy of a pump (Ex. 1004, 23:4-8).

66

> Here a sensor is located in a patient's circulatory system generally and operators can observe whether or not the patient's blood pressure is sufficient.  The operators can then infer whether the pump is or is not circulating sufficient blood.  In this arrangement the sensor would **not be located near either the pump or the cannula**, because neither of those locations provide an accurate indication of a patient's blood pressure.  The pressure in either of these locations would not be indicative of a patient's blood pressure generally, but instead would be indicative of the pressure rise associated with the pump.

(Abiomed Opening Markman Br. Ex. 10 at 52-54 (underlined emphasis added)).

Abiomed focuses on Maquet's statement that the blood pressure detection mechanism of claim 16 is located "proximate the intravascular pump of cannula," which allows it to "measure the pressure associated with the pump directly, either at the cannula opening or the pump opening," and contends that Maquet thereby limited its claims to pressure measurements taken "at the cannula opening or the pump opening."  But, read in context, Maquet was merely contrasting its claims, which require measuring the blood pressure around the pump directly, with the claims of Aboul-Hosn, which measure the patient's blood pressure generally and infer the efficacy of the pump from that measurement.  In the same discussion, Maquet twice refers to the pressure detection mechanism as being "near" the pump, further communicating that the blood pressure detection mechanism of the claims need only be located close enough to the pump or cannula to be measuring the blood pressure of the area directly.  Maquet's statements in the IPR do not clearly and unmistakably require the blood pressure detection mechanism to be specifically located at the opening of the pump or cannula, and are consistent with the ordinary meanings of "proximate" and "adjacent."

Abiomed also contends that the terms "proximate" and "adjacent" are ambiguous and that the specification fails to clarify what they mean.  As with the term "intravascular blood pump," Abiomed is free to argue that the claims are indefinite at the appropriate time; for now, it suffices to say that Abiomed has not provided a compelling reason for the claim construction to depart

67

from the ordinary meaning.

Therefore, the terms "proximate at least one of the intravascular blood pump and cannula," "proximate the intravascular blood pump," and "adjacent the intravascular blood pump" will be given their ordinary meanings.

### 3.   <u>"Distal Tip Member"</u>

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "distal tip member" | "rod bonded to the end of the cannula" | Ordinary meaning where the "distal tip member" is not a guidewire | '314: 21 '437: 22 |

Abiomed contends that the term "distal tip member" in the '314 and '437 patents must be construed to mean a "rod bonded to the end of the cannula" because Maquet has disclaimed all other configurations. Maquet contends that it at most disclaimed configurations where the distal tip member is a guidewire.

The Court agrees with Maquet. The specification states that "[v]arious distal tip configurations can be selected for cannula 1120 depending on the particular application as appreciated by those of ordinary skill in the art." ('437 patent, col. 26 ll. 29-31). It goes on to describe a pigtail shape, which "can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod 1174 formed into a loop at the distal end of the cannula 1120," and a J-tip wire, which could be "a conventional guidewire movable or fixedly supported in a dedicated lumen" or "supported, rigidly or movably, between layers of material from which the wall 1122 of the cannula 1120 is formed." (*Id.*, col. 26 ll. 31-46). The section concludes by stating: "The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be apparent to one of ordinary skill in the art that modifications thereto can be

68

made without inventive departure from the spirit and scope of the invention."  (*Id.*, col. 26 ll. 58-62).

In its petition for IPR of the '314 patent, Abiomed pointed to Jegaden as prior art disclosure of a distal tip member.  Maquet distinguished Jegaden as follows:

> Jegaden simply shows a conventional guide wire, which cannot be repurposed to be the claimed distal tip member.

> First, the claims demonstrate that the distal tip is attached to the end of the cannula, and cannot be a separate, conventional guide wire. . . .

> The specification further establishes a guide wire is not a "distal tip member," stating how this feature can include a "pigtail shape . . . formed by bonding or thermal welding or otherwise attaching a thermoplastic rod . . . at the distal end of the cannula" (Ex. 1001, 26:33-36).  Petitioners ignore this fundamental difference between the claimed "distal tip member" and the separately referenced guide wire explained throughout the specification.  Thus, because Petitioners only argument for this limitation relies on a disclosure directed to a guide wire, their argument fails.

> Moreover, the Jegaden guide wire and catheter are never solely at one end of the device, as is required by the claims.  When used, they traverse the entire length of the device, even extending outside the patient.  The Jegaden guide wire cannot be parsed arbitrarily so that one portion constitutes the claimed "guide wire," but another portion comprises the claimed "distal tip member."  Quite simply, the Jegaden guide wire is just that, a guide wire, and cannot be the claimed "distal tip member at one end."

(Abiomed Opening Markman Br. Ex. 18 at 57-59).

Abiomed argues that this is a disclaimer of all J-tip wires, because the guidewire in Jegaden was shown to be shaped like a J; therefore, the only disclosure left in the specification supporting the "distal tip member" is the portion talking about pigtails, which are described as rods bonded to the end of the cannula; therefore, the words "distal tip member" in the claims must be limited to rods bonded to the end of the cannula.  There are two principal flaws in that argument.

First, it is true that the specification does not explicitly describe a wide variety of distal

69

tip configurations.  But neither does it attempt to define the term "distal tip member," and there is no reason to read only the particular limitations disclosed by the specification into the claims—quite the opposite.  Second, Maquet's statements during the IPR clearly and unmistakably state that the distal tip member cannot be identical to the guidewire—they must be physically separate components.  Maquet makes no mention of J-shaped wires, as opposed to other shapes.

Accordingly, the term "distal tip member" will be given its ordinary meaning, except that the "distal tip member" is not a "guidewire."

### 4.    "Cannula Coupled to a Distal End of the Intravascular Blood Pump"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "cannula coupled to a distal end of the intravascular blood pump" | Maquet disclaimed a cannula with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end of the cannula" | Ordinary meaning | '468: 1, 22 |

Abiomed contends that the cannula in claim 22 of the '468 patent cannot have a "pigtail, J-shaped, helical, or helix shape, or stem/tail" on its distal end because Maquet disclaimed those cannulas.  Maquet contends that the term should be given its ordinary meaning.

During the prosecution of the '468 patent, Maquet attempted to add the following claims, among others:

> 39.  (NEW).  The intravascular blood pump system of claim 24 further comprising a pigtail shaped distal tip member at one end.

> 40.  (NEW).  The intravascular blood pump system of claim 24 further comprising a J-shaped shaped [sic] distal tip member at one end.

> 49.  (NEW).  An intravascular blood pump system, comprising . . . a distal tip member at one end of the cannula, the distal tip member comprising a stem portion, extending distally away from a distal end of the cannula lumen, and a curved tail portion located distal to the stem portion . . . .

70

 

     50.  (NEW).  The intravascular blood pump system of claim 49 wherein the elongate lumen is shorter in length than the cannula lumen and the distal tip member is pigtail shaped or J-shaped.

     53.  (NEW).  The intravascular blood pump system of claim 49 wherein when the intravascular blood pump is positioned in the patient to provide left-heart support both the elongate lumen and the tip member are wholly within the left ventricle.

(Abiomed Opening Markman Br. Ex. 9-A at MAQ_00007621-25).  Although none of these claims mention helices, the examiner rejected the claims as failing to comply with the enablement requirement:

> <u>Claims 39, 40, 49, 50 and 53</u> call for a pigtail or J-shaped distal tip member, or a stem or tail portion.  The specification does not any [sic] feature having a pigtail, J-shaped, helical or helix shape, or stem/tail on the distal end of the cannula.  At most, the specification describes several springs located inside the pump assembly (¶ [0064], spring 54; ¶ [0070], spring 94; ¶ [0082], bias spring 156; ¶ [0085], seal spring 182).  These helical springs do not project from the distal tip of the cannula, and are not analogous to the claimed pigtail or J-shaped distal tip member.  Fig. 19 shows a curved or bent pump, but this does not provide a pigtail shape or stem/tail on the distal end of the cannula.

(Abiomed Opening Markman Br. Ex. 9-B at MAQ_00008885).  A subsection of these claims were also provisionally rejected for obviousness-type double patenting.  (*Id.* MAQ_00008887 (rejecting claims 24-33, 36, 38-43, 45, 48, 49, and 52)).

     Maquet responded to the rejection by cancelling claims 39 and 40, deleting the portions of claims 49 and 50 that referred to a "distal tip member," but leaving claim 53.  (Abiomed Opening Markman Br. Ex. 9-C).  It also added nineteen new drawings (including figures 30-32, showing the pigtail and J-shaped distal tip members) from the Appendices to the drawings of the pending application.  (*Id.* Ex. 9-C at MAQ_00009038).  Maquet explained: "Claims 25, 32, 49, 50 and 52 have been amended, while claims 38 through 40 have been cancelled without prejudice or disclaimer.  The amendments made to claims 49 and 50 remove limitations directed to the 'distal tip member', and the amendments to dependent claims 25, 32, and 52 have been

made to improve readability."  (*Id.* Ex. 9-C at MAQ_00009039).

Abiomed contends that by cancelling or amending claims 39, 40, 49, and 50 in response to the examiner's enablement rejection, Maquet has disclaimed a cannula that has a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end."  But any such disclaimer does not seem to the Court to be "clear and unmistakable."  First, although the examiner also rejected claim 53 for lack of enablement, Maquet did not cancel or amend that claim, which was eventually allowed.  (Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009240).  Second, after the rejection, Maquet added the figures depicting the distal tip configurations it was seeking to claim to the specification from the appendices; the examiner did not seem to consider those figures in his rejection.  Third, the mere statement that Maquet was cancelling the claims without prejudice or disclaimer would count for little on its own, if it had in fact been forced to surrender claim scope to obtain patentable claims.  But Maquet was later successful in claiming cannulas with pigtail and J-shaped distal tip members in what are now the '314 and '437 patents without adding new matter to the specification.  (*See* '314 patent, claims 10, 12-13; '437 patent, claims 22-24).  Finally, because Maquet did not even try to claim "helical or helix shape" distal tip members, it is certainly not appropriate to hold that it has disclaimed them because the examiner chose to so describe the added claims.

Taken as a whole, the prosecution history does not give the reader a clear and unmistakable impression that Maquet viewed its invention—which in its final form is silent not only as to the shape of the distal tip member, but as to the existence of a distal tip member—to exclude cannulas with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end."  Therefore, the term "cannula coupled to a distal end of the intravascular blood pump" will be given its ordinary meaning.

72

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor, IV
Dated:  September 7, 2018          United States District Judge

73

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MAQUET CARDIOVASCULAR LLC,

      Plaintiff and Counter-Defendant,

    v.

ABIOMED, INC; ABIOMED R&D, INC. and
ABIOMED EUROPE GMBH,

      Defendants and
      Counter-Claimant.

No. 1:17-cv-12311-FDS

**HIGHLY CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDER**
**AND MOTION TO SEAL**

**ABIOMED'S OPENING CLAIM CONSTRUCTION BRIEF**

across all asserted patents.'" *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369

(Fed. Cir. 2016).

### C. Maquet Disclaimed Designs Where the Guide Wire Passes Through the Free Space of the Rotor Blades

| Claim Term | Claim | Abiomed's Proposal | Maquet's Proposal |
|---|---|---|---|
| "guide mechanism is configured to allow a guidewire to slideably advance" | 783: 1 | "the guide wire does not extend through the free space in between the rotor blades" | Plain meaning |
| "guide wire does not pass through the rotor hub or the catheter" | 783: 24 | *Plain meaning but with the disclaimer that:*<br><br>"guide wire does not pass through the free space in between the rotor blades" | Plain meaning |

This dispute here is whether these claim terms must account for Maquet's disclaimer that

"the guide wire does not pass through the free space in between the rotor blades."[4]  As this Court

already ruled, Maquet distinguished its invention from the guide wire used for placing a pump in

Völker (Ex. 14).  *Abiomed I*, D.I. 241, at 24.  Like Maquet's repeated disclaimers that its patents

did not cover a lumen in the free space of the blades because the pump would be inoperative,

Maquet represented that the guide wire in the free space of the blades in Völker would make the

claimed device inoperative (the blades necessary for the pump to work would not turn).  The law

is clear that Maquet cannot now assert that its claims cover this surrendered subject matter.

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (holding that

---

[4] Abiomed raised this issue in connection with the first identified term in *Abiomed I*, however, the issue was not explicitly addressed by the Court.  *Abiomed I*, D.I. 241, at 22-27 (focusing solely on the lumen).  Abiomed believes that the adopted construction already precludes a guidewire within the free space of the blades because the Court required that the "**guidewire** lumen does not extend through the free space between the rotor blades."  *Id.* at 27 (emphasis added).  Abiomed asks that this Court clarify its construction to confirm that this prohibition also includes the guidewire in the lumen.

10

prosecution disclaimer doctrine applies to IPR proceedings to "ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers").

As already decided in *Abiomed I*, during the IPRs, Maquet adopted the Examiner's distinguishing of the patents from Völker on the grounds that, unlike the blood pump systems claimed in the '728 patent, Völker had a guidewire in the free space of the blades and that rendered the rotor inoperative. *See* Ex. 15 ('728 POPR, IPR2017-01027) at 63. ("One reference that the Examiner explicitly considered and found the claims patentable over is Voelker . . . . As such, Patent Owner submits that the Board should defer to Primary Examiner Kidwell's [sic] considered judgment and deny the Petition."); *see also* Ex. 16 ('728 POPR, IPR2017-01026) at 64; Ex. 17 ('068 POPR, IPR2017-01028) at 64; Ex. 18 ('068 POPR, IPR2017-01029) at 64. Maquet made this same argument no less than *four* times to the USPTO to preserve its patents. *See id.* During the course of those statements, Maquet repeatedly endorsed the USPTO's conclusion that Völker was different than the '728 patent. *See* Ex. 12-B ('728 PH, July 21, 2014 Notice of Allowance) at MAQ_00004994 ("Völker does not provide a separate second lumen for the guide mechanism. Instead, **Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning** (p. 14, ¶4, while the guide wire 25 is located in the pump housing, no Rotation (sic) of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of [then-pending] claims 15, 29 or 45 [issued independent claims 1, 10 and 22].") (emphasis added).

This is demonstrated in Fig. 2 of Völker shown below. Guide wire **25** runs within the free space between the rotor blades **20**, and would therefore jam the rotor if not removed before the rotor begins to rotate. *See* Ex. 14, Völker at 2:37-45, 3:43-47.

11



Völker, Fig. 2 (annotated)

This Court not only already found that the examiner's statements "tend to show that one of ordinary skill in the art, reading the prosecution of the patent family would view the claims of the '728 and '468 patents as excluding the inoperable embodiments that would result from applying the teachings of the prior art," but also that "Maquet appears to have approved of the examiner's treatment of Völker as of the IPR proceedings of the '728 and '068 patents." *Abiomed I*, D.I. 241, at 26. As a result, this disclaimer is binding on Maquet and the claim terms in this patent family.

This disclaimer is consistent with Maquet's repeated insistence that nothing interfere with rotation of the blades of its pump systems. *See Abiomed I*, D.I. 241, at 26-27 (finding Maquet also disclaimed a lumen in the free space of the blades for the same reasons). The patent specification makes clear that its integrated, **dedicated** guide wire lumen ('783 at 9:20-24, 12:47-50, 14:35-36) **was designed to permit the** guide wire to remain in place during operation. *See* '783 at 12:59-13:2 (discussing that, in the over-the-wire design, the central lumen should be sized to avoid "inadvertent rotation of the guide wire during pump operation" and removal of the guide wire is optional); 14:48-53 (discussing that removal of the guide wire is optional during pump operation). Accordingly, the specification provides no teaching or example where the guide wire passes through the free space between the rotor blades. Nor does the patent

12

specification offer any suggestion of how this could be achieved by modifying any of the described embodiments.  Using the rotor blade free space for the guide wire is not Maquet's invention, but rather, was already known in the prior art as disclosed in Völker.  This is why Maquet distinguished Völker from its claims.

The claims of the '783 patent must therefore be construed, consistent with the specification and Maquet's disclaimers, to exclude guide mechanisms that run the guide wire through the free space between the rotor blades because they would jam the blades if the pump were actuated with the wire in place.

## V.      INDEFINITE CLAIM TERMS

### A.      Claim 2 Is Incomprehensible

| Claim Term | Claim | Abiomed's Proposal | Maquet's Proposal |
|---|---|---|---|
| "wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism" | 783: 2 | *This term is indefinite as it fails to define the scope of the invention with "reasonable certainty."* | Plain meaning |

The dispute here is whether this term is indefinite.  Claim 2 includes multiple ambiguous terms and an unintelligible comparison between them.  As a result, its scope cannot be deciphered.  The law is clear that such terms are indefinite.  *See Interval Licensing*, 766 F.3d at 1371 ("[T]here is an indefiniteness problem if the claim language might mean several different things and no informed and confident choice is available among the contending definitions.") (internal quotations omitted).

Claim 2 purports to require that (1) a point concerning the guide wire and cannula ("the guide wire passes through the region delimited by the outer cannula surface") (2) is proximal to

| **SUPPLEMENTAL AMENDMENT** | Attorney Docket No. | 06-01506US06 |
|---|---|---|
| | Confirmation No. | 5519 |
| | First Named Inventor | Walid N. Aboul-Hosn et al. |
| Mail Stop: Amendment Commissioner for Patents P.O. Box 1450 Alexandria, VA 22313-1450 | Application Number | 14/966,669 |
| | Filing Date | 12-11-2015 |
| | Group Art Unit | 3761 |
| | Examiner Name | MARCETICH, ADAM M |
| | Title | GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS |

## SUPPLEMENTAL AMENDMENT TO PENDING UTILITY APPLICATION

Sir:

Prior to examination on the merits, kindly amend the above-captioned application as follows.

**Amendments to the Claims** are reflected by the Listing of Claims that begins on page 2 of this paper.

**Remarks/Arguments** begin on page 12 of this paper.

**I.       Amendments to the Claims:**

The following listing of claims will replace all prior versions and listings of claims in the application.

**Listing of the Claims:**


1– 13.   (CANCELLED)

14.     (NEW)        A method for providing left-heart support using an intravascular blood pump system, the intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within the circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in the distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending radially outward from the rotor hub, a distal end of the hub extending distally beyond a most distal portion of the at least one blade;


a catheter coupled to a proximal end of the intravascular blood pump, a purge lumen extending through the catheter;


a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a cannula lumen and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port;


an elongate lumen associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub, the elongate

lumen adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the intravascular blood pump;

a housing connected to a proximal end of the catheter; and

first and second conduits each connected to the housing, at least one of the first conduit and second conduit in fluid communication with the purge lumen, the housing remains outside the patient while providing left-heart support; the method comprising:

passing the guide wire through the patient's femoral artery such that a distal end of the guide wire is positioned in the left ventricle of the patient's heart;

placing the guide wire through both the cannula and the elongate lumen such that the guide wire extends proximally away from the intravascular blood pump, the guide wire not passing through the rotor hub or the catheter, and the guide wire extends out of the intravascular blood pump system in a distal direction through the elongate lumen;

advancing the cannula into the patient using the guide wire and positioning the cannula across an aortic valve of the patient such that a distal end of the cannula and the at least one second port are positioned in the left ventricle and a proximal end of the cannula and the at least one first port are positioned in the aorta, and the elongate lumen lies wholly within the left ventricle during left-heart support;

passing purge fluid through one of the first and second conduits, through the housing and purge lumen towards the intravascular blood pump;

measuring pressure adjacent the intravascular blood pump; and

spinning the rotor so as to pump blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support.

15.     (NEW)        The method of claim 14 wherein the intravascular blood pump system further comprising a distal tip member at one end, the distal tip member comprising a stem portion, extending distally away from a distal end of the cannula lumen, and a curved tail portion located distal to the stem portion.

16.     (NEW)        The method of claim 14 wherein the intravascular blood pump system further comprising a pigtail shaped distal tip member at one end.

17.     (NEW)        The method of claim 14 wherein the intravascular blood pump system further comprising a J-shaped shaped distal tip member at one end.

18.     (NEW)        The method of claim 14 wherein the intravascular blood pump system further comprising a fluid delivery pump configured to deliver purge fluid through the purge lumen towards the intravascular blood pump.

19.     (NEW)        The method of claim 14 wherein the fluid delivery pump is configured to deliver the purge fluid at a pressure that is both sufficient to avoid clotting of the patient's blood and that is higher than a blood pressure of the patient adjacent the intravascular blood pump.

20.     (NEW)        The method of claim 14 wherein the intravascular blood pump system further comprising a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable drive are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprising a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

21.    (NEW)        The method of claim 14 wherein the purge lumen is a side lumen extending longitudinally through the catheter but offset radially from a central axis of the catheter.

22.    (NEW)        A method for providing left-heart support using an intravascular blood pump system, the intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within the circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in the distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending radially outward from the rotor hub, a distal end of the hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump, a purge lumen extending through the catheter;

a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a cannula lumen and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port;

an elongate lumen is associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the

elongate lumen and the cannula lumen not extending through the rotor hub, the elongate lumen adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the intravascular blood pump;

a housing connected to a proximal end of the catheter;

first and second conduits each connected to the housing, at least one of the first conduit and second conduit in fluid communication with the purge lumen, the housing remains outside the patient while providing left-heart support; and

a pigtail shaped or J-shaped distal tip member at one end of the intravascular blood pump system;

the method comprising:

passing the guide wire through the patient's femoral artery such that a distal end of the guide wire is positioned in the left ventricle of the patient's heart;

placing the guide wire through both the cannula and the elongate lumen such that the guide wire extends proximally away from the intravascular blood pump, the guide wire not passing through the rotor hub or the catheter, and the guide wire extends out of the intravascular blood pump system in a distal direction through the elongate lumen;

advancing the cannula into the patient using the guide wire and positioning the cannula across an aortic valve of the patient such that a distal end of the cannula and the at least one second port are positioned in the left ventricle and a proximal end of the cannula and the at least one first port are positioned in the aorta, and both the elongate lumen and the distal tip member are wholly within the left ventricle during left-heart support;

passing purge fluid through one of the first and second conduits, through the housing and purge lumen towards the intravascular blood pump at a pressure that is both sufficient to avoid clotting of the patient's blood and that is higher than a blood pressure of the patient adjacent the intravascular blood pump;

measuring pressure adjacent the intravascular blood pump; and

spinning the rotor so as to pump blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support.

23.     (NEW)        The method of claim 22 wherein the intravascular blood pump system further comprising a fluid delivery pump configured to deliver purge fluid through the purge lumen towards the intravascular blood pump.

24.     (NEW)        The method of claim 22 wherein the intravascular blood pump system further comprising a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable drive are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprising a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

25.     (NEW)        The method of claim 22 wherein the purge lumen is a side lumen extending longitudinally through the catheter but offset radially from a central axis of the catheter.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/966,669 | 12/11/2015 | Walid N. ABOUL-HOSN | 06-01506US06 | 5519 |

99185          7590          06/21/2017
Getinge US Legal Shared Services
1300 MacArthur Boulevard
Mahwah, NJ 07430

| EXAMINER |
|---|
| MARCETICH, ADAM M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3761 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/21/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents@getinge.com

| **Office Action Summary** | **Application No.**<br>14/966,669 | **Applicant(s)**<br>ABOUL-HOSN ET AL. |
|---|---|---|
| | **Examiner**<br>Adam Marcetich | **Art Unit**<br>3761 | **AIA (First Inventor to File)**<br>**Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

### Status

1) ☒ Responsive to communication(s) filed on <u>11 December 2015</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL**.       2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims*

5) ☒ Claim(s) <u>14-33</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>14-33</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

### Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on <u>29 December 2015</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

### Priority under 35 U.S.C. § 119

12) ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All   b) ☐ Some**  c) ☐ None of the:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>4 (four)</u>.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____ .

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Drawings*

The amended drawings and specification filed 04 November 2016 have been

accepted. The revised drawings and specification incorporate subject matter from

priority applications 09/280,988 and 09/280,970. No new matter has been added.

### *Claim Objections*

Claims 20, 24, 28 and 31-33 contain minor informalities.

Claims 20, 24 and 28 should be revised for clarity in part, to read "…wherein the

intravascular blood pump system **[[comprising]] comprises** a dual construction

arrangement whereby the rotor is configured to be docked within the rotor shroud."

Claim 31 should be revised for clarity in part, to read "…wherein the intravascular

blood pump system further **[[comprising]] comprises** a distal tip member at one end

…"

Claim 32 should be revised for clarity in part, to read "…wherein the intravascular

blood pump system further **[[comprising]] comprises** a pigtail shaped distal tip …"

Claim 33 should be revised for clarity in part, to read "…wherein the intravascular

blood pump system further **[[comprising]] comprises** a J-shaped shaped distal tip …"

Application/Control Number: 14/966,669                                          Page 3
Art Unit: 3761

### *Claim Rejections - 35 USC § 112 - First Paragraph*

The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

> (a)  IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 14 and 22 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the enablement requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention.

<u>Claims 14 and 22</u> call for "… the ***entire elongate lumen distal to*** the intravascular blood pump…" This claim describes the embodiment of Fig. 7, which comprises an offset guidewire lumen. The guidewire lumen extends partially along the pump, on a distal segment of the cannula. However, the pump also comprises the cannula, and the cannula is therefore not entirely distal to the pump. This claim should be revised to describe that the entire elongate lumen is distal to one or more of the ***rotor, first port or rotor shroud***.

| **AMENDMENT**<br><br>Mail Stop: Amendment<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | Attorney Docket No. | 06-01506US06 |
|---|---|---|
| | Confirmation No. | 5519 |
| | First Named Inventor | Walid N. Aboul-Hosn et al. |
| | Application Number | 14/966,669 |
| | Filing Date | 12-11-2015 |
| | Group Art Unit | 3761 |
| | Examiner Name | ADAM M. MARCETICH |
| | Title | GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS |

## AMENDMENT IN RESPONSE TO NON-FINAL OFFICE ACTION

Sir:

In response to the non-final Office Action mailed June 21, 2017 with respect to the above-identified application, kindly amend the above-captioned application as follows.

**Amendments to the Claims** are reflected by the Listing of Claims that begins on page 2 of this paper.

**Remarks/Arguments** begin on page 13 of this paper.

**I.      Amendments to the Claims:**

Kindly amend the claims as follows.

The following listing of claims will replace all prior versions and listings of claims in the application.

**Listing of the Claims:**

1– 13.   (CANCELLED)

14.      (Currently Amended)  A method for providing left-heart support using an intravascular blood pump system, the intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within the circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in the distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending radially outward from the rotor hub, a distal end of the hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump, a purge lumen extending through the catheter;

a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a cannula lumen and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port;

an elongate lumen associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub, the elongate

lumen adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the rotor~~intravascular blood pump~~;

a housing connected to a proximal end of the catheter; and

first and second conduits each connected to the housing, at least one of the first conduit and second conduit in fluid communication with the purge lumen, the housing remains outside the patient while providing left-heart support; the method comprising:

passing the guide wire through the patient's femoral artery such that a distal end of the guide wire is positioned in the left ventricle of the patient's heart;

placing the guide wire through both the cannula and the elongate lumen such that the guide wire extends proximally away from the intravascular blood pump, the guide wire not passing through the rotor hub or the catheter, and the guide wire extends out of the intravascular blood pump system in a distal direction through the elongate lumen;

advancing the cannula into the patient using the guide wire and positioning the cannula across an aortic valve of the patient such that a distal end of the cannula and the at least one second port are positioned in the left ventricle and a proximal end of the cannula and the at least one first port are positioned in the aorta, and the elongate lumen lies wholly within the left ventricle during left-heart support;

passing purge fluid through one of the first and second conduits, through the housing and purge lumen towards the intravascular blood pump;

measuring pressure adjacent the intravascular blood pump; and

spinning the rotor so as to pump blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support.

15.     (Previously Presented)  The method of claim 14 wherein the intravascular blood pump system further comprising a distal tip member at one end, the distal tip member comprising a stem portion, extending distally away from a distal end of the cannula lumen, and a curved tail portion located distal to the stem portion.

16.     (Previously Presented)   The method of claim 14 wherein the intravascular blood pump system further comprising a pigtail shaped distal tip member at one end.

17.     (Previously Presented)   The method of claim 14 wherein the intravascular blood pump system further comprising a J-shaped shaped distal tip member at one end.

18.     (Previously Presented)   The method of claim 14 wherein the intravascular blood pump system further comprising a fluid delivery pump configured to deliver purge fluid through the purge lumen towards the intravascular blood pump.

19.     (Previously Presented)  The method of claim 14 wherein the fluid delivery pump is configured to deliver the purge fluid at a pressure that is both sufficient to avoid clotting of the patient's blood and that is higher than a blood pressure of the patient adjacent the intravascular blood pump.

20.     (Currently Amended)  The method of claim 14 wherein the intravascular blood pump system further comprising a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable drive are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises~~comprising~~ a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

21.    (Previously Presented) The method of claim 14 wherein the purge lumen is a side lumen extending longitudinally through the catheter but offset radially from a central axis of the catheter.

22.    (Currently Amended) A method for providing left-heart support using an intravascular blood pump system, the intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within the circulatory system of a patient by a guide wire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in the distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending radially outward from the rotor hub, a distal end of the hub extending distally beyond a most distal portion of the at least one blade;

a catheter coupled to a proximal end of the intravascular blood pump, a purge lumen extending through the catheter;

a cannula coupled to a distal end of the intravascular blood pump, a portion of the rotor shroud having an outer diameter matching an inner diameter of a proximal portion of the cannula, the proximal portion of the cannula disposed about a distal end of the rotor shroud, one or more first ports and one or more second ports establishing fluid communication between a cannula lumen and an exterior region of the cannula, wherein at least one first port is located in proximity to the rotor and at least one second port is spaced apart from and located distal to the at least one first port;

an elongate lumen is associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the

elongate lumen and the cannula lumen not extending through the rotor hub, the elongate lumen adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the <u>rotor</u>~~intravascular blood pump~~;

a housing connected to a proximal end of the catheter;

first and second conduits each connected to the housing, at least one of the first conduit and second conduit in fluid communication with the purge lumen, the housing remains outside the patient while providing left-heart support; and

a pigtail shaped or J-shaped distal tip member at one end of the intravascular blood pump system;

the method comprising:

passing the guide wire through the patient's femoral artery such that a distal end of the guide wire is positioned in the left ventricle of the patient's heart;

placing the guide wire through both the cannula and the elongate lumen such that the guide wire extends proximally away from the intravascular blood pump, the guide wire not passing through the rotor hub or the catheter, and the guide wire extends out of the intravascular blood pump system in a distal direction through the elongate lumen;

advancing the cannula into the patient using the guide wire and positioning the cannula across an aortic valve of the patient such that a distal end of the cannula and the at least one second port are positioned in the left ventricle and a proximal end of the cannula and the at least one first port are positioned in the aorta, and both the elongate lumen and the distal tip member are wholly within the left ventricle during left-heart support;

passing purge fluid through one of the first and second conduits, through the housing and purge lumen towards the intravascular blood pump at a pressure that is both sufficient to avoid clotting of the patient's blood and that is higher than a blood pressure of the patient adjacent the intravascular blood pump;

measuring pressure adjacent the intravascular blood pump; and

spinning the rotor so as to pump blood from the patient's heart into the at least one second port through the cannula lumen and out the at least one first port to provide left-heart support.

23.    (Previously Presented)  The method of claim 22 wherein the intravascular blood pump system further comprising a fluid delivery pump configured to deliver purge fluid through the purge lumen towards the intravascular blood pump.

24.    (Currently Amended)  The method of claim 22 wherein the intravascular blood pump system further comprising a motor assembly and a drive cable, the drive cable at least partially disposed within the catheter,

wherein the motor assembly and drive cable drive are configured to drive the rotor,

wherein the elongate lumen is proximal to the cannula and the motor assembly is configured to remain external to the patient, and

wherein the intravascular blood pump system comprises~~comprising~~ a dual construction arrangement whereby the rotor is configured to be docked within the rotor shroud.

25.    (Previously Presented)  The method of claim 22 wherein the purge lumen is a side lumen extending longitudinally through the catheter but offset radially from a central axis of the catheter.

## II.    REMARKS

By this paper, the claims 20, 24, 28 and 31-33 have been amended to overcome claim objections raised by the Examiner.

Independent claims 14 and 22 have been amended to recite "the entire elongate lumen distal to the rotor," as supported by original Figure 7.

New claim 35 depends upon claim 15 and additionally recites "the stem portion of the distal tip is fixed to the cannula and does not form part of the guidewire," as supported by Appendix A, at ¶ [00177], and by Figures 30-32, of Applicants' amended disclosure, which includes the second substitute specification and new Figures 20-54 pertaining to the incorporated disclosures of U.S. Patent Application Nos. 09/280,988 and 09/280,970.

New claims 36, 37 and 38 depend upon claims 16, 17 and 22, respectively, and each recites "the distal tip member does not form part of the guidewire" as supported, for example, by Appendix A, at ¶ [00177], and by Figures 30-32, of Applicants' amended disclosure.

New claims 39, 40 and 41 depend upon claims 14, 22 and 26, respectively, and additionally recite that "the elongate lumen extends longitudinally in the distal direction" as supported, for example, by original Figures 3, 6 and 7.

The present amendment adds no new matter to the above-captioned application.

### A.    Formalities

Applicants direct the Examiner's attention to the USPTO's PAIR database for this application, in which an amendment to the specification appears incorrectly itemized in the image file wrapper "available document" section.  The listed document, made of record on June 21, 2017, is characterized by PAIR as "Specification – Amendment Not Entered" as shown by the annotated screen shot provided below.



On the other hand, the Examiner's notations on this document include the notation "OK to enter entire revised specification, 51 pages /AMM/." See Figure 1 below. Applicants wish to confirm that the substitute specification filed by Applicants on November 4, 2016 has, in fact, been entered as indicated by the Examiner's annotated document of June 21, 2017.



Figure 1

Applicants conclude that the document description, as indicated by the above screen shot in PAIR, is incorrect. If this is the case, then the Examiner is asked to kindly contact the undersigned representative to resolve any discrepancies with respect to the entry of the amendments previously filed.

## B. <u>The Rejections</u>

Claims 14 and 22 stand rejected under 35 U.S.C. § 112(a) or 35 U.S.C. § 112 (pre-AIA), first paragraph, as allegedly failing to comply with the enablement requirement.

Claims 14-34 stand rejected on the grounds of non-statutory obviousness-type double patenting over claims 4, 5, 9, 10, 12-15, 17 and 19 of U.S. Patent 9,561,314 B2, issued to Walid N. Aboul-Hosn et al.

Applicants respectfully traverse the Examiner's rejections and request reconsideration of the above-captioned application for the following reasons.

### C.  **Applicants' Arguments**

In view of the present amendment, claims 14-41 are pending.

Applicants contend that previous claims 14 and 22 comply with 35 U.S.C. § 112 (and therefore traverse the rejection of record as being inappropriate), however, purely in order to expedite prosecution, Applicants have amended claims 14 and 22 in accordance with the Examiner's suggestions, thereby rendering the Examiner's rejection under Section 112 moot. Thus, the Examiner should withdraw the Section 112 rejection.

Applicants file herewith a terminal disclaimer that is in compliance with 37 C.F.R. § 1.321(c) or (d) and that is directed to U.S. Patent 9,561,314 B2.  This terminal disclaimer overcomes the Examiner's obviousness-type double patenting rejection.


### III.   **CONCLUSION**

For all of the above reasons, the amended claims of the above-captioned application are believed to be in condition for allowance, and a prompt notice of allowance is earnestly solicited.

If the Examiner believes a telephone call would be useful in expediting the allowance of the application, then the Examiner is invited to contact the undersigned.

Applicants believe no fee is due for the response other than the fee for seven additional dependent claims.  However, if an additional fee is due, including fees for additional extensions of time, then please charge Deposit Account No. 04-0170, from which the undersigned is authorized to draw, under order number 06-01506US06.

Respectfully submitted,

Date: June 28, 2017

By:_____
Wesley Scott Ashton
Registration No. 47,395


MAQUET Cardiovascular
1300 MacArthur Blvd
Mahwah, NJ 07430
Phone No: 1-201-995-8816



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 99185    7590    07/21/2014 | | EXAMINER |
| MAQUET Cardiovascular LLC | | MARCETICH, ADAM M |
| 1300 MacArthur Boulevard | | |
| Mahwah, NJ 07430 | ART UNIT | PAPER NUMBER |
| | 3761 | |

DATE MAILED: 07/21/2014

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/772,810 | 05/03/2010 | Walid N. Aboul-Hosn | 06-01506US04 | 4661 |

TITLE OF INVENTION: GUIDABLE INTRAVASCULAR BLOOD PUMP AND RELATED METHODS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 10/21/2014 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u>** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

MAQ_00004988

| *Notice of Allowability* | Application No. 12/772,810 | | Applicant(s) ABOUL-HOSN ET AL. | |
|---|---|---|---|---|
| | Examiner ADAM MARCETICH | | Art Unit 3761 | AIA (First Inventor to File) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to <u>07/07/2014</u>.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are <u>15,23-27,29,31,33,35-39,41-45 and 48-52</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see <u>http://www.uspto.gov/patents/init_events/pph/index.jsp</u> or send an inquiry to <u>PPHfeedback@uspto.gov</u> .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>07/07/2014</u>
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☒ Examiner's Amendment/Comment
6. ☒ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/ADAM MARCETICH/
Primary Examiner, Art Unit 3761

MAQ_00004992

Application/Control Number: 12/772,810                                    Page 2
Art Unit: 3761

## EXAMINER'S COMMENT / REASONS FOR ALLOWANCE

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Examiner's Comment*

Rejection of claims 30 and 46 under 35 U.S.C. 112 (pre-AIA), first paragraph and

rejection of claim 49 under 35 U.S.C. 112 (pre-AIA), second paragraph are withdrawn in

view of the amendments filed 29 March 2014.

### *Allowable Claims*

Claims 15, 23-27, 29, 31, 33, 35-39, 41-45 and 48-52 are allowed.

### *Reasons for Allowance*

All references listed on the IDS filed 07 July 2014 have been considered.

Völker, Wolfram (WO 9746270, machine translation), the closest art of record,

discloses an intravascular blood pump system (p. 4, ¶ 4, pump in the course of the

catheter, p. 11; ¶ 4, Figs. 1-3, pump is located between the catheter tube 10 and the

balloon support 13 16; p. 11, ¶ 5, Figs. 1-3, this includes a pump housing 17;),

comprising:

a rotor having a rotor hub and at least one blade (p. 12, ¶ 5, the impeller 20 has a

plurality of vanes 22);

a guide mechanism (p. 13, ¶ 5, a guide wire 25 is provided, which is initially

placed in the blood vessel, and is then slid over the catheter).

MAQ_00004993

However, Völker lacks several features of the invention, namely a hub tapering in the distal direction, a hub distal end extending distally beyond the blade and a guide mechanism configured as a second lumen. Instead, vanes 22 extend along the full length of impeller 20. Additionally, Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning (p. 14, ¶ 4, while the guide wire 25 is located in the pump housing, no Rotation of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of claims 15, 29 or 45.

Also cited on the IDS, <u>Sammler, Rolf et al. (DE 19821307, machine translation)</u> discloses an intravascular blood pump system (p. 1, ¶ 2, intracardiac blood pump; p. 12, ¶ 6, Fig. 1, blood pump 10), comprising:

a guide mechanism configured as an elongate lumen for a guide wire (p. 21, ¶ 1, 3, 5, Fig. 4, catheter 48; p. 22, ¶ 4, 6, Fig. 5, catheter 48).

However, Sammler lacks a blood pressure detection mechanism comprising a fluid column. Additionally, Sammler is silent whether the lumen for catheters 46/48 is arranged coaxially with the distal or proximal end of the cannula, and whether the blood pump comprises a generally conical rotor hub. Sammler does not disclose enough detail in order to modify any of the art of record with a coaxial elongate lumen for passing a guidewire.

MAQ_00004994

Application/Control Number: 12/772,810                                    Page 4
Art Unit: 3761

    Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


*Conclusion*

    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to:

Tel    (571)272-2590
Fax   571-273-2590
Email  Adam.Marcetich@uspto.gov

    The Examiner can be reached 8:00am to 4:00pm Monday-Friday.
    If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Tatyana Zalukaeva can be reached on 571-272-1115.  The fax phone
number for the organization where this application or proceeding is assigned is 571-
273-8300.
    Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a
USPTO Customer Service Representative or access to the automated information
system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Adam Marcetich/
Primary Examiner, Art Unit 3761

MAQ_00004995

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

**Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH,**
*Petitioners*

**v.**

**Maquet Cardiovascular, LLC**
*Patent Owner*

**Case IPR2017-01027**
**U.S. Patent No. 8,888,728**

## PATENT OWNER'S PRELIMINARY RESPONSE

**D.    The References Relied Upon are Redundant.**

Aboul-Hosn represents a well-worn path of references that were previously before the Office during prosecution. Aboul-Hosn was before the Examiner during prosecution, along with many similar and redundant references. For at least these reasons, the Board should exercise its authority to reject the Petition, as the Office has previously considered the same or substantially the same issues. *See* 35 U.S.C. § 325(d); *see also* Institution Decision at 12-13, *Prism Pharma Co., Ltd v. Choongwae Pharma Corp.*, IPR2014-00315 (P.T.A.B. Jul. 8, 2014), Paper 14 (rejecting the Petition because the same prior art and substantially the same arguments were presented to the Office previously during prosecution); Institution Decision at 7-8, *Integrated Global Concepts, Inc. v. Advanced Messaging Techs., Inc.*, IPR2014-01027 (P.T.A.B. Dec. 22, 2014), Paper 16.

Aboul-Hosn was cited by the Applicant in an information disclosure statement considered on February 03, 2012, some two years before the Notice of Allowance was issued (Ex. 1003, 138). After the Applicant cited Aboul-Hosn, the Examiner issued four Office Actions and two Notices of Allowance, never listing Aboul-Hosn as a reference relevant to the patentability of the claims (Ex. 1003).

One reference that the Examiner explicitly considered and found the claims patentable over is Voelker.[4] The Petition relies on Voelker to establish the so-called state of the art. The Petition further explains that Voelker and Aboul-Hosn have similar teachings. For example, the Petition admits that Voelker teaches the same guide mechanism as Aboul-Hosn: "[a]s explained in further detail in Sections VII and X below, Aboul-Hosn disclosed that same well-known 'over-the-wire' catheterization technique and used it in delivering intravascular blood pumps into the heart" (Petition, 8). This alleged similarity should provide the Board with sufficient reason to deny the Petition.

Not only does the Petition admit the redundant nature of Aboul-Hosn and Voelker, but Petitioners' expert confirms they are redundant (Ex. 1002, ¶¶ 37, 43, 63, 70, 84).

In short, the Petition presents "old art"—Aboul-Hosn is no different from other art already considered. This is exactly the type of Petition that the Board routinely denies. As such, Patent Owner submits that the Board should defer to Primary Examiner Kidwell's considered judgment and deny the Petition.

---

[4] The US Patent that corresponds to the PCT Publication was cited by Petitioners as Ex. 1011.

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

**Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH,**
*Petitioners*

v.

**Maquet Cardiovascular, LLC**
*Patent Owner*

---

### Case IPR2017-01026
### U.S. Patent No. 8,888,728

---

## PATENT OWNER'S PRELIMINARY RESPONSE

Accordingly, in addition to failing to combine the separate embodiments in Aboul-Hosn, Petitioners fail to show unpatentability of the claimed blood pressure detection mechanism.

### E.   The References Relied Upon are Redundant.

Aboul-Hosn represents a well-worn path of references that were previously before the Office during prosecution. Aboul-Hosn was before the Examiner during prosecution, along with many similar and redundant references. For at least these reasons, the Board should exercise its authority to reject the Petition, as the Office has previously considered the same or substantially the same issues. *See* 35 U.S.C. § 325(d); *see also* Institution Decision at 12-13, *Prism Pharma Co., Ltd v. Choongwae Pharma Corp.*, IPR2014-00315 (P.T.A.B. Jul. 8, 2014), Paper 14 (rejecting the Petition because the same prior art and substantially the same arguments were presented to the Office previously during prosecution); Institution Decision at 7-8, *Integrated Global Concepts, Inc. v. Advanced Messaging Techs., Inc.*, IPR2014-01027 (P.T.A.B. Dec. 22, 2014), Paper 16.

Aboul-Hosn was cited by the Applicant in an information disclosure statement considered on February 03, 2012, some two years before the Notice of Allowance was issued (Ex. 1003, 138). After the Applicant cited Aboul-Hosn, the Examiner issued four Office Actions and two Notices of Allowance, never listing Aboul-Hosn as a reference relevant to the patentability of the claims (Ex. 1003).

One reference that the Examiner explicitly considered and found the claims patentable over is Voelker.[3] Petitioners rely on Voelker to establish the so-called state of the art. Petitioners further explain that Voelker and Aboul-Hosn have similar teachings. For example, Petitioners admit that Voelker teaches the same guide mechanism as Aboul-Hosn: "[a]s explained in further detail in Sections VII and X below, Aboul-Hosn disclosed that same well-known 'over-the-wire' catheterization technique and used it in delivering intravascular blood pumps into the heart" (Petition, 8). This alleged similarity should provide the Board with sufficient reason to deny the Petition.

Not only do Petitioners admit the redundant nature of Aboul-Hosn and Voelker, but Petitioners' expert confirms they are redundant (Ex. 1002, ¶¶ 37, 43, 60, 67, 85).

In short, Petitioners present "old art"—Aboul-Hosn is no different from other art already considered. This is exactly the type of Petition that the Board routinely denies. As such, Patent Owner submits that the Board should defer to Primary Examiner Kidwell's considered judgment and deny the Petition.

---

[3] The US Patent that corresponds to the PCT Publication was cited by Petitioners as Ex. 1011.

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

**Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH,**
*Petitioners*

v.

**Maquet Cardiovascular, LLC**
*Patent Owner*

**Case IPR2017-01028**
**U.S. Patent No. 9,327,068**

## PATENT OWNER'S PRELIMINARY RESPONSE

Accordingly, in addition to failing to combine the separate embodiments in Aboul-Hosn, Petitioners fail to show unpatentability of the claimed blood pressure detection mechanism.

### F.   The References Relied Upon are Redundant.

Aboul-Hosn represents a well-worn path of references previously before the Office during prosecution. Aboul-Hosn was before the Examiner during prosecution, along with many similar and redundant references. For at least these reasons, the Board should exercise its authority to reject the Petition, as the Office has previously considered the same or substantially the same issues. *See* 35 U.S.C. § 325(d); *see also* Institution Decision at 12-13, *Prism Pharma Co., Ltd v. Choongwae Pharma Corp.*, IPR2014-00315 (P.T.A.B. Jul. 8, 2014), Paper 14 (rejecting the Petition because the same prior art and substantially the same arguments were presented to the Office previously during prosecution); Institution Decision at 7-8, *Integrated Global Concepts, Inc. v. Advanced Messaging Techs., Inc.*, IPR2014-01027 (P.T.A.B. Dec. 22, 2014), Paper 16.

Aboul-Hosn was cited by the Applicant in an information disclosure statement considered on August 10, 2015 prior to issuing the first, and only, Office Action (Ex. 1003, 107-117 & 145). In response to the Office Action, a Terminal Disclaimer was filed, and the first Notice of Allowance was issued (Ex. 1003, 153 & 171-180). The Applicant then submitted two additional information disclosure

statements citing additional references with a request for continued examination (Ex. 1003, 190-200, 213-221). These new references were considered and a new Notice of Allowance was issued (Ex. 1003, 685-704). Aboul-Hosn was never listed as a reference relevant to the patentability of the claims.

One reference the Examiner explicitly considered and found the claims patentable over is Voelker.[3] Petitioners rely on Voelker to establish the so-called state of the art. Petitioners further explain Voelker and Aboul-Hosn have similar teachings. For example, Petitioners admit Voelker teaches the same guide mechanism as Aboul-Hosn: "[a]s explained in further detail in Sections VII and X below, Aboul-Hosn disclosed that same well-known 'over-the-wire' catheterization technique and used it in delivering intravascular blood pumps into the heart" (Petition, 8). This alleged similarity should provide the Board with sufficient reason to deny the Petition.

Not only do Petitioners admit the redundant nature of Aboul-Hosn and Voelker, but Petitioners' expert confirms they are redundant (Ex. 1002, ¶¶ 36, 42-43, 59, 66, 84).

---

[3] The US Patent corresponding to the PCT Publication was cited by Petitioners as Ex. 1012.

In short, Petitioners present "old art"—Aboul-Hosn is no different from other art already considered. This is exactly the type of Petition the Board routinely denies. As such, Patent Owner submits the Board should defer to Primary Examiner Marcetich's considered judgment and deny the Petition.

### G.     Grounds 2 & 3 Fail to Invalidate Dependent Claims

Grounds 2 and 3 also fail to invalidate any claims in the '068 Patent. These grounds are directed to dependent claims and allegedly disclose the additional features disclosed in these limitations. Because Ground 1 fails for the reasons listed above to invalidate independent Claim 1, these additional grounds also fail to invalidate these dependent claims (*supra* §§ III(A)-(F)).

## IV.   ADDITIONAL ISSUES

This section addresses the hypothetical POSITA, the qualifications of Petitioners' expert Dr. Collins, and claim construction. The many deficiencies in the Petition described above do not turn on these issues because the references simply do not show what Petitioners allege, and because Petitioners fail to show a basis for their proposed combinations. Nevertheless, as noted below, Petitioners present the wrong level of skill and an incorrect claim construction, and Petitioner's expert Dr. Collins lacks sufficient qualifications.

### A.     Person of Ordinary Skill

The hypothetical person of ordinary skill in the art, or POSITA, is not an extraordinarily innovative person, nor a researcher of inexhaustible patience, but is

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

**Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH,**
*Petitioners*

v.

**Maquet Cardiovascular, LLC**
*Patent Owner*

---

**Case IPR2017-01029**
**U.S. Patent No. 9,327,068**

---

**PATENT OWNER'S PRELIMINARY RESPONSE**

As a result, Petitioners fail to demonstrate Aboul-Hosn teaches or suggests the claimed method. ***Petitioners do not cite to Siess '913 to make up for these shortcomings.*** Accordingly, Petitioners fail to show there is a likelihood Claim 10 is unpatentable.

### E.    The References Relied Upon are Redundant.

Aboul-Hosn represents a well-worn path of references that were previously before the Office during prosecution. Aboul-Hosn was before the Examiner during prosecution, along with many similar and redundant references. For at least these reasons, the Board should exercise its authority to reject the Petition, as the Office has previously considered the same or substantially the same issues. *See* 35 U.S.C. § 325(d); *see also* Institution Decision at 12-13, *Prism Pharma Co., Ltd v. Choongwae Pharma Corp.*, IPR2014-00315 (P.T.A.B. Jul. 8, 2014), Paper 14 (rejecting the Petition because the same prior art and substantially the same arguments were presented to the Office previously during prosecution); Institution Decision at 7-8, *Integrated Global Concepts, Inc. v. Advanced Messaging Techs., Inc.*, IPR2014-01027 (P.T.A.B. Dec. 22, 2014), Paper 16.

Aboul-Hosn was cited by the Applicant in an information disclosure statement considered on August 10, 2015 prior to issuing the first, and only, Office Action (Ex. 1003, 107-117 & 145). In response to the Office Action, a Terminal Disclaimer was filed, and the first Notice of Allowance was issued (Ex. 1003, 153

& 171-180). The Applicant then submitted two additional information disclosure statements citing additional references with a request for continued examination (Ex. 1003, 190-200, 213-221). These new references were considered and a new Notice of Allowance was issued (Ex. 1003, 685-704). Aboul-Hosn was never listed as a reference relevant to the patentability of the claims.

One reference that the Examiner explicitly considered and found the claims patentable over is Voelker.[4] Petitioners rely on Voelker to establish the so-called state of the art. Petitioners further explain that Voelker and Aboul-Hosn have similar teachings. For example, Petitioners admit that Voelker teaches the same guide mechanism as Aboul-Hosn: "[a]s explained in further detail in Sections VII and X below, Aboul-Hosn disclosed that same well-known 'over-the-wire' catheterization technique and used it in delivering intravascular blood pumps into the heart" (Petition, 7). This alleged similarity should provide the Board with sufficient reason to deny the Petition.

Not only do Petitioners admit the redundant nature of Aboul-Hosn and Voelker, but Petitioners' expert confirms they are redundant (Ex. 1002, ¶¶ 37, 43-44, 63, 70, 84).

---

[4] The US Patent that corresponds to the PCT Publication was cited by Petitioners as Ex. 1012.

In short, Petitioners present "old art"—Aboul-Hosn is no different from other art already considered. This is exactly the type of Petition that the Board routinely denies. As such, Patent Owner submits that the Board should defer to Primary Examiner Marcetich's considered judgment and deny the Petition.

### F.   Ground 2 Fails to Invalidate Dependent Claim 11

Ground 2 also fails to invalidate any claims in the '068 Patent. Ground 2 is directed to dependent claim 11 and allegedly discloses the additional features disclosed in this claim. Because Ground 1 fails for the reasons listed above to invalidate the independent claims, this additional ground also fails to invalidate dependent claim 11 (*supra* §§ IV(A)-(E)).

## IV.   ADDITIONAL ISSUES

This section addresses the hypothetical POSITA, the qualifications of Petitioners' expert Dr. Collins, and claim construction. The many deficiencies in the Petition described above do not turn on these issues because the references simply do not show what Petitioners allege, and because Petitioners fail to show a basis for their proposed combinations. Nevertheless, as noted below, Petitioners present the wrong level of skill and an incorrect claim construction, and Petitioner's expert Dr. Collins lacks sufficient qualifications.

### A.   Person of Ordinary Skill

The hypothetical person of ordinary skill in the art, or POSITA, is not an extraordinarily innovative person, nor a researcher of inexhaustible patience, but is

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAQUET CARDIOVASCULAR LLC, | |
|        Plaintiff/Counter-Defendant, | |
|    v. | |
| ABIOMED, INC.; ABIOMED R&D, INC.; and ABIOMED EUROPE GMBH, | No. 1:17-cv-12311-FDS |
|        Defendants/Counter-Claimants, | |
|    v. | |
| GETINGE AB, | |
|        Third-Party Defendant. | |

**MAQUET CARDIOVASCULAR LLC'S OPENING *MARKMAN* BRIEF**

*LLC v. Arthro-7*, 2013 U.S. Dist. LEXIS 189647, at *25 and *30 (C.D. Cal. Apr. 16, 2013); *see also Therasense, Inc. v. Becton, Dickinson & Co.*, 560 F. Supp. 2d 835, 877 (N.D. Cal. 2008).

## IV.  CLAIM TERMS IN DISPUTE

No construction is necessary for each of the 14 terms of the '783 Patent proposed for construction by Abiomed because each term's plain and ordinary meaning is sufficient to properly understand the term. In other words, no language in any term is so ambiguous or overly technical such that a lay jury cannot apply the term to the factual issues of validity and infringement as stated in the claim without further construction. *See Phillips*, 415 F.3d at 1314. As discussed in more detail below, the plain and ordinary meaning of each term is further consistent with the uses of each term—and its constituent elements—throughout the specification and prosecution history of the patents-in-suit.

As further discussed below, Abiomed's proposed constructions are generally not directed toward curing ambiguous or technical language within the claims.  Instead, Abiomed has proposed constructions that primarily attempt to import limitations, sometimes from the specification and/or prosecution history, into the claims. In doing so, Abiomed repeatedly commits the "cardinal sin" of claim construction. *See Phillips*, 415 F.3d at 1320; *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807–9 (Fed. Cir. 2007) (the patentee's decision not to use narrower language used in the specification demonstrates that the patentee "chose a different term that implies a broader scope"); *Unwired Planet, LLC*, 829 F.3d at 1358 (requiring "words or expressions of manifest exclusion" to narrow the scope of a claim).

### A.  Rotor Hub

| Claim Term | Claims | Maquet's Proposed Construction | Abiomed's Proposed Construction |
|---|---|---|---|
| "rotor having a rotor hub tapering in the distal direction" | 783: 1, 24 | *As construed by the Court in Abiomed, Inc. v. Maquet* | *As construed by the Court in Abiomed, Inc. v. Maquet* |

| Claim Term | Claims | Maquet's Proposed Construction | Abiomed's Proposed Construction |
|---|---|---|---|
| | | *Cardiovascular LLC, No. 16-cv-10914 (D. Mass.) ("MAQ I"), D.I. 241 at 58:*<br><br>"a rotor having a rotor hub generally tapering in the distal direction." | *Cardiovascular LLC, No. 16-cv-10914 (D. Mass.) ("Abiomed I"), D.I. 241 at 58:*<br><br>"a rotor having a rotor hub generally tapering in the distal direction" |

There is no dispute for this term. In MAQ I, the Court construed this term as "a rotor having a rotor hub generally tapering in the distal direction." Both parties agree with the Court's construction.

### B.  Guide Mechanism and Guide Wire Terms

| Claim Term | Claim | Maquet's Proposed Construction | Abiomed's Proposed Construction |
|---|---|---|---|
| "guide mechanism comprising a lumen" | 783: 1 | This term should be given its plain and ordinary meaning.<br><br>However, if the Court determines that a construction is necessary, the term should be given its previous construction:<br><br>"guide mechanism comprising a lumen that does not extend through free space between rotor blades" MAQ I, D.I. 241, at 27. | *Same construction as construed by the Court for the "lumen" terms in Abiomed I, D.I. 241 at 27:*<br>"guidewire lumen does not extend through the free space between the rotor blades"<br><br>*And with the additional clarification that:*<br>"guidewire lumen is not distal to the cannula" |

The words in this term have a readily apparent meaning in the context of the patented invention. A POSA and lay jury would have no problem understanding their meaning. As discussed below, the prosecution history of the '783 Patent contains no disclaimer of claim scope and, accordingly, this claim should be given its plain and ordinary meaning.

However, despite the Court substantially adopting Abiomed's proposed construction of similar terms in MAQ I (*e.g.*, "guide mechanism configured as an elongate lumen," '728 patent, claim 10, discussed at MAQ I, D.I. 241 at 22–27), Abiomed now argues for the very first time that a new *negative limitation* should be attached to this claim term. Because Abiomed substantially prevailed based on its prior claim construction arguments and its current arguments are not consistent with those prior positions, Abiomed should be judicially estopped from pursuing a different construction here. *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 13 (1st Cir. 1999).

Nevertheless, as the Court knows, negative limitations are strongly disfavored and are only permitted when the patent or the prosecution history contains an explicit disavowal, which is not the case here. Abiomed never raised this alleged negative limitation during the MAQ I claim construction process for the lumen / guide mechanism claim terms, and for good reason, because there is no support for it. In MAQ I, instead of its currently proposed construction with the added negative limitation, Abiomed proposed a construction of "lumen and guide wire not extending through the free space between the rotor blades," without the added negative limitation. However, the Court, recognizing that there was no support for a construction mandating a routing of the guide wire, ruled only that "the guidewire *lumen* does not extend through the free space between the rotor blades." MAQ I, D.I. 241 at 27 (emphasis added). The newly added "not distal" negative limitation in this case is a transparent attempt to avoid what has transpired during discovery in MAQ I, which is that Abiomed's witnesses admitted that the accused products meet the Court's guidewire *lumen* limitation without the newly added "not distal" negative limitation. By not raising this negative limitation in MAQ I, Abiomed has not only procedurally waived its ability to raise it now, but also has demonstrated the substantive weakness of its position.

The Federal Circuit has set a high bar for adopting a negative limitation. In particular, the

importation of negative limitations are generally disfavored and will not be imparted to claim terms without clear, unmistakable disavowal in the specification or prosecution history. *See, e.g. Omega Eng'g. Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332-33 (Fed. Cir. 2003) (rejecting district court's construction, which included negative limitation where an "independent review of the patent document reveals . . . there is no basis in the patent specification for adding the negative limitation."); *WesternGeco LLC v. ION Geophysical Corp.*, 735 F. Supp. 2d 623, 637 (S.D. Tex. 2010) ("Importing negative limitations into a claim absent an explicit disavowal is generally disfavored."); *Hyperion Solutions Corp. v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 773 (E.D. Tex. 2006) ("Importing a negative limitation into a claim, particularly where the claim language does not contain such a limitation, is generally not favored."). Indeed, when added during prosecution, negative limitations require support from the written description of a patent. *In re CSB-System International, Inc.*, 832 F.3d 1335, 1342 (Fed. Cir. 2016); *INPHI Corp. v. Netlist, Inc.*, 805 F.3d 1350 (Fed. Cir. 2015). It is not sufficient for there to be an absence of a particular feature in the patent disclosure to justify a negative limitation. *See Jang v. Boston Scientific Corp.*, 493 Fed. Appx. 70, 78 (Fed. Cir. 2012) (refusing to add negative limitation "simply based on the absence of any disclosure"). In order to construe a claim as containing an imported negative limitation, there must be an "express disclaimer or independent lexicography in the intrinsic record that justifies including the negative limitation." *Vehicle IP, LLC v. AT&T Mobility, LLC*, 594 F. App'x 636, 642 (Fed. Cir. 2014) ("Neither the district court nor Appellees point to any express disclaimer or independent lexicography in the intrinsic record that justifies including the negative limitation").

Here, there is no express disclaimer by the patent owner that clearly and unmistakably disavows that the lumen may extend distally from the cannula. The specification throughout states that the lumen may extend through the cannula. *See, e.g.*, '783 Patent at 9:20–24, 10:43–49 and

12:51–55. However, the specification never once says that it may not extend distally from the cannula, which Abiomed would improperly have the Court read into the claim language.

The plain and ordinary meaning of this term should prevail. However, should the Court determine that this term requires some construction, it should adopt the construction determined in MAQ I of "guide mechanism comprising a lumen that does not extend through free space between rotor blades" without the additional, negative limitation newly proposed by Abiomed.

| Claim Term | Claim | Maquet's Proposed Construction | Abiomed's Proposed Construction |
|---|---|---|---|
| *wherein an* "axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | 783: 1 | This term should be given its plain and ordinary meaning.<br><br>However, if the Court determines that a construction is necessary, the term should be given its previous construction:<br><br>"the axis of at least a portion of the guide mechanism . . . must run through a region delimited by the outer cannula surface" MAQ I, D.I. 241, at 43-44 | *As construed by the Court in Abiomed I, D.I. 241 at 43:*<br><br>"the axis of at least a portion of the guide mechanism . . . must run through a region delimited by the outer cannula surface"<br><br>*And with the additional clarification that:* "guide wire lumen is not attached outside the cannula" |

The plain and ordinary meaning of this term is readily apparent on its face and does not require clarification. Once again, the prosecution history and specification do not support the negative limitation proposed by Abiomed. Accordingly, the term should be given its plain and ordinary meaning.

In MAQ I, the Court construed this exact same term. MAQ I, D.I. 241 at 36–44. Abiomed, however, now argues for the first time that a new negative limitation ("guide wire lumen is not attached outside the cannula") should be included in the court's construction. Having not raised

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MAQUET CARDIOVASCULAR LLC,

        Plaintiff/Counter-Defendant,

   v.

ABIOMED, INC.; ABIOMED R&D, INC.;
and ABIOMED EUROPE GMBH,

        Defendants/Counter-
        Claimants,

No. 1:17-cv-12311-FDS

**MAQUET CARDIOVASCULAR LLC'S RESPONSIVE *MARKMAN* BRIEF**

## II.    CLAIM TERMS IN DISPUTE

### A.    Guide Mechanism and Guide Wire Terms

| Claim Term | Claim | Maquet's Proposed Construction | Abiomed's Proposed Construction |
|---|---|---|---|
| "guide mechanism comprising a lumen" | 783: 1 | This term should be given its plain and ordinary meaning.<br><br>However, if the Court determines that a construction is necessary, the term should be given its previous construction:<br><br>"guide mechanism comprising a lumen that does not extend through free space between rotor blades" MAQ I, D.I. 241, at 27. | *Same construction as construed by the Court for the "lumen" terms in Abiomed I, D.I. 241 at 27:* "guidewire lumen does not extend through the free space between the rotor blades"<br><br>*And with the additional clarification that:* "guidewire lumen is not distal to the cannula" |

In its Opening Brief, Abiomed argues that a claim amendment made by Maquet during prosecution of a different patent application to a completely different claim term than is at issue here is evidence of a disclaimer of some portion of this claim term's otherwise existing claim scope. However, despite having every opportunity to argue this new disclaimer theory in MAQ I (where identical claim language was at issue), Abiomed chose not to (presumably due to its manifest weakness) and there the Court adopted Abiomed's ***own proposed construction***. *See* MAQ I, D.I. 241 at 22–27. Abiomed does not dispute that it could have raised its new disclaimer theory during claim construction in MAQ I and only meekly notes that the alleged source of that disclaimer, an amendment made during prosecution of the application that issued as U.S. Pat. No. 9,789,238 (the "'238 Patent"), occurred in connection with a patent that was "not at issue" in MAQ I. *See* D.I. 137 at 8. However, the '238 Patent is likewise not presently at issue here, yet Abiomed

- 3 -
Appx635

did not let that fact prevent it from advancing its current theories. Abiomed advanced a claim construction position in MAQ I that the Court adopted and should be estopped from taking a different position now. *See Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007) (stating that "[t]he doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation" and that judicial estoppel applies to "a party … asserting clearly inconsistent positions on claim construction") (citation omitted); *see also Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 13 (1st Cir. 1999).

The Parties both agree that there has been no clear and unmistakable statement present in the specification or made by the applicant during prosecution that can support the negative limitation Abiomed now seeks to attach to this claim term. *See, e.g. Omega Eng'g. Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332–33 (Fed. Cir. 2003); *WesternGeco LLC v. Ion Geophysical Corp.*, 735 F. Supp. 2d 623, 637 (S.D. Tex. 2010); *Hyperion Solutions Corp. v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 773 (E.D. Tex. 2006). Instead, Abiomed's entire argument hinges on the act of amending a claim term in a different application that is substantially and materially different than the claim term from the '783 Patent at issue here. *See* D.I. 137 at 8–10. The terms are shown below in comparison:

| *Claim 1, '783 Patent* | *Original claim 14, U.S. Pat. App. No. 14/966,669* |
|---|---|
| guide mechanism comprising a lumen | an elongate lumen associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub, the elongate lumen adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the intravascular blood pump; |

The original claim 14 in U.S. Pat. App. No. 14/966,669 was an elongate lumen associated with the cannula and sized in relation to the cannula, whereas the claim at issue in MAQ II is simply a guide mechanism comprising a lumen. The Federal Circuit has repeatedly held that an amendment made to a claim term may not result in a disclaimer applicable to later, related patents that are using different claim terms. *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 944 (Fed. Cir. 2013) (Disclaimer is inapplicable to later claim terms except when there are "immaterial differences" between the two claims.); *see also Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply."); *Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[P]rosecution disclaimer generally does not apply when the claim term in the descendent patent uses different language."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application."); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language."); *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003) ("When the applicant is seeking different claims in a divisional application, estoppel generally does not arise from the prosecution of the parent.").

Here, the term "*an elongate lumen associated with the cannula and sized to slidably receive the guide wire and dimensioned such that the guide wire passes slidably and coaxially through the elongate lumen, the elongate lumen is sized smaller cross sectionally than the cannula lumen, both the elongate lumen and the cannula lumen not extending through the rotor hub, the elongate lumen*

*adapted to guide the guide wire through a distal end of the intravascular blood pump system, the elongate lumen shorter in length than the cannula lumen, the entire elongate lumen distal to the intravascular blood pump*" is not the same (and certainly not "immaterially different") than "*guide mechanism comprising a lumen.*" *See Amgen Inc. v. Mylan, Inc.*, No. 2:17-cv-01235, 2018 U.S. Dist. LEXIS 197482, at \*41–43 (W.D. Pa. Nov. 20, 2018) (holding that a prosecution disclaimer from an ancestor application with the identical specification did not apply to a descendant patent despite the claim terms differing only by one word and explaining that the "subject matter of the two patents may be the same … but the claim scope and language are not.")*; Broadridge Financial Solutions, Inc. v. Inveshare Inc.*, 2012 WL 1245723 at \*4 (D. Del. Apr. 11, 2012) ("Relatively nuanced variations in claim language between patent generations have barred importing a disclaimer to a child claim.").

Moreover, what Abiomed obscures is that the amendment in that different patent application kept the same claim scope (or, at most, broadened the scope) of the then-pending claims of the '238 Patent and cannot support the narrowing negative limitation Abiomed seeks to add now. The amendment cited by Abiomed was to then-pending claim 14 of U.S. Pat. App. No. 14/966,669, which, before amendment, read in pertinent part:

> 14.  *A method for providing left-heart support using **an intravascular blood pump <u>system</u>**, the intravascular blood pump system **<u>comprising</u>***:
>
> [1] *an **intravascular blood pump** … comprising a **rotor** … and a **rotor shroud**;*
>
> …
>
> [2] *a **cannula** <u>coupled to</u> a distal end of **the intravascular blood pump** … ;*
>
> [3] *an **elongate lumen** associated with the **cannula** … , the entire elongate lumen distal to the **intravascular blood pump**;*

D.I. 138-9 at pp. 4–5 of 64 (emphasis and brackets added).

The figure below, adapted from Figs. 1, 3, and 6 of the application, illustrates the arrangement of the claim elements in claim 14 prior to the cited amendment. As then claimed, the entire elongate lumen associated with the cannula is distal to the intravascular blood pump (comprised of a rotor and rotor shroud).[4] The cannula is not a component of the intravascular blood pump in this claim. Instead, the cannula is recited as a separate element of the intravascular blood pump **system**, not the intravascular blood **pump**, as indicated by the semicolon terminating the recitation of intravascular blood pump element that separates the "pump" element from the remainder of the claim elements and further confirmed by the recitation that the "***cannula*** [*is*] ***coupled to*** *a distal end of the **intravascular blood pump***."



After claim 14 was introduced, the examiner reviewed and rejected the claim as purportedly failing to comply with the enablement requirement of 35 U.S.C. §112(1). D.I. 138-11 at p. 6 of 13. However, in reciting the disclosure of the figures and specification purportedly lacking enablement of the claim, the examiner incorrectly asserted that the "pump also comprises the cannula." *Id.* Thus, even though this arrangement was not what was claimed, the examiner apparently examined the claim with the erroneous understanding that the claim language required

---

[4] The transitional term "comprising" is synonymous with "including," "containing," or "characterized by" and requires inclusion of the listed elements, but does not exclude additional, unrecited elements. *See, e.g.*, *Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004).

an "elongate lumen associated with the cannula" entirely distal to the intravascular blood pump *system* (*i.e.*, distal to **both** the intravascular blood pump **and** the cannula):



Based on this misunderstanding, the examiner suggested amending the claim to recite that the elongate lumen "is distal to one or more of the rotor, first port or rotor shroud." *Id.* In response to this rejection, recognizing the examiner's mistake and with the knowledge that the proposed amendment would not affect the claim's scope and would give Maquet exactly what it wanted to begin with, Maquet "traverse[d] the rejection of record as being inappropriate[], however, purely in order to expedite prosecution, [Maquet] amended claims 14 and 22 in accordance with the examiner's suggestions…." D.I. 138-12 at p. 17 of 17. The amendment was:

> *14.  A method for providing left-heart support using an intravascular blood pump system, the intravascular blood pump system comprising:*
>
> *an intravascular blood pump … comprising a rotor … and a rotor shroud;*
>
> *…*
>
> *a cannula coupled to a distal end of the intravascular blood pump … ;*
>
> *an elongate lumen associated with the cannula … , the entire elongate lumen distal to the <u>rotor</u> ~~intravascular blood pump~~;*

*Id.* at pp. 4–5 of 17. Thus, the position of the lumen according to the amended claim is the same as it had been before amendment (*i.e.*, distal to the intravascular blood pump, which comprises the rotor):



Indeed, even if the examiner's position was correct, which it was not, the effect of Maquet's amendment under the examiner's incorrect assumption that the "intravascular blood pump" included the "cannula" was that the scope of the claim was **broadened** to **expand the range of positions** for the elongated lumen. The law is clear that broadening amendments do not evidence disclaimer of claim scope and do not support a departure from a claim term's plain and ordinary meaning. *See, e.g., 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1372 (Fed. Cir. 2003) ("The fact that [plaintiff] broadened its claims in response to an indefiniteness rejection and dropped the sequential limitation is perhaps unusual, but it is entirely permissible, and the plain language of the claim as issued must control."), *citing Smith v. Snow*, 294 U.S. 1, 16 (1935) ("It is of no moment that in the course of the proceedings in the Patent Office the rejection of narrow claims was followed by the allowance of the broader claim 1."); *see also United States v. Telectronics, Inc.*, 857 F.2d 778, 782–83 (Fed.Cir.1988) (Concluding that adding a limitation to a claim during prosecution and then removing it when the limitation failed to result in allowance of the claim over the prior art does not permit reading of limitation into claim when the claim issued without it); *Abbott Labs. v. Lupin Ltd.*, 753 F. Supp. 2d 382, 402 (D. Del. 2010) ("The key here is that the inventors submitted claims that would have *excluded* a hydrophobic component, but these claims were rejected. Thus, the claims as issued were not limited to the narrower scope proposed by the inventors. By implication, the claims that did issue—which do not contain the rejected

narrowing limitation—are broader, indeed sufficiently broad to allow for *the possibility* of internal hydrophobic components."). Thus, the Court should reject Abiomed's attempt to add an unsupported negative limitation to its claim construction.[5]

---

[5] The Federal Circuit has warned that negative limitations should not be appended to claims based on an examiner's rejection based on lack of support in the specification. *See Chiron Corp. v. Genentech, Inc.*, 266 F. Supp. 2d 1172, 1189 n.16 (E.D. Cal. 2002) (holding that "[i]t would be improper for the court to read a limitation in-to the broad monoclonal antibody claims because narrower claims to sell lines were rejected" and explaining that although "somewhat counter-intuitive, the Federal Circuit's reasoning is that a broad claim encompasses even subject matter that cannot be specifically claimed. Thus, a rejection of a narrow claim because it is not supported by the disclosure cannot be used to limit issued claims that are written broadly.") (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996) (rejecting the addition of a negative limitation to a patent claim based on an examiner rejection that the claim element was unsupported in the specification). In *Ethicon*, during the prosecution history of the patent in suit the examiner rejected claim 1 of the patent which recited a lockout mechanism located "on the stapler," saying "there is no support in the specification for a lockout mechanism that is mounted to the stapler" but conceding that the specification does support the lockout mechanism mounted to the staple cartridge. The Federal Circuit stated that even after such a rejection by an examiner, the applicant is still free to draft claims "broadly … to exclude the lockout's exact location as a limitation of the claimed invention" and this does not otherwise allow the district court to impose on a broad claim an additional negative limitation that it does not contain. *Id.* ("The district court should not have imposed on claim 24 an additional limitation which it does not contain."). The Federal Circuit concluded that "[s]uch a claim would not be unsupported by the specification even though it would be literally infringed by undisclosed embodiments." *Id.*

MAQUET

**Plaintiff Maquet Cardiovascular LLC's Presentation; November 18, 2019 *Markman* Hearing**

– in –

*Maquet Cardiovascular LLC v. Abiomed Inc. et al.,*
No. 1:17-cv-12311-FDS (D. Mass. filed November 22, 2017)

Overview

1

# Claims are Similar to Those in *Maquet I*

**MAQUET**

## '783 Patent, Claim 1 Compared to Already-Construed '728 Patent, Claim 1

- **Red** / "~~strikethrough~~" are deletions from already-construed '728 Patent, Claim 1
- **Blue** / "<u>underline</u>" are additions over already-construed '728 Patent, Claim 1

An intravascular blood pump system, comprising:
**an intravascular blood pump comprising:**

a rotor having a rotor hub tapering in ~~the~~ <u>a</u> distal direction, at least one blade extending **radially** outward from the rotor hub, the <u>rotor</u> hub has a distal end extending distally beyond the most distal portion of the ~~at least one~~ blade and

a shroud within which the rotor is rotatably disposed;

a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;

~~a first lumen in fluid communication with the intravascular blood pump and operatively arranged to deliver purge fluid to the intravascular blood pump; and~~

a guide mechanism **configured as** <u>comprising</u> a **second** lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within ~~the~~ <u>a</u> circulatory system of a patient;

wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

3

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3

4                                      )
     MAQUET CARDIOVASCULAR LLC,        )
5        Plaintiff and Counter-Defendant  ) Civil Action
                                       )
6    vs.                               ) No. 17-12311-FDS
                                       )
7    ABIOMED, INC., ABIOMED R & D,     )
     INC., and ABIOMED EUROPE GMBH,    )
8        Defendant and Counter-Claimant

9
                      MARKMAN HEARING
10

11

12        John Joseph Moakley United States Courthouse
                      Courtroom No. 2
13                    1 Courthouse Way
                      Boston, MA 02210
14
                      November 18, 2019
15                       10:56 a.m.

16

17

18

19

20

21

22
                 Valerie A. O'Hara, FCRR, RPR
23                  Official Court Reporter
          John Joseph Moakley United States Courthouse
24              1 Courthouse Way, Room 3204
                      Boston, MA 02210
25               E-mail: vaohara@gmail.com

1    this afternoon, your Honor, but we simply wanted to note them

2    because we think it kind of figures into the kind of confusion

3    we're dealing with now.

4            As to the indefiniteness, which is a particular flavor

5    of confusion, some of these claims, four of them, there's

6    really no way to understand what they mean, and you need to be

7    able to do that as a potential competitor or as a Court to

8    figure out what the boundaries are so you can tell whether

9    there's infringement or not, and some of the terms are vague.

02:18PM 10           They don't appear in the patent application at all.

11   They're very abstract terms, and they appear to be used in an

12   attempt to broaden and capture more than was invented, and as

13   we all know and we talked about it at the first Markman, you

14   should get a patent on what you actually invent, and we believe

15   that we can't address the non-infringement or invalidity issues

16   because the claims are too vague.

17           Thank you, your Honor.

18           THE COURT:  All right.  Thank you.  Mr. Tanck.

19           MR. TANCK:  Thank you, your Honor.  Again, my name is

02:19PM 20   Paul Tanck on behalf of Maquet Cardiovascular.  Thank you for

21   your time today.  So, one of the things I wanted to talk about

22   was just take a step back about this '738 patent, and that's

23   the patent that we're construing, and if you have your copy of

24   your patent, you'll see that the title of the patent is a

25   guidable intravascular heart pump or guidable intravascular

1    blood pump and related methods, and what this technology is,

2    it's a blood pump that goes into the heart, and the purpose of

3    putting it into the heart is to help move the blood around the

4    circulatory system, so some patients or some people have a hard

5    time with pumping blood around their circulatory system.  These

6    pumps are inserted into the heart to help facilitate the

7    movement of the blood around the body.

8         And the background of this technology, initially these

9    pumps were introduced surgically into the heart, so you can

02:20PM 10   imagine a very invasive procedure where a surgeon would open up

11   your heart, your chest cavity and put this into your heart, and

12   that was one way of doing it, and what the technology and the

13   people that were doing this realized, if this was going to be a

14   successful technology, it needed to be changed from surgically

15   implanted to a percutaneous insertion.  And what that means is

16   this is an insertion, a less invasive way of inserting it.

17        So, instead of opening up your chest and sticking it

18   into your heart, you'd be able to insert this device through

19   the vasculature, and typically it's done through the femoral

02:21PM 20   artery, which is in your leg, and it's put up in your heart.

21        In fact, in this case, what you'll learn about more as

22   this case goes along is that what happened is the developer on

23   the defendant's side here started with the surgical pump,

24   thought that that was going to be successful, and it ended up

25   bankrupting his company, and it was completely unsuccessful,

1    and he realized he had to get it percutaneous, had to figure

2    out a way to insert it into the heart, and he realized that --

3    he actually read our patent application and then figured out

4    how to do it.

5           And so, again, the patent application and the patent

6    talks about how to navigate the torturous pathways of the

7    circulatory system in order to get these pumps into the heart

8    minimally invasively, and the way it's done is using a

9    guidewire.  So what happens is you insert a guidewire through

02:22PM 10    the femoral artery into the heart, and you take the pump, and

11    you guide it along the guidewire so that it could be inserted

12    successfully into the heart.

13           There's certain techniques and structure that the

14    patent disclose on how to do that.  And, again, this is what

15    was copied by the defendant, and that's what made their company

16    from a bankrupt company into what now is a billion dollar

17    flagship product.

18           So that's the technology, and I think for the purposes

19    of what's at hand here, which is the Markman, the thing that's

02:22PM 20    really important to remember, and I think you heard that from

21    counsel on the other side is that this was already done before.

22           The claims of the '783 patent, which were issued in

23    2019, March 26th, share the same specification as the '100

24    patent and the other patents that were construed in Maquet I.

25    The exact same specification, same terms, same -- in fact, the

1    same claims, as you'll see, this is an example, and you saw

2    counsel's presentation.  These are two claims from the two

3    patents.

4         So the '783 patent is a patent that we're construing

5    now, and the '728 patent was a patent that was construed in

6    Maquet I, and this red line shows you that hardly anything has

7    changed, it's just some deletions.  Some things were removed,

8    and the Patent Office granted this patent.

9         And I think Mr. Weingaertner put up claim 24, and you

02:23PM 10   saw the same thing.  So the point here is and the reason why

11   these red lines are important is that the heavy lifting has

12   been done.

13        The Court can go back to its first Markman ruling and

14   look at where it already addressed these issues.  It weighed

15   these disclaimer issues that Abiomed is now raising, and that's

16   the other important thing to not forget.

17        Everything that Abiomed is now trying to do to narrow

18   these claims is based on arguments that were available to them

19   in Maquet I, and it's either them rearguing the same thing

02:24PM 20   hoping for a different result or an argument that they could

21   have made that they never made, and the reason why they never

22   made it is because it wasn't good to begin with, and now

23   they're trying to make it now.

24        So the point is, as the Court is going through this, a

25   lot of the work has been done, and you can find that in the

1    Court's initial Markman ruling.

2         So the Court has already construed a number of these

3    terms.  This patent was issued subsequently, but, again, all of

4    the disclaimers that they're raising were available in the

5    first one, and the claims are the same claims as far as the

6    terminology.  And, again, we tried to consolidate this into one

7    case, but the Court said that we can maybe do this after this

8    construction, so that's what we'll probably do after we're done

9    with this.

02:25PM 10         Why is Abiomed doing this?  Well, they have an

11    infringement problem, and the problem is is that after the

12    first go-around, we had the construction, we had discovery,

13    their witnesses and documents showed that they met those

14    limitations in the construction, so the only way they can get

15    around that now is to go back and try to further narrow claims

16    that they already had a full, fair opportunity to narrow, so

17    that's what's going on here.

18         Why are they trying to press on this so hard is

19    because they tried to invalidate these patents in the Patent

02:25PM 20    Office with 20 IPRs, and all of them were rejected by the

21    Patent Office saying that there's no reasonable likelihood that

22    they would prevail on all of their prior art that they're

23    saying invalidates our patents, so that's why they are pressing

24    so hard, and that's we're having so much argument about this

25    Markman on these terms that the Court has already done.

 1          And just to be clear, they are further narrowing,
 2    which is inappropriate, is all based on this idea of
 3    prosecution disclaimer, and what the Court will have to find to
 4    find these further narrowing limitations is clear and
 5    unmistakable disavowal, statements by us saying we don't want
 6    this as our invention anymore.  You won't find that.  You'll
 7    find every time they make these arguments, they're not pointing
 8    to the specification for narrowing these claims, which is the
 9    first part of the intrinsic record that you would look at, and
02:26PM 10    they're not looking at the prosecution history many times of
11    this patent itself.
12          What they're actually looking at is prosecution
13    history of other patents in this family, which the Court, and
14    we'll show you the law on this, is not supposed to be using in
15    the way Abiomed is saying it should be done.
16          So, and, finally, the last part of their argument is
17    that many of these claims are indefinite, and we'll go through
18    each one of them with you, but the point there is that the
19    Patent Office issued these claims.
02:27PM 20          The Patent Office reviewed these claims and issued
21    this claim language and had no problem when it issued this
22    claim language with its understanding it and its
23    indefiniteness, so for them to actually invalidate these claims
24    by indefiniteness on a Markman, what they would need to do is
25    show clear and convincing evidence, and they are not going to

        1    be able to do that.

        2           It's a very high bar, and the support that they have

        3    is a single expert, who when I cross-examined him, ended up

        4    taking back pretty much everything he said about

        5    indefiniteness, and he's not here in the room today, which I

        6    think is telling.  Thank you, your Honor.

        7           THE COURT:  All right.  Mr. Padro, how are we going to

        8    proceed here?  What are we going to take up first?

        9           MR. PADRO:  "The Regions Delimited By."  That's a

02:28PM 10    coaxial term, your Honor.  You'll see it here.

        11          Good afternoon, my name is John Padro.  Again, I'm

        12    from White & Case on behalf of Abiomed.  Here are copies of the

        13    slides that we prepared for today.  I promise I'll be brief.

        14    Some of this has already been covered, and I'll do it as

        15    quickly as possible here, but I'll be presenting on the axis

        16    coaxial width, also known, as the Court referred to it, as

        17    "extends through a region delimited by the outer cannula

        18    surface."

        19          And what you'll see here is kind of the lay of the

02:28PM 20    land of where we are.  First, you'll see the claim term on the

        21    left.  That is a claim term that was construed in connection

        22    with Abiomed I.  Okay.  Now, you'll see that same claim term

        23    appears in Claim 1 of the '783 patent.

        24          And what you'll see is the two various positions

        25    between the parties.  That looks a bit more complicated than it

1    every opportunity to raise this.  They chose not to, for

2    whatever reason, probably because they didn't think their

3    witnesses would admit infringement, but that being said, there

4    is nothing left for the Court to do here.

5         THE COURT:  All right.  Let's go to the next term,

6    which is --

7         MR. WEINGAERTNER:  Your Honor, this would be the

8    guidewire mechanism configured to allow the guidewire to

9    slidably advance.

03:11PM 10        THE COURT:  Okay.

11        MR. WEINGAERTNER:  There's a companion term as well.

12   So, your Honor, on the left, we'll see -- I'm sorry, your

13   Honor, there are two claim terms that we thought made sense to

14   deal with at the same time.  One of them is in claim 1, the

15   other is in claim 24.

16        The first is "guide mechanism is configured to allow a

17   guidewire to slidably advance," and the other is "guidewire

18   does not pass through the rotor hub or the catheter."

19        Abiomed's proposed construction is that the guidewire

03:12PM 20   does not extend through the free space between the rotor

21   blades.  It's very close to what the Court had considered and

22   ruled on in the first Markman.

23        As to the second, we would be fine with the plain

24   meaning, except that we believe it's important to capture that

25   the guidewire does not pass between the free space between the

1    rotor blades.  In both instances, Maquet is content with the

2    plain and ordinary meaning.

3         So, this Court already ruled that Maquet disclaimed a

4    guidewire lumen extending through the free space, so the free

5    space, and I'll show it a bit later is in order to get the

6    blood to pump out of the left ventricular up to the circulatory

7    system, you need to have a propeller to do that.

8         We talked in the first tutorial about how they rotated

9    at very high speed, tens of thousands of RPMs and somehow

03:13PM 10   manage not to destroy the blood tissue, which is an innovation

11   that Abiomed came up with.  It's nowhere in the patent, but in

12   order to thread a guidewire through, and this goes back to the

13   prior art Voelker reference, which we'll talk about, the

14   inventor of the Impella, Thorsten Siess, realized that you

15   could thread the guidewire through the free space of the

16   blades, which is an existing structure.  You don't have to add

17   anything, you just take it advantage of that, feed it through,

18   it comes out the other end, and, wah-lah, you're done.

19        You don't have to increase the profile, the thickness

03:13PM 20   by adding anything to the side wall, so that's highly relevant

21   here, but in the prior art, and it's interesting because that

22   patent is one of the prior art references referred to, it's not

23   of record, but Dr. Siess worked with Dr. Voelker and had come

24   up with that idea.

25        The thing that's relevant is that it's in the record

1    and in the prior art, as we'll talk about, but the Court looked

2    at this very closely and had come to the conclusion, we think

3    the correct conclusion, that passing a guidewire lumen, which

4    could be a separate tube that a guidewire would pass through,

5    and guidewire could go either through a separate lumen or not,

6    it could go through it directly, but at least the guidewire

7    lumen was disclaimed because once it's in there, you can't

8    rotate the blades, it blocks them, and there were clear

9    representation disclaimers to that effect.

03:14PM 10        As to the guidewire itself, as opposed to the

11   guidewire lumen, this was raised.  It wasn't explicitly

12   addressed by the Court, which focused on the lumen.  We think

13   that the disclaimer already precludes the guidewire, but we

14   think it's helpful to go through that and to clarify that point

15   because it's relevant here because, again, both a guidewire

16   lumen and a guidewire would both preclude the rotation of the

17   rotor.  It's a common sense point, and it's confirmed by the

18   prosecution record as well as by the patent itself, the whole

19   patent family.

03:15PM 20        So, again, Maquet narrowed its claims in this case not

21   for enablement in this case but to avoid the prior art, several

22   prior art references.  So the point was that the guidewire

23   lumen does not pass through the free space.  A configuration

24   would be inoperable.  Examiner relied on Maquet's admissions,

25   and Maquet endorsed the examiner's reasoning, so this shows the

1   reference, one of the main references where Maquet had to

2   modify and distinguish, and so this reference that you can see

3   here at the top of the figure, it shows a -- I'll just pull up

4   the pointer here.  It shows the rotor right here, which

5   rotates, and in red is the path of a guidewire lumen that's

6   coming through the sides.  This was not a new idea really for

7   Bedingham.

8       And so the applicant clarified the nature of the

9   invention according to the examiner noting that rotors require

03:16PM 10   a space to rotate if Bedingham were modified with the guidewire

11   lumen of Gordon 46, it would occupy space within the shroud and

12   obstruct the impeller.

13       So, what he's saying there is that Maquet argued

14   around this combination of Bedingham and Gordon and said, hey,

15   you can't combine them because if you proceed that way, it's

16   going to block the rotor, and we don't do that.

17       So, and then it says modifying the Bedingham device

18   with the structure of the lumen would result in the lumen and

19   side wall being located in the open space, the blades of the

03:16PM 20   rotor would hit the wall preventing the blood pump from

21   operating.

22       So the other point that was made was that Bedingham

23   also lacks an elongate lumen sized to slidably receive a

24   guidewire, not just the guide lumen.  The guidewire could be

25   offset from the central axis so that it passes between the

1    veins of the outlet flow straightener of the impeller and the
2    inlet flow straightener.

3         So those were the references that the Court looked at
4    with regard to disclaimer of the guidewire lumen, and, in
5    addition, and this is important, this is the Voelker reference
6    that I mentioned.  In Voelker, what's passing through the free
7    space is the guidewire itself, and, again, we don't believe
8    there's a huge distinction there.

9         And in this particular instance, the examiner noted it
03:17PM 10   among his reasons for allowances because the Voelker reference
11   was before him.  He talked about the other references, and he
12   said, by the way, even for this guidewire, you've distinguished
13   over that, so I'll allow this patent over Voelker.

14        Now, when we argued that a year and a half ago, some
15   mention was made that, well, this isn't on itself on its own
16   any kind of disclaimer because the examiner is stating it, and
17   it wasn't embraced by Maquet; however, during one of the IPRs
18   of the related '728 patent, Maquet did rely on it in order to
19   overcome a reference and said, hey, you know we're going to
03:18PM 20   adopt and ratify what was said about the Voelker reference.

21        We clear that, and for that reason, you should deny
22   the IPR request, which was denied, so it wasn't just some
23   isolated point that an examiner made, it was a point that was
24   ratified and adapted and used in the prosecution history, and
25   an additional point that we'd like to note is that the examiner

1    can in some way stand as a person of ordinary skill in the art

2    in terms of interpreting what is meant by these terms.

3         So the other point that's really important to make is

4    that the application that led to these patents is totally

5    consistent with this.  This was sort of the message of the

6    whole alleged invention, which is that we don't have to pass

7    through the blades of the rotor because we have these

8    integrated guide mechanisms that distinguish over those kinds

9    of older approaches.

03:19PM 10         One of them goes down the very middle.  It doesn't go

11    through the free space of the blades, it goes right through the

12    hub itself.  Very impractical, is never used as far as we know,

13    as far as I know.

14         The other, of course, is alongside.  It completely

15    bypasses the blades.  That's the other embodiment we've talked

16    about.

17         And, the third is this docking mechanism, which,

18    again, is really irrelevant because you don't need it there.

19    It's guided in a different way.  So everything about the patent

03:19PM 20    application, and every representation that's ever been made by

21    it is consistent that they provide an alternative to a kind of

22    approach we would have to do things like thread a lumen or a

23    guidewire through the free space.

24         So, in the '738 patent, in the text itself, it says

25    the present invention overcomes the drawbacks of the prior art

1    by providing these integrated features.

2         It also notes that here this is at column 11, 43 to

3    46, it mentions, because there was some discussion about this,

4    whether the guidewire needs to remain in place or not, and the

5    point is that according to the patent, they provide for the

6    ability of the guidewire to remain in place during operation,

7    so that's an important distinction.

8         With the prior art, Voelker, and the other references,

9    it can't, it must be removed, so that is a clear theme that's

03:20PM 10    consistent with the disclaimer that was made.

11         Again, the guidewire removal is only mentioned as

12    optional, which means that the system needs to be able to

13    permit it to remain because that's the other option.

14         So, passing the guidewire lumen through the free space

15    was already held by the Court to be disclaimed.  The point of

16    the guidewire lumen is to carry the guidewire itself.  Both can

17    obstruct the motor blades, and Maquet confirmed a disclaimer

18    not only of the guidewire lumen but the guidewire by relying on

19    Voelker, the Voelker comment in the inter partes' review.

03:21PM 20    Thank you, your Honor.

21         THE COURT:  Okay.  Thank you.

22         MR. McARDLE:  So, your Honor, if a lot of that sounded

23    familiar, it's because this is the exact same argument that

24    Abiomed made last time and the Court rejected, so I'm going to

25    walk us through it, but what the Court really needs to do is

1    just take a look at its opinion from last time.  That's what it

2    did, and I guess we can just start by looking at the claims.

3            Abiomed has chosen claims 1 and claims 24 because they

4    both recite guidewire, so it's the last limitation of claim 1.

5    We said it's a rotor shroud, cannula, guide mechanism, and then

6    there's these two wherein clauses, and this last one is,

7    "Wherein the guide mechanism is configured to allow for a

8    guidewire to slidably advance therealong."

9            Then in claim 24, there's a different guidewire

03:22PM 10    limitation, it says, "Wherein the guidewire does not pass

11    through the rotor hub or the catheter."

12            So Maquet's position on both of these is that these

13    are term that a POSA can easily understand, that a lay juror

14    can understand.  They use simple words and they should be given

15    their plain and ordinary meaning.

16            What Abiomed's doing, once again, is even though these

17    are the same terms the Court looked at or similar terms, the

18    Court looked at as to last time, Abiomed is now trying to add

19    in a new limitation that the Court already looked at and

03:23PM 20    rejected.

21            The last time the Court said the guidewire lumen does

22    not pass through the free space between the blades.  This time

23    they're trying to say the guidewire itself can't go through the

24    free space in the blades, so if this feels like you've already

25    heard it, you absolutely have.

1    In Maquet I, the Court -- so, Abiomed was arguing for

2 disclaimer for five different terms related to elongate lumens

3 or second lumens, and it was arguing that -- and it's right

4 here in red, the lumen and the guidewire not extending through

5 the free space between the rotor blades.

6    The Court looked at that argument and it rejected it,

7 so instead the Court said that the disclaimer was going to be

8 more limited.  It would only be the guidewire lumen itself does

9 not extend through the free space between rotor blades, and the

03:23PM 10 Court rejected Abiomed's argument and explained that when

11 looking at the specification, it said while certain parts of

12 the specification suggest that the guidewire can be removed

13 prior to operation, nothing suggests that the guidewire lumen

14 itself is removable, so the Court distinguished between the

15 guidewire, which can be taken out before the device is used,

16 and the guidewire lumen, which the Court viewed as being

17 permanent, and so that's the reason why it didn't adopt

18 Abiomed's construction and instead limited the disclaimer to

19 just the guidewire lumen not extending through the free space

03:24PM 20 between the blades.

21    So, again, if we're going to read in another negative

22 limitation, like Abiomed wants to, we're supposed to follow

23 these steps.  We first look at the specification of the '783.

24 There's nothing in the specification that would warrant this

25 disclaimer.  This isn't an issue that the parties are

1    disputing.

2         You look at the '783 patent's prosecution history

3    first.  Is there anything there?  No, there's nothing in the

4    prosecution history of the '783 patent that would create this

5    clear and unmistakable disclaimer.

6         So, again, Abiomed points to the '728 patent, and what

7    it's talking about, what its primary argument in its brief, at

8    least, is that it points to this notice of allowance, and it's

9    the notice of allowance goes through, if you look at the whole

03:25PM 10   document, it talks about a whole bunch of different things and

11   all the reasons why claim 1 of the '728 patent is going to be

12   allowable.

13        But one of the things it says is that Voelker does not

14   provide a separate second lumen for the guide mechanism.  If

15   you look over at the '728 patent I've highlighted, it says, "a

16   guide mechanism configured as a second lumen," so the examiner

17   said Voelker doesn't have that, it doesn't have a separate

18   second lumen, and as Abiomed's counsel pointed out.

19        The examiner goes on to say, instead, it does

03:26PM 20   something else, it threads this guidewire through there, but

21   the thrust is that Voelker doesn't have a separate second

22   lumen.  That's the limitation in the claim, and that's what the

23   examiner says Voelker is missing.

24        So what did the Court focus on last time?  Why did the

25   Court distinguish the guidewire lumen from the guidewire in

1   finding the Court's limited disclaimer?  Well, the Court looked

2   at the specification, and there's several places in the

3   specification that are clear that the guidewire can be

4   withdrawn.

5           Even the quotes that Abiomed's counsel put up, if you

6   look at the next few words in the quotes, they say, "The

7   guidewire may be withdrawn," so because the guidewire can be

8   removed, it's not that permanent lumen that remains and can't

9   be in the free space, and that's what the Court said last time.

03:26PM 10          So, again, just to summarize, this is the exact same

11  evidence that was before the Court last time.  Abiomed made

12  these same arguments.  The Court rejected those arguments.

13  There's nothing new that it's come up with.  There's no new

14  statement, and none of this creates a clear, unmistakable

15  disavowal of this scope that Abiomed's trying to limit.

16  Thank you.

17          THE COURT:  All right.  Thank you.

18          MR. WEINGAERTNER:  So, your Honor, turning to the

19  point that counsel for Maquet just made, the issue isn't

03:27PM 20  whether it can be removed, whether it must be removed because,

21  of course, if it's in a side lumen, it doesn't matter whether

22  it's there, but if it's going to go through the rotor blades,

23  it has to be, and that's not provided for anywhere, and I

24  believe that counselor's discussion of the Voelker reference,

25  he highlighted -- he didn't highlight the line regarding the

1    guidewire.  I don't think it supports Maquet's position at all,

2    and I also, very briefly, your Honor, don't believe the Court

3    rejected the guidewire argument but simply addressed it and it

4    got to the lumen but may not have reached the guidewire issue,

5    which we believe is relevant now, which is why we've

6    re-presented it to the Court, which we hope won't take the

7    Court a lot of time.  Thank you, your Honor.

8              MR. McARDLE:  Nothing further, your Honor.

9              THE COURT:  All right.  Thank you.  Why don't we take

03:28PM 10   a 10-minute break.

11             THE CLERK:  All rise.

12             (A recess was taken.)

13             THE CLERK:  All rise.

14             THE COURT:  All right.  Next up.  Yes.

15             MR. PADRO:  Your Honor, again, I'm John Padro, and

16   we're going to present because I think it dovetails nicely into

17   the last conversation.

18             Claim 24 is an "intravascular blood pump adapted to be

19   guided by a guidewire."  As you'll see here, the term is

03:41PM 20   provided on the left, which is the first limitation of claim

21   24, which regards the intravascular blood pump.  The parties'

22   dispute here is whether this term is indefinite or not.  It's

23   pretty clear, I believe, when you look at the totality of

24   what's been described here that it is and all the evidence

25   presented before you.

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 12/772,810 | ABOUL-HOSN ET AL. |
| | Examiner | Art Unit | |
| | ADAM MARCETICH | 3761 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>08 November 2013</u>.

2a)☒ This action is **FINAL**.     2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) <u>15,23-27,29-31,33,35-39,41-46,48 and 49</u> is/are pending in the application.

     5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>15,23-27,29-31,33,35-39,41-46,48 and 49</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on <u>03 May 2010</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

     Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).

     Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to.  See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner.  Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     a)☐ All   b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____ .

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

     * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
     Paper No(s)/Mail Date _____ .

4)☐ Interview Summary (PTO-413)
     Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

MAQ_00004678

Application/Control Number: 12/772,810                                    Page 2
Art Unit: 3761

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.


### *Claim Rejections - 35 USC § 112 first paragraph*

The following is a quotation of 35 U.S.C. 112(a):

(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.


The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 30 and 46 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-

AIA), first paragraph, as failing to comply with the enablement requirement.  The

claim(s) contains subject matter which was not described in the specification in such

a way as to enable one skilled in the art to which it pertains, or with which it is most nearly

connected, to make and/or use the invention.

Claim 30 calls for "… the guide wire passing through the elongate lumen in the

cannula but not extending through the catheter." Parent claim 29 has been amended to

describe a guide mechanism having a lumen arranged coaxially with the cannula. This

describes the embodiment of Figs. 1-5 (¶ [0069], "over-the-wire" guide mechanism 16).

The claimed embodiment has a guide lumen that extends through the catheter. Another

MAQ_00004679

Application/Control Number: 12/772,810                                Page 3
Art Unit: 3761

embodiment describes a guide mechanism that does not extend through the catheter (¶

[0073], Figs. 6-9, "side-rigger" guide mechanism 122). However, no single embodiment

or combination of embodiments discloses a coaxial guide lumen that passes through an

elongate lumen in the cannula and does not extend through the catheter.

Claim 46 calls for "…which further provides for the guide wire to pass through an

outer cannula surface of the cannula." This describes the embodiment of Figs. 6-9.

However, parent claim 45 has been amended to describe the "over-the-wire" guide

mechanism 16 of Figs. 1-5. Similarly to claim 30 discussed above, no single

embodiment or combination of embodiments describes a coaxial guide wire lumen

which passes through an outer surface of the cannula.


### *Claim Rejections - 35 USC § 112 second paragraph*

The following is a quotation of 35 U.S.C. 112(b):

(b)  CONCLUSION.—The specification shall conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which the inventor or a joint inventor
regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claim 49 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards

as the invention.

MAQ_00004680

Application/Control Number: 12/772,810                                    Page 4
Art Unit: 3761

New claim 49 calls for "…a first conduit and a second conduit **terminating in a**

**fitting** that is configured to be located outside a patient…" This language is unclear

whether the first, second or both conduits terminate in a fitting. Examiner has

interpreted the claim to require only one of the first or second conduits terminating in a

fitting.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.   Determining the scope and contents of the prior art.
2.   Ascertaining the differences between the prior art and the claims at issue.
3.   Resolving the level of ordinary skill in the pertinent art.
4.   Considering objective evidence present in the application indicating obviousness or
     nonobviousness.

**Claims 15, 23-25 and 49 are rejected under pre-AIA 35 U.S.C. 103(a) as**

**being unpatentable over Bedingham; William et al. (US 6245007) in view of Nix;**

**Christoph et al. (US 6176822) in view of Gordon; Lucas S. (US 5938645).**

Regarding claim 15, Bedingham discloses an intravascular blood pump system

(col. 1, lines 58-64, blood pump), comprising:

MAQ_00004681

Application/Control Number: 12/772,810                              Page 5
Art Unit: 3761

an intravascular blood pump (col. 4, lines 27-39, Fig. 1, blood pump 20),

comprising:

a rotor having a rotor hub (col. 6, lines 15-24; col. 8, lines 1-17, Figs. 7, 9, 9a,

impeller 56 / 56a);

at least one blade extending radially outward from the

rotor hub (Figs. 7, 9, 9a, impeller 56 / 56a having plurality of

blades);

a shroud within which the rotor is rotatably disposed

(col. 4, lines 40-52, annotated Fig. 7, proximal portion of

inner sleeve 38 and inner sleeve wall 40);

a cannula extending from the shroud and comprising

an outer cannula surface (col. 4, lines 40-52, annotated Fig.

7, distal portion of inner sleeve 38 and tip 46);

the outer cannula surface having a substantially

circular cross-section along a portion of its length (col. 5,

lines 58-63, generally cylindrical inner sleeve);

a first lumen in fluid communication with the

intravascular blood pump and operatively arranged to

deliver purge fluid to the intravascular blood pump (col. 7,

lines 51-62, Figs. 3, 7, 8, liquid is introduced into the lumen



annotated Fig. 7 of
Bedingham et al. (US 6245007)

MAQ_00004682

of the inner sheath 28, then exits the inner sheath 28 through the channels 100 and into

the slots 98; cols. 6-7, lines 65-14, Figs. 5, 6, internal passageways 74, 75 for

conducting fluids towards pump mechanism 24); and

a guide mechanism adapted to guide a distal portion of said intravascular blood

pump system to a predetermined location within the circulatory system of a patient (col.

9, lines 35-43, guide wire advancing the pump into position, by passing through the

pump housing between the distal tip and the distal end of the cable sheath);

wherein the guide mechanism is configured to allow for a guide wire to slideably

advance therealong (col. 9, lines 35-43, guide wire passing through the pump housing

and therefore allowing a guide wire to slide).

Bedingham teaches the invention substantially as claimed by Applicant with the

exception of a tapered rotor hub extending distally beyond a blade. Nix discloses an

intravascular blood pump (col. 3, lines 11-19, Fig. 1, pump 10), comprising:

a rotor having a rotor hub tapering in the distal direction (col. 3, lines 37-47, Fig.

1, impeller wheel 34 having hub 35);

at least one blade extending radially outward from the rotor hub (col. 3, lines 37-

47, Fig. 1, blades 36); and

the hub has a distal end extending distally beyond the most distal portion of the

blade (Fig. 1, impeller wheel 34 having distal end extending distally beyond blades 36).

Nix selects a contoured shape that will minimize damage to blood as it flows past

the rotor and other flow-directing components. A skilled artisan would have been able to

modify Bedingham with the teachings of Nix by tapering impeller 56 on its distal edge.

MAQ_00004683

One would be motivated to modify Bedingham with the tapered rotor of Nix to reduce

blood turbulence since Bedingham calls for minimizing damage to blood cells (col. 8,

lines 1-17, especially lines 9-17). Therefore, it would have been obvious to one of

ordinary skill in the art at the time the invention was made to modify Bedingham with the

tapered rotor of Nix in order to minimize hemolysis.

Bedingham and Nix teach the invention substantially as claimed by Applicant

with the exception of a guide mechanism configured as a second lumen that extends

through the outer cannula surface. Gordon discloses an intravascular system (col. 4,

lines 53-61, col. 8, lines 13-22, Fig. 1, catheter 12), comprising:

a cannula (col. 8, lines 23-32, Fig. 5a, catheter 18);

a guide mechanism configured as a second lumen having a proximal end and a

distal end (col. 8, lines 54-67, Figs. 5a, 5c, catheter lumen 46 having proximal and distal

ends);

the guide mechanism adapted to guide a distal portion of said intravascular

system to a predetermined location within the circulatory system of a patient end (col. 8,

lines 54-67, Figs. 5a, 5c, catheter lumen 46 for accepting guidewire 14);

wherein an axis coaxial with and extending through a portion of said guide

mechanism extends through a region delimited by the outer cannula surface (Fig. 5c,

axis extending through guidewire 46 within region delimited by catheter 18); and

wherein the guide mechanism is configured to allow for a guide wire to slideably

advance therealong (col. 8, lines 54-67, Figs. 5a, 5b, catheter lumen 46 for accepting

guidewire 14).

MAQ_00004684

Gordon guides a larger cannula through tight bends by positioning means for capturing a guidewire on the side of the cannula (col. 5, lines 5-22, especially lines 20-22). One would be motivated to modify Bedingham and Nix with the guide mechanism as taught by Gordon to maneuver a catheter through winding vessels since Bedingham calls for delivering the blood pump into the heart (col. 1, lines 58-65). Additionally, the guide mechanism of Gordon would avoid passing a guidewire in proximity to the blades on impeller 56 of Bedingham. Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to modify Bedingham and Nix with the guide mechanism of Gordon in order to deliver a cannula through vessels towards the heart.

Regarding claim 23, Bedingham discloses that the rotor comprises a second blade extending radially from the rotor hub (Figs. 3, 7, 9, 9a, at least three blades depicted on impeller 56 / 56a).

Regarding claim 24, Bedingham teaches the invention substantially as claimed by Applicant with the exception of a conical rotor hub. Nix discloses a rotor hub that is generally conical (Fig. 1, impeller wheel 34 generally conical).

Nix streamlines a rotor hub to promote smooth blood flow, thereby avoiding blood damage. One would be motivated to modify Bedingham with the conical rotor hub of Nix to reduce turbulence as called for by Bedingham (col. 8, lines 1-17). Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made

MAQ_00004685

to modify Bedingham with the conical rotor hub of Nix in order to reduce blood

turbulence.

Regarding claim 25, Bedingham and Nix teach the invention substantially as

claimed by Applicant with the exception of a guide mechanism. Gordon discloses a

guide mechanism configured such that the guide wire passes through the region

delimited by the outer cannula surface at a location proximal to where the guide wire

establishes slidable contact with the guide mechanism (Fig. 5a, proximal entrance to

guidewire lumen 46 is located proximally to guidewire 46). Gordon improves the ability

for a surgeon to guide an intravascular device through vessels towards the heart as

discussed for claim 15 above.


Regarding claim 49, Bedingham, discloses a first conduit (col. 7, lines 9-14, Fig.

5, tube 72); and

a second conduit (col. 7, lines 9-14, Fig. 6, tube 73);

terminating in a fitting that is configured to be located outside a patient when the

intravascular blood pump and cannula are located inside the patient (cols. 6-7, lines 65-

8, Fig. 5, fluid connectors 70, 71);

at least one of the first conduit and second conduit in fluid communication with

the first lumen (col. 7, lines 9-14, Figs. 5, 6, internal passageways 74 and 75 connect

with tubes 72 and 73 respectively).

MAQ_00004686

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 12/772,810 | ABOUL-HOSN ET AL. |
| | Examiner | Art Unit |
| | ADAM MARCETICH | 3761 |

All participants (applicant, applicant's representative, PTO personnel):

(1) _Kurt Denniston, Applicant's Representative_ .     (3)_____.

(2) _Adam Marcetich, Examiner_.     (4)_____.

Date of Interview: _28 February 2014_.

Type:  ☒ Telephonic  ☐ Video Conference
      ☐ Personal [copy given to: ☐ applicant  ☐ applicant's representative]

Exhibit shown or demonstration conducted:  ☐ Yes  ☒ No.
  If Yes, brief description: _____.

Issues Discussed  ☐101 ☐112 ☐102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _15,30 and 46_.

Identification of prior art discussed: _Bedingham; William et al. (US 6245007), Nix; Christoph et al. (US 6176822), Gordon; Lucas S. (US 5938645)_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_Applicant clarified the nature of the invention, noting that the rotors require a space to rotate within the shroud while pumping blood. Applicant noted that Gordon is a catheter, not a blood pump, and therefore does not require an open lumen for a rotor. if Bedingham were modified with guidewire lumen 46 of Gordon, it would occupy space within the shroud and obstruct impeller 56 of Bedingham._

_Examiner acknowledged that this combination would destroy the teachings of Bedingham. Examiner suggested filing a response under the AFCP 2.0 program. Guidelines are available online regarding submission requirements:_
_http://www.uspto.gov/patents/init_events/afcp.jsp_

_Examiner noted that claims 30 and 46 are rejected under 35 USC 112 first paragraph. It appears that multiple embodiments have been combined in each of these claims._

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04. If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /ADAM MARCETICH/ Primary Examiner, Art Unit 3761 | |
|---|---|

| | |
|---|---|
| **RESPONSE AFTER FINAL REJECTION - AMENDMENT UNDER 37 C.F.R. §1.116(b) – After Final Consideration Pilot 2.0**<br><br>Address to:<br>Mail Stop:  AF<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | Attorney Docket: 06-01506US04 |
| | Confirmation No.: 4661 |
| | First Named Inventor: Walid N. ABOUL-HOSN |
| | Application Number: 12/772,810 |
| | Filing Date: May 3, 2010 |
| | Group Art Unit: 3761 |
| | Examiner Name: Marcetich, Adam M. |
| | Title: Guidable Intravascular Blood Pump and Related Methods |

Sir:

This amendment is responsive to the Final Office Action dated November 25, 2014 according to the provisions of the After Final Consideration Pilot 2.0 program.  An extension of time is being filed concurrently making this response timely filed.  In view of the amendments to the claims and the remarks put forth below, reconsideration and allowance are respectfully requested.

The **Claims** begin on page 2.

**Remarks** being on page 8.

Appx1101

MAQ_00004716

Atty Dkt. No.:  06-01506US04
USSN:  12/772,810

## REMARKS

### Formal Matters

Claims 15, 23-27, 29-31, 33, 35-39, 41-46, 48-49 were examined.

Claims 1-14, 16 – 22, 28, 32, 34, 40 and 47 were previously canceled.

Claims 30 and 46 are currently canceled.

Claims 29 and 49 are currently amended.

Claims 50-52 are newly added.

Claims 15, 23-27, 29, 31, 33, 35-39, 41-45, and 48-52 are pending after entry of and amendments.

Support for the amendments can be found throughout the specification and drawings. More specifically, support can be found as follows:

Support for amended claim 29 can be found for example in Figure 3.

Support for amended claim 49 can be found for example in paragraph [0061] and Figure 2.

Support for new claims 50-52 can be appreciated in view of Figure 1.

No new matter has been added.

Applicants respectfully request reconsideration of the application in view of the amendments and remarks made herein.

### The Office Action

I.      **Teleconference of February 28, 2014**

A teleconference was held between the Examiner and the undersigned attorney of record, Kurt Denniston, on Friday, February 28, at 2:00pm.  The obviousness combinations of Bedingham and Nix with the secondary references, *i.e.*, Gordon and Masch were discussed.  More specifically, it was discussed that while Bedingham and Nix are directed generally to blood pumps, Gordon and Masch are not.  Arguments against the combination were discussed, notably with respect to Gordon as detailed in the Examiner's Interview Summary dated March 6, 2014, wherein the Examiner indicated that the arguments would be persuasive if presented in a reply in the After Final 2.0 program.

8

MAQ_00004723

Atty Dkt. No.:  06-01506US04
USSN:  12/772,810

## II.      Claims Rejected Under 35 U.S.C. § 112 First Paragraph

The Examiner has rejected claims 30 and 46 for allegedly failing to comply with the enablement requirement.  Applicant has cancelled Claims 30 and 46, rendering the objections thereto moot.


## III.      Claims Rejected Under 35 U.S.C. § 112 Second Paragraph

The Examiner has rejected claim 49 as allegedly failing to particularly point out and distinctly claim the subject matter which the inventor regards as the invention. Applicant believes the amendments made to claim 49 clarify the intended meaning of this claim and overcome the Examiner's rejection.  As no prior art rejection has been made with respect to claim 49, claim 49 is understood by the Applicants to be allowable in light of the amendment to overcome the rejection under 35 U.S.C. § 112 second paragraph.


## IV.      Claims Rejected Under 35 U.S.C. § 103(a)

In the Office Action, claims 15, 23-25, 29, 30, 35-42, and 45-48 have been rejected under 35 U.S.C. 103(a) as being unpatentable over U.S. Patent No. 6,245,007 to Bedingham et al. ("Bedingham") in view of U.S. Patent No. 6,176,822 to Nix et al. ("Nix") and U.S. Patent No. 5,938,645 to Gordon ("Gordon").

Claim 15 recites, in pertinent part, "*a guide mechanism configured as a second lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within the circulatory system of a patient…wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.*"

Instead of a guide wire mechanism configured as a lumen, Bedingham only suggests inserting a guide wire into the existing structure of the pump housing, as taught at column 9, lines 35-42, so that the guide wire "passes between the vanes of the outlet flow straightener, impeller and inlet flow straightener".  The use of a lumen is not taught in Bedingham. Nix is also silent with respect to a guide mechanism configured as a lumen that allows for a guide wire to slideably advance therealong.  Accordingly,

9

MAQ_00004724

Atty Dkt. No.:  06-01506US04
USSN: 12/772,810

the Examiner relies upon Gordon to teach a guide wire mechanism configured as a lumen and that allows for a guide wire to slideably advance therealong.  Unlike Nix and Bedingham, however, Gordon is not directed to an intravascular blood pump.  Instead, Gordon is directed to a percutaneous aspiration catheter (for in-vivo insertion) which may fluidically connect to a vacuum pump that remains at all times ex-vivo. The catheter of Gordon is essentially an open tubular structure that requires only an open space to provide vacuum suction therethrough, and does not house any type of impeller structure for that portion which is inserted in-vivo.

Bedingham effectively teaches away from the combination with Gordon, as Bedingham indicates no need for a specially constructed lumen, such as the catheter lumen 46 of Gordon.  More specifically, Bedingham already teaches a solution for enabling its blood pump to be positioned with a guide wire, namely, by threading the guide wire in through the existing vane structure of the outlet straightener, past the blood pump in the space between blades of the impeller, and out through the existing vane structure of the inlet straightener of the pump. The guide wire of Bedingham would therefore enter and exit the pump housing through the pump housing's sidewalls. The Examiner has provided no reasoning as to why one would forsake the teaching of Bedingham, which actually teaches a solution for positioning a blood pump on a guide wire, and instead implement a structure utilized by the catheter of Gordon.  Simply, one of ordinary skill in the art would not look to Gordon for solutions for delivering a blood pump to a location within a patient, particularly when that problem was already solved by Bedingham.

Additionally, even assuming arguendo that one were to look to Gordon, the Examiner has not provided any guidance as to how one would implement the proposed modifications to the device of Bedingham.  Importantly, again unlike Bedingham and Nix (and other blood pump systems), the catheter 18 of Gordon does not need to accommodate for in-vivo insertion of a blood pump, *e.g.*, having a rotor and blades, in, along, adjacent to, or otherwise disposed with the catheter 18. That is, as noted above, Gordon essentially only requires an open lumen to provide a vacuum pressure, and does not need to accommodate a blood pump. Accordingly, additional modifications would be necessary to teach one of ordinary skill in the art how to arrange the catheter lumen 46 of Gordon so that it would enable a guide wire to pass along, in, through, about, or

MAQ_00004725

Atty Dkt. No.: 06-01506US04
USSN: 12/772,810

otherwise with the blood pump of Bedingham. The Examiner has failed to provide such teaching with any sort of rational underpinning.  For the reasons given above, the combination of Bedingham and Gordon is not proper and cannot be supported.

Assuming further, arguendo, that the combination of Bedingham and Nix with Gordon were proper and permissible, which it is not for the reasons discussed above, modifying the Bedingham device as proposed by the Examiner would render the resulting modified device inoperable. More specifically, as discussed above, Bedingham relates to a blood pump, which has blades extending radially outwardly from a rotor. Necessarily, the rotor and blades rotate to pump blood.  Bedingham does not include simply an open lumen akin to the Gordon catheter.  As a result, Bedingham teaches guiding the blood pump into a location by threading a guide wire in through one of a plurality of outlets of the blood pump, through the space between the blades, and out through one of the plurality of inlet of the blood pump. Modifying the Bedingham device with the structure of the lumen 46 of Gordon would thus result in the lumen 46 and its sidewall being located in the open space between the blades of the blood pump of Bedingham.  If such a lumen were so arranged, the blades of the motor would hit the wall of the lumen and be unable to rotate, thereby preventing the blood pump from operating.

Accordingly, one of ordinary skill in the art both could not and would not combine Bedingham, Nix, and Gordon. In view of the foregoing, Applicants respectfully submit that the cited combination of references do not render independent claim 15 obvious. Applicants respectfully submit that claim 15, and all claims depending therefrom are thus in condition for allowance, which action is courteously requested.


## V.    Claims Rejected Under 35 U.S.C. § 103(a) (Bedingham, Nix, and Gordon in view of Teirstein)

The Examiner has rejected claim 26 under 35 U.S.C. 103(a) as being unpatentable over Bedingham, Nix, and Gordon, in view of U.S. Patent No. 5,234,407 to Teirstein et al. ("Teirstein").

Teirstein is cited only with respect to the particular limitations of claim 26, and clearly fails to disclose the base limitations of claim 15, from which claim 26 depends.

11

MAQ_00004726

Atty Dkt. No.:  06-01506US04
USSN: 12/772,810

Since the combination of Bedingham, Nix, and Gordon fails for all of the reasons discussed above, no combination also including Teirstein could possibly have enabled one of ordinary skill in the art to arrive at the claimed invention.

In view of the foregoing, Applicants respectfully submit that the cited combination of references do not render claim 26 as obvious, at least due to their dependency from claim 15.  In view of the foregoing, withdrawal of the rejection is respectfully requested.

## VI.    Claims Rejected Under 35 U.S.C. §103(a) (Bedingham, Nix, and Gordon, in view of Watkins)

The Examiner has rejected claim 27 under 35 U.S.C. § 103 as being unpatentable over Bedingham, Nix, and Gordon in view of  U.S. Patent No. 3,995,617 to Watkins et al. ("Watkins").

Watkins is cited only with respect to the particular limitations of claim 27, and clearly fails to disclose the base limitations of claim 15, from which claim 27 depends. Since the combination of Bedingham, Nix, and Gordon fails for all the reasons discussed above, no combination also including Watkins could possibly have enabled one of ordinary skill in the art to arrive at the claimed invention.

In view of the foregoing, Applicants respectfully submit that the cited combination of references do not render claim 27 as obvious, at least due to its dependency from claim 29.  In view of the foregoing, withdrawal of the rejection is respectfully requested.

## VII.    Claims Rejected Under 35 U.S.C. §103(a) (Bedingham, Nix, and Gordon, in view of Siess)

The Examiner has rejected claim 43 under 35 U.S.C. § 103 as being unpatentable over Bedingham, Nix, and Gordon, in view of U.S. Patent No. 6,007,478 to Siess et al. ("Siess").

Siess is cited only with respect to the particular limitations of claim 43, and clearly fails to disclose the base limitations of claim 29, from which this claims depends.  Since the combination of Bedingham, Nix, and Gordon fails for all the

MAQ_00004727

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAQUET CARDIOVASCULAR LLC,<br><br>        Plaintiff/Counter-Defendant,<br><br>  v.<br><br>ABIOMED, INC.; ABIOMED R&D, INC.;<br>and ABIOMED EUROPE GMBH,<br><br>        Defendants/Counter-Claimants,<br><br>  v.<br><br>GETINGE AB,<br><br>        Third-Party Defendant. | No. 1:17-cv-12311-FDS |

**PLAINTIFF MAQUET CARDIOVASCULAR LLC'S SECOND
SUPPLEMENTAL PRELIMINARY INFRINGEMENT CONTENTIONS**

Pursuant to this Court's Initial Scheduling Order (D.I. 36), Plaintiff/Counter-Defendant Maquet Cardiovascular LLC ("Maquet") provides the following Second Supplemental Preliminary Infringement Contentions to Defendants/Counter-Claimants Abiomed Inc., Abiomed R&D Inc., and Abiomed Europe GmbH (collectively "Abiomed" and "Defendants").

These Second Supplemental Preliminary Infringement Contentions provide a good-faith basis for identifying the specific products which Maquet believes infringe U.S. Patent No. 10,238,783 ("the '783 Patent") and are based on information currently known to Maquet. Maquet reserves the right to supplement and/or amend these disclosures based on Maquet's ongoing investigation and information that becomes available through discovery.

# Appendix A
## U.S. Patent No. 10,238,783

| Claims | Infringement Analysis |
|---|---|
| **1. An intravascular blood pump system, comprising: an intravascular blood pump comprising:** | The Impella 2.5, Impella 5.0, Impella CP, and Impella CP with SmartAssist are intravascular blood pumps. |
| **1.1 a rotor having a rotor hub tapering in a distal direction, at least one blade extending outward from the rotor hub, the rotor hub has a distal end extending distally beyond the most distal portion of the at least one blade and a shroud within which the rotor is rotatably disposed;** | The above-identified Impella blood pumps have a rotor that meets these limitations. <br><br> <u>Impella 2.5/5.0</u> <br> These products include an intravascular blood pump having a rotor with a rotor hub that generally tapers in the distal direction. These pumps also have at least one blade extending outward from this rotor hub, and the distal end of the rotor hub extends beyond the most distal portion of the blade. These products also include a shroud within which the rotor is rotatably disposed. This is shown in at least the below image. <br><br>  <br><br> (MAQ_0000190, "Use of the Impella 2.5 in High-Risk Percutaneous Coronary Intervention," p. e5). |

Appx1150

| Claims | Infringement Analysis |
|---|---|
|  | **Impella CP and Impella CP with SmartAssist**<br><br>These products also include an intravascular blood pump having a rotor with a rotor hub that generally tapers in the distal direction. These products also have at least one blade extending outward from this rotor hub, and the distal end of the rotor hub extends beyond the most distal portion of the blade. These products also include a shroud within which the rotor is rotatably disposed. This is shown in at least the below images. In these images the cannula has been removed for clarity.<br><br>(Image from Abiomed's Website Video at 25 sec. (http://abiomed.com/impella/impella-25, last visited May 26, 2019.))<br><br>Rotor Hub extending beyond the most distal portion of the rotor blade<br><br>

Shroud

Distal Direction

Most distal portion of the Rotor Blade |

| Claims | Infringement Analysis |
|---|---|
| 1.2 a cannula extending from the shroud and comprising an outer cannula | The above-identified Impella blood pumps include a cannula extending from the shroud and an outer cannula surface with a substantially circular cross-section.<br><br><br><br>Shroud<br>Rotor Hub<br>Rotor Blade<br>Rotor Blade<br><br>Distal Direction<br>Rotor Blade<br>Rotor Hub extending distally beyond the blades<br>Shroud |

| Claims | Infringement Analysis |
|---|---|
| surface, the outer cannula surface having a substantially circular cross-section along a portion of its length; | <u>Impella 2.5</u><br><br>This product includes an intravascular blood pump having a cannula that extends distally from the pump's shroud. This is shown in at least the below image, where Abiomed identifies this device as having a cannula extending from the pump's motor housing, which contains the rotor and shroud.<br><br><br><br>*See* "Impella® Ventricular Support Systems IFU for Impella 2.5®, Impella 5.0®, Impella LD®, and Impella CP® (Shock) Impella 2.5® and Impella CP® (HRPCI) INSTRUCTIONS FOR USE AND CLINICAL REFERENCE MANUAL" Released 2018-11-09 ("Impella IFU") describing Impella 2.5, at 3.5; *see also,* below image: |

| Claims | Infringement Analysis |
|--------|----------------------|

**Infringement Analysis** (continued)

(http://www.abiomed.com/impella/impella-25, last visited May 26, 2019)

Impella 5.0

This product includes an intravascular blood pump having a cannula that extends from the pump shroud.

This is shown in at least the below image, where Abiomed identifies this device as having a cannula.



Cannula

Shroud

Impella 2.5®

Catheter diameter: 9Fr
Flow rate: up to 2.5 L/min

Blood Inlet Area

Blood Outlet Area

12FR Pump Motor



Pigtail

Inlet Area

Cannula

Differential
Pressure Sensor

Motor
Housing

Outlet
Area

Appx1154

| Claims | Infringement Analysis |
|---|---|
| | Impella IFU (describing Impella 5.0) at 3.6; *see also*, below image:<br><br><br><br>(http://www.abiomed.com/impella/impella-50, last visited May 26, 2019)<br><br><u>Impella CP</u><br>This product includes an intravascular blood pump having a cannula. The cannula extends from the shroud. This is shown in at least the below image, where Abiomed identifies this device as having a cannula. |

6

| Claims | Infringement Analysis |
|---|---|
| | Impella IFU (describing Impella CP) at 3.5; *see also,* below image:<br><br><br><br>(http://www.abiomed.com/impella/impella-cp, last visited May 26, 2019) |

7

| Claims | Infringement Analysis |
|---|---|
| | Also, below are pictures of the cannula in the Impella CP product, which is representative of all of the above-identified pumps. This picture further illustrates that the cannula in these products meets this claim limitation.<br><br><br><br>**Impella CP with SmartAssist**<br>This product includes an intravascular blood pump having a cannula. The cannula extends from the shroud. This is shown in at least the below image, where Abiomed identifies this device as having a cannula. |

| Claims | Infringement Analysis |
|---|---|
| | Impella CP® with SmartAssist® Pressure Sensing



**Figure 3.3  Impella Catheters**

"Impella CP® with SmartAssist for Use During Cardiogenic Shock and high-Risk PCI) INSTRUCTIONS FOR USE AND CLINICAL REFERENCE MANUAL" Released 2019-04-25 ("Impella CP with SmartAssist IFU") describing Impella CP with SmartAssist, at 3.3. |

| Claims | Infringement Analysis |
|---|---|
| *1. 3* a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location | ([http://www.abiomed.com/impella/impella-cp-with-smartassist](http://www.abiomed.com/impella/impella-cp-with-smartassist), last visited June 16, 2019)<br><br>The above-identified Impella blood pumps have a guide mechanism comprising a lumen that meets this claim limitation.<br><br><br><br>These pumps include a "pigtail" feature defining a lumen with a proximal end and a distal end. The lumen defined by the pigtail is adapted to guide the pump to a predetermined location in the heart by slideably engaging with a guidewire during pump placement. For example, Abiomed's own documents explain that the pigtail "straightens out over the guidewire during placement" (AB-M0013I310) and thus the lumen defined by the pigtail is adapted to guide the pump during placement. Likewise, other Abiomed documents refer to the pigtail (and thus the lumen defined thereby) as the "guiding catheter" when that lumen slideably engages with the guidewire. *See* AB-M00386205. |

10

Appx1159

| Claims | Infringement Analysis |
|---|---|
| within a circulatory system of a patient; | Below is an image of the pigtail feature in the Impella 2.5, the body of which defines the lumen. This image is representative of at least the Impella 2.5, 5.0, and CP blood pumps.<br><br><br><br>EasyGuide Lumen<br>Pigtail<br>Inlet Area<br>Radiopaque Marker<br>Outlet Area<br>Open Pressure Area<br>Motor Housing<br>Cannula<br><br>Lumen defined by pigtail body. Distal end shown by top line. Proximal end shown by bottom line. |

| Claims | Infringement Analysis |
|---|---|
| | Impella IFU (describing Impella 2.5) at 3.5; *see also, id.* (describing Impella CP) at 3.5; *see also* Impella CP with SmartAssist IFU (describing Impella CP with SmartAssist) at 3.3. |
| | In addition, Abiomed's manuals further demonstrate that the lumen defined by the body of the "pigtail" feature is configured to allow a guide wire to slideably engage and advance. *See* Impella IFU (describing Impella 2.5) at 5.11–5.15; (describing Impella 5.0) at 5.25–5.28; (describing Impella CP) at 5.16–5.20, *see* Impella CP with SmartAssist IFU (describing Impella CP with SmartAssist at 5.13–5.14). |
| *1.4* wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong. | The above-identified Impella blood pumps utilize a guidance lumen that meets this limitation.

Below is an image of the pump including the pigtail feature in the Impella 2.5, the body of which defines the lumen. This image shows that the axis of the pigtail's lumen, which serves as the guide mechanism, is coaxial with and extends through a region delimited by the outer cannula surface. The pigtail's lumen is configured to allow for a guide wire to slideably advance therealong.

Abiomed's user guide for the Impella devices further demonstrates that the lumen defined by the body of the "pigtail" feature is configured to allow a guide wire to slideably engage and advance as shown in the image below.



**Figure 5.31  Guidewire Placement** |

| Claims | Infringement Analysis |
|---|---|
| | *See, e.g.,* Impella IFU (describing Impella 5.0) at 5.26 (instructing the user to "Straighten the blue pigtail and thread it over the 0.018 inch placement guidewire (see Figure 5.31)"; *see also id.* (describing Impella 2.5) at 5.11–5.15; (describing Impella 5.0) at 5.25–5.28; (describing Impella CP) at 5.16–5.20; *see also* Impella CP with SmartAssist IFU (describing Impella CP with SmartAssist) at 5.13–5.14.<br><br>In addition, the image shown for the Impella 2.5 is representative of at least the Impella 2.5, 5.0, CP, and CP with SmartAssist blood pumps. |

13

| Claims | Infringement Analysis |
|---|---|
| 2. The intravascular blood pump system of |  |

Impella IFU (describing Impella 2.5) at 3.5; *see also, id.* (describing Impella 5.0) at 3.6; (describing Impella CP) at 3.5; *see also* Impella CP with SmartAssist IFU (describing Impella CP with SmartAssist) at 3.3.

The above-identified Impella blood pumps meets this additional limitation.

| Claims | Infringement Analysis |
|---|---|
| claim 1, wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism. | Below is an image of the pump including the guide wire in the Impella 2.5, which is representative of the above-listed Impella Products and shows that the guide wire passes through the region delimited by the outer cannula surface.

This image also shows that the guide wire passes through the pigtail's lumen, which serves as the guide mechanism. The guide wire establishes slidable contact in the pigtail's lumen. The guide wire passes through the region delimited by the outer cannula surface proximal to the pigtail's lumen.

Abiomed's user guide for the Impella devices further demonstrates that the lumen defined by the body of the "pigtail" feature is configured to allow a guide to slidably engage and advance as shown in the image below.



*Figure 5.31 Guidewire Placement* delimited by the outer cannula surface, which is at a location proximal to the pigtail's lumen.

Guide wire passes through the region

Region delimited by outer cannula surface

shown by green dotted lines.

*1 cm*

*Catheter (with marking)*

*Outlet   Sensor*

*Inlet   Pigtail*

*Guidewire*

*See, e.g.*, Impella 2.5 IFU (describing Impella 5.0) at 5.26 (instructing the user to "Straighten the blue pigtail and thread it over the 0.018 inch placement guidewire (see Figure 5.31)"); *see also id.* (describing Impella 2.5) at 5.11–5.15; (describing Impella 5.0) at 5.25–5.28; (describing Impella CP) at 5.16–5.20; *see also* Impella CP with SmartAssist IFU (describing Impella CP with SmartAssist) at 5.13–5.14. |
| 3. The intravascular blood pump system of claim 1, further comprising: | The above-identified Impella 2.5 and Impella CP blood pumps meet these claim limitations. These products include catheters extending proximally from the pumps and pressure sensors for measuring the pressure adjacent the blood pump in accordance with the claim language. |

1          UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
3    ─────────────────────────────────────────
4

   Abiomed Inc,                    )
5                                   )
   Plaintiff and Counter-Defendant, )
6                                   )
   vs.                             )  1:16-cv-10914-FDS
7                                   )
   Maquet Cardiovascular LLC,      )
8                                   )
   Defendant and Counter-Claimant, )
9                                   )
   vs.                             )
10                                  )
   Abiomed R&D, Inc., and Abiomed  )
11   Europe GMBH,                    )
                                    )
12   Third-Party Defendants.        )
   ─────────────────────────────────────────
13
14              HIGHLY CONFIDENTIAL
15        VIDEOTAPED DEPOSITION UPON ORAL
16              EXAMINATION OF
17              WALID ABOUL-HOSN
18          Thursday, August 22, 2019
19             Brussels, Belgium
20
21
22
23
24
25   Reported by: Christine Myerly

1  Deposition of WALID ABOUL-HOSN
2  held at the offices of:
3          White & Case
           Brussels, Belgium
4
5  Pursuant to agreement, before Christine Myerly,
6  Court Reporter
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1         A P P E A R A N C E S
2  FOR PLAINTIFF:
3      Paul Tanck
        Christopher McArdle
4      Alston & Bird
        90 Park Avenue
5      New York, NY 10016
6
7  FOR DEFENDANTS:
8      Scott Weingaertner
        Anne-Raphaelle Aubry
9      White & Case
        1221 Avenue of the Americas
10     New York, NY 10020
11
12 ON BEHALF OF THE WITNESS:
13     Steven J. Thompson
        Nixon Peabody
14     70 West Madison Street
        Chicago, IL 60602
15
        Ronald I. Eisenstein
16     Nixon Peabody
        53 State Street
17     Boston, MA 02110
18
19
20 ALSO PRESENT:
21     Philip Hill, Videographer
22
23
24
25

1
2
3      Brussels, Belgium - August 22, 2019
4          9:30 a.m.
5          --oOo--
6      WALID ABOUL-HOSN Deponent herein, having been
7  first duly sworn on oath, was examined and testified
8  as follows:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              C O N T E N T S
2  EXAMINATION OF WALID ABOUL-HOSN        Page
3    BY MR. WEINGAERTNER              6
     BY MR. TANCK            105
4    BY MR. WEINGAERTNER      234
     BY MR. TANCK            261
5
   EXHIBITS
6
   Exhibit 1  MAQ_00499265-00499267        25
7  Exhibit 2  MAQ_00499272-00499286        26
   Exhibit 3  MAQ_00319907-00319936        30
8  Exhibit 4  AB-M00566162-00566257        44
   Exhibit 5  AB-M00326745-00326750        49
9  Exhibit 6  MAQ_00276013-00276054        59
   Exhibit 7  MAQ_00274989-00275082        68
10 Exhibit 8  MAQ_00335856-00335968        74
   Exhibit 9  MAQ_00335861-00335898        75
11 Exhibit 10 MAQ_00338120-00338226        96
   Exhibit 11 US Patent 6,295,877 B1       96
12 Exhibit 12 Walid Aboul-Hosn LinkedIn Profile   112
   Exhibit 13 MAQ_00499260               118
13 Exhibit 14 MAQ_00499268-00499271        119
   Exhibit 15 Wall Street Journal, Nuts and Bolts 122
14 Exhibit 16 MAQ_00003937-00003950        128
   Exhibit 17 MAQ_00001160-00001162       133
15 Exhibit 18 AB-M00270560, including email attachments 159
   Exhibit 19 AB-M00566258-00566273       166
16 Exhibit 20 Abiomed's Opening Claim Construction Brief 172
   Exhibit 21 International Patent Classification A61m 175
17 Exhibit 22 AB-M00190740-00190743       186
   Exhibit 23 AB-M00261300-00261316       190
18 Exhibit 24 AB-M00566274-00566278       194
   Exhibit 25 US Patent 5,921,913         207
19 Exhibit 26 US Patent 6,974,436 B1       211
   Exhibit 27 US Patent 10,238,783 B2      238
20
21
22
23
24
25

Page 6

1          THE VIDEOGRAPHER:  We are now on
2 the record.  The time is 09:32 a.m. local time in
3 Brussels.  Today's date is August 22, 2019.  My name
4 is Philip Hill, representing Veritext.  Today's --
5 this deposition is being held at the Brussels
6 offices of White and Case in Belgium.  This is taken
7 in the matter of Abiomed Inc. versus Maquet
8 Cardiovascular, LLC.  This case is being held in the
9 United States District Court for the District of
10 Massachusetts, case number 116cv10914.  The witness
11 is Walid Aboul-Hosn.  Please will all attorneys
12 introduce themselves for the record and state whom
13 they represent.
14          MR. WEINGAERTNER:  Scott
15 Weingaertner of White and Case for Plaintiff
16 Abiomed.
17          MS. AUBRY:  Anne-Raphaelle Aubry
18 of White and Case for Plaintiff Abiomed.
19          MR. TANCK:  Paul Tanck on behalf
20 of Maquet Cardiovascular.
21          MR. MCARDLE:  Chris McArdle with
22 Alston and Bird on behalf of Maquet Cardiovascular.
23          MR. THOMPSON:  I am Steven
24 Thompson.  I am from Nixon Peabody, on behalf of the
25 witness.

Page 7

1          MR. EISENSTEIN:  Ronald Eisenstein
2 from Nixon Peabody on behalf of the witness.
3          THE VIDEOGRAPHER:  The court
4 reporter today is Christine Myerly.  Please will --
5 representing the Veritext Court Reporting Services.
6 Please will the court reporter swear in the witness.
7          (Witness was sworn.)
8          EXAMINATION
9 BY MR. WEINGAERTNER:
10     Q     Good morning.
11     A     Good morning.
12     Q     Would you kindly state your name,
13 for the record.
14     A     Walid Aboul-Hosn.
15     Q     Thank you, Dr. Aboul-Hosn.  I
16 understand you are testifying voluntarily today; is
17 that correct?
18     A     That is correct.
19     Q     And you are not testifying
20 pursuant to any subpoena.  It is a voluntary
21 deposition; is that correct?
22     A     It is a voluntary deposition.
23     Q     We thank you, by the way, for
24 making time.  We recognize that there are limits on
25 time here, which we will respect.  I will try to go

Page 8

1 under the allotted time, if I can, make more time
2 for you.  Dr. Aboul-Hosn, have you had your
3 deposition taken before?
4     A     No, this is the first time in this
5 case.
6     Q     Okay.  And have you had it taken
7 in the past in any other litigation?
8     A     No, I have not.
9     Q     Okay.  So, what I will do is just
10 to orient you a little bit, I will go over more or
11 less how it works.  You may have heard that already.
12 But I will be asking some questions.  You are under
13 oath and you are to answer the questions that I
14 pose, subject to any instructions from your counsel.
15 If you don't understand a question, please let me
16 know.
17     A     I shall.
18     Q     And I will clarify for you, if I
19 can.  We will try our best not to talk over each
20 other, if that is okay with you.  And if you need to
21 take a break, you are the boss, you get to do it
22 whenever you need to.  So, don't stand on ceremony,
23 if you need to take a break, just let me know.
24     A     Okay.  Thank you.
25     Q     Before we begin, I also wanted to

Page 9

1 just talk a little bit about the use of company
2 names.  I will be referring to A-Med Systems, Inc.,
3 I may refer to it as A-Med for short.  I may refer
4 to Maquet Cardiovascular.  If I do, I might refer to
5 it as Maquet.  Just want to be clear about that.
6 And with respect to Abiomed Europe GmbH, I will try
7 to refer to it specifically by name, but I might
8 refer to it by Abiomed as well.
9          MR. TANCK:  Object to form.
10 BY MR. WEINGAERTNER:
11     Q     So, Dr. Aboul-Hosn, I understand
12 you have a consulting relationship with Abiomed
13 Europe GmbH?
14     A     Yes, I do.
15     Q     When did your relationship, your
16 consulting relationship, with Abiomed begin?
17     A     If I recall correctly, it is
18 December 2007.  That is my recollection.
19     Q     And you are an outside consultant
20 to the company?
21     A     Yes, I am.
22     Q     How did it come to pass that you
23 became an outside consultant for Abiomed Europe?
24     A     I do know Thorsten Siess, the
25 chief technical officer of Abiomed, and we go way

3 (Pages 6 - 9)

1 back. And I was consulting in the Aachen area for
2 another medical company that he was somehow
3 involved, on the board or something like this, and
4 it came down to him asking me if I have time to
5 consult for Abiomed, and I did, and it started back
6 then and it is still continuing.
7       Q       That is Aachen, Germany, just for
8 the record?
9       A       Aachen, Germany, yes.
10      Q       When did you originally meet
11 Dr. Siess?
12      A       Yesterday.
13      Q       Originally meet him.
14      A       Originally, I met him -- I don't
15 know the exact date, to be honest with you. But it
16 goes way back. I would assume, but very vague
17 assumption, it might be in the 1994/95, maybe.
18      Q       And when you first met, you were
19 both working in the field of blood pump technology?
20      A       When we met, I was working in the
21 field of blood pump. He was a student at the
22 university at that time and he was looking for a
23 dissertation subject and turned to be the blood
24 pump.
25      Q       Understood. When you first began

1 consulting with Abiomed Europe, was the Impella
2 intravascular blood pump a working device at that
3 time?
4       A       For sure it was.
5       Q       How far along in the sort of
6 development of the product was the Impella at the
7 time you joined as an outside consultant?
8       A       It was commercially available, if
9 I recall correctly, in Europe, and did not get FDA
10 approval. So, it was completed.
11      Q       And to your understanding, who was
12 responsible -- primarily responsible for developing
13 the Impella?
14      A       I have to guess. I think
15 Thorsten. He is the core guy that started this
16 whole thing.
17             MR. THOMPSON: I am sure he
18 doesn't want you to guess.
19      A       Okay. I am not sure. But I know
20 Thorsten was involved, at what level, I don't know.
21 BY MR. WEINGAERTNER:
22      Q       And over the course of your years
23 of knowing Dr. Siess, what do you think of him?
24      A       A wonderful friend.
25      Q       What do you think of his

1 engineering abilities?
2       A       A superstar.
3       Q       And what do you think about, you
4 know, the work leading to the Impella?
5             MR. THOMPSON: Object to form. I
6 am not sure he has any basis to talk about the
7 development of the Impella.
8 BY MR. WEINGAERTNER:
9       Q       Understood. Will the fact you
10 have had a consulting relationship with Abiomed
11 affect the truthfulness of your testimony today?
12      A       Definitely not.
13      Q       And we will be referring to them
14 later, but you were the first named inventor in the
15 patents in suit in this case, as I think you know.
16 Would it be fair to say that you care about the work
17 that you did that led to those patents?
18             MR. TANCK: Object to form. You
19 can answer.
20      A       Okay. I am sorry, could you
21 repeat the question.
22 BY MR. WEINGAERTNER:
23      Q       Sure. Would it be accurate that
24 you care about and have pride in the work that you
25 did that led to the patents in suit?

1             MR. TANCK: Same objection.
2 Sorry. Just so you know, there are times I am going
3 to object, but you can ignore what I say. Only if
4 your lawyer tells you something, you can worry about
5 what he says. I am just putting stuff on the record
6 for lawyer stuff. It is not meant to interrupt you.
7             MR. THOMPSON: Just a lot of
8 noise.
9             MR. TANCK: A lot of hot air. So,
10 I apologize if I object, but that is part of the
11 process.
12 BY MR. WEINGAERTNER:
13      Q       Well, I will restate it so that
14 the record is more clear. Would it be accurate or
15 fair to say, Dr. Aboul-Hosn, that you are proud of
16 the work that you did that led to the patents in
17 suit?
18      A       I sure am.
19      Q       And that pride in your work
20 wouldn't affect your truthfulness of your testimony
21 today in any way?
22             MR. TANCK: Object to form.
23      A       No.
24 BY MR. WEINGAERTNER:
25      Q       Thank you, Dr. Aboul-Hosn.

4 (Pages 10 - 13)

Page 14

1 Dr. Aboul-Hosn, what was your first experience with
2 intravascular blood pumps?
3    A    My first experience was in 1982.
4 I was still a student, and I came across a physician
5 by the name Dr. Rich Wampler, who was the inventor
6 of hemopump. And I then started working with him as
7 a student, assisting him in his own garage
8 developing a intravascular blood pump.
9    Q    And I know it is a long time ago,
10 generally, what time frame do you recall that to
11 have been?
12    A    This -- I met him in 1982. He was
13 a student at the same university, and I started
14 working with him in the summer of 1983.
15    Q    And that was working on the
16 hemopump?
17    A    Yes.
18    Q    And how long did you work with
19 Dr. Wampler?
20    A    So, the hemopump got through a
21 couple acquisitions, in total it was 12 years.
22    Q    Was there a name for the company
23 that was working on the hemopump?
24    A    So, the first company name --
25 first it started out of his garage with no name, and

Page 15

1 then it became Nimbus Medical, and then it was
2 acquired by Johnson and Johnson Interventional,
3 JJIS -- Johnson and Johnson Interventional Systems.
4 And I left at that time.
5    Q    Can you briefly describe, in your
6 own words, how the hemopump was structured?
7    A    The hemopump, it is an
8 intravascular pump, which is a broad definition. It
9 is a pump that is intended to be placed inside the
10 circulatory system. It had a electric motor outside
11 the patient body that communicated a rotation to the
12 Impella by flexible cable.
13    Q    And where was the actual pump
14 mechanism?
15    A    So the pump itself, it was away
16 from the aortic valve. We call it proximal, meaning
17 it was before you reached the aortic valve. That is
18 the pump itself. But the pump had an inflow tube
19 that crossed the aortic valve into the left
20 ventricle, and it had a catheter that extended all
21 the way from the pump through the vascular system,
22 all the way to the outside on the leg of the
23 patient. And that is where the electric motor was
24 positioned.
25    Q    Would it be correct to say that

Page 16

1 the tube extending from the motor -- sorry. Let me
2 rephrase that. Would it be correct to say that the
3 tube extending from the pump head into the left
4 ventricle was a cannula?
5         MR. TANCK: Object to form.
6    A    That is what it is referred to
7 technically, yes.
8 BY MR. WEINGAERTNER:
9    Q    What is your understanding of what
10 a cannula is?
11    A    A cannula is a -- is a tube that
12 is intended to be used as a conduit for blood,
13 typically, to be transferred from one part of the
14 body to another part of the body.
15    Q    What is the difference between a
16 cannula and a catheter, to your knowledge?
17    A    A cannula is intended to transfer
18 blood, a catheter typically is not. Even though in
19 some application it might use that. A cannula is
20 intended to transfer a large volume of blood, versus
21 a catheter, it might transfer a minute amount of
22 blood. But in most cases, a catheter is used to
23 access a vascular system or to deploy a device. It
24 is more of a tracking system. A cannula is not a
25 tracking system.

Page 17

1    Q    Was hemopump ever approved in the
2 US by the FDA?
3    A    A hemopump get an IDE approval to
4 do a clinical trial, but it never got approved to be
5 a commercial product.
6    Q    And were clinical trials conducted
7 pursuant to the IDE?
8    A    Yes.
9    Q    Do you know why approval for use
10 in humans commercially wasn't achieved at the FDA?
11    A    I would have to speculate, and I
12 am not going to speculate.
13    Q    Understood. Do you recall --
14 again, recognizing that it was sometime ago, what
15 your work on the hemopump involved, your personal
16 work, that is?
17    A    I was involved in all aspects of
18 it. Like I told you, I started working out of
19 Dr. Wampler's garage, and I was the only person
20 working on it beside him. And it evolved into the
21 electronics, the mechanics. And due to my medical
22 background, I got involved quite a bit in the animal
23 use and the clinical trial. The thing I was not
24 involved with is quality control and FDA approvals.
25    Q    And could you briefly describe

5 (Pages 14 - 17)

Page 18

1 your medical background, Dr. Aboul-Hosn?
2     A     I am a medical student at the
3 American University of Beirut.  I completed my
4 second year before I had to leave due to war
5 circumstances, and I got the chance to complete my
6 degree through a program for the United Nations,
7 basically.  So, I have an MD, but it is not an MD
8 that entitles me to practice.
9     Q     What did you do after finishing
10 work with the hemopump?
11     A     After I finished work with
12 hemopump, I moved for one year to a company in
13 Seattle, before I came back to California and
14 started working on my own companies.
15     Q     And can you describe briefly the
16 companies that you started?
17     A     So, the first company I started,
18 it was a company that -- it manufactured cannulas.
19 And it manufactured cannulas for the hemopump.  At
20 the time Medtronic acquired the hemopump from
21 Johnson and Johnson, and they didn't have the
22 know-how how to make the cannula, so that was the
23 first company I started.
24     Q     What was the name of that company,
25 Dr. Aboul-Hosn?

Page 19

1     A     It was named New Horizon, as the
2 present company is named.
3     Q     So, although the cannula appears
4 to be a tube, are there complexities associated with
5 its design and manufacture?
6         MR. TANCK:  Object to form.
7     A     Yeah, great design requirement.
8 It is a tube, but technically, it is a very complex
9 tube to complete the job required.
10 BY MR. WEINGAERTNER:
11     Q     At a very high level, can you
12 identify some complexities that are worth noting in
13 the design of the cannula?
14     A     It has to be kink resistant.  So,
15 it is inside the patient, that it does not kink.  It
16 has to be able to cross the aortic valve, which
17 is -- the aortic valve is a difficult structure to
18 cross.  It is the one that has to be biocompatible,
19 of course.  It has to be soft, that it does not
20 cause any damage to the surrounding tissue.  These
21 are the typical --
22     Q     So, there are a number of
23 competing design issues that you have to take into
24 account when designing a cannula?
25         MR. TANCK:  Object to form.

Page 20

1     A     Yes.
2 BY MR. WEINGAERTNER:
3     Q     Were there -- you mentioned there
4 was more than one company.  What other companies had
5 you founded after you had left the hemopump project?
6     A     So, the second company was A-Med
7 Systems.
8     Q     And do you recall when you founded
9 that company?
10     A     It was in 1996.
11     Q     Did you found it with any
12 co-founders?
13     A     No, I was the sole founder.
14     Q     What -- when you founded the
15 company, what were the goals that you had for A-Med?
16     A     A-Med was targeting beating heart
17 surgery.  That is a surgery procedure used for open
18 chest, and it eliminates the need of artificial
19 oxygenator and heart machines.  That was the target
20 at the beginning.
21     Q     And was it your goal to develop
22 devices for use in beating heart surgery?
23     A     The first device, yes.
24     Q     And could you describe, briefly,
25 that device that you are referring to?

Page 21

1     A     That device is basically -- it
2 requires an open chest, and it is a cannula, blood
3 cannula.  And it is placed directly into the heart,
4 and it would take over the heart function while the
5 physician is manipulating the heart to do his
6 surgery.
7     Q     Did there come a time when your
8 focus included devices for other than beating heart
9 surgery?
10     A     Yes.  I think -- I don't know
11 exactly when, but I know after that we started
12 focusing on catheter pumps, similar to hemopump.
13     Q     Are the designs for catheter pumps
14 significantly different from those used for beating
15 heart surgery?
16     A     Very different.
17     Q     Do you recall what some
18 differences are between the two alternatives?
19     A     In an open chest, you can put a
20 bulky device.  In a catheter pump, you have to be
21 cognizant of the fact that this is a small vessel.
22 You have to advance it through a small vessel and --
23 they are completely different designs.
24     Q     So, with the catheter pumps that
25 you referred to that were, I guess, following the

HIGHLY CONFIDENTIAL - COURTESY COPY

1 footsteps of hemopump, would that be fair to say?
2        MR. TANCK: Object to form.
3     A     Yes.
4 BY MR. WEINGAERTNER:
5     Q     Was the drive system similarly
6 flexible cable drive as it had been for hemopump?
7        MR. TANCK: Object to form.
8     A     Yes.
9 BY MR. WEINGAERTNER:
10     Q     Were there -- as you sit here
11 today, were there any differences with -- between
12 the A-Med catheter pump and hemopump that stick out
13 in your memory?
14        MR. TANCK: Object to form.
15     A     I mean, you have to be specific.
16 There is lots of differences.
17 BY MR. WEINGAERTNER:
18     Q     What do you think, from your
19 recollection, are the primary differences between
20 them?
21        MR. TANCK: Object to form.
22     A     The primary difference was in the
23 deployment method, how you deploy the device into
24 the patient.
25

1 BY MR. WEINGAERTNER:
2     Q     That would include positioning the
3 pump, getting it from outside the patient into the
4 left ventricle; would that be accurate?
5     A     That is --
6        MR. TANCK: Object to the form.
7 BY MR. WEINGAERTNER:
8     Q     And at a very high level, could
9 you describe the work that A-Med did with regard to
10 that positioning functionality for the A-Med pump?
11     A     I really don't recall the full
12 details. I was more managing the team of engineers
13 that -- lots of different designs were investigated.
14 So, I have a very vague recollection of that, to be
15 honest with you.
16     Q     At any point, did you consider any
17 alternatives to a cable drive system for the pump?
18        MR. TANCK: Object to form.
19     A     No.
20 BY MR. WEINGAERTNER:
21     Q     Why -- why is that, if you can
22 recall?
23     A     The technical difficulty in
24 miniaturizing an electric model to the size required
25 to pass through a vessel, back at that time it was

1 perceived as almost impossible.
2     Q     Understood. At the time, do you
3 recall using any particular pressure detection
4 mechanisms with the pump that A-Med was building?
5     A     Yes. It is common to use a
6 pressure transducer. Pressure transducers were
7 used.
8     Q     And again, I know this is going
9 way back, but do you recall what kind of pressure
10 transducers you used at A-Med?
11     A     A variety of them were used, but I
12 don't recall all of them.
13     Q     During your period at A-Med, you
14 had mentioned you met Dr. Siess in the mid 90s. Did
15 you have any interaction with him while A-Med was up
16 and running?
17     A     Yes, we did.
18     Q     And were you aware of any work he
19 was doing on board, sort of pump designs that
20 include a motor on board?
21        MR. TANCK: Object to form.
22     A     Yes, I did.
23 BY MR. WEINGAERTNER:
24     Q     And what did you think of his
25 efforts in that regard?

1     A     He is crazy.
2     Q     In terms of the engineers that you
3 worked with at A-Med, and we will refer to the
4 patents shortly, did those engineers include
5 Mr. Kanz and Mr. Baker?
6     A     Yes.
7     Q     That is Bill Kanz and Bruce Baker?
8     A     That is correct.
9     Q     And you worked with them on blood
10 pump designs?
11     A     Yes, I did.
12     Q     Do you recall any other
13 individuals that stand out in your memory as
14 engineering people at A-Med that worked on blood
15 pump designs with you?
16     A     Many, with different level of
17 involvement.
18     Q     What I would just like to do, for
19 the record, is to mark an exhibit, which is A-Med
20 Systems Employment Agreement. It bears Bates
21 MAQ00499265 through 267. I will mark it as Exhibit
22 1.
23        (Exhibit 1.)
24        MR. THOMPSON: Do you have one of
25 those for me?

Page 266

1    A    No, I haven't.
2         MR. TANCK:  Okay.  I haven't
3    either, so I am going to ask to the extent you guys
4    have an agreement that I may not be aware of, if you
5    have one, if at some point you could provide it to
6    us.
7         MR. THOMPSON:  Just for the
8    record, the only correspondence we have had about
9    this was an e-mail.
10        MR. TANCK:  Okay.
11        MR. THOMPSON:  I wouldn't describe
12   any of this as an agreement.  I would describe it as
13   the conditions he would agree to voluntarily appear.
14   Whether you agree or not is a separate issue.
15        MR. TANCK:  Okay.  Thank you.
16        MR. WEINGAERTNER:  But you did
17   take the deposition subject to knowing those
18   conditions; correct?
19        MR. TANCK:  I am not here to
20   answer your questions, Mr. Weingaertner.
21        MR. WEINGAERTNER:  Can't answer
22   it?
23        MR. TANCK:  So, I think with that,
24   that is all I got.
25        MR. THOMPSON:  We will reserve

Page 267

1    signature, and now slidably leave.  That is a word I
2    just learned.
3         THE VIDEOGRAPHER:  Going off the
4    record.  The time is 17:20.  This is the end of
5    video card 5.  This is the end of the video
6    deposition of Walid Aboul-Hosn.
7         (Off the record.)
8         MR. TANCK:  Any of the exhibits
9    that are marked highly confidential, need to remain
10   highly confidential.  And I am just going to reserve
11   that any of the testimony around those exhibits for
12   now we are going to state as highly confidential.
13        MR. WEINGAERTNER:  Stipulate to
14   that.
15        MR. TANCK:  And we will provide
16   further clarification.  But the exhibits and any
17   testimony regarding those exhibits should remain
18   highly confidential.
19        (Off the record.)
20
21
22
23
24
25

Page 268

1         CERTIFICATE OF COURT REPORTER
2         I, Christine Myerly, do hereby certify that
3    I took the stenotype notes of the foregoing
4    deposition and that the transcript thereof is a true
5    and accurate record transcribed to the best of my
6    skill and ability.
7         I further certify that I am neither
8    counsel for, related to, nor employed by any of
9    the parties to the action in which this deposition
10   was taken, and that I am not a relative or
11   employee of any attorney or counsel employed by
12   the parties hereto, nor financially or otherwise
13   interested in the outcome of the action.
14        Dated this 3rd day of September, 2019.
15
16
17
18
19
20
21
22
23   _____
24   Christine Myerly
25

Page 269

1
2
3         DEPOSITION ERRATA SHEET
4    Name of Witness:  Dr. Walid Aboul-Hosn
5    Date of Deposition:  August 22, 2019
6    Reason Codes:  1. To clarify the record.
7              2. To conform to the facts.
8              3. To correct transcription errors.
9
10
11
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24   Page _____ Line _____ Reason _____
25   From _____ to _____

68 (Pages 266 - 269)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ABIOMED INC.,

            Plaintiff and Counter-Defendant,

    v.

MAQUET CARDIOVASCULAR LLC,

            Defendant and Counter-Claimant,

    v.

ABIOMED R&D, INC. and ABIOMED
EUROPE GMBH,

          Third-Party Defendants.

No. 1:16-cv-10914-FDS

## ABIOMED'S OPENING CLAIM CONSTRUCTION BRIEF

the particular patent at issue." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).

A party's reliance on a position of "no construction" or "'plain and ordinary meaning" is inadequate, particularly when reliance on a term's so-called "ordinary" meaning does not resolve the parties' dispute or if the term has more than one "ordinary meaning." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Courts have found constructions "deficient" when a party seeks a "plain and ordinary meaning" construction without explanation.  *See, e.g.*, *Baxter Healthcare Corp. v. Mylan Labs. Ltd.*, No. 14-7094 (JBS/JS), 2016 U.S. Dist. LEXIS 45670, at *15-16 (D.N.J. Apr. 5, 2016).

## IV.   GUIDE MECHANISM TERMS

Maquet purports to have invented the use of integrated guide mechanisms, but Maquet was not the first to conceive such a solution.  To obtain the patents, Maquet repeatedly distinguished its claims from the prior art on the grounds that the guide mechanisms of the patents differed from the prior art.  Maquet's statements about these differences are binding; they define and limit the claims and resolve ambiguities about the claim scope.

### A.   Every Independent Claim Requires a Guide Wire and a Lumen that Do Not Pass Through the Free Space between the Rotor Blades

| Claim Term | Claims | Abiomed's Proposal | Maquet's Proposal |
|---|---|---|---|
| "guide mechanism" (100: 16)<br>"elongate lumen sized to slideably receive a guide wire" (468: 1, 22; 437: 1, 28;  314: 1, 20, 27)<br>"guide mechanism is configured as a second lumen… wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong" (728: 1; 068: 1)<br>"a guide mechanism configured as an elongate lumen … a guide wire arranged to be advanced along the lumen" (728:10) | 100: 9, 16<br>728: 1, 10<br>068: 1, 10, 20<br>468: 1, 22<br>314: 1, 20, 27<br>437: 1,  28 | "lumen and guide wire not extending through the free space between the rotor blades" | Plain meaning |

11

| "guide mechanism configured as an elongate lumen and adapted to guide said intravascular blood pump … the method comprising: … advancing the blood pump system along the guide wire" (068: 10)<br><br>"elongate lumen having a luminal interior… sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong … advancing the blood pump along the guide wire to the predetermined location" (068: 20) | | | |

A significant part of this case turns on a clear concession by Maquet during prosecution[5]: Maquet repeatedly sought to distinguish the patents by representing—and emphasizing—that the guide wire and its lumen do not pass through the "free space" between the rotor blades of the pump. As Maquet was forced to admit, such a design would be "inoperable" because the guide wire and its lumen would be threaded between the blades of the impeller and prevent the impeller from rotating. Maquet's statements, quoted in detail below, constitute prosecution disclaimer. The proper construction of the claim terms must incorporate these representations by Maquet.

Maquet first advanced its position in an interview and follow-on exchange with the Examiner during prosecution of the '728 patent. In the interview, Maquet explained that the very nature of its alleged invention excluded insertion of an impediment in the rotor blade free space: "Applicant clarified the nature of the invention, noting that the rotors require a space to rotate within the shroud while pumping blood . . . ." Ex. 7-H ('728 PH, Feb. 24, 2014 Examiner Interview) at MAQ_00004714. Maquet contrasted the claims from the prior art reference Bedingham, arguing that if "Bedingham were modified with guidewire lumen 46 of Gordon, it would occupy space within the shroud and obstruct impeller 56 of Bedingham." *Id.*

---

[5]      "Prosecution" refers to both the original prosecution history and the IPR proceedings.



Bedingham, Figs. 3, 7 (annotated)

This concession is critical and, as discussed below, applies not only to the claims of the '728 patent but to all related patents. An applicant's statements about the "invention" "unambiguously" reflect the applicant's "own understanding of its inventions" and they constitute a clear disavowal of such a configuration. *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1376 (Fed. Cir. 2008) (holding prosecution statements regarding "the Applicants' invention" constituted clear and unambiguous disavowal).

Maquet followed this Interview with a further representation and admission about how the distinction applies to the claim language "*guide mechanism configured as a second lumen*"[6] (found in claim 1 of the '728 patent and claim 1 of the '068 patent) and the claim language "*guide mechanism configured as an elongate lumen*" (found in claim 10 of the '728 patent and claim 10 of the '068 patent). Ex. 7-I ('728 PH, Mar. 28, 2014 Amendment and Response) at

---

[6]     For clarity, proposed and issued claim language is italicized throughout the brief.

MAQ_00004724.  In particular, Maquet admitted that these terms require a lumen designed for a guide wire, and that the guide wire cannot merely run through the pump housing itself without the aid of this lumen.  *Id.* ("Instead of a guide wire mechanism configured as a lumen [such as in the claim terms], Bedingham only suggests inserting a guide wire into the existing structure of the pump housing … so that the guide wire passes between the vanes of the outlet flow straightener, the impeller and inlet flow straightener.") (internal citations omitted); *id.* at MAQ_00004728 (same).  Maquet then reemphasized its Interview statement that modifying Bedingham to add a dedicated guide wire lumen "would render the resulting modified device ***inoperable***," because it "would thus result in the lumen 46 and its sidewall being located in the open space between the blades of the blood pump of Bedingham.  If such a lumen were so arranged, the blades of the motor would hit the wall of the lumen and be unable to rotate, thereby preventing the blood pump from operating."  *Id.* at MAQ_00004726 (emphasis added); *see also id.* MAQ_00004729.  Consequently, Maquet made clear that the claims exclude designs that pass the guide wire and dedicated guide wire lumen and the guide wire itself through the free space between the rotor blades.

The Examiner relied on this distinguishing feature as the reason for allowing the '728 claims over ***two*** prior art references.  *See* Ex. 7-J ('728 PH, Apr. 7, 2014 Notice of Allowance) at MAQ_00004746 (the Examiner explained that "[m]odifying Bedingham and Nix with Gordon ***would not provide an operable device*** since Bedingham requires free space for impeller 56 to rotate.") (emphasis added); *id.* at MAQ_00004748 ("Masch provides no teaching for how to modify … impeller 56 … in order to pass a guidewire.").  The Examiner's understanding of prosecution arguments was decisive in his allowance of the claims and reflects how a person of ordinary skill would understand those arguments.  *See Salazar v. Procter & Gamble Co.*, 414

14

F.3d 1342, 1347 (Fed. Cir. 2005) ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1332 (Fed. Cir. 2013) (explaining that "examiner's statement during reexamination was . . . representative of how one of skill in the art would understand the term.").

After considering additional art, the Examiner again allowed the '728 claims for the same reason, specifically distinguishing prior art that ran the guide wire through the rotor blade free space. *See* Ex. 7-K ('728 PH, July 21, 2014 Notice of Allowance) at MAQ_00004994. In particular, the Examiner explained that "Völker does not provide a separate second lumen for the guide mechanism. Instead, ***Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning*** (p. 14, ¶4, while the guide wire 25 is located in the pump housing, no Rotation (sic) of the impeller). Therefore, Völker fails to teach or suggest the side-rigger or coaxial guide mechanisms of [then-pending] claims 15, 29 or 45 [issued independent claims 1, 10 and 22]." *Id.* (emphasis added). Fig. 2 of Völker shows this concept in practice—guide wire (25) runs within the free space between the rotor blades (20), and would therefore jam the rotor if not removed before the rotor begins to rotate (the non-removable guide wire lumen required by the claims would similarly jam the rotor if it were present).



Völker, Fig. 2 (annotated)

15

Thus, the claims issued over *three* prior art references because those references pass the guide wire and its lumen through the free space between the rotor blades.

During *inter partes* review, Maquet expressly endorsed the Examiner's reasons for finding the claims patentable over Völker.  Ex. 12 ('728 POPR, IPR2017-01027) at 63. ("One reference that the Examiner explicitly considered and found the claims patentable over is Voelker … As such, Patent Owner submits that the Board should defer to Primary Examiner Kidwell's [sic] considered judgment and deny the Petition."); *see also* Ex. 11 ('728 POPR, IPR2017-01026) at 64.  This express endorsement is binding on Maquet and cannot now be ignored.  *See, e.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 n.6 (Fed. Cir. 2013) (holding "adoption" of examiner's characterization constitutes prosecution disclaimer). The claims of the '728 patent must therefore be construed to exclude guide mechanisms that run the guide wire or the guide lumen through the free space between the rotor blades because they would jam the blades if the pump were actuated with the wire in place.

Maquet's acknowledgement that neither the guide wire nor its lumen can run through the rotor blade free space does not only apply to the independent claims of the '728 patent. Concessions made to gain allowance of a patent apply to its family members that claim similar subject matter.  *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).  That reasoning applies especially here because the same distinction was critical to allowance of claims beyond the '728 patent.  For example, in allowing claims with the term "an elongate lumen sized to slideably receive a guide wire"—found in a number of patents (*see* chart above (start of this section))—over Bedingham, the Examiner stated that, "Bedingham also lacks an elongate lumen sized to slidably receive a guide wire.  At most, Bedingham calls for a guide wire that does not pass through a separate lumen, but instead passes through existing openings of

the rotor and pump." *See* Ex. 9-D ('468 PH, Nov. 22, 2016 Notice of Allowance) at

MAQ_00009242 (internal citations omitted).  Similarly, in its IPR responses defending the

claims of the '068 patent, Maquet again ratified the Examiner's understanding of Völker.  *See*

Ex. 13 ('068 POPR, IPR2017-01028) at 64; Ex. 14 ('068 POPR, IPR2017-01029) at 64.

      Even though the claim language differs slightly in each asserted claim, as reflected in the

chart above, the concept that the guidewire and its dedicated lumen cannot pass through the rotor

blades remains the same throughout.  *See, e.g.*, *Advanced Cardiovascular Sys. v. Medtronic*

*Vascular, Inc.*, 182 F. App'x 994, 997 (Fed. Cir. 2006) (holding "circular member," "stent

member," "ring," and "endovascular support member," found in later patents, to have the same

construction as "stent," found in the parent patent, when the terms from the later patents were

used "in a manner analogous to and interchangeable with the term 'stent'" in the claims).

      The specification of the patents is consistent with the clear disavowals made by Maquet

during prosecution—the specification provides no teaching or example where the guide wire, or

its dedicated lumen, passes through the free space between the rotor blades.  The "over-the-wire"

approach requires that "a central lumen is formed through at least a portion of the intravascular

blood pump system" ('437 at 3:11-14) and this central lumen runs through the central hub of the

rotor, not the free space for the rotor blades (*id.* at 9:12:47-55).  *See also* Fig. 3 (showing the

guide wire lumen passing through the rotor hub).  Similarly, the "side rigger" type requires that

"a side lumen is formed along a length of at least one of the intravascular blood pump and the

cannula" and therefore does not pass through the free space for rotor blades either.  '437 at 3:26-

29; *see also* Fig. 7 (showing the guidewire running outside of the rotor blades).  The "guide

catheter" does not use a guide wire to insert the pump rotor into the housing and therefore is not

relevant to the asserted claims.

17

None of the patents' embodiments runs the guide wire through the rotor blade free space; nor does the patent specification offer any suggestion of how this could be achieved by modifying any of the described embodiments.  This is not surprising, because the patents contemplate that the guide wire may remain in place while the rotor turns.  *See* '437 at 12:59-13:2 (discussing that, in the over-the-wire design, the central lumen should be sized to avoid "inadvertent rotation of the guide wire during pump operation" and removal of the guide wire is optional); 14:48-53 (discussing that removal of the guide wire is optional in the side-rigger).

Abiomed's construction, set forth in the table above, is thus consistent with the specification and is required by the prosecution history and IPR positions Maquet has taken. Due to the clear and unambiguous disavowal during prosecution of systems that extend the guide wire and the guide wire lumen through the free space between the rotor blades, and the Examiner's clear understanding and reliance upon the criticality of this distinction in allowing the claims to issue, each of these claim terms should be construed to require that the "lumen and guide wire not extend[ ] through the free space between the rotor blades."

This construction applies equally to claim 16 of the '100 patent, even though it pre-dates the cited prosecution statements and does not expressly recite a guidewire or guidewire lumen. Claim 16 contains claim language "*guide mechanism adapted to guide said intravascular blood pump*"—the same found in other claims that are subject to the above-described prosecution disclaimer (*see, e.g.,* '068 at claim 10).  Because Maquet's disclaimer was not limited to a specific claim or guide mechanism type, but concerned the overall inventions disclosed in the patents, claim 16 must be construed consistently with Maquet's later patents given the common claim language.  *See, e.g.*, *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) ("where multiple patents derive from the same parent application and share many

18

common terms, we must interpret the claims consistently across all asserted patents."); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").  Further, as described below, Claim 16 is a means-plus-function term and thus limited to the three guide mechanisms disclosed in the specification, none of which suggest a guide wire running through the free space between the rotor blades.  *See* § VIII.B.1.

**B.    The "Over-the-Wire" Claims Require the Lumen to Extend Through the Cannula and the Catheter**

| Claim Term | Claims | Abiomed's Proposal | Maquet's Proposal |
|---|---|---|---|
| "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion] of the cannula" | 728: 10<br>068: 10, 20<br>314: 1, 20 | "A guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter" | Plain meaning |

This dispute is whether the guide wire lumen in the above "over-the-wire" claims must not only extend through the cannula, but also through the catheter that extends out of the body. During prosecution, Maquet conceded that the lumen must extend through both structures, and this design is reflected in the specification and in Abiomed's construction.

On its face, the claim term describes an "over-the-wire" configuration because it requires that the lumen is coaxial with (*i.e.*, shares a common axis with) one end of the cannula.  *See* § II.C (background).  The only lumen that meets this description is the lumen of the "over-the-wire" configuration demonstrated in Figs. 1-5.  '437 at Figs. 1-5, 12:47-63; *see also id.* at 9:13-32; 10:47-57.  Consistent with this understanding, when Maquet added the above claim limitation during prosecution, Maquet cited the "over-the-wire" design of Figs. 1-3 as support. *See* Ex. 7-F ('728 PH, Nov. 8, 2013 Amendment and Response) at MAQ_00004663 (claim 29),

19